## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | GRAND JURY ORIGINAL |
| | ) | |
| v. | ) | Criminal No. |
| | ) | |
| THEODORE F. STEVENS, | ) | COUNTS ONE:    18 U.S.C. § 1001 |
| | ) | THROUGH SEVEN:  (False Statements) |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

Unless specified otherwise, at all times relevant to this Indictment:

### COUNT ONE
### FALSE STATEMENTS
### (18 U.S.C. § 1001(a)(1))

**I.    BACKGROUND**

**A.    Relevant Parties and Entities**

1.    THEODORE F. STEVENS (hereinafter "STEVENS") was an elected member of the United States Senate. STEVENS has represented the State of Alaska in the United States Senate since 1968. From 1997 to 2001 and from 2003 to 2005, STEVENS was chairperson of the Senate Committee on Appropriations, which was responsible for the drafting of legislation to allocate federal funds to numerous government agencies, departments, and organizations on an annual basis.

2.    The "Girdwood Residence" was a piece of real estate, including a single-family house, located in Girdwood, Alaska. The Girdwood Residence was owned by STEVENS and his

wife.  STEVENS often referred to the Girdwood Residence as "the chalet."

3.    VECO Corporation (hereinafter "VECO") was a privately held, Alaska-based corporation that, among other things, provided oil pipeline and construction services to the oil industry and to the public sector worldwide.  VECO was one of the largest private employers in Alaska, with multiple subsidiary companies and more than 4,000 employees internationally. VECO was not in the business of home construction, remodeling, or improvement.

4.    BILL J. ALLEN (hereinafter "ALLEN") was the Chief Executive Officer and part-owner of VECO.  ALLEN was a personal friend of STEVENS.

5.    PERSON A was the owner of a retail business located in the State of Alaska. PERSON A was a personal friend of STEVENS.

6.    PERSON B was the owner of a real estate business located in the State of Alaska. PERSON B was a personal friend of STEVENS.

7.    Construction Firm A was a private residential construction firm located in the State of Alaska.

**B.    The United States Senate's Financial Disclosure Forms**

8.    Recognizing that public office is a public trust, Congress enacted the Ethics in Government Act of 1978 ("EIGA") in part to restore public confidence in its institutions.  EIGA requires all members of the United States Senate to file a form by May of the following year, detailing specified financial transactions that the Member engaged in during the prior calendar year (hereinafter a "Financial Disclosure Form").  These Financial Disclosure Forms were documents required to be submitted to and filed with the Secretary of the United States Senate (hereinafter "Secretary of the Senate"), an office within the legislative branch, and were available

to the public.

9.    A primary purpose of the yearly Financial Disclosure Forms is to disclose, monitor and deter conflicts of interest, thereby maintaining public confidence in the integrity of the United States Senate and its Members.  Because the yearly Financial Disclosure Forms require public disclosure of financial information by each Member of the United States Senate, such as income, assets, gifts, financial interests, and liabilities, the Forms provide the public at large, including the voters of a particular state, with the information necessary to allow the public to evaluate and consider official conduct by a Member of the United States Senate in light of that Member's private finances.

10.    The Secretary of the Senate was an office or agency of the United States Congress that was responsible for receiving the Financial Disclosure Forms filed by, or on behalf of, each United States Senator, and for providing accurate information to the public about the financial disclosures filed by, or on behalf of, each United States Senator.  The Financial Disclosure Forms were subject to further review and possible investigation by the United States Senate Select Committee on Ethics.

11.    For calendar years 1999 through 2006, the Financial Disclosure Forms contained a section that read as follows:  "Any individual who knowingly and willfully falsifies . . . this report may be subject to civil and criminal sanctions.  (See 5 U.S.C. app. 6, 104, and 18 U.S.C. 1001.)"  This section was located next to the signature block on the first page of each Financial Disclosure Form.

12.    For calendar years 1999 through 2006, the Financial Disclosure Forms required the filer to disclose certain particular information concerning income, assets, liabilities, and

outside positions either held or obtained by himself, his spouse, and any dependent children during that calendar year.

13.     With respect to liabilities, the Financial Disclosure Forms required the filer to disclose the amount of liabilities in excess of $10,000 that were owed at any point in time during that calendar year by the filer, the filer's spouse, or any dependent child, as well as the identity of the individual or entity to whom each debt was owed.

