## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  )
                                               )
          v.                               )          Criminal No. 08-231 (EGS)
                                               )
THEODORE F. STEVENS,          )
                                               )
          Defendant.                    )
_____)

## GOVERNMENT'S MOTION *IN LIMINE* CONCERNING THE
## INAPPLICABILITY OF THE SPEECH OR DEBATE CLAUSE

The United States of America, by and through the undersigned counsel, respectfully

moves this Court in limine for an Order ruling that the protections afforded by the Speech or

Debate Clause of the United States Constitution, Art. I, § 6, Cl. 1, do not preclude the admission

of certain evidence the government intends to introduce at trial concerning solicitations made by

VECO Corporation ("VECO") and its executives or non-legislative acts taken by Senator

Theodore F. Stevens or his staff in response to VECO's solicitations.  As discussed below, such

evidence will be offered at trial for the purpose of demonstrating Senator Stevens' intent and his

motive to conceal the substantial benefits he received from VECO by, among other things, lying

on his mandatory, financial disclosure forms.

## I.    OVERVIEW OF ARGUMENT

The Speech or Debate Clause has been interpreted by the Supreme Court to protect those

activities integral to a Member's legislative activities – such as the drafting, consideration,

debate, or passage or defeat of legislation.  E.g., Gravel v. United States, 408 U.S. 606, 624-25

(1972); Hutchinson v. Proxmire, 443 U.S. 111, 126-27 (1979); Doe v. McMillan, 412 U.S. 306,

313 (1973).  What it clearly does not prohibit, however, are solicitations of Members of

Congress; inquiry into illegal conduct that may even have some nexus to legislative functions;[1]

and a gamut of so-called constituent services, such as the making of appointments with

Government agencies, assistance in securing government contracts and federal grants,

influencing other governmental agencies or entities;[2] or disseminating information outside

Congress to a Member's constituents.[3]  These non-legislative activities do not implicate Speech

or Debate concerns because they are not "an integral part of the deliberative and communicative

processes by which Members participate" in their constitutionally-mandated duties.  Gravel, 408

U.S. at 625.

     The government's criminal case against Senator Stevens is not based on his legislative

activities, but on his receipt of financial benefits and his need to conceal those benefits from

public scrutiny, particularly in light of the myriad of constituent-based errands that Senator

Stevens was performing or had promised to perform on VECO's behalf at approximately the

---

[1]     Gravel, 408 U.S. at 426 (government may inquire into criminal acts done in preparing for or implementing legislative acts); Brewster v. United States, 408 U.S. 501, 528 (1972) (Clause "does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions"); id. at 528; Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 415 (D.C. Cir. 1995) ("Malfeasance by a Member does not fall within the legislative sphere simply because it is associated with congressional duties.").

[2]     E.g., Brewster, 408 U.S. at 528 (government may rely on "acts casually or incidentally related to legislative affairs but not part of the legislative process itself"); id. at 512 (no immunity for political activities, including "a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress"); Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1, 24 (D.C. Cir. 2006) (en banc) (quoting Brewster), cert. denied, 127 S.Ct. 2018 (2007); Gravel, 408 U.S. at 625 ("Members of Congress are constantly in touch with the Executive Branch or administrative agencies – they may cajole, and exhort with respect to the administration of a federal statute – but such conduct, though generally done, is not protected legislative activity.").

[3]     Hutchinson, 443 U.S. at 132-33; McMillan, 412 U.S. at 313; Gravel, 408 U.S. at 625.

same time.  The Speech or Debate Clause is simply not at issue in this prosecution because evidence relating to these constituent-based errands do not impinge on protected legislative activities.  See Brewster, 408 U.S. at 512.  The government is therefore seeking an Order from the Court holding that the following categories of evidence are not shielded by the Speech or Debate Clause:  (1) solicitations of Senator Stevens or his staff by VECO executives (either directly or indirectly through lobbyists), including any internal or external communications concerning the solicitations; (2) acts taken, or communications made, by Senator Stevens or his legislative staff to secure government contracts or federal grants for VECO or to otherwise influence other governmental agencies or entities; (3) acts taken, or communications made, by Senator Stevens or his staff with respect to pipeline legislation pending within the Alaska State Legislature; and (4) constituent communications between VECO executives and Senator Stevens or his staff.

As discussed below, these categories of evidence are not protected by the Speech or Debate Clause and may be relied on by the government.  To the extent that Senator Stevens disagrees and seeks to oppose this motion, he has the burden both to produce evidence and to persuade the Court by a preponderance of the evidence that the privilege applies.  United States v. Rostenkowski, 59 F.3d 1291, 1300 (D.C. Cir. 1995) (citing Virgin Islands v. Lee, 775 F.2d 514, 524 (3d Cir. 1985)); In re Possible Violations, 491 F. Supp. 211, 213-14 (D.D.C. 1980). More specifically, "To invoke the Speech or Debate Clause, [Senator Stevens] should include with this evidence an affidavit from an individual eligible to invoke the Speech or Debate Clause

recounting facts sufficient to show that" the Clause applies.[4]  <u>Fields v. Office of Eddie Bernice Johnson</u>, 459 F.3d 1, 16 (D.C. Cir. 2006) (en banc), <u>cert. denied</u>, 127 S.Ct. 2018 (2007).

