IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 08-CR-231 (EGS) |
| ) | |
| THEODORE F. STEVENS, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

UNITED STATES' NOTICE OF THE INTENT TO INTRODUCE EVIDENCE
OR, IN THE ALTERNATIVE, NOTICE PURSUANT TO RULE 404(b)

The United States of America, by and through its undersigned attorneys, hereby respectfully gives notice to defendant Theodore F. Stevens ("Stevens") that the United States may introduce at trial evidence to prove the alleged conduct described herein. This includes evidence to prove the following acts and conduct: (1) Stevens' personal involvement in a real estate transaction between 2001 and 2003, in which Stevens made over $100,000 in gross profit on an initial investment of $5,000, and which was facilitated by a $31,000, interest-free loan from a personal friend that Stevens never reported on his 2001 Senate Financial Disclosure Form; (2) a backup generator for Stevens' residence in Girdwood, Alaska (the "Girdwood Residence"), which was purchased and installed by Bill Allen at Stevens' direct request, and for which Stevens never paid; (3) multiple instances of Allen providing, at Stevens' request, things of value to benefit two of Stevens' children and one of Stevens' grandchildren; and (4) communications between Stevens and a personal friend that demonstrate Stevens' consciousness of guilt concerning the conduct charged in the Indictment.

The evidence described herein: (1) is proof of elements of the crimes charged in the Indictment; (2) relates to conduct that is inextricably intertwined with the conduct charged in the Indictment; (3) establishes Stevens' personal relationships with individuals named in the Indictment; (4) provides background to the conduct charged in the Indictment; and/or (5) is evidence of Stevens' consciousness of guilt.  However, in an abundance of caution, the United States is providing defendant Stevens with notice of its intention to introduce these acts pursuant to Fed. R. Evid. 404(b).  In doing so, the United States does not intend to waive any additional argument it may have that the evidence described herein is otherwise admissible at trial.

Background

With respect to Rule 404(b), it provides that: "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b).  As the United States Court of Appeals for the District of Columbia Circuit has consistently recognized, "the rule permits such evidence for other purposes, including proof of motive, intent, knowledge, identity, and absence of mistake." *United States v. Douglas*, 482 F.3d 591, 596 (D. C. Cir.2007).  "'Rule 404(b) is a rule of inclusion rather than exclusion, prohibiting the admission of other crimes evidence in but one circumstance -- for the purpose of proving that a person's actions conformed to his character.'" *Id.*(quoting *United States v. Crowder*, 141 F.3d 1202, 1206 (D. C. Cir.1998) (*en banc*)) (internal citation and quotation marks omitted).  For that reason, "'Rule 404(b) thus is not so much a character rule as a special aspect of relevance' because it 'does not prohibit character evidence generally, only that which lacks any purpose but proving character.'" *Id.*(quoting *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000)).

Evidence Concerning Other Acts Taken By Stevens

1.   Florida Real Estate Transaction, 2001-03

At trial, the United States will seek to introduce evidence that, between 2001 and 2003, Stevens was intimately involved in a Florida real estate transaction with another personal friend. After an initial investment of only $5,000 by Stevens, Stevens' friend sold his real estate interest only six months later, with an eventual gross profit to Stevens of more than $100,000. To facilitate Stevens' participation in the transaction, Stevens' friend provided Stevens with a $31,000, interest-free loan, which, despite the fact that he knowingly carried the debt for more than 10 months, Stevens did not report as a liability on his 2001 Financial Disclosure Form.

More specifically, on February 4, 2001, defendant Stevens and his spouse, Catherine, signed a contract with Company B, a partnership engaged in the business of constructing a condominium development in Florida. One of the partners in Company B was Person C, a personal friend of Stevens. The contract was signed by Person C, on behalf of Company B, on February 5, 2001. Under the terms of the sales contract, the Stevenses agreed to purchase a specific condominium unit in Company B's to-be-constructed development for $360,000. The contract specifically noted that an "Initial Deposit [of] 10% of [the] Purchase Price" was due to Company B "Upon execution of this Agreement by Buyer." In the contract, the figure of $36,000 – representing ten percent of the purchase price – was handwritten next to the above-referenced description. The contract further provided that other payments would be due by the Stevenses as the construction of the condominium development progressed.

Although Stevens was required to pay a $36,000 deposit at the time he executed the contract, Stevens in fact paid only $5,000 at that time. The remaining $31,000 deposit that

Stevens was obligated to pay was instead paid by Person C, by personal check dated April 9, 2001, to an escrow company under the name and for the benefit of "Theodore and Catherine Stevens."

On August 21, 2001, Person C wrote a letter to Stevens in which Person C noted that, "[a]s I told you," Company B had recently "accepted an offer for $515,000 to purchase the garden apartment" that Stevens, only six months earlier, had agreed to purchase for $360,000. Person C told Stevens that the new purchaser would "essentially assume [the $360,000] liability" incurred by Stevens, and that Stevens could expect to profit by approximately $129,250 from the transaction. In that letter, Person C specifically referenced the fact that Person C had "funded" the $31,000 deposit shortfall that Stevens did not pay.

In connection with the foregoing correspondence, the United States has also obtained a copy of a two-page set of handwritten calculations concerning the condominium unit. The calculations are believed to be in Stevens' handwriting, and comprise a handwritten tally of the relevant financial terms that were subsequently set forth in Person C's August 21, 2001, letter to Stevens. Among other things, Stevens' handwritten calculations: (a) note that he anticipated an expected profit of approximately $129,250 from the sale of his interest to another buyer; (b) contain Stevens' calculation that, after a "20% tax" on the sale, Stevens stood to make a profit of slightly more than $103,000, and (c) include a specific reference to the fact that Person C, not Stevens, provided $31,000 of Stevens' required $36,000 deposit.

The government will further prove that it was only after reaching the August 21, 2001, agreement to sell their to-be-constructed condominium at a substantial profit that the Stevenses repaid the $31,000 deposit that was "funded" by Person C. On September 12, 2001, Stevens

-4-

requested his United States Senate staff send a $15,000 check, drawn on Stevens' personal checking account, to Company B. Stevens requested that a second check, for the amount of $16,000, be sent on December 11, 2001.

Part VII of the 2001 United States Senate Financial Disclosure Form required Stevens to disclose any liability that he "owed to any creditor which exceeded $10,000 at any time during" calendar year 2001. Although Stevens knowingly carried debt on a $31,000, interest-free loan from his personal friend for more than 10 months during 2001, Stevens did not list such a liability on his 2001 Financial Disclosure Form.

    2.    <u>Generator provided by VECO in 1999 at Stevens' Request.</u>

In 1999, Stevens asked Bill Allen to purchase and install a backup electric generator at the Girdwood Residence. The United States will prove this through, among other evidence, an October 10, 1999 email written by Stevens to a personal friend, in which Stevens wrote:

> Incidentally, I asked Bill Allen to hook up a generator to our chalet
> for Y2K – JUST IN CASE!!

Allen and VECO thereafter purchased and installed a backup electric generator at Stevens' request. Stevens never reimbursed Allen for the cost of the generator or its installation, and never reported receiving the generator on Stevens' 1999 Senate Financial Disclosure Form.

    3.    <u>The 2005 Jeep Cherokee</u>

During calendar year 2005, Allen and Stevens had a series of discussions concerning the 1999 Land Rover that Allen provided to Stevens in June 1999. Allen offered to get Stevens' daughter a new car in exchange for the 1999 Land Rover, and Stevens agreed. Thereafter, Allen had conversations with Stevens and Stevens' daughter, in which it was determined that Allen

would purchase a 2005 red Jeep Grand Cherokee, and would then trade that car to Stevens' daughter.

Although the 1999 Land Rover transaction was between Allen and Stevens, the 2005 automobile transaction occurred instead between Stevens' daughter and a VECO employee, for the purposes of hiding Allen's involvement in the transaction. On July 15, 2005, Allen wrote a personal check for $35,000 to a VECO employee. On the same day, July 15, 2005, and at Allen's direction, the VECO employee wrote a personal check to an Alaska car dealership, for approximately $34,000, to purchase a 2005 Jeep Grand Cherokee  The vehicle was registered in the VECO employee's name, and was shipped to Seattle by VECO. VECO then paid for the VECO employee to fly to Seattle, pick up the 2005 Jeep Grand Cherokee, and drive it to Berkeley, California.

Alaska motor vehicle records indicate that on August 1, 2005, defendant Stevens transferred the title of the 1999 Land Rover Discovery into the name of his daughter. California motor vehicle records indicate that on September 1, 2005, Stevens' daughter transferred the 1999 Land Rover, along with a $13,000 check, to the VECO employee, in exchange for the VECO employee transferring the 2005 Jeep Grand Cherokee to her. At the time of this exchange, the 1999 Land Rover had an approximate value of $9,000.

4.      Stevens' March, 2006, Request for Employment for His Son.

In March 2006, Stevens used an intermediary to ask Allen to help provide a job for one of Stevens' adult sons. On March 5, 2006, the government intercepted a telephone conversation between Allen and Lobbyist A, a lobbyist based in Washington, D.C. In that conversation, Lobbyist A told Allen that, in a recent lunch meeting with defendant Stevens, Stevens asked

Lobbyist A whether Bill Allen could provide one of Stevens' adult sons with a job in the Phoenix area:

> I saw [Senator Ted Stevens] at lunch and, and he asked if I, asked if you – <u>I'm not sure why he mentioned it to me – but he asked me to, I think, find out if you had any business contacts in Phoenix with respect to his son . . .</u> who is down there, who finds himself without a job at this point . . . . Do you have anything down in (unintelligible) – that's what he was interested in, and I thought I would pass that along to you 'cause you're going to see [Stevens] next week.

(emphasis added).  Allen and Lobbyist A then discussed that the job should be in Phoenix, and discussed other possible individuals who might also be able to help with the job.  Lobbyist A then told Allen:

> But [Senator Ted Stevens] specifically mentioned you by name, and I wasn't sure why, and I said, I better call you and just tell you that.

In the summer of 2006, Allen directed VECO to provide a position for Stevens' adult son at one of VECO's operations in Alaska.  Stevens' son accepted the position with VECO, and also received a personal loan from Allen.

     5.     <u>Stevens' Request for VECO Employment for His Grandson.</u>

In or around 2003, Stevens had conversations and communications with both Allen and another VECO executive, in which Stevens asked if VECO could provide permanent employment for one of Stevens' grandsons.  Prior to those conversations, Stevens' grandson had been an off-and-on VECO employee from 2000 to 2003.  After the request by Stevens, VECO rehired Stevens' grandson and enrolled him in a technical training program at a vocational

institute in Alaska. VECO paid the tuition, room, board, and other expenses in the amount of approximately $10,876.

      6.      <u>September 1, 2006, Correspondence from Stevens to Person A.</u>

On August 31, 2006, local and national media reported that, in connection with a public corruption investigation, the Federal Bureau of Investigation had executed search warrants on multiple locations within the state of Alaska. The media reported that the offices of multiple members of the Alaska State Legislature were searched, including those of Stevens' son, former Alaska State Senate President Ben A. Stevens. The media further reported that VECO Corporation's offices had been searched. Finally, at least one newspaper reported that the FBI executed a search warrant in Girdwood, Alaska, in connection with the VECO investigation.

On September 1, 2006, defendant Stevens sent two emails to Person A, asking if Stevens' house had been searched in connection with the Allen/VECO investigation. At 3:49 a.m. on September 1, 2006, Stevens wrote Person A: "press releases say the FBI served a warrant in Girdwood??? Did they hit our house? T." At 5:33 p.m. later that day, Stevens again wrote: "Have you been by the Chalet? Teds"

      7.      <u>May 2007 Correspondence from Stevens to Person A.</u>

By mid-May 2007, Stevens learned that Person A had been subpoenaed to testify before a grand jury in D.C. On May 17, 2007, Stevens sent Person A two emails that discussed Person

A's upcoming grand jury testimony. In the first email, Stevens told Person A that "I hope we can work something out to make sure you aren't led astray on this occasion." In the second, Stevens was more explicit: "don't answer questions you don't KNOW the answers to." (Capitalization in original.)

                                                  Respectfully submitted,

                                                  WILLIAM M. WELCH II
Chief, Public Integrity Section

  /s/ Brenda K. Morris
BRENDA K. MORRIS
Principal Deputy Chief

NICHOLAS A. MARSH
EDWARD P. SULLIVAN
Trial Attorneys

JOSEPH W. BOTTINI
JAMES A. GOEKE
Assistant United States Attorneys
   for the District of Alaska

Dated: Washington, D.C.
       August 14, 2008

CERTIFICATE OF SERVICE

      I hereby certify that on August 14, 2008, a copy of the United States' Notice of the Intent to Introduce Evidence Or, in the Alternative, Notice Pursuant to Rule 404(b) was served electronically, via the District Court's ECF system, on defense counsel as set forth below:

      Robert Cary, Esq.
      Williams & Connolly LLP
      725 Twelfth St. NW
      Washington, D.C.  20005

                                                      /s/ Nicholas A. Marsh
                                                          Nicholas A. Marsh