**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
|  | ) |  |
| UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | Crim. No. 08-231 (EGS) |
| THEODORE F. STEVENS, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**SENATOR STEVENS'S MOTION TO DISMISS INDICTMENT OR FOR A MISTRIAL**

The defense believed that Rocky Williams was a key government witness. The government apparently thought so too. For the better part of the past two weeks, the government has had Mr. Williams in Washington, D.C., interviewing him and preparing him to testify. Apparently, government counsel did not like what they heard. They sent him back to Alaska last Thursday, the day of opening statements.

Shortly after indictment, defense counsel contacted Mr. Williams and requested an interview. Mr. Williams declined. But on Friday evening Mr. Williams called defense counsel, and today defense counsel were able to interview him for the first time. In three telephone conversations today, Mr. Williams disclosed highly exculpatory information to defense counsel that apparently has been known to the government for years. Among other things, Mr. Williams informed defense counsel that he spent nowhere near 8 hours per day, 6-7 days per week, on the Girdwood home renovation project – in direct contrast to the timesheets that the government has placed in evidence to support its central theory that the unpaid cost of the project to Veco was $188,000. This new information gravely undercuts the government's case as described in its opening statement and as presented by government witnesses to date.

Yet the government never disclosed this information to defense counsel pursuant to its

unquestionable *Brady* obligations. Worse yet, the government has presented evidence at trial

that, in light of the information now disclosed to defense counsel by Mr. Williams, can charitably

be described as grossly misleading.

The government's decision to withhold this information has prejudiced the

defense. Had it been disclosed, the exculpatory evidence would have been a significant theme of

defense counsel's opening statement, and it could have been used effectively to cross-examine

the government's witnesses. In particular, this evidence was directly relevant to the testimony of

government witness Cheryl Boomershine, who testified about Mr. Williams's billing entries on

Veco timesheets, which inaccurately suggest that he worked full days, 6-7 days a week, with

substantial overtime, on the Girdwood project. In addition, Williams's statements about his own

billing practices could have been used to cross-examine other Veco workers who have already

testified. The Court therefore should dismiss the indictment or, in the alternative, should declare

a mistrial to remedy the prejudice caused by the government's conduct.

## STATEMENT OF FACTS

1.      As the Court is well aware, since the indictment in this case, defense

counsel have sought diligently to enforce Senator Stevens's right to discovery from the

government – including specifically his right to be informed of all exculpatory information

pursuant to *Brady v. United States* and its progeny. Defense counsel wrote numerous letters to

government counsel requesting *Brady* material and, when the government did not promptly

provide it, filed two separate motions to compel production of this constitutionally-required

discovery. *See* Motion To Compel Discovery Pursuant to *Brady v. Maryland* and Fed. R. Crim.

P. 16 (Dkt. No. 60) (Sept. 2, 2008); Motion to Compel Emergency Relief and Discovery (Dkt.

No. 65) (Sept. 12, 2008). The Court took up *Brady* issues at 3 separate hearings, on September

10, 12, and 18. In sum, the defense's paramount interest in receiving *Brady* materials cannot

have been clearer to the government. In response, the Court on September 10, 2008 ordered the

government to comply with its *Brady* obligations as explained in *United States v. Safavian*, 233

F.R.D. 12 (D.D.C. 2005). At a subsequent hearing on September 12, the government represented

that it had fully complied.[1]

   2. Robert "Rocky" Williams is a significant witness who defense counsel

believed, until today, would have a prominent role in the government's case-in-chief. The

government listed Mr. Williams on its witness list, and it moved on three occasions, both before

and during trial, to exclude evidence potentially relevant to his cross-examination. During the

first two days of trial, Mr. Williams was prominently mentioned by multiple government

witnesses as a Veco employee who participated in supervising the Girdwood renovations. By

eliciting these references, the government obviously wished to create the inference that Mr.

Williams performed substantial work on behalf of Veco for which Senator Stevens never paid.

   On Friday, September 26, the government called Cheryl Boomershine, an

employee in the accounting department of Veco Corporation (now employed by CH2M HILL).

Trial Tr. (Sept. 26, 2008 p.m.) at 6-7 (attached hereto as Ex. B). Through Ms. Boomershine, the

---

[1] *See* Hr'g Tr. (Sept. 12, 2008) at 40-41:

>   MR. CARY: And your Honor, one question the defense has, it is
> not clear to us whether the government believes that they're finished with
> their Brady and Giglio obligations. I understand it's ongoing, but at least
> as to what they know right now.
>   THE COURT: It's probably fair to ask you, if you had anything
> else you'd be producing it right now?
>   MS. MORRIS: That's absolutely right, Judge. We know that
> there's a continuing duty. If something else comes up we provide it.

government admitted numerous Veco invoices and a job cost detail report generated from Veco's

accounting software.  *See* GX 1058 - GX 1093; Sept. 26 p.m. Tr. (Ex. B) at 15.  These

documents reflect (among other things) a vast amount of time expended by Mr. Williams,

purportedly on the Girdwood project.  At the government's prompting, Ms. Boomershine

specifically testified about Mr. Williams, explaining that he was a former employee of Veco

Equipment, a subsidiary of Veco Corporation.  Sept. 26 p.m. Tr. (Ex. B) at 21.  She described an

invoice from Veco Equipment (GX 1060) that shows numerous time entries for Mr. Williams

that were billed from Veco Equipment to Veco Corporation.  Sept. 26 p.m. Tr. (Ex. B) at 20-21.

Ms. Boomershine testified that the total amount coded in Veco Corporation's records (under two

separate codes) to the Girdwood project – including all of Mr. Williams's time – totaled

$188,928.82 between September 2000 and April 2001.  *See* GX 177; Sept. 26 p.m. Tr. (Ex. B) at

43-45, 21-25.

The Veco accounting records introduced as exhibits through Ms. Boomershine

reflect that Mr. Williams billed a prodigious amount of time to the Girdwood codes.  They show

that he regularly worked 6-7 full days per week, plus overtime, from September 2000 through

February 2001.  *See* GX 1058-1063; GX 1090.  The chart attached hereto as Exhibit A depicts

the number of hours that, according to the Veco timesheets, Mr. Williams supposedly billed to

the Girdwood project. (Defense counsel prepared this chart based on those timesheets.)[2]

3.      Shortly after the indictment in this case, defense counsel contacted Mr.

Williams to request an interview.  He declined.  The government subsequently identified Mr.

Williams as a government witness; it filed motions to exclude certain potential defense cross-

---

[2] As used in Ex. A, "St Time" means standard time, i.e., non-overtime hours worked.  "OT"
means overtime hours.  The shaded dates are days when Mr. Williams billed no time to the

examination and impeachment evidence with regard to him.  Defense counsel assumed that Mr.

Williams would be a key government witness.

The government apparently thought so too.  We now know that the government

brought Mr. Williams from his home in Anchorage to Washington, D.C. on or about Monday,

September 15.  The defense succeeded in serving him with a trial subpoena in Anchorage on that

day.  After eleven days in Washington, during which time he worked with the government in

preparation for his trial testimony, the government sent him home to Anchorage.  Mr. Williams

has been suffering from health issues, including coughing episodes, and the government

explained to him that they had everything they needed without his testimony, and that he should

return home to attend to his health.  Mr. Williams flew back to Anchorage on Thursday,

September 25.

After he got home, Mr. Williams contacted defense counsel by telephone to

discuss his compliance with the subpoena they had served on him.[3]  Defense counsel first spoke

with him this afternoon, Sunday, September 28, 2008.  In three conversations today, Mr.

Williams revealed information that casts the government's decision to send him home – on the

eve of Bill Allen's testimony – in a very different light.

4.      Among the information Mr. Williams provided to defense counsel today is

the following, *see* Declaration of Simon A. Latcovich (attached hereto as Exhibit C):

---

Girdwood code.  The government produced no March 2001 timesheets for Mr. Williams that we
have located; accordingly, Ex. A ends in February 2001.

[3] Mr. Williams recalls that he left a telephone message on a general after-hours Williams &
Connolly LLP service while he was in D.C.  Defense counsel did not receive the message.  Mr.
Williams then left a voicemail message for defense counsel on the evening of Friday, September
26, which counsel retrieved and returned today.

- **Mr. Williams never worked a single full day on the Girdwood home renovations.** Rather, he divided his time among a number of different projects, and Veco then billed the total to its Girdwood cost code for accounting purposes. Mr. Williams assumed that Veco would bill the proper percentage of his time to the appropriate cost codes.

- **Mr. Williams worked on other projects even while he spent time at the Girdwood home renovation.** He often spent time on his cellular phone coordinating other Veco activities, including personal tasks for Bill Allen.

- **Mr. Williams advised Bill Allen that Veco should be involved as little as possible in the Girdwood home renovations.** He believed that Veco – an oil services company specializing in part in constructing steel structures – was ill-suited to provide cost efficient residential renovations.

- **Raising the Girdwood residence a full eight feet as opposed to creating a daylight basement was a break-even or only slightly more-expensive proposition.** Contrary to the government's statements in opening, raising the chalet to create an entirely new first floor rather than a daylight basement was not substantially more expensive because of (1) differences in material costs and (2) concerns that groundwater intrusion could foster mold or other problems.

- **Mr. Williams wrote a $2,000 check to Catherine Stevens in January 2001 to purchase various household items for members of Bill Allen's family.** Bill Allen instructed Mr. Williams to purchase from Catherine Stevens an electrical heater, bathtub, fireplace insert, cabinets, and old doors. In the opinion of Mr. Williams, the fair market value of these items was at least $2,000. Mr. Williams wrote the check because Bill Allen does not carry a checkbook.

Bill Allen then gave these items to family members, and Mr. Williams was later reimbursed by Veco for the purchase.

- The only interest Senator Stevens showed in the renovation of the Girdwood residence was keeping his wife Catherine happy. Senator Stevens's concerns were more modest – he wanted a place where he could chop and then burn wood.

Importantly, Mr. Williams unequivocally stated that he informed the government of every one of these facts, either in his grand jury testimony or in personal interviews. Latcovich Decl. ¶ 13. Yet none of the above information was revealed to defense counsel in the government's *Brady* submissions.[4]

5. After learning this information from Mr. Williams, defense counsel contacted counsel for the government and requested a copy of his grand jury testimony. After initially refusing, government counsel agreed to provide a copy of the transcript. It corroborates Mr. Williams's current recollections in significant respects, which clearly should have been provided to the defense long ago as *Brady* material:

- Billing time to the Girdwood account. Mr. Williams testified before the grand jury that he was at the Girdwood residence "at least three times a week if not more." Tr. of Robert Williams Grand Jury Testimony at 29 (D. Alaska Nov. 7, 2006).[5] He went on to testify that on average he spent "never less than 24 hours a week" on the project. *Id.* at 30. As

---

[4] Prior to today, the government provided the defense with no excerpts of Mr. Williams's grand jury testimony. It provided one heavily redacted Form 302 and a letter detailing certain exculpatory information, but none of the information stated here.

[5] The transcript is not attached to this filing, but defense counsel is prepared to provide a copy of the entire transcript to the Court upon request.

demonstrated by Ms. Boomershine's testimony last Friday, however, Veco billed on average between sixty and seventy hours a week of Mr. Williams' time to the Girdwood account.

- Veco was ill-suited for residential construction.  Mr. Williams's grand jury testimony confirms what he told defense counsel on the telephone: "VECO's a very good oil field company, but they don't have housing carpenters, except for myself and maybe one other or two others, that were capable of doing this." *Id.* at 18.

- Raising the chalet a full eight feet would not cost much more than building a daylight basement.  Just as above, Mr. Williams's grand jury testimony stands in direct contradiction to the government's opening statements:  "Once we determined that it wouldn't cost that much more to jack it up to the eight feet from four feet, everything else just kind of moved along." *Id.* at 13.

- Bill Allen purchased household items from Catherine Stevens for his own family.  Mr. Williams's grand jury testimony directly supports his statements earlier today, with the exception that he believed the $2,000 price was "a little more than fair." *Id.* at 54.  He noted in today's conversation, however, that he had underestimated the cost of the electric heater by approximately $500 because he forgot that it had hardly ever been used.

- Senator Stevens's interest in the property.  Finally, Mr. Williams also testified that Senator Stevens "mostly just wanted to chop wood or go fishing." *Id.* at 49.

In sum, the grand jury testimony is consistent with Mr. Williams's current recollections, and both are highly exculpatory.

6.    Mr. Williams's information obviously is highly material to the defense.  It directly and unequivocally undercuts the government's position that Veco incurred $188,000 in unpaid labor and expenses on the Girdwood project.  It destroys the reliability and probative

value of the Veco documents, which the government admitted through Cheryl Boomershine, that allegedly support the $188,000 figure. *See* GX 1058 – GX 1093.  Had the defense possessed this information prior to trial, it would have used the information in opening statement.  The defense also could have used the information to cross-examine government witnesses who testified about Mr. Williams's significant role on the renovation project. *See* Trial Tr. (Sept. 25, 2008 p.m.) at 12 (John Hess testimony) (attached hereto as Exhibit D); Sept. 26 a.m. testimony of Roy Dettmer; Sept. 26 a.m. testimony of Mike Luther; Sept. 26 a.m. testimony of Daniel McBirney.[6] It could have further questioned government witnesses who claimed to have worked herculean hours on the renovation project at Veco's expense. *See* Sept. 26 a.m. testimony of Roy Dettmer. And, the defense could have used the information from Mr. Williams to cross-examine Ms. Boomershine about the Veco accounting exhibits.  In addition to the exhibits purporting to establish the $188,000 figure, Mr. Williams's exculpatory account of the $2,000 check he wrote to Catherine Stevens would have obliterated the government's insinuations that it was an improper, clandestine transaction, based on out-of-context notes decribed by Ms. Boomershine. *See* Sept. 26 p.m. Tr. (Ex. B) at 41-43; GX 1075.

But the government did not produce the information.  Rather, government counsel sent Mr. Williams back to Alaska, on the first day of trial, apparently in the hope that he would continue his policy of declining to speak to defense counsel and that defense counsel would not have this critical exculpatory information in time to cross-examine Bill Allen or otherwise to use the information at trial.  It then proceeded to offer the Veco accounting records as evidence in support of its $188,000 theory.

---

[6] As of the filing of this motion, the transcript of proceedings on Friday morning, September 26, 2008 was not yet available.

**ARGUMENT**

I.     **THE GOVERNMENT HAS VIOLATED *BRADY* AND HAS PROFFERED MISLEADING EVIDENCE AT TRIAL.**

There can be no question that the information Mr. Williams revealed should have been produced long ago under the *Brady* doctrine.  Under *Brady v. Maryland*, 373 U.S. 83 (1963), and successive cases, including *United States v. Agurs*, 427 U.S. 97 (1976), and *Giglio v. United States*, 405 U.S. 150 (1972), the government is required to produce exculpatory information to the defense.  As Judge Friedman explained in *Safavian*, this duty exists regardless of whether the prosecution may believe the information could affect the result at trial:

> [T]he government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial.  The question before trial is not whether the government thinks that disclosure of the information or evidence . . . might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed.  Because the definition of 'materiality' discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction process for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase.  The only question before (and even during) trial is whether the evidence at issue may be 'favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.

233 F.R.D. at 16.

The undisclosed information here unquestionably is exculpatory and producible under *Brady*.  Indeed, it directly undercuts the government's theory of the case and provides highly significant ammunition for cross-examining government witnesses.  Mr. Williams has informed defense counsel in no uncertain terms that he provided all of this information to the government, which interviewed him on multiple occasions over a two-year period between September 1, 2006 and last week.  And indeed, much of the same exculpatory information

appears in Mr. Williams's grand jury transcript.  But the government never informed defense

counsel of any of it.  Instead, government counsel decided not to call Mr. Williams as a trial

witness and sent him from D.C. back to Alaska on the first day of trial.

Mr. Williams therefore was 3,300 miles away from Washington when the

government proffered Ms. Boomershine's testimony, and the Veco accounting exhibits,

purporting to show – falsely – that Mr. Williams worked 6-7 full days a week, plus overtime, on

the Girdwood renovations.  If Mr. Williams told the government that he did <u>not</u> work all (or even

close to all) of those hours on the Stevens home renovations, then the evidence the government

adduced last Friday, and foreshadowed in its opening statement on Thursday, was grossly

misleading to say the least.  Similarly, Mr. Williams was 3,300 miles away when Ms.

Boomershine offered a "Mission Impossible"-style "reversible document" story about his $2,000

check to Catherine Stevens – an insinuation Mr. Williams now rebuts based on personal

knowledge.

The government has a duty to refrain from putting on evidence that is inaccurate

or misleading.  This duty stems both from the ethics rules, *see* D.C. R. Prof. Cond. 3.3, 3.4, and

from the Fifth Amendment's Due Process Clause, which is violated by prosecutorial conduct that

"shocks the conscience" of the court, *see United States v. Elmardoudi*, No. 06-CR-112-LRR,

2007 WL 2002066, at *2 (N.D. Iowa July 5, 2007) ("If the court finds that the government has

engaged in conduct that "shocks the conscience," the court may utilize the "outrageous

government conduct" rule and dismiss criminal charges to avoid a Fifth Amendment due process

violation.") (*citing United States v. Boone*, 437 F.3d 829 (8th Cir. 2006)).  As discussed below,

the government's violations of its duty to provide *Brady* material to the defense, and of its duty

of candor to the Court, warrant a substantial sanction.

## II.    THE INDICTMENT SHOULD BE DISMISSED.

"Brady violations are just like other constitutional violations.  Although the appropriate remedy will usually be a new trial, a district court may dismiss the indictment when the prosecution's actions rise . . . to the level of flagrant prosecutorial misconduct."  *United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008).  The dismissal remedy is further warranted here, where the facts show more than ordinary *Brady* violations; they also show that the government has presented fundamentally misleading evidence at trial while failing to disclose to defense counsel the very information needed to understand and rebut that evidence.

Courts have not hesitated to dismiss indictments when faced with similarly severe constitutional violations.  For example, in *United States v. Wang*, No. 98 CR 199(DAB), 1999 WL 138930, at *37 (S.D.N.Y. Mar. 15, 1999), the court found a due process violation and dismissed an indictment due to the government's failure to provide defense counsel with "material information" until the "eve of trial," and its delay in disclosing that its key witness was unavailable and would not be called to testify.  Similarly, in *United States v. Lyons*, 352 F. Supp. 2d 1231, 1251-52 (M.D. Fla. 2004), the court dismissed an indictment due to the government's multiple and flagrant *Brady* and *Giglio* violations.  *See also United States v. Sabri,* 973 F. Supp. 134, 147 (W.D.N.Y. 1996) (finding due process violation and dismissing one count of indictment based on government's outrageous conduct in engaging defendant's civil attorney to accumulate evidence for use against him in criminal prosecution); *United States v. Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991) (finding due process violation and dismissing indictment where government interfered in the defendant's attorney-client relationship by using his former attorney to obtain incriminating information upon which indictment was based).

The defense respectfully submits that the above facts demonstrate an egregious constitutional violation that warrants dismissal of the indictment.  Particularly in combination

12

with the government's pattern of failures to provide timely *Brady* disclosures throughout this case, and the government's delays and obfuscations in providing witness and exhibit information to the defense and to the Court during trial, the sanction of dismissal is appropriate.

## III.   IN THE ALTERNATIVE, THE COURT SHOULD DECLARE A MISTRIAL.

At the very least, a mistrial is necessary.  It is axiomatic that when the defendant has established a *Brady* violation, the district court should declare a mistrial.  *See, e.g., Giglio v. United States*, 405 U.S. 150, 153 (1972) (noting that "*Brady v. Maryland*, 373 U.S. at 87, held that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." (internal quotations omitted)); *United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008) ("If the undisclosed evidence is material, a new trial is required.") (*citing Kyles v. Whitley*, 514 U.S. 419 (1995)); *Government of Virgin Islands v. Fahie*, 419 F.3d 249, 252 (3d Cir. 2005) ("[T]he Court has assumed that *Brady* violations that have affected the judgment of a jury normally will be remedied by a new trial . . . ."); *United States v. Evans*, 888 F.2d 891, 897 n.5 (D.C. Cir. 1989) (appropriate relief for a *Brady* violation is a mistrial).

A mistrial is essential in this case because the defense has proceeded with its opening statement, and cross-examination of seven government witnesses, without the critical information from Mr. Williams.  Had the defense possessed this information, it would have used the information in opening statement to rebut the government's emphasis, in its opening, on Veco's alleged $188,000 cost figure.  Had the defense possessed this information, it could have cross-examined Ms. Boomershine's testimony about the Veco accounting documents.  Indeed, the government likely would not have offered Ms. Boomershine to vouch for the accuracy and reliability of those accounting records if it had known the defense was in possession of information from Mr. Williams that directly undermined those records.  Had the defense possessed this information, moreover, it could have cross-examined other government witnesses

who testified about Mr. Williams's significant role in the renovation project on behalf of Veco,

and who testified that they expended extraordinary time on the renovation project.  And, had the

defense possessed this information, it would have prepared differently for Mr. Allen's cross-

examination, which is now only one day away.

## CONCLUSION

The damage to the just presentation of evidence in this trial cannot be undone.  If

the indictment is not dismissed altogether, the Court should declare a mistrial.

Dated:  September 28, 2008

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:    /s/ Craig D. Singer_____
       Brendan V. Sullivan, Jr. (Bar No. 12757)
       Robert M. Cary (Bar No. 431815)
       Craig D. Singer (Bar No. 445362)
       Alex G. Romain (Bar No. 468508)

       725 Twelfth Street, N.W.
       Washington, D.C. 20005
       (202) 434-5000
       (202) 434-5029 (facsimile)

       *Attorneys for Defendant Theodore F. Stevens*