**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.            )<br>)<br>THEODORE F. STEVENS,    )<br>)<br>Defendant.    )<br>_____) | Criminal No. 08-231 (EGS) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS INDICTMENT OR FOR A MISTRIAL**

The United States of America, by and through its undersigned counsel, submits the following opposition to defendant Theodore F. Stevens' motion to dismiss the indictment or for a mistrial.

**INTRODUCTION**

True to form, defense counsel continues with their "win at all cost" tactics. See United States v. Forbes, No. 3:02 CR 00262 (AWT), 2006 WL 680562 at *2 (D. Conn. Mar. 16, 2006). This time, defendant has gone too far, accusing the government of Brady violations and of proffering misleading evidence at trial. Nothing could be further from the truth and, for the reasons set forth below, defendant's motion should be denied in its entirety.

**FACTUAL BACKGROUND**

As the Court knows, the government listed Robert "Rocky" Williams as a potential trial witness during the government's case-in-chief. The government brought Mr. Williams from Alaska to Washington, D.C. for purposes of trial preparation. See Exhibit 1 (Affidavit of Special Agent Chad Joy). At the time when Mr. Williams was subpoenaed, the government anticipated that he would be one of the first witnesses in the government's case-in-chief. However, when Mr. Williams arrived in Washington, D.C. and met with government counsel to prepare for his

testimony, it was apparent to counsel that Mr. Williams had serious, health-related issues that warranted medical attention. Between the time that he had testified in the grand jury on November 7, 2006, and the present, Mr. Williams had become almost unrecognizable. Mr. Williams had lost a substantial amount of weight, his abdomen was distended (and had been previously drained of excess fluid), he appeared jaundiced, his face was gaunt, he had substantially aged, he had chronic coughing spells, and he was frequently short of breath. Ex. 1. In addition, Mr. Williams told the government he lacked energy and was unable to walk far enough to do any sightseeing as he originally hoped. Id.

The government attempted to prepare Mr. Williams for his testimony. It became apparent, however, that Mr. Williams needed to attend to his medical issues. Mr. Williams advised us that he was under the care of physicians in Alaska, and he further advised us that his doctors were calling him because he had missed scheduled, follow-up appointments for blood work and other tests. The government informed Mr. Williams that he should return to Alaska to attend to his health and to meet with his doctors. We informed Mr. Williams that we would be in contact with him to see if he would be able to testify or not. Id.

The government also told Mr. Williams that, because he was under subpoena with defense counsel, he should contact defense counsel and inform them that he was returning to Alaska. Mr. Williams contacted defense counsel before he left Washington, D.C. and so advised them. See Def. Motion at 5 n.3 (conceding that Mr. Williams had advised defense counsel that he had a telephone message with counsel "while he was in [Washington,] D.C." and further conceding that Mr. Williams left a second message on Friday, September 26, 2008). Moreover, prior to leaving Washington, D.C., Mr. Williams informed the government on September 24,

2008, that he had contacted defense counsel by telephone and left a message for them that included his cellular telephone number and the hotel where he was staying. According to Mr. Williams, defense counsel did not return his call. Ex. 1.

Mr. Williams also informed the government on September 26, 2008, that he had low energy, he felt somewhat better after he had arrived back in Alaska. Mr. Williams also told the government that he understood the government's concern about his health-related issues. Id.

On September 28, 2008, the government contacted Mr. Williams by telephone. Mr. Williams told the government that a physician who is a specialist wanted to conduct a follow-up appointment with him to run another series of tests. Mr. Williams advised the government that, although he did not feel bad, he had shortness of breath, needed to gain at least 10 pounds, and that he might need to get intravenous fluids and vitamin B shots if necessary. He further stated that he felt, "90 years old instead of 58." Mr. Williams had a pervasive cough throughout this conversation. The government asked Mr. Williams if it was possible for him to come back to Washington, D.C. to testify after he met with his physicians. Mr. Williams did not respond to this question, but did refer to additional tests that needed to be done and that he needed to take care of these appointments.

\*   \*   \*

Late yesterday afternoon, defense counsel demanded by electronic mail that we immediately turn over Mr. Williams' grand jury testimony and any formal reports of interviews of Mr. Williams so that defendant could file an emergency motion for relief. See Exhibit 2. The government contacted defense counsel, who refused to disclose the basis for defendant's motion or why it was imperative that they immediately receive Mr. Williams' testimony and the Form

-3-

302s.  Notwithstanding defendant's utter lack of good faith negotiation over this issue, we provided defense counsel with a copy of Mr. Williams' grand jury testimony:

> [W]e are still confused as to what your concerns are, but we would very much appreciate an opportunity to discuss them to see if they can be resolved.  To that extent and in the spirit of cooperation, we are willing to provide you with a transcript of Mr. Williams' grand jury testimony for your review.  Please call one of us at your earliest convenience to discuss.

Id.

As the Court also knows, the government has made confidential, Brady-related disclosures concerning Mr. Williams.  Those disclosures are contained in, among other things, the government's letter to defense counsel dated August 25, 2008, and September 9, 2008, and are incorporated by reference herein.  The government, moreover, provided defense counsel with the entire grand jury transcripts of Augie Paone and Robert Persons and, now, Rocky Williams.  In addition to all of this material – including all of the documents produced to defendant – we have provided grand jury testimony of other witnesses pursuant to our obligations under the Jencks Act, 18 U.S.C. § 3500.  The government, of course, stands willing and able to provide all of this information to the Court for in camera review.

Prior to trial commencing this morning, the Court advised us to submit an affidavit from Chief William Welch and an affiant familiar with Mr. Williams' health-related issues.  Those affidavits are attached hereto as Exhibits 1 and 3.

**ARGUMENT**

I. **THERE HAS BEEN NO VIOLATION OF *BRADY***

Defendant's motion is the proverbial "Hail Mary." Rather than focusing on the merits of the government's evidence or the flaws in defendant's response to this evidence, defendant resorts instead to leveling baseless accusations against the government. The faulty premise woven throughout defendant's motion is the idea that the government deliberately suppressed exculpatory evidence that should have been produced pursuant to Brady v. Maryland, 373 U.S. 83 (1963), United States v. Giglio, 405 U.S. 150 (1972), and their progeny.

Defendant erroneously suggests that the government withheld exculpatory information concerning Mr. Williams' involvement in the renovations on defendant's house. In fact, the opposite is true. As a result of the government's substantial discovery in this case, including its Brady-related disclosures, defendant has been give access to material above and beyond the government's obligations. In any event, the material produced by the government to defendant fully refutes defendant's unfounded allegations, which we address in turn.

A. **Mr. Williams' Time at Girdwood**

Defendant contends that Mr. Williams never worked a single full day at the chalet. This statement is contrary to Mr. Williams past statements to the government. In Mr. Williams' grand jury testimony, he stated that he "was usually out there at least three times a week if not more." Grand Jury Testimony, p. 30. Mr. Williams also stated:

> Q: About how many hours a week would you say on average you spent out on this site?
>
> A: On, a good 24, maybe even – sometimes more and sometimes – I would say never less than 24 hours a week. I'd have to make at least two trips out for materials and stuff, and a lot of times I was probably out there – at the first part of this, the framing and the stairs and everything going in, I was probably out there every day.

Id.  Later in Mr. Williams' grand jury testimony, when discussing VECO electricians who were sent to the project, he stated:

> Q:	Well, now you were there during most of this time, is . . . .
>
> A:	I was there . . .
>
> Q:	. . . that correct?
>
> A:	. . . most of the time.  I don't remember . . .
>
> Q:	Okay.
>
> A:	. . . exactly who did what.

Grand Jury Testimony, at 41.

Furthermore, Mr. Williams, during a recent interview, estimated to the government that he spent approximately 2,000 hours working on defendant's Girdwood residence.  He also previously estimated he worked approximately 15-30 hours a week at the Girdwood residence for approximately 10 weeks.  Mr. Williams has not advised the government that he "never worked a single full day on the Girdwood home" as stated in defendant's motion.

Moreover, as part of its Brady-related disclosures, the government informed defense counsel that Bill Allen thought the internal billing costs for VECO may have been too high.  Importantly, as noted in opening arguments, the issue is not whether the work was worth more than $188,000 or less.  The key issue is whether it was worth more than the threshold amounts triggering disclosure on defendant's financial disclosure forms.

### B.	Scope Of Mr. Williams' Work

Defendant asserts that Mr. Williams worked on other projects using his cellular phone while at Girdwood.  Mr. Williams did not offer this information in his grand jury testimony and

has not advised the government that he spent any significant time directing other projects from Girdwood for Allen via his cellular telephone.

Moreover, defendant is aware of various statements from Robert Persons which make clear that Mr. Williams' worked at the site. Specifically, defendant produced to the government an e-mail from Persons to defendant dated 8/23/2000 wherein Persons stated in relevant part: "[I] kind of torment [R]ocky to keep him concentrating on the chalet rather than all the other projects [B]ill keeps him working on. [T]he skies are clear in [G]irdwood and we are still running behind on the chalet, [I] don't want to waste this good construction weather." GX 1033 (also marked as DX 0396).

Defendant also produced to the government an e-mail from Bob Persons dated 9/10/2000 wherein Persons stated in relevant part: "[I] can't emphasize enough how much and how well [R]ocky does, [B]ill has a true gem there the guy works 7 days a week on [B]ill's projects." GX 1017 (also marked as "DX 0436").

Defendant also produced an e-mail dated January 13, 2001 at 3:02 p.m. wherein Persons stated to defendant:

> "[D]ear [S]enator, [I] have just returned form the house and it looks good. [A]ll of the interior walls were finished yesterday and [S]teve finished the shower on the first floor. [T]he electrician and [D]ave [A]nderson's son were the only workers this morning but everyone will be back on the job [M]onday morning. [I] spoke to [R]ocky by phone and he iis [sic] trying to round up special paint and a new wood stove insert that cas wants. [T]he biggest holdup is materials for specialized portions of the construction. [W]e have $30,000 in bills that [R]ocky is trying to get [B]ill to look at and o.k.. [T]here is some concern on [R]ocky's part that we have already paid some of the plumbing bill. [I]t looks to me as if all that is needed is some varnish, underlayment and flooring and trim out but [R]ocky believes it will take until the end of [F]ebruary, [I] don't know what to say, it just does not look like that much work. [I] was only able to keep

> [P]at [J]efferson up here for one week and [I] think we need some more skilled help. [I]'ll call [B]ill [A]llen and see if we can spur this thing up a bit. [L]et me know of any concerns you have and [I] will see to them post hast. [M]y best, bob.

GX 444.

Finally, defendant also produced an e-mail dated January 13, 2001 at 11:08 p.m. wherein Persons stated in relevant part:

> [I] called [B]ill [A]llen to try to speed the operation up and we have played phone tag today, hopefully [I] will get him tomorrow. [I]f you don't need the chalet until [M]arch it may be best to let [R]ocky take his time. [I] am amazed by his attention to detail, he is repainting your old ceiling because you can see the joints. [W]here the tongues and grooves come together. [L]ooked fine to me but [I] know cas will love it when it is finished.

GX 1034 (also marked as DX 0330).

### C. VECO's Involvement With Project

Defendant contends that Mr. Williams advised Allen that VECO should be involved as little as possible in the renovation of defendant's Girdwood residence. Mr. Williams, however, advised the government on numerous occasions that VECO was heavily involved and he so told the Grand Jury. The e-mail traffic produced by defendant noted above also demonstrates that VECO was heavily involved with the project.

The government also previously advised defendant in a Brady disclosure letter that Mr. Williams stated in an interview with law enforcement agents that 99 percent of the work at defendant's Girdwood residence was performed by Christensen employees and that in a subsequent interview Mr. Williams did not recall making that statement. In the same letter, the government also advised defendant that Allen believes Mr. Williams has a drinking problem. The government also advised defendant in a previous Brady disclosure letter that "[t]he

government is also aware of rumors concerning excessive alcohol use by Mr. Williams and it is possible that Mr. Williams may have an alcohol dependency issue."  In that same letter the government advised defendant of Mr. Williams' criminal history that includes convictions for manslaughter, failure to assist/render aid, and DWI

### D. Raising The Girdwood Residence

Defendant contends that Mr. Williams' statement that raising the chalet beyond what was necessary for a daylight basement was not substantially more expensive.  Mr. Williams, however, also testified in his grand jury testimony that expanding the scope of the project made the project more complicated, stating:

> Q: Okay.  Did there come a point in time in which some renovation work started on the house in Girdwood, Senator Stevens' house?
>
> A: Yes, it did.  I think at that time we had already determined that the project had grown from just putting 28 feet of wall up and four-foot high to what was – ended up being a fairly major project.  So – I'm sorry, I . . .

Grand Jury Testimony, p. 12.  Mr. Williams went on to state that cost to jack the house up from 4 to 8 feet was not substantially more expensive, but then stated that enlarging the size meant the project was "wasn't something that was just going to be a fairly simply [sic] job" and at that point suggested getting a contractor involved.  Id., p. 13.

### E. The $2,000 Check

Defendant is already in possession of a cancelled check from Catherine Stevens to Rocky Mr. Williams noting on the memo line that the check was for items from defendant.  Mr. Williams testified in the grand jury about his transaction as follows:

> Q: And did you think this was a fair price for the stuff that you bought?
>
> A: I thought it was a little more than fair.

> Q: And by that, sir, just if you can clarify?
>
> A: Well, the one nice heater was probably worth $800. The electric heater wasn't worth much. And the cabinets. I probably wouldn't have given $1500 for the whole shebang.

Grand Jury Testimony, p. 54. Through discovery, defendant has been aware of this transaction for quite some time.

### F. Defendant's Interest In The Renovation

Defendant is well aware of his own sentiments. Defendant's sentiments as to his motivation for the renovation do not impact whether he was aware of the value of work and materials that he did not pay for or otherwise account for on his financial disclosure forms.

## II. DEFENDANT IS NOT ENTITLED TO A DISMISSAL OR A NEW TRIAL

Defendant's motion fails to establish that any Brady violation has occurred. To find a Brady violation, the Court must determine that (1) the evidence was suppressed by the government; (2) the suppressed evidence was favorable to the accused; and (3) prejudice must have occurred. In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 892 (D.C. Cir. 1999). In order for prejudice to have occurred, the suppressed evidence must be material to the defense. See Kyles v. Whitley, 514 U.S. 419, 432-38 (1995). Materiality is established only if there is a reasonable probability that the evidence would have changed the outcome of the proceeding. In re Sealed Case, 185 F.3d at 892.

The Supreme Court has emphasized that a defense claim that the government failed to produce information that is cumulative, irrelevant, or merely "useful" to the defense is insufficient to establish a Brady violation. E.g., United States v. Ruiz, 536 U. S. 622, 630 (2002) ("But the Constitution does not require the prosecutor to share all useful information with the

defendant."); Weatherford v. Bursey, 429 U.S. 545, 559 (1997) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.").  In addition, the government is not required to provide information that already is known to the defendant and its failure to do so cannot be deemed prejudicial. See United States v. DiGiovanni, 544 F.2d 642, 645 (2d Cir. 1976) ("The government is not required to make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony he might furnish.") (internal citation omitted); United States v. Prior, 546 F.2d 1254, 1259 (5th Cir.1977) ("numerous cases have ruled that the government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (citations omitted).

As the Court explained at length in United States v. Agurs, 427 U.S. 97 (1975):

> The Court of Appeals erred in assuming "that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. . . .  If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice . . . .  Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much . . . .  The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.

Id. at 108-10; see also  Moore v. Illinois, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case"); Zeigler v. Callahan, 659 F.2d 254, 266 (1st

Cir. 1981) (cumulative evidence not material where defense had opportunity to impeach witness by other means).

For the reasons detailed in the factual statement, above, the information defendant frames as the basis for a claim <u>Brady</u> violation was not suppressed, is not favorable to the accused, and is certainly not material.  Accordingly, defendant's motion should be denied.  Further, the proper remedy for a claimed <u>Brady</u> violation at this stage of the proceedings would not be dismissal of the indictment or the declaration of a mistrial.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that defendant's motion to dismiss the indictment or for a mistrial be denied.

>Respectfully submitted,
>
>WILLIAM M. WELCH II
>Chief, Public Integrity Section
>
>/s/
>BRENDA K. MORRIS
>Principal Deputy Chief
>
>NICHOLAS A. MARSH
>EDWARD P. SULLIVAN
>Trial Attorneys
>
>JOSEPH W. BOTTINI
>JAMES A. GOEKE
>Assistant United States Attorneys
>for the District of Alaska
>
>Criminal Division, Public Integrity Section
>U.S. Department of Justice
>1400 New York Ave. NW, 12th Floor
>Washington, D.C. 20530
>Tel: 202-514-1412
>Fax: 202-514-3003

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of September, 2008, I caused a copy of the foregoing "GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR FOR A NEW TRIAL" to be delivered electronically to the following:

> Brendan V. Sullivan, Jr., Esq.
> Robert M. Cary, Esq.
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C.  20005

/s/<br>
Edward P. Sullivan