1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
   -------------------------X
3  UNITED STATES OF AMERICA,      Docket No. 08-231
                    Plaintiff,
4
            v.                    Washington, D.C.
5                                 **Wednesday, October 15, 2008**
                                  2:20 p.m.
6
   THEODORE F. STEVENS,
7                    Defendant.  **\*\*\*SEALED PORTION REDACTED\*\*\***
   -------------------------X
8
        **TRANSCRIPT OF JURY TRIAL - DAY 16 - AFTERNOON SESSION**
9            BEFORE THE HONORABLE EMMET G. SULLIVAN
                  UNITED STATES DISTRICT JUDGE
10

11 APPEARANCES:

12 For the Government:    UNITED STATES DEPARTMENT OF JUSTICE
                         By:  Ms. Brenda K. Morris
13                       1400 New York Avenue, N.W.
                         12th Floor
14                       Washington, D.C.  20005
                         202.514.1412
15
                         UNITED STATES DEPARTMENT OF JUSTICE
16                       By:  Mr. Nicholas A. Marsh
                         10th and Constitution Ave., N.W.
17                       555 13th Street, N.W.
                         Washington, D.C.  20530
18                       202.307.1049

19                       UNITED STATES ATTORNEY'S OFFICE
                         By:  Mr. Joseph W. Bottini
20                       District of Alaska
                         222 W. Seventh Avenue
21                       Federal Building and U.S. Courthouse
                         Anchorage, Alaska  99513-7567
22                       907.271.5071

23 APPEARANCES cont'd on next page.

24

25

1    APPEARANCES, cont'd.

2    For the Defendant:        WILLIAMS & CONNOLLY, L.L.P.
                                By:  Mr. Brendan V. Sullivan
3                                    Mr. Robert M. Cary
                                     Mr. Alex G. Romain
4                                    Ms. Beth Stewart
                                     Mr. Joseph Terry
5                                    Mr. Craig Singer
                                725 Twelfth Street, N.W.
6                               Washington, D.C.  20005
                                202.434.5000
7
     Court Reporter:           Catalina Kerr, RPR
8                              Official Court Reporter
                               U.S. District Courthouse
9                              Room 6716
                               Washington, D.C.  20001
10                             202.354.3258

11   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2           (2:00 P.M.; OPEN COURT; JURY NOT PRESENT.)

 3           THE DEPUTY CLERK:  Please remain seated and come to

 4   order.

 5           THE COURT:  All right, Counsel.  I want to return to

 6   you your letter, Counsel.  With respect to that issue that we

 7   discussed at the bench, I'm going to need more information

 8   from the Government, so I want a declaration filed by the

 9   close of business today addressing the circumstances under

10   which that matter was opened, where -- I mean, when, the

11   reason why, when the decision was made to reopen it or to open

12   it, and I need that today.

13           That's for the Court's eyes only.  Then I'll make a

14   determination about whether and under what circumstances the

15   Defendant should have any information.

16           And also, whether or not the subject of that

17   investigation -- of that -- of that topic knows about it.

18   Sorry to be cryptic, but you understand that.

19           All right.  And if so, when did the subject -- when

20   was the subject informed.

21           With respect to the issues before the Court, as I've

22   indicated, assuming that counsel can make the appropriate

23   connection between 801(d)(2)(E) and 806, then of course you

24   can -- you can use that information against the declarant.

25           Insofar as 803, Subsection 3 is concerned, it's been
```

1  a law in this jurisdiction that at least since 1978 and

2  probably earlier than that, maybe not, as set forth in the --

3  in the case of *United States versus Day,* 192 -- actually, 591

4  Fed 2d 861.  It's a criminal case from the court of appeals.

5          It's been the law in this jurisdiction that -- in a

6  criminal case that the existing mental, emotional or physical

7  condition or indeed a statement of declarant's then existing

8  state of mind, such as intent, plan, motive, is admissible,

9  but the Court went on to say, though, that that evidence, when

10  it comes in, should come in with an appropriate limited

11  instruction, and that's not inconsistent be what this court

12  said earlier.

13          If I allow it to come in, I will tell the jurors

14  that it's not being offered for the truth of the matter

15  asserted.  It comes in arguably with respect to the

16  declarant's state of mind.

17          But I caution you.  There is some borderline --

18  there is some relevance here, but it's borderline relevance

19  because the Defendant's not charged with failing to pay a

20  bill.  He's charged with failing to disclose gifts on a form.

21  So there is some -- there is some relevance with respect to

22  what his state of mind was, vis-a-vis, the bill, but that's

23  completely different with respect to state of mind, intent

24  when it comes to declarations made or not made on the

25  financial disclosure forms, but I'm going to allow it to come

 1   if with an appropriate instruction.

 2           Now, with respect to the expert issue.

 3   Substantially for the reasons advanced by the Government in

 4   its opposition to the motion to admit expert testimony and the

 5   supplemental memorandum that the Court directed the Government

 6   to file with respect to the *Safavian* decision, the Court is

 7   not persuaded that the expert should be allowed to testify and

 8   I therefore will deny that motion, and I reserve the

 9   opportunity, indeed the right to write on that subject at the

10   appropriate time, if necessary.

11           I'm ready to proceed.  Bring the jurors in.

12           Now, Mr. Martin, have a nice day.  Sorry to keep you

13   back in the witness room.  Tell them my apologies.

14           MR. MARTIN:  I will.

15           THE COURT:  All right.

16           (JURY PRESENT.)

17           THE COURT:  All right.  Ladies and gentlemen, good

18   afternoon.  We are going to proceed.  Call your next witness,

19   Counsel.

20           MR. CARY:  Our next witness is Bob Persons.

21           THE DEPUTY CLERK:  Please raise your right hand.

22           (WITNESS SWORN BY THE DEPUTY CLERK.)

23           THE DEPUTY CLERK:  Have a seat.

24           THE COURT:  Good afternoon, sir.

25           THE WITNESS:  Hello, Judge.  Your Honor.  You're

1    Judge or Your Honor?

2               THE COURT:  Both.

3               THE WITNESS:  Both, okay.

4               THE COURT:  How are you today?

5               THE WITNESS:  I'm all right; rather be fishing.

6                          ROBERT PERSONS,

7    having been duly sworn, testified as follows:

8                        DIRECT EXAMINATION

9    BY MR. CARY:

10   Q    Good afternoon, Mr. Persons.

11   A    Sir.

12   Q    Where do you live, sir?

13   A    Girdwood, Alaska.

14   Q    And specifically, where within Girdwood, Alaska do you

15   live?

16   A    Crow Creek Road.

17   Q    And is there a building on Crow Creek Road that you live

18   in?

19   A    Yes, sir.

20   Q    Where is that?

21   A    It's my restaurant, the Double Musky Inn.

22   Q    And could you move the microphone just a little close to

23   your face so I won't have to --

24               THE COURT:  You can sit back and relax and --

25               THE WITNESS:  I don't think I can relax.

1             (LAUGHTER.)

2     Q     (BY MR. CARY)  Sir, where were you born and raised?

3     A     Mobile, Alabama.

4     Q     How did you find your way to Alaska, in short form?

5     A     Short form.  Friend of mine got out of the Army who -- he

6     had gone in the Army after high school and finished his three

7     years, wanted to go to Alaska.  I was working my way through

8     college and was tired of it, so I went with him.

9     Q     And how did you come to work -- Well, do you own the

10    Double Musky Restaurant?

11    A     I do.

12    Q     How did that come to pass?

13    A     Well, I worked for Chrysler Corporation for 11 years,

14    hated it, and got -- managed to get them to transfer me to

15    Alaska.  I wanted to get back to Alaska, and they did.  And my

16    wife and I built a house -- well, we bought a framed up house

17    and finished it in Alaska, in Girdwood.  And you couldn't buy

18    a hamburger there, so we started a little hamburger joint, and

19    that worked, and nine months later the Double Musky failed for

20    the sixth time, so we managed to buy that.

21    Q     What year was that, sir?

22    A     1979.

23    Q     Were you trained as a chef at that time?

24    A     No.

25    Q     How did you get your training in running a restaurant?

1    A    Well, my wife is Cajun from Louisiana and I was -- I had

2    the restaurant, knew how to cook but I didn't know how to cook

3    in a restaurant.   So, I was looking for recipes one day.   I

4    was looking through one magazine and saw an article about Chef

5    Paul Prudhomme and I called him.   He's a Cajun.   I told him my

6    wife was Cajun, that I had this restaurant that I didn't know

7    what to do.

8            So, he invited me down and gave me a months'

9    training and then sent up a chef named Buddy Fitzpatrick back

10   to Alaska with me for a year, and we just got lucky.   People

11   liked it, liked Cajun food.

12   Q    And how long has the Double Musky been in business now?

13   A    Well, we've had it for 30 -- this will be our 30th

14   year.

15   Q    Okay.   And did I understand you correctly that you

16   actually live above the Double Musky on the second floor?

17   A    Yes, sir.

18   Q    Do you have a nickname in Girdwood, Alaska?

19   A    Walking Bob.

20   Q    Why do they call you Walking Bob, if you know?

21   A    Well, I enjoy walking.   I need the exercise and I walk

22   five miles a day.

23   Q    Do you know a Ted Stevens?

24   A    I do.

25   Q    How did you come to know Ted Stevens?

1   A    Met him in the restaurant.   He and his family came for

2   dinner many years ago.

3   Q    And do you know, can you approximate how many years ago

4   that would have been?

5   A    25.

6   Q    And how would you describe your relationship with Ted

7   Stevens and his family today?

8   A    We're friends.

9   Q    Okay.  Did there come a time when you became involved

10   with a renovation of the Senator's home in Girdwood?

11   A    Yes, sir.

12   Q    How did that come to pass?

13   A    Well, Ted and I were talking one day and he has -- his

14   house then, I hear people refer it to as a chalet now, but a

15   chalet is actually just a little mountain hut.   So Ted's

16   always called it a chalet, and we were sitting there one day.

17   He says, you know, Lilly is going off to college and she'll be

18   coming home with friends and there is no place for them to

19   sleep.   He says, you know what I would like to do is lift that

20   house up and put a big room underneath and put bunks around

21   the walls and put -- maybe put a bathroom down there, and that

22   was how it started.

23           MR. CARY:   Okay.   Can I have Defendant's

24   Exhibit 219, please.   This is for identification only.   And

25   could we flip through the three pages for Mr. Persons quickly.

1    Q    (BY MR. CARY)  Do you see that document, sir?

2    A    Yes, sir.

3    Q    What is that?

4    A    That was Senator and Mrs. Stevens -- did this thing

5    change?

6    Q    It actually went to the first page.  Let's go to the

7    second page if we could.  There's a problem with the computer

8    there.  There we go.

9    A    They made me -- they made me their, what do you call it,

10   gave me their power of attorney.

11   Q    Okay.

12            MR. CARY:  Your Honor, I move admission of

13   Defendant's Exhibit 219.

14            THE COURT:  Any objection?

15            MR. MARSH:  No objection.

16            THE COURT:  Admitted.

17            (DEFENDANT'S EXHIBIT 219 ADMITTED.)

18            MR. CARY:  Could we publish that for the jury, sir?

19   Thanks.

20   Q    (BY MR. CARY)  Now, could you explain why you obtained

21   this power of attorney from the Stevenses?

22   A    Yes, sir.  I went over to get his building permit and

23   they wouldn't give it to me without that.

24   Q    They tell you why not?

25   A    Said either they had to do it or I had to have their

1   power of attorney to do it.

2   Q   And by "they," you mean the Stevenses?

3   A   The -- the guy at the planning, municipal office called

4   me, that I had to have their power of attorney.

5   Q   Okay.  Were the Stevenses in Alaska at the time?

6   A   No, sir.

7   Q   How did you go about getting the power of attorney from

8   the Stevenses?

9   A   I called them and they sent it to me.

10  Q   Okay.  And what do you understand the power of attorney

11  authorizes you to do, if anything?

12  A   Sign those papers to get that permit.

13          MR. CARY:  Okay.  Let's turn to the next exhibit

14  then, if we could.  Defendant's Exhibit 431, which is not in

15  evidence yet.

16  Q   (BY MR. CARY)  See what that is, Mr. Persons?

17  A   I do.

18  Q   All right.  And what is it?

19  A   It's their Land Use Permit.

20          MR. CARY:  I move admission of Defendant's Exhibit

21  431.

22          THE COURT:  Any objection?

23          MR. MARSH:  No objection.

24          THE COURT:  Admitted.

25          (DEFENDANT'S EXHIBIT 431 ADMITTED.)

1          MR. CARY:  And could we blow up the lower portion,

2   please.

3   Q    (BY MR. CARY)  Whose signatures is on that Land Use

4   Permit?

5   A    That's mine.

6   Q    And why did you sign it?

7   A    I had to.

8   Q    Okay.  As opposed to the Stevenses, why did you sign it?

9   A    Pardon?

10  Q    As opposed --

11  A    Well, they weren't there.

12          MR. CARY:  Okay.  And if we can move up just a

13  little bit, or actually if we can highlight "Total

14  Construction Valuation."

15  Q    (BY MR. CARY)  Do you see where it says, "Total

16  Construction Valuation"?

17  A    Yes, sir.

18  Q    What is that number?

19  A    $84,878.

20  Q    Do you know how that value is determined?

21  A    That's what we thought it would cost.

22  Q    Okay.  Do you know whether there's any sort of formula or

23  anything like that that's used by the office where you got the

24  permit?

25  A    I don't know.  I don't recall that.

1           MR. CARY:  Okay.  If we could have Government's

2   Exhibit 2, which is already in evidence, please.

3   Q   (BY MR. CARY)  Mr. Persons, do you recognize Government's

4   Exhibit 2?

5   A   I do.

6   Q   What is that?

7   A   That's Ted's original chalet.

8   Q   Okay.  I draw your attention to this kind of appendage,

9   this structure that sticks out on the right-hand side.  Do you

10  know what that is?

11  A   I do.  That's that arctic entry.

12  Q   What's an arctic entry?

13  A   Well, in Alaska, we have extremely cold weather and a lot

14  of blizzards and you -- you -- generally, you don't just go

15  into your living room of your house.  You have to go into an

16  arctic entry, take your skies off, your boots off, whatever,

17  before you go into your house.

18          MR. CARY:  Okay.  Can we have Government's

19  Exhibit 3, please.

20  Q   (BY MR. CARY)  And have I -- what's the structure I've

21  circled there?

22  A   That's the arctic entry.

23  Q   Is that from another angle?

24  A   Yes, sir.

25  Q   All right.  Do you know what happened to the arctic entry

1    in this house?

2    A    Yeah.  I tore it down, almost got killed.

3    Q    How did that happen?  How did you almost get killed?

4    A    Well, you know, it's -- it was kind of not much to it,

5    you know, and I was kind of knocking walls off and suddenly

6    this top collapsed and almost got me.

7                MR. CARY:  All right.  If we could go back to

8    Government's Exhibit 2, please.

9    Q    (BY MR. CARY)  And is there a deck on the front of that

10   structure?

11   A    Yes, sir.

12   Q    Do you know what happened to that?

13   A    I tore that off.

14   Q    Okay.  Do you know what happened to the debris after --

15   after you tore it off?

16   A    A couple of guys from Girdwood came by and threw it in

17   the back of their truck and hauled it down to the dump.

18   Q    Okay.

19               MR. CARY:  Could I have Defendant's Exhibit 197,

20   which is already admitted, and if we could blow up the top

21   half, please.

22   Q    (BY MR. CARY)  All right.  Do you recognize this document,

23   Mr. Persons?

24   A    I do.

25   Q    What is it?

1   A    It's a proposal from Hannah Construction Company --

2   Contracting, whatever.

3   Q    And do you know who obtained this proposal?

4   A    I did.

5   Q    And I see the name "Bob" on there; you see that?

6   A    Uh-huh.

7   Q    Who does that refer to?

8   A    That's me.

9        MR. CARY:   If we could go down to the bottom of the

10  page, please.

11  Q    (BY MR. CARY)  Does -- whose signature is that?

12  A    That's mine.

13  Q    What -- what did -- why did you sign that document?

14  A    Told me they wouldn't do it if I didn't.

15  Q    And what was the purpose of the document?

16  A    To have them come over, Hannah Construction come over and

17  lift the house.

18  Q    Okay.

19       MR. CARY:   Could I have Government Exhibit 10,

20  please.

21  Q    (BY MR. CARY)  What is Government's Exhibit 10,

22  Mr. Persons?

23  A    That's the house after Tony lifted it up.  They put those

24  blocks under it.  They lifted it a little bit at a time and

25  put blocks under each one of them.

1    Q    Did you observe the house in this condition?

2    A    Oh, I did, yeah.

3    Q    Did you -- in addition to retaining the services of

4    Hannah Construction, did you retain the services of another

5    company?

6    A    Yes, sir.

7    Q    And what company was that?

8    A    Redmond Construction Company.

9         MR. CARY:  Could I have 502, please, already

10   admitted, Defendant's.

11   Q    (BY MR. CARY)  What is Exhibit 502, Mr. Persons?

12   A    That's a bill from Redmond.

13   Q    And what is the bill for?

14   A    Excavation, materials and labor.

15   Q    And who is the bill sent to?

16   A    It was sent to me.

17   Q    Okay.  Did you pay that bill?

18   A    No.

19   Q    Okay.  Did you pay the Hannah bill?

20   A    No.

21   Q    Do you know who did?

22   A    Stevens.

23        MR. CARY:  If I could have Defendant's Exhibit 956

24   not in evidence, please.

25   Q    (BY MR. CARY)  Do you recognize Defendant's Exhibit 956?

1    A    I do.

2    Q    What is that, sir?

3    A    That's the -- can you blow that up a little bit?

4    Q    Yes, we can blow up the first part.  That would be great.

5    A    Okay.  That's the Hannah -- for the house lifting,

6    Redmond's for the first part of the dirt work and then Tom

7    Swanson for cutting that tree down.

8    Q    Who is Tom -- Well, who is Tom Swanson?

9    A    Tom's a guy that lives up the end of Crow Creek Road.

10   Q    What work did he do if any at the --

11   A    He cut a big tree down.

12   Q    Who arranged to have that take place?

13   A    I did.

14   Q    Okay.  And who prepared this document, Defendant's

15   Exhibit 956?

16   A    You know, I don't know.  I don't know whether I did that.

17   I probably did that, but I don't know.

18           MR. CARY:  If we could go down to the bottom of the

19   page, if we could, and blow up just the bottom part where

20   it --

21   Q    (BY MR. CARY)  Do you see the line down there next to the

22   Defendant's exhibit sticker?

23   A    I do see it, yeah.

24   Q    And does that refresh your recollection as to when it

25   occurred?

1    A   It does.  I did that.

2    Q   There's some handwriting.  If we could back up.  There's

3    some handwriting on there.  Do you know whose handwriting that

4    is?

5    A   I don't.

6           MR. CARY:  Your Honor, I would move admission of

7    Defendant's Exhibit 956, but subject to connecting it later,

8    and we would not display the handwriting to the jury until

9    such time as we establish whose handwriting that is.

10           THE COURT:  Any objection?

11           MR. MARSH:  Objection, hearsay.

12           THE COURT:  Let me speak with counsel at the Bench.

13           (AT THE BENCH; ON THE RECORD.)

14

15

16

17

18

19           (OPEN COURT.)

20           THE COURT:  Sustained.  He can testify what he did

21    with it.

22    Q   (BY MR. CARY)  Mr. Persons, what did you do with

23    Defendant's Exhibit 956?

24    A   I'm sure I sent it to Catherine.

25           THE COURT:  Don't guess about it.  If you know.

1    A    I sent it to Catherine or faxed it or something.  I don't

2    know what I did with it.  I really don't recall.  I shouldn't

3    even say that.

4    Q    (BY MR. CARY)  Okay.  Let's move on then, if we could.

5            MR. CARY:  If I could have Government's Exhibit 1017

6    already admitted into evidence, please.  If we could blow that

7    up.

8    Q    (BY MR. CARY)  Mr. Persons, what is this document,

9    Government Exhibit 1017?

10   A    That's an e-mail I sent to the Senator.

11   Q    Did you send the Senator e-mails from time to time

12   regarding what was happening at the chalet?

13   A    I did.

14   Q    Is this one of those e-mails?

15   A    Yes, sir.

16   Q    Could you read it for us, please.

17   A    (Reading)  Hello, Senator.  Catherine did give me one

18   check for Hannah, which will pay for the house raising.  We

19   will owe him for a small footing and block he installed, but

20   we're not going to pay him his "off the top of his head"

21   figure of $1200.  That is twice what that work should have

22   cost.

23           (Reading)  We put the center wall up yesterday and

24   should be ready to install the plywood next week.  We won't be

25   finished when you get here but you will be able to see exactly

```
1    what the finished product will be.

2              (Reading)  I can't emphasize enough how much and how

3    well Rocky does.  Bill has a true gem there where the guy

4    works seven days a week on Bill's projects.  Tell Catherine we

5    have a plan to expand the bathroom.  My best, Bob.

6    Q    There's a reference in there to somebody named "Rocky."

7    You see that?

8    A    I do.

9    Q    Who is Rocky?

10   A    That's Rocky Williams.

11   Q    What role, if any, did Rocky Williams have in this

12   project?

13   A    Initially, Rocky was the contractor, was in charge of it.

14   Q    Was Rocky Williams replaced at some point?

15   A    I think so, when Augie took over.

16   Q    Okay.  Who's Augie?

17   A    Augie Paone.

18   Q    And does Augie have a company?

19   A    He does.

20   Q    Do you know the name of that company?

21   A    It's Christiansen Builders.

22   Q    Do you know who Dave Anderson is?

23   A    I do.

24   Q    Who is Dave Anderson?

25   A    That's Bill's nephew.
```

1    Q    Did -- what role, if any, did Dave Anderson play in this

2    project?

3    A    Well, initially, he was helping Rocky when they were

4    putting the subflooring down, and I don't know what he did

5    after that.

6    Q    Did you have a chance to observe Dave Anderson's work

7    habits at all?

8    A    Not any work efforts.

9    Q    Okay.  How would you describe what Dave Anderson was

10   doing at the project?

11   A    Most of the time Dave sat in his truck.

12        MR. CARY:  If I could have Government Exhibit 1040

13   already admitted in evidence, please.  If we could blow up

14   this lower portion there.  That's great.  We need to scroll

15   down just a little bit more.

16   Q    (BY MR. CARY)  All right.  Could you -- what is Government

17   Exhibit 1040, Mr. Persons?

18   A    It's a -- it's a letter from me to Senator.

19   Q    And could you read the -- is it a letter or is it an

20   e-mail?

21   A    It's an e-mail.

22   Q    Could you read the e-mail that you sent to the Senator,

23   please.

24   A    Right.  (Reading)  Hi, Boss.  Glad you're back safely.

25   Thanks for the info on Cas coming in early.  I'll use that to

```
 1   stir the crew up.  They're really doing great.  Bill comes out
 2   quite often and Dave works every day.  I think the house will
 3   really look good with the gray and navy.
 4            (Reading)  I bet the airline races were good.  I
 5   thought about going down, but I'm more interested in the house
 6   and I'm having to deal with some problems that have come up
 7   with Charlie's will.  I'm having to protect his widow from his
 8   children and see to it that we don't have a problem with our
 9   liquor license.  Pretty much have it all under control.
10            (Reading)  Well, I'll report tomorrow and I'll find
11   out why Rocky can't get the pictures to you.  My best, Bob.
12   Q    At what stage of the renovation did you write this
13   particular e-mail?
14   A    That was when they were doing the subflooring and all of
15   that.
16   Q    Okay.  How often was Bill Allen coming to the project at
17   that point in time?
18   A    Once a week.
19   Q    How often was Dave Anderson coming to the project at that
20   point in time?
21   A    Well, at that point he was coming out with Rocky every
22   day.
23   Q    Did that change at some point?
24   A    It did.
25   Q    Was the Senator in town at this time when you're sending
```

1    this report?

2    A    No, no.

3    Q    Was Mrs. Stevens in town at that point --

4    A    No.

5    Q    -- when you sent this report?

6    A    No.

7    Q    Did she come later from time to time, if you recall?

8    A    I don't recall.

9    Q    Okay.  Could you read your response, sir?

10            MR. MARSH:  Objection.

11   A    Their response?

12            THE COURT:  Just a moment.  Response.

13            MR. CARY:  It's in evidence, Your Honor.

14            MR. MARSH:  I don't believe it's Mr. Persons'

15   response.

16            MR. CARY:  I'm sorry.  That was just -- I just

17   misspoke.

18   Q    (BY MR. CARY)  Could you read the Senator's response?

19            MR. CARY:  Objection, Your Honor.

20            THE COURT:  That's fair enough.  I actually see -- I

21   see what the objection is.  We'll move on to the next

22   document.  That's fine.

23            MR. CARY:  If I could have 1041 admitted in

24   evidence, please.

25   Q    (BY MR. CARY)  What is this document, sir?

1  A   (Reading)  Good evening, Senator -- Oh, this is an e-mail

2  from me to the Senator.

3  Q   Could you read that one as well, please?

4  A   Uh-huh.  (Reading)  Good evening, Senator.  Big day

5  today.  The concrete floor was poured for the garage.  Strange

6  how such things become so important and each addition becomes

7  a small triumph.  By the end of the week all the walls will be

8  up, the kitchen floor, new addition, ceiling of the garage and

9  hopefully the new roof over the addition will be complete.

10      (Reading)  We will have the electrical and the

11  plumbing done by next week and we'll be finishing the changes

12  upstairs and bringing in the sheetrock.  That is my goal for

13  the next two weeks.

14      (Reading)  Augie Paone's crew is working like

15  beavers, and he is such an easy fellow to get along with.  You

16  may know Augie.  He lived in the Girdwood for about 20 years

17  and does a lot of construction in the area.  He certainly is

18  one of your ardent fans.

19      (Reading)  Everything is going so smooth thanks to

20  Rocky, Bill and Augie.  I went over and got all the pieces of

21  the tree out of Butch West's yard today.  You'll have firewood

22  for the next umpteen years.

23      (Reading)  I just called the telephone company to

24  get your telephone reconnected so Catherine will have one when

25  she gets here.  My best, Bob.

1    Q    There's a reference there to "Rocky, Bill and Augie."

2    A    Right.

3    Q    As of September 19th, 2000, what role did you

4    understand that Rocky was playing?

5    A    Well, Rocky was still working with Augie and -- I'm

6    not -- you know, I think he was -- whatever needed to be

7    advised on, any advisory capacity, and maybe doing some other

8    stuff, you know.

9    Q    And what role was Augie playing at that point in time?

10   A    Augie was in charge of everything.

11   Q    And what role was Bill playing at that point, from your

12   observation?

13   A    Well, if Bill ever came out, you know, he would -- he'd

14   just -- you know, he didn't stay long or I didn't stay long.

15   I was never there for more than a few -- except for the very

16   beginning, I went over and helped those guys with that

17   subflooring, but after that, a few minutes here, a few minutes

18   there.

19   Q    And what were the occasions, Mr. Persons, in which you

20   would stop by and give these periodic reports?

21   A    I would walk by most every day, you know.  I didn't stop.

22   Sometimes I'd -- you know, I didn't want to interfere with

23   what they were doing, so I'd go by and see what was going on

24   and just go on my way.

25   Q    Was that a difference from the role you played at the

1   beginning of this renovation?

2   A   At the beginning, yeah, I was over there.   I was trying

3   to help out in any way I could.

4               MR. CARY:   Okay.   If I could have Government

5   Exhibit 1022 admitted in evidence, please.

6   Q   (BY MR. CARY)   What is Government Exhibit 1022?

7   A   That -- that was another e-mail from me to the Senator.

8   Q   Could you read that e-mail for us, Mr. Persons.

9   A   (Reading)   Good evening, Senator.   It's me again.   Rocky

10  came by to discuss a few things.   Bill wants to install a

11  jacuzzi in the old blue fixture bathroom and that costs about

12  $2,000.   Do you want to do that?   The plumbers are working now

13  and have already ripped out the old fixtures.   The only thing

14  is your firewood.

15              (Reading)   We're going to build a wire mesh,

16  something, around your firebox because you need at least

17  two inches of clearance and some of your firewood was lying on

18  the firebox and that had fallen down by the water heater.   We

19  want to make sure you don't have a fire hazard.

20              (Reading)   So let me know about the jacuzzi and you

21  will have to tell Bill if you don't want it because he's the

22  big dog.   Lots done today.   My best, Bob.

23  Q   Why did you ask Senator Stevens about the cost of the

24  jacuzzi?

25  A   I didn't know if he wanted to spend $2,000 on a jacuzzi.

1    Q    Okay.  And what was the Senator's response?

2    A    (Reading)  Bob, as a matter of interest, I believe

3    Catherine would like the jacuzzi.  The steam room will be on

4    the first floor.  She will use the bathtub on the second

5    floor, so if you can get the jacuzzi for $2,000, please do it.

6    Thanks.  In a hurry, will be back to you later today, Ted.

7            MR. CARY:  All right.  If I could have Defendant's

8    Exhibit 946, which is not in evidence yet.  If we could blow

9    up those e-mails.

10   Q    (BY MR. CARY)  What is Defendant's Exhibit 946,

11   Mr. Persons?

12   A    It's another e-mail to the Senator.

13   Q    And is it from you?

14   A    It is.

15           MR. CARY:  I move admission of Defendant's Exhibit

16   946.

17           MR. MARSH:  Objection, hearsay, Your Honor.

18           THE COURT:  I'm not sure that last answer is

19   accurate.  The question was --

20   Q    (BY MR. CARY)  Who is it from, sir?

21   A    Oh, who is this from?

22   Q    Yes, the lower e-mail first and then the upper e-mail.

23   A    Right.  It's from me.

24   Q    And what was your e-mail address at the time?

25   A    Muskyx2@aol.com.

```
 1    Q    And who did you send this to?

 2    A    Senator Stevens.

 3    Q    And then there's a response up above?

 4    A    From the Senator, yeah.

 5    Q    And who is the response to?

 6    A    To me.

 7    Q    And is there another e-mail address there as well?

 8    A    Oh, yeah.  To muskyx2@aol.com and stevenscas@aol.com.

 9    Q    Do you know whose e-mail stevenscas@aol.com is?

10    A    That's Mrs. Stevens.

11         MR. CARY:  Now, Your Honor, we move the admission of

12    Defendant's Exhibit 946.

13         MR. MARSH:  Same objection, Your Honor.

14         THE COURT:  I will allow a portion of that, the

15    second sentence.  Actually, the third sentence, I will allow

16    that to come in.

17         MR. CARY:  Okay.  And also the lower half as well,

18    Your Honor?

19         THE COURT:  Let me see.  That's a sentence that

20    comes in, ladies and gentlemen, does not come in for the truth

21    of the matter asserted, just comes in arguably to show state

22    of mind.  You may or may not consider it for that purpose.

23    You are not to consider it for the truth of the matter

24    asserted.

25         MR. CARY:  And, Your Honor, may I have him read the
```

1   initial e-mail that he sent to the Senator first?

2           THE COURT:  Any objection?

3           MR. MARSH:  No objection, Your Honor.

4           THE COURT:  All right.  Admitted.

5           (DEFENDANT'S EXHIBIT 946 ADMITTED.)

6           MR. CARY:  May we at least display the second part

7   and then just have him read the sentence from the upper part?

8           THE COURT:  Sure.

9           MR. CARY:  Great.

10  Q   (BY MR. CARY)  Could you read that, sir.

11  A   (Reading)  Hi, Boss.  May be too late to hook up the

12  washer and dryer in your area.  We did not plumb for it, but I

13  will try.  Ben and Elizabeth and the kids were down last

14  evening and Ben is quite impressed with the new house.  It is

15  really taking shape and you will be amazed at the size

16  difference.  We're adding about 1500 square feet and remaking

17  the kitchen and old bathroom.

18          (Reading)  The Redmonds have done a marvelous job of

19  contouring the land around the house, foundation, house and

20  foundation.  We will have some more bills from them.  I keep

21  worrying about the cost because we have added so much.  I'm

22  doing the best I can to keep the expense down.  My best, Bob.

23          MR. CARY:  And now, Carol, I think we need to take

24  it off the screen for the jury.

25  Q   (BY MR. CARY)  But Mr. Persons, I would like for you to

```
 1   read the third sentence of your response.  Beginning, I
 2   believe -- I believe it begins with the words "Don't worry."  Do
 3   you see that?  I'm sorry, Senator Stevens' response to you.
 4   A    Okay.  (Reading)  Don't worry about the added cost.  I
 5   expected it when we started making changes and we have
 6   arranged for a mortgage to pay off all the costs right away.
 7             Continue?
 8   Q    No, I think you need to stop right there.
 9             Mr. Persons, what was your understanding as to who
10   was going to pay for the costs of this renovation?
11             MR. MARSH:  Objection, Your Honor.
12             THE COURT:  Sustained.
13             MR. CARY:  Could I have Defendant's Exhibit 434,
14   which is in evidence.
15   Q    (BY MR. CARY)  Do you recognize that document, sir?
16   A    Could you blow it up a little bit?
17   Q    Yes.
18   A    I can, yes.
19   Q    What is that, sir?
20   A    That's a bill from the Redmonds.
21   Q    And if we could back down a little bit.  Do you know what
22   it's a bill for?
23   A    It was more of the work on the property, Northland.  It
24   was for the labor and materials and they had already paid that
25   first $1200.  So it was labor, materials and the previous
```

1   payment.

2   Q    Okay.  Did you present this bill to anybody to make sure

3   it gets paid?

4   A    I did.

5   Q    Who did you present it to?

6   A    Senator Stevens.

7   Q    And is there any particular person you would have given

8   it to?

9   A    Probably Catherine.

10          MR. CARY:  If we could have Government Exhibit 1035,

11  please, already admitted.

12  Q    (BY MR. CARY)  What is Government Exhibit 1035,

13  Mr. Persons?

14  A    It's a letter.  It's from -- it's from me to the Senator.

15  Q    And you say it's a letter.  Is it different --

16  A    E-mail.  I never write letters, really, hardly ever write

17  letters.

18  Q    Okay.  Could I ask you to read it but this time there's

19  some other stuff in there.  Just start on the second line --

20  actually, where you say, "I went over to the house today."

21  A    Oh, okay.  (Reading)  I went over to the house today and

22  noted it a bit and I think things will start moving very

23  quickly now.  The plumbing is roughed in and the appliance

24  shouldn't take that long to install.  Rocky tells me that a

25  four-man crew should be able to hang the sheetrock in one day.

```
 1    Right.  The electrician should be here within the next two
 2    weeks and hopefully we will be through by the end of October.
 3              (Reading)  That's pretty fast, I suppose, for all
 4    that's being done.  Augie and his crew are there every day.
 5              And do I continue?
 6    Q    (BY MR. CARY)  Yes, please.
 7    A    (Reading)  Augie and his crew are there every day and
 8    work diligently and expertly.
 9    Q    Okay.  I think that's good enough because that's the part
10    that talks about the house.
11              MR. CARY:  How about Government Exhibit 1036,
12    already admitted, please.
13    Q    (BY MR. CARY)  And what is that document, sir?
14    A    It's a letter from me -- e-mail from me to the Senator.
15    Q    And could you -- could you read that for us, please.
16    A    (Reading)  Good morning, Senator.  We are back and all is
17    well here.  Lots of snow on the mountain and cold here in the
18    valley.  I was a bit disappointed in the progress on the
19    house, but Rocky said the weather was miserable last week.
20    They still slacked off.  The plumbing is mostly done and the
21    electrician was there yesterday.
22              (Reading)  It is good that Catherine is coming to
23    town.  We will have some bills, a little from Redmond, Hannah
24    and the first bill from Augie.  It should be a total of about
25    $15,000.  I hope you have recovered from your operation and
```

1    are feeling good.  Everyone in Alaska wants you to be in

2    tiptop shape.  You know what's good for Alaska --

3    Q    That's good enough.  That's good enough.  That's the part

4    that --

5    A    Okay.

6         MR. CARY:  Could I have Defendant's Exhibit 966,

7    which is not in evidence yet.

8    Q    (BY MR. CARY)  What is Defendant's Exhibit 966?

9    A    It was a letter from me to Ted.

10   Q    Okay.  And you keep saying letter, but do you mean --

11   A    An e-mail, I'm sorry.  E-mail.

12   Q    Okay.  And could you read that one for us, please.

13        MR. MARSH:  Objection.

14        MR. CARY:  I'm sorry.  I move Defendant's

15   Exhibit 966 in evidence.

16        MR. MARSH:  Hearsay and relevance, Your Honor.

17        THE COURT:  Let me just read it.

18        (PAUSE.)

19        THE WITNESS:  That's why he wouldn't have dinner

20   with me the other night.

21        MR. CARY:  Just a moment.

22        (PAUSE.)

23        THE COURT:  Sustained.

24        MR. CARY:  Government Exhibit 1023 already admitted,

25   please.

1   Q    (BY MR. CARY)  Would you read that e-mail for us, please.

2   A    (Reading)  Good evening, Senator.  Hope you are well.

3   The house is taking shape.  Roofs are on, deck is on, windows

4   are in, electrical is done, plumbing is waiting for fixtures.

5   We have to put the window in the master bedroom and we expect

6   to foam the insulation in next week, then we can sheetrock the

7   walls, install the doors and start on the kitchen.

8        (Reading)  There is so much that it will take us

9   until the end of November to finish, according to Rocky.

10  Bills are coming in, another $2200 from Redmond, $15,000 from

11  Christiansen Construction Company, Augie.  Bill and I went

12  over Augie's bill tonight and it looks like an excellent deal.

13  He did not overcharge for anything.

14       (Reading)  Bill is a champ for keeping Rocky and

15  Dave on the job and securing Augie's construction company to

16  do the concrete and most of the carpentry.  These guys went

17  well beyond my level sometime back and I just stay out of the

18  way and call Chugach and the telephone company and the gas

19  company when needed.  Hate to spend your money, but I think

20  the only person who has made a lot of money on this is Hannah,

21  that rickety blank-blank, and I told him so.  Take care, Bob.

22  Q    Do you know whether Mr. Hannah got paid?

23  A    He got paid.

24  Q    Did there come a time, sir, where you were less involved

25  in the project?

1   A   Yeah, I was -- after the first couple of months, you

2   know, a minute here, a minute there, people ask me questions,

3   I'd get answers, that sort of thing.

4   Q   Is there a time of year when you normally take a trip?

5   A   I do.  I left on the 27th of October and didn't come

6   back until sometime in December.

7   Q   And is -- do you have any sort of practice with respect

8   to an annual time where you take a trip?

9   A   I close down my restaurant every November.  Typically,

10  some part of October, some part of December and all of

11  November.

12  Q   Did you come back in December of 2000?

13  A   I did.

14  Q   What was the status of the house then?

15  A   Pretty much done, I think.  December of 2000?

16  Q   Yes, Your Honor -- I mean, yes, Mr. Persons.

17  A   Well, I think everything was pretty much closed up and

18  they were just doing finish work.

19  Q   Do you know when the house was actually finished, was in

20  fact completed, the renovation work?  And let me try to help

21  you actually refresh your recollection.  If I could have

22  Government's Exhibit --

23          MR. MARSH:  Excuse me, Your Honor, he didn't give

24  the witness a chance to answer.

25          THE COURT:  Go ahead and answer.

1          (LAUGHTER.)

2    Q    (BY MR. CARY)  Go ahead and answer.  I apologize,

3    Mr. Persons.

4    A    That's been seven years ago, eight years ago.  I think it

5    was pretty much -- it was either the finish work by that time,

6    you know, in December and January of 2001 they were doing, you

7    know.  Pretty much done.

8          MR. CARY:  Could I have Government Exhibit 1034,

9    which is admitted in evidence.

10   Q    (BY MR. CARY)  And, sir, I would ask you to begin reading

11   on the third line on the far right where it says, "I called Bill

12   Allen."

13   A    (Reading)  I was wrong about it being --

14         MR. MARSH:  Objection, he's already testified as to

15   his understanding as to when the house was done.

16         THE COURT:  He did.

17         MR. CARY:  I'm moving on, Your Honor.

18         THE WITNESS:  Well, excuse me, Your Honor.

19         THE COURT:  Just a minute, just a minute.  Ask the

20   next question.

21         MR. CARY:  I was going to ask him to read this

22   communication that's already in evidence.

23         THE WITNESS:  But -- but --

24         THE COURT:  Just a minute, just a minute, sir.  You

25   can't ask that.  It's already been admitted.  He can read it.

1    A    You want me to read some of this?

2    Q    (BY MR. CARY)  Yes.

3    A    You want me to read the whole thing?

4    Q    Yeah, beginning with the words, "I called Bill Allen."

5    And I note, Mr. Persons, that you need to -- I know I told you

6    this, to sit close to the microphone, but you need to back up

7    just a little bit.  People are having a hard time

8    understanding.

9    A    (Reading)  I called Bill Allen to try to speed the

10   operation up and we have played phone tag today.  Hopefully, I

11   will get him tomorrow.  If you don't need the chalet until

12   March, it will be best to let Rocky take his time.  I am

13   amazed at his attention to detail.  He is repainting your old

14   ceiling because you can see the joints where the tongue and

15   grooves are coming together.

16          (Reading)  Looked fine to me, but I know Cas will

17   love it when it is finished.  Thanks for everything, Bob.

18   Q    Okay.  Mr. Persons, there was -- did there come a time

19   when it was finished?

20   A    Right.  But let me say that --

21          THE COURT:  You've answered the question.  Next

22   question.

23          MR. CARY:  Okay.

24   Q    (BY MR. CARY)  Let's fast-forward to 2002 if we could,

25   please.

1    A    Okay.

2    Q    And I ask you, sir, if there were any issues -- actually,

3    let me back up.  Were there any issues with the roof on this

4    porch that you noticed in your rounds walking through

5    Girdwood?

6    A    The roof on the porch, it was slatted and water dripped

7    through it.

8    Q    And did that create any issues with respect to snow and

9    the like?

10   A    It did.

11          MR. CARY:  Could I have Defendant's Exhibit 408,

12   which has already been admitted.

13   Q    (BY MR. CARY)  What is Defendant's Exhibit 408,

14   Mr. Persons?

15   A    That's snow on the roof and they -- that snow packed

16   above the garage.

17   Q    Is that the condition you were just talking about?

18   A    Yes.

19   Q    Okay.  Did you observe that condition personally?

20   A    I did.

21   Q    Did you attend to that condition?

22   A    I tried to.

23          MR. MARSH:  Objection.

24          THE COURT:  Sustained.  Rephrase that.  What, if

25   anything, did you do about that condition?

```
 1   Q    (BY MR. CARY)  What, if anything, did you do about that
 2   condition?
 3   A    I chipped it off.
 4   Q    What happened when you chipped it off?
 5   A    Well, fortunately, I was standing to one side when it
 6   came off.  It was so heavy that it cracked the sheetrock
 7   inside that garage.
 8   Q    And did you make any reports about that condition to
 9   anybody?
10             MR. MARSH:  Objection, Your Honor, leading.
11             THE COURT:  Sustained.  Refrain from leading.  It's
12   your witness.
13   Q    (BY MR. CARY)  What did you do -- what did you do when --
14   after that happened?
15   A    I told the Senator about it.
16   Q    Did there come a time where you observed, in your walking
17   around Girdwood, that --
18             THE COURT:  Sustained, Counsel.  Let him testify.
19   You can't lead your own witness.
20             MR. CARY:  Excuse me.
21   Q    (BY MR. CARY)  Can you tell me whether or not you made any
22   observations regarding any remedies or repairs to that
23   condition?
24             MR. MARSH:  Objection.
25             THE COURT:  Sustained.
```

```
 1   Q   (BY MR. CARY)  You can't answer, Mr. Persons.

 2   A   Okay.

 3   Q   What happened next with respect to that condition?

 4   A   They put some heat tape on.

 5   Q   Did you observe the heat tape?

 6   A   I did see the heat tape.

 7   Q   What observations, if any, did you make about the heat

 8   tape?

 9   A   I didn't think it would work.

10   Q   Okay.  Fast-forward to the year 2002, Mr. Persons.  Did

11   you notice any changes to the chalet in that year?

12   A   Yes, sir.  In 2002, are you asking me what I saw?

13   Q   Yes, what did you observe?

14   A   A new bottom deck.

15   Q   Did you have any discussions with Senator Stevens about

16   that new bottom deck?

17           MR. MARSH:  Objection, that calls for speculation.

18           THE COURT:  Well, he can answer the question.  He

19   can't say what the Senator said.

20   A   No, I just told him that it looked good.  It was there.

21   Q   (BY MR. CARY)  Did you have any discussions with Senator

22   Stevens about bills for that bottom deck?

23   A   I don't think so.  Nobody gave me a bill at all.

24           MR. CARY:  If I could have Government Exhibit 497,

25   please, already in evidence.
```

1    Q    (BY MR. CARY)  Do you see that, sir?  Do you see that; is

2    that an e-mail?

3    A    Uh-huh.

4    Q    And from whom to whom?

5    A    From me to the Senator.

6    Q    And I would ask you to read that if you could, please.

7    A    (Reading)  Dear Ted, went by the house Friday and all is

8    well.  The downstairs deck with cover is in place, has been

9    painted and looks great.  They left the lights on and I went

10   to the third floor to discover a new wall fan in your bedroom

11   which creates some circulation, plus the windows are being

12   covered with the tinting material that Cas requested.

13        (Reading)  We have a system for the de-icer that

14   can't be mistaken and the Sequoia has not broken ground.

15   Those apple trees are behaving the same as last year, and I'm

16   concerned about them getting hit with an early snowfall before

17   the leaves fall.  I'll ask an expert tomorrow.  The front is

18   completely tinted while the deck dries.  Spoke to Bill about

19   your concerns and all is well.

20        (Reading)  We can't find a likely colt at the

21   Barretts sale and Darrell is looking elsewhere.  Jim Janssen

22   is the only person who has not sent his money.  My best, Bob.

23   Q    When you "spoke to Bill about your concerns and all is

24   well," to what were you referring there?

25        MR. MARSH:  Objection, calls for hearsay.

```
 1            THE COURT:  He says what were your concerns?
 2            THE WITNESS:  Oh, I didn't have any concerns.  No, I
 3   was concerned about the trees.
 4            THE COURT:  You just answered the question.
 5   A    I was concerned about the trees.
 6   Q    (BY MR. CARY)  Okay.  Mr. Persons, let me ask you this:
 7   Did you ever say to Bill Allen --
 8            THE COURT:  Don't lead him.  Don't lead him.
 9            MR. CARY:  Your Honor, this is Rule 806.  I'm
10   allowed to --
11            THE COURT:  Don't lead him.  You're not going to
12   lead him.
13            MR. CARY:  May I approach, Your Honor?
14            THE COURT:  No.
15   Q    (BY MR. CARY)  Can you tell me, sir, whether or not you
16   ever said -- whether or not you ever said, "Bill" --
17            THE COURT:  Don't lead him.  Ask a question, but
18   don't lead him.
19            MR. CARY:  Your Honor, I respectfully ask to
20   approach about this.
21            THE COURT:  Rephrase the question, Counsel.  What,
22   if anything, did you say to whom when.
23   Q    (BY MR. CARY)  What, if anything, Mr. Persons, did you say
24   to Bill Allen regarding bills for work done on the chalet?
25            MR. MARSH:  Objection, Your Honor.
```

1          THE COURT:  Let me speak with counsel at the bench.

2          (AT THE BENCH; ON THE RECORD.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          (OPEN COURT.)

1        THE COURT:  I'll allow it.  I'll allow the question

2    to be asked.

3    Q    (BY MR. CARY)  Mr. Persons.

4    A    Yes, sir.

5    Q    Did you say to Bill Allen, "Bill, don't worry about

6    getting a bill, Ted is just covering his ass?"  Did you say

7    that to Bill Allen?

8    A    No.  Crazy.

9    Q    Mr. Persons --

10        MR. SINGER:  If I could have Government Exhibit 203,

11   please, already admitted in evidence.

12   Q    (BY MR. CARY)  Could you tell me what Government

13   Exhibit 203 is, sir.

14   A    Yes, sir.  That's a bill from Chugach Sewer & Drain.

15   Q    And did you receive this bill?

16   A    I did.

17   Q    And what did you do with it when you received it?

18   A    I faxed it to Senator Stevens.

19   Q    And what's the next thing that happened with respect to

20   that bill, from your perspective, after you faxed it to

21   Senator Stevens?

22   A    Got real ugly.  Bill and I were talking, and as we were

23   talking, I noticed for the first time that it said, "Labor

24   paid by Bill," so I was shocked.

25        I knew that Bill wanted to -- he had told me that he

1   wanted to pay the labor and didn't want Ted to know about it,

2   so I felt real bad about it, and I apologized to him for

3   letting Ted know, and told him that, you know, of course the

4   only reason I let him know is because I didn't read the bill.

5   I just get the bills and stick it in the fax machine and there

6   it goes, so...

7   Q   Mr. Persons, were you in Washington, D.C. during January

8   of the year 2001?

9   A   I was, yes, sir.

10  Q   And did you have occasion to be at the Union Station

11  doing some shopping?

12  A   Yes, sir.

13  Q   And who was there with you?

14  A   Bill Allen and some lady was with him.

15  Q   Okay.  And did you happen to go by the Brookstone store?

16  A   We did, yes, sir.

17  Q   And what took place at the Brookstone store?

18  A   I had this back massage chair at home and I saw one

19  there, and Bill and I talked about it and said we should get

20  it for the Senator.

21  Q   And what -- did you in fact get it for the Senator?

22  A   I did, yes, sir.

23  Q   Who paid?

24  A   I did.

25  Q   Did there come a time where you communicated the fact

1    that you purchased this chair to Senator Stevens?

2    A    Yes, sir.

3             MR. CARY:   Can I have Government Exhibit 451, which

4    is in evidence.

5    Q    (BY MR. CARY)   What is Government Exhibit 451,

6    Mr. Persons?

7    A    Can I say --

8             THE COURT:   Just answer the question.

9    A    Okay.  All right.  (Reading)  Good morning, Senator.

10   When speaking with the Brookstone representative, he advised

11   me that he needed a local contact in case he had trouble in

12   delivering my chair.  I hope it was okay for me to give him

13   DeLynn's name and number.  You are so right.  You cannot call

14   that a chalet now.  It is a remarkable house.

15   Q    (BY MR. CARY)   That's enough.  We were just talking about

16   this chair now.

17   A    All right.

18            MR. CARY:   Could I have Government's Exhibit 462

19   already admitted.

20   Q    (BY MR. CARY)   And, sir, can you read that for us, please.

21   A    (Reading)  Bob, the chair arrived and I tried it out last

22   night.  It is great.  I can't tell you how much I enjoyed it.

23   Catherine and Beth tried to get me out of it.  I just went to

24   sleep in it.  Thank you and thanks to Bill.  It will be a

25   Godsend this year.  It is just a loan, but I really appreciate

1  it being here now.  With regard to Janice, I don't know her.

2  She came on me hard and said she wants to do work for the

3  things you and I want for Girdwood.  Who is the opposition?

4  Ted.

5  Q   Okay.  Mr. Persons, did you have a discussion with

6  Senator Stevens about the chair?

7  A   I did.

8  Q   And what was your intention when you bought the chair?

9  A   A gift to him.

10 Q   Did that intention change?

11 A   It did.

12 Q   Why?

13 A   He told me he couldn't accept it.

14 Q   Mr. Persons, did you receive -- did you know who Courtney

15 Boone is?

16 A   I do.

17 Q   Who is Courtney Boone?

18 A   She's a lady that worked for the Senator.

19 Q   Did you receive a call from Courtney Boone in the year

20 2004?

21 A   Yes.

22 Q   What was the nature of that call?

23 A   Something about an article coming out in the Anchorage

24 Press.

25 Q   And did she ask you a question --

```
1    A   She did.

2    Q   -- or questions?  And did you respond to her?

3    A   I did.

4    Q   What did you tell her?

5    A   I told her that --

6    Q   Actually, let me ask, what did she ask you first?

7    A   She asked me who paid for the --

8            MR. MARSH:  Objection.

9            THE COURT:  Sustained.

10   Q   (BY MR. CARY)  What did you tell Ms. Boone?

11   A   I told her the Senator paid every bill he got.

12   Q   Backing up to the chair for a minute.  Did you have

13   occasion to testify before a grand jury in this matter?

14   A   I did.

15   Q   And when you testified before the grand jury, had you had

16   a chance to see the e-mails that we looked at about the chair?

17   A   I had not.

18   Q   And was your testimony before the grand jury different

19   than it is today?

20   A   It was.

21   Q   And why is that, sir?

22   A   My attorney showed me those e-mails and that brought it

23   back to me.  I remember it then after seeing the e-mails, that

24   the Senator told me he couldn't accept that chair.

25   Q   How many days did you testify before the grand jury?
```

1   A   Two days.

2   Q   Did the Government -- there were Government attorneys

3   there?

4   A   There were.

5   Q   Were there any Defense attorneys there?

6   A   No.

7   Q   Were you asked about the comment upon -- that you

8   allegedly made to Bill Allen about Ted just covering his ass

9   during any of those two days?

10  A   No.

11  Q   Were you asked that?

12  A   No.

13  Q   How many times have you been interviewed by the FBI?

14  A   Three.

15  Q   On any of those three occasions, were you asked about the

16  comment that you supposedly made to Bill Allen, "Ted is just

17  covering his ass"?

18  A   Absolutely not.  Nobody's ever me asked me that question

19  before.

20  Q   Can -- when is the first time you were interviewed by the

21  FBI?

22  A   Oh, when all this came down, when they came in and did a

23  search warrant on my house.

24  Q   Can you describe what it was like to be interviewed by

25  the FBI?

```
 1            MR. MARSH:  Objection, Your Honor.

 2            THE COURT:  Sustained.

 3   Q    (BY MR. CARY)  Mr. Persons, who is Jim Kaiser?

 4   A    Jim is a stained glass artist in Girdwood.

 5   Q    What's your relationship to Jim Kaiser?

 6   A    He's been a friend for 30-plus years.

 7   Q    How did you first get to meet him?

 8   A    I kind of inherited Jim when I bought the Double Musky.

 9   He lived in a little log cabin there at the -- on the

10   property.

11   Q    Do you charge rent to Mr. Kaiser?

12   A    No.

13   Q    Mr. Persons, have you ever said that Catherine says --

14   "Catherine Stevens said that Ted Stevens gets hysterical when

15   he has to spend his own money"?

16            MR. MARSH:  Objection, hearsay.

17            THE COURT:  Sustained, Counsel.

18   Q    (BY MR. CARY)  Mr. Persons, can you tell me whether or not

19   you have ever made statements reflecting what Catherine says --

20   Catherine Stevens says about Ted's attitude about spending his

21   own money?

22            MR. MARSH:  Objection.

23            THE COURT:  I will allow that without telling us

24   what the statements are.  Have you?

25   A    I have.
```

1    Q    (BY MR. CARY)  And what was that statement?

2              MR. MARSH:  Objection.

3              THE COURT:  I'm going to sustain that objection.

4              MR. CARY:  Your Honor, a response to audio that was

5    in here, audio that was played.

6              THE COURT:  Let me speak with counsel.

7              (AT THE BENCH; ON THE RECORD.)

8

9

10

11

12

13

14

15

16

17

18

19              (OPEN COURT.)

20              THE COURT:  Ladies and gentlemen, we're going to

21   take a break in just one second, all right.  I haven't

22   forgotten you.  All right.  I will allow that one question.

23   Q    (BY MR. CARY)  Mr. Persons, have you ever said -- told

24   anybody that "Catherine Stevens says that Ted Stevens gets

25   hysterical when he has to spend his own money"?

1    A    I have.

2    Q    What did you mean by that, sir?

3    A    It was a joke.

4         THE COURT:   I'm going to curtail your examination.

5    It's 3:25.   How many more questions you have?

6         MR. CARY:   Half a dozen at the most.

7         THE COURT:   All right.   Go ahead.

8    Q    (BY MR. CARY)   Mr. Persons, have you participated in a

9    horse racing business venture with other people?

10   A    I have.

11   Q    And who's in that horse racing venture?

12        MR. MARSH:   Objection, Your Honor, relevance.

13        THE COURT:   I don't know whether it is or not, but

14   I'll let the question be answered.

15   A    Well, there is presently there is nine members.

16   Q    (BY MR. CARY)   Okay.   Is Ted Stevens one of those members?

17   A    Yes.

18   Q    Can you tell me whether or not Senator Stevens has a

19   habit, in terms of paying his share of that horse --

20        MR. MARSH:   Objection, leading.

21        THE COURT:   Yeah, I'm going to sustain that

22   objection.

23        MR. CARY:   Your Honor.

24        THE COURT:   Sustained.   Move on.

25   Q    (BY MR. CARY)   Does Senator Stevens eat at your

```
 1    restaurant, sir?

 2    A    Pardon me?  Yes, sir.

 3    Q    How often?

 4    A    When he's in town, quite a bit.

 5    Q    Is there a pattern or practice or habit that he has with

 6    respect to the bills for dinner at your restaurant?

 7              MR. MARSH:  Objection.

 8              THE COURT:  I'll allow it for whatever relevance it

 9    has, if any.  I'll allow it.

10    Q    (BY MR. CARY)  What is that habit, sir?

11    A    He always pays his own bill.

12              MR. CARY:  Subject to one additional issue, Your

13    Honor, that's all I have.

14              THE COURT:  All right.  We're going to take our

15    15-minute recess, ladies and gentlemen.  Return in 15 minutes.

16              (A BRIEF RECESS WAS TAKEN.)

17              (JURY NOT PRESENT.)

18              THE DEPUTY CLERK:  Please remain seated.

19              THE COURT:  There was some testimony about this

20    horse racing venture.  I recall that.  I'll allow some

21    questions, a few questions with respect to his ability to pay

22    bills.

23              MR. MARSH:  Your Honor, there is one thing we wanted

24    to bring up.  I believe most of us in the courtroom heard this

25    as we left.  The witness interacted with the jury to some
```

1    significant degree, at least for us.  The witness was joking

2    and laughing to the jury.  I personally couldn't tell whether

3    it was initiated by the witness or not, but there was some

4    significant contact.

5           In fact, I believe that the witness had to be

6    escorted away from the jury as the juror was leaving.  I

7    didn't personally see any reactions of the jurors, but

8    there -- it did appear as though there was contact.

9           THE COURT:  I think I left in front of the jury.

10   Sometimes I don't.  I didn't notice anything.  I don't know.

11          MR. CARY:  You actually did leave first, Your Honor,

12   and I think Government Counsel and I saw at the same time, and

13   I think Addy may have seen it as well.  I couldn't tell you

14   what was said.  There was just a little conversing back and

15   forth.

16          THE COURT:  What do you want me to do?

17          MR. MARSH:  Pardon?

18          THE COURT:  What would you like me to do?

19          MR. MARSH:  I'm concerned, Your Honor.  I'm

20   concerned that -- that's something that we haven't had happen.

21   I haven't seen that happen before.  I am concerned about it.

22          THE COURT:  Let me speak with counsel and the

23   marshal at the bench.

24          (AT THE BENCH; ON THE RECORD.)

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          (OPEN COURT.)

18          THE COURT:  All right.  Apparently no one saw or

19  heard anything inappropriate.  I'll give him the same

20  instruction that I normally give witnesses, and I will remind

21  the jurors again that they are not to speak to anyone about

22  the case.

23          I have no reason to believe that anything

24  inappropriate was said by the witness, and no one is asking me

25  to do anything else, correct?

```
1              All right.  We'll bring the panel back in.

2              MR. MARSH:  We'd just ask that the witness be given

3    the instruction.

4              THE COURT:  All right, I'll do that.  Carol, before

5    you bring them in, I'll talk to the witness.

6              All right.  Mr. Persons, we are going to proceed

7    with the examination by Senator Stevens' attorney.  I have to

8    instruct you like I would any other witness not to have any

9    engagement with any of the participants, the jurors, don't

10   speak with anyone.

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  Okay.  Did you say something to the

13   jurors when you were leaving?

14             THE WITNESS:  I did.

15             THE COURT:  What did you say?

16             THE WITNESS:  I said, "Do you have a bathroom back

17   there?"

18             (LAUGHTER.)

19             THE COURT:  All right.  It's fairly innocuous, but I

20   have to instruct you not to have any further conversation.

21             THE WITNESS:  I won't.

22             THE COURT:  With any of the participants or

23   especially the jurors.

24             THE WITNESS:  Yes, sir.

25             (JURY PRESENT.)
```

```
 1                    THE WITNESS:  Do I have to stand up?

 2                    THE COURT:  Go ahead.

 3                    All right.  You can proceed.  There was some direct

 4       testimony about the horse racing venture.  I'm going to allow

 5       some cross-examination in that area.  Counsel.

 6       Q    (BY MR. CARY)  Mr. Persons, just a couple of questions

 7       about the horse racing, please.

 8       A    Yes, sir.

 9       Q    Can you tell me whether or not Senator Stevens has a

10       habit with respect to paying his share of the expenses in the

11       horse racing venture?

12       A    Yes, sir.

13       Q    What is that habit?

14       A    He's generally the first pay.

15                    MR. CARY:  No further questions.

16                    THE COURT:  All right.  Redirect?

17                    MR. CARY:  Actually, that was the end of direct,

18       Your Honor.

19                    THE COURT:  I'm sorry.  Cross-examination.  Sorry.

20                              CROSS-EXAMINATION

21       BY MR. MARSH:

22       Q    Good afternoon, Mr. Persons.

23       A    Hi, Mr. Marsh.

24                    THE COURT:  Long day, ladies and gentlemen.

25                    (LAUGHTER.)
```

1   Q    (BY MR. MARSH)  I would like to take you back to part of

2   your direct testimony.

3            Fair to say, sir, you and I have met before?

4   A   Pardon?

5   Q   You and I have met before?

6   A   Yes, sir, we have.

7   Q   A couple of times?

8   A   Yes, sir.

9   Q   And as Mr. Cary asked you, you testified before the grand

10  jury?

11  A   Yes, sir.

12  Q   Here in Washington, D.C.?

13  A   Yes, sir.

14  Q   You took an oath to tell the truth?

15  A   I did.

16  Q   Similar to the one you took here today?

17  A   Yes, sir.

18  Q   Now, on direct, sir, you were being asked some questions

19  about -- you were asked some questions about when you first

20  got involved with this project, sir?

21  A   Yes, sir.

22  Q   And generally, sir, your testimony was about a time when

23  you and Senator Stevens got together and talked about raising

24  this house?

25  A   Yes, sir.

1    Q    And, sir, you'll recall that the next document that you

2    were shown was the July 26th, 2000 Power of Attorney,

3    correct?

4    A    Yes, sir.

5    Q    But some other things happened in between those times,

6    correct?

7    A    Between what times?

8    Q    Between the time that you first spoke with Senator

9    Stevens about the remodel.

10   A    Uh-huh.

11   Q    And the time that you received the power of attorney.

12   A    Yes, sir.

13   Q    There were some other things that happened in that time

14   period in connection with your involvement in this remodel,

15   true?

16   A    Nothing that I recall.

17   Q    Do you recall, sir, being in the grand jury here in

18   Washington, D.C.?

19   A    Yes, sir.

20   Q    On May 30th, 2007, sir?

21   A    Yes, sir.

22   Q    And do you recall being asked about the first time that

23   you met Rocky Williams?

24   A    Yes, sir.

25   Q    And do you recall that, sir, you said that it was at the

1   kickoff for the Kenai Classic?

2   A   Yes, sir.

3   Q   And you're aware that that is an event that occurs right

4   around July 4th of every year?

5   A   Yes, sir.

6   Q   And at this particular meeting, was at Bill Bittner's

7   house?

8   A   Yes, sir.

9   Q   That's the Defendant's brother-in-law?

10  A   Yes, sir.

11  Q   And you were there?

12  A   Yes, sir.

13  Q   And Bill Allen was there?

14  A   Yes, sir.

15  Q   And Ted Stevens was there?

16  A   Yes, sir.

17  Q   And Bill Allen and Ted Stevens were together --

18  A   Yes, sir.

19  Q   -- when they introduced you to Rocky?

20  A   Yes, sir.

21  Q   And when they introduced you to Rocky, they said Rocky

22  was going to be doing the remodel, correct?

23  A   Yes, sir, that's right.

24  Q   And at that time, sir, there was no other talk of hiring

25  any other contractors to do the work at the residence?

 1    A    No, sir.

 2    Q    And it was clear to you that a decision had been made by

 3    the Kenai Classic that Rocky was going to be doing the

 4    remodel?

 5    A    That's what I understood, yes, sir.

 6    Q    So that was a decision, sir, that you were not part of?

 7    A    Right.

 8    Q    Now, Mr. Persons, I'd like to show you what was admitted

 9    as Defendant's Exhibit 431.

10          MR. MARSH:   Madam Clerk, could we have the Elmo,

11    please.

12    Q    (BY MR. MARSH)   This is the Land Use Permit, sir.  Do you

13    recall seeing that?

14    A    Yes, sir.

15    Q    Okay.  Now, Mr. Persons, do you recall being asked in the

16    grand jury whether or not you had seen architectural drawings

17    for the house renovation?

18    A    I don't recall that.

19    Q    Sir, I handed you two volumes of your grand jury

20    transcript.

21    A    Okay.

22    Q    I would like for you to take a look at the one on May

23    30th and go to page 104.

24    A    Yes, sir.

25    Q    Now, sir, you recall being asked, "Did you ever see any

1    plans of the house?"

2              And your response was, "No"?

3    A   Yeah, I have seen plans.  I don't recall when I saw them.

4    Q   You did say "no," though; is that correct?

5    A   I said, "No, I have never seen plans for the house"?

6              THE COURT:  Why don't you focus him on the page and

7    the line.

8    Q   (BY MR. MARSH)  Let's go back again, Mr. Persons, to page

9    104.

10   A   Page 104?

11   Q   Yes, sir.  Line 17, sir, allow me to read.

12             (Reading)  Question:  Were there any -- did you ever

13   see any plans for the house of -- how we're going to get to

14   Grand Jury Exhibit 5 to where we see there today.

15             Sir, do you see your answer was "no"?

16   A   Right.

17   Q   Now, sir, this -- Defendant's 431, which has already been

18   admitted.

19             Now, this is what you prepared on July 31st, 2000.

20   This was submitted on July 31st, 2000; is that correct, sir?

21   A   Yes, sir.

22   Q   Okay.  And so this is after the Kenai Classic when you

23   met Rocky?

24   A   I don't know when the Kenai Classic was, but if you say

25   so, sure.

```
 1    Q    Well, sir, let's go back again.  You're familiar with the
 2   Kenai Classic.
 3    A    I am.
 4    Q    It's an event that's held yearly?
 5    A    Yes, sir.
 6    Q    And that event is held generally around the 4th of July?
 7    A    If you say so.
 8    Q    You have no independent recollection as to when that was?
 9    A    I don't.
10    Q    Okay.  Now, sir, I would like to turn to page -- this
11   page here.  This is one of the documents that you submitted on
12   July 31st, 2000; is that correct?
13    A    Okay.
14    Q    Is that correct, sir?
15    A    If you say so.  Probably.
16    Q    Well, sir, you were asked some questions on direct
17   examination about this document; isn't that correct?
18    A    I'm sure I was.
19    Q    Okay.  And you were asked specifically whether or not you
20   recognize this document.
21    A    If you say so, yes.
22    Q    Do you remember that, sir?
23    A    I don't remember that, but if you say so.
24    Q    That was just --
25    A    I will go there.
```

1    Q    That was just a few -- a few -- 20, 30 minutes ago,

2    Mr. Persons.

3    A    You asked me if I had ever seen the drawings?

4    Q    Do you recall a line of questioning about a half hour

5    ago, sir?

6    A    Uh-huh.

7    Q    In which you were asked to authenticate this document?

8    A    Right.

9    Q    You remember those questions?

10   A    Yes.

11   Q    Okay.  And what was your answer, sir?

12   A    Yes, that document.

13   Q    Okay.  And everything in there was what you submitted.

14   A    Well, I don't know what else was in there.

15           MR. MARSH:  Your Honor, at this time we move to

16   strike 431.

17           THE COURT:  Let me speak with counsel.

18           (AT THE BENCH; ON THE RECORD.)

19

20

21

22

23

24

25

1

2              (OPEN COURT.)

3              THE COURT:  All right.  Just the first page of that

4    document will remain in the evidence for the record, ladies

5    and gentlemen.

6    Q    (BY MR. MARSH)  Now, Mr. Persons, you were -- in addition

7    to your grand jury testimony, you've been interviewed by the

8    FBI; is that correct?

9    A    Yes, sir.

10   Q    Okay.  The first time was at the time the search warrant

11   was executed?

12   A    Yes, sir.

13   Q    And if I said that was August 31st, 2006, would that

14   sound about right?

15   A    Yes, sir.

16   Q    Okay.  And do you recall being interviewed a second time

17   the next day?

18   A    Yes, sir.

19   Q    And do you recall, in addition, being asked to come in

20   earlier this year, in May of this year?

21   A    Yes, sir.

22   Q    Okay.  And, sir, in those interviews, you talked at some

23   length, sir, about what you believed to be your bad memory.

24   A    Right.

25   Q    And at some points you've indicated that you believe your

1   memory is worse than others?

2   A   Yes, sir.

3   Q   And specifically, in May of 2008, of this year, you were

4   brought in, at least in part, to ask if you had any additional

5   information to provide above and beyond your grand jury

6   testimony, correct?

7   A   Yes, sir, uh-huh.

8   Q   And you recall that you again said that you had a very

9   bad memory?

10  A   In some cases, yes, sir.

11  Q   And, sir, in particular, you told the Government that

12  your family had a history of Alzheimer's, yes or no, sir?

13  A   Yes, sir.

14  Q   Okay.  But yet, today, you testified in very great detail

15  about all the things you remember --

16  A   Yes, sir.

17  Q   -- concerning this remodel that was seven or eight years

18  ago?

19  A   Right, right.

20          MR. CARY:  Objection, Your Honor.  I don't think

21  that characterize the testimony.

22          THE COURT:  I'll allow it.  It's cross-examination.

23  Q   (BY MR. MARSH)  Yes or no, sir.

24  A   When I see something that jogs my memory, it helps as you

25  just did with these drawings.  I remember them when I see

1   them.

2   Q    Okay.  Well, let me try to jog your memory with something

3   else.

4   A    Okay.

5   Q    When you testified in front of the grand jury during May

6   of 2007, sir.

7   A    Yes, sir.

8   Q    You recall that you were given a grand jury subpoena?

9   A    Yes, sir.

10   Q    And that was sometime in mid May of 2007?

11   A    Yes, sir.

12   Q    And, sir, you recall that after you got that grand jury

13   subpoena, you sent Ted Stevens an e-mail?

14   A    Yes, sir.

15   Q    About the subpoena?

16   A    Yes, sir.

17   Q    You told them that you were being subpoenaed to testify?

18   A    Yes, sir.

19   Q    You told them what the topics were going to be?

20   A    Yes, sir.

21   Q    And you told them when generally it was going to be?

22   A    Yes, sir.

23   Q    And you were set to testify on May 30th of 2007?

24   A    Yes, sir.

25   Q    Now, a few days before that, sir --

 1              THE COURT:  Let me speak with counsel at the bench

 2    for a second.

 3              (AT THE BENCH; ON THE RECORD.)

 4

 5

 6

 7

 8

 9              (OPEN COURT.)

10    Q    (BY MR. MARSH)  Now, sir, a few days before you flew to

11    D.C. for that grand jury appearance, you had a meeting with

12    Senator Stevens, correct?

13    A    Yes, sir.

14    Q    He came by your restaurant?

15    A    Yes, sir.

16    Q    And then you were busy that night?

17    A    Yes, sir.

18    Q    Then you went by his house?

19    A    Yes, sir.

20    Q    Okay.  And at that time you had already told Senator

21    Stevens that you were coming here to talk, what you thought,

22    about his home remodel?

23    A    Yes, sir.

24    Q    And in that conversation between you and the Defendant,

25    days before your grand jury testimony, you talked about a

1  number of the things that you thought you'd be testifying

2  about before the grand jury, correct, sir?

3  A   Yes, sir.

4  Q   Okay.  Now, particularly, Defendant Stevens told you that

5  Bill Allen had given him a generator.

6  A   Yes, sir.

7  Q   And in that conversation he then told you that the

8  generator really wasn't what he wanted?

9  A   Yes, sir.

10  Q   But when you were asked about, in the grand jury, do you

11  recall being asked a question as to whether or not Senator

12  Stevens ever repaid Bill Allen for the generator?

13  A   Yes, sir.

14  Q   Do you recall saying that you didn't know?

15  A   I don't know.

16  Q   And so you talked about the generator in May of 2007, but

17  the topic of repayment never came up?

18  A   No, sir.

19  Q   Okay.  Certainly, sir, the Senator never told you that he

20  paid Bill Allen back for that generator?

21  A   No, sir.

22  Q   Now, sir, you were asked some -- you also had a

23  discussion with Senator Stevens days before your grand jury,

24  about the rope lighting in his house.

25  A   Right.

1    Q   And in your May 30th, 2007 testimony, you testified

2   that you thought that the Stevens family hated the lights,

3   correct?

4    A   Yes, sir.

5    Q   That you were not down there at the house when those rope

6   lights were installed.

7    A   Right.

8    Q   And that's because if you had been down there, you would

9   have stopped them, correct?

10    A   I would have stopped the lights in the tree.

11    Q   Sir, I would like to draw your attention to your May

12   30th grand jury testimony at page 44, sir.

13    A   Yes, sir.

14    Q   I would like you to focus on line 15.

15    A   Page 34?

16    Q   44, sir.

17    A   Oh, 44.  Yes, sir.

18    Q   Line 15 is a question.  (Reading)  When were those lights

19   put up in the house and in the tree?"  Correct?

20    A   Right.

21    Q   Okay.  I would like for you to turn to the next page.

22   And if you can read your answer at lines 2 through 4.

23    A   2 through 4.

24          MR. CARY:  Your Honor, I think the entire Q and A

25   should be read.

1          THE COURT:  All right.  That's fair enough.

2     Q    (BY MR. MARSH)  Mr. Persons, would you like me to read the

3     Q and A?

4     A    You want me to read that?

5     Q    Yeah, let's start at line 15 on page 44.

6     A    15 at page 44.  The question, (Reading)  When were those

7     lights put up in the house and in the tree?

8               (Reading)  Oh, I don't know.

9               (Reading)  Question:  Would it have been --

10              (Reading)  Answer:  It's been quite a long time ago,

11    I know that, but after remodel -- well, yes, yes, sir.  Yes,

12    sir.  Yeah, they've been there a long time.

13              (Reading)  So 2001, at the earliest, sometime

14    possibly, sometime after that, yes.  2002, maybe.

15              (Reading)  Answer, well, I believe it was all done

16    at one time.  If I had seen it, I would have stopped him, and

17    if Ted had seen him, he would have stopped him.  Nobody wants

18    that --

19              (Reading)  Question:  To your knowledge, was Senator

20    Stevens at the residence when the lights were installed?

21              (Reading)  No.

22         MR. CARY:  Your Honor, I object.  There is nothing

23    inconsistent about this testimony.

24              THE COURT:  I agree.  Let's move on, Counsel.

25    Q    (BY MR. MARSH)  And Mr. Persons, you then later indicated

1   that you didn't believe that the lights had ever been on,

2   correct?

3   A    The tree lights.

4   Q    Okay.  Now, I'd like to go to what's already been

5   admitted.

6              MR. MARSH:  Madam Clerk, if we can.

7   Q    (BY MR. MARSH)  Government Exhibit 515.  If we can just

8   focus on there.

9              Now, Mr. Persons, this is an e-mail that you sent

10  Ted Stevens on December 11, 2002.

11  A    Okay.

12  Q    Correct?

13  A    Uh-huh.

14  Q    Okay.  And I want you to start --

15             MR. MARSH:  Grace, if we can highlight this on with

16  the light, "the guys."

17  A    Okay.  (Reading)  The guys put some great Christmas

18  lights out and I intend to see how they look in the dark.

19  Q    (BY MR. MARSH)  And Mr. Persons, "the guys" there, that

20  was VECO guys, correct?

21  A    I think they were.

22  Q    Did you have any reason to believe they were anyone else?

23  A    No.

24  Q    Certainly not Christiansen Builders?

25  A    No.

```
 1   Q    Because they weren't working on the house at this time?

 2   A    No.

 3   Q    I would like to go to what's not been admitted into

 4   evidence yet, Government Exhibit 1026.

 5             Mr. Persons, I'd like for you to take a minute for

 6   this and let me know if you recognize this as an e-mail that

 7   you sent to Ted Stevens on December 15th, 2003.

 8   A    Uh-huh.  Yeah.

 9             MR. MARSH:  Your Honor, the Government moves to

10   admit and publish 1026.

11             THE COURT:  Any objection?

12             MR. CARY:  No, Your Honor.

13             THE COURT:  I'm sorry, 1023 or 1026?

14             MR. MARSH:  1026, Your Honor.

15             THE COURT:  All right.

16             (GOVERNMENT EXHIBIT 1026 ADMITTED.)

17   Q    (BY MR. MARSH)  Mr. Persons, I would like for you to read

18   the first two sentences of this e-mail.

19   A    (Reading)  Dear Ted, we are looking forward to your

20   return.  Dave decided to come down Monday and he is bringing

21   an electrician with him.  We need to make sure the lights in

22   the tree are working properly.

23   Q    And that "Dave," sir, is Dave Anderson?

24   A    I think that was Dave Anderson, yes, sir.

25   Q    Now, I would like to go to what's been marked for
```

1   identification only as Government's 1027.

2           Sir, please read this and let me know if you

3   recognize this as an e-mail that you sent to Ted Stevens on

4   December 17th, 2003.

5   A   Okay.  (Reading)  Good morning.

6           And I do recognize it.

7   Q   You do?

8   A   You want me to read it?

9           MR. MARSH:  One moment, sir.  The Government moves

10  to admit and publish 1027.

11          THE COURT:  Any objection?

12          MR. CARY:  None, Your Honor.

13          THE COURT:  Admitted.

14          (GOVERNMENT EXHIBIT 1027 ADMITTED.)

15  Q   (BY MR. MARSH)  And, sir, if you could pick up with the

16  sentence that begins, "Dave Anderson."

17  A   (Reading)  Dave Anderson and the electrician came down

18  yesterday, and the problem with the lights in the big tree is

19  due to a malfunction which will be corrected soon.  Everything

20  else is good and the weather is perfect for your homecoming.

21  I'll be looking for all three of you Friday.  Hope your day is

22  as good as mine is shaping up to be.

23  Q   So, in December 2003, Mr. Persons, you got Dave Anderson

24  to make sure that the big lights in the tree -- the lights in

25  the big tree were fixed?

1    A    I called them to come fix them, yes, sir.

2    Q    Okay.  And that was before the Defendant got home for

3    Christmas?

4    A    Yes, sir.

5    Q    But you told the grand jury that you had no idea who put

6    in those lights in the tree?

7    A    I still don't know who put them in the tree.

8    Q    Okay.  And, sir, you told the grand jury that you didn't

9    think the lights had ever been on?

10   A    I still don't think the lights have ever been on.

11   Q    Mr. Persons, how did you know they were broken if you had

12   never seen them on?

13   A    Because I assumed if they were never on, there is

14   something wrong with them.  I told you.  I tried to tell you

15   several times.  I never could get them to turn them on -- to

16   turn on, and even after I went back home, I went over and

17   tried again and I still couldn't get those fool lights to come

18   on.

19   Q    Now, Mr. Persons, do you recall telling the grand jury --

20   you remember being asked in the grand jury about whether

21   Senator Stevens knew who would install those lights on his

22   house and in the tree?

23   A    Not really.

24   Q    Okay.  Sir, I'd like to turn your attention to page 45 of

25   that transcript.

1    A    Okay.  All right.

2    Q    And, sir, I'm going to, if you don't mind, I'd like to

3    read this for you.  I'm going to pick up at line 5.  Okay.

4            MR. CARY:  Your Honor, I think the proper technique

5    is --

6            THE COURT:  Go ahead and focus his attention on it.

7    Q    (BY MR. MARSH)  Mr. Persons, why don't you pick up on line

8    5 at page 45.

9    A    (Reading)  Question:  To your knowledge, was Senator

10   Stevens at the residence when the lights were installed?

11           (Reading)  Answer:  No.

12   Q    And keep going, sir.

13           MR. CARY:  Your Honor, I think he should be asked

14   whether it refreshes his recollection.

15           THE COURT:  Are you using that to refresh his

16   recollection, Counsel?

17   Q    (BY MR. MARSH)  Mr. Persons, please take a look and read

18   pages 45 through 46 and let me know if this refreshes your

19   recollection as to whether this topic came up in the grand jury.

20           (PAUSE.)

21   A    Yes, okay.

22   Q    And, sir, what did you tell the members of the grand jury

23   when you were asked about that?

24           MR. CARY:  Your Honor, I think the question is, does

25   that refresh his recollection.

1      THE COURT:  Well, does it refresh your recollection?

2  It does.  All right.  Now, what is your recollection that's

3  refreshed then.

4      THE WITNESS:  I'm not sure what he's asking me.

5  Q    (BY MR. MARSH)  Mr. Persons, I'm asking you, sir, what you

6  told the grand jury about what you learned from Senator Stevens

7  about who put those lights in his house.

8  A    Oh, okay.  This is -- this is later, much later after all

9  that stuff.  Yeah, I was told that Senator said that --

10     MR. CARY:  Objection.

11     THE COURT:  Sustained.  The question that was

12  asked -- What was your original question, Counsel, to him?

13  Q    (BY MR. MARSH)  What did you tell the grand jury as to

14  when --

15     THE COURT:  The question is:  What did you tell the

16  members of the grand jury when you were asked about that, and

17  then asked about that was the Christmas lights, and you

18  said -- and you were shown that to see whether or not it

19  refreshes your recollection.

20     The question is does it refresh your recollection or

21  not, and if it does, tell us what your recollection is.

22  A    Okay.  My recollection is I don't know when the trees

23  were -- when the lights were put in the trees and I don't know

24  who put them there.  When I -- what I -- with this thing, I

25  know that Chris Von Imof told the Senator that VECO put them

1    in the tree at a much later time.

2              MR. CARY:  I object as hearsay.

3              THE COURT:  It's not responsive to that question,

4    Counsel.

5              MR. MARSH:  Your Honor, we respectfully submit it's

6    an 801(d)(2)(E) statement.

7              THE COURT:  I'll allow it in for that purpose as an

8    exception to the hearsay rule.

9              MR. CARY:  Your Honor, Chris Von Imof?

10             THE COURT:  Let me speak with counsel at the bench.

11             (AT THE BENCH; ON THE RECORD.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4                  (OPEN COURT.)
 5                  THE COURT:  All right.  Objection is overruled.
 6   Q    (BY MR. MARSH)  Mr. Persons, when you testified before the
 7   grand jury, sir, you told the grand jury that Senator Stevens
 8   told you that he had just learned recently that VECO installed
 9   the lights?
10   A    Yes, sir.
11   Q    And he told you specifically that a particular gentleman
12   had told him very shortly before your grand jury appearance,
13   correct?
14   A    Yes, sir.
15   Q    That VECO put in the lights?
16   A    Yes, sir.
17   Q    Okay.  And that's what you told the grand jury?
18   A    Yes, sir.
19   Q    Because that's what Senator Stevens told you?
20   A    Yes, sir.
21   Q    Okay.  Now, I would like to go to Government's 509, sir.
22        Mr. Persons, have you ever received handwritten
23   correspondence from Senator Stevens?
24   A    Yes, sir, a few times.
25   Q    And do you recognize the handwriting on this page?
```

1    A    I do.

2    Q    Okay.  Let's just focus in on this top part, and I would

3    like to read it together.

4         Mr. Persons, do you see where it begins, "The

5    Christmas"?

6    A    (Reading)  The Christmas lights, what, top and...

7    Q    "Top it all," sir, perhaps?

8    A    Is that what that says, "top it all"?  And something

9    else.  (Reading)  To the tree lighted to the highest point.

10   Q    And, Mr. Persons, how tall is the tree in front of

11   Senator Stevens' house?

12   A    It's about 65 feet.

13   Q    Okay.  And what date is on this note, sir?

14   A    November the 8th of 2002.

15   Q    And Mr. Persons, you know Bill Allen, correct?

16   A    I do.

17   Q    Is that his address?

18   A    Pardon?

19   Q    Do you recognize that to be his address?

20   A    I don't know that that's his address.  I know his name.

21   I assume that's his address.

22   Q    Now, sir, let's go back to this meeting that you had with

23   Senator Stevens right before your grand jury testimony.

24   A    Yes, sir.

25   Q    You also talked about the tools, correct?

1    A    Yes, sir.

2    Q    And Senator Stevens brought up the tools?

3    A    Yes, sir.

4    Q    Told you that Bill Allen had left those tools for you?

5    A    Yes, sir.

6    Q    And Senator Stevens told you that he didn't want the

7    tools?

8    A    Yes, sir.

9    Q    But you indicated that you had seen the tool chest?

10   A    Yes, sir.

11   Q    And you described it as pretty nice?

12   A    Yes, sir.

13   Q    And that was a gift, sir, correct?

14        MR. CARY:  Objection, Your Honor.

15        THE COURT:  Sustained.

16   Q    (BY MR. MARSH)  Now, Mr. Persons, you understood that

17   these type of things were the things that you were probably

18   going to be asked about in your grand jury appearance just a few

19   days later, correct?

20   A    Yes, sir.

21   Q    And you had a conversation with the Defendant about them

22   just days before?

23   A    Uh-huh.

24   Q    But in no time in that conversation did the Defendant

25   show you checks where he paid VECO back for the work, correct?

1    A    No.

2    Q    And, in fact, he never told you that he paid VECO back

3    for the work?

4    A    No.

5    Q    Now, sir, I would like to take you back again to that

6    first time the FBI came to your house.

7    A    Okay.

8    Q    I believe I represented August 31st, 2006.  You

9    indicated that that sounds about right.  Okay, sir.

10            Now, do you recall, sir, that when the FBI came,

11   they asked you about your involvement in the renovation of the

12   Defendant's chalet?

13   A    Yes, sir.

14   Q    And you told the agent, sir, that you were the one who

15   contacted the company that completed the work?

16   A    I contacted the company that completed the work?

17   Q    Do you recall saying that, sir?

18   A    I don't, no.  I was in pretty much of an uproar that day.

19   Q    Okay.  Sir, I have handed you a copy of an FBI Form 302.

20   I would like to direct your attention to page 5, the last

21   paragraph and ask if that refreshes your recollection about

22   what you told the FBI on that day.

23            MR. CARY:  Your Honor, I don't believe we have a

24   copy of that.

25            THE COURT:  I think you do.  Let me speak with

1    counsel.

2              (AT THE BENCH; ON THE RECORD.)

```
 1
 2
 3              (OPEN COURT.)
 4              THE COURT:  All right, ladies and gentlemen, you can
 5  just stay there, and you can talk among yourselves about
 6  anything other than this case and we just have to make a copy
 7  of a couple of documents.  I am not going to keep you past
 8  4:45.
 9              THE WITNESS:  Your Honor...
10              THE COURT:  No.
11              THE WITNESS:  This is not what you asked me.
12              THE COURT:  All right.  We'll get back to that.
13  We'll get back to it.
14              (PAUSE.)
15  Q    (BY MR. MARSH)  Mr. Persons, I apologize for the delay,
16  sir.  If you can please turn to page 5.
17  A    All right.
18  Q    I would like to focus you six lines up from the bottom
19  and ask you if that refreshes your recollection about what you
20  told the FBI on August 31, 2006.
21  A    Right.  Raising the house and remodeling the house is two
22  totally different things.  So, I did contact him about raising
23  the house.
24  Q    And you indicated, sir -- so you do remember saying that
25  you were the one who contacted them?
```

1   A    Absolutely.

2   Q    Okay.  And, sir, do you recall -- do you recall being

3   asked some questions about the company that completed the

4   renovation of Senator Stevens' house in Girdwood?

5   A    Right, that I thought it was Christiansen.

6   Q    And, sir, you said nothing about VECO having any

7   involvement whatsoever, correct?

8   A    I don't think I was asked that question.

9   Q    Now, sir, how often were you at the Defendant's house in

10  the fall of 2000 through the spring of 2001?

11  A    Fall through the spring of 2001?

12  Q    Not counting the time that you testified when you were

13  out of the state, how often did you go by?

14  A    It was probably, you know, total of from fall to spring,

15  three or four hours.

16  Q    Total?

17  A    I would think so.  I would just walk in, walk out, walk

18  by, sometimes I didn't even stop by there.

19  Q    So from say August 2000 to May 2001 --

20  A    August is not fall.

21  Q    Okay.  Let's go back to August, sir.

22  A    I was there a lot in August.  July, August, part of

23  September.

24  Q    Okay.  And during July, August and September, how often

25  were you there?

1    A    Oh, probably, I don't know.  I was over there quite a few

2    days when they were putting down that subflooring and trying

3    to help them put up the retaining walls, but I never stayed

4    more than a few hours.

5    Q    Okay.  Now, sir, the subflooring in the walls, was that

6    right around the same time that there were some framing going

7    up after the house had been raised?

8    A    Right.  You had to do that after the house got raised.

9    Q    And that was -- that was all the same general time

10   period, sir?

11   A    Yes, sir.

12   Q    And that's the time that you're saying here today you

13   were there quite a lot?

14   A    Yes, sir.

15   Q    But do you recall in the grand jury being asked about

16   that time and saying that you were at the house rarely?

17   A    I was there rarely after that.  Well, it depends on what

18   "rarely" is.

19   Q    Do you recall using that word, sir?

20   A    It wasn't every day.  I wasn't working there.  I would

21   walk by.  Occasionally, I would hold some boards for them and

22   do things like that, yeah.

23   Q    Okay.

24   A    I was there more than I was later.

25   Q    And, sir, do you recall telling the jury on June 1st

1   that you were just trying to get Hannah to put the house back

2   down, and other than that, I wasn't doing anything else?

3   A   Right, nothing was going on then because the house was

4   just jacked up.

5         MR. CARY:  Your Honor, I object to this.  It should

6   be -- if there is an inconsistent answer, then he can complete

7   it.

8         MR. MARSH:  He indicated he was there all the time,

9   Your Honor, and the grand jury is inconsistent.

10        THE COURT:  I'll allow it.

11  Q   (BY MR. MARSH)  Now, sir, I would like to --

12        MR. MARSH:  If we can pull up Government's 1031,

13  please.

14  Q   (BY MR. MARSH)  Mr. Persons, focusing on the period from

15  July 2000 to May 2001.

16  A   Okay.

17  Q   Fair to say, sir, you sent a number of e-mails to Senator

18  Stevens concerning the work that was going on?

19  A   Right.

20  Q   And, sir, fair to say you remember that you mentioned

21  Bill Allen a fair amount?

22  A   Yes, sir.

23  Q   You mentioned Rocky a fair amount?

24  A   Right.

25  Q   And you knew Rocky worked for VECO?

```
 1    A    Yes, sir.  Well, I didn't know whether he worked for VECO

 2    or for Bill Allen.

 3    Q    And, sir, fair to say Bill Allen is VECO, in your

 4    opinion?

 5    A    In my opinion, he owns the -- well, he owns the -- I

 6    guess he owned the majority of the stock, yeah, land things.

 7    Q    Fair to say in these e-mails you also reference "Dave,"

 8    right?

 9    A    Right.

10    Q    Dave Anderson?

11    A    Uh-huh.

12    Q    Now, here we are, Senator -- I mean, here we are,

13    Mr. Persons, July 20th, 2000, correct?

14    A    That's correct.

15    Q    Okay.  Now, this is 11 days before you filed that permit?

16    A    Right.

17    Q    Okay.  And, sir, can you read the first sentence, please.

18    A    (Reading)  Senator, I spoke to Bill and Rocky this

19    morning.  Rocky will begin the drawings Friday and hopefully

20    he'll have them for me on Monday.

21            You want me to continue?

22    Q    Sir, that's Rocky Williams?

23    A    Yes, sir.

24    Q    If we can go to Government Exhibit 425.  Sir, this is an

25    e-mail on August 7, 2000 that you sent to the Defendant?
```

1    A    Yeah.

2    Q    I would like for you to pick up the first line, "I'm

3    pretty proud."

4    A    Yeah.

5    Q    If you can read that to us, please.

6    A    Oh.  (Reading)  I'm pretty proud of myself.  I spent

7    about six or eight hours and managed to remove the deck,

8    steps, arctic entry, room, even managed to get the roof off by

9    myself.  Denting the filing cabinet a little when I took it

10   out of the room, sorry, but it was heavier than I expected.  I

11   got my exercise, saved a ton of money and am feeling pretty

12   good about having done something Rocky thought would require

13   several people and power tools.

14   Q    If you can keep continuing, sir.

15   A    (Reading)  The expense to you was... remember that white

16   chocolate truffle you used to have in the refrigerator and

17   those shortbread cookies and that chocolate rum cake and those

18   diet cokes, well, you still have some of the cookies and some

19   of the cake.

20   Q    And, Mr. Persons, I will stop you right there, sir.  Sir,

21   you understood that every day Rocky Williams was down at the

22   chalet --

23   A    Yes, sir.

24   Q    -- working on the house --

25   A    Uh-huh.

1   Q    -- those were expenses that accrued to Senator Stevens,

2   correct?

3   A    Yes, sir.

4   Q    Okay.  Same thing with Dave Anderson, sir?

5   A    Yes, sir.

6   Q    And you know, certainly with respect to your labor down

7   there, you thought your labor had value, too, correct?

8   A    Cookie value.

9   Q    And white chocolate truffle, sir?

10  A    Absolutely.

11  Q    But you didn't think Rocky Williams was working for white

12  chocolate truffle?

13  A    No.

14  Q    And same thing for Dave Anderson?

15  A    Right.

16  Q    So you understood that those guys cost money?

17  A    Absolutely.

18  Q    And those guys work for Bill Allen?

19  A    True.

20  Q    If we can continue onto Government's 1033, please.

21  Again, sir, August 23rd, 2000.  Do you see a reference to

22  Rocky in there?

23  A    "Kind of torment Rocky"?

24  Q    Can you finish reading that sentence?

25  A    (Reading)  I kind of torment Rocky to keep him

1  concentrating on the chalet rather than all the projects Bill

2  keeps him working on.

3  Q   Now, 1017.  Government's 1017, please.  Mr. Persons, one

4  moment, sir.  We are putting up Government Exhibit 1017, which

5  has already been admitted into evidence.

6          Sir, this is a September 10th, 2000 e-mail you

7  sent to the Defendant.  I would like to see if you see "Rocky"

8  referenced in there.

9  A   I do see "Rocky."

10  Q   Okay.  And, sir, can you read that sentence?

11  A   (Reading)  I can't emphasize enough how much and how well

12  Rocky does.  Bill has a true gem there.  The guy works seven

13  days a week on Bill's projects.  Tell --

14  Q   I'm sorry, continue, sir.

15  A   (Reading)  Tell Catherine we have a plan to expand the

16  bathroom.  My best, Bob.

17  Q   Now, fair to say, Mr. Persons, you're aware that

18  throughout the fall you sent a number of other e-mails to the

19  Defendant which you referenced "Rocky"?

20  A   Yes, sir.

21  Q   Which you referenced "Bill"?

22  A   Yes, sir.

23  Q   Okay.  Let's go to Government's 1041, please.  If we can

24  focus on this bottom part.  Sir, do you see another reference

25  to "Rocky" in there?

1  A   Yes.  (Reading)  Everything is going so smooth thanks to

2  Rocky, Bill and Augie.

3  Q   Now, Mr. Persons, you were asked some questions in direct

4  examination, sir, about whether Rocky was in charge of the

5  project.  Do you recall being asked some of those questions?

6  A   I was.

7  Q   Okay.  And fair to say your response was something along

8  the lines of, "Rocky was in charge until Christiansen Builders

9  came in," correct?

10  A   Right.

11  Q   Now, I'd like to turn your attention to Government's

12  Exhibit 452 already admitted in evidence.

13      Now, Mr. Persons, Christiansen Builders came in

14  sometime in September?

15  A   Yes, sir.

16  Q   Okay.  Now, this is an e-mail in February of 2001,

17  correct?

18  A   February of -- 7th, 2001, yes, sir.

19  Q   E-mail from you to Ted Stevens?

20  A   Yeah.

21  Q   Okay.  Can you pick up with the phrase, "You cannot."

22  A   (Reading)  You cannot call that a chalet now.  It is a

23  remarkable house.  Rocky is building this like a fine cabinet.

24  Everything is just right.

25  Q   Now, sir, you didn't mention Augie Paone in this e-mail,

1    correct?

2    A    Right.

3    Q    And you don't mention Christiansen Builders, sir.

4    A    No, sir.  But that was what I didn't get to finish

5    earlier.  Building a house takes a lot of time to do the

6    finish work on the house, and that was what I was going to say

7    awhile ago.  I didn't mean to say that the house was done in

8    December.  It had finish work done on it.

9    Q    But, sir, you're aware that in February of 2007, you're

10   referring to the person who's building it like a fine cabinet

11   is Rocky?

12   A    He was doing finish work on it, yes, sir.

13   Q    Not Augie?

14   A    Right.

15   Q    Not Christiansen?

16   A    Right.

17   Q    Now, Mr. Persons, do you recall --

18              THE COURT:  February 2001.

19              MR. MARSH:  That's correct.

20              THE COURT:  You said 2007.  You meant 2001.

21              MR. MARSH:  Oh, I'm sorry, February 2001, yes.

22   Q    (BY MR. MARSH)  Now, Mr. Persons, I'd like to take your

23   attention to May of 2001.

24   A    Uh-huh.

25   Q    Fair to say by that point the project was in its final

```
 1  stages, sir?

 2   A   Pretty much.

 3          THE COURT:  We're going to move into a new area that

 4  we can't complete in five minutes, Counsel.  It's probably

 5  good to break for the evening.

 6          Ladies and gentlemen, so we'll start at

 7  9:30 tomorrow morning.  Enjoy your evening, and again I ask

 8  that you not discuss the case with anyone, that you avoid any

 9  radio, TV or news reports that you may read, see or hear about

10  the case.  Enjoy your evening.

11          (JURY NOT PRESENT.)

12          THE WITNESS:  Can I go, too?

13          THE COURT:  Wait.  All right, sir.  Mr. Persons, you

14  can step down, please.  Do not discuss your testimony with

15  anyone.  You have to come back tomorrow.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  I think in view of what you said about

18  the problem posting that information on the Government's

19  website, I'm not going to send the computers back.  The last

20  thing I want is some malfunction with respect to a computer

21  and evidence, so we'll send the paper back, but still, both

22  sides are going to have to sign off on the evidence that goes

23  back to the jury room.

24          Where are you with respect to any discussions

25  regarding instructions, Counsel?  Or have you had a chance to
```

```
 1    talk to one another?

 2              MR. SINGER:  Your Honor --

 3              THE COURT:  Making any progress there?

 4              MR. SINGER:  I think we are, Your Honor.  After

 5    Mr. Marsh and I spoke with Addy yesterday, we've looked at the

 6    document that the Court provided to us yesterday.  We have

 7    taken a stab at trying to do something that's user-friendly

 8    and I have given a copy earlier today to Mr. Marsh, and I

 9    think we are going to try and talk this evening and try and

10    make more progress.

11              MR. MARSH:  That's right.

12              THE COURT:  All right.  Now, there are several

13    motions.  There's a motion to strike evidence of uncharged

14    gifts, there's a motion to strike and preclude reference to

15    public interest, motion to strike the vehicle and county

16    records, and those motions are ripe.  I will rule on those

17    tomorrow.

18              With respect to Catherine Stevens' objections, we

19    have the Government's objections.  I'm not sure we've received

20    it, responses, I'm not sure about that, so I don't think we

21    have.

22              MR. CARY:  We responded that same night.  It was two

23    nights ago.  It was basically done, however.

24              THE COURT:  All right.  What about Senator Stevens?

25              MR. CARY:  We submitted our exhibits and I don't
```

```
 1   think there have been objections to them.  I don't believe.

 2              THE COURT:  I don't believe they have been.  That's

 3   why I'm inquiring.

 4              MS. MORRIS:  I believe that's correct, Your Honor.

 5   I don't think we've actually done them yet, but no --

 6              THE COURT:  All right.  We will probably get to -- I

 7   assume -- how long do you anticipate your direct of

 8   Mr. Stevens will be?

 9              MR. CARY:  One hour, Your Honor.

10              THE COURT:  All right.  It's very likely we get to

11   Senator Stevens' testimony so I need to know what objections

12   there are, if any.  So I need to get that tonight so I can

13   rule on those promptly tomorrow.

14              MS. MORRIS:  Judge, we can get them to you by 6:15.

15              THE COURT:  That's fine.  That's fine.  There was a

16   Defense motion also to strike the generator evidence.  I'm not

17   sure the Government's filed a response to that.  I don't think

18   you have.

19              MR. MARSH:  We haven't, Your Honor, but we'll file

20   something tonight if that's okay.

21              THE COURT:  That's fine.  That's fine.  The earlier

22   the better, Counsel.  Anything else we need to talk about,

23   Counsel?

24              MS. MORRIS:  Yes, Judge.  There is a matter if we

25   could approach.
```

1          THE COURT:  Sure.

2          (AT THE BENCH; ON THE RECORD.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          (OPEN COURT.)

 1          THE COURT:  You may be excused.  Thank you.  Oh, one

 2   other question.  If we get to Senator Stevens, how long you

 3   anticipate his direct to be?  I'm not trying to curtail your

 4   examination.

 5          MR. SULLIVAN:  I am unable to estimate.  I would say

 6   at least two hours.

 7          THE COURT:  That's reasonable.  All right.

 8          MR. SULLIVAN:  Maybe.

 9          THE COURT:  I just -- Again, I'm not trying to

10   curtail.  I'm not trying to hold you to it.  I certainly will

11   not cut you off after two hours.  I won't do that.  I'm just

12   trying to look forward and plan.  It appears that we'll

13   probably finish -- well, I don't know.

14          Rebuttal.  I mean, how many rebuttal witnesses do

15   you anticipate calling?  I'm not going to hold you to it.

16          MS. MORRIS:  I believe right now, Judge, it's three,

17   and they are rather short.

18          THE COURT:  All right.

19          MR. CARY:  And, Your Honor, I think we had an

20   agreement that they were going to disclose them to us at

21   6:00 o'clock tonight.

22          THE COURT:  All right.  So, in all likelihood, we

23   might finish the evidentiary portion of this by Friday, and if

24   so, we can let the jurors go, finalize instructions, closing

25   arguments and instructions Monday.

1          MS. MORRIS:  Yes, sir.

2          THE COURT:  Everything in one day.  Any problems

3   with that?

4          MS. MORRIS:  No, sir.

5          THE COURT:  How much time you need for closing?

6          MS. MORRIS:  For the Government, we'd ask for two

7   hours, Judge, for closing and rebuttal close.

8          MR. SULLIVAN:  Three hours.

9          THE COURT:  Not to be outdone.

10          MR. SULLIVAN:  Could be short.

11          THE COURT:  Let's see.  Let me think about that.  I

12   don't have any problems with that, I don't think.  I am trying

13   to think.  Let's see, instructions will take awhile.  I don't

14   want to break up argument.  We'll play it by ear.  We'll talk

15   more about it.  My preference would be, obviously, to have

16   instructions and argument the same day.  But we're talking

17   five hours of argument.  That's probably not workable.

18          Certainly the jury will get the case by early

19   Tuesday certainly.  I don't think I want to have argument.  I

20   could provide the Government one afternoon and then Defense

21   counsel next morning.  We can talk about it.  My preference

22   would be to get the case to the jury on Monday, but if we

23   can't do it, we can't do it.

24          All right.  Thank you.  Have a nice evening.

25          MS. MORRIS:  Thank you.

1    (PROCEEDINGS END AT 4:46 P.M.)

2    *-*-*-*

3    **CERTIFICATE OF REPORTER**

4    I, Catalina Kerr, certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-entitled matter.

7

8    _____   _____

     Catalina Kerr                    Date

9

10   *-*-*-*-*

11   I N D E X

12   **EXAMINATIONS**                              **Page**

13   DIRECT EXAMINATION OF ROBERT PERSONS            3

14   CROSS-EXAMINATION OF ROBERT PERSONS            58

15

16   **EXHIBITS**

17   **DESCRIPTION**

18   Government's Exhibit 1026 admitted              74

19   Government's Exhibit 1027 admitted              75

20   Defendant's Exhibit 219 admitted               10

21   Defendant's Exhibit 431 admitted               11

22   Defendant's Exhibit 946 admitted               29

23

24

25