1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3      UNITED STATES OF AMERICA,      .
                                      .
4               Plaintiff,            .
                                      .  CR No. 08-231
5         v.                          .
                                      .
6      THEODORE F. STEVENS,           .  Washington, D.C.
                                      .  Tuesday, October 21, 2008
7               Defendant.            .  9:03 a.m.
                                      .
8      . . . . . . . . . . . . . .    .

9

10          TRANSCRIPT OF JURY TRIAL - DAY 20 - MORNING SESSION
                 BEFORE THE HONORABLE EMMET G. SULLIVAN
11                 UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13

14     For the Government:          BRENDA K. MORRIS, ESQ.
                                    United States Department of Justice
15                                  1400 New York Avenue, N.W.
                                    12th Floor
16                                  Washington, D.C.  20005
                                    202-514-1412

17                                  NICHOLAS A. MARSH, ESQ.
                                    United States Department of Justice
18                                  10th and Constitution Avenue, N.W.
                                    Washington, D.C.  20530
19                                  202-307-1049

20                                  JOSEPH W. BOTTINI, ESQ.
                                    United States Attorney's Office
21                                  District of Alaska
                                    222 W. Seventh Avenue
22                                  Federal Building and U.S. Courthouse
                                    Anchorage, Alaska  99513-7567
23                                  907-271-5071

24

25     APPEARANCES con't. on next page.

1    APPEARANCES, con't.

2

3

     For the Defendant:          BRENDAN V. SULLIVAN, ESQ.
4                                ROBERT M. CARY, ESQ.
                                 ALEX G. ROMAIN, ESQ.
5                                BETH STEWART, ESQ.
                                 JOSEPH TERRY, ESQ.
6                                Williams & Connolly, LLP
                                 725 Twelfth Street, N.W.
7                                Washington, D.C.  20005
                                 202-434-5000
8

9

10

11   Court Reporter:            JACQUELINE M. SULLIVAN, RPR
                                Official Court Reporter
12                              U.S. Courthouse, Room 6720
                                333 Constitution Avenue, NW
13                              Washington, D.C. 20001
                                202-354-3187
14

15

16

     Proceedings reported by machine shorthand, transcript produced
17   by computer-aided transcription.

18

19

20

21

22

23

24

25

PROCEEDINGS

1    COURTROOM DEPUTY:  08-231, United States versus
2    Theodore Stevens.

3    Will counsel please identify yourselves for the
4    record?

5    MS. MORRIS:  Good morning, Judge.  For the government,
6    Brenda Morris, Joseph Bottini, Nicholas Marsh, and Grace
7    Williams.  With the Federal Bureau of Investigation, Mary Beth
8    Kepner.

9    MR. CARY:  For the defense, Rob Cary, Brendan
10   Sullivan, Alex Romain, Beth Stewart and Joseph Terry.

11   THE COURT:  Pursuant to a telephone conversation I had
12   with counsel for the parties last evening, and I told them I'd
13   put this on the record, I'm not going to allow any further
14   redactions to the indictment.  That's over defendant's
15   objection.

16   With respect to the exhibits, the VECO business record
17   that the Court ordered certain information stricken from, I
18   spelled out three options to the attorneys yesterday as to how
19   they could address that issue.  I don't know if you've had a
20   chance to talk among yourselves.  If you can't resolve it, I'll
21   resolve it.

22   MR. CARY:  We have spoken, your Honor, and offer our
23   objection.  We don't think any revision should be made to the
24   government's.  We think the least intrusive option is for the

1    government to number, or the Dave Anderson affected items would

2    be redacted, and then they'll hand write the new number with

3    Dave Anderson's time.

4              THE COURT:  That's fine.

5              MR. CARY:  That's over our objection, your Honor, but

6    we think that's the least intrusive thing to do.

7              THE COURT:  I think that's only fair, though, and

8    certainly consistent with what the Court had in mind when it

9    struck the information regarding Anderson and Williams.

10             That brings up another issue.  I'm looking over the

11   instructions this morning.  There is an instruction with respect

12   to redacted documents.  I'll read it.  It's brief and, you know,

13   it's verbatim.

14             During the course of this trial a number of exhibits

15   were admitted in evidence.  Sometimes only those parts of an

16   exhibit that are relevant to your deliberations were admitted.

17   Where this has occurred I've required the relevant parts of the

18   statement to be blacked out or deleted.  Thus, as you examine

19   the exhibits and you see or hear a statement where there appear

20   to be omissions, you should consider only the portions that were

21   admitted.  You should not guess as to what's been taken out.

22             I read that thinking I probably need to say something

23   about an insertion, because I'm allowing, you know, delineation

24   of information there.  So I think I need to explain that.

25             Are there any suggestions?  I thought about just

1    adding the words "or insertions."  I don't think they'd know

2    what that means, but I just saw it in the last five minutes, so

3    someone may have a better word for it.  I don't know.

4              MR. CARY:  I need to speak to him for a moment.

5              THE COURT:  Okay.

6              (There was a pause in the proceedings.)

7              THE COURT:  I could say I've required the relevant

8    parts of the statement to be blacked out, common, deleted, or

9    corrected.  I could say that.

10              MR. CARY:  We would object to that, your Honor, and

11   maybe I don't want to speak for Mr. Marsh, but I think from the

12   defense's perspective, we'd prefer you not change this

13   instruction.

14              THE COURT:  All right.  I need to say something about

15   that, though, because they'll look at that and say, well, gee,

16   he said something about redacted and deletions.

17              What's the government's position?

18              MR. MARSH:  We defer to the Court.  We think it's --

19   we think it's probably okay as it is.  We also are sensitive to

20   the Court's concept.  We think if the Court is willing to do

21   something --

22              THE COURT:  2.28, and I withdrew that.  It's just a

23   thought that occurred to me, if everyone is comfortable with it,

24   just leave it the way it is.

25              MR. CARY:  That would be our preference.

1           MR. MARSH:  We think it's fine too, your Honor.

2           THE COURT:  All right.  Any other matters?

3           MR. CARY:  No, your Honor.

4           THE COURT:  Senator, how are you today?

5           THE DEFENDANT:  Fine, sir.  Thank you very much.

6           THE COURT:  Good.

7           All right.  Then we'll start at 9:30, counsel.

8           Now, another thought I had was this, and I don't want

9    this to be artificial.  You know how far you want to go with the

10   first part of your opening.  I was going to suggest an

11   hour-and-a-half.  If you're more comfortable with something

12   less, then that's fine.  I don't want to interrupt any attorney,

13   but I can't let you go -- my only concern is letting attorneys

14   go over their time.  I can't do that because we have to finish

15   all the arguments today, and I'm doing it out of an abundance of

16   caution because I think it's unfair to allow the government to

17   come back tomorrow after the jurors have had a night to rest,

18   and then present rebuttal argument, so I really have to watch

19   the time, so I'll leave it up to counsel.  I mean, one thought

20   would be I'll just tell the jurors we'll break at eleven

21   o'clock.  If you think you may conclude your first half shorter

22   than that, I won't say that, but I can't let you go past that.

23   An hour-and-a-half for anyone to sit and listen to argument is a

24   long time.  I just want to remind everyone again we have to

25   stick to the allotted time, and I think that three hours each

1    side is more than enough time for this case.

2              MR. BOTTINI:  Just one last thing I wanted to raise,

3    and that is, in relation to the evidence that the Court had

4    ordered stricken, I just want to make sure that counsel is not

5    intending to argue that or to address it at all in his closing.

6              THE COURT:  I had that concern, but I don't think the

7    reason for the striking should be mentioned.  I've already

8    imposed a sanction.  I've told them.  I struck the evidence and

9    I'm giving an instruction.  I think the least said about that

10   the better, and, you know, hint to counsel, advice to counsel:

11   You get too far I'm going to cut you off.  I don't think it's

12   appropriate to resurrect that instruction at all.  I don't think

13   anyone would do this, but let me say it now:  I don't think that

14   anyone should mention anything that General Powell did this week

15   in connection with the closing argument.  I think that would be

16   highly inappropriate.

17             MR. BOTTINI:  I agree.

18             THE COURT:  Enough said.  See you at 9:30.

19             COURTROOM DEPUTY:  This Honorable Court now stands in

20   recess until 9:30.

21             (Recess taken at about 9:09 a.m.)

22             COURTROOM DEPUTY:  Please remain seated and come to

23   order.

24             (Back on the record at about 9:32 a.m.)

25             THE COURT:  All right.  Let's proceed.

1        (Jury enters courtroom at about 9:33 a.m.)

2        THE COURT:  All right.  Good morning, ladies and

3    gentlemen.

4        THE JURY:  Good morning.

5        THE COURT:  As I told you yesterday, the next two

6    phases are the closing arguments of the attorneys, and the

7    instructions.  We're going to break it up because we couldn't

8    finish everything today, so you'll hear the closing arguments

9    today.  As I told you yesterday, the government has two

10   opportunities to speak with you.  Defense has one opportunity to

11   speak with you.

12       The closing arguments of the attorneys are not

13   evidence, just as the opening statements are not evidence.  The

14   closing arguments are intended to be what the attorneys believe

15   the evidence has demonstrated.

16       Now, another thing about the closing arguments, if

17   anyone, including me, anyone says anything to you about the

18   evidence and what the evidence shows and that statement

19   conflicts with your recollection of the evidence, it is your

20   recollection of the evidence.  It's not Judge Sullivan's

21   recollection, not the attorneys' recollection.  It's your

22   recollection of what the evidence shows.

23       So we'll proceed with the government's opening portion

24   of its closing argument, and then we'll take a fifteen-minute

25   recess, and then we'll hear from the defense counsel, and we'll

```
 1    go to lunch; we'll come back and you'll hear from defense

 2    counsel the second part of their argument, and then we'll hear

 3    from government, and then we'll go home for the day.

 4         Counsel?

 5

 6                        CLOSING ARGUMENT

 7

 8         MR. BOTTINI:  May it please the Court, counsel,

 9    gentlemen, ladies and gentlemen, Ted Stevens had a good friend,

10    and his name was Bill Allen.  Ted Stevens knew that his friend,

11    Bill Allen was wealthy.  He knew that Bill Allen was generous,

12    and he knew that his good friend, Bill Allen, would help him and

13    give him hundreds of thousands of dollars' worth of free

14    benefits.  He also knew that his good friends, Bill Allen, Bob

15    Persons, and Bob Penney, were trusted and loyal associates who

16    would cover for him.  Ted Stevens knew that his friends would

17    give, and he was perfectly willing to receive because, as two of

18    the closest people to him said:

19         (Audiotape played:  "Ted gets hysterical when he has

20    to spend his own money so I want to keep it down.  And, you

21    know, and the other flip side of that is he gets hysterical

22    because he can't really afford to pay a bunch of money, I don't

23    think.")

24         (End of audiotape excerpt.)

25         MR. BOTTINI:  Now, ladies and gentlemen, the price is
```

1        always right when it's free.

2               Now, as my colleague Brenda Morris told you during the

3        opening statement, this is a simple case about an elected public

4        official who received hundreds of thousands of dollars' worth of

5        free benefits and then concealed those facts by repeated false

6        statements made on his financial disclosure forms filed with the

7        United States Senate year after year after year, and he did

8        these things, ladies and gentlemen, so that no one would know

9        and that the free benefits wouldn't stop.

10              Now, over the past four weeks you've heard the

11       testimony of a lot of witnesses.  You've seen a great deal of

12       evidence:  photographs, records, documents, e-mails, and other

13       correspondence.  You've heard recorded conversations involving

14       the defendant and others.  You've seen the defendant's financial

15       disclosure forms where he disclosed no gifts or liability from

16       Bill Allen, VECO, or his other good friends, Bob Persons or Bob

17       Penney.  All of that evidence, ladies and gentlemen, proves

18       beyond a reasonable doubt that the defendant clearly knew that

19       he was receiving these benefits and that he had an obligation to

20       report them and that he did not do so and that he acted

21       knowingly and willfully in failing to do that.

22              Ladies and gentlemen, the evidence in this case is

23       compelling.  By actively concealing his receipt of those free

24       benefits and by knowingly and willfully failing to disclose

25       those facts, the defendant is guilty of each of the seven counts

1    charged against him in the indictment.

2           Now I want to start by taking just a few minutes to

3    talk about the elements of offenses that are charged in this

4    case.  Judge Sullivan is going to instruct you on the law

5    tomorrow morning, and of course his instructions control and his

6    instructions may have these elements ordered slightly

7    differently, but here are the basic elements of offenses charged

8    in the indictment:

9           The first element as it relates to count one is that

10   the defendant knowingly concealed a fact by a scheme.  The first

11   element as it relates to counts two through seven is that the

12   defendant knowingly made a false statement.  The rest of these

13   elements are all basically the same for all of the counts, and

14   the second element, the defendant acted knowingly and will-

15   fully.  The third element, that the fact concealed or the false

16   statement was material.  Fourth, that the subject matter was

17   within the jurisdiction of the legislative branch of the

18   government of the United States.  Fifth, that the fact concealed

19   or the false statement pertained to an administrative matter

20   like the required filing of a financial disclosure form, and

21   finally, sixth, that the defendant had a legal duty to disclose

22   a fact allegedly concealed.

23          Now, a number of these elements are already

24   conclusively established by one government exhibit, and that's

25   Government Exhibit No. 1123.  Those are the instructions for the

1    financial disclosure forms for the years 1999 through 2006.

2    This is an exhibit that was admitted into evidence and came in

3    without objection.  And here's what Government's Exhibit 1123

4    establishes:

5            First, as to the third element, was the concealed fact

6    or false statement material to the Senate Select Committee on

7    Ethics?  Of course it is.  Government Exhibit 1123 lays out the

8    process by which the financial disclosure forms get reviewed.

9    First of all, the secretary of the Senate require that these

10    forms be filed each May.  The secretary in turn gives

11    responsibility to the Select Committee on Ethics to review the

12    forms for compliance with the law.  The disclosure of gifts and

13    liabilities over a certain dollar amount is mandatory.  The

14    committee has the power to initiate ethics investigations over

15    the nondisclosure of gifts and they can issue public censures or

16    reprimands.

17            Now, you see the defendant's e-mails where he talks

18    about the ethic rules.  Remember that letter where he wrote to

19    Allen where he talked about remember Torricelli?  Clearly he's

20    aware of that.  The nondisclosure of gifts and liability is

21    obviously material because the Senate Ethics Committee can't

22    investigate what they don't know.  All of this shows the

23    concealed fact or the false statement is in fact material, that

24    it does matter, so when you go back to the jury room you can

25    check off this element as having been proven beyond a reasonable

1    doubt.

2         Element number four, did the fact concealed or the

3    false statements fall within the jurisdiction of the legislative

4    branch?  Of course it did.  Again, Government Exhibit 1123

5    clearly establishes that these financial disclosure forms had to

6    be filed with the secretary of the United States Senate, so when

7    you go back to the jury room you can check off that element as

8    having been established beyond a reasonable doubt.

9         Now, element number five, did the fact concealed or

10   the false statement pertain to an administrative matter of the

11   legislative branch?  Again, of course it did.  Government's

12   Exhibit 1123 lays out the administrative process by which these

13   forms must be filed, and filing financial disclosure forms is an

14   administrative matter, so again, when you go back to the jury

15   room you can check off this element as having been proven beyond

16   a reasonable doubt.

17        And then finally as to the sixth element, did the

18   defendant have a legal duty to disclose the concealed facts?  Of

19   course he did.  Again, Government Exhibit 1123 clearly proves

20   that the defendant had a legal duty to disclose certain gifts

21   and certain liabilities over a certain dollar amount, anywhere

22   from $260 to $305, depending on the year in question, for gifts,

23   or any liabilities in excess of $10,000, so when you go back to

24   the jury room you can check off this element as having been

25   proven beyond a reasonable doubt.

1          So what I want to do now is talk to you about the

2     facts that establish beyond a reasonable doubt that this

3     defendant in fact received substantial gifts and free benefits

4     from Bill Allen, from VECO, and others during the years in

5     question, and that he knew that he had received these gifts and

6     free benefits, and that he knew these gifts and benefits were

7     the kind that were required to be disclosed, and that he

8     knowingly and willfully decided, made a conscious decision that

9     he would not disclose those gifts and benefits on his required

10    financial disclosures forms for the years in question.  That is

11    basically what you have to find, and that is indeed what

12    happened in this case, ladies and gentlemen.

13         Now, it makes perfect sense that the defendant would

14    expect to receive substantial free gifts and benefits from his

15    friend, Bill Allen, one of his closest friends that he had in

16    Alaska.  As you know, Bill Allen was the chief executive officer

17    of VECO Corporation, an oil field services company that Allen

18    built up to be the largest private employer in the state of

19    Alaska.  And you heard Allen's story about how he came from the

20    humblest of beginnings and built this company from the ground up

21    starting in 1968 from literally nothing to the point where he

22    had something like four to five thousand employees, and in 2005

23    revenues close to a billion dollars.  As you heard time and

24    again in this trial, Bill Allen was VECO and everybody knew

25    that.  This was his company that he started from scratch.  Now,

as a result of VECO's success, Allen was rich, Bill Allen was
wealthy, Bill Allen was generous, Bill Allen was not hysterical
about spending his money, and the defendant knew that.  They
were close friends for several years.

Now I want to explain to you how he and Senator
Stevens met many years ago and how their casual relationship at
first developed into this close friendship.  You heard him talk
about he and the defendant spent a lot of time together doing
things like traveling to those boot camps in Arizona or
California or when they were in Alaska they'd get together and
go fishing; things like that.  One thing about Allen, if there
ever was a what-you-see-is-what-you-get kind of guy, that's Bill
Allen.  You heard how he talks, and I'm not talking about how
his speech was affected by the motorcycle accident.  I'm talking
about his plain speaking, his bluntness.  He's a little rough
around the edges for sure and not the best formally-educated
man, but what you see is what you get with that guy.  Think
about this too:  Did it look like Allen was out to get the
defendant during his testimony in this trial in the hopes that
somehow he was going to please the government and he might get a
lighter sentence?  And no doubt you're going to hear that
argument later today from Mr. Sullivan, but ladies and
gentlemen, if he were, then why did he say he wasn't trying to
bribe the defendant?  And think about this:  If he was really
manufacturing testimony, wouldn't his story be better?  I mean,

1    here's a guy that spent a lot of time, private time, with this

2    defendant, and he would have had ample opportunity to make up

3    anything he wanted.  But what you saw is what you got with that

4    guy.  I gave those free things to the defendant.  The defendant

5    knew I gave them to him, and I did it because I liked him and I

6    wanted to help him.  That's what happened here.

7            I want to start by talking about the backup generator,

8    that generator that you heard so much about during this trial,

9    and I want to start with the generator because it's the first of

10   the many free things that the defendant gets from Allen, and

11   it's a benefit that he clearly asks for.  It's also something

12   that he has great difficulty trying to explain away, his request

13   for the generator, his receipt of that, and his failure to

14   disclose it.  Judge Sullivan is going to tell you tomorrow that

15   the evidence related to the defendant's receipt and

16   nondisclosure of the generator is something that you may

17   consider as it relate to the defendant's motive, his intent, or

18   lack of mistake in relation to the other benefits that aren't

19   disclosed in the later years.

20           As you know, in 1999 the defendant asked Allen to get

21   him a generator to supply power in his Girdwood home in the

22   event of a power failure.  Is there any question that the

23   defendant asked Allen for a generator and knew that it came from

24   VECO?  Take a look at Government's Exhibit 417.  You've seen

25   this a couple of times during the trial.  This is the October

1    10, 1999 e-mail from Ted Stevens to his good friend Bob Penney

2    where he tells Penney that incidentally, I asked Bill Allen to

3    hook up a generator to our chalet for Y2K just in case.  He

4    didn't say to Penney in this e-mail that I asked Bill Allen to

5    go out and rent a small pull-out generator and drag it down to

6    the chalet for Y2K New Year's Eve.  He says, I asked Bill Allen

7    to hook up a generator for Y2K.  He doesn't go to the Yellow

8    Pages and look for a place to rent or buy a small generator.  He

9    turns to his friend Bill Allen.  Why Bill Allen?  Because Bill

10   Allen was a close friend, Bill Allen was wealthy, Bill Allen was

11   generous, Bill Allen was the head of VECO, Bill Allen was VECO,

12   and the defendant knew if he asked Bill Allen for a generator he

13   was going to get one, and that's what happened.  Not only that,

14   but Allen sends VECO employees down there to hook this thing up

15   to the house like the senator wanted and they buy something

16   called a transfer switch that's a device that works with a

17   generator, that it comes on automatically if there's a power

18   failure.  That cost nine hundred fifty bucks.  When you account

19   for all the VECO labor, cost of the generator, cost of the

20   transfer switch and the materials to wire it up, we're talking

21   about a free benefit to this defendant well in excess of $6,300.

22   It's a clear gift that he asked for, that he received, he knew

23   he never paid for, and never disclosed.  Catherine Stevens

24   wasn't involved in this.  He can't blame her.  Bob Persons

25   wasn't involved in it.  He can't take the fall.  Bob Penney

wasn't involved.  He can't cover this up.  The defendant's

nondisclosure of this gift is all on him, ladies and gentlemen.

Now, his story is that, well, I only meant for Allen

to rent a small pull-start generator and, you know, drag it down

there for New Year's Eve, but does that make any sense?  I mean,

he's worried about power failures in the middle of winter in

Alaska, particularly when he isn't home, and he wants something

that is going to power up the house to keep it from freezing up.

How in the world would one of those small pull-start generators

have accomplished that?  The thing he circled on the picture and

pointed out, well, that's what I wanted there.  That's a

generator that was down there to power tools on the construction

of the house.  Something like that might have powered up his

T.V. or microwave or some other appliances, but it wouldn't have

accomplished what he wanted, and that was a backup power system

for the home when the power failure occurred.  I heard him say

that he wasn't home at Girdwood all that often.  Well, who's

going to go out and pull the rope to start this thing up if he

just intended it to be this small pull-start generator?  He says

he only wanted it for New Year's Eve, but his e-mail to Penney

again says that he asked Allen to hook up a generator, not just

to have one delivered so it would be there on a stand-by basis

if the power went out.  If he didn't want such a big generator,

why go to Allen?  Why not go down the street to the local

hardware store like everyone else?  Because the price is always

1    right when it's free.  He needed and wanted just what he got,

2    something that was large enough to power up the electrical

3    system and the heating system on the home in the event the power

4    went out.

5            He also says, well, I didn't want this thing, I didn't

6    want that thing that Allen bought me, and I told him to get it

7    out of there.  It's still there, ladies and gentlemen.  We're

8    now nine years down the road from when that generator was

9    purchased by Allen and VECO for the senator, and it's still

10   there.  We're going to talk about this more in a minute, but

11   does anybody believe that the defendant can't really get Bill

12   Allen to remove this stuff from his house, haul this stuff that

13   he says I didn't want this, I told them to take it away?  Does

14   anybody believe that he can't keep this guy from giving him this

15   free stuff?  I didn't want this stuff.  I told him I didn't want

16   it.  If he didn't really want it, then why do this stuff on the

17   house when they do a remodel?  VECO had to beef up the transfer

18   switch because of the increased power load for the increased

19   size of the house.

20           Now, he also says that, well, Allen wouldn't take the

21   generator away like I asked him to do so I asked him to add it

22   in to an overall bill after the remodel was finished, but I

23   thought he said that Allen and VECO didn't do any work on the

24   house during the remodel, so what is this mysterious overall

25   bill that the generator is going to be somehow wrapped into it?

He wanted a generator and he got a generator as a gift from
Allen and VECO, just like he wanted.  He knew he got it and he
didn't disclose it.  Period.

Take a look at Government's Exhibit No. 961.  This is
the defendant's 1999 financial disclosure form, and you'll see
there a question on each of these forms asking about whether you
received any gifts, and you'll notice that he checked the "Yes"
box, he did receive some gifts, but when you go to Section V of
that form, Roman numeral five, where you're supposed to itemize
the gifts that you received, there is no mention of the
generator.  He lists three things there, and we'll talk about
those in a minute.

Now, it was his obligation to report this, and even if
Allen didn't shove an invoice under his nose to show him how
much VECO paid for this, he's got an obligation to list a good-
faith estimate of the value of this thing.  When you look at
Government's Exhibit No. 1123, the instruction forms,
instructions for the forms that he has been filling out for over
thirty years by the time he filled out this 1999 form, it tells
you just that the term "value," it means a good-faith estimate
of the dollar value if the exact value is neither known or
easily obtainable and not otherwise required for the
instruction.  What was so difficult about acquiring the price
for this generator?  He could have asked Allen.  He had the
owner's manual.  He could have called the manufacturer and asked

what do these things go for?  And why not list the source?  He
clearly knew where this thing came from.  He disclosed nothing,
ladies and gentlemen, because he didn't want anyone to know, and
further, he couldn't let anybody know about that.  Can you
imagine what the press would have done if he would have put on
this 1999 disclosure form a $6,000 generator from Bill Allen,
CEO of VECO Corporation?  They would have been all over him.  I
mean, it would have been front-page news, and he knows that and
he knew it then.  He couldn't disclose this, ladies and
gentlemen.  Furthermore, the Senate Ethics Committee would have
started looking into this, reporting a gift like that from the
chief executive officer from a company that's the largest
private employer in the state that he represents.  Furthermore,
that would have been it.  That would have been the end of any
more benefits from Allen and VECO if he would have listed that
thing, and he certainly didn't want that.

        I now want to talk for a minute about the requirement
that certain public officials, elected public officials, have to
disclose the receipt of gifts or other benefits over a certain
dollar amount, or disclose liabilities over a certain amount.

        As you know, United States senators, like the
defendant here, must truthfully disclose each year whether or
not they've received gifts or benefits over a minimal dollar
amount.  The years in question here was anything from $260 to
$305, starting in 1999 up to 2006.  You heard Senator Stevens

admit yesterday that he is responsible, the senators are

responsible for what is disclosed or not disclosed on those

forms.  He admitted that these forms are important.  He admitted

that these forms are made available to the public, and he

admitted that it is very important to provide accurate

information, and that the Senate Select Committee on Ethics

relies on that information.

Now, for the years in question here, 1999 to 2006,

Senator Stevens again was required to disclose any gifts or

benefits.  In 1999 it was $260, all the way up to 2006 when they

had raised it up to $305, and that law is clearly laid out in

Government Exhibit No. 1123, these instructions for the forms.

The instructions describe the process by which these forms have

to be filed.  They get publicly filed every year, and they

matter.  They aren't just thrown into a file cabinet or a box

somewhere.  The Senate Select Committee on Ethics reviews the

forms to determine whether or not they comply with the law and

that they're accurate, and if the committee determines that

they're not accurate, then they ask for additional information

from the senator.  The instructions also make it clear that the

committee subjects a senator to civil sanctions if they provided

misinformation, and it also makes clear that a senator can be

subjected to criminal prosecution if that is done knowingly and

willfully.  So Government Exhibit 1123 again proves beyond a

reasonable doubt that the materiality of these offenses, whether

1   these things matter or not, has been established.  These things

2   do matter.

3          Now, there's no question that the defendant clearly

4   understood the requirement to report gifts.  He saw his

5   financial disclosure forms during the trial for the years '99 to

6   2006, and you'll have them in evidence back in the jury room

7   with you, and you saw that the defendant did indeed report the

8   receipt of certain gifts during certain years.  For example, in

9   the 1999 disclosure form that we just looked at, again, it's

10  Government Exhibit 961, he reports three gifts:  a Japanese

11  sword, amount, $2,800; $2,500 cash price; and a bust of

12  President Eisenhower, valued at $1,000, but he doesn't disclose

13  the generator, so it's obvious that he knew how and when to

14  report and whether he had received reportable gifts or other

15  benefits.  He just deliberately chose not to list that generator

16  on that '99 form.  And what you won't see on any of these other

17  later forms for the later years are any of the gifts that he got

18  from Allen, from VECO, from Bob Persons or Bob Penney.

19         Now, the secretary of the Senate and the Senate Select

20  Committee on Ethics, they stand in the shoes of the public in

21  enforcing these disclosure requirements, and let's be clear

22  here.  This case is not about, it's not about Senator Stevens

23  taking things, receiving free gifts and benefits in exchange for

24  doing anything.  That's not what this case is about.  This case

25  is about the requirement of open disclosure of whether or not

1      he's receiving these gifts and benefits.

2                Now, what was defendant's attitude towards the

3      disclosure requirement?  Let's take a look at Government's

4      Exhibit No. 1003.  This is the e-mail about the dog, one of the

5      e-mails about the dog, and this is where the defendant was

6      basically making sure everyone was getting their story straight

7      about what happened with the dog or what he wanted them to

8      believe happened with the dog, and what does he say about the

9      disclosure form?  He calls it this the GD -- pardon me -- this

10     god damn disclosure form.  That pretty much sums up his attitude

11     about these forms right there, doesn't it?  He doesn't like

12     having to do this, but he doesn't get to unilaterally decide

13     whether or not he has to comply or not.  He's not above the law

14     and he can't evade it simply because he doesn't like it.  Now,

15     he certainly didn't like having to disclose those gifts that

16     were given to him by his close friends and associates.  In fact,

17     what you saw here is that when he didn't disclose those gifts

18     we'll talk about here in a minute, and then he gets called on

19     it, people start poking around, like the press, he has to

20     manufacture stories to cover it up.  Beyond what he said about

21     the form here itself in this e-mail about the dog, what did he

22     do here in connection with this issue about the dog?  And again

23     you may hear Mr. Sullivan later today say the government made a

24     federal case about this dog.  The case isn't about the dog.

25     It's never been about the dog.  The dog's important, though,

1    because of what he does about the dog later on, and is there any

2    doubt that he cooked up a story here to cover up what actually

3    happened?  You know exactly how he got the dog.  Bob Penney

4    bought that dog at that auction in 2003 down at the Kenai River

5    Classic and he paid a thousand bucks for it.  Their own witness

6    said, Hobo Jim, the guy said Bob Penney bought the dog, and Jeri

7    Best, the lady from the auction, showed you the invoice where

8    Penney paid a thousand dollars for the dog and then he turned

9    around and he gave the dog to Senator Stevens.  In fact, you

10   heard how Catherine Stevens gave her business card to Jeri Best

11   that same night at the auction so the dog could be shipped to

12   their home in Washington, D.C.  Sometime much later in May of

13   2004 the dog comes to the attention of the press.  And the

14   defendant then cooks up a story of how the dog was not given to

15   him by Penney, that it was given to him by the Kenai River Sport

16   Fishing Association Classic.  Take a look at this slide here.

17   Up at the top you see this is the senator's 2003 financial

18   disclosure form and this is how he reported it.  August of 2003,

19   sled dog different given as honorary award in recognition of

20   public service, from the Kenai River Sport Fishing Association,

21   a value of $250.  That's not what happened here and you know it.

22   Penney bought the dog for a thousand bucks and then he goes here

23   you go.

24          Now look at the e-mail traffic in May of 2004 starting

25   with the one down here in the lower left-hand corner that's

Government's Exhibit No. 1003.  It's an e-mail he sends to
Penney on May 2nd:  Since the dog was worth more than $285, the
limit for gifts, neither you nor Bill can give it to me.  I
think I should just report that I received the dog from the
Classic.

Two days later he sends Penney another one, on May
4th, Government Exhibit 1028:  I don't think the dog was
purchased by either of them, but each paid the Classic what they
bid and the Classic gave the dog to me.  You agree, right?

And then he sends them another one later that day, on
May 4th, Government 1029:  It is very important in view of the
recent attacks on me and the publicity, I cannot accept gifts of
that value from a person.  I can accept one from the Classic.

This is a classic cover up, ladies and gentlemen.  He
knows that dog wasn't presented to him by the Classic as an
honorary award.  Penney gave it to him after he bought it, and
what they tried to do here is structure a story so that it got
laundered through the Classic so he didn't have to report that
he got this dog from Bob Penney and that it was a thousand-
dollar gift that was given to him.  And we see that time and
again in the evidence that you saw during the trial here:
repeated efforts to cover and conceal things when people, press
in particular, start nosing around and asking about some of this
stuff that he got.  Did the defendant's explanation that he gave
here at trial on Friday about what happened with the dog make

1    any sense whatsoever?  You saw how uncomfortable he became when

2    his attorney asked him to explain the dog, and you're in the

3    best position as jurors to view and observe the demeanor of

4    witnesses when they testify and make your determination as to

5    when someone appears to be telling the truth or not.  And that's

6    all I have to say about that.  If he's willing to mislead and

7    cover up about a small-ticket item like that dog, what does that

8    tell you what he'd be willing to do when we talk about things

9    like the remodel of his home?

10   Now the massage chair, the one that he got from Bob in

11   2001.  You recall that Persons bought that chair from Brookstone

12   and it cost him $2,695.  Where was it delivered to?  Right to

13   Senator Stevens' home here in the District of Columbia in March

14   of 2001.  Was it a gift?  You heard Persons admit that he told

15   the grand jury here in the District of Columbia last year it was

16   a gift for Senator Stevens.  Of course now here at trial he

17   says, oh, no, that was just a loan, but he also admitted that

18   he's already got one of these massage chairs himself.  What did

19   he need with another one?  In fact, Senator Stevens said during

20   his testimony that Persons told him I want to give this to you

21   as a gift, but Senator Stevens said I can't take that as a gift.

22   Now, remember the e-mails that we showed you between

23   the defendant and Bob Penney concerning the massage chair,

24   starting with this one, Government's Exhibit No. 445.  This was

25   on February 2nd, 2001, where Persons tells the senator that the

chair should arrive that week and that the senator should let

Persons know if the chair didn't arrive.  That's followed up

three days later by an e-mail on February 5th, 2001.  This is

Government's Exhibit 446.  The defendant replies to Persons that

fortunately we have not heard about the chair.  Two days later,

on February 7th, Persons sends an e-mail to the senator and

says, tells him that he had spoken with someone from Brookstone

who needed a local contact in case he had trouble delivering the

chair and that Persons had given Brookstone contact information

for one of Senator Stevens' staffers, Barbara Flanders.  Then

another assistant, staffer for him, e-mails the senator to

inform him on March 7th, 2001, that Brookstone would be

delivering a massage chair in the next few days, and the senator

replies, and this is Government Exhibit 461, Barb, yes, deliver

it.  Ask CAS -- you know that to be his wife -- I'd like it in

the big room downstairs.  And then finally, on March 12th, 2001,

the defendant e-mails Persons and sends him the following

message, this is Government's Exhibit 462:  Bob, the chair

arrived and I tried it out last night.  It is great.  I can't

tell you how much I enjoyed it.  Catherine and Beth tried to get

me out of it.  I just went to sleep in it.  Thank you and thanks

to Bill.  It will be a godsend this year.  It is just a loan,

but I really appreciate it being here right now.  So he says now

during his testimony that he knew Persons wanted to give this to

him as a gift but he knew that he couldn't accept the gift so

1    what do they do?  Let's just call it a loan.  Isn't that

2    basically what they did here?  We can't call this a gift.  Let's

3    just say it's a loan.  Does anyone really believe that he

4    thought that chair was a loan?  It's been in his house for seven

5    years, ladies and gentlemen.  For seven years he's sat in it,

6    he's slept in it, and you're supposed to believe that he thought

7    it was still a loan?  It's still there.  What were the terms of

8    this loan, zero percent interest at 84 months?  This was a gift

9    to him.  It was clearly a gift to him, and he knows it.  Simply

10   saying we're just going to call this a loan and therefore I

11   don't have to report it is nonsense.  And do you see the pattern

12   here?  His close friends go out and they buy him expensive stuff

13   like this, the massage chair, that Viking gas grill on the deck

14   of his home in Girdwood, the fish statue, the tool box full of

15   tools, and he says, well, these are yours, they're not really

16   mine, or they're just here as a loan and therefore I don't have

17   to report them as gifts.  Nonsense.  These are gifts that should

18   have been reported and he knows it.  Again, ladies and

19   gentlemen, how he treats these smaller items, these smaller

20   gifts, speaks volumes about how he intended to treat the big-

21   ticket items like the home remodel.  He's willing to manufacture

22   stories about this chair being a loan to cover up the fact that

23   it was clearly a gift for him.  What would he be willing to do

24   about the home renovation?

25            You also heard about the stained glass artwork that

that guy Jim Kaiser made that was purchased by Jean Penney as a
house-warming gift, and there's a picture of it, Government's
Exhibit No. 72.  It was clearly a gift and the defendant knew
that he received it.  It's hanging in the front window of his
home in Girdwood to this day.  It's also clear that this is
something that any reasonable person would know is a reportable
gift.  His wife estimated that the cost of the frame alone on
this thing was about two hundred bucks.  Now, when he received
this artwork in 2001, the limit for reporting gifts was $260.
And it doesn't matter if they say, well, this was just intended
for Catherine Stevens, it wasn't intended for the both of them,
because he's got to report gifts not only to himself, and you'll
see on the form, Did you, your spouse, or dependent child
receive any gift in excess of this dollar amount?  Now, he knew
this was a gift to both he and his wife, and even if he thought
that this was just for his wife, it still needed to be reported.
He just doesn't like the fact that he has to disclose things
like this, gifts that are given to him by his friends, and he
simply chose not to do it.  Furthermore, even if he didn't know
how much this thing cost, you know from looking at those forms
you still have an obligation to try and find out what it's
worth.  You can't just go after, you know, I don't know what
that's worth.  You have an obligation to find out.

          One of the other things you heard a lot about was the
bronze fish statue that's located on the lower deck of his home,

1    on the home in Girdwood.  This was artwork purchased for $29,000

2    at the Kenai Classic in 2002 by a group of people.  It's been on

3    the deck at his house since late '02 or '03.  The defendant

4    takes the position that this wasn't really intended for him.  It

5    was intended for this memorial library that some day is going to

6    be built.  Take a look at Government Exhibit 1021.  This is the

7    e-mail he sends to Persons in September of 2002.  What does he

8    say about this?  Bob, that sculpture was given to me by the

9    Kenai Classic crowd.  He doesn't say anything there about this

10   was purchased for the foundation so one day when there's a

11   memorial library built it will go there.  He said this was

12   purchased, given to me, and if it's really by -- if it really

13   was for this library that still hasn't been built, then why

14   didn't somebody tell the Ted Stevens Foundation they've got a

15   $29,000 asset sitting on the deck at the senator's home in

16   Girdwood?  It's still there on the deck, on the deck that VECO

17   built, and it's nice and dry because of all the other work that

18   VECO did.  It's got VECO lights all over it, and it's hooked up,

19   VECO installed and paid for the switch to turn them on and off.

20            Let's talk about the free gifts during that remodel of

21   his home.  You heard about the renovation, the add-ons, and

22   repairs that took place over the years for over seven years.

23   When all was said and done, all that work that VECO did down

24   there is worth well over a hundred thousand dollars.  These were

25   unmistakable free financial benefits that the defendant knew he

1    received, knew that he never paid a dime for it, and knows he

2    should have reported, and he never did disclose it.  Let's make

3    one thing clear.  When we talk about the value of this work that

4    VECO did at his home in Girdwood, it doesn't matter what VECO

5    thought this was worth, as Ms. Morris told you during the

6    opening statement.  It doesn't matter if VECO accounted for

7    these and figured they were $188,000, $250,000, $100,000, or

8    $50,000.  That's not the issue.  The issue is what did he think.

9    What did he think the value of all this work was that was done

10   down there?  More specifically, did he think it was worth more

11   than $260 or $305 at any given year.  Think about it this way:

12   Did he think that it was worth more than a single or maybe two

13   home visits by a plumber or electrician to do some work?  What

14   did he think it was worth?  That's the issue, not what VECO put

15   on their books.  Of course he knew it was worth more than that.

16   As Ms. Morris told you during the opening statement, you as

17   jurors don't leave your common sense behind when you walk in

18   here to become jurors.  Any reasonable person would have known

19   that.

20           Now, as you well know, Allen and VECO had a major role

21   in renovating the senator's home when it went from this rather

22   modest A-frame chalet to this.  And just let's stop here for a

23   minute and think.  Now, why would he ask Bill Allen and VECO to

24   be involved in this home renovation?  When you think of the home

25   remodel, do you think, boy, I need an oil field services company

1    to do this work, or I need a company that's never built a house

2    before?  How about this:  The defendant was happy with VECO

3    doing this, even though they were the most improbable home

4    contractor around because he knew that his good friend, Bill

5    Allen, was wealthy, he knew that Bill Allen was generous, he

6    knew that his close friends Bill Allen and Bob Persons were

7    loyal and trusted friends who would cover for him, and he knew

8    that the price was right.  He was going to get this work for

9    free.  In fact, Allen explained to you how VECO, a company that

10   doesn't build homes and never had built one before, got involved

11   in this.  Senator Stevens shared with Allen his desire to

12   increase the space of his home in Girdwood.  Initially what he

13   was talking about remember was simply raising the house and

14   building that additional space underneath.  Now, when the

15   defendant first mentioned this idea to Allen, Allen says, he

16   told the senator that I think VECO might have the equipment to

17   do that, and how did the senator respond?  He said, yeah, that's

18   great.  And in fact, yesterday you saw that as early as 1997 in

19   that letter we looked at that the defendant was wanted to raise

20   the chalet and add that space underneath but he simply didn't

21   have the money to do it.  This is that letter, Government

22   Exhibit 401, that he wrote to Stevens and Anderson where he

23   says, incidentally, I did look into lifting the chalet.  I just

24   have not had the cash to do that, so we fast-forward to 1999 and

25   2000.  The idea comes up again about raising the house and

1  building the space underneath it.  And that's when Allen finds

2  out about it.  And they have this discussion about VECO doing

3  the work.  Now, when the work finally starts on this in the

4  summer of 2000, is there any question that the defendant fully

5  understands that VECO is doing the initial work down there?

6  Take a look at Government's Exhibit No. 1031.  This is a July

7  20th, 2000, e-mail from Bob Persons to the senator.  And what

8  does Persons tell him in this e-mail?  Again, this is July 20th

9  of 2000.  "I spoke to Bill and Rocky this morning.  Rocky will

10  begin the drawings Friday and hopefully will have them for me on

11  Monday."

12       There's no question who Bill and Rocky are.  The

13  defendant clearly knew that VECO was doing the work on the

14  chalet right from the start.  Look at the dates here.  This is

15  July 20th, a month before the chalet actually ever got lifted,

16  and it's way before Augie Paone and Christensen Builders get

17  involved in this.

18       Now, as you learned at some point, the plan to simply

19  raise the chalet and add that space underneath changed.

20  Defendant tells Allen that his wife, Catherine Stevens, wants to

21  make the home larger than simply adding that one room

22  underneath.  As Allen told you, that once he hears that, that

23  it's going to be more complicated, he told Senator Stevens we

24  probably should have some sort of formal architectural plans to

25  work off if it's going to be that complicated.  And he tells the

1   senator that he could probably have someone at VECO do that

2   work, and in fact, as you learned, Allen did arrange for VECO to

3   provide that service, and that was John Hess, the VECO employee

4   who was the first witness that you heard from in this trial.

5   There's one of Hess' drawings that he did for the remodel.  You

6   heard about how Hess met with Allen and with the senator to

7   discuss the Girdwood renovation.  Was there any mystery as to

8   who John Hess was?  You heard how Hess was introduced to Senator

9   Stevens as a VECO employee.  During his testimony here the

10  defendant initially said something about how well Allen

11  recommended that we hire this guy.  I think his name was Hess.

12  During cross-examination he finally admitted that he knew Hess

13  worked for VECO, but then he gave some bizarre explanation how

14  he thought that Hess was actually working on his own, was

15  moonlighting, I guess, while he did this work and that he

16  thought that they had hired him directly.  But he also says

17  there's no contract with Hess, he didn't get a cost estimate

18  from Hess as to how much this was going to cost him, and he said

19  he didn't care how much Hess' services were going to cost.  Does

20  that make any sense whatsoever?  Do you really think if he

21  thought he was hiring Hess directly he would have at a minimum

22  gotten a cost estimate from this guy, how much is this going to

23  cost me?  The defendant and his wife were both attorneys.  Does

24  it make any sense that he would have sailed off on this venture

25  with Hess without getting things in writing up front?  In fact,

1    later on when they talk about Hess screwed up, he screwed up on

2    the design of the roof, if he thought he was hiring Hess

3    directly, they would have had some protections in place for just

4    that very eventuality.  He looked at those memos and e-mails

5    between the defendant and Barbara Flanders, his assistant who

6    effectively acted as his bookkeeper or his personal financial

7    accountant, and ask yourself does his explanation I didn't

8    really care how much it cost, it's the Alaska way, we just do

9    it?  Does that make any sense if this is a guy who kept

10   meticulous track of his personal financial matters?  He's got

11   Barbara Flanders updating him on a regular basis as to where his

12   money is going.  It doesn't make any sense that he would have,

13   you know, engaged in this relationship that he said that he

14   thought he had with Hess without getting some sort of financial

15   understanding with this guy?  It's nonsense, ladies and

16   gentlemen.

17          Now, Hess told you about how he and the senator

18   discussed design ideas at that initial meeting and then they had

19   further communication back and forth after that.  Hess is doing

20   the drawings and he's sending them back either by facsimile or

21   otherwise.  He's getting input from Senator Stevens on what they

22   want.  And during the course of his communication with the

23   senator, Hess receives this handwritten note dated August 26th

24   of 2000, which the senator has sent to Hess' VECO address.  This

25   is the one where he says I need a bill from you, Hess, and he

1    sends it to VECO.  When he was asked, well, why did you send

2    that to VECO, he said something like my secretary mailed it

3    there.  How would she know where to mail this letter to that

4    guy?  The senator is dealing with him directly.  His wife wasn't

5    involved at this point.  Bob Persons isn't involved.  Senator

6    Stevens would have had to have told her where to send this thing

7    to the place where this guy work, VECO corporation.  Hess told

8    you when he got this letter he replied to Senator Stevens and

9    said, look, I can't bill you for my time.  I'm already being

10   paid by VECO while I did this work, and he told the senator,

11   look, you're going to have to talk to Bill Allen if you want to

12   bill for my services.  The defendant tells you, well, this

13   letter went to Hess and then I never heard from them again, but

14   I assume that he sent us a bill and we paid it.  Huh?  You know,

15   who would Hess have sent the bill to?  He was dealing directly

16   with Senator Stevens here.  He wasn't dealing with his wife or

17   with Bob Persons or with the senator's secretary or anybody

18   else, and remember, this is still early on.  This is well before

19   they got any financing, well before Paone enters the picture.

20   Does that make any sense whatsoever?  How could he possibly

21   assume that Hess sent him a bill and that it was paid?  Think

22   about this too:  Why does he ask Hess to send him a bill?  He

23   knew that Hess worked for VECO.  Why doesn't he just go to Allen

24   directly and say, look, I got to pay for Hess' time?  Because,

25   ladies and gentlemen, he knew that Hess was outside of his

comfort zone.  Hess wasn't part of his trusted inner circle of
Allen, Persons, and Penney, and he had to cover himself with
Hess just in case.  If it ever became an issue he can pull out
the letter and say, well, I asked for a bill.  Of course he
never asks Allen for a bill because he didn't expect a bill for
Hess' services.  He understood what was going on here, that he
was going to receive the gift of John Hess' time.  From this
point on, the point in time where Rocky Williams and Dave
Anderson and John Hess start to get involved in this work on his
chalet, again, this is well before Augie Paone comes into the
picture, the defendant knew and he understood that the workers
that Allen was bringing in on this thing were VECO workers, they
were on VECO time, and that he was going to get their services
for free.  His explanation that he thought all these guys were
moonlighting or just working on their own is nonsense.  It makes
no sense whatsoever.  He knew they worked for VECO and he
understood that they were being paid by VECO when they were
doing this work.

Equally absurd is his testimony that he thought it was
only Bill Allen, not VECO Corporation, Bill Allen who was
involved in this.  How many times have you heard that in this
trial?  Bill Allen was VECO, and he certainly knew that.  Allen
didn't have a private Army of people that were being paid by him
directly.  These guys were all VECO employees.  Now -- oh, and
what is their other subtle little defense to this?  That Hess

did a bad job, now the house has problems with ice build-up.
Well, you get what you pay for.  That's what you get when you
get it for free.  You don't get any warranties for something
that's provided to you for free.  You know the expression you
can pay me now or pay me later?  Senator Stevens chose the "pay
me never" option.

Here's another thing.  When they clearly know that
Hess was the architect on this project, everybody knew that, and
it comes time to list a general contractor and the architect on
that building permit application, do they list VECO and Bill
Allen, the people that are doing the work down there, or John
Hess?  Of course they don't.  This is Government's Exhibit 2003,
the permit application.  You know, how could they do that if
they want to keep VECO and Allen's involvement in this quiet?
They can't put Bill Allen/VECO, contractor, or John Hess/VECO as
the architect, so instead the permit application lists two
people who were guaranteed to keep VECO's involvement in this
quiet and who would mislead the press or anybody else when they
came poking around if it came to that, and that was Bob Persons
and the owner of the home, Senator Stevens.

Now, VECO, as you know, supplied a substantial amount
of labor and materials that were used in the construction of
that home for free, just like the defendant expected.  You heard
about how Rocky Williams and Dave Anderson, both of whom were
long-time VECO employees, were assigned to oversee the work that

1   was being done down there.  In fact, as Anderson told you, both

2   he and Williams spent hundreds of hours down there working on

3   the home and supervising the renovation.  All of that time which

4   VECO, not Senator Stevens, paid for.  Now, is there any question

5   that the defendant knew that VECO was working on the house at

6   this time?  I know you've seen all these e-mails, and you're

7   probably sick of seeing them by now, but let's take a look at

8   this letter.  This is Government's Exhibit 428.  This is a

9   letter that Senator Stevens writes to Allen on August 21st,

10  2000.  Again, this is before Paone comes into the picture.  And

11  what does he say?  "Thank you for all you are doing to help us

12  on the house."  The lifting was supposed to start.  Now, again,

13  his explanation that he thought these guys, Rocky and Dave, were

14  somehow just moonlighting, that they weren't on VECO's clock, is

15  just ridiculous, and his story that, well, I thought we were

16  paying these guys through Paone, does that make any sense

17  whatsoever?  He's got these guys down there working on that

18  house well before Paone shows up, well before Paone is brought

19  in by VECO.  That e-mail that we looked at a little bit, the one

20  that was dated July 20th of 2000, he knew from that that Rocky

21  Williams is working on the house as of July 20th.  How could he

22  possibly have thought that he was paying these guys through

23  Paone?  That's just nonsense.

24          Now, they tried to leave you with the impression that

25  they thought that Bill Allen was somehow separated from VECO,

and Catherine Stevens said something like, well, she thought

that he had been retired for the last several years.  That's not

true, and Senator Stevens knows that.  He knows that Bill Allen

ran that company right up until the time it was sold last year,

and if there's any doubt about that, consider that he was

dealing with Allen on these gas pipeline issues that were of

great importance to VECO throughout 2006.  You heard the

testimony about that, and you may have seen one or two e-mails

about that.  Bill Allen wasn't divorced and separated from VECO.

He hadn't retired.  He was running that company right up until

the end, and Senator Stevens knows that.

Now, you're supposed to believe that they thought

Rocky and Dave were somehow working directly for Paone and

Christensen Builders.  It's nonsense again, ladies and

gentlemen.  Why does his wife send that correspondence to Rocky

Williams at VECO?  She couldn't explain that one away, other

than to say, well, I knew he worked there at one time.  If they

thought he was working for Paone and Christensen Builders why

not send to Paone and Christensen Builders?  They certainly had

that address.

Now, there's no dispute that the actual lifting of the

chalet was done by Hannah Construction and the senator and his

wife paid for that.  And as you know, the renovation also

required excavation work, which was done by the Redmonds, the

folks that live down there in Girdwood, and there is no dispute

1  that the defendant and his wife paid for that work too, but

2  think about this:  Of course they had to pay Hannah and Redmond.

3  Hannah and Redmond aren't billion-dollar companies that can

4  absorb the costs.  They're not close friends who he could count

5  on to keep quiet, and in the end the defendant had to pay

6  something in relation to this home remodel if the scheme to

7  conceal VECO's involvement was ever going to work.  He had to be

8  able to produce some checks showing that he had paid for

9  something.  And while the defendant paid for the lifting and the

10 excavation, as you heard, VECO employees, including Rocky

11 Williams and Dave Anderson, were on the scene all this time

12 observing what was going on and overseeing the entire

13 operations.  It was Williams and Anderson, as Anderson told you,

14 who built that new subfloor after the house had been raised, and

15 again, this is well before Augie Paone comes into the picture.

16 As the renovations became more complicated, as you know, VECO

17 realized that their employees didn't have the expertise in home

18 renovation necessary to effectively complete all the work, so it

19 was VECO, VECO, not the defendant, who decided that a third-

20 party builder should be brought in to assist in completing the

21 renovation.  In fact, Augie Paone, the guy who winds up coming

22 in, tells you that.  He wasn't contacted by Bob Persons or the

23 senator or his wife.  It was VECO who lined him up to do that

24 work.  And what does that tell you right there about VECO's

25 involvement in this at that stage?  As Paone told you, VECO was

1    running the show down here, not him.  And again, it's not until

2    September 2000, after the project is well under way, that Paone

3    gets contacted by VECO and lined up to come in and work.  Is

4    there any question about that, who about who lined Paone up?

5    Take a look at Government's Exhibit 1023.  This is that e-mail

6    from Persons to Senator Stevens on October 13th, 2000.  And he

7    said, Bill is a champ for keeping Rocky and Dave on the job and

8    securing Augie's construction company to do the concrete and

9    most of the carpentry.  Concrete and carpentry, that says it

10   right there, doesn't it, ladies and gentlemen?  What about all

11   the other stuff, like the engineering and the electrical work

12   and the plumbing and the steel structures that were put on the

13   house?  Well, you know who did that.  And remember this.  This

14   is that press statement that the defendant and his wife

15   authorized in late 2004 when the press starts poking around

16   about this rumor they've heard about VECO being involved in the

17   home renovations.  What do they say in this press statement?

18   Through the help of their good friend and long-time Girdwood

19   resident, Bob Persons, Mrs. Stevens secured the help of a

20   general contractor.  That's not true.  VECO lined that up and

21   they knew it when they authorized the statement saying it was

22   Persons and Stevens who contacted Paone.  It's not true.  It was

23   a false statement manufactured by the defendant and Persons and

24   his wife to cover up VECO and Allen's involvement in this.

25   Christensen assists in the renovation project from September

1    2000 to March 2001.  As you know, there's numerous other VECO

2    employees working on the house at the same time, and you also

3    heard again that was VECO employees, primarily Williams and

4    Anderson, not Paone, who generally had direct contact with the

5    senator or his wife about the home renovations.  What does that

6    tell you right there?  In fact, Paone said it on

7    cross-examination:  VECO ran the show on this home remodel.

8    Paone basically did the concrete, the carpentry, and the finish

9    work, and VECO did everything else.

10         Now, there is no dispute that the defendant and his

11   wife paid Paone for most of the work that he did down there and

12   for a lot of materials that went into the construction.  And

13   again, ladies and gentlemen, of course he paid him.  He had to.

14   Christensen Builders wasn't a billion-dollar company.  They

15   wouldn't absorb the costs on this.  Augie Paone was not a close

16   personal friend who the senator could count on to be quiet in

17   the end.  Again, if the scheme to conceal VECO's involvement in

18   this was ever going to work, they had to be able to produce some

19   checks showing that they paid for some of this.

20         One other thing that's significant about the payments

21   that were made to Christensen, take a look at Defense Exhibit

22   No. 560.  This is the last payment that was made here.  It's

23   dated March 28th of 2001, but the check only pays for work that

24   was done through February the 18th.  It says 2/14/01 on there,

25   but the corresponding invoice says February 18th.  Now, why is

that significant?  Because the remodel was not finished on
February 18th.  There was still a lot of work that remained to
be and which was done after February the 18th, and the defendant
and his wife know that.  They know this thing wasn't finished as
of February 18th.  Now, VECO worked on the house throughout that
remodel, right from the beginning up till the end.  You know
that they did all the electrical work, plumbing work, some of
the carpentry work, and all of the manufacturing and
installation of the steel structures, and he wasn't aware of
this?  Of course he was.  And again, I know you're sick of
looking at these e-mails, but keep in mind that Bob Persons is
giving him regular updates as to what's going on during that
remodel.  You start by looking at Exhibit 1017.  This is an
e-mail from Bob Persons on September 10.  What does he say?  "I
can't emphasize how much and how well Rocky does.  Bill is a
true gem there.  The guy works seven days a week on Bill's
projects."

        Let's follow it up by an e-mail the following day, on
September 11th, Government Exhibit 1038.  Rocky is pretty
impatient to get the plywood on the walls because the north wind
is beginning to blow.  A few days later, on September 14th,
Government Exhibit 1018, he reports that Bill has arranged for
an electrician and plumber to come in as soon as the house is
closed up.  Boy, he sure did, didn't he, ladies and gentlemen?
That's followed up on a September 16th e-mail, Government's

1    Exhibit 1019.  Rocky wants to know if Catherine would like the

2    house painted a different color.  The next day he sends him an

3    e-mail, Government's Exhibit No. 1040, and says that Bill comes

4    out quite often and Dave works every day, and then the defendant

5    forwards that e-mail to his wife the next day with this note:

6    How about that, Bill Allen going out to work on the house with

7    Rocky?  A few days later, on September 20th, Government Exhibit

8    1020, Persons reports that the plumbers are laying their part

9    out.  Rocky thinks CAS wants hardwood floors throughout, and

10   then the defendant sends this e-mail to Allen on September 24th,

11   Government Exhibit 432.  But what does he say?  Bob has been

12   filling us in on all the help you've given him on our project.

13   We've never -- it's all the work you guys have done, and we've

14   never worked with a man so easy to get along with as Rocky, plus

15   everyone who's seen the place wants to no who's done the things

16   he's done.  There's no question that he knows at a minimum that

17   Rocky Williams has been working on this thing from at least July

18   20th and continuing all the way through the completion of this

19   project.

20          Take a look at this e-mail.  It's Government's Exhibit

21   464.  This is one that the senator sent to his son on March 14th

22   of 2001, the following spring.  What does he say?  Bill Allen,

23   Bob Persons, and Rocky and Bill have keys, have keys to the

24   chalet, so he clearly knows that Rocky Williams is still working

25   this job right up to the end.  Now he has to concede that

 1    Williams and Anderson were working on the house, and he has to

 2    concede, well, I knew they were long-time VECO workers, but now

 3    he says I thought they were working on their own.  They weren't

 4    on VECO's clock.  I thought we were paying them directly through

 5    Paone, and he also tries to make this differential between Allen

 6    and VECO.  Does that make any sense whatsoever?  Who told him

 7    that?  He doesn't know that these guys worked for VECO.  Bill

 8    Allen is one of his closest friends ever.  You heard him

 9    describe that relationship on one of the conversations you

10    listened to.  He doesn't know that these guys worked for VECO?

11    It's just nonsense, ladies and gentlemen.

12           Now, do you see what happened here?  Bill Allen, he

13    wanted to help Senator Stevens.  He wanted to give and the

14    senator was perfectly willing to receive the gift of Rocky and

15    Dave and John Hess and Doug Alkie and Derrick Awad and Dave

16    Anderson, Junior and Dan McBurney and Jeremiah Eldridge and Roy

17    Demmer and Cecil Dale, III and Clint Murdock and Daniel Johnston

18    and John Fugate and Edgar Hernandez and Adam Pedia, Jack

19    Billings, Brian Bryne and Mark Firie and Charlie Hart.  Those

20    are all guys who worked on the senator's house over the years,

21    and it was all labor that VECO, not Senator Stevens, paid for.

22    It's nonsense, ladies and gentlemen, this notion that they

23    didn't know that VECO was responsible for a substantial portion

24    of this remodel and all of those add-ons and repairs later on.

25           Now, one other thing about this e-mail traffic from

1    Persons that we looked at to the defendant in the fall of 2000,

2    numerous times he mentioned specific things in some of these

3    e-mails, specific cost items, such as the first bill from Augie

4    or the cost of the Jacuzzi; things like that.  No where does he

5    mention the cost of any plumbing or electrical work, because

6    there was no cost.  It was free, courtesy of VECO, and the

7    defendant knew it.

8         Now I want to talk a little bit about those infamous

9    steel stairs post landings that were installed on the house,

10   Government Exhibit No. 352.  There is a picture of the stairs

11   right there (indicating).  No question that VECO did all of the

12   exterior metal work on the house, including that steel staircase

13   and the coverings.  The defendant in a much mishap said we

14   didn't want it.  That's not what we wanted, and he thought that

15   somehow it was Bill Allen, not VECO, who would supply these

16   materials?  Does that make any sense whatsoever?  Bill Allen has

17   got his own private scrap yard in the backyard of his house?

18   That's nonsense, ladies and gentlemen.  This steel came from

19   VECO, and he knows it.  What about the story the defendant told

20   during cross-examination about how this staircase came off an

21   old oil platform, they weren't custom made?  What a

22   co-incidence, steps that come off the side of a platform exactly

23   match the side of his house.  You heard about how these stairs

24   were custom fabricated by Dave Anderson at VECO.  Perfect match.

25        Now, the metal work included the platform and the

1    ladder on the back of the house.  That's Government's Exhibit

2    249 there, and it included that escape ladder which VECO bought.

3    That one item light there alone VECO spend $1,900 for it to go

4    along with that platform there.  It was all free, courtesy of

5    VECO, and he knew it.  What's his defense of this?  He didn't

6    want it, Allen just did it.  Allen has bad taste.  The steel

7    stairs weren't appropriate for the chalet.  What do you expect

8    when you have an oil field services company doing this work on

9    your house?  He got what he paid for.

10          And of course, as you know, it didn't stop there.

11   There was more stuff that Allen gave to the defendant.  This is

12   Government's Exhibit 1109.  There's the gas grill.  The

13   professional Viking gas grill that's permanently plugged into

14   the gas line on the senator's house.  What does he say about

15   that again?  This isn't mine, this is Bill Allen's.  I didn't

16   want it, but it's still there, it's still there on his deck,

17   ladies and gentlemen.

18          We got the tool box full of tools, Government Exhibit

19   No. 74.  There's a particular purchase of it there.  He said

20   again, I didn't want these.  I've got my own tools, but they're

21   still there.

22          The black leather furniture and the other stuff,

23   Government's Exhibit 285, what did he say yesterday?  Bill Allen

24   stole my furniture and he replaced it with all this stuff I

25   didn't want.  It's inappropriate.  We don't like it, we hate it.

It's still there in the chalet, and if it was so offensive and
so bad, then why was he considering giving that stuff to his son
and daughter-in-law?

Defense Exhibit 3322, this is the e-mail that he sends
to Allen.  Liz, Ben, and Elizabeth are looking at a larger
house.  We told them if they got one we'd like for him to bring
the furniture over to the chalet.  If they want the stuff.  And
he didn't stop Allen from giving them stuff.

What about this?  This is an e-mail that he sent to
Bill Allen in July 2003.  What does he say there?  Catherine hit
her head on the roof.  The bed is too big.  She wants me to get
a queen size bed.  Could you arrange to get this done?  We may
need to get some new sheets for the smaller bed.

If he can't control this guy, if Allen is just
continually shoving stuff at him that he doesn't want, if Allen
won't do what he says he asked him to do, get rid of the stuff,
why in July of 2003 is he asking him for help to get a bed into
their bedroom at Girdwood?  It's nonsense, ladies and gentlemen.
He had no problem at all with Allen giving him this stuff.  Now,
again, if you really wanted Allen to stop, take his key away.
The guy's had a key to that house for years.  In fact, you heard
the senator state at one point we even had the house rekeyed,
they had the locks changed and they gave Allen a new key.  Does
that sound like he wants him to stop?  He stole my furniture.
Well, why not call the cops, get a restraining order?  It's

nonsense, ladies and gentlemen.  There's no doubt that VECO

spent a ton of money on the remodel of that house.  When you

consider that Christensen Builders, they for most of this time

just had two guys working on there.  You heard that Paone wasn't

there very often, a couple times a week, and basically they had

twelve guys working on the tab where it came to $150,000.  What

do you think VECO has sunk into this when they got all these

guys working on the house?  I am sure there was some

unsatisfaction and some insufficiency, but that's what you get

when you have an oil field services company doing this work.

Were they really that unsatisfied?  Keep in mind they tipped

Rocky Williams that $2,000 check because they had been so

delighted with the work he had done.  Again, the issue is not

what the value of VECO for that work, what does he think it's

worth, what does he think that free labor is worth by him?  More

than a visit by an electrician or plumber.  Any person would

knows the labor he put in that house was way above the amount he

should have reported.

Now we get to the 2002 work, the construction of the

lower deck, the de-icing system on the roof, and the lights all

over the house and in the tree.

Can you skip ahead to Government's Exhibit No. 67?

There's the photograph of the lower deck and that subroof, that

plastic roof that was put on to keep the water off.  You heard

about that.  VECO paid for all of that.  They hired that Brian

1    Bryne guy, the carpenter, to build the deck.  VECO paid for all

2    the materials.  When all was said and done, they paid Byrne over

3    $4,400, and the materials alone came to something like $3,500 to

4    $7,000.  They also supplied laborers.  He hired Hernandez and

5    Adam Pedia to go down and help Bryne build that deck, and then

6    they stained the deck after it was done and refinished the upper

7    deck.  All that was paid for by VECO.  Then they build -- that

8    work Dave Anderson told you about that -- the entire lower deck

9    package.  If you add in that roof and everything that was done

10   there, conservatively that cost VECO at least $15,000 when you

11   factor in all the labor and all the materials.  Now, what does

12   the defendant and his wife say about that?  She says she doesn't

13   have any idea where the deck came from, didn't know who built it

14   or who paid for it or who they may owe for it.  The defendant

15   said he knew Allen went ahead and did it, but I didn't object to

16   it and I thought we paid for it and I want to pay for it.  That

17   doesn't make any sense.  They didn't talk about it between the

18   two of them.  It's nonsense, ladies and gentlemen.  He says,

19   well, I asked for a bill and I assumed that Allen sent me one

20   and we paid for it.  Why does he assume that?

21       Now, the heat tape that they put on the roof, that

22   VECO put on the roof.  You heard a lot about that.  Government

23   Exhibit 100 is a photograph of that heat tape.  Again defendant

24   says I wasn't consulted about this.  Allen just went ahead and

25   did it.  It's more stuff that Allen just keeps sticking on his

1    house.

2           And the rope lights, again, you heard about that.

3    That was something Allen told you the senator didn't ask for,

4    that he just went ahead and did it because he thought it would

5    be a nice idea.  I wanted to do something nice for my friend.

6    Is there any question that the defendant knew that VECO was

7    doing all this work in 2002?  Again, Persons is just giving him

8    regular e-mail updates.  Start with government Exhibit 484.

9    This is an e-mail that Persons sent on September 18th for

10   reports on the construction of the deck.  "I'm dumbfounded by

11   the work on the house.  The lower deck is beautiful and pretty

12   fancy with a clear roof on it."  When the senator gets that

13   e-mail, does he send an urgent message back, is this Bill Allen

14   again putting stuff on my house?  Does he send him a bill?

15   Cease and desist, I don't want that?  Of course not.  A week

16   later Persons sends him another one on September 24th,

17   Government's Exhibit 491.  You're going to love the changes Bill

18   has made to the house.  The porch is beautiful and the de-icer

19   on the roof is clear.  He knows it's Bill Allen again.  Does he

20   send another urgent message to Bill Allen or others, cease and

21   desist, I don't want that stuff?  Of course he doesn't.

22          Finally in November Persons sends him an e-mail to

23   notify him about the lights, all that work that was done by

24   VECO.  VECO conservatively sinks at least another 40 to $50,000

25   into that house at that time.  There again defense didn't want

1    it, didn't like it, never asked for it.  Isn't that what a gift

2    is?  For your birthday do you run around and tell your friends

3    I'd like gifts, please?  These were gifts given to him by Allen

4    and by VECO, and he knew it.  He says I did ask for a bill for

5    2002 work.  Government 495 is the note he sent on October 6th,

6    2002, the Torricelli note, and you remember what Bill Allen said

7    after that?  Bob Persons did pay him a visit, came by and he

8    told him, look, he doesn't really want a bill.  He's just --

9    pardon my French -- covering his ass.  Now the defendant says,

10   well, Allen just made that up, that's a lie, that never

11   happened.  Again, you saw and you heard from Bill Allen and you

12   saw and you heard from Bob Persons.  You can judge yourself the

13   credibility of those two individuals.  Again, if that were so,

14   if Allen just made that up, wouldn't the story be better about

15   that?

16          Think about this too.  When you fast-forward to

17   February of 2006 when Persons and Allen are talking about how to

18   cover up the fact that Allen had paid for the labor charges on

19   that bill, the boiler repair, what do they talk about?  We won't

20   play those for you right now because we're constrained for time,

21   but remember what Persons says:  You got to talk to that

22   plumber, get him to take that out of his file, lose that

23   document, tell him to get rid of it.  First thing I'm going to

24   do is scratch off on my copy "Labor paid by Bill."  You got to

25   make that guy believe that Ted actually did pay for the labor.

He comes up with the idea why don't you just have Ted write you a check and you never cash it, don't deposit it, and if anybody asks you about it, you can say look here, he did pay for it. What does that tell you about what Persons would be willing to do to cover for the defendant?  You saw that in his testimony right here in this trial, ladies and gentlemen.  His whole testimony here was yet another effort to cover for Senator Stevens.

Now, as you know, there was additional work done by VECO at the house after this 2002 work.  There's a bunch of repairs that take place from 2004 to 2006 when John Fugate, the fellow who went down to fix the heat tape, and Jack Billings, both go down there to repair stuff at the house.  Is there any question that the senator knew that John Fugate was a VECO employee?  You heard Fugate say I left him my VECO card, and the senator sends that little thank-you note with the key chain?  Where?  To Fugate at his VECO address.  He knew Billings was a VECO employee too, but does he ever ask these guys send me a bill for your services?  He didn't ask Fugate for a bill and he didn't ask Billings for a bill because, once again, he knew what the deal was.  Bill Allen was taking care of him just like he had done throughout this.  Same thing on that boiler repair, the boiler repair in January of 2006.  He knows, he fully knows that Bill Allen paid for the labor.  It says that right on the copy of his bill, and after that he contacts VECO and says I should

1    really pay for the plumber, but he never does.  He never does

2    pay for the plumber, and he certainly can find out, if he

3    couldn't squeeze it out of Bill Allen, how much that labor was.

4    He could have called that Charlie Hart guy at Chugach Sewer &

5    Drain, how much was the labor, Charlie?

6              Now, in closing, ladies and gentlemen, what is really

7    telling here is the defendant's own words and his own actions

8    after he learned that Allen had been contacted by the FBI and

9    after he learned that a number of search warrants had been

10   served, and after he learned that the work that had been done on

11   his house in Girdwood by VECO was the focus of the

12   investigation.  Remember the e-mails that he sends to Persons on

13   September 1st, 2006?  This is Government's Exhibit 1013.  Bob,

14   press releases say the FBI served a warrant in Girdwood.  Did

15   they hit our house?  What does that tell you right there?  He is

16   worried about that.  Did they hit our house?  If he doesn't have

17   anything to worry about, why is he sending this frantic

18   did-they-hit-our-house message to Persons that's followed up by

19   a second one later that day where he says have you been by the

20   chalet?  And he's worried about this, ladies and gentlemen.  He

21   knows what's going on.

22             And then we get to that conversation that he has with

23   Allen on October 18th of 2006.  This is the one where he says a

24   number of times throughout the conversation we didn't do

25   anything wrong.  Well, you know, but what's really telling is

these two brief clips that we're going to play for you.  Take a
listen to this first one.

(Audiotape played.)

MR. BOTTINI:  Does that sound like someone who really
believes that he didn't do anything wrong?  If he thought that
he had paid all the bills and had received no gifts, then what
is it that he and Bill Allen could have done that would leave an
impression that they had done something wrong?  And how about
when he says it's a long time before we're going to be in front
of a jury?  What does that tell us?  And listen to this next
clip.

(Audiotape played.)

MR. BOTTINI:  Who talks about spending a little time
in jail unless they know they've done something wrong?  What
does that tell you right there?  "I'm developing an attitude
that I don't think I did anything wrong."  That says it all
right there, doesn't it?  You don't develop an attitude that you
don't think you've done anything wrong unless you know you've
done something wrong.

Ladies and gentlemen, the defendant is charged with
covering up and concealing the fact that he had received these
benefits by filling out financial disclosure forms which
contained false statements concerning the benefits he received,
and we told you at the beginning of the trial that we would
prove to you that the defendant knew each year that he was

1    required to publicly disclose any gifts or financial benefits

2    that he had received over a certain dollar value, and likewise,

3    that he had to disclose the existence of any debt or liability

4    over a certain amount.  We told you that we would prove that he

5    knew he received these financial benefits from Bill Allen from

6    VECO and from others that had a dollar value far above the

7    amount which was required to be reported.  We told you that we

8    would prove that he knowingly and willfully failed to disclose

9    those benefits when he knew that he was required to disclose

10   them, and finally, we told you that his nondisclosure of those

11   benefits was material.  It simply means that it mattered, that

12   if he had truthfully reported these things it could have made a

13   difference, and as we told you right from the beginning, ladies

14   and gentlemen, this case is about an elected public official who

15   made a conscious decision to hide the fact that he was receiving

16   these substantial financial benefits.  The defendant had a clear

17   legal duty to disclose these things and he simply chose to cover

18   it up.  Based on the overwhelming evidence in this case, there's

19   no question that the defendant knew that he was getting

20   substantial benefits from Allen, from VECO Corporation, and

21   others during this time frame, from '99 to 2006.  There's no

22   question that he knew he was required to disclose that.  There's

23   no question that he knowingly and willfully failed to do so.

24   And we ask you on behalf of the United States to find the

25   defendant guilty of each of the false statement crimes charged

```
 1    against him in the indictment.

 2              Thank you for your attention.

 3              THE COURT:  All right.  Thank you, counsel.

 4              Ladies and gentlemen, we'll take our fifteen-minute

 5    recess.

 6              (Jury exits courtroom at about 10:56 a.m.)

 7              THE COURT:  Ladies and gentlemen, you're more than

 8    welcome to be here.  I have to insist, though, that if anyone

 9    has a cell phone on, turn it off or the marshal will take it

10    from you.  We're getting feedback up here with our electronic

11    equipment.  It's interfering with our equipment, and that's not

12    acceptable, so please turn your phones off.

13              The other thing is, counsel, I didn't write the

14    exhibit number down of the e-mail dated 7/12/03.  I believe the

15    last paragraph should be redacted for speech-and-debate reasons.

16    Take a look at that.  I just don't have the exhibit number.  It

17    just popped off the screen before I could get to it, but the

18    last paragraph should not go back to the jury room.

19              We'll resume promptly in fifteen minutes.  That will

20    be 11:15.  Thank you.

21              (Recess taken at about 11:16 a.m.)

22              COURTROOM DEPUTY:  Please remain seated and come to

23    order.

24              THE COURT:  All right.  Carol?

25              If anyone needs to turn his or her phone off, I won't
```

1    look for a few minutes.  Seriously, it really interferes with

2    the court reporter.

3              (Jury enters courtroom at about 11:16 a.m.)

4              THE COURT:  All right, ladies and gentlemen.  We'll

5    proceed with the defendant's closing argument.

6

7                     CLOSING ARGUMENT

8

9              MR. B. SULLIVAN:  Let me start by thanking you for

10   serving as a juror in the District of Columbia.

11             You've heard a very twisted interpretation of the

12   evidence, and that's why I guess the judge warns all the time

13   you should look at the evidence yourself and not listen to

14   lawyers.  I'm going to be very careful in going to the evidence

15   to show you what really happened.

16             I forgot to turn my mike on.  Sorry.

17             Not only were you given a twisted interpretation of

18   the evidence, but you've been given a varying interpretation of

19   real life, the way they lived it, the way they lived it.  Not,

20   seven, six, eight years later.  To believe the government's

21   version of the evidence you got to think he's some mastermind of

22   a conspiracy that goes through life, doesn't mean what he says

23   in the documents, writes something so it will protect him seven

24   or eight years later out here somewhere, and by the way, that

25   little trick at the end about that tape, you listen to that tape

of October 18th, not a word on that tape about renovations, about gifts, nothing.  That tape is Ted Stevens talking to Bill Allen when Bill Allen is distressed about what's happening in his life.  It focuses on campaign contributions, potential campaign violations.  That's what the focus of that is.  Not one word.  It had nothing to do with what counsel said it addressed.

You see, the problem is, if you look at life through a filthy dirty glass, we've all seen them places, just dirty glass that doesn't get washed for five years or ten years, some hard-to-get place, then the whole world looks dirty.  You have heard evidence that this is a very decent man.  Would he be involved in a conspiracy in 2000, 2001, year after year, covering, covering up?

To believe the government you have to ignore the written record.  The government uses the word "nonsense, nonsense," a dozen times when it addresses how real people who lived a real life back in 2000, '01, '02, and so forth lived. The government doesn't want you to understand the evidence here.

Ladies and gentlemen of the District of Columbia, you have an innocent man on your hands, and you've got to understand the evidence.  You've got to understand what the evidence means. It doesn't mean what you heard.

Let's look at Exhibit 495.  This is a letter written on October 6th, 2002, by Ted Stevens to Bill Allen.  The government wants to make you think this is a cover-up, just a

1  letter written by a man thinking some day he's got to account

2  for something.  You read that letter to yourself.  I urge you,

3  take this 495.  I've got a memory aid for you, by the way.  We

4  all like memory aids sometimes.  This is Exhibit 495.  You know

5  where we live here in the District.  You can't get far without

6  going to route 495.  If you take this Exhibit 495, it will take

7  you straight into the mind of Ted Stevens on that day.  That

8  shows his intent, that shows why he's not guilty, that shows why

9  he didn't do anything willfully or knowingly to violate the law.

10  Let's just read it.  "Thanks for all the work on the chalet.

11  You owe me a bill."  You owe me a bill.  He emphasizes that with

12  a second thought.  He says, Remember Torricelli, my friend.

13  He's pointing out something then in the newspaper about a

14  senator that got in trouble for taking gifts, nothing to do with

15  renovations, despite what Mr. Allen wanted you to believe.  And

16  then there's a third thought.  Friendship is one thing,

17  compliance with the ethics rules entirely different.  Third

18  thought.  Third thought.  Some master coverup by some sinister

19  senator somewhere who's focusing only on one day he might be

20  before a jury somewhere.  That's sick.  That's sick thoughts.

21  That's not real life.  That's not the way things happen.  Read

22  it for what it is.

23          Next, I asked Bob P -- you know that to be Bob

24  Persons -- to talk to you about this, so don't get pissed off at

25  him.  Think about that.  He so much wants a bill he says to Bob

Persons go and tell Bill Allen to send a bill.  Why in the world would you put that in a letter if you didn't mean what you said?  Lastly, It just has to be done right.  Five thoughts.  I beg you, hold it in your hands; remember 495.  Straight into his mind.  That shows his innocence.  And I'm going to tell you a story that will make you sick.

The government of the United States tries to take that and erase it out, put it off with a false testimony of a witness they brought in this courtroom who got on that stand and said to you Mr. Persons told me don't pay any attention to that letter, that's just Ted covering his ass.  An explosion in the courtroom, wipes out a letter that was written by a man on October 6th, 2000.  I'm going to prove to you that's an absolute lie that brought this lie into the court.  They're trying to convict a senator and they put that testimony on the witness stand.

One other thing you might be interested in.  Can you imagine with all this staff no one ever went out and asked Mr. Persons did you say that, did you say that to Bill Allen?  You heard the testimony they didn't even go and ask Mr. Persons.  It took a subpoena from the defense to bring him in here, put him on the stand, and you heard the question that was asked:  Did you ever say that to Bill Allen?  No.  Crazy.  We're trying to convict an innocent man in this courtroom on an interpretation of evidence that is so far from real life that it should make

1    you sick.

2         The government has the obligation to prove its case

3    beyond a reasonable doubt.  The judge is going to spend a couple

4    of hours instructing you on evidence and what the evidence is.

5    I just want to focus on a couple of things because before I

6    start going through this evidence bit by bit, brick by brick, I

7    want you to understand something about the foundation, because

8    you have to understand the law in order to interpret the

9    evidence.

10        The government has not proven its case beyond a

11   reasonable doubt because they have not proven that Ted Stevens

12   knowingly and willfully concealed material facts.  What do those

13   words mean?  "Knowingly" means and is defined as a person who

14   acts knowingly if that person acts consciously within an

15   awareness and comprehension and not because of ignorance,

16   mistake, misunderstanding, or other similar reason.  A person

17   who submits a statement which that person believes to be

18   truthful does not act knowingly.  Ted Stevens submitted

19   statements in this case which he thought were truthful.  He did

20   not act knowingly.

21        "Willfully" is a component of that as well.  It is

22   defined as an act is done willfully if done voluntarily and

23   intentionally with knowledge that one's conduct is unlawful with

24   specific intent to do something the law for bids.  Specific

25   intent.  Ted did not act willfully with specific intent to

1    violate the law when he reached the age of 77 and supposedly

2    entered into this conspiracy after 77 years up to 84 years now.

3    He's just violating the law, one-man crime spree every year

4    violating the law?  There is no evidence of that.  There has to

5    be a scheme.  Steven has to knowingly and willfully conceal

6    material facts.  He has to engage in a scheme.

7         What's a scheme?  A scheme is a deliberate plan and

8    affirmative action designed to deceive the government by

9    preventing or delaying the discovery of information.  Ted

10   Stevens did not engage that scheme.  There's no proof beyond a

11   reasonable doubt or anywhere that he engaged in a scheme.  Thank

12   goodness our government has an obligation before they can brand

13   a citizen a convicted felon to prove to twelve jurors

14   unanimously beyond a reasonable doubt.  Those are magic words;

15   we know those words.

16        Here's the definition of reasonable doubt:  Reasonable

17   doubt is the kind of doubt that would cause a reasonable person,

18   that's you, after careful and thoughtful reflection, to

19   hesitate, to act in the graver or more important matters of

20   life.  You can't submit evidence and just call it something that

21   it's not, because it has to make sense to jurors.  We hear from

22   the government VECO, VECO, VECO, VECO, VECO, VECO.  I'm sick of

23   hearing VECO.  He didn't live through a VECO world.  His friend

24   was Bill Allen.  Eight years.  You know, I don't know football,

25   I'm not sure I even appreciate football, although all of us love

1  the Redskins, but I could win the football game on Monday

2  morning, I could do it.  I could coach it and I could be

3  quarterback on Monday morning.  The government is being the

4  Monday-morning quarter back six, seven, and eight years out.  It

5  was not VECO.  You know, Ted Stevens didn't become a friend of

6  VECO.  He was a friend of Bill Allen's because, as he told you,

7  he's about that age when his friends start to die and he looks

8  for some new friends, and it's lonely out there at the cabin

9  sometimes on the twenty days a year he spends there.  Sometimes

10 his wife can't be there.  It wasn't VECO that he took to boot

11 camp, it wasn't VECO that he told to worry about his health.  It

12 wasn't VECO that he told on that tape of October 18th that they

13 played in the last minutes here about not obstructing justice,

14 having faith in the system, having faith in jurors.  If he

15 didn't have faith in jurors that's not a bad thing, he wouldn't

16 be here, would he?  It wasn't VECO that joined Bill Allen.  It

17 wasn't VECO that had dinner with him at the Double Musky.  It

18 was Bill Allen, not VECO, that used the chalet.  It was Bill

19 Allen, not VECO, that took the furniture and put his own

20 furniture in there.  It wasn't VECO that said I love you, Ted.

21 It wasn't VECO that was charged with criminal conduct either.

22 It wasn't VECO that pled guilty like Bill Allen did.  You know,

23 you use your common sense.  They said use your common sense.

24         I'm sure you've all seen or been involved in some kind

25 of change or renovations or putting in shovels or changing a

kitchen.  Well, try doing it when it's 3,300 miles away.  You

need some friends.  You need some help.  And they reached out

for friends.  The fact of the matter is that this Monday-morning

quarterbacking looking through a dirty glass tries to obscure

what actually happened.  Understand the evidence, walk in their

shoes, see what they saw then.  Read the documents and believe

them.  You can see the innocence in the documents.  The Stevens

family paid $160,000 plus for this renovation.  They paid fair

value for what was received.  Some may say they ended up with a

wacky house, a bad roof that needed to be fixed, a steel

staircase that belongs on an oil platform, not on a chalet in

the mountains of Alaska.  They received a matching downstairs

deck which is part of Bill Allen's grandiosity, so is there

anything this guy does small or reasonable even without them

knowing, without asking permission?  The evidence is that

Catherine, who received the bills and paid the bills, believed

she paid for everything.  Ted Stevens didn't handle the bills,

review the bills, or write the checks.  You know, he's one of

these guys that focuses on his thing in life.  He's like, to me,

the Energizer bunny.  He's just moving forward all the time

working on the things that are important to him.  The Alaskan

issues, issues for the nation and otherwise.  He didn't run this

project.  Catherine Stevens had the checkbook, wrote the checks,

got the bills, got the financing at the Bank of Alaska.  Ted

left it to Catherine.  He was very happy to do so.  This house

1    had been there for seventeen years.

2         Catherine didn't show much of an interest, they didn't

3    go very much, although it is his residence, his technical

4    residence in Alaska.  He was happy that his wife got involved,

5    he was happy that his wife had an interest, he was happy that

6    she took off in June 2000 so she could focus on it, and he just

7    went right on in his world, that world that you or I probably

8    don't -- I don't know what goes on there, focusing on what's

9    good for the people of the state, or what's good for the nation,

10   and also he told you about that third hat, the hat he wears for

11   this international focus.  The government has fallen far short

12   of proving any charge beyond a reasonable doubt, and I ask you

13   after your deliberations and after hearing these arguments and

14   the instructions from his honor that you come back and you walk

15   into this courtroom and you say seven times "not guilty" because

16   that's what's required on the evidence that's been presented to

17   you.

18        And any twisted view through a dirty glass or any

19   twisted view through conspiracies that last six, seven, and

20   eight years ago and maybe twisted view of what that letter

21   meant, that's the heart of it, by the way, that kind of

22   expression, that was in 2002.  That was after all the

23   renovations were paid for, according to his belief.  In 2000 and

24   2001 how could you write such a letter if you didn't believe

25   that you actually paid for what you got?  That is his head and

1    his soul.  And any view to twist that can be nothing but

2    frightening, and any view to twist it by bringing into the

3    courtroom a witness who is a paid witness who's protecting his

4    children, who's protecting his $70-million holdback, who's

5    protecting his employees and hoping for less jail time, you want

6    to believe that?  Can you sleep the night you give a verdict

7    relying upon that statement that that document, 495, is a

8    cover-your-ass document?  Can you wake up a week later, a month

9    later, thinking that, yes, I've done my duty as a juror, the

10   government proved its case beyond a reasonable doubt?  That's

11   called recent fabrication.  He didn't even know when he told the

12   government about.  These rooms are supposed to be sacred.

13   You're not supposed to take a man and put him on trial with that

14   kind of evidence.  And when you do, you risk grave injustice.

15   You know this really is a simple story, it's a simple family

16   story.  It's just like we all wish when we get older, have a

17   place that the children can be attracted to, that the

18   grandchildren can be attracted to to bring them back, even

19   though he's only there twenty days a year at this point in his

20   life.  Maybe he'll be tired of being a senator and maybe he'll

21   go back to where he's comfortable.  He's a very simple guy.  He

22   asks for nothing and he's got some guy that's foisting things on

23   him and he says no.  So when he puts up the trees and the

24   lights, should he go out and spend $5,000 and a crane to get

25   them out?  He didn't want them.  What's he supposed to do with

1    the steel steps?  Hire a crew, spend five or ten thousand, take

2    them off.  Send them back?  You saw in his own words he's livid.

3    That's part of the conspiracy too, I guess.  He wrote, you know,

4    as the years roll by I went with the woods.  I like to go to the

5    chalet and think and read and fish, whatever it was.  You'll see

6    it in the evidence.  That's Ted Stevens.  Do you have any

7    evidence that he cares about a grill or a fish sculpture or the

8    rest of that stuff?  Just because it's foisted upon you doesn't

9    mean you have to take it, nor does it mean that you took a gift.

10   Those rules are meant for a reason, you know.  That kind of

11   meant that there'd be disclosures so that if you're taking

12   something that influences your judgment or you're doing someone

13   a favor or you're giving some guy a contract, that means

14   something.  You've seen the evidence.  They tried to dirty him

15   up there by bringing in people saying, oh, he was also dealing

16   in these Alaskan things and he did this for VECO and that for

17   VECO.  What kind of craziness is that?  How many witnesses did

18   you see that show you the soul of Ted Stevens?  He helps

19   everybody.  You're an Alaskan, you could come into town this

20   afternoon and walk in his office and ask him anything and he'll

21   put that wonderful woman you saw who worked for him for a career

22   on the case and get the case done.  That's Ted Stevens.

23        Use your common sense.  Go back there and live back in

24   2000 and 2001 and 2002 and you'll understand what the Stevens

25   were doing.  When I opened and told you that it was an important

1    factor for you to remember, I think one of the first things I

2    said, let's remember throughout this evidence that this place

3    that's being renovated is 3,300 miles away.  In the year 2000

4    Ted Stevens was there two days, two days of this renovation.

5    Most renovations you see people do, they kind of live through

6    the dust, they live through the pain.  It isn't done right, they

7    do the best they can.  You know from common sense how that all

8    works.  Here he's not even there.  The witnesses said he wasn't

9    there.  The list, these witnesses aren't here, like Ted's

10   supposed to know.  Dettmer he listed was there for four months.

11   Never saw Ted.  McBurney never saw Ted.  Luther, who was a Paone

12   employee, saw him once.  Brian Bryne, the guy that did the down-

13   stairs porch, never saw him.  Hernandez never saw him.  Hannah

14   never saw him.  Redmond never saw him.  Paone, the general

15   contractor, how can you possibly have a renovation done without

16   ever talking to the general contractor?  But it was done that

17   way, and Catherine as well, but he sent the bills.  The bills

18   included labor and materials, plumbing materials, electrical

19   materials, and they paid it, about $160,000 for the whole.  And,

20   you know, it looks like somehow relying on a friend is dirty

21   when you're looking through the dirty glass, and when you find

22   out, remember, Ted Stevens had a friend he thought was one of

23   the more reputable people in Alaska, a businessman praised for

24   the things he does with the company, employs four thousand

25   people.  We're looking at Bill Allen as if he's the bum that he

1    turned out to be, having pled guilty to bribing people, pled

2    guilty to campaign violations, none of which involves Ted

3    Stevens.

4            Go back then.  Is it now a crime to rely upon a friend

5    and expect them to be honest with you?  He asked Bob Persons to

6    help him.  You've seen the many e-mails from Bob Persons, and he

7    asked Bill Allen to help him, and do you know what?  Alaska is a

8    little different.  You have to rely upon people a little bit

9    more.  You especially have to rely upon people when you're three

10   thousand or more miles away.

11           I want to show you something else about the

12   government's evidence.  This is rather shocking.  Do you

13   remember Dave Anderson came in here and he told this whole story

14   that's kind of a dirty-glass story, kind of a conspiracy story?

15   He basically says, oh, I and Bill and Rocky, we met.  Bill put

16   us up at the Aleyeska Hotel and then we discussed Ted's cabin,

17   so we discussed it and we sat there, we talked about it, you

18   know, we were trying to figure out how to do that, how we would

19   lift it.  Well, we were going to lift the house up and build

20   underneath it, like it was their idea in the year 2000.  You've

21   seen the evidence.  You know it wasn't their idea.

22           Hannah came here to testify and said that lifting was

23   discussed.  He actually came to the house a year earlier in

24   1999.  Catherine testified that she knew of Hannah.  He was the

25   guy that raised houses in that part of the country and

discussions had occurred earlier.  You heard from Mr. Tryck and
you saw his letter.  When did he discuss lifting the house?
Back in the holiday season of 1996.  Ted wrote a letter on
August 4th, '97, in which he says I still hope to be able to
lift it and do a few things that I believe will restore its
value in the next couple of years.  Raising the chalet, that
wasn't Dave Anderson or Bill Allen's idea, but that's the way it
was portrayed.

Also you want to talk about intent, what's in the
minds of people when they do a project.  How about the evidence,
which is very powerful, about how they decided to finance it?
You saw the e-mail of the letter from Ted to his friend Ray
Craft in which he said he's closing out a trust.  Why is he
closing out a trust?  To get $50,000.  Why?  No evidence he's
out there in New Jersey throwing it away gambling or anything.
He's getting $50,000 so he can pay for the cost.

And here's one.  Now I want to ask you this:  Remember
the day that lovely young lady, the FBI agent, got up there on
the stand and she took a lot of time?  Admittedly we nod off a
little bit maybe, I do, and when she was going through all the
e-mails, I think she almost put into evidence a hundred e-mails
that day and read them, I want you to see right now the one that
was not in the pile.  It just was left out.

Please put up 946.  If you blow up the bottom part
first, please, Beth.

1          Look at way down on the bottom highlight.  I keep

2     worrying -- this is from Persons.  This is on 9/24, 2000.  Look

3     at it.  He says, Persons says, I keep worrying because we've

4     added so much.  I'm doing the best I can to keep the expense

5     down.  My best, Bob.

6          Now, what does he say in return to that at that time?

7     Walk in his shoes.  Look at it.  "Don't worry about the added

8     cost."  The government portrays Ted Stevens as somebody that's

9     hysterical when he spends his own money.  Didn't they play that

10    tape about Bob Persons hysterical when he spends his own money?

11    Remember those words?  I want you to go with these documents.

12    You find one concern about Ted Stevens about the cost.  He says

13    don't worry about the added cost.  I expected it when we started

14    making changes, and we have arranged for a mortgage to pay off

15    all the costs right away.  That's Ted Stevens.  That's his

16    intent.  That's his soul at the moment.  That's what he's

17    thinking.  Too bad it was left out of the pile the day the agent

18    testified.  It came in much later after impressions might have

19    been formed.

20         Quickly looking at Defendant's Exhibit 272, and I

21    don't expect you to read these because I'm going to be moving

22    too fast, but just to familiarize yourself with it.  What is it?

23    It's a letter from the National Bank of Alaska to Catherine

24    saying they're happy to extend a line of credit for a hundred

25    thousand dollars.

1          Let's look at 287.  Here are the loan documents to

2     sign up for the hundred thousand dollars.

3          Let's look at 983, the promissory note which Ted

4     signed and Catherine signed.

5          Let's look at the deed of trust, since they put their

6     house up for the hundred thousand dollars.  And that's

7     defendant's 984.

8          Lastly, let's look at Defendant's 282.  There you have

9     a transfer of a portion of a hundred thousand dollars.  What

10    does this show in real life, folks?  Does this show a

11    conspiracy, or does this show a couple gathering together their

12    funds and making them available for payment of the costs that

13    they're incurring on this renovation three thousand miles away?

14         How about intent to pay?  How about intent to pay if

15    this isn't about intent?  We still don't convict anyone in this

16    country unless they have an intent to commit a crime.  Remember

17    that.  It's pretty easy to convict sometimes, but the government

18    has to prove that beyond a reasonable doubt.  Don't try to

19    strain yourself.

20         I'm just going to show you briefly Defendant's 532,

21    Ted to Barb Flanders, his staff person, to pay for this.  I want

22    to terminate a trust, open the house account.  It will be used

23    to pay for house costs.

24         Next is 359, Defendant's.  Note to George Raycraft.  I

25    plan to use the trust money for improvements at Girdwood.

1        Government Exhibit 145, Ted to Hess.  Thanks.  Now I

2   want you to give us your bill.  The government made a big deal

3   about that note must be a coverup.

4        Ladies and gentlemen, you're going to decide that.

5   Ladies and gentlemen, you read the words as they were written,

6   or whether there's some grand conspiracy looking through a dirty

7   glass.  With all you've heard about this man, including the

8   character testimony that was brought in here, could any honest,

9   reasonable, thoughtful person say these aren't genuine, that

10  they didn't mean what they said?  To convict they're trying to

11  show you they don't mean what they say, they're either a

12  cover-your-ass letter from the witness they brought into this

13  courtroom and that you should think it's part of a cover-up.

14  That's the only way to explain that kind of evidence.

15       On September 10, Defendant Exhibit 441, Ted to

16  Persons:  Catherine says she hasn't made out a check for Augie,

17  the surveyor, or the second half for Hannah.  They want the

18  bills.

19       Government's Exhibit 1022, by the way, the most, the

20  oddest and most amusing you might find.  In this one they're

21  asking Ted if he wants and will approve a $2,000 Jacuzzi.  By

22  the way, praise the Lord, that's what people should be doing,

23  asking an owner what they want.  It's the only time, they only

24  asked for a $2,000 Jacuzzi, and he asked his wife and approves

25  it and writes back and says yes, put in the $2,000 Jacuzzi.

1          Look at Government Exhibit 432.  What does Ted say?

2    Putting a mortgage, putting on a mortgage to pay the freight.

3    That's what he says to Bill Allen.  Is that part of a

4    conspiracy?  He must be awake, up all night long thinking about

5    how to send these letters that are going to look good eight

6    years out.  Or do they mean what they say?

7          Government Exhibit 1506, Ted to Persons:  I'm certain

8    Catherine is prepared to pay the bills you've mentioned.  We did

9    open an account at the National Bank of Washington.  The

10   evidence is that it was Catherine's project, and to me at least,

11   touching note, Ted says in Exhibit 536, I think the idea she can

12   decorate and furnish new rooms and get some of my stuff out of

13   her way has invigorated my roommate.  Touching note.  I guess

14   that's part of it too.  He just threw that in there in September

15   2000 because it looked good in court some day.

16         Ted testified, again I may sound a little

17   old-fashioned, but he tried to explain why this was Catherine's

18   project, and he said, well, you have to understand our theory of

19   life.  We go on the theory of in the tee-pea and out of the tee-

20   pea, and I don't know if you ever had that concept, but what

21   goes on in the house is Catherine's business, what goes on

22   outside is my business.  So when she said she didn't like the

23   plan, there was a new plan and there was no arguing about it.

24   It was her plan, and I'm not unhappy about that, he said.  I was

25   happy about that.  A touching exchange between a wife and a

husband right there.  That's what he told you.  That's the way
they lived.

He went on to say, well, you know, I have five
grandchildren.  I have many grandchildren.  Excuse me.  We have
five children and grandchildren from our first family and I
wanted primarily to have this place so my kids could bring my
grandchildren and have a space.  He just wanted one big room,
you know.  That's the guy's view of life, one big room, bunk-
beds and a bathroom.  She was willing to get involved in it.
And I was happy about it.  She wanted to do it her way.  This
all fits.  Catherine was the one who dealt with the Bank of
Alaska.  She's the one that looked at the checks.

Let's look at 381, by the way.  Some big conspiracy.
It's not a conspiracy, you know, I guess, when you're writing
$160,000 worth of checks.  Here's the checkbook, all written in
Catherine's hand.  She ran the project, she ran the books, she
got the bills, she wrote the checks.  Catherine's project.  You
also see it's Catherine's, because even John Hess testified he
had a couple of questions that Senator Stevens wanted to defer
and talk over with Catherine and to get back to me, and he did.
Even Bill Allen said that Catherine decided about the project.
Apparently Allen asked about a steel deck and Catherine vetoed
it.  What a remarkable thing for a lady to do.  Imagine stepping
out of your house and walking on to a steel deck with these big
chunka holes in them.  Can't go barefoot, can't go in any kind

1    of a lady's heel.  I guess you would make it if you had on

2    sneakers or something.

3                Government Exhibit 428, a note from Ted to Bill in

4    August 2000.  He says, The plans now really please Catherine.

5                Government's 1017, Bob to Ted.  Tell Catherine we have

6    a plan to expand the bathroom.

7                Government's 1018, Please ask Catherine if she's okay

8    with certain fixtures.

9                Let's go to the press statement, which they make much

10   of, which is part of the dirty glass world, the press statement.

11   The press statement mentions Catherine three times.  This was

12   done in 2004 when Ted was asked about it.  He asked Catherine

13   because she had the checks and the files.  This nice press young

14   lady came in and testified she got information from Catherine as

15   well.  Look:  Catherine, Catherine, Catherine, that they put out

16   to the public.  The first thing when there was a question on the

17   renovation, What did Ted do?  He looked at Catherine to get the

18   answers.  This is not part of a conspiracy.  This was reacting

19   at the moment honestly to what had occurred and what had been

20   inquired about.  Catherine herself says that she had the time.

21   You remember Ted testified that she took off some time.  She

22   worked all her life with the exception of maybe six, seven years

23   when her daughter was young, and then took time off in June of

24   2000 right through to February of the next year before she

25   started her law firm job.  And Catherine testified since I had

1    the time and the interest I was the one who was going to be in

2    charge of the renovation.

3            Mike Luther, the Paone employee, question:  And was it

4    your perception that she dealt mostly with the project?

5            Answer:  Yes.

6            Now I'd like to give you our little slide show about

7    the bills that were paid.  The government had a couple of slide

8    shows for you.  Let's look at the bills that were paid here just

9    so you get a feel for them.  They're all in evidence, and it's

10   mostly just to familiarize yourself with in.  Just go through it

11   slowly.  I'm not going to read them all.

12           Here's the bill from Redmond.  On the right side is a

13   check.  Here's the bill from Redmond.  On the right side,

14   another check.  Here's a bill from Hannah, on the other side a

15   check.  And by the way, let's just stop there.  Remember that

16   story about Bill Allen offering to raise the chalet?  And I

17   think government counsel said something about, oh, yeah, okay.

18   Bill Allen didn't raise the chalet.  One of the more amazing

19   things heard in the courtroom was he thought he raised the

20   chalet.  It turned out it was Hannah, that guy that lives in the

21   village that raises chalets, and it turns out that they paid

22   him.  Okay.  Just plow by that.  Maybe the jury will miss it.

23   Who cares?  Just a little point.  Ted Stevens rejected Bill's

24   offer that he raise the chalet.  Rejected it.  That's the

25   evidence.  Right here.  They want to make you think that they

1    raised the chalet.

2           Next, here's another part of amounts that were paid to

3    the fellow that raised it.

4           Go ahead.

5           The guy that cut the tree down.  Anderson came in

6    earlier and he told you he cut the tree down.  Why do you think

7    we brought a guy three thousand miles from Alaska to get up here

8    and tell you that he cut the tree down?  For our amusement?  No.

9    Because the government proffered to you Dave Anderson, who said

10   he cut the tree down.  And sometimes we lawyers can't always

11   find a way to prove a lie, so we took a fellow, brought him

12   three thousand miles, sent him home three thousand miles, so he

13   could come in here and say he cut the tree down and was paid

14   $400 for doing it, not Dave Anderson.  But so what?  This guy's

15   life is on the line, what does it matter?  Let Dave Anderson

16   take credit for doing work out there.  Let him take credit for

17   raising the deck, let him take credit for remember he said I

18   crawled under that hole and I undid the bolts myself?  Remember

19   that testimony?  Sounded so real.  Made you believe he did it

20   until Redmond got here and said, I mean Hannah, Hannah got here

21   and said he did it, he took the bolts off.  Maybe they think

22   you're a customer to buy the Brooklyn Bridge and it doesn't

23   matter, but I say the jurors of the District of Columbia will

24   think and make the government prove its case beyond a reasonable

25   doubt before they take a citizen and brand him a criminal.

1          Please, through the checks.  Christian Brothers.

2     Here's the bills on the right, the check on the left of the

3     thing the right of the check.  Fifteen thousand.  Here's a bill,

4     it doesn't have backup.  That's the way the bill was sent.

5     Didn't need backup for Catherine Stevens to pay it.  She just

6     paid it, and by the way, for people that are so schemish

7     supposedly about paying, how come they paid within a week or ten

8     days?  They sent the money right away.

9          By the way, do you remember that e-mail that Bob

10    Persons sends?  What the heck is it?  It's gone right out of my

11    mind.  Oh, yeah.  He's complaining about Hannah charging too

12    much.  Do you remember that?  He says he's just pulled a figure

13    of $1,200 out of the air, just pulled that figure out, and Bob

14    Persons is complaining about that's costing too much.  What does

15    Ted Stevens do?  He tells his wife send the check.  He lets it

16    pass right by.  Send the check.

17          Go ahead, please.  Thank you.

18          Sears bills that they paid for appliances in the

19    house.

20          Here's another bill to Christian Builders, $31,000.

21    Here's another one, $37,000.  Here's a projected expenses, by

22    the way.  Look at the top part Christian Builders, Inc.  Someone

23    sent this to Catherine.  They list how much has been paid to the

24    total of 101,000, and they list out the projected things.

25    Forty-one thousand.  Isn't that kind of normal?  That's kind of

1    normal.  Maybe that's part of the conspiracy too.  I don't know.

2            Go ahead, please.

3            Another check for $700.

4            Go ahead.

5            Here's something for the North Heat paid for, 1756.

6    Classic floors, $6,000 that he paid for.  Christian Brothers

7    again, check of $30,000.  By the way, so far it doesn't look, if

8    you go back there in their shoes and someone is not screaming

9    VECO, VECO, VECO, that you would be led to believe three

10   thousand miles away that you're getting the bills for the

11   materials and the labor.  It says "labor" in there.  One of them

12   is $16,000.  The testimony is that Bill Allen got people that

13   were willing to work on the job.  Dave Anderson, Rocky Williams

14   are there because they've been referred by Bill Allen.  That's

15   what was done.  That's why Bill Allen was needed.  Bill Allen

16   found this fellow too.  That's what they understood was

17   happening.  They didn't know then what we know now.  They didn't

18   know that he stopped -- Bill Allen stopped the sixth bill and

19   told poor Augie, the little businessman, eat it.  We didn't know

20   that.  We didn't know.  He didn't know.  He didn't know when he

21   lived there.  But, you know, we get eight years out and you can

22   put a whole thing on that when you look through the dirty glass.

23           Next, oh, Rocky Williams.  I think they even make this

24   part of the conspiracy.  Here is a couple that was happy with

25   what this worker did and they decided to give him a bonus of

1    $2,000 and some airline tickets.  I mean, how twisted can we

2    get, that somehow that's indicative that they didn't know that

3    Rocky was paid for?  We're in different worlds.  Thank, thank

4    goodness for jurors.

5           Another check for $10,000 for supplies.  And then you

6    add it all up and that's what they paid.

7           Let me show you something else, by the way.  They say,

8    oh, how about the plumber and the electrician?  By the way, the

9    evidence is that the plumber wasn't even a VECO employee.  He

10   wasn't a VECO employee.

11          Let's look at the plumbing slide show for a moment.

12   Do you see this Augie bill, by the way, that we just saw in the

13   total?  Look at these.  I'm directing your attention when you're

14   in there in the jury room to look at Alaska Pipe in there.

15   Alaska Pipe, Alaska Pipe, Alaska Pipe.  Guess what Alaska Pipe

16   is?  It's a supply store for plumbing.  That's what it is.

17   Right on the bills, plumbing supplies.  Graybar down at the

18   bottom.  Graybar is an electrical supply place.  Invoice after

19   invoice after invoice, Alaska Pipe, Graybar, Graybar, Graybar,

20   Alaska Pipe.  Wouldn't that lead the normal woman who is running

21   a project to believe that there are electrical and plumbing

22   supplies that they're paying for?

23          Is there a next one there, Beth?

24          MR. B. SULLIVAN:  At any rate, we're all through the

25   bills.

1          By the way, Defendant's Exhibit 3346, look at this to

2     show normalcy in life the way someone would have lived it.

3     Okay.  It says in here Bob Persons writes -- listen to this:  We

4     have thirty thousand, thirty thousand in bills that Rocky is

5     trying to get Bill to look at.  Remember, Catherine Stevens

6     thought that they were looking at the bills to make sure that

7     they were okay.  She didn't know that he would cheat on the

8     sixth bill and just tell Augie to forget it.  Bob Persons goes

9     on to write, listen to these words:  There is some concern on

10    Rocky's part that we have already paid some of the plumbing

11    bills.  You know what?  Already paid some of the plumbing bills,

12    right there in the records that the government wants you to see

13    as somehow part of a conspiracy.

14          Let me also direct your attention to where Rocky signs

15    various invoices, Beth.

16          Let me show you some other pages here, ladies and

17    gentlemen of the jury.  These are the bills that were received.

18    I just listed them all with the checks, showed you a total.

19          Let's take a look at this.  Look at that, Christian

20    Brothers at the top.  Guess who signs for Christian Brothers?

21    Guess who signs?  Rocky Williams.  Today they see that Rocky

22    was, unbeknownst to the Stevens, on the payroll of VECO, but

23    then they were sending bills to Catherine Stevens where Rocky

24    was signing Christian Brothers, the general contractor sheets.

25    Let's look at some more.  Look, Rocky Williams.  Look up at the

top.  Christian Brothers.  The yellow at the top, ladies and
gentlemen, is the same as in the yellow big block that we put in
there.  Rocky Williams signs again for Christensen Brothers.
Christensen Builders.  I always get that mixed up.  Christensen
Builders, Inc., CBI, Augie Paone's company.  Look at them.
Let's just run through them, please.  Look at them again and
again and again.  All Rocky Williams signature on Christensen
Builders invoices sent to Catherine Stevens.

          Now go back as they lived it.  You get a bill.  Rocky
is signing for Christian Brothers.  Would that lead you to
conclude Rocky is working with Christian Brothers and being paid
on the labor bills of Christensen Builders?  To a normal person
it would, but no, we're not normal here in this courtroom.
We're eight years out, six years out, trying to nit-pick a very
decent man's life.

          Let's go to Augie's sixth bill for a minute, the
evidence that we find there.  You heard the testimony about the
bills and the checks that were paid, so what happened, what
stopped the bill from coming from Augie Paone?  Well, you heard
the story, you know, Bill Allen is not all bad.  He's gruff and
he's rough and he knows he's got power, so that when he says to
Augie Paone, this little carpenter who's actually created his
own business with five or six other carpenters and is doing
well, doing good work, wanting to do good things, when Bill
Allen, this CEO of a massive company that employs four or five

1    thousand people, says to him, don't send the bill, I think it's

2    too much, Augie said he didn't want to commit business suicide

3    and so he didn't send the bill.  And the proof is absolutely

4    certain that Catherine and Ted Stevens didn't know anything

5    about that.  That's just Bill Allen up to his mischief.  That's

6    Bill Allen, along with the other things you see Bill Allen

7    doing.  Augie's testimony, question:  Did you submit this

8    invoice to someone?

9              Could I have 2273, please?

10             This is the last invoice that he prepared, ladies and

11   gentlemen.  He was going to send it along just as normal.  He

12   did send it along.  He sent it through Rocky or to Bill Allen

13   and then a month later says where's the bill.  He was wondering,

14   because the Stevens had always paid so promptly, where's the

15   bill, so he finds out, he finds out from Bill Allen in a meeting

16   from Bill Allen that he just, Bill Allen doesn't want the bill

17   sent along, unbeknownst to them.  His testimony:  Mr. Allen

18   stated as I walked in that maybe I should eat this bill, or look

19   at it as a political contribution.  How disgusting.  Even Bill

20   Allen says if he permitted the bill to go on, he knew the

21   Stevens would have paid it.  Bill Allen says that if he had sent

22   a bill for Mr. Hess' work, that Ted Stevens would have paid it.

23             And by the way, while we're at it, the testimony about

24   the bill for the boiler in 2006, Bill Allen says that Exhibit

25   495, Ted was just covering his ass.  Why did Bill Allen get so

distressed in 2006 when he knew Ted Stevens would get a bill

that reflected that Bill Allen had paid half of it?  He knew Ted

Stevens would be upset.  He knew Ted Stevens would ask for the

bill.  He did ask for the bill.  You've seen it and heard it.

He paid the bill that he got and he pursued Bill Allen to get

the rest of the bill, and somehow that's part of the conspiracy.

That's evidence of Ted Stevens.  That's what it is.  That's what

Bill Allen was so upset about when he found that Persons had

sent the bill to him with the notation about Bill Allen paying

the labor.  Ted Stevens' reaction on the boiler bill is

consistent with the October 6th, 2002 letter, 495, that they

want to wipe off the screen with the false testimony of Bill

Allen that it is not to be taken seriously, it's just covering

his ass.

You know, Augie is not exactly a total pushover.  So

later, as the facts show, when Bill Allen was doing renovations

on his own home, he hired Augie Paone, Christian Builders, Inc.,

to come and work on that home.  And at that time still pressing

the fact he's out this money that you saw on the bill, he

pressed the fact that he wanted to be paid.  And what did Bill

Allen do at that time Augie is working on his house?  He shrugs

his shoulder and says, well, just put it on my bill, and that's

what happened.  It came on to his house bill, not known to

Catherine or to Ted Stevens.

Let's look at Exhibit 950, Defendant's 950.  There's

1    the revised bill for $13,000.

2           Now let's look at Defendant's 10, Defendant's No. 10.

3    This is the cover sheet, and if you look at a page in on this

4    exhibit, you'll find right down there in the bottom left some of

5    the costs that Augie attributed to the Girdwood project.  Why

6    are they on there?  Because Bill Allen told Augie to eat the

7    bill, he wouldn't let him send it on, unbeknownst to the

8    Stevens.  Bill Allen permitted it to be put on his bill.  The

9    Stevens don't know anything about it, didn't know anything about

10   that until this case, but somehow it's part of a grand

11   conspiracy like an old pitcher who throws three slow balls and

12   then throws a fast ball by, throws fast balls by the jury.  Bill

13   Allen admitted to this.  He admitted on the stand that he

14   stopped the bill.

15          You know, I want to show you something.  Back to 495

16   for a minute, and we'll see later.

17          Let's go to 495, Beth.

18          Guess what happened four days before this letter was

19   sent, four days?  You'll find it, and if I miss it I ask you to

20   look for it in there.  Four days before, the 495 document, Bob

21   Persons sent an e-mail to Ted Steven in which he said something

22   to the effect, quote, The only new work is the porch.  Four days

23   later.  Now, if he wasn't interested in paying for the porch,

24   why four days after that e-mail would he write this note, which

25   is the heart of the case, that shows the clear intent of Ted

1    Stevens that shows the complete absence of willfulness or

2    knowledge or intention to make a false statement.  Look for it.

3    And then not getting a bill, a month later, on November 8th, he

4    sends another one, Don't forget, we need a bill.  Even Bill

5    Allen said that when he first was captured by the FBI and

6    brought into the little fold, the little family there, to become

7    a cooperating witness, that he said to them then Ted Stevens

8    wanted to pay for everything he got.

9          There was evidence about tiles and floors and shelving

10   that were follow-up costs, and Augie told you that those costs

11   found their way on to that last bill that we saw.  He attributed

12   this to 2001 at Christmastime, the first Christmas that the

13   Stevens were in the house.  These bills too, since they followed

14   the sixth bill, were directed by Bill Allen to be put on Bill

15   Allen's bill.  Remember his, Augie's words.  He has a lot to

16   lose by fighting Bill Allen.  He said at this final billing I

17   thought about sending it over to the senator directly, which he

18   hadn't done before with the other five bills, but I knew it

19   would be business suicide on my side if I did that.  He said we

20   were dealing with a corporation that Bill owns that has five

21   thousand employees and is the biggest contractor in Alaska and

22   he's dealing with a company, my company, Augie's company, that

23   has five employees.  Augie says, so it wasn't -- so the match up

24   wasn't even.

25         Allen testified that with respect to Hess' work he

said that if he had sent a bill from the architect Hess, that it would have been paid.

Even as to VECO's work, remember some of the nonsense that he talked about that he didn't quite know how to send a bill, but even there his testimony was, question:  So what you're saying is if you had sent them a bill which you had reviewed and made fair, they would have paid it?

Answer:  Yes.

There's another thing I think you should bear in mind when focusing upon, looking at the evidence.  At the time it happened, walking in their shoes, living then, not being the Monday-morning or the eight-years-later quarterback, is evidence that Ted Stevens was a trusting person.  Remember again Sykes that came in as a character witness who is now in a high position at Yale.  Her testimony was, yes, he's definitely a trusting character and a trusting soul.  You know, there's something about forty years in the Senate.  Normally when you ask someone to do something they follow up, and Ted's the kind of a guy, the evidence shows, that he just told someone to do it and went about the business that he was focusing on.  He left things to others, and the testimony supports that.

Louis Johnston who worked for him for decades up on Capitol Hill, she was cross-examined and they tried to make her into an employee that somehow couldn't have discretion to do things.  What did she testify to?  When the senator gave it to

me to do, he left it up to my responsibility to do unless I had a problem.

Augie Paone's testimony, remember he's not even met Ted Stevens, didn't even meet Ted Stevens, shows the unusual nature of doing a renovation three thousand miles away.  But Augie says something of interest which supports, which you heard in testimony about doing things in Alaska.  The Alaskan way, Augie says, you know, it's not unusual for what goes on in Alaska.  There are a lot of people that leave the state for the winter.  And I've done quite a few projects where a friend or a family member watches out for a remodel.

Well, as you know from the evidence, the only time Ted Stevens is at the Girdwood residence, he estimates, is twenty days a year.  Even when he's in Alaska it's such a big state, he's not near Girdwood, and in 2000, remember he was there two days.  Interestingly enough, part of the evidence in the case is a punch list, Exhibit 217.  Look at it for a minute.  In the history of the world has there ever been a punch list that the home owner's didn't see?  Well, we found one right here.  There is no evidence that Mr. or Mrs. Stevens even saw the punch list, and you notice the VECO stationary on it.  Guess what?  The testimony is that the punch list was done by the man who worked for Augie Paone.  He's not a VECO employee.  He had the punch list because he was there.  The owners were three thousand miles away.  He had the punch list and he filled the punch list.  Why

use this paper?  He said it was a scrap of paper he found there.
Never sent.  You see, when you see that in evidence, you see
that in the jury room and you're pouring through this, you look
at that and you say, oh, my goodness, here's the punch list on
VECO's stationary that was done by a Christensen Builders
employee who was in charge of the carpentry work.

Catherine Stevens testified.  It gives you a little of
the local flavor.  She was born and brought up there.  Do you
remember the testimony she went to high school there before she
came down here to Georgetown University?  She says, first of
all, in Alaska that's how you do projects.  You do references
from people.

And by the way, it's clever.  The Yellow Pages is a
clever trial lawyer's thing to reference why didn't they look it
up in the Yellow Pages?  Do people really go to the Yellow Pages
when they want someone to renovate their home?  Don't you start
by asking for suggestions from friends who's had a similar
problem?  Are you going to fix something up in the yard or the
house?  Don't you try to find someone who has had a good
experience on a roofing job, or do you just go to the Yellow
Pages and pick out a roofing company?  I don't think so.  I
don't think that's much different here in the District of
Columbia than it is in Alaska.  And then when Ted Stevens is
asked about, well, why rely upon these friends?  Look in
Washington.  He has friends.  You've seen them.  They've come to

court for him.  They put their honor on the line to come to

court and say to you that he's a truthful man and an honest man.

I call them the big shots.  I don't hang around with them, but

that's in his life in Washington, and I don't mean big shots in

a bad way.  I mean they're people you know and see, see on T.V.

and so forth.  I'm not being mad, but when he goes home out to

Alaska in that community that's about as far away from Anchorage

as it's here to Baltimore, forty miles out of town in the woods,

1,500 population.  You don't have Yellow Pages out there.  You

ask.  People come from Anchorage, it's like if we had to have a

plumbing thing we'd call someone in Baltimore.  We're not used

to that, but that's the way things work out here, Ted Stevens

says, speaking about Bill Allen.  This is a many trusted guy,

and besides, he was a good friend and I trusted him.  That's why

I'm asking you to go back and live it as they lived it.  Don't

think of Bill Allen as the Bill Allen that we've seen come into

this courtroom, a convicted felon and a man protecting his

children, that the government makes a deal with him.  I won't

indict your son and your family if you'll cooperate.  What will

a man say on the witness stand to prevent his children from

being charged?  The testimony of a cooperating witness is so

dangerous that there's a special instruction for it.  You'll

hear from the judge.  It basically says watch out for these

cooperating witnesses because they have a motive to lie.  Have

you ever heard of a motive to lie worse than holding your family

and your son hostage?  And it isn't over yet.  He's got to do

his job, he's got to do his cooperation.  He's got to make

substantial contributions, substantial contributions.  I guess

it would be substantial if you testified that the document 495

is no good and it was to cover your ass and maybe help the

government get a senator convicted.  That would be substantial.

They make fun, they make fun of Ted when he said, well, I didn't

ask Hess how much.  I didn't ask him how much before he started

to do the work.  You know, there are some people in life that

just kind of trust you're going to do the right job and you're

going to -- and he's going to pay what -- he's going to give for

what he believes it's worth and he's going to pay the bill.

That's what that shows.  The government gives that also and says

look at that.  He sent Hess a letter.  By the way, have you ever

met anybody that thanked people more than Ted Stevens?  Is there

anything you can think of that he didn't thank for?  I guess

that's the way he's brought up.  He's the workaholic in the

Senate, always taking a piece of paper, always got a briefcase,

always writing a note.  As he told you, someone does something

for me, I thank them.  When he's using Hess to draw up some

simple plans, and only plans that this courtroom saw were the

simple plans.  There were other plans later on.  There's no

evidence that they got those plans.  It was a simple job.  It's

an A-frame.  Look at it when it started.  And by the way, don't

be confused to thinking this is some grand house.  Still the

1    heart and soul of this house is still that little tiny A-frame

2    that the government out there says is worth about seventy-six

3    thousand bucks at the time and when it's raised up, got a room

4    under it, the living space is under the room.  You look at that

5    massive deck.  You say, oh, my goodness, they have a mansion.

6    In your minds I bring this down to cut off this deck with your

7    eyes.  That's the house.  It's a simple house to begin with.

8    It's a simple house now.  Ted says about Hess, I just asked him

9    for the bill.  That's the Alaska way.  If someone agrees to do

10   something, you pay them.  You pay them what he asked for, what

11   he does.  How do we turn that simple basic principle of relating

12   to another human being who's done some plans into a part of a

13   crime, a conspiracy?

14          Could I have Exhibit 177?  Is this the one that's

15   blocked out?

16          MS. MORRIS:  May we approach?

17          MR. B. SULLIVAN:  I don't want to be interrupted.

18          THE COURT:  Don't put it on.  Is that the one that's

19   been redacted?

20          MR. B. SULLIVAN:  Yes, but I'm just going to make it

21   with the redaction.

22          THE COURT:  You can mention it, but I don't want it

23   shown on the screen.

24          MR. B. SULLIVAN?  Very well.

25          You're going to see 177.  I'm going to ask you to

1    remember another out there.  177.  It's going to be redacted,

2    ladies and gentlemen.  It's going to be redacted, and it's being

3    redacted, and information has been taken off of there.

4           In their opening statement the government opened by

5    saying that this document basically would be a document -- I'll

6    just read from the opening statement.  It said, counsel said

7    VECO kept track of most of the costs right down to the penny.

8    Right down to the penny.  Of course Stevens didn't know that.

9    He never knew that until this case comes up.  He says, you'll

10   see VECO's internal system and accounting records for the chalet

11   project and you'll see that VECO's portion of the work during

12   that period of time, and VECO's costs total more than $188,000.

13   Now, that of course is to say to a jury, oh, my goodness,

14   someone did something for $188,000.  He must have known that.

15   Well, that exhibit you're going to get back there, please look

16   for it.  It's Exhibit 177.  It's going to be blacked out.  There

17   will be some blocking on it.  That document is worthless, it's

18   trash.  You can do with it what you want.  But at least $80,000

19   of that bill has been thrown out the window in the blocking.  It

20   just can't be.  It's just out of the case.

21          So this business about $188,000, you can forget that.

22   Just roughly subtract in your own mind $88,000.  Now we're down

23   to $108,000.  There's one other thing if you want to go through

24   the exercise, it's pretty interesting, on that document.  It is

25   that there's a guy on that document, you'll see that's not

1   blacked out.  That document is, it was a fellow named McBurney.

2   I want you to do some arithmetic in the jury room.  Get your

3   pencil and I'll tell you how to do it.

4          McBurney testified in this court, ladies and gentlemen

5   of the jury, that he spent about 40 to 60 hours out there.  I

6   have 40 to 60 hours.  Never met them.  Stevens didn't see him or

7   know what he was doing.  But there are two exhibits that show

8   you, No. 1064 and 1069.  At page three of each of those exhibits

9   McBurney's time is recorded at 152 hours and 137 hours.  That's

10  a total of 389 hours that you're going to get in the exhibit

11  that's all blacked out, that's phony.

12         THE COURT:  Ladies and gentlemen of the jury, let me

13  instruct you that the blacked out portions are redactions

14  pursuant to Court order.

15         MR. B. SULLIVAN:  At our request.  Is that all right

16  to say?

17         THE COURT:  I'm sorry?

18         MR. B. SULLIVAN:  At our request.

19         THE COURT:  Proceed with your argument, counsel.

20         MR. B. SULLIVAN:  They're redacted at the defense's

21  request.

22         THE COURT:  Pursuant to Court order.

23         MR. B. SULLIVAN:  Yes.  Thank you.

24         Now I'd like to show you something.

25         THE COURT:  That's all you need to know, pursuant to

1    Court order.

2            MR. B. SULLIVAN:  So my bottom line on that document,

3    177, ladies and gentlemen of the jury, is that the 188, take 80,

4    throw that away, and then if you want to figure out the phony

5    time records for McBurney, you can take 389 hours or less 40 out

6    of that.

7            Now, let me show you something else before we break

8    for lunch.

9            I'd like to go to the value of the renovations chart,

10   Beth, please.

11           I'm going to show you something here that would be of

12   interest to you, I hope.  So after the Stevens pay this $162,000

13   or so, okay, you've seen the bills, and you know out there that

14   VECO has been doing some work that they didn't know anything

15   about.  Who knows what value they added by their work.  Maybe it

16   was nothing.  Who knows?  Let's look at this.  On the left side,

17   and you'll have these exhibits, if you can hone in on them a

18   little bit more, if you can right there, look.  This is a

19   valuation of $87,000 for the building.  That's before the

20   renovations, okay.  Now let's look at what the official tax

21   assessment people say after the renovations.  Look at that.

22   $129,000.  So if you go to the chart and take the 2001

23   appraisal, for example, at $87,500, and the 2000 appraisal, the

24   total value at that time is $104,000.  That's the value of the

25   chalet.  Now, the Stevens invested $163,000, but it only came

1    up, according to the tax assessment, of $104,000.  Where is all

2    this 188?  Where is it?  Well, we know 88 is stricken, and I

3    told you about McBurney.

4           Let's go to the next one, please.

5           Do you remember the real estate appraisal fellow that

6    came in from the bank that did the real estate appraisal on the

7    mortgage so that they could borrow the hundred thousand so they

8    could pay their bills?  Here's an evaluation that he did.  Let's

9    just look at the bottom number.  He thought taking into account

10   all the renovations he expected to be made on the house included

11   here, he came up with a total value of $123,000.  Look at it

12   there.  He added the living space, $96,000.  That's $80 a square

13   foot times the square feet.  The next line is the garage, $34

14   times 558.  And the deck, $8,500, for a total value of 123.

15   That's his conclusion.  That's after anticipating the

16   renovations.  Look at it another way from the appraiser's

17   evaluation.  Doing it a different way, because appraisers

18   normally approach things several different ways, he has a total

19   valuation of 115,000.  Considering the beginning value of the

20   87,000 and the final appraised value at $202,000, true value,

21   115,000, and then finally here they are all together.  The

22   assessor, by the way, you heard testimony, ladies and gentlemen

23   of the jury, that the assessor attributes full value to these

24   things.  It's not a percentage.  They don't tax you on 80

25   percent.  They put the full value in this.  That was the

testimony.  The assessment is 104,000.  The fellow from the bank

doing it one way, the appraiser is 115,000.  The appraiser,

doing it another way, doing it 123,000, and the yellow portion

is what they paid.  There it is.  What did they get out of this

big conspiracy that ran eight years?  They got a house worth,

according to these people, that kind of money after they bought

it way back for X dollars and they put in $102,000, what are we

talking about?  The evidence is overwhelming that what they paid

was fair and what they saw as they lived through it was

reasonable and when they paid $162,000, they believed they were

paying their debts and they didn't think they were getting

anything for free.

       The lower porch, remember the lower porch came almost

a year-and-a-quarter after the original renovations.  If you

think of it, that what the renovations are in 2000 and 2001, and

then the lower porch comes in in 2002.  Now, what's the most

amazing part of the evidence with regard to the lower porch out

there in the fall of 2002?  Bill Allen thought the house looked

unbalanced.  It had this big deck up on the top and nothing on

the bottom.  So Bill Allen decided in his possessive sense, the

guy who uses the place, a guy that wants to help out and knows

no bounds, he decides to put on a bottom deck.  It was not

approved.  There's no testimony it was approved.  He never

talked to Ted Stevens about it, and by the way, one clue that

that's absolutely true, but who in the world but Bill Allen

1    could think about that wacky steel roof over the bottom deck?

2    How many decks do you need?  Anybody imagine that Ted Stevens or

3    Catherine Stevens would think, you know, let's put up a nice

4    steel roof over the lower deck?  This is Bill Allen's world.  He

5    builds the deck.  How was it built?  Brian Bryne.  Augie Paone

6    referred Brian Bryne, the same guy that did the renovations.

7    Bryne went with Allen.  He learned from Allen on the spot there

8    was a deck that he wanted built.  He wanted built.  Bill Allen

9    said as follows:  It didn't balance real good.  It didn't look

10   real good.  It didn't balance.  He says, I don't remember

11   talking to Ted about the deck.  Now, what kind of an operation

12   is this, that he would put up the bottom porch without talking

13   to Ted, but that's what he did.

14           Then we go back to that memo.  There's an e-mail.  I

15   might find it.  I've got a box full of stuff, but if I didn't,

16   you can find it.  I think it's dated December 17th or 18th,

17   2002, in which Bob Persons writes to Ted and he says Catherine

18   will love the porch.  That's the first notice to anybody that

19   there's a porch.  This is now a year away from the renovations.

20   Catherine will love the porch.  On October 2nd, 2002, as I

21   mentioned earlier to you, Persons writes to Ted and says only

22   new work is the porch.  And four days later what happens?

23           Could I have exhibit 495, please?

24           Ted Stevens asks for the bill.  Soon after, he learns

25   there is a porch.  He didn't approve it.  Once it was there, he

1      knew he had to pay for it.  And he says write this letter saying

2      thanks for all the work on the chalet.  You owe me a bill.  And

3      the rest of the five thoughts you know well.

4              So let's break for lunch and I'll do the second half

5      of my argument after lunch, and then the government, because

6      they have the burden of proof beyond a reasonable doubt, has the

7      last chance to talk to you.

8              Thank you for your attention.

9              THE COURT:  All right, ladies and gentlemen.  Enjoy

10     your lunch.

11             (Jury exits courtroom at about 12:43 p.m.)

12             THE COURT:  How much more time do you need, counsel,

13     just for planning purposes?

14             MR. B. SULLIVAN:  Me?

15             THE COURT:  I'm sorry.  Mr. Sullivan, yes.

16             MR. B. SULLIVAN:  I tend to use my full time.  I

17     think --

18             THE COURT:  That's fine.

19             MR. B. SULLIVAN:  I think it's been --

20             THE COURT:  I think you have about an hour-and-a-half

21     left, I think; something like that.

22             MR. B. SULLIVAN:  Okay.

23             THE COURT:  That's about right.  I don't want to

24     deprive you of any minutes.  I think it's about an

25     hour-and-a-half.

1          Let's see.  We'll start back at 1:45.

2          (A luncheon recess was taken at about 12:44 p.m.)

3                           -  -  -

1                        I N D E X

2

3    CLOSING ARGUMENT BY MR. BOTTINI                        9
     CLOSING ARGUMENT BY MR. BRENDAN V. SULLIVAN           48
4

5

6

7

8                      E X H I B I T S

9
     None.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE

2          I, JACQUELINE M. SULLIVAN, Official Court Reporter,

3    certify that the foregoing pages are a correct transcript from

4    the record of proceedings in the above-entitled matter.

5                         _____

6                         JACQUELINE M. SULLIVAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25