14.     With respect to gifts, the Financial Disclosure Forms also required the filer to disclose gifts received by himself, his spouse, and any dependent children during that calendar year.  Each Form required the disclosure of gifts from a single source if the aggregate value of the items received in that year was greater than a particular dollar value.  For calendar years 1999 through 2002, that dollar value was $260; for calendar year 2003, it was $285; for calendar years 2004 through 2006, it was $305.

## II.     STEVENS' Scheme To Conceal His Receipt of Things of Value From ALLEN and VECO.

15.     Beginning in or about May 1999, and continuing to in or about August, 2007, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the United States Government and subject to the legislative function exception, STEVENS, while a sitting United States Senator, knowingly and willfully engaged in a scheme to conceal a material fact, that is, his continuing receipt of hundreds of thousands of dollars' worth of things of value from a private corporation and its chief executive officer by, among other things, failing to report them, as was required, on STEVENS' required yearly Financial Disclosure Forms.  These things of value provided by ALLEN and VECO to STEVENS

included, among other things: home improvements to the Girdwood Residence, such as the creation of a new first floor, a new garage, a new first- and second-story wraparound deck, new plumbing, new electrical wiring, and other such additions and improvements; automobile exchanges in which STEVENS received new vehicles worth far more than the used vehicles STEVENS provided in exchange; other household goods, such as furniture, a new, permanently-attached professional Viking gas grill, and a new multi-drawer, stationary tool storage cabinet with new tools. The aggregate value of these things of value that STEVENS accepted was greater than $250,000.

16.     It was a further part of the scheme that STEVENS took multiple steps to conceal his continued receipt of things of value from ALLEN and VECO. During the nearly seven-year period in which STEVENS received multiple things of value from ALLEN and VECO, STEVENS filed and caused to be filed false annual Financial Disclosure Forms for the years 1999 to 2006 that did not report STEVENS' receipt of any thing of value from ALLEN and VECO, either as gifts or as liabilities, as required. STEVENS also made and caused to be made multiple false representations to his friends, his staff, and the media concerning the improvements at the Girdwood Residence and STEVENS' receipt of things of value from ALLEN and VECO.

17.     It was a part of the scheme that STEVENS, while during that same time period that he was concealing his continuing receipt of things of value from ALLEN and VECO from 1999 to 2006, received and accepted solicitations for multiple official actions from ALLEN and other VECO employees, and knowing that STEVENS could and did use his official position and his office on behalf of VECO during that same time period. These solicitations for official

action, some of which were made directly to STEVENS,  included the following topics: (a)

funding requests and other assistance with certain international VECO projects and partnerships,

including those in Pakistan and Russia; (b) requests for multiple federal grants and contracts to

benefit VECO, its subsidiaries, and its business partners, including grants from the National

Science Foundation to a VECO subsidiary; and (c) assistance on both federal and state issues in

connection with the effort to construct a natural gas pipeline from Alaska's North Slope Region.

A.    **Things of Value from ALLEN and VECO to Benefit STEVENS**

1999:  A New 1999 Land Rover Discovery

18.    In or about the spring of 1999, STEVENS and ALLEN discussed the fact that

STEVENS wished to obtain a new car for his dependent child.  Thereafter, in or about June,

1999, ALLEN transferred a new 1999 Land Rover Discovery, which ALLEN had purchased new

for approximately $44,000, to STEVENS in exchange for STEVENS' 1964½ Ford Mustang and

$5,000.  At the time ALLEN transferred the 1999 Land Rover Discovery to STEVENS, the

1964½ Ford Mustang was worth less than $20,000.

2000-2006:  Improvements to the Girdwood Residence by VECO

19.    Beginning in the spring and summer of 2000, STEVENS and ALLEN discussed

whether VECO could renovate the Girdwood Residence.  After that conversation, spanning over

the next approximately six years, STEVENS accepted from ALLEN and VECO more than

$250,000 in free labor, materials, and other things of value in connection with the substantial

renovation, improvement, repair and maintenance to the Girdwood Residence.  STEVENS never

paid ALLEN or VECO anything for these expenses, and STEVENS never listed his receipt of

these things of value on any of his yearly Financial Disclosure Forms, all the while sitting as one

of Alaska's United States Senators.

*2000-2001:  Improvements to the Girdwood Residence*

20.     In or about the spring and summer of 2000, after STEVENS and ALLEN

discussed whether VECO could perform renovations on the Girdwood Residence, STEVENS

and ALLEN met with an architect employed by VECO to discuss the renovations of the

Girdwood Residence.  Over the remainder of 2000, STEVENS expanded the scope of the project

so that the project eventually became a full basement, first-floor addition with multiple bedrooms

and a bathroom.  The VECO architect prepared drawings for the proposed renovations and

discussed the drawings with STEVENS.

21.     In or about the fall of 2000, VECO and STEVENS hired Construction Firm A to

perform a portion of the renovations at the Girdwood Residence.  Construction Firm A's invoices

were sent to STEVENS, which STEVENS paid by personal check.  Construction Firm A's

invoices, however, did not include the labor costs of VECO employees and contractors and did

not include the costs of materials provided by VECO.

22.     Because VECO and STEVENS hired Construction Firm A to focus on the

carpentry and finish work of the renovations at the Girdwood Residence, VECO employees and

contractors performed a significant portion of the remaining renovations.  ALLEN and others at

VECO directed VECO employees and contractors to perform the renovation tasks on the

Girdwood Residence.

23.     From in or about June 2000 to in or about April 2001, multiple VECO employees

and contractors participated in renovating the Girdwood Residence.  That renovation work

included jacking up and resting the house on stilts, building a new first floor with two bedrooms

and a bathroom, renovating the existing residence, and adding a garage with workshop and a second-story wraparound deck. Among other tasks, VECO employees and contractors also installed electrical, plumbing, framing, heating, and flooring materials in the Girdwood Residence. VECO employees and contractors also purchased and installed certain fixtures and appliances.

24. From in or about the summer of 2000 to on or about December 31, 2001, VECO incurred over $200,000 in materials, labor and other costs in connection with the work that VECO employees and contractors performed at the Girdwood Residence. These costs included, but were not limited to, approximately $81,775.18 in materials, labor, architectural design and services, and other costs from approximately June 2000 to December 31, 2000, and approximately $110,153.64 in the first three and a half months of 2001 alone.

25. STEVENS knew that VECO employees and contractors performed significant portions of the Girdwood Residence renovations during calendar years 2000 and 2001. Nonetheless, STEVENS never paid or reimbursed VECO at any time for the cost of materials provided and labor performed by VECO and its employees and contractors on the Girdwood Residence renovations during 2000 or 2001.

### 2002:  Improvements to the Girdwood Residence by VECO

26. From in or about January 2002 to in or about December 2002, multiple VECO employees and contractors continued to be involved in renovating, repairing, and improving the Girdwood Residence. During calendar year 2002, the work performed by VECO employees and contractors at the Girdwood Residence included, among other projects, the installation of a first-floor wraparound deck, a plastic roof between the first- and second-floor decks, a heat tape

system on the roof of the Girdwood Residence, and the installation and partial removal of rope lighting on multiple portions of the property. These projects cost VECO approximately $55,000.

27.     STEVENS knew that VECO employees and contractors performed significant renovation tasks on the Girdwood Residence during calendar year 2002. Nonetheless, STEVENS never paid or reimbursed VECO at any time for the cost of materials provided and labor performed by VECO and its employees on the Girdwood Residence during calendar year 2002.

### 2004-2005: Improvements to the Girdwood Residence by VECO

28.     From in or about July 2004 to on or about December 31, 2004, STEVENS contacted ALLEN and VECO employees multiple times to request that VECO employees or contractors perform additional tasks at the Girdwood Residence. These tasks included, without limitation, the installation of multiple kitchen appliances and maintenance on the heat tape system on the roof of the Girdwood Residence.

29.     From in or about January 2005 to in or about December 2005, STEVENS contacted ALLEN and VECO employees multiple times to request that VECO employees or contractors perform additional tasks at the Girdwood Residence. These tasks included, without limitation, roof and gutter repairs, electrical wiring, and the replacement of sensors.

30.     STEVENS knew that VECO employees and contractors performed tasks at his request on the Girdwood Residence during calendar years 2004 and 2005. STEVENS, however, never paid or reimbursed VECO at any time for the cost of materials provided and labor performed by VECO and its employees at the Girdwood Residence during those times.

31.     The repairs performed by VECO employees or contractors at the Girdwood

Residence in each of the calendar years 2004 and 2005 had a combined value of greater than $305 for each of those two years.

### 2006: Improvements to the Girdwood Residence by VECO

32.    In or about January, 2006, STEVENS contacted ALLEN to request that VECO employees or contractors inspect and repair the boiler and heating system at the Girdwood Residence.

33.    On or about January 10, 2006, ALLEN contacted a VECO employee by telephone and directed the VECO employee to travel to the Girdwood Residence to inspect and repair the boiler and heating system. When the VECO employee arrived at the Girdwood Residence, both STEVENS and ALLEN were there. Over the course of the next several days, the VECO employee and an outside contractor performed the repairs to the boiler and heating system that had been originally identified by STEVENS.

34.    On or about January 25, 2006, ALLEN contacted the outside contractor referenced in Paragraph 33 and directed him to split the repair costs into two invoices – one for materials and one for labor – and to send the invoice for materials to STEVENS and the invoice for labor to ALLEN. Each of those invoices was for an amount greater than $1,000. The invoice for materials in fact was addressed to STEVENS in Washington, D.C., and was paid by STEVENS, and the invoice for labor was addressed to ALLEN in Alaska and paid by ALLEN.

35.    On or about February 16, 2006, after becoming aware that ALLEN had paid for the labor costs for the boiler and heating system repairs at the Girdwood Residence, STEVENS sent ALLEN an e-mail concerning the boiler and heating system repairs. Although STEVENS now knew that ALLEN paid for the labor costs, and now knew the name and contact information

-10-

of the outside contractor who had performed the work, STEVENS asked ALLEN to have the outside contractor send STEVENS an invoice for the labor costs.

36.     Despite this knowledge, STEVENS never reimbursed ALLEN for the labor costs paid by ALLEN.  STEVENS also never paid the outside contractor directly for the labor costs paid by ALLEN.

**B.     STEVENS' Involvement in the Renovations**

37.     During the approximate six-year period in which VECO employees and contractors were performing improvements and repairs to the Girdwood Residence, STEVENS had repeated involvement and contact with the work being done by VECO.  STEVENS' involvement included, but was not limited to, the following:

> a.     STEVENS had multiple conversations and correspondence with ALLEN in which the two discussed, among other things, the work of VECO employees and contractors on the renovation project;
>
> b.     STEVENS interacted, in person and by telephone, with VECO employees and contractors in both the planning and construction phases of the improvements to the Girdwood Residence;
>
> c.     STEVENS was present at the Girdwood Residence when VECO employees and contractors performed improvements and repairs to the Girdwood Residence;
>
> d.     STEVENS reviewed and commented upon plans drawn by a VECO employee, surveyed the work done by VECO employees and contractors during the renovations, and at various times suggested additional improvements be done by VECO employees and contractors;
>
> e.     STEVENS also thanked ALLEN multiple times for the work that VECO and its employees and contractors had performed, and were performing, in connection with the renovation of the Girdwood Residence.

38.     For instance, on or about September 24, 2000, STEVENS sent an electronic mail

("e-mail") to ALLEN that stated: "we've never worked with a man so easy to get along with as [name of a VECO employee]. Plus, everyone who's seen the place wants to know who has done the things he's done. . . . You and [PERSON A] have been the spark plugs and we are really pleased with all you have done. hope to see you and the chalet soon. best teds."

39.    From in or about June 2000 to on or about August 30, 2006, PERSON A monitored the work being done at the Girdwood Residence, and provided STEVENS with periodic updates by e-mail on the renovations. In some of these communications, PERSON A specifically noted that certain renovations were being done by VECO employees and contractors at the direction of ALLEN.

40.    For example, on or about October 7, 2002, PERSON A sent STEVENS an email captioned "The House" in which PERSON A reported, among other things, that he "went by the house [Girdwood Residence] on Friday and all is well, the downstairs deck w/cover is in place, has been painted and looks great . . . We have a system for the de-icer that can't be mistaken . . . Spoke to Bill about your concerns and all is well."

41.    From in or about June 2000 to in or about February 2006, STEVENS was present at the Girdwood Residence on multiple different occasions in which VECO employees and contractors were performing renovation, repair or maintenance tasks at the Girdwood Residence. On those occasions, STEVENS interacted with the VECO employees and contractors who performed work at the Girdwood Residence.

42.    STEVENS also thanked VECO employees and contractors who performed tasks at the Girdwood Residence. STEVENS did this through correspondence and conversations with ALLEN, with PERSON A, and with multiple VECO employees and contractors.

43.    As an example, on or about November 11, 2004, STEVENS sent a handwritten letter addressed to a VECO electrician at VECO's corporate address in which STEVENS stated, "Thanks for fixing the heat tape.  It seems to be working ok now."

44.    In or about the summer of 2001, ALLEN gave STEVENS other items of value, including new and used furniture, a new stationary tool storage cabinet with new tools, and a new professional Viking gas grill.  Each of these things of value was worth greater than $260.00.

45.    For calendar years 1999 through 2006, STEVENS filed and caused to be filed with the Secretary of the Senate a yearly Financial Disclosure Form.  For calendar years 1999 through 2006, each year's Financial Disclosure Form required STEVENS to report the things of value he received that have been described at Paragraphs 18 through 44 herein.

46.    STEVENS knew the requirements of the Financial Disclosure Forms, and knowingly and intentionally sought to conceal and cover up his receipt of things of value by filing Financial Disclosure Forms that contained false statements and omissions concerning STEVENS' receipt of these things of value.

All in violation of Title 18, United States Code, Section 1001(a)(1) and (c)(1) and (2).

## COUNT TWO
## FALSE STATEMENTS
## (18 U.S.C. § 1001(a)(2))

47.    Paragraphs 1-14, 19-25, and 37-44 of this Indictment are realleged as if set forth fully herein.

### STEVENS' 2001 Senate Financial Disclosure Form

48.    On or about May 15, 2002, STEVENS filed and caused to be filed a signed document titled "United States Senate Public Financial Disclosure Report For Annual and Termination Reports" (hereinafter "2001 Financial Disclosure Form"). The 2001 Financial Disclosure Form was a document required by rule to be submitted to and filed with the Secretary of the Senate, an office within the legislative branch of the United States Government. The 2001 Financial Disclosure Form was signed by STEVENS and hand-dated "May 15, 2002."

49.    The 2001 Financial Disclosure Form required STEVENS to identify and report his receipt of gifts, with an aggregate value of greater than $260.00 from any single source, received by STEVENS, his spouse, and his dependent children during calendar year 2001. The 2001 Financial Disclosure Form also required STEVENS to identify and report any liabilities greater than $10,000 owed by STEVENS, his spouse, and his dependent children at any time during calendar year 2001.

50.    The first page of the 2001 Financial Disclosure Form contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child receive any reportable
> gift in the reporting period (i.e., aggregating more than $260 and
> not otherwise exempt)? If yes, Complete and Attach PART V.

On the 2001 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a

completed Part V form.

51.    The first page of the 2001 Financial Disclosure Form also contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child have any reportable liability (more than $10,000) in the reporting period? If yes, Complete and Attach PART VII.

On the 2001 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a completed Part VII form.

52.    On or about May 15, 2002, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States and subject to the legislative function exception, that is, the United States Senate and the Secretary of the United States Senate, defendant STEVENS knowingly and willfully made and caused to be made material false, fictitious, and fraudulent statements and representations, that is, STEVENS falsely reported and caused to be reported on his 2001 Financial Disclosure Form and attachments thereto, which he then certified, signed, filed and caused to be filed with the Secretary of the Senate, that during calendar year 2001 he had received no gifts from a single source with an aggregate value of more than $260.00, and that he had no liabilities in an amount greater than $10,000, when in truth and in fact STEVENS knew that his transactions with, including his receipt of things of value from, ALLEN, VECO, PERSON A and PERSON B were required to be reported either as gifts or as liabilities on his 2001 Financial Disclosure Form.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (c)(1) and (2).

## COUNT THREE
## FALSE STATEMENTS
## (18 U.S.C. § 1001(a)(2))

53.     Paragraphs 1-14, 19-27, and 37-44 of this Indictment are realleged as if fully set forth herein.

### STEVENS' 2002 Senate Financial Disclosure Form

54.     On or about May 13, 2003, STEVENS filed and caused to be filed a signed document titled "United States Senate Public Financial Disclosure Report For Annual and Termination Reports" (hereinafter "2002 Financial Disclosure Form"). The 2002 Financial Disclosure Form was a document required by rule to be submitted to and filed with the Secretary of the Senate, an office within the legislative branch of the United States Government. The 2002 Financial Disclosure Form was signed by STEVENS and hand-dated "May 13, 2003."

55.     The 2002 Financial Disclosure Form required STEVENS to identify and report his receipt of gifts, with an aggregate value of greater than $260.00 from any single source, received by STEVENS, his spouse, and his dependent children during calendar year 2002. The 2002 Financial Disclosure Form also required STEVENS to identify and report any liabilities greater than $10,000 owed by STEVENS, his spouse, and his dependent children at any time during calendar year 2002.

56.     The first page of the 2002 Financial Disclosure Form contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child receive any reportable
> gift in the reporting period (i.e., aggregating more than $260 and
> not otherwise exempt)? If yes, Complete and Attach PART V.

On the 2002 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a

-16-

completed Part V form.

57.    The first page of the 2002 Financial Disclosure Form also contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child have any reportable
> liability (more than $10,000) in the reporting period?  If yes,
> Complete and Attach PART VII.

On the 2002 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a completed Part VII form.

58.    On or about May 13, 2003, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States and subject to the legislative function exception, that is, the United States Senate and the Secretary of the United States Senate, defendant STEVENS knowingly and willfully made and caused to be made material false, fictitious, and fraudulent statements and representations, that is, STEVENS falsely reported and caused to be reported on his 2002 Financial Disclosure Form and attachments thereto, which he then certified, signed, filed and caused to be filed with the Secretary of the Senate, that during calendar year 2002 he had received no gifts from a single source with an aggregate value of more than $260.00, and that he had no liabilities in an amount greater than $10,000, when in truth and in fact STEVENS knew that his transactions with, including his receipt of things of value from, ALLEN, VECO, PERSON B, and others were required to be reported either as gifts or as liabilities on his 2002 Financial Disclosure Form.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (c)(1) and (2).

## COUNT FOUR
## FALSE STATEMENTS
## (18 U.S.C. § 1001(a)(2))

59.     Paragraphs 1-14, 19-27, and 37-44 of this Indictment are realleged as if fully set forth herein.

### STEVENS' 2003 Senate Financial Disclosure Form

60.     On or about May 17, 2004, STEVENS filed and caused to be filed a signed document titled "United States Senate Public Financial Disclosure Report For Annual and Termination Reports" (hereinafter "2003 Financial Disclosure Form"). The 2003 Financial Disclosure Form was a document required by rule to be submitted to and filed with the Secretary of the Senate, an office within the legislative branch of the United States Government. The 2003 Financial Disclosure Form was signed by STEVENS and hand-dated "May 17, 2004."

61.     The 2003 Financial Disclosure Form required STEVENS to identify and report his receipt of gifts, with an aggregate value of greater than $285.00 from any single source, received by STEVENS, his spouse, and his dependent children during calendar year 2003. The 2003 Financial Disclosure Form also required STEVENS to identify and report any liabilities greater than $10,000 owed by STEVENS, his spouse, and his dependent children at any time during calendar year 2003.

62.     The first page of the 2003 Financial Disclosure Form contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child receive any reportable gift in the reporting period (i.e., aggregating more than $285 and not otherwise exempt)? If yes, Complete and Attach PART V.

On the 2003 Financial Disclosure Form, STEVENS checked the "YES" box, and attached a

completed Part V form in which STEVENS listed receiving a gift in 2003 from the "[Fishing

Association] 501(c)(3)." The gift was described as being "given as honorary award in

recognition of public service," and was listed as having a value of $250.00.

63.    The first page of the 2003 Financial Disclosure Form also contained the following

question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child have any reportable
> liability (more than $10,000) in the reporting period? If yes,
> Complete and Attach PART VII.

On the 2003 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a

completed Part VII form.

64.    On or about May 17, 2004, in the District of Columbia and elsewhere, in a matter

within the jurisdiction of the legislative branch of the Government of the United States and

subject to the legislative function exception, that is, the United States Senate and the Secretary of

the United States Senate, defendant STEVENS knowingly and willfully made and caused to be

made material false, fictitious, and fraudulent statements and representations, that is, STEVENS

falsely reported and caused to be reported on his 2003 Financial Disclosure Form and

attachments thereto, which he then certified, signed, filed and caused to be filed with the

Secretary of the Senate, that (1) during calendar year 2003 he received a gift, valued at $250.00,

from the Fishing Association in recognition of STEVENS' public service, when STEVENS in

fact and in truth knew that the gift was actually given to him by PERSON B, and had a value of

greater than $285.00, and (2) that during calendar year 2003 he had received no other gifts from a

single source with an aggregate value of more than $285.00, and that he had no liabilities in an

amount greater than $10,000, when in truth and in fact STEVENS knew that his transactions

with, including his receipt of things of value from, ALLEN and VECO were required to be reported either as gifts or as liabilities on his 2003 Financial Disclosure Form.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (c)(1) and (2).

## COUNT FIVE
## FALSE STATEMENTS
## (18 U.S.C. § 1001(a)(2))

65.    Paragraphs 1-14, 19-31, and 37-44 of this Indictment are realleged as if fully set

forth herein.

### STEVENS' 2004 Senate Financial Disclosure Form

66.    On or about May 16, 2005, STEVENS filed and caused to be filed a signed

document titled "United States Senate Public Financial Disclosure Report For Annual and

Termination Reports" (hereinafter "2004 Financial Disclosure Form").   The 2004 Financial

Disclosure Form was a document required by rule to be submitted to and filed with the Secretary

of the Senate, an office within the legislative branch of the United States Government.  The 2004

Financial Disclosure Form was signed by STEVENS and hand-dated "May 16, 2005."

67.    The 2004 Financial Disclosure Form required STEVENS to identify and report his

receipt of gifts, with an aggregate value of greater than $305.00 from any single source, received

by STEVENS, his spouse, and his dependent children during calendar year 2004.  The 2004

Financial Disclosure Form also required STEVENS to identify and report any liabilities greater

than $10,000 owed by STEVENS, his spouse, and his dependent children at any time during

calendar year 2004.

68.    The first page of the 2004 Financial Disclosure Form contained the following

question, followed by boxes for "YES" and "NO":

>    Did you, your spouse, or dependent child receive any reportable
>    gift in the reporting period (i.e., aggregating more than $305 and
>    not otherwise exempt)?  If yes, Complete and Attach PART V.

On the 2004 Financial Disclosure Form, STEVENS checked the "YES" box, and attached a

completed Part V form in which STEVENS disclosed the receipt of four gifts, totaling $1,428,

from dignitaries of three foreign governments. STEVENS did not list receiving any gifts from

ALLEN or VECO on the Part V form attached to his 2004 Financial Disclosure Form.

69.    The first page of the 2004 Financial Disclosure Form also contained the following

question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child have any reportable
> liability (more than $10,000) in the reporting period?  If yes,
> Complete and Attach PART VII.

On the 2004 Financial Disclosure Form, STEVENS checked the "YES" box, and attached a

completed Part VII form in which STEVENS disclosed a liability to the Internal Revenue Service

of an amount within a range from $100,001 to $250,000.  STEVENS did not list having any

liabilities or owing any debts to ALLEN or VECO on the Part VII form attached to his 2004

Financial Disclosure Form.

70.    On or about May 16, 2005, in the District of Columbia and elsewhere, in a matter

within the jurisdiction of the legislative branch of the Government of the United States and

subject to the legislative function exception, that is, the United States Senate and the Secretary of

the United States Senate, defendant STEVENS knowingly and willfully made and caused to be

made material false, fictitious, and fraudulent statements and representations, that is, STEVENS

falsely reported and caused to be reported on his 2004 Financial Disclosure Form and

attachments thereto, which he then certified, signed, filed and caused to be filed with the

Secretary of the Senate, that during calendar year 2004 he had received no gifts from either

ALLEN or VECO with an aggregate value of more than $305.00, and that he had no liabilities to

ALLEN or VECO in an amount greater than $10,000, when in truth and in fact STEVENS knew

that his transactions with, including his receipt of things of value from, ALLEN and VECO were required to be reported either as gifts or as liabilities on his 2004 Financial Disclosure Form.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (c)(1) and (2).

## COUNT SIX
## FALSE STATEMENTS
## (18 U.S.C. § 1001(a)(2))

### STEVENS' 2005 Senate Financial Disclosure Form

71.     Paragraphs 1-14, 19-31, and 37-44 of this Indictment are realleged as if fully set forth herein.

72.     On or about May 15, 2006, STEVENS filed and caused to be filed a signed document titled "United States Senate Public Financial Disclosure Report For Annual and Termination Reports" (hereinafter "2005 Financial Disclosure Form").   The 2005 Financial Disclosure Form was a document required by rule to be submitted to and filed with the Secretary of the Senate, an office within the legislative branch of the United States Government.  The 2005 Financial Disclosure Form was signed by STEVENS and hand-dated "May 15, 2006."

73.     The 2005 Financial Disclosure Form required STEVENS to identify and report his receipt of gifts, with an aggregate value of greater than $305.00 from any single source, received by STEVENS, his spouse, and his dependent children during calendar year 2005.  The 2005 Financial Disclosure Form also required STEVENS to identify and report any liabilities greater than $10,000 owed by STEVENS, his spouse, and his dependent children at any time during calendar year 2005.

74.     The first page of the 2005 Financial Disclosure Form contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child receive any reportable gift in the reporting period (i.e., aggregating more than $305 and not otherwise exempt)?  If yes, Complete and Attach PART V.

On the 2005 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a

completed Part V form.

75.    The first page of the 2005 Financial Disclosure Form also contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child have any reportable
> liability (more than $10,000) in the reporting period?  If yes,
> Complete and Attach PART VII.

On the 2005 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a completed Part VII form.

76.    On or about May 15, 2006, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States and subject to the legislative function exception, that is, the United States Senate and the Secretary of the United States Senate, defendant STEVENS knowingly and willfully made and caused to be made material false, fictitious, and fraudulent statements and representations, that is, STEVENS falsely reported and caused to be reported on his 2005 Financial Disclosure Form and attachments thereto, which he then certified, signed, filed and caused to be filed with the Secretary of the Senate, that during calendar year 2005 he had received no gifts from a single source with an aggregate value of more than $305.00, and that he had no liabilities in an amount greater than $10,000, when in truth and in fact STEVENS knew that his transactions with, including his receipt of things of value from, ALLEN and VECO were required to be reported either as gifts or as liabilities on his 2005 Financial Disclosure Form.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (c)(1) and (2).

## COUNT SEVEN
## FALSE STATEMENTS
## (18 U.S.C. § 1001(a)(2))

### STEVENS' 2006 Senate Financial Disclosure Form

77.     Paragraphs 1-14 and 19-44 of this Indictment are realleged as if fully set forth herein.

78.     On or about July 17, 2007, STEVENS filed and caused to be filed a signed document titled "United States Senate Public Financial Disclosure Report For Annual and Termination Reports" (hereinafter "2006 Financial Disclosure Form"). The 2006 Financial Disclosure Form was a document required by rule to be submitted to and filed with the Secretary of the Senate, an office within the legislative branch of the United States Government. The 2006 Financial Disclosure Form was signed by STEVENS and hand-dated "July 17, 2007."

79.     The 2006 Financial Disclosure Form required STEVENS to identify and report his receipt of gifts, with an aggregate value of greater than $305.00 from any single source, received by STEVENS, his spouse, and his dependent children during calendar year 2006. The 2006 Financial Disclosure Form also required STEVENS to identify and report any liabilities greater than $10,000 owed by STEVENS, his spouse, and his dependent children at any time during calendar year 2006.

80.     The first page of the 2006 Financial Disclosure Form contained the following question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child receive any reportable gift in the reporting period (i.e., aggregating more than $305 and not otherwise exempt)? If yes, Complete and Attach PART V.

On the 2006 Financial Disclosure Form, STEVENS checked the "YES" box, and attached a

completed Part V form in which STEVENS disclosed the receipt of a single gift, valued at

$1,400, from a charitable organization. STEVENS did not list receiving any gifts from ALLEN

or VECO on the Part V form attached to his 2006 Financial Disclosure Form.

81.    The first page of the 2006 Financial Disclosure Form also contained the following

question, followed by boxes for "YES" and "NO":

> Did you, your spouse, or dependent child have any reportable
> liability (more than $10,000) in the reporting period?  If yes,
> Complete and Attach PART VII.

On the 2006 Financial Disclosure Form, STEVENS checked the "NO" box, and did not attach a

completed Part VII form.

82.    On or about July 17, 2007, in the District of Columbia and elsewhere, in a matter

within the jurisdiction of the legislative branch of the Government of the United States and

subject to the legislative function exception, that is, the United States Senate and the Secretary of

the United States Senate, defendant STEVENS knowingly and willfully made and caused to be

made material false, fictitious, and fraudulent statements and representations, that is, STEVENS

falsely reported and caused to be reported on his 2006 Financial Disclosure Form and

attachments thereto, which he then certified, signed, filed and caused to be filed with the

Secretary of the Senate, that during calendar year 2006 he had received no gifts from ALLEN or

VECO with an aggregate value of more than $305.00, and that he had no liabilities in an amount

greater than $10,000, when in truth and in fact STEVENS knew that his transactions with,

including his receipt of things of value from, ALLEN and VECO were required to be reported

either as gifts or as liabilities on his 2006 Financial Disclosure Form.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (c)(1) and (2).

A TRUE BILL.


_____          Dated: _____
     Foreperson


WILLIAM M. WELCH II
Chief, Public Integrity Section

By:_____
     BRENDA K. MORRIS
     Principal Deputy Chief
     NICHOLAS A. MARSH
     EDWARD P. SULLIVAN
     Trial Attorneys
     Public Integrity Section
     Criminal Division
     United States Department of Justice
     1400 New York Avenue N.W.
     Washington, D.C.  20005

     JOSEPH W. BOTTINI
     JAMES A. GOEKE
     Assistant United States Attorneys
       for the District of Alaska
     Federal Building & U.S. Courthouse
     222 West Seventh Avenue
     Anchorage, Alaska  99513-7567