## II.    <u>FACTUAL BACKGROUND</u>

The indictment filed in this matter on July 29, 2008, charges Senator Stevens with seven counts, all pursuant to 18 U.S.C. § 1001.  As it relates to VECO and its former Chief Executive Officer, Bill J. Allen, the indictment generally alleges that VECO and Allen were providing Senator Stevens with financial benefits and other things of value at or near the time when VECO and its executives solicited Senator Stevens or his legislative staff for official or political acts that would benefit VECO or Allen.  Paragraph 17 of the indictment specifically alleges as follows:

> It was a part of the scheme that STEVENS, while at the same time concealing his continuing receipt of things of value from ALLEN and VECO from 1999 to 2006, received and accepted solicitations for multiple official actions from ALLEN and other VECO employees, and knowing that STEVENS could and did use his official position and his office on behalf of VECO during that same time period.  These solicitations for official action, some of which were made directly to STEVENS, included the following topics: (a) funding requests and other assistance with certain international VECO projects and partnerships, including those in Pakistan and Russia; (b) requests for multiple federal grants and contracts to benefit VECO, its subsidiaries, and its business partners, including grants from the National Science Foundation to a VECO subsidiary; and (c) assistance on both federal and state issues in connection with the effort to construct a natural gas pipeline from Alaska's North Slope Region.

---

[4]    The affiant, moreover, "must have personal knowledge of the facts underlying his averment and otherwise be able to assert a Member's Speech or Debate Clause immunity."  <u>Id.</u> The affidavit must also specify the "legislative activity" or the "matter integral to the due functioning of the legislative process."  <u>Id.</u>

At trial, the government intends to introduce certain evidence, described below, to prove the allegations set forth in paragraph 17 of the indictment.[5]  Among other things, this evidence includes the following:

- Intercepted communications between Bill Allen, Senator Stevens, and others in which Senator Stevens:  (i) discusses the status of state legislation concerning the construction of a natural gas pipeline in Alaska; (ii) offers to take steps to influence members of the Executive Branch concerning the state legislation; and (iii) promises to take future steps to expedite the Executive Branch's review and permitting process of the gas pipeline once the state legislation is enacted;

- An August 23, 1999, letter from Bill Allen to Senator Stevens regarding assistance from the World Bank concerning the Pakistani pipeline and internal VECO communications concerning this request;

- An April 23, 1999, letter from Bill Allen to Senator Stevens requesting support for a federal grant from the National Science Foundation;

- Internal and external e-mails and correspondence from VECO to Senator Stevens and his legislative staff concerning federal funding for a training program for Russian workers;

- A letter from Bill Allen to Senator Stevens seeking a $5 million earmark from the Department of Transportation's Research and Special Projects Agency;

- 2005 and 2006 e-mails indicating that Senator Stevens and his legislative staff had been contacted by VECO regarding assistance with immigration issues;

- An April 1999, internal VECO e-mail discussing a meeting between Bill Allen and officials from the Federal Emergency Management Agency that was arranged by Senator Stevens;

- Internal VECO notes indicating that Senator Stevens' staff was assisting VECO concerning, among other things, a sole source contract with the Department of Energy;

- A December 22, 1999, e-mail from Bill Allen to a legislative aide for Senator Stevens describing assistance that VECO may need concerning an apprenticeship and training program authorized through the Department of Labor.

---

[5]      The government intends to introduce documentary, electronic, and testimonial evidence. The government's electronic evidence, including intercepted conversations involving Senator Stevens, was disclosed to Stevens' counsel on or about August 7, 2008.

-5-

The present motion seeks a ruling prior to trial that such evidence is <u>not</u> barred by the Speech or Debate Clause and, instead, is subject only to traditional evidentiary standards concerning authenticity and admissibility.

    **A.**    **Evidence Relating To Senator Stevens' Non-Legislative Acts Concerning Alaska's Intra-State Natural Gas Pipeline**

Federal law enacted in October 2004 established a two-part framework for the completion of a natural gas pipeline within the State of Alaska. <u>See generally</u> Alaska Natural Gas Pipeline Act, Pub. L. No. 108-324, § 105, 118 Stat. 1258, 1258-59, 15 U.S.C. § 720c (2004). In the first step, the State of Alaska was permitted to negotiate for and enter into a contract with oil producing corporations to build and operate the pipeline. In the second step, the federal government would conduct a permitting and review process concerning the agreement reached by the State of Alaska.

With respect to the first step, the State of Alaska, in 2005, began negotiations with representatives of three oil companies concerning the construction of a natural gas pipeline from Alaska's North Slope. The agreement to build the proposed gas pipeline, however, had to be approved by the Alaska State Legislature.[6]

On February 21, 2006, Alaska Governor Frank Murkowski announced that the State of Alaska had reached an agreement with the primary oil producers regarding the construction of a gas pipeline. The agreement, however, contained a "condition precedent" that significantly changed the manner in which the State of Alaska would tax oil production. In other words, if the

---

[6]    Construction of the gas pipeline was of vital importance to VECO. At the time of the State's negotiations, VECO was primarily an oil field services company, and a significant source of VECO's income was derived from contracts with the primary oil producers in Alaska.

Alaska State Legislature did not approve the proposed formula for the taxation of oil production, then the agreement concerning construction of the gas pipeline would not take effect.

Shortly after the announcement of the gas pipeline agreement, the Murkowski administration proposed legislation (the "Stranded Gas Act") relating to the negotiated change in the taxation of oil production. The Stranded Gas Act legislation and, in particular, the negotiated tax formula, was the subject of much debate throughout the 2006 regular and special state legislative sessions.

VECO and its executives had developed a close relationship with Senator Stevens during this time period. As early as 2000, VECO executives began sending correspondence to Senator Stevens and his staff, as well as having both formal and informal meetings with Stevens, concerning the natural gas pipeline effort. Letters and e-mails from Senator Stevens' office bear his handwriting, indicating Stevens' involvement in the process. VECO continued to provide input to Senator Stevens regarding the natural gas pipeline through Fall 2006.

While the Alaska State Legislature was considering the Stranded Gas Act and the related tax issues, Senator Stevens used his official position and took official acts in an attempt to get the state legislature to pass legislation authorizing the construction of the natural gas pipeline. For instance, between January and June 2006, the government intercepted a series of telephone calls between Bill Allen, Senator Stevens, his legislative staff, and others – including Stevens' son – in which the participants generally discussed the gas pipeline, Governor Murkowski's negotiations with the oil producers, and the proposed Stranded Gas Act. In certain of these discussions, Senator Stevens told Bill Allen that he would take action to accelerate and "whittle down" the federal permitting and review process after the state legislature passed the gas pipeline legislation.

Similarly, on June 25, 2006, the government intercepted a telephone call between Bill Allen and Senator Stevens in which Allen and Stevens discussed strategy with respect to the gas pipeline, particularly with respect to hearings being held by the Alaska Senate's Energy & Natural Resources Committee on July 6-7, 2006. Senator Stevens then told Allen:

> I've been working with [Stevens' son] and, uh, we're trying to see what we can do about this [State Senator's] hearing. Uh, I'm gonna try to see if I can get some bigwigs from back here to go up there and say, "Look, uh, you just gotta make up your mind, you gotta get this done. There's no politics in it, there's necessity in it for the Federal government." We'll see if I can get that done.

After discussing his itinerary, Senator Stevens asked what he could do to assist Allen. Stevens added: "I'm going to try and see if I can get . . . the Secretary of Energy and also the head of, of the Federal Energy Regulatory Commission [("FERC")] up there to explain why it's necessary that they act before we act."

On July 7, 2006, Senator Stevens traveled to Alaska and addressed the Alaska Senate Energy and Natural Resources Committee, urging it to cease infighting and pass the pipeline legislation before liquified natural gas monopolizes the marketplace. Three days later, on July 10, 2006, the FERC issued a report similar to the message delivered by Stevens. The FERC report suggested that delays to a gas pipeline in Alaska could cripple the project by forcing North American customers to make long-term deals to buy imported gas.

### B.    Evidence Concerning VECO's Solicitations Of Senator Stevens And Non-Legislative Acts Taken By Senator Stevens In Response Thereto

#### 1.    Pakistani Pipeline Assistance

In the mid-1990s, a VECO subsidiary obtained an ownership interest in Asia Petroleum Limited ("APL"), a company that owns and operates a petroleum products pipeline in Pakistan. In or around 1998, the Government of Pakistan awarded a letter of intent to APL concerning

-8-

APL's construction of an underground pipeline to transport fuel oil to a privately-owned power generation plant near Karachi, Pakistan.  When the Government of Pakistan delayed an agreement implementing the project, VECO contacted Senator Stevens for assistance. Specifically, on or about August 23, 1999, Bill Allen sent a letter to Senator Stevens asking Senator Stevens and his staff to "give [VECO] some assistance with VECO's Pakistan partnership, [APL]."  Allen requested that Senator Stevens work with VECO executives in contacting the World Bank, which was a financial participant in the project.  Allen further requested that Senator Stevens ask the World Bank to send a representative to upcoming meetings involving the Government of Pakistan.

By letter dated September 20, 1999, Senator Stevens wrote to James D. Wolfensohm, President of the World Bank Group.  Stevens informed Wolfensohm that he had attempted to contact Wolfensohm by telephone and that Stevens had previously asked Wolfensohm for assistance on APL's project in 1998.  Senator Stevens also told Wolfensohm that VECO and APL had concerns regarding the Government of Pakistan's failure to sign the implementation agreement and, in that regard, asked whether the World Bank intended to send a representative to the upcoming meeting between APL and the Government of Pakistan.  Senator Stevens further asked whether the World Bank supported the lifting of sanctions against Pakistan, which Stevens had been asked to facilitate.

On September 22, 1999, a legislative aide to Senator Stevens sent a signed copy of Stevens' September 20, 1999, letter to a VECO executive, Rick Smith, by facsimile.  The cover sheet for the facsimile advised Smith that VECO should contact certain individuals within the World Bank to "discuss this issue . . . to see what they can do."

###### 2.    VECO's $40 Million Grant From The National Science Foundation

In or about April 1999, Bill Allen provided a letter to Senator Stevens dated April 23, 1999. The letter advised Stevens of VECO Alaska's involvement in the National Science Foundation's ("NSF") Relocatable Atmospheric Observatory ("RAO") project, estimated by Allen to cost $40 million. Allen's letter detailed the specific construction and development involved in the project and included "a background paper and briefing charts on the RAO." Allen's letter also requested that Stevens support the RAO project by providing earmarks in the appropriations bill for the "Independent Agencies." Attached to the letter was proposed language to be inserted into the appropriations bill.

In or about early 2000, NSF awarded its "Arctic Research Logistics Support Services Contract" – a five-year contract valued at $4 to $5 million per year – to a VECO subsidiary, VECO Rocky Mountain, Inc. The contract was for $27 million, with funding approved for up to $70 million. To fulfill the requirements of the contract, VECO enlisted the assistance of Polar Field Services (PFS) and SRI International. Together they comprised VECO Polar Resources.

In or about April 2004, VECO submitted a bid to NSF for a renewal of the contract, and again sought Senator Stevens' assistance in connection therewith. On April 6, 2004, a VECO executive sent Stevens an e-mail in which the VECO executive noted VECO's submission of the bid to NSF, and asked for "any assistance" that Stevens' office could give. Senator Stevens responded to the VECO executive the same day, informing the VECO executive that Stevens' office's contact at NSF had been on leave. Stevens told the VECO executive that, although it was a "touchy situation – we could lose it for you for sure if they screamed we were pressuring them," Stevens reassured the VECO executive that "[w]e are still trying."

-10-

### 3.    Request For Sakhalin Island Training Assistance

During the late 1990s, VECO and its subsidiaries were significantly involved in a series of oil production plants and refineries on Sakhalin Island, Russia.  The Sakhalin Island facilities were being constructed at that time through a series of "modules" that were constructed in other countries and then transported on-site.  VECO sought to obtain contracts with the Russian government to build some of these modules in Alaska.  To meet the bid requirements for the projects, VECO needed to use Russian workers; however, in order to be able to work VECO's equipment, the Russian workers needed additional training on American equipment.

In or around 1999, Allen contacted Senator Stevens to request Stevens' assistance in obtaining federal funding to train Russian workers in Alaska in connection with VECO's proposed module construction contracts.  In August 1999, Allen and Senator Stevens traveled to Sakhalin Island to meet with Russian officials and the oil companies to improve VECO's standing and relationship with the Russian government and to help VECO secure construction contracts and federal funding for the training program.

Shortly after the trip to Sakhalin Island, Bill Allen, on September 29, 1999, sent a letter to Senator Stevens enclosing the "Sakhalin Equipment Supply Study."  Allen told Stevens that VECO had located good used Caterpillar equipment to assist with the infrastructure work on Sakhalin Island.  Allen concluded the letter by stating, "As you can see, if we have an answer on the funding by the end of October, we could make the schedule work."

### 4.    Additional Request For Sakhalin Island Training Assistance

In approximately November 2004, VECO again solicited Senator Stevens for additional funding for the training of Russian workers in Alaska.  On November 20, 2004, a VECO executive sent an e-mail to a former officer of VECO Construction, Inc., regarding the federal

funds obtained to train workers in Sakhalin.  In regards to the training money, the VECO

executive wrote:

> Bill got Ted to fund this a few years ago.  Bill went back to Ted
> Stevens over the weekend to ask about more money.  Ted found $3
> million that is available now.  Stevens [s]taff person is going to
> call [an oil company executive] next week to make the money
> available so that Exxon can get some good publicity.

In a follow-up e-mail dated November 29, 2004, the VECO executive informed the former

officer of VECO Construction that VECO "needs to get the credit from Exxon for this. . . .  It

would be good if we could be the ones in control of the program."  The VECO executive also

copied Bill Allen, Rick Smith, and VECO's lobbyist in Washington, D.C.

On February 8, 2005, VECO's Washington, D.C. lobbyist sent an e-mail to a legislative

aide for Senator Stevens, stating that Bill Allen was calling frequently regarding the funding for

the Sakhalin Island training program.  The legislative aide responded to VECO's Washington,

D.C. lobbyist in an e-mail dated February 11, 2005, advising VECO's Washington, D.C. lobbyist

that the agency receiving the funds – the United States Agency for International Development

("USAID") cleared the funds months ago and that the funds should already have been sent from

USAID to the American Russian Center – a training facility in Anchorage, Alaska.  Follow-up e-

mails between VECO's Washington, D.C. lobbyist, Smith, a VECO executive, and others

indicate that the funds were to be transferred to the American Russian Center and then to the

Alaska Training Institute effort in Sakhalin, which was being funded and supported by Exxon.

### 5.   Research And Special Projects Agency Grant

In or around 2004, Bill Allen wrote a letter to Senator Stevens seeking a $5 million

earmark from the Department of Transportation's Research and Special Projects Agency which

would be used to support the creation of a pipeline failure prevention program.  Allen sought the

earmark through the Department of Transportation and Treasury's Fiscal Year 2005 Appropriations Bill. Allen's letter to Senator Stevens stated that VECO had formed a partnership with SRI International and the University of Alaska at Fairbanks "with the goal of immediately and continuously reducing the nation's pipeline vulnerabilities." As part of the team, VECO would "provide project management, engineering, operations and construction services[,]" including a full range of pipeline activities such as facilities and pipeline design and automation. Allen's letter thanked Senator Stevens for his support for the grant and working to "achieve funding for this important initiative."

### 6.    VECO - AHTNA Joint Venture

In or about early 2000, VECO entered into a contractual relationship with AHTNA, Inc., one of the 13 Native Alaskan regional corporations. AHTNA contracted with VECO to make AHTNA more attractive when bidding on engineering and construction contracts where VECO could take the lead on executing the contracts. AHTNA also originally approached VECO because of VECO's political capabilities. VECO, in turn, saw AHTNA as an opportunity to obtain a bidding advantage due to AHTNA's status as a Native-owned, small business that was entitled to sole source contracts.

Between approximately April 2000 and April 2001, VECO and AHTNA contacted Senator Stevens and other congressmen from Alaska to assist them with obtaining various federal contracts. For instance, in April 2001, AHTNA/VECO sought a sole source contract from the U.S. Department of Energy relating to a mining project in Moab, Utah. A VECO executive's handwritten notes state that a legislative aide for Senator Stevens was assisting AHTNA/VECO with respect to the funding for the project. The notes further reflect that AHTNA/VECO had discussed the issue with another legislative aide for Senator Stevens.

### 7.     Assistance With Immigration Issues

On June 21, 2005, a VECO assistant forwarded an e-mail to several VECO executives regarding an attached petition letter that was being sent to Senator Stevens for assistance in obtaining a secondary passport with the U.S. Passport Office in Seattle.  The VECO assistant stated in the e-mail that a legislative aide in Senator Stevens' office in Anchorage was contacting the U.S. Passport Office and "carrying the torch for VECO.  He is sending Bill [Allen's] letter on to Senator Ted Stevens so he will know directly our issues."

Similarly, on or about July 13, 2006, a VECO executive sent a letter by e-mail to Senator Stevens.  The VECO executive stated in the letter that VECO "needs to bring to Alaska a small number of Russian engineering advisors to instruct our engineers in Russian design standards." The VECO executive further stated that VECO was applying for immigration visas and was told that a "supporting letter from [Stevens] would help."[7]

### 8.     Rebuilding Efforts In Yugoslavia And Eastern Europe

An April 1999 internal e-mail between VECO Vice President Rick Smith and other VECO employees discussed a trip that Allen was taking in early May 1999 to Washington, D.C. The e-mail described that the trip was for Allen to attend a meeting arranged by Senator Stevens with certain unidentified officials at the Federal Emergency Management Agency ("FEMA"). The purpose of the meeting was for VECO to attempt to obtain a federal contract, through FEMA, to do rebuilding projects in the former Yugoslavia region of Eastern Europe.  The e-mail further referenced that VECO's top competitor for the project would be Kellogg Brown & Root.

---

[7]     VECO executives also contacted Senator Stevens and his staff on behalf of an oil company employee who was seeking immigration assistance.

### 9.     Department Of Labor's Bureau of Apprenticeship and Training

On December 22, 1999, Bill Allen sent an e-mail to a legislative aide to Senator Stevens. Allen informed the legislative aide that a VECO subsidiary, VECO Alaska, had requested authorization from the U.S. Department of Labor's Bureau of Apprenticeship and Training ("BAT") to establish a BAT training program in Alaska for individuals seeking employment in the construction and oil field service industries. VECO was interested in establishing a BAT program in Alaska because, based on its interpretation, Federal regulations at the time allowed for reduction in the wages and benefits paid to apprentices enrolled in a BAT training program. BAT, however, took the position that only wages could be reduced, not benefits.

Allen informed the legislative aide that VECO would be sending to Senator Stevens' office the material submitted to BAT. Allen further stated that he was not asking the legislative aide or Senator Stevens to take any action at the time on the matter. Rather, VECO wanted to make Senator Stevens aware of the issue in the event BAT continued in its refusal to comply with the applicable regulations. "If that turns out to be the case, [VECO] may ask for your help." Allen added that he would be in Washington, D.C. the next week and would mention the BAT program to Senator Stevens at that time.

## III.     ARGUMENT

### A.     Scope Of The Speech Or Debate Clause

The Speech or Debate Clause, Article I, § 6, Cl. 1, provides that "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place." Rooted in the separation of powers doctrine, the Clause applies in both civil and criminal proceedings and serves two core functions. The first is to preserve the separation of powers and protect the legislative branch from intimidation or harassment by either the executive

branch or a "hostile judiciary." United States v. Johnson, 383 U.S. 169, 179 (1966); see also

McMillan, 412 U.S. at 311. The second is to protect legislators and the legislative process from

the burden and delay of litigation concerning legislative actions. See Eastland v. United States

Servicemen's Fund, 421 U.S. 491, 503 (1975); Johnson, 383 U.S. at 180-81; Rostenkowski, 59

F.3d at 1302. Although the "heart of the Clause is speech or debate in either House," Gravel v.

United States, 408 U.S. 606, 625 (1972), the Supreme Court has interpreted the Clause to apply

to all "legislative acts" or acts within the "legislative sphere."[8] Brown & Williamson Tobacco

Corp. v. Williams, 62 F.3d 408, 415 (D.C. Cir. 1995) (quoting Doe v. McMillan, 412 U.S. 306,

312-313 (1973)); see also United States v. Helstoski, 442 U.S. 477, 489-90 (1979).

The Clause's protection, however, is "not all-encompassing," Gravel, 408 U.S. at 625,

and it "does not purport to confer a general exemption upon Members of Congress from liability

or process in criminal cases." Id. at 626; see also Walker v. Jones, 733 F.2d 923, 929 (D.C.

Cir.), cert. denied, 469 U.S. 1036 (1984). Instead of extending to "all conduct relating to the

legislative process," Brewster v. United States, 408 U.S. 501, 515 (1972), the Clause only shields

"matters that are part of, or integral to, the due function of the legislative process. . . ." Fields v.

Office of Eddie Bernice Johnson, 459 F.3d 1, 12 (D.C. Cir. 2006) (en banc), cert. denied, 127

S.Ct. 2018 (2007). In other words, the activity must be integral to the Member's participation in

the drafting, consideration, debate, and passage or defeat of legislation. Gravel, 408 U.S. at 625;

see also Brown & Williamson, 62 F.3d at 415 ("[T]he constitutional protection for acts within

the legislative sphere does not extend to all conduct relating to the legislative process, but only to

those activities that are clearly a part of the legislative process – the due functioning of the

---

[8]      When the Clause applies, it confers immunity from criminal and civil liability. Eastland,
421 U.S. at 508; McMillan, 412 U.S. at 311-12.

process.") (internal citations omitted).  The Supreme Court has therefore recognized that a

Member's non-legislative actions are outside the scope of the Clause's protection:

> [T]he Clause has not been extended beyond the legislative sphere.
> That [Members of Congress] generally perform certain acts in their
> official capacity as [Members of Congress] does not necessarily
> make all such acts legislative in nature.  Members of Congress are
> constantly in touch with the Executive Branch of the Government
> and with administrative agencies . . . but such conduct, though
> generally done, is not protected legislative activity.

Gravel, 408 U.S. at 624-25.  Put simply, the Speech or Debate Clause is neither a license to

commit crime nor a vehicle to hide evidence of crimes, and Members of Congress cannot shield

their every act from scrutiny simply by claiming that it has some connection to their legislative

functions.  Brewster, 408 U.S. at 516 (privilege was not designed "to make Members of

Congress super-citizens, immune from criminal responsibility"); id. at 408 (the "speech or

debate privilege was designed to preserve legislative independence, not supremacy").  The

government may therefore rely on acts "casually or incidentally related to legislative affairs but

not a part of the legislative process itself" in proving its case.  Brewster, 408 U.S. at 528; see

also United States v. Rose, 28 F.3d 181, 187 (D.C. Cir. 1994).

**B.    The Speech Or Debate Clause Does Not Apply To VECO's Solicitations Of
        Official And Political Acts From Senator Stevens Or His Staff**

Much of the evidence described above constitutes attempts by VECO to obtain assistance

from Senator Stevens or his legislative staff concerning matters impacting VECO's business

interests.  These types of solicitations, standing alone, do not give rise to Speech or Debate

concerns because they involve no action – official, political, or otherwise – on the part Senator

Stevens or his staff.  They are merely requests by a constituent (VECO) to receive services from

a Member of Congress (Stevens).  When viewed in isolation, a constituent's request for

-17-

assistance cannot be considered an activity by a Member that is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings. . . ."  Gravel, 408 U.S. at 625; see also Hutchinson v. Proxmire, 443 U.S. 111, 126 (1979).

The Supreme Court, moreover, has repeatedly held that the Speech or Debate Clause cannot be invoked when a Member of Congress agrees to perform a legislative act in the future. Helstoski, 442 U.S. at 489 ("Promises by a Member to perform an act in the future are not legislative acts."); Brewster, 408 U.S. at 526-27; see also United States v. McDade, 28 F.3d 283, 293 (3d Cir. 1994) (Alito, J.) ("the Clause prohibits only proof that a member actually performed a legislative act" in the past), cert. denied, 514 U.S. 1003 (1995).  If a Member's agreement to perform a future act is not privileged, it logically follows that a constituent's request for assistance is not shielded by the Clause either.  A Member cannot agree to perform a future official or political act if a constituent has not asked for one.

     **C.    The Speech Or Debate Clause Does Not Apply To Efforts By Members Of Congress To Secure Government Contracts And Federal Grants Or Influence Other Governmental Entities**

The evidence described above also generally involves situations where VECO asked Senator Stevens or his staff to intervene or assist VECO in either securing government contracts or federal grants or otherwise influencing the conduct of executive, independent, or intergovernmental agencies or organizations.  These types of activities are correctly viewed by the courts as non-legislative "errands" performed by a Member of Congress on behalf of the Member's constituents.[9]  Brewster, 408 U.S. at 512; Fields, 459 F.3d at 24; Rose, 28 F.3d 188.

_____

[9]    The fact that some of the contacts were made by Senator Stevens' staff does not somehow change these unprotected communications into privileged ones.  Members of Congress do not simply direct their "alter egos with regard to constitutionally protected activities." Fields, 459 F.3d at 12.  "That Senators generally perform certain acts in their official capacity as Senators

-18-

They are "political in nature rather than legislative" and "are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. <u>Brewster</u>, 408 U.S. at 512. Thus, "it has never been seriously contended that these political matters . . . have the protection afforded by the Speech or Debate Clause." <u>Id.</u>

### 1.    <u>Securing Government Contracts And Federal Grants</u>

The boundaries of the Speech or Debate Clause do not include attempts by a Member to secure government contracts on behalf of a constituent.[10] <u>See</u> <u>Brewster</u>, 408 U.S. at 512; <u>Fields</u>, 459 F.3d at 24; <u>Rose</u>, 28 F.3d at 188 ("[T]he Court has found that many activities routinely engaged in by lawmakers, such as constituent services, communications with government agencies, assistance in securing government contracts, and speeches delivered outside of Congress, do not qualify for immunity.") (citations omitted); <u>McDade</u>, 28 F.3d at 295-96 ("the Clause does not shield . . . assistance in securing Government contracts"). Thus, evidence showing that Senator Stevens assisted VECO with respect to contracts or grants funded through FEMA, NSF, USAID, the Department of Energy, or other agencies, cannot be excluded on Speech or Debate grounds.

---

does not necessarily make all such acts legislative in nature." <u>Id.</u> (quoting <u>Gravel</u>, 408 U.S. at 625). "Legislative aides are no different." <u>Id.</u>

[10]    In this regard, the government may also introduce evidence that Senator Stevens held certain positions in the United States Senate, including Chairman of the Committee on Appropriations. "[P]roof of legislative status, including status as a member or ranking member of a committee, is not prohibited by the Speech or Debate Clause." <u>McDade</u>, 28 F.3d at 289; <u>see also</u> <u>Rostenkowski</u>, 59 F.3d at 1303.

## 2.    **Communications With Other Governmental Entities**

The Supreme Court has also repeatedly stated that attempts by a Member to communicate with and influence the conduct of executive agencies, administrative offices, or other governmental entities are not immunized by the Speech or Debate Clause.  See, e.g., Hutchinson, 443 U.S. at 121 n.10 (noting that, even if a Member's call to a government agency seeking information were a protected activity, contacting an executive agency in order to influence its conduct is not); Gravel, 408 U.S. at 625 (explaining that Members' contacts with Executive Branch officials to "cajole" or "exhort [them] with respect to the administration of a federal statute" does not qualify as "protected legislative activity," even "though generally done"); Johnson, 383 U.S. at 172 (suggesting that the Clause did not cover a Member's "attempt to influence the Department of Justice"); McMillan, 412 U.S. at 313; Chastain v. Sundquist, 833 F.2d 311, 314-15 (D.C. Cir. 1987) (Congressman's letters to the Attorney General were "not shielded by the Clause" because they "did not seek information or otherwise attempt to aid a congressional investigation"), cert. denied, 487 U.S. 1240 (1988).

Thus, to the extent the government's proffered evidence shows that Senator Stevens attempted to influence, cajole, or persuade components of the Executive Branch (or, for that matter, intergovernmental entities such as the World Bank) in order to assist VECO, then such action on Senator Stevens' part is not shielded from government use.  Likewise, any evidence demonstrating that Stevens or his staff scheduled meetings with components of the Executive Branch on behalf of VECO (such as the 1999 meeting involving FEMA), is non-legislative in nature.  See Gravel, 408 U.S. at 625; Brewster, 408 U.S. at 512; Fields, 459 F.3d at 24; McDade, 28 F.3d at 295-96; Rose, 28 F.3d at 188.

**D.      The Speech Or Debate Clause Does Not Apply To Communications Disseminated To The Public**

If the Speech or Debate Clause does not protect VECO's solicitations or the actions taken by Senator Stevens in response thereto, then it logically follows that Stevens' communications with VECO concerning the status of those requests do not qualify for immunity either.  For example, Senator Stevens, as noted above, intervened with the World Bank in 1999 and NSF in 2004 – both times at VECO's request and both times concerning non-legislative activities.  After taking these official, non-legislative acts, Senator Stevens (or his staff) communicated to VECO the actions taken and the steps remaining.  It cannot be said that an update to a constituent concerning a non-legislative errand is Speech or Debate privileged.

In any event, Congress does not have an "informing function" as it relates to the public.  See Hutchinson, 443 U.S. at 132-33.  The Supreme Court has therefore refused to extend the Speech or Debate privilege to situations where an individual Member is disseminating information outside Congress to the Member's constituents.  See generally id. (privilege does not protect newsletters and press releases of Member); McMillan, 412 U.S. at 313 (public dissemination of a congressional report not protected); Gravel, 408 U.S. at 625 (private republication of documents introduced and made public at a congressional hearing not protected).  This point was made explicit in McMillan:

> [W]e cannot accept the proposition that our conclusion, that general, public dissemination of materials otherwise actionable under local law is not protected by the Speech or Debate Clause, will seriously undermine the "informing function" of Congress. To the extent that the Committee report is printed and internally distributed to Members of Congress under the protection of the Speech or Debate Clause, the work of Congress is in no way inhibited.  Moreover, the internal distribution is "public" in the sense that materials internally circulated, unless sheltered by specific congressional order, are available for inspection by the

-21-

> press and by the public.  We only deal, in the present case, with
> general, public distribution beyond the halls of Congress and the
> establishments of its functionaries, and beyond the apparent needs
> of the "due functioning of the (legislative) process."

Id. at 317 (quoting Brewster, 408 U.S. at 516).  Thus, for instance, when Senator Stevens

provided VECO with e-mail communications, status reports, and other forms of updates

concerning the federal enabling legislation dealing with the natural gas pipeline, he chose to

disseminate this information "beyond the halls of Congress" and, in doing so, the material ceased

being privileged to the extent it was even privileged in the first place.

### E.    Senator Stevens' Assistance On Matters Involving The Alaska State Legislature Do Not Involve Protected Legislative Activities

As set forth § II, above, Senator Stevens and his legislative staff took numerous official

and political acts at both the federal and state level that were intended to accelerate and assist the

effort to construct the natural gas pipeline.  The evidence the government intends to offer at trial

to prove this particular point is not barred by the Speech or Debate Clause for several reasons.

First, the speech that Senator Stevens made on or about July 7, 2006, to the Alaska

Senate Energy and Natural Resources Committee is not subject to immunity given that it was

made outside the Congress.[11]  See Brewster, 408 U.S. at 512 (noting that Member's speeches

outside the Congress are non-legislative activities); Fields, 459 F.3d at 24 (same); Rose, 28 F.3d

at 188; McDade, 28 F.3d at 295-96; Chastain, 833 F.2d at 314.

---

[11]    The government is also not barred from introducing evidence demonstrating that Senator Stevens traveled to Alaska to make the speech.  See, e.g., United States v. Biaggi, 853 F.2d 89, 103-04 (2d Cir. 1988) (congressional travel generally not covered by the Clause even when the travel is related to the legislative process), cert. denied, 489 U.S. 1052 (1989); McDade, 28 F.3d at 298-99 (holding same).  The same holds true for Senator Stevens' trip to Sakhalin Island in 1999.

Second, the assurances that Senator Stevens gave to Bill Allen and others with respect to the pipeline's federal permitting and review process are not covered by the Clause. At best, these assurances constituted an agreement or a promise on Stevens' part to take future acts to expedite the construction of the gas pipeline after the enactment of state law. Even assuming these future acts are legislative in nature (a point the government disputes below), the promise to perform them is not barred by the Speech or Debate Clause. E.g., Helstoski, 442 U.S. at 489; Brewster, 408 U.S. at 526; McDade, 28 F.3d at 293.

Third, to the extent Senator Stevens solicited help from members of the Executive Branch in order to exert pressure on the Alaska State Legislature, such actions on Stevens' part are not subject to immunity. As discussed above, evidence showing that Senator Stevens influenced or intervened with the other branches of government is not Speech or Debate privileged. E.g., Hutchinson, 443 U.S. at 121 n.10; McMillan, 412 U.S. at 313; Chastain, 833 F.2d at 314.

Finally, for the reasons set forth above, communications between Senator Stevens and VECO executives concerning the status of the Stranded Gas Act – including those that were intercepted by the government – are not within the purview of the Speech or Debate Clause. All of these communications relate to events occurring at the state level that "are not integral part of the deliberative and communicative processes" by which Senator Stevens participated in any federal proceedings. Gravel, 408 U.S. at 625.

Nor can Senator Stevens claim that information passed from VECO to him concerning the pending state legislation was for the purpose of informal information gathering, an activity

that is arguably unprotected in any event.[12]  Senator Stevens was not attempting to gather

information from Allen and other VECO executives in connection with or in aid of a protected

legislative activity, such as the preparation or sponsorship of future legislation.  He was instead

seeking information beyond the formal investigative setting so that he could then:  (1) exert

pressure on the Alaska State Legislature through his own actions and the actions of others in the

Executive Branch for politically-motivated purposes; and (2) accelerate the permitting and

review process at the federal level – an exercise performed by the Executive Branch, not

Congress.  The communications captured by the government involve political activities between

Stevens and VECO that are well beyond the scope of the Speech or Debate Clause and, thus,

may be introduced by the government at trial.

IV.     **CONCLUSION**

        Evidence that VECO and Bill Allen solicited Senator Stevens for official and political

acts is relevant to explaining why Senator Stevens concealed the substantial benefits he received

from VECO at or near the same point in time.  Evidence that Senator Stevens actually performed

certain, non-legislative acts in response to these "constituent errands" is relevant for the same

reason.  Importantly, this evidence is not only relevant, it is unprotected by the Speech or Debate

Clause and may be introduced by the government at trial.

        The government therefore requests that this Court issue an Order finding that the Speech

or Debate Clause does not preclude the admission of the following categories of evidence:  (1)

---

[12]      Although the Supreme Court has never directly addressed whether the Clause covers
informal information gathering by Members or their staff, at least one court has held that such
activities are not legislative in nature and, thus, not privileged.  See Bastien v. Office of Senator
Ben Nighthorse Campbell, 390 F.3d 1301, 1305-06, 1316 (10th Cir. 2004) (holding that
legislative aide's informal contacts with constituents and other sources of information and
opinion were non-legislative activities), cert. denied, 546 U.S. 926 (2005).

solicitations of Senator Stevens or his legislative staff by VECO executives (either directly or indirectly through lobbyists), including any internal or external communications concerning the solicitations; (2) acts taken, and communications made, by Senator Stevens or his legislative staff to secure government contracts or federal grants for VECO or to otherwise influence executive, independent, or intergovernmental agencies or entities; (3) acts taken, and communications made, by Senator Stevens or his legislative staff with respect to pipeline legislation pending within the Alaska State Legislature; and (4) constituent communications between VECO executives and Senator Stevens or his legislative staff.

Respectfully submitted,

WILLIAM M. WELCH II
Chief, Public Integrity Section

/s/Edward P. Sullivan
BRENDA K. MORRIS
Principal Deputy Chief

NICHOLAS A. MARSH
EDWARD P. SULLIVAN
Trial Attorneys

JOSEPH W. BOTTINI
JAMES A. GOEKE
Assistant United States Attorneys
for the District of Alaska

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August, 2008, a copy of the United States'

Motion in Limine Concerning the Inapplicability of the Speech or Debate Clause was served

electronically, via the District Court's ECF system, on the following:

Brendan Sullivan, Esq.
Robert Cary, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005


/s/ Edward P. Sullivan
Edward P. Sullivan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 08-231 (EGS) |
| | ) | |
| THEODORE F. STEVENS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**[PROPOSED] ORDER**

Upon consideration of the United States' Motion <u>in Limine</u> Concerning the

Inapplicability of the Speech or Debate Clause, IT IS HEREBY ORDERED that the United

States' motion shall be, and hereby is, GRANTED.

ORDERED this _____ day of _____ 2008

_____
THE HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE