1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF COLUMBIA

3    UNITED STATES DISTRICT COURT       CRIMINAL ACTION NO. 08-0231

4                                       WASHINGTON,D.C.

5    VERSUS                             MONDAY, SEPTEMBER 29, 2008

6                                       **REDACTED TRANSCRIPT**

7    THEODORE F. STEVENS                1:45 P.M.

8

9                    **JURY TRIAL (DAY 6 – PM SESSION)**

10           **BEFORE THE HONORABLE EMMET G. SULLIVAN**

11              UNITED STATES DISTRICT COURT JUDGE

12

13   <u>A P P E A R A N C E S:</u>

14   FOR THE PLAINTIFF,                 JOSEPH W. BOTTINI,ESQ.
                                        U.S. ATTORNEYS OFFICE
15                                      District of Alaska
                                        22 West Seventh Avenue
16                                      Federal Building and U.s.
                                        Courthouse
17                                      Anchorage, AK 99513-7567

18                                      NICHOLAS A. MARSH,ESQ.
                                        U.S. Department of Justice
19                                      10th and Constitution Ave.
                                        NW
20                                      Washington, DC 20530
                                        202-307-1049
21
                                        BRENDA MORRIS, ESQ.
22                                      U.S. DEPARTMENT OF JUSTICE
                                        1400 New York Avenue, NW
23                                      12th Floor
                                        Washington, DC 20005
24                                      (202) 514-1412

25



FOR THE DEFENDANT,                    BRENDAN SULLIVAN, ESQ.
                                      ROBERT MADISON CARY,ESQ.
                                      ALEX G. ROMAIN, ESQ.
                                      BETH STEWART, ESQ.
                                      CRAIG SINGER, ESQ.
                                      WILLIAMS & CONNOLLY
                                      725 12th Street, NW
                                      Washington, DC 20005
                                      (202) 434-5000


REPORTED BY:                          WENDY C. RICARD, RPR, CCR
                                      OFFICIAL COURT REPORTER
                                      333 Constitution Avenue
                                      Room #6718
                                      Washington, DC  20001
                                      (202)354-3111


Proceedings recorded by mechanical stenography.

Transcript produced by computer-aided transcription.

1                          I N D E X

2

3      WITNESSES:                                      PAGE:

4          BRIAN BYRNE................

5              BY:  MR. BOTTINI........         16,27

6              BY:  MR. ROMAIN........         23

7          EDGAR HERNANDEZ............

8              BY:  MR. BOTTINI........         29,41

9              BY:  MR. ROMAIN........         38

10         CALEB SLEMONS..............

11             BY MS. MORRIS...........         43

12             BY MR. ROMAIN...........         47

13         CECIL DALE.................

14             BY MR. MARSH...........          48,81

15             BY MR. STEWART...........        65,83

16         DANIEL JOHNSTON............

17             BY MR. BOTTINI...........        91,112

18             BY MS. STEWART...........        107

19

20

21

22

23

24

25

                              **P R O C E E D I N G S**

1                  (Whereupon, after the lunch recess, court resumed

2         as follows:)

3                  THE DEPUTY CLERK:  Please remain seated and come to

4         order.

5                  THE COURT:  All right.  Before we start, the

6         parties are going to have to do some more work.  I am very

7         disturbed about the fact that Mr. Williams is not present

8         before the Court, and the reason for my concern is as

9         follows, and I'm going to be very sensitive about the

10        discussion at the bench, and I'm not going to go into details

11        about the underlying reasons why the government contends that

12        -- why the government states that it put him on the plane on

13        the day of opening statement.

14                 Here's what I'm concerned about:  It appears to me

15        that Williams, who was subpoenaed by the government to

16        testify, was also subpoenaed by defense counsel to testify in

17        this case and that the government knew that Williams had been

18        subpoenaed by defense counsel.

19                 I'm concerned because it appears that Williams may

20        have been in Washington, DC, for a rather significant period

21        of time prior to the date of opening statement, and then for

22        the reasons articulated at the bench by the government, the

23        government made a unilateral decision to put him on a

24        commercial flight and send him away from the Court knowing

1      that he had also been subpoenaed by defense counsel to be

2      present in this court and to testify.

3              My understanding is that defense counsel was never

4      informed in advance that the government had made this

5      unilateral decision to fly Williams back to Alaska until after

6      Williams was indeed in Alaska and, indeed, my understanding

7      is that witness Williams was informed when you arrive in

8      Alaska, you might want to call the other side, the other

9      attorneys, whom the government knew full good and well had

10     subpoenaed Williams to testify.

11             I'm concerned that a subpoenaed witness, a witness

12     subpoenaed by both sides to testify in a federal court, was

13     -- let me be careful about the manner in which I describe him

14     leaving -- was advised to leave the District of Columbia, and,

15     indeed, assisted in leaving the District of Columbia by the

16     government for reasons that have not been fully explored by

17     defense counsel or by the Court.

18             There may be an inference that could be drawn from

19     this that the government chose not to call him to testify

20     because the government finally realized that his testimony

21     might not be helpful to the government.  Now, that's not a

22     conclusion the Court is prepared to reach at this point.  It

23     may well be for the reasons discussed at the bench it was

24     appropriate to -- for the government to advise Williams to

25     leave, and, indeed, it may be appropriate -- it may have been

1    appropriate for the government to help him leave, but I find

2    that I find that very curious.

3              I was in contact with counsel for the parties and in

4    at least one joint telephone call over the weekend on Saturday

5    afternoon.  I was not informed -- I learned about this by

6    Williams being here and leaving when I saw the motion this

7    morning, the motion filed by defense counsel.  It seems to me

8    that government was under an obligation to at least -- even if

9    it didn't want to share this information with defense counsel

10   -- to apprise the Court that there was a problem; there was a

11   problem with a witness who had been in this jurisdiction for

12   many days arguably being prepared by the government to testify

13   in this case, and the Court was never informed that there was

14   a problem with any potential witness, and, indeed, probably a

15   witness whose testimony would be very critical to the

16   government's case-in-chief or could be critical.  That is for

17   the jury to determine, but I was never informed of that, and

18   that causes the Court some concern.

19             I'm not concluding or even suggesting at this point

20   that there's been misconduct on the part of government

21   attorneys.  I'm not suggesting that, but I want the parties to

22   brief that issue because if that's the case, then I'm going to

23   impose sanctions as appropriate.   I find it very, very

24   disturbing that this has happened.  I am concerned about the

25   appearance of propriety and/or impropriety, and I find it

1    absolutely amazing that government counsel -- even if they

2    didn't want to share this information about Williams with

3    their opponent -- didn't seek to inform the Court ex parte

4    about what was happening with a material witness,  a witness

5    so important that the government had him here for days in

6    advance.

7              There may have been some options available, who

8    knows?  He's not here.  There may have been some options

9    things that the Court could have done.  At the very least, the

10   Court could have had an inquiry with the witness about the

11   reasons discussed at the bench in an effort to determine

12   whether alternatives were available to, if appropriate, insure

13   his testimony in this court.  After all, this is a search for

14   the truth, and people ought not forget that.

15             So I'm concerned about this scenario.  That's all

16   I'm going to call it at this point.  I'm not making any

17   finding.  I'm not in a position to make any findings, but I

18   want the parties to brief the issues as to whether or not what

19   happened is sanctionable, and, if it is,  then I'm going to

20   sanction as appropriate.  I'll leave it at that, but I'm just

21   not going to drop that issue because it's a serious one.

22   We're all officers of the Court.

23             It's clear that the government attorneys as officers

24   of the Court had an obligation to at least inform the Court of

25   this problem that they perceived to be so important that they

1    made it possible for a witness under subpoena by not only the

2    government, but by defense counsel to leave the jurisdiction

3    without mentioning anything to either defense counsel or, more

4    importantly, to the Court.

5              Now, what that means in the final analysis, I'm not

6    prepared to say, but I am prepared to say that I am disturbed

7    enough about that scenario and the repercussions for it that I

8    want further briefing from the parties.

9              Now, again, we're all in trial, and we all have

10   after hour assignments in this case and maybe others, but I

11   want your best thoughts about that.  I have the 302s and

12   MOIs(Phonetic), and I was reading -- I haven't finished

13   reading them.  I was reading them over the lunch hour,  and so

14   what am I supposed to do with that.  It's relevant,  of

15   course, if Williams testifies, and I have that information.  I

16   can determine whether there's Brady material available and

17   whether or not the government should have turned over that

18   Brady material, whether it's impeachable material for that

19   witness or somebody else,  but if he doesn't testify,  then

20   what?

21              But no more about Brady.   It's not really focusing

22   on Brady, it's focusing on the scenario that developed as a

23   result of Williams being assisted in leaving the District of

24   Columbia without any advance notice to anyone.

25              Now, I invite your response as to when such a memo

```
 1      should or could be filed.  I don't want to be arbitrary and
 2      say file it by seven, but I want your best thoughts soon,
 3      sooner than later.  Nine o'clock this evening?  The government
 4      should probably file first.  Yes?
 5              MR. CARY:  I was going to suggest simultaneous
 6      briefs at nine o'clock this evening, Your Honor, is what I was
 7      coming to the podium to suggest.
 8              THE COURT: Simultaneous is fine, but I'm going to
 9      need a response.  I would like a response from the opponent
10      with respect to a submission.  I suggest that maybe the
11      government goes first since the government always has the
12      burden since this was -- since he left as a result of the
13      government.
14              MR. CARY:  That would be fine, Your Honor.
15              THE COURT:  But you filed last night at midnight.
16      Nine o'clock for the government, and what's reasonable for
17      defense counsel.  I'm not go to sit here and tell you to file
18      it by midnight.  I don't get any pleasure of --
19              MR. CARY:  Mr. Sullivan is saying  midnight.  Mr.
20      Singer is shaking his head.
21              THE COURT:  Mr. Sullivan, is he going to be at the
22      word processor at midnight.  I mean what's fair,  counsel?
23      Look, it may well be an issue that can just be briefed,  and I
24      mean the big question mark is Williams' uncertainty.  That's
25      the big question mark, his unavailability, potentially, as a
```

1    witness.  It may make more sense just to file it tomorrow

2    morning.  I don't know.  But I need some thoughts from you.

3              MR.  CARY:  Tomorrow morning would be best, Your

4    Honor.

5              THE COURT:  All right.  And you told me you've

6    monitored -- I assume the government is monitoring Williams,

7    monitoring Mr.  Williams; are you, I assume?

8              MS.  MORRIS:  We were in touch with him since he's

9    been back, yes, to find out how he's doing.

10             THE COURT:  So nine o'clock tonight by the

11   government, and, what,  eight o'clock tomorrow morning?

12   Probably going to need a response -- maybe I'll just limit it

13   to that.

14             MS.  MORRIS:  Judge, if I may, in the brief we filed

15   over the lunch period,  that does contain -- it addresses

16   those issues, and it also has --

17             THE COURT:  I didn't get a chance to read that.  It

18   addresses everything.  If those are your best thoughts,  that'

19   fine.

20             MS.  MORRIS:  And two affidavits that are with that.

21             THE COURT:  So if it's the government's belief it

22   doesn't need to do anything further,  that's fine.  I haven't

23   read it.

24             MS.  MORRIS:  I don't believe so, Judge.  I think

25   that's everything contained in it, but I have to be honest,

1    when we got it, it was warm.  So we just Got it,  and I got it

2    right to the Court.

3            THE COURT:  When you got what?

4            MS.  MORRIS:  It had just come out of the printer.

5    Somebody had dropped it in a cab and got it over here to us.

6    So we haven't totally read through it ourselves.  We talked to

7    our office, to other attorneys at our office who drafted it,

8    and two people that attached the affidavit,  but I think it is

9    complete, Judge.  It's just I'm saying that with the proviso

10   that the attorneys who are present here in court haven't had a

11   full opportunity to --

12           THE COURT:  But you filed it anyway even though you

13   didn't read it?

14           MS.  MORRIS:  Well, it's a team effort, Judge.

15           THE COURT:  That's fine.  That's fine. If that's

16   your best response,  that's fine.  I haven't read it,  so,

17   anyway.

18           MR. CARY:  Your Honor, if that's their best

19   response, we could respond by nine o'clock tonight.

20           THE COURT:  That's fine.  Fair enough.  You have a

21   stipulation with respect to some other witnesses who are going

22   to testify today?

23           MS. MORRIS:  Yes, sir.

24           MR. CARY:  We do, Your Honor.

25           THE COURT:  And, again, I want to be clear about

```
 1        that, I'm not passing judgment on -- I haven't said you've

 2        done anything unethical.   I'm just saying I'm very concerned

 3        and disturbed.   That's all.

 4                MS.  MORRIS:  We totally understand,  Judge.

 5                THE COURT:  All right.

 6                MS.  MORRIS:  And that's totally within your

 7        purview,  and we totally understand,  and so you're not doing

 8        anything that we think is unreasonable.  We understand that.

 9                THE COURT: All right.  Okay.

10                MR. CARY:  We do have a stipulation,  however, that

11        addressed the need to recall John Hess; Roy Dettmer; Daniel

12        McBirney; and Michael Luther.  And I'd be happy to hand it up

13        or I can read it,  whichever --

14                THE COURT:  Go ahead and read it.

15                MR.  CARY:  It reads as follows:  The parties hereby

16        stipulate and agree that if recalled to testify each of the

17        following witnesses would testify that he does not know how

18        many total hours Robert Rocky Williams spent working on the

19        Girdwood home renovations and that he does not know whether

20        Mr.  Williams worked on other matters for Bill Allen during

21        the same time period that he was working on the Girdwood home

22        Renovations,  and then the four witnesses listed are:  John

23        Hess; Roy Dettmer; Daniel McBirney; and Michael Luther.  And

24        we'd ask that this be read to the jury that way we don't have

25        to inconvenience these people and bring them back.
```

1          THE COURT:  Absolutely.  Fair enough.  I applaud the

2     efforts of counsel.  Fair enough.  And as far as witnesses

3     this afternoon, you have people?

4          MS.  MORRIS:  Yes, sir.  One thing I would like to

5     bring up, Your Honor.  It just --

6          THE COURT: I'll just go ahead and read that

7     stipulation.  How do you want it to come into the record,  as

8     defendant's exhibit,  as joint exhibit,  government's exhibit?

9          MS. MORRIS:  It can be a joint exhibit,  Your Honor.

10          MR. CARY:  That's fine,  Your Honor.  We probably

11     ought to type it up.  I was hoping it could be red and maybe

12     we could type it up without the red --

13          MS.  MORRIS:  Insertions.

14          THE COURT: They aren't going to see that anyway.

15     Let me just make sure I can read it.  How many total hours --

16     That's fine.  I'll just read it to them.  Then if you want to

17     offer it as a joint exhibit,  that's fine.

18          MR.  CARY:  Thank you.

19          THE COURT:  Give it a number.  That's fine.  You

20     have witnesses for today.

21          MS.  MORRIS:  Yes, sir.  But one thing I would like

22     to point out as far as the motion or the response that we

23     filed -- and I don't think you've had a chance to look yet

24     over the lunch hour,  but with regard -- it doesn't address

25     sanctions and whether or not sanctions are appropriate,  so

1    maybe we do need to submit something to the Court whether or

2    not sanctions are appropriate.

3           That we do take this very seriously, and we

4    understand. We're not saying that anything is inappropriate.

5    We just want to appropriately respond so everything is laid

6    out so you know what steps we took, what considerations were

7    in place.

8           So if the Court is considering sanctions, we would

9    like --

10          THE COURT: No. I'm not considering -- believe me,

11    if I start considering sanctions, I will let you know. I am

12    not going to just consider them in vacuum, but I'm just

13    raising thoughts with counsel because of the appearance this

14    creates.

15          MS. MORRIS: No. We understand, Judge, and this

16    was not a decision that came easily. This was a -- well,

17    we've filed it and --

18          THE COURT: It would have been very easy to get me on

19    the phone ex parte and say, Judge, we have a problem here.

20          MS. MORRIS: I understand. It was a unique

21    situation. I'm sorry, Judge.

22          THE COURT: All the more reason, totally unique

23    situation, right?

24          MS. MORRIS: Yes, Your Honor.

25          THE COURT: For somebody who had been here for quite

1    awhile.

2              MS. MORRIS: Yes, Your Honor.

3              THE COURT:  Well,  what's fair?  You want to address

4    the issue of sanctions before they have to respond or --

5              MS.  MORRIS:  I think,  yes, Judge.

6              THE COURT: All right.  Nine o'clock, then?

7              MS. MORRIS:  Yes, sir.

8              THE COURT: And then eight o'clock tomorrow for

9    defense counsel.

10             MR. CARY:  Yes, Your Honor.  Just to clarify ,

11   this brief has arrived.  I would propose that we file one

12   brief tomorrow morning that addresses the one that they filed

13   and the one that they're going to file at nine rather than

14   having more briefs passing in the night.

15             THE COURT:  That's fine.  I don't have any problem

16   with that.

17             MR. CARY:  Thank you.

18             THE COURT:  All right.  Now,  maybe we can proceed.

19             (Whereupon,  the jury enters the courtroom at this

20   time after the lunch recess.)

21             THE COURT:  All right.  Ladies and gentlemen,  good

22   afternoon.  I'm going to read to you a stipulation,  and I'll

23   tell you that a stipulation is an agreement between counsel

24   that what has been stipulated to is indeed true.  It is --

25   we'll call it a joint stipulation.  You'll see it again when

1    you retire to deliberate.  You'll see all the evidence in the

2    case.

3              The parties hereby stipulate and agree that if

4    recalled to testify that each of the following witnesses would

5    testify that he does not know how many total hours Robert

6    Rocky Williams spent working on the Girdwood home renovations

7    and that he does not know whether Mr.  Williams worked on

8    other matters for Bill Allen during the same time period that

9    he was working on the Girdwood home renovations.

10             And those people are:  John Hess; Roy Dettmer;

11   Daniel McBirney; and Michael Luther.  So accept that as true.

12   All right, counsel.  You can proceed with your direct

13   examination.

14             MR.  BOTTINI:  Thank you,  Your Honor.

15   BY MR. BOTTINI:

16   Q.   Mr.  Byrne, before we go forward here, I just wanted

17   clear something up in relation to something you said this

18   morning.  Now, when you worked on the lower deck there at

19   Senator Stevens' house,  you were not employed by Christensen

20   Builders at that time; is that correct?

21   A.   I was not, no.

22   Q.   In fact,  if we go back to Government's Exhibit 152 at

23   the second page,  the invoice that you submitted,  at that

24   time you were in business for yourself; is that correct?

25   A.   That's correct,  yep.

1    Q.   In fact, the invoice appears to read: Brian Byrne,

2    D/B/A, doing business as Byrne Construction.

3    A.   That's correct.

4    Q.   Okay.  When we broke for lunch, we were talking about the

5    work that you had done there on the lower deck.  So let me ask

6    if we could have Government's Exhibit No. 37 I believe it is

7    -- I'm sorry -- 67 displayed for you.  This has been admitted

8    into evidence.

9         Mr. Byrne, you were running through that photograph and

10   explaining the work that you had done; do you recall that?

11   A.   I do, yes.

12   Q.   All right.  Now, at the bottom of the steps there, there

13   appears to be some formations there like supports for the

14   deck.  Do you see that?

15   A.   I do.

16   Q.   Did you do that work?

17   A.   Yeah.  The rockery at the base of the structural columns,

18   I installed that, as well as forming and for the concrete pad

19   underneath the stairs.

20   Q.   This pad right here(Indicating)?

21   A.   That's correct, yeah.

22   Q.   Okay.  If you could then run through the photograph again

23   and tell all that you did there on the deck.

24   A.   Sure.  Beam work; structural support; joists; and

25   handrail; decking; the skirt board, which is the portion that

1    you see that's dark brown, the posts are attached to.

2    Building those box posts.  They are made out of two by six.

3    Fabricating the caps for those posts; installing the rails and

4    pickets; the handrails on there; the stairs.  And that wraps

5    around the corner.  There's a small section of that deck

6    that's underneath the stairs on the back side, as well.

7    Q.  All right.  Let me ask if I could for Exhibit Number --

8    Government Exhibit 34, which, at this point, is only marked

9    for identification be displayed for you only here.  Do you

10   have that up on your screen?

11   A.  I do.

12   Q.  What do we see there in that photograph?

13   A.  Different than what has already been talked about.

14   Q.  Well, a little more detail as far as the structure

15   that's right above the lower deck.

16   A.  There's a cover on the deck.

17   Q.  Yes.

18   A.  Is that what you're looking at?

19   Q.  Yes.  Does that accurately depict you recall it looking

20   like?

21   A.  Yeah.

22          MR. BOTTINI:  We'd offer 34 at this time, Your

23   Honor.

24          MR. ROMAIN:  No objection.

25          THE COURT:  Any objection?  All right.  Admitted.

1      BY MR. BOTTINI:

2      Q.   And what you were just focusing on there, Mr. Byrne, is

3      that this -- there we go.  Well, I locked it up here, Mr.

4      Byrne.  There we go.  Thank you.  Sorry.

5               MS. MORRIS:  You're welcome.

6      BY MR. BOTTINI:

7      Q.   All right.  This -- above the lower deck there, there

8      appears to be some sort of a roof structure.  Do you see that?

9      A.   I do.

10     Q.   Metal framework grid.

11     A.   Correct.

12     Q.   Did you work on that?

13     A.   I didn't, no.

14     Q.   Do you know anything about that, though?

15     A.   I mentioned that something like that would probably be a

16     good idea.

17     Q.   All right.  Why did you think that was a good idea?

18     A.   Having worked on that deck, if it had rained or even

19     snowed slightly, the drip would come from the upper deck,

20     and long after it would rain, it would still be dripping on

21     the lower deck.

22     Q.   Okay.  Now, did you do any other work at the house

23     besides this lower deck?

24     A.   I did, yeah.  I put in a handrail on the interior of the

25     house, which is just a normal safety rail, handrail on some

1    stairs.

2    Q.    All right.  Let me ask For Exhibit No. 32 which is also

3    only marked for identification at this his point to be

4    displayed.  Do you recognize what you see there in Exhibit 32?

5    A.    I do,  yeah.  That's the handrail I installed.

6            MR. BOTTINI:  We'd offer 32,  Your Honor.

7            THE COURT: Any objection?

8            MR. ROMAIN:  No objection.

9            THE COURT:  Admitted.

10   BY MR.  BOTTINI:

11   Q.    And could you show the ladies and gentlemen of the jury,

12   Mr.  Byrne,  what you're referring to as the handrail that you

13   installed?

14   A.    Sure.  No problem.  It starts here.  Travels up the stair

15   system here; comes back and actually continues up to the top

16   of the stairs.

17   Q.    Okay.  Any other work that you did at the house in

18   relation to the work that you did for VECO?

19   A.    Yeah.  I modified an opening for an exhaust fan in the

20   attic.  I think that either the fan was broken or it was

21   undersized.  I'm not sure the reason for that.  There's a

22   small fan in the attic that I cut a larger hole for to install

23   the new fan.

24   Q.    Let me ask that Government's Exhibit No. 31 be displayed.

25   This is marked for identification only at this point.  All

1    right.  Do you recognize what we see in that picture,  Mr.

2    Byrne?

3    A.    I do,  yeah.

4    Q.    What is that?

5    A.    The white box above the curtain rod here is an exhaust

6    fan.

7                MR. BOTTINI:  We'd offer 31, Your Honor.

8                THE COURT: Any objection?

9                MR. ROMAIN:  No objection.

10               THE COURT: Admitted.

11   BY MR. BOTTINI:

12   Q.    All right.   Mr.  Byrne, for the benefit of the jurors

13   who now see the photograph,  you've drawn a box basically a

14   around the work that you've done there.

15   A.    Yes; that's correct.

16   Q.    And that was on a ventilation fan?

17   A.    Yeah,  uh-huh.  Exhaust fan.

18   Q.    Any other work that you did at the home that you can

19   recall?

20   A.    I worked on a gutter on the exterior of the house which

21   on the mountain side of the house.  I'm not sure if that is

22   north or south right there.  I think it's the south side of

23   the house.

24   Q.    What kind of work did that require?

25   A.    Getting on the roof to install a gutter that had been

1    taken off by ice damming or I think that ice had pulled the

2    gutter off of the roof.

3    Q.   All right.  Now, the dates that you worked at the home

4    there, at Senator Stevens' home,  are the date that are

5    reflected on your invoice in Exhibit 152; is that correct?

6    A.   Yeah.  That's right.

7    Q.   All right.  Did you have occasion to see Senator Stevens

8    or any other members of his family at the house while you were

9    working there?

10   A.   I didn't,  no.

11   Q.   What about a gentleman by the name of Bob Persons; do you

12   know who that is?

13   A.   I do.  I spent a lot of time thinking about this, and I

14   don't know that if I had seen Bob there that it would have

15   really stood out in my mind having just done another job for

16   him.

17   Q.   Okay.  So you just don't recall whether he was at the

18   house?

19   A.   I don't recall.  I don't.

20   Q.   All right.  Now,  the work that you did at Senator

21   Stevens' home,  who were you paid by?

22   A.   By VECO.

23   Q.   By VECO?

24   A.   I was.

25           MR. BOTTINI:  Yeah.  That's all the question I have

1 for you, Mr. Byrne. Thank you.

2     THE COURT: All right. Any cross-examination?

3 **CROSS-EXAMINATION BY MR. ROMAIN:**

4 Q. Good afternoon, Mr. Byrne.

5 A. Good afternoon.

6 Q. My name is Alex Romain, and I represent Ted Stevens.

7 I just have a few question for you.

8 A. Sure.

9 Q. When you began to work at Girdwood, you did so in

10 response to an ad in a paper, correct?

11 A. Yeah, that's correct. For Christensen Builders, yes.

12 Q. For Christensen Builders. And Augie Paone put out that

13 ad; is that right?

14 A. Yes. To the best of my knowledge, yes.

15 Q. Okay. And so then you began to work at Bob Persons'

16 residence in response to this ad put out by Christensen

17 Builders, correct?

18 A. Correct. Uh-huh.

19 Q. And how long did you spend working at Bob Persons'

20 residence?

21 A. I don't know the total time that I was there. I would

22 say between two weeks and a month, somewhere in that time

23 frame.

24 Q. Great. And then when you began to work at Senator

25 Stevens' residence, that was Augie Paone's recommendation,

1    correct?

2    A.    On his recommendation, yes.  It was a referral.

3    Q.    You also testified in response to one of Mr. Bottini's

4    questions that it's hard to find construction workers in

5    Girdwood.  Do you remember that testimony?

6    A.    It depends.  Yeah.  It depends on I guess on the quality

7    of people that you'd be looking for.

8    Q.    If you're looking for good people.

9    A.    Sometimes that's harder to find in Girdwood, yeah.

10   Q.    Now, let me direct your attention to what has already

11   been admitted as Government Exhibit 152.

12   A.    Uh-huh.

13   Q.    Okay.  Now, this is an invoice that you submitted,

14   correct?

15   A.    It is.

16   Q.    For the work that you did at Senator Stevens' house,

17   correct?

18   A.    That's correct.

19   Q.    Now, this reflects your dates of service from September

20   4th, 2002, to October 13th, 2002; do you see that?

21   A.    I do.

22   Q.    Great.  Now, that's a total of about six weeks,

23   correct?

24   A.    Yes.  Uh-huh.

25   Q.    Now, during those six weeks, you charged a total of 135

1    hours.

2    A.    Correct.

3    Q.    For your work at Senator Stevens' house,  correct?

4    A.    Correct,  uh-huh.

5    Q.    And that was for all the work that you did at Senator

6    Stevens' house,  correct?

7    A.    Correct, uh-huh.

8    Q.    That would mean that you spent approximately four hours

9    or a little bit more that four hours, five days a week,

10    during those six weeks at Senator Stevens' house?

11    A.    That would vary based on we would have a full eight-hour

12    day,  and it was not a full 40-hour week straight through

13    definitely.  I was not on site the whole time.

14    Q.    You were part time working there.

15    A.    Yeah.  We would have maybe a week where the structural

16    work was going in full bore,  and I'd be there the majority of

17    that time.

18    Q.    Okay.

19    A.    Then when things could be turned over to say Edgar or

20    David,  I wouldn't see the need for my services and had other

21    things that I was trying to do,  as well.

22    Q.    Okay.  But you were able to complete all of your work

23    within that six-week period,  correct?

24    A.    Yes, uh-huh.

25    Q.    And I take it that you're proud of the work you did

1    there, correct?

2    A.    Yeah.  I thought it looked pretty good, yeah.

3    Q.    And in addition to that,  within that six-week period,

4    that's when you also did the rocks that you talked about?

5    A.    I believe so.  I'm not a hundred percent sure on that,

6    but I believe so.

7    Q.    And after providing this invoice for a 135 hours,  you

8    don't know do you how VECO accounted for your time?

9    A.    I don't.

10   Q.    Okay.  You just provided the invoice and that's all that

11   you know,  correct?

12   A.    That's correct.

13   Q.    Now,  after you finished working on the porch yourself --

14   A.    Uh-huh.

15   Q.    -- was there anything else left to be done on the porch

16   such as staining and sealing?

17   A.    That I didn't have any part of.

18   Q.    And that was all that was left to be done on the porch

19   itself,  correct?

20   A.    Yeah.  I'd say that's fairly accurate.

21   Q.    I just wanted to clarify one point on -- that you

22   indicated on direct examination.

23   A.    Uh-huh.

24   Q.    To be clear about the people who are helping you; that

25   was Edgar Hernandez was helping you.

1    A.    Yep.  Yep.

2    Q.    And Adam Padilla was helping you.

3    A.    Yes.

4    Q.    All right.  And they were not there all the time,

5    correct?

6    A.    That's correct.

7    Q.    They were there off and on.

8    A.    Correct.

9    Q.    And,  of course,  Dave Anderson was not in the same

10   category as Edgar Hernandez and Adam Padilla;  is that right?

11   A.    That's correct.

12   Q.    He had a largely -- had a largely supervisory role.

13   A.    I would say that's accurate.

14   Q.    And he would check on the progress of the porch.

15   A.    Yes,  that's correct.

16   Q.    And,  of course,  during your six weeks there,  you never

17   saw Senator Stevens or his wife?

18   A.    I did not,  no.

19          MR. ROMAIN:  Thank you very much.

20          THE WITNESS:  No problem.

21          THE COURT: All right.  Redirect,  counsel?

22          MR.  BOTTINI:  Just very briefly,  Your Honor.

23   **REDIRECT EXAMINATION BY MR. BOTTINI:**

24   Q.    Very briefly,  Mr.  Byrne,  in response to one of Mr.

25   Romain's questions about whether you were there on site the

```
1    whole time.

2    A.    Uh-huh.

3    Q.    Fair to say that you weren't there eight hours a day;  is

4    that correct?

5    A.    That would depend on the day,  but,  yeah.

6    Q.    Okay.

7    A.    But,  yeah,  I would be eight hours some days and,

8    perhaps,  two on another day or not there at all.

9    Q.    Okay.  Times when you were not there were Edgar and/or

10    Adam doing work on the deck?

11    A.    There would have been times that would have occurred,

12    yes,  because layout everything -- get the -- one of the

13    tricky things with that deck was the fact that the decking

14    itself ran around both structural steal columns,  and so there

15    is -- it's not ridiculously hard to lay that out,  but I've

16    seen people mess that up quite a bit.  So any time that we hit

17    one of those columns,  I made those cuts around to make those

18    tight,  the columns.

19    Q.    And they would be in charge of affixing the boards to the

20    supports?

21    A.    Yeah.

22          MR.  BOTTINI:  That's all the questions I have for

23    you.  Thank you.

24          THE WITNESS:  No problem.

25          THE COURT:  Any objections to excusing the witness?
```

1      All right.

2              MR. ROMAIN:  No objection.

3              THE COURT: Have a safe trip home.  I would ask you

4      not to discuss your testimony with anyone.  Thank you.

5              THE WITNESS:  No problem.  All right.

6              THE COURT: All right, counsel.

7              MR.  BOTTINI:  Your Honor, our next witness is Edgar

8      Hernandez.

9              THE COURT:  All right.

10             *              *              *              *

11             **EDGAR HERNANDEZ**, having been called as a witness in

12     this case,  after having been duly sworn by the deputy clerk,

13     testified as follows:

14             *              *              *              *

15             THE COURT:  Good afternoon,  sir.

16             THE WITNESS:  Hello.

17     **DIRECT EXAMINATION BY MR. BOTTINI:**

18     Q.   Sir,  could you please state your first and last names

19     and spell those for the record,  please?

20     A.   Edgar Hernandez; E-D-G-A-R; H-E-R-N-A-N-D-E-Z.

21     Q.   Mr.  Hernandez,  where do you currently reside,  sir?

22     A.   Anchorage, Alaska.

23     Q.   How long have you lived in Alaska?

24     A.   For 25 years.

25     Q.   Have you ever worked for VECO corporation?

1    A.    Yes, sir.

2    Q.    Can you tell us when that was and what you did for VECO?

3    A.    I was hired back in January of 19 -- no, 2001; January 29

4    of 2001.

5    Q.    And what were your hired to do?

6    A.    I was hired as laborer down there at the Port when VECO

7    and BP and the union were building the North Star Project.

8    Q.    Okay.  Were those the modules that were being built down

9    there?

10   A.    Yes, sir.

11   Q.    All right.  Did you work for VECO on and off over the

12   next couple of years?

13   A.    Yes,  I did.

14   Q.    And what was your employment with the company during

15   those times?  What did you do for VECO?

16   A.    I was a laborer.

17   Q.    Did there come a point in time when you were asked to go

18   down and work on a project down in Girdwood, Alaska?

19   A.    Yes,  there was.

20   Q.    Do you remember when that happened?

21   A.    That was in April of 2002.

22   Q.    In April of 2002 in Girdwood?

23   A.    I worked at Girdwood around August of 2002,  but I was

24   hired by VECO in April of 2002.

25   Q.    Okay.  So when did the Girdwood project come up?

1    A.   In August.

2    Q.   Okay.  And what was the project down in Girdwood that you

3    worked on?

4    A.   I worked on a log cabin.  We built a wraparound deck on

5    the bottom floor.

6    Q.   All right.  Let me ask that Government's Exhibit No. 29

7    which has been admitted into evidence be displayed for you,

8    Mr.  Hernandez.  All right.  Do you recognize what you see in

9    that picture?

10    A.   Yes, sir,  I do.

11    Q.   And what is that?

12    A.   That is Mr.  Stevens' house.

13    Q.   All right.  Is that the home that you worked on in

14    Girdwood?

15    A.   Yes, sir,  it is.

16    Q.   All right.  Now,  in this photograph,  Mr. Hernandez,

17    there appears to be a couple of decks; do you see that?

18    A.   Yes, sir, I do.

19    Q.   Which is the deck that you worked on?

20    A.   The bottom.  The bottom deck is the deck I worked on,

21    and I helped stain the top deck.

22    Q.   Okay.  You were working for VECO at this time as a

23    laborer; is that correct?

24    A.   Yes,  sir,  I was.

25    Q.   Do you remember how much you were being paid per hour?

1    A.    It was around 10 to $14 an hour.

2    Q.    Okay.  And now the construction of that lower level deck

3    that you talked about,  were there other people working on

4    that?

5    A.    Yes,  there was.

6    Q.    Who else was working on that?

7    A.    David Anderson was my supervisor,  and there was another

8    gentleman by the name of Adam, and a subcontractor by Brian

9    Byrne's.

10    Q.    Now,  the materials that were used in the construction of

11    that lower level deck, do you know where those came from?

12    A.    SBS Minnesota & Tudor(Phonetic).

13    Q.    All right.  What's SBS?

14    A.    Oh, Spinard(Phonetic) Builder Supply.

15    Q.    Spinard Builder Supply?

16    A.    Yes, sir.

17    Q.    How do you know they came from Spinard Builder Supply?

18    A.    Because me and David Anderson went there and picked up

19    all the supplies.

20    Q.    Okay.  Do you know how they were paid for; in other

21    words, who purchased the materials?

22    A.    I believe VECO paid for them.

23    Q.    All right.  And why do you say you believe VECO paid for

24    them?

25    A.    Because when I was working for VECO,  my supervisor had

1      all the invoices, and I would just -- I was just there with
2      him to get all the materials that we needed;  screws that we
3      needed; any kind of wood that we needed and stuff,  so I was
4      assuming that they were paying for it.
5      Q.    Okay.  I take it the materials were then taken down to
6      Girdwood; is that correct?
7      A.    Yes.  I went there with a F354 -- diesel and a 20 foot
8      trailer and ended up loading all the lumber and drove it to
9      Girdwood myself.
10     Q.    Okay.  Now, who did the truck belong to?
11     A.    VECO.
12     Q.    Now,  when you got down to home with the materials,  who
13     was down there to work on the deck?
14     A.    David Anderson,  myself,  and the subcontractor, Brian --
15     Brian Byrnes.
16     Q.    Brian Byrnes.  What was Mr.  Byrnes' role in the
17     construction of the deck?
18     A.    He was a contractor that was building the deck,  and I
19     was helping him put the screws in.  I wasn't cutting any
20     boards or nothing,  but i was a laborer there.
21     Q.    Okay.  What about the other gentleman, Adam,  that you
22     referred to,  what was he doing?
23     A.    Adam was doing the same thing,  labor work.
24     Q.    Who did Adam work for; do you know?
25     A.    VECO.

1    Q.    What about Dave Anderson,  who did he work for?

2    A.    VECO.

3    Q.    How long did it take for this deck to be built; do you

4    remember?

5    A.    About two to three months.

6    Q.    Did you do other work there at the house besides help on

7    the construction of the deck?

8    A.    I stained the house,  the top deck right up here,  and I

9    also helped paint some of the trimmings on the dark brown --

10   there by the windows and stuff.  And,  also,  I did some

11   screws on the very top floor for the roof,  and then also I

12   helped David Anderson with the skeleton frame for the second

13   roof that was on the bottom deck.

14   Q.    Now,  is all that work you just described,  did that take

15   place within the two to three months that you said you

16   estimated you worked down there?

17   A.    Yes, sir, I did.

18   Q.    Let me ask you about that last thing you just mentioned

19   and ask that Government's Exhibit No. 34,  which has been

20   admitted into evidence,  be displayed for you.  All right,

21   Mr.  Hernandez,  you mentioned something about a roof or

22   something that you worked on; is that correct?

23   A.    Yes, sir.

24   Q.    Do we see that in this picture, Exhibit 34?

25   A.    Yes,  I do.

1    Q.   And we're just drawing a couple of lines there, is that

2    the structure that you were referring to?

3    A.   Yes, sir, it is.

4    Q.   All right.  Now, tell us about how that was constructed?

5    A.   Well, we first set it on the skeleton, the fabrication.

6    I believe David Anderson sent me to get that fabrication from

7    the fab shop which is off of C Street and 64th I think.

8    Q.   Is that a VECO shop?

9    A.   Yes.  It's a fabrication shop.

10   Q.   Go ahead.

11   A.   And I helped him hold the metal frame piece by piece as

12   he welded it together, and sooner -- after that, we started

13   putting that plastic roof part and stuff, which is the top of

14   the metal frame and stuff so that no water or snow would fall

15   down into that bottom deck.

16   Q.   How long did that take to put up that roof there you've

17   just been testifying about?

18   A.   About two to three weeks.

19   Q.   Okay.  Now, you mentioned that you helped to stain the

20   deck; is that correct?

21   A.   Yes, sir, I did.

22   Q.   All right.  And was it just the one deck that you

23   referred to or did you stain two decks?

24   A.   I stained both the decks.  We did the bottom one first

25   because it was fresh wood, and as we were done with that

1   bottom deck,  staining it and painting it, I ended up doing

2   the top deck because it needed it to be stained,  and the

3   paint on the -- started to chip off and come off.  Obviously,

4   from the previous years,  so we just stained on top one,  as

5   well.

6   Q.   All right.  Where did those materials come from that you

7   used to stain or preserve the deck?

8   A.   I believe Spinard Builder Supply.

9   Q.   With a VECO purchase?

10  A.   Yes.

11  Q.   Now,  you mentioned some other work that you did at the

12  house, some screws that you replaced and things like that; is

13  that correct?

14  A.   Yes.

15  Q.   All right.  Various and sundry little things besides the

16  roof and the deck that you've talked about.

17  A.   Yes.

18  Q.   What about any decorative lighting,  did you assist in

19  putting anything like that on the house?

20  A.   I helped with the lighting that goes around the whole

21  house,  and these poles right here.  I remember that we had a

22  big roll of rope lights that you have to assemble yourself and

23  cut off the ends and "T"(Phonetic) them off so they would all

24  connect to each other so they all light up.

25  Q.   And what parts of the house did you put those lights on?

1    A.    On the poles; on the bottom deck here where you see the

2    steps(Indicating); and the top deck.  And also on a tree.

3    Q.    All right.  Can we go back to Government's Exhibit 29,

4    please?  All right.  Mr.  Hernandez,  looking at Exhibit 29,

5    did you see where the rope lights are that you helped to put

6    on the house?

7    A.    Yes,  I do.

8    Q.    And if you can,  just trace on the screen with your

9    finger.  Press a little hard and show the jury where on the

10   house that you helped to affix the lights to.

11   A.    Right in here(Indicating);  all the way down; all these

12   poles; the back one there;  and right here on these steps.

13   Q.    Okay.  What about on the upper level there, the upper

14   deck and the other part of the house?

15   A.    This right here (Indicating),  also;  and I helped Adam

16   with that.

17   Q.    Okay.  How long did that take -- oh, Adam worked on the

18   putting the lights up,  too?

19   A.    Yeah.

20   Q.    How long did that take,  putting lights on the house?

21   A.    About a week,  week-and-a half.

22   Q.    You mentioned something about a tree.

23   A.    Yes.

24   Q.    Tell us about that.

25   A.    The tree was a big spruce tree,  and we put lights around

1    it so we can go ahead and light up the tree like the house.

2    Q.    Did you ever have an occasion to see Senator Stevens or

3    his wife at the house?

4    A.    No.

5    Q.    Do you know a gentleman by the name of Bob Persons?

6    A.    Yes.

7    Q.    Did you ever see Bob Persons at the house while you were

8    working?

9    A.    I saw him at least twice.

10   Q.    Did you see Mr. Persons interacting with anybody at the

11   house while you were there?

12   A.    With my supervisor, David Anderson.

13          MR. BOTTINI:  That's all the questions I have for

14   you, Mr. Hernandez.  Thank you.

15          THE WITNESS:  Okay.

16          THE COURT: Cross-examination.

17   **CROSS-EXAMINATION BY MR. ROMAIN:**

18   Q.    Good afternoon, Mr. Hernandez.  My name is Alex Romain,

19   and I represent Ted Stevens.  I just have few questions for

20   you.

21   A.    Okay.

22   Q.    When you worked at Senator Stevens' house, you would

23   submit your hours to Mr. Anderson; is that correct?

24   A.    Yes, I would.

25   Q.    And then after submitting your hours, you would get

1    paid; is that right?

2    A.   Yes.

3    Q.   Now, you don't know how VECO accounted for your hours,

4    do you?  You didn't do anything other than submit your hours

5    to David Anderson and then receive a check; is that right?

6    A.   Well, I submitted my hours to Mr. Anderson and then he

7    would take care of submitting it himself, and I would get a

8    check.

9    Q.   But you don't know what he did with your hours?  You

10   don't know how he recorded your hours, do you?

11   A.   No, I don't.

12   Q.   You stained and sealed the bottom the lower deck; is

13   that correct?

14   A.   Yes, sir.

15   Q.   How long did it take you to stain and seal the lower

16   deck?

17   A.   About to two to three weeks.

18   Q.   About two to three weeks?

19   A.   Yeah.

20   Q.   And you did that after the deck was completed,

21   obviously?

22   A.   Yes.

23   Q.   Now, you also talked about retrieving materials to build

24   the deck.  You would go with Mr. Anderson to Spinard Builders

25   to go get the materials; is that correct?

```
 1    A.   Yes, sir.

 2    Q.   Mr. Anderson had the list of materials -- correct?

 3    A.   Yes.

 4    Q.   And Mr. Anderson would handle all the invoices; is that

 5    correct?

 6    A.   I believe so.  There was I think a couple of invoices

 7    that he did.

 8    Q.   It wasn't your responsibility to handle the invoices for

 9    the materials; is that correct?

10    A.   Correct.

11    Q.   And I just wanted to clarify Mr. Byrnes' role.  You said

12    he was a contractor who came in to do the deck.  Mr. Byrnes

13    would occasionally or on a regular basis give you and Mr.

14    Padilla direction about what to do to complete the deck; is

15    that correct?

16    A.   As far as screwing down the nails, yes, or the screws.

17    Q.   You were basically there to help him do whatever he

18    needed to do to get it done, correct?

19    A.   Yes, sir.

20    Q.   And so in the several months or three months -- it's

21    about three months?

22    A.   About two to three months, yeah.

23    Q.   I think you testified you didn't see Senator Stevens

24    there at all or his wife.

25    A.   No.
```

1          MR.  ROMAIN:  Thank you very much.

2          THE WITNESS:   You're welcome.

3          THE COURT:  All right.  Redirect.

4          MR. BOTTINI:  Just very briefly, Your Honor.

5    **REDIRECT EXAMINATION BY MR.  BOTTINI:**

6    Q.   Mr. Hernandez, Mr. Romain asked a question about how

7    long it took to stain and seal the lower deck.  Do you recall

8    whether there were any steps taken to protect the decks while

9    you were actually doing that work;  in other words, to protect

10   it from rain or snow?

11   A.   Yes,  from rain and snow.

12   Q.   All right.  Tell us about that.

13   A.   The bottom deck,  we -- after it was built,  we ended up

14   staining it right away and stuff,  and as soon as we got done

15   with that,  we let it dry.  We put a big Visqueen on top of

16   the --

17   Q.   What's Visqueen?

18   A.   Visqueen is just big plastic sheets of just plastic so

19   you can go ahead and make sure that nothing gets wet.  It was

20   raining.  We didn't want the wood getting wet or damaged,  so

21   we would have the top of the roof; staple the Visqueen and

22   dragged all the way to the bottom.

23   Q.   All the way to the top of that A-frame we see on the

24   house?

25   A.   Yes.

```
1    Q.   How did the Visqueen bubble cover the whole front of the
2    house,  did it?
3    A.   Pretty much the whole front of the house was covered with
4    that Visqueen,  and there was a heater that would keep the
5    material dry when we were building it and stuff.
6    Q.   Where did all those materials come from,  the plastic
7    sheeting and the heater and all that?
8    A.   I believe -- the heater I'm not sure.  Maybe VECO.  I'm
9    not sure.  Maybe they had some themselves.  I don't know if
10   they rented it or not,  but the Visqueen was bought I believe
11   through SBS,  which is Spinard Builder Supply.
12            MR.  BOTTINI:  Thanks.  That's all the questions I
13   have for you.
14            THE COURT:  All right.  Thank you,  sir.
15   You may step down.
16            THE WITNESS:  Okay.
17            THE COURT:  Please do not discuss your testimony
18   with anyone.
19            THE WITNESS:  Okay.
20            THE COURT: Call your next witness.
21   *              *              *              *
22            **CALEB SLEMONS**, called as a witness in this case, and
23   after having been duly sworn, testified as follows:
24   *              *              *              *
25            THE COURT:  Good afternoon, sir.
```

```
 1              THE WITNESS:  Good afternoon.
 2    DIRECT EXAMINATION BY MS.  MORRIS:
 3    Q.   Good afternoon,  sir.  In a loud,  clear voice,  would
 4    you state your name and spell your last name.
 5    A.   Caleb Slemons; S-L-E-M-O-N-S.
 6    Q.   Thank you,  sir.  Mr.  Slemons, where do you currently
 7    reside?
 8    A.   Chugiak, Alaska.
 9    Q.   And how far is Chugiak from Anchorage?
10    A.   About 25 miles north.
11    Q.   And how long have you lived in Alaska?
12    A.   Thirty-one years.
13    Q.   Now,  sir,  directing your attention to approximately
14    2002,  where were you employed?
15    A.   VECO.
16    Q.   And what were your duties -- what was your title at that
17    time?
18    A.   Senior Purchasing Agent.
19    Q.   And what were your duties and responsibilities as a
20    Senior Purchasing Agent?
21    A.   Various job sites would send in requisitions with
22    material on them,  and we would go to different vendors in
23    town and purchase the material and send it to the job sites.
24    Q.   And when you say "job sites",  sir,  what types of job
25    sites were there that you were ordering materials for?
```

1     A.    We had various.  We had jobs up on the North Slope.  We

2     had a fabrication shop in Anchorage.  Things of that sort.

3     Q.    And what type of work did VECO do at that time?

4     A.    Generally, oil field construction type and what they call

5     "truckable modules" out at our fabrication site.

6     Q.    Was VECO responsible or did it perform any home

7     renovations?

8     A.    Not usually, no.

9     Q.    Where are you currently employed, sir?

10    A.    Currently.

11    Q.    Yes, sir.

12    A.    I'm at CH2M Hill.

13    Q.    And did CH2M Hill purchase VECO?

14    A.    Yes, it did.

15    Q.    And what is your job title, now?

16    A.    I am the Alaska District Purchasing Manager.

17    Q.    So you're still in the procurement field?

18    A.    Yes, I am.

19    Q.    Sir, directing your attention again to year 2002, did

20    it come to your attention that VECO was participating on a

21    project in Girdwood, Alaska?

22    A.    Yes.

23    Q.    And did you know that project was?

24    A.    They were working on someone's house, senator Stevens'

25    house.

1    Q.   And did you purchase or did you make any orders for any

2    materials for that home?

3    A.   Yes, I did.

4    Q.   Now, directing your attention again to that time frame,

5    were you involved in the purchasing of rope lighting?

6    A.   Yes, I was.

7    Q.   Would you please describe for the jury what rope lighting

8    is?

9    A.   It's kind of -- just as it says, it's lighting that

10   looks like a rope.  It's about as big around as your finger,

11   and it comes in rolls, and it's actually clear, clear

12   plastic, and inside it is little LED lights.

13   Q.   And what is the purpose of rope lighting?

14   A.   I think more or less decorative type of lighting.

15   Q.   Is rope lighting the normal type of purchase that VECO

16   would make?

17   A.   No, it isn't.

18   Q.   So in 2002, what did you do to become involved with rope

19   lighting, purchasing of rope lighting for the Girdwood

20   residence?

21   A.   Why did I?

22   Q.   Yes.

23   A.   Some of the people working on the project had requested

24   it, and, in fact, they had gone out in town and found the

25   vendor that had some in stock and had come -- stopped by the

1    office and filled out a requisition for us to purchase some.

2    Q.    How is the rope lighting purchased, is it in bundles?

3    Is it in bags or how does it come?

4    A.    It comes in -- as near as I can remember, it came in

5    rolls, and we purchased basically all -- there was a couple

6    vendors in Anchorage that had some, and we purchased all that

7    was available that we could find in Anchorage and brought some

8    more in from I believe it was Chicago. They had to ship some

9    more in.

10    Q.    So in total, how much rope lighting and costs did you

11    purchase?

12    A.    I couldn't tell you exactly. It was about $3,500 per

13    bundle, and I forget the footage of bundles, but we did buy

14    several -- several bundles.

15    Q.    Several bundles. And how much in total do you recall?

16    A.    Ten to $12,000 worth of just the rope lighting.

17    Q.    That you purchased?

18    A.    Yes.

19    Q.    Now, sir, did you actually ever see the rope lighting

20    yourself?

21    A.    No.

22    Q.    Is that common for you in the purchasing office to --

23    procurement office to purchase items that you never see?

24    A.    Yeah, it's real common. I don't see probably 98 percent

25    of the things I purchase.

1    Q.    Just one moment.  Now,  sir,  prior to the purchase of

2    the rope lighting in 2002,  had you ever purchased any rope

3    lighting before for VECO?

4    A.    No.

5    Q.    Was this a relatively new type of item?

6    A.    Yes,  it was.  That's kind of why I remember it in

7    particular.  At that time,  it was fairly new on the market.

8            MS.  MORRIS:  Thank you,  sir.  I have no further

9    questions.

10           THE COURT: Cross-examination.

11   **CROSS-EXAMINATION BY MR. ROMAIN:**

12   Q.    Good afternoon,  Mr.  Slemons.  My name is Alex Romain,

13   and I represent Ted Stevens.  I just have a few questions for

14   you.  You testified that you ordered the rope lighting because

15   some of the folks were working on the project requested it.

16   Who in particular requested it?

17   A.    Cecil Dale.

18   Q.    Okay.  And do you know whether or not all the rope

19   lighting went to Senator Stevens' house?

20   A.    No,  I don't.

21           MR.  ROMAIN:  Thank you.  That's all I have.

22           THE COURT: Redirect.

23           MS.  MORRIS:  No, Your Honor.

24           THE COURT: Okay.  Thank you,  sir.  You can step

25   down.  Please do not discuss your testimony with anyone.  Call

1    your next witness.

2             MR. MARSH: Your Honor, the government calls Cecil

3    Dale.

4    *             *             *             *

5             **CECIL DALE**, having been called as a witness in this

6    case and after having been sworn by the deputy clerk,

7    testified as follows:

8    *             *             *             *

9             THE COURT: Good afternoon, sir.

10            THE WITNESS: Good afternoon.

11   **DIRECT EXAMINATION BY MR. MARSH:**

12   Q.   Good afternoon, sir. Could you please state and spell

13   your name for the record?

14   A.   Cecil Dale; C-E-C-I-L; D-A-L-E; III.

15   Q.   Mr. Dale, are you currently employed?

16   A.   Yes.

17   Q.   Where?

18   A.   CH2M Hill out of Denver.

19   Q.   And do you currently live in Denver?

20   A.   No. I live in Raton, New Mexico.

21   Q.   And why do you work in Denver and live in New Mexico?

22   A.   I manage a field for El Paso, EMP.

23   Q.   And can you tell us a little bit more about what that is?

24   A.   Basically, I'm a consultant to them as an electrical

25   manager.

```
 1    Q.   Fair to say your experience is in electrical stuff?

 2    A.   Yes, it is.

 3    Q.   Mr. Dale, did there come a point in time in which you

 4    lived in Alaska?

 5    A.   From '98 to 2002.

 6    Q.   And when you lived there, what city did you live in?

 7    A.   Anchorage.

 8    Q.   Where did you work?

 9    A.   For VECO.

10    Q.   And Mr. Dale, I wanted to -- if you could tell us a

11    little about focusing in on 2002.  What were your doing at

12    VECO?

13    A.   I was managing the electrical work, most of which was

14    done in town, anchorage area; had four or five jobs going on

15    there, a couple of commercial jobs and then the little jobs

16    that would spring up here and there.

17    Q.   Sir, are you familiar with a product referred to as heat

18    tape or heat trace system?

19    A.   Yes, I am.

20    Q.   And Mr. Dale, if you could please pull the microphone

21    just a little closer to you.  Thank you.  Sir, did there come

22    a point in time at which you became involved with a project at

23    a house in Girdwood, Alaska, relating to that product, that

24    heat tape?

25    A.   Yes, there was.  We had to install what's called a "snow
```

1    melt system" on the roof of the house to keep ice from

2    building up and sliding off onto a garage.

3    Q.    When did you first get asked to go down to this house?

4    A.    Very first time would have been probably late '99.

5    Q.    Fair to say, prior to this heat tape project, you had

6    to do some other small projects at this particular house?

7    A.    Correct.

8    Q.    Whose house was it?

9    A.    I believe it was Ted Stevens.

10    Q.    Mr. Dales, focusing in on this heat tape project that

11    you did down there, when did you first get involved in that?

12    A.    Probably, the spring of 2002, I'm thinking.

13    Q.    And tell what us you remember about how you first got

14    involved with that.

15    A.    I was called by Dave Anderson; said there was a problem

16    out there, and I needed to come out there and look at it and

17    help them come up with a solution.

18    Q.    And after you got that call from Dave Anderson, what did

19    you do next?

20    A.    I believe it was either the next day or day after, I

21    drove out there; took a look around.  Seen where a huge sheet

22    of ice had slid off the eave and landed on the garage,

23    knocked down some light fixtures, and he was basically

24    wanting us just to throw some heat trace up on the roof, and I

25    told him at that point, it's something that needed to be

1    looked at by a heat trace engineering company.

2    Q.    Mr.  Dale,  we put on your screen what's been previously

3    admitted into evidence as Government's Exhibit 29;  do you

4    recognize this,  sir?

5    A.    Yes,  I do.

6    Q.    What is it?

7    A.    It was the house in Girdwood.

8    Q.    The same house you were just referencing.

9    A.    Yes.

10    Q.    Sir,  can you describe in some more detail what heat tape

11    or heat trace systems are.

12    A.    Basically,  they are self-regulating cable that will heat

13    up.  The colder it gets and the more it needs to -- kind of

14    like it's own thermostat.  You can install it on water pipes,

15    typically,  and then insulate it.  There are snow melt systems

16    that exist in Anchorage that use them in a lot of cold areas

17    for gutters,  eaves,  things like that;  just to keep ice

18    build-up at a minimum.

19    Q.    And how does a system like this keep ice build-up to a

20    minimum?

21    A.    By heating up and then just keeping the ice melting off

22    when it gets below freezing.  The colder it gets,  the warmer

23    it gets to a point and keeps the ice from building up.

24    Q.    Looking at the Exhibit 29 that's in front of you,  can

25    you show us where the area was that was of concern at the

1    time.  You can actually circle it with your finger if you

2    touch it on the screen.

3    A.    Actually,  this whole area right here.

4    Q.    Okay.  This area right here?

5    A.    Yeah.  But it was basically built up right there where

6    the steeper part of the roof meets the les steep part of the

7    roof until it pushed it all during break up.

8    Q.    Can you take one more time and try and show us with the

9    --

10   A.    Right in there(Indicating).

11   Q.    Okay.  After you got this call from Dave Anderson and you

12   went down there,  what happened next?

13   A.    I believe he gave me some drawings of the pitch of the

14   roof,  and I took them back to Anchorage;  got up with one of

15   my heat trace suppliers a couple days later;  met with the

16   engineering crew that he met me -- he hooked me up with,  and

17   we went through the pitch of the roofs and what it was going

18   to take to keep that roof warm enough to where the ice

19   wouldn't build up and cause another problem.

20        They,  basically,  probably a week went by or so.   They

21   gave us a material list,  and we proceeded to purchase the

22   material and install the heat trace.

23   Q.    Did there come a point in time where heat trace was in

24   fact installed in this house?

25   A.    Was what?

1      Q.   Did there come a point in time in which you put this on

2      the house?

3      A.   Yes.

4      Q.   Okay.  Sir,  I'm handing you what's been marked for

5      identification only as Government's Exhibit 233.  One moment

6      please.  Okay.  Sir, do you recognize this document?

7      A.   Yes.

8      Q.   Okay.  What's the name on the top of the document?

9      A.   It would be a quotation from Engineering Equipment

10     Company.

11     Q.   What is Engineering Equipment Company?

12     A.   That would be the heat trace engineering company I was

13     referring to.

14     Q.   And do you recognize your name on this first page of the

15     document?

16     A.   Yes,  I do.

17     Q.   And do you see a field called "Project Title"?

18     A.   Yes.

19     Q.   And what is does it say after "Project Title"?

20     A.   Girdwood Roof Melt.

21          MR. MARSH:  Your Honor,  at this time, government

22     moves admission and request to publish 233.

23          THE COURT:  Any objection?

24          MS. STEWART:  None, Your Honor.

25          THE COURT:  Admitted.  I'm sorry,  counsel,  what's

1       the number for that one?

2                    MR. MARSH:  233, Your Honor.  It's the fourth page

3       --

4                    THE COURT: Right.  That's fine.

5       BY MR. MARSH:

6       Q.   Mr. Dale, this is it fair to say the portion of the

7       document we were just talking about; is that correct?

8       A.   Yes.

9       Q.   And that's your name?

10      A.   Yes.

11      Q.   And that's the project title.  Do you see a date on

12      there, sir?

13      A.   I'm not seeing it.  Oh, yes, I do.

14      Q.   What date is on that document?

15      A.   9/3/2002.

16      Q.   And can you -- if we can blow it up, please -- Mr.

17      Dale, can you describe some of the different listings on this

18      document.  What is the stuff that's reflected here?

19      A.   Basically, it looks like there's some heat trace itself

20      cable; some power connection kits; some end kits; a

21      thermostat; and some fasteners to hold it to the roof.

22      It looks like a little control unit is in there, too, and a

23      transformer.

24      Q.   Is there a total value amount listed on this?

25      A.   It's $4,532.60.  I have 60, but --

1    Q.   One more time, Mr. Dale, could you read that, please?

2    A,   $4,532.60.

3    Q.   And I'd like for you to turn to the seventh page in that

4    document.

5    A.   Yes.

6    Q.   Sir, do you recognize anything in particular about this

7    page of the document?

8    A.   That's my signature.

9    Q.   Where is it, sir?

10   A.   At the bottom.

11   Q.   Can you circle it on the screen for us, please?

12   A.   Witness complies.

13   Q.   And what is this page here?

14   A.   This would be a packing list probably that came with the

15   materials because I can see the quantities are circled.

16   Q.   Now, Mr. Dale, what type of things have to happen in

17   order to install a heat tape system on a house?

18   A.   This would be about probably half of the materials

19   required.  This is basically just the heat trace that goes on

20   the roof itself.  You would still have to come from the panel

21   with conduit and wiring and energize it with circuit breakers,

22   get it up to the eave of the roof, and then terminate each

23   run of cable.

24   Q.   Now, sir, were you involved in the installation of this

25   product on the house that we just looked at Government's 29?

```
 1    A.   I directed the installation of it,  and I was in and out
 2    during installation of it.
 3    Q.   Who did you ask to be involved in the installation?
 4    A.   I believe Clint Murdock did most of it for me.
 5    Q.   And who was Clint Murdock?
 6    A.   He was a lead man foreman that was working for me at the
 7    time.
 8    Q.   And sir, where did he work?
 9    A.   For VECO out of the Anchorage office.
10    Q.   Do you recall how long it took Mr.  Murdock to complete
11    this project?
12    A.   At least a couple of weeks,  maybe more.
13    Q.   And did you ask anyone else to go down and help him?
14    A.   He had at least an apprentice and sometimes two with him,
15    and there was some architectural guys that were fastening
16    sheets of metal over the heat trace for aesthetics.
17    Q.   I'd like to come back to that point in a minute,  but I'd
18    like you first to look at what's been marked for
19    identification sa Government's 97.
20         Mr.  Dale,  during your involvement with this project,
21    did you ever have a chance to go down to the house while it
22    was being installed?
23    A.   Yes.
24    Q.   I'd like for you to take a look at Government's 97 and
25    let me know if you recognize what it is.
```

1    A.   Yes.  That's the heat trace system on the eave of the

2    roof.

3           MR.  MARSH:   Your Honor, the government moves to

4    admit and publish 97.

5           THE COURT: Any objection?

6           MS. STEWART:  None, Your Honor.

7           THE COURT:  Admitted.

8    BY MR. MARSH:

9    Q.  Sir,  can you tell us where the heat trace is?  You said

10   this is the roof,  picture of the roof --

11   A.   Yes.  This is that eave of the roof that I pointed to

12   earlier.

13   Q.   Can you explain to us how this thing works?

14   A.   Basically,  it runs right up the center here

15   (Indicating).   It loops over and runs back down,  and that

16   would be a circuit.  And you would have another circuit here

17   running over and back down.  You would have a power kit and an

18   end kit down at the bottom of it.

19   Q.   The actual material,  the actual system --

20   A.   The cable itself heats up.

21   Q.   And,  sir,  you mentioned some sheet metal that occurred,

22   as well.

23   A.   Yes.  You can see it fastened right over the top of the

24   cable right here.

25   Q.   And why was that again?

1     A.    Just for looks.

2     Q.    Do you know who did the sheet metal work on that roof?

3     A.    Dave Anderson had a group of guys that did most of that.

4     Q.    We can do go to what's been marked for identification as

5     Government's 98.  Do you recognize this,  sir?

6     A.    Yes,  I do.

7     Q.    What is it?

8     A.    It's the rest of the roof.

9           MR.  MARSH:   Okay.  I Move to admit and publish 98.

10          THE COURT:  Any objection?

11          MS. STEWART:  None, Your Honor.

12          THE COURT: Admitted.

13    BY MR.  MARSH:

14    Q.    How,  if any,  does this differ from what you just

15    described concerning Government's 97?

16    A.    It's the same pattern.  You follow it all the way down

17    the roof.  You can see the loops of the cable at each junction

18    point.

19    Q.    And can you tell us,  Mr.  Dale,  what orientation this

20    is where this is looking on the house?

21    A.    I mean it would be the flat eave that is directly

22    adjacent to the garage eave.

23    Q.    I'd like to now show you what's been marked for

24    identification as Government's 101.  Mr. Dale, do you

25    recognize this photo?

1    A.    Yes.   That's looking at it from the top down.

2            MR. MARSH:  Move to admit and publish 101.

3            THE COURT: Any objection?

4    BY MR. MARSH:

5    Q.    Again, Mr. Dale, the same kind of thing going on.

6    A.    Same thing, yes..

7            MS. STEWART:  None, Your Honor.

8            THE COURT: All right.  Admitted.

9    BY MR. MARSH:

10   Q.    Now, sir, you indicated previously that putting the heat

11   tape on the roof was only part of the work that needed to be

12   done.

13   A.    Correct.

14   Q.    What else would have to be done in order to make this

15   system operational?

16   A.    At the time, there was a -- there was a couple things

17   actually.  Naturally, you had to run the power to the cable

18   and terminate it all and tie it into the panel, and then there

19   was the issue of Girdwood power isn't very reliable, and they

20   wanted it all on a generator system, which was already

21   partially in place, but the generator wasn't large enough to

22   handle it all so we ended up having to install a panel and tie

23   that into the generator and tie these circuits into that

24   panel.

25   Q.    I'd like to show you what's been marked for

1    identification as Government's 95.  Sir, do you recognize what

2    this is?

3    A.    Yes.  That would be the conduit and power connection kit

4    that's feeding the heat trace.

5              MR. MARSH:  Move to admit and publish 95, Your

6    Honor.

7              THE COURT:  Any objection?

8              MS. STEWART:  None, Your Honor.

9              THE COURT: Admitted.

10   BY MR. MARSH:

11   Q.    Sir, can you describe in little bit more detail what we

12   see here and how that relates to what you just described.

13   A.    Well, your conduits here are coming from the panel that's

14   located in the garage, and then come up to a box which is

15   where you terminate the heat trace cable, and you pull on your

16   conductors, and this other conduit run would be an additional

17   circuit running over to the power connection kit.

18   Q.    And the two pieces of metal conduit you've marked there,

19   where do they go on each side?

20   A.    They would run all the way back to the panel and the

21   garage.

22   Q.    And can you be a little more specific what you mean by

23   "panel"?

24   A.    The load center, the power distribution point.

25   Q.    A circuit breaker more or less.

1    A.    A circuit breaker, yes.

2    Q.    Sir, do you recall whether or not this heat -- well,

3    these other materials you talked about; where did that come

4    from?

5    A.    We would purchase them through one of our local

6    wholesales or distributor shops.

7    Q.    Do you know who paid for them?

8    A.    I don't.  It was ordered I would imagine through Graybar

9    at the time.  That's who we do most of our work with.

10   Q.    Not including the materials that we looked at reflected

11   on Government's 233, how much did the other materials -- how

12   much would they have cost?

13   A.    If I had to guess, I would say around four to five --

14            THE COURT:  Don't guess. Don't guess. Don't guess.

15   If you don't know, just tell us you don't know rather than

16   guess at it.

17            MS. STEWART:  Objection.

18            THE COURT:  Do you know?

19            THE WITNESS:  I know I would say three to $4,000.

20            THE COURT: Is that a guess?

21            THE WITNESS:  It's an estimate.

22            THE COURT:  Is it a guess?

23            THE WITNESS:  More of an estimate than a guess, but

24   --

25            THE COURT: What's your foundation for your guess?

1              THE WITNESS:  I have been estimating work for work

2       for 10 years plus.

3              THE COURT: All right.

4       BY MR. MARSH:

5       Q.   Mr.  Dale, this heat tape system, heat trace system that

6       was ultimately installed, was it manual or automatic or how

7       did it work?

8       A.   It was automatic.  It was set up with a thermostat

9       located down by the door to come on at a certain temperature

10      and then from there the heat trace regulates itself based on

11      resistance.

12      Q.   I'd like to show you what's been marked for

13      identification as Governments 92.  Do you recognize that, sir?

14      A.   Yes.  That would be the thermostat and the control box.

15             MR. MARSH:  Your Honor, I move to admit and publish

16      92.

17             THE COURT:  Any objection?

18             MS. STEWART:  None, Your Honor.

19             THE COURT:  Admitted.

20      BY MR. MARSH:

21      Q.   Mr.  Dale, looking at the picture this way, do you know

22      where the front door of the house is?

23      A.   Yes.

24      Q.   Where is it, sir?

25      A.   It would be right here(Indicating).

1    Q.    And can you point us this control unit for this heat

2    tape?

3    A.    (Witness complies).

4    Q.    I'd like to show you now what's marked for identification

5    as Government's 93.  And do you recognize this?

6    A.    Yes.

7    Q.    What is it?

8    A.    Control box.

9              MR. MARSH:  I move to admit and publish 93.

10             THE COURT: Any objection?

11             MS. STEWART:  None, Your Honor.

12             THE COURT:  Admitted.

13   BY MR. MARSH:

14   Q.    Mr. Dale, we just Looked a Government's 92 where you

15   circle something in the middle.  How does what's now being

16   shown at Government 93 relate to what you circled in the

17   middle of the photo in Government's 92?

18   A.    That is what I circled.

19   Q.    Mr. Dale, do you recall any add additional involvement

20   you had in connection with the installation of this heat tape

21   system?

22   A.    I believe that would be about it.

23   Q.    Now, sir, did you ever become involved or become familiar

24   with a project to install rope lighting at this house?

25   A.    Yes, I did.

1    Q.    Tell us what you recall about that.

2    A.    I received another phone call from Dave Anderson asking

3    to put some accent lighting around a statue that they had on

4    the front porch.

5    Q.    On the front porch of where, sir?

6    A.    The house at Girdwood.

7    Q.    Can you describe the statue for us.

8    A.    It was a couple fish jumping out of the water or

9    something.

10   Q.    And about how -- do you remember how big it was?

11   A.    I know it was pretty heavy.  You had to have a forklift

12   to set it, but it was -- I don't know a couple feet by three

13   or four feet.

14   Q.    Mr.  Dale, what happened after you got that call from

15   Dave Anderson?

16   A.    I showed up there, looked at the job; suggested the rope

17   lighting.  He -- Dave agreed that it would be a good idea.  We

18   went back, purchased it, and installed it, and upon installing

19   it a couple days later, they seemed to like the way it looked

20   and asked to install more of it.

21   Q.    Approximately, how many people were involved in the

22   installation of all this rope lighting?

23   A.    All of it?

24   Q.    Yes, sir.

25   A.    I'd say maybe six to eight.

1    Q.   And do you know how long it took?

2    A.   Eight to 10 days.

3    Q.   And, sir, do you recall anyone you spoke with concerning

4    how to get this rope lighting?

5    A.   I believe I went through our VECO Material Department and

6    best recollection is it was purchased through Arctic Lighting

7    on Arctic Street.

8    Q.   Do you recall whether or not you spoke with anyone in

9    particular at VECO in connection with getting all this rope

10   lighting?

11   A.   It would have been Seth or Caleb.

12   Q.   And --

13   A.   Probably both.

14   Q.   Sir, what do you know about rope lighting?

15   A.   It's basically used for accent and background lighting.

16   I wasn't real familiar with it at the time, but I got more

17   familiar with it.

18   Q.   How much rope lighting ended up being purchased?

19   A.   I want to say a thousand feet or so, maybe more.

20   Q.   Do you know how much that cost?

21   A.   It usually cost four or $5 a foot.

22        MR. MARSH:  No additional questions, sir.

23        THE COURT:  All right.  Cross-examination.

24   **CROSS-EXAMINATION BY MS. STEWART:**

25   Q.   Good afternoon, Mr. Dale.  My name is Beth Stewart, and I

1    represent Senator Stevens.  Mr.  Dale, you were first called

2    out to Girdwood during the summer, do you recall, by Rocky; is

3    that correct?

4    A.   Yes.

5    Q.   And do you recall that you were called for, quote, a

6    supposedly minor problem?

7    A.   Yes.

8    Q.   And you went out to the house; is that right?

9    A.   Correct.

10   Q.   And when you got there, you saw that the house was

11   stilted up about four feet off the ground; is that also

12   correct?

13           MR. MARSH:  Objection, Your Honor.  Beyond the scope

14   of this --

15           THE COURT: I'll allow it.

16   BY MS. STEWART:

17   Q.   Is that correct, sir?

18   A.   Yes.

19   Q.   And was it your understanding that they were just about

20   to disconnect the electricity from the house?

21   A.   I don't recall if they actually had disconnected it or

22   not.  I know that I was asked to make it safe.

23   Q.   Okay.  In fact, do you recall Rocky trying to get some

24   advice from you about what kind of electrical materials

25   and labor they were going to need?

```
1     A.   Correct.

2     Q.   And is it fair to say you thought he was asking you that

3     because he didn't know himself what he would need; is that

4     correct?

5     A.   Correct.

6     Q.   And you told him that before you could really advise him

7     that, they needed to figure out where the walls were going to

8     be; is that right?

9     A.   Correct.

10    Q.   And ideally, they would have some kind of drawing; is

11    that also right?

12    A.   Correct.

13    Q.   And during that trip, you never saw Senator Stevens; is

14    that right?

15    A.   Correct.

16    Q.   And you never saw his wife; is that also correct?

17    A.   Correct.

18    Q.   Now, there came a time about six or nine months later

19    when you were asked to go back to Girdwood; is that also

20    right?

21    A.   Yes.

22    Q.   And this time, Rocky Williams wasn't there, right?

23    A.   Correct.

24    Q.   Dave Anderson was there.

25    A.   Correct.
```

1    Q.    And you were asked to do some rewiring of various kinds.

2    A.    Somewhat.  The project was handed off to me by another

3    superintendent at that time, so I had to finish the remodel,

4    and that led into the heat trace and the melt system.

5    Q.    Were you called originally at that point to do some

6    rewiring, some electrical work?

7    A.    It was finishing up the wiring that had already been

8    started basically.

9    Q.    And, in fact, the person that had started had to leave to

10   suddenly to go to another project; is that your understanding?

11   A.    Correct.

12   Q.    Okay.  And during that sort of second period, you never

13   saw Senator Stevens; is that right?

14   A.    Correct.

15   Q.    And you never saw his wife; is that also correct?

16   A.    Correct.

17   Q.    Now, Mr. Dale you testified that in the spring or the

18   summer of 2002 that Dave Anderson asked you to go back to

19   Girdwood again; is that right?

20   A.    Yes.

21   Q.    And you said I believe in your direct examination that he

22   said there was a problem, and they needed you to come up with

23   a solution; is that right?

24   A.    Yes.

25   Q.    And was your understanding that what had happened was ice

1    had built up on the flat part of the roof and then it had

2    fallen onto the garage?

3    A.    Correct.

4    Q.    And there was a lot of damage; is that right?

5    A.    Correct.

6    Q.    In fact, when it hit the garage, it hit it so hard

7    that the light fixtures fell from the ceiling of the garage;

8    is that right?

9    A.    Yes.

10   Q.    And you had to fix the lighting I assume?

11   A.    Yes.

12   Q.    And when you got there, was there still snow on the

13   ground at the time?

14   A.    Patches of it I believe.

15   Q.    Was there snow on the roof at the time?

16   A.    Yes, there was.  They had to scrape it off.

17   Q.    Okay.  Could I please have Defense Exhibit 408 for

18   identification purposes?  Mr. Dale, I'm showing you alone

19   what's been marked as Defendant's Exhibit 408 for

20   identification.  Can you identify that photo?  Do you who know

21   what it represents?

22   A.    Yeah.  That's roughly the way the roof looked I believe

23   when I was there, that big chunk of ice is a sheet that fell

24   onto the garage.

25          MS. STEWART:  Your Honor, at this time, we would

1    move to admit Defendant's Exhibit 408.

2                THE COURT: Any objection?

3                MR. MARSH:  No objection.

4                THE COURT:  Admitted.

5                MS. STEWART:  May we publish it to the jury, Your

6    Honor?

7                THE COURT: Sure.

8    BY MS. STEWART:

9    Q.   Mr.  Dale, looking at that photo, is it fair to say that

10   that big chunk of ice is what landed on the roof?

11   A.   Yes.

12   Q.   And you said there was some damage; is that right?

13   A.   Yes.

14   Q.   And you understood that part of the reason you were there

15   was to come up with a solution because there had been, quote,

16   piss poor planning when they gad originally designed the roof;

17   is that right?

18   A.   Yes.

19   Q.   Do you remember using those words?

20   A.   Yes.

21   Q.   And you understood that there was a residential flaw that

22   required a solution; is that right?

23   A.   Yes.

24   Q.   And you asked for some advice from your friends at the

25   heat trace engineering company; is that right?

1      A.   Correct.

2      Q.   And they advised the heat trace system, the snow melter

3      system; is that right?

4      A.   Yes, correct.

5      Q.   Now, Mr.  Dale, I think you testified that you're an

6      industrial and commercial electrician; is that fair?

7      A.   My roots are residential.

8      Q.   Your roots are residential?

9      A.   Yes.  And for the past few years, has most of your work

10     been in electrical -- excuse me -- in commercial and

11     industria?

12     A.   Since roughly '96.

13     Q.   So in the past decade or so, you haven't been doing much

14     residential; is that right?

15     A.   Correct.

16     Q.   Okay.  And isn't it fair to say that at the time this

17     snow melt system first came up, you didn't really know very

18     much about these systems; is that right?

19     A.   I knew quite a bit about heat trace itself.  I had never

20     installed it on a roof before.

21     Q.   So you never installed one.  Do you recall in testifying

22     before that didn't really know much about how it worked?

23     A.   Yes.

24     Q.   And you asked one of you workers, Clint Murdock, to

25     actually do the installation of the heat tape; is that right?

1    A.    Correct.

2    Q.    And there was a real rush to get this stuff done, right?

3    A.    Well, they wanted to get it on before the snow fell.

4    A.    Because if the snow fell and dammed up on the roof again,

5    they might break the garage again; is that right?

6    A.    Correct.

7    Q.    And is it fair to that Clint was kind of pulling his hair

8    out about putting up this heat tape?

9    A.    Yes.  He wasn't too happy about it.

10    Q.    And he wasn't too happy because he didn't know how to put

11    it up.  It wasn't something he was familiar with; is that also

12    correct?

13    A.    Yes.  And the logistics of the location.

14    Q.    Getting out to Girdwood?

15    A.    Correct.

16    Q.    Now, after it was installed, there was black cable

17    running up and down the roof in loops; is that right?

18    A.    Yes.

19    Q.    Now, heat tape isn't actually tape like we would think of

20    it, is it?

21    A.    No.  It's more of a cable -- like a flat extension cord.

22    Q.    Okay.  Does it look kind of like the black cable that's

23    on your monitor, sir, just wrapped around it?

24    A.    It's a little larger than that, yes.

25    Q.    So when it was done, looping up and down the roof; is

1    that right?

2    A.    Yes.

3    Q.    And it was an eye sore, wasn't it?

4    A.    Correct.

5    Q.    And, in particular, Dave Anderson thought it was pretty

6    unattractive, didn't he?

7    A.    Yes.

8    Q.    And so after that, you guys came up with the idea that

9    you would screw some sheet metal on top of the heat tape that

10    you just installed, correct?

11    A.    Correct.

12    Q.    Can I have Government Exhibit 97 that's just been

13    admitted.  Okay.  So Mr.  Dale, is it fair to say that in this

14    photo, we see a few little loops, but for those screwed green

15    panels, all of that roof would be black cable; is that right?

16    A.    Correct.

17    Q.    Mr.  Dale, I want to turn your attention to the rope

18    lighting that you testified about a little bit ago.  You

19    understand there was rope lighting that was being installed at

20    Bill Allen's house; is that right?

21    A.    Yes.

22    Q.    And also at his son's house.

23    A.    Correct.

24    Q.    And did you understand in a in fact rope light had been

25    purchased in big batches for all three houses?

1    A.    It could be correct, yes.

2    A.    Although, there was -- it was probably all purchased at

3    once, possibly, but we used more of it here than we did

4    anywhere else.

5    Q.    Okay.  So an entire bulk was all purchased at once for

6    those three homes?

7    A.    Correct.

8    Q.    Any other homes you guys were installing rope lights on?

9    A.    Just those three.

10   Q.    And your memory is that this all started because they

11   wanted to put a little bit of light on a fish statue; is that

12   right?

13   A.    Correct.

14   Q.    Could I please have Government Exhibit 70?  Mr.  Dale,

15   I'm sowing you what's been marked as Government 70.  I don't

16   believe it's come into evidence for your identification.  Can

17   you tell what that is?

18   A.    Yeah.  That's the statue I spoke of.

19        MS. STEWART:  Your Honor, at this time, I would move

20   to admit Government Exhibit 70.

21        THE COURT: Any objection?

22        MR. MARSH:  No objection.

23   BY MS. STEWART:

24   Q.    Mr.  Dale, you just testified I believe -- Your Honor,

25   has this been published to the jury, and may it?

```
 1                THE COURT: Sure.
 2      BY MS. STEWART:
 3      Q.    Mr. Dale, so it all started with just putting light on
 4      this statue; is that right?
 5      A.    Correct.
 6      Q.    And I am trying to see there, it looks like the rope
 7      lighting is attached to the statue with those little plastic
 8      ties that people put on trash bags; is that right?
 9      A.    Yeah, zip ties.
10      Q.    Okay.  So that's how it got started.  And is it fair to
11      say that once they put it on the statue, they sort of thought,
12      well, let's put it on some pillars; is that right?
13      A.    Pillars and steps and the eve of the roof and a tree.
14      Q.    So you just testified about a tree; that tree was to the
15      right side of the house if you were looking at it, right?
16      A.    Correct.
17      Q.    It was a spruce tree?
18      A.    Correct.
19      Q.    How tall was that tree?
20      A.    70', 100', maybe.
21      Q.    70 or a 100'. And did they put it all the way to the top?
22      A.    I don't remember.  I didn't put it up there, but I think
23      they tried to.
24      Q.    Okay.  And after they had wrapped all this lighting all
25      the way around the house and around the tree, now that didn't
```

1    address actually powering the lighting; is that correct?

2    A.    Correct.

3    Q.    That was a separate step that needed to be done?

4    A.    Correct.

5    Q.    And in fact do you recall that they needed to install

6    three circuits just to get the tree to light up?

7    A.    Sounds about right.

8    Q.    Could I please have Defense Exhibit No. 703?    Mr.  Dale,

9    I am showing you what's been marked as No. 703 for your

10    identification.  Do you recognize that?

11    A.    Yes.  That would be the power box for the lighting on the

12    tree.

13          MS. STEWART:  Your Honor, at this time I would move

14    to admit Exhibit No. 703 and publish it to the jury.

15          THE COURT:  Any objection?

16          MR. MARSH:  No objection, Your Honor.

17          THE COURT: Admitted.

18    BY MS. STEWART:

19    Q.    Mr.  Dale, this is the spruce tree, right?

20    A.    Correct.

21    Q.    And was any of this stuff on the tree before the lighting

22    went up?

23    A.    No.

24    Q.    And I assume they had to screw that stuff into the tree?

25    A.    Correct.

1 Q. And what are those - it looks like one, two, three, four,

2 five, six, seven, eight cords dangling out of that box?

3 A. It is similar to Christmas tree lights.  That's where the

4 rope lighting plugs into.

5 Q. So to get this tree lit up, you had to run about eight

6 cords into that box?

7 A. No.  It -- the box was set up for more than what we ended

8 up running.  I'd say four or five maybe -- so a transformer is

9 what that box is.

10 Q. So just four or five?

11 A. Right.

12 Q. And in order to get the power from the house to that box,

13 you guys had to dig a ditch in the yard; is that right?

14 A. Correct.

15 Q. And you ran some electricity through that ditch to this

16 box?

17 A. From the panel, correct.

18 Q. Now, Mr. Dale, shortly after six to eight people worked

19 to install these lights, you had to take some of them down; is

20 that right?

21 A. I never did, no.

22 Q. But you understood that some of them had to be taken

23 down?

24 A. Turned off.

25 Q. And the reason they had to be turned off was because the

1    neighbors were complaining about the glare; is that right?

2    A.    That's what I was told.

3    Q.    And in fact you yourself testified that the spruce tree

4    was so lit up that it could be seen from the ski slopes a

5    thousand feet up the mountain; is that right?

6    A.    Yeah, I would imagine.

7    Q.    Do you remember that Dave Anderson didn't take too kindly

8    to the neighbors complaints, did he?

9    A.    No.

10    Q.    In fact he was cussing about the neighbors' complaints;

11    is that right?

12    A.    I believe so.

13    Q.    But you wouldn't blame the neighbors for complaining,

14    would you?

15    A.    That's an opinion.

16    Q.    Do you remember testifying you wouldn't?

17    A.    No, I don't remember.

18    Q.    Okay.  Would you have blamed the neighbors, Mr. Dale?

19    A.    Probably not.  They had a big window right in front of

20    the tree.

21    Q.    Now, Mr. Dale, when the lights were originally going up,

22    you understood that they were not going to be permanent,

23    right?

24    A.    Correct.

25    Q.    And you went out there a second time and you realized

1      that they had done so much that it was pretty clear they

2      weren't going to be taking those lights down; is that right?

3      A.   I figured they wouldn't be taking them down off of the

4      house.  I was hoping they would take them down off of the tree

5      because it is not what those lights are meant for.

6      Q.   Because -- I'm sorry -- say again?

7      A.   You don't want to leave lights on a tree that is growing

8      or you could have problems down the road.

9      Q.   It could kill the tree?

10     A.   Kill the tree, start a fire, lots of things.

11     Q.   Okay.  Mr.  Dale, I have one last set of questions for

12     you and I appreciate your time today.  Around the time the

13     neighbors were complaining there was one occasion where Dave

14     told you that maybe the Stevens were there; is that correct?

15     A.   Correct.

16     Q.   But you never saw them?

17     A.   I did see Mr.  Stevens.

18     Q.   You did see Mr.  Stevens?

19     A.   Yes.

20     Q.   Mr.  Dale, do you remember testifying previously in this

21     matter?

22     A.   No, I don't.

23     Q.   You don't recall ever having testified before?

24     A.   Yes.  I recall testifying before, but I don't remember

25     the exact question.

1    Q.    You do recall giving sworn testimony before though?

2    A.    Yes.

3    Q.    You recall taking an oath to tell the truth?

4    A.    Yes.

5    Q.    Do you recall being asked this question and do you recall

6    giving this answer, and I'm at Page 46:  At any point did Dave

7    Anderson say anything about who owned this house and whether

8    or not they were there?  Answer:    I believe it was the very

9    last time.  It was right about the time when the neighbors

10   were complaining and I pulled up and he said Ted and his

11   family were there.  And I didn't -- excuse me -- Ted and his

12   family were there.  Period.  Ted Stevens.  And I didn't see

13   them.  I didn't really see any vehicles.  They could have been

14   parked in the garage.  Usually what Dave told me about that

15   sort of thing I took with a grain of salt anyway.

16        Do you recall giving that testimony, sir?

17   A.    It has got to be right.

18   Q.    So you didn't see Senator Stevens, did you?

19   A.    I do recall seeing him, but I recall it -- I didn't

20   recall it then but I do now.

21   Q.    Okay.  So at the time and this was February 9th of 2007;

22   is that correct?

23   A.    Correct.

24   Q.    It's fair to say that was closer to the events in

25   question?

1      A.    Yeah.  My memory was jarred later on.

2      Q.    Your memory was jarred.

3      A.    It is trying to come back.

4            MS. STEWART:  Thank you, Mr. Dale.  I don't have

5      any further questions at this time.

6            THE COURT: All right.  Redirect?

7            MR. MARSH.  Just briefly, Your Honor.

8      **REDIRECT EXAMINATION BY MR. MARSH:**

9      Q.    Mr. Dale, what jarred your memory about seeing Senator

10     Stevens at the house?

11     A.    When I got subpoenaed to come here, my wife had asked me

12     a question, if I still had the cigar.  And that's when I

13     remembered meeting Mr. Stevens.

14     Q.    What do you mean by that, sir?

15     A.    He had given me a cigar and shook my hand and told me

16     good job, with Dave Anderson standing there.

17     Q.    About when was this now?

18     A.    It would have been my last visit there.

19     Q.    Now, sir, you got asked a few questions about the first

20     time you went down to the defendant's house on

21     cross-examination; do you recall that?

22     A.    Yes.

23     Q.    That was when you met Rocky there?

24     A.    Correct.

25     Q.    What year was that, sir?

1    A.    '99, '98, somewhere around there.

2    Q.    And then the later time, that was the second time you

3    went down there; is that correct?

4    A.    Correct.

5    Q.    Now, you got asked some questions about whether you had

6    ever installed heat trace system before this.  Had you ever

7    installed heat trace system on any type of surface before

8    this?

9    A.    Yes.

10   Q.    And where had you installed it, sir?

11   A.    Just about everywhere.  All over, water pipes, gas lines,

12   you know, just about everything but a roof that would need it.

13   Q.    And if we can pull up what's been now admitted as

14   Government's Exhibit No. 70 -- pull up for -- yes.  You

15   indicated that you remember seeing this at the house?

16   A.    Correct.

17   Q.    Did you ever have any conversation with Dave Anderson

18   about it?

19   A.    Yes.

20   Q.    What did he tell you?

21   A.    He said that Bill had purchased it at a fund raiser and

22   was giving it to Ted Stevens for some reason.

23          MS. STEWART:  Objection, Your Honor, calls for --

24          THE COURT: Sustained, sustained.

25          MR. MARSH:  No further questions.

1          THE COURT: Disregard that last answer, ladies and

2     gentleman.

3          MS. STEWART:  Your Honor, may I have brief recall?

4          THE COURT: Sure.

5     **RE-CROSS-EXAMINATION BY MS. STEWART:**

6     Q.   Mr. Dale, just a couple more quick questions.  I just

7     want to readdress this heat tape issue.  Again, you recall

8     testifying previously?

9     A.   Yes.

10    Q.   And do you recall being asked the following question and

11    do you recall giving the following answer:  Question: Okay.

12    So when you looked at the problem, what did you decide that

13    you needed to install a heat tape product you said -- Page 22,

14    excuse me -- and did you give the answer:  Well, to be honest

15    with you, I didn't know much about it?

16    A.   That roof system, I didn't know much about.

17    Q.   You didn't know much about it.  Okay.  Second question:

18    How was the cigar?

19    A.   I never smoked it.

20         MS. STEWART:  All right.  Thank you.

21         THE COURT: He is the government's witness, if you

22    want to conclude with your witness, that's fine.

23         MR. MARSH:  No, Your Honor.

24         THE COURT: You may step down.  Thank you.  Please do

25    not discuss your testimony with anyone.  It is 3:30.  I didn't

1    overlook you, ladies and gentlemen.  I was just trying to

2    finish with the last witness.  We'll take a 15 minute recess.

3    I will not keep you past 4:45.  We will take a 15 minute

4    recess though.  Before the attorneys leave, I need to share a

5    couple of words with you.

6              (Whereupon, the jury exited the courtroom at this

7    time.)

8              THE COURT:  I'm not going to keep you from your 15-

9    minute recess, but in thinking more about the Williams' issue

10   -- you can have a seat, counsel -- in thinking more about the

11   Williams' issue, it seems to me that counsel should address

12   whether or not at some point the missing witness instruction

13   might be appropriate.

14             And I raise that for this reason:  For all I know,

15   Mr. Williams may testify at some point and moot all of this

16   out, but maybe he won't testify.  It seems to me that for a

17   very discreet and precise period of time on the day of opening

18   statements, the government was peculiarly within control of

19   this witness.  The government made a decision that he go back

20   to Alaska or maybe in conjunction with Williams' decision to

21   go back.  I don't know.  I don't know enough about who decided

22   what at that point.

23             But my understanding is that the government took the

24   steps to get him to the airport and probably took the steps to

25   initiate his return to Alaska; and maybe he won't testify and

1    maybe this dovetails with what I said earlier.  Maybe the

2    inference is that his testimony would be unfavorable to the

3    government, which may also further dovetail into whether at

4    some point if he is no longer available, a missing witness

5    instruction should be given.  Because for that very precise,

6    very definite period of time on the day of opening statements,

7    the government, it seems to me, arguably controlled whether

8    Williams was going to remain in Washington, D.C. or not.

9         And whether he was under subpoena by defense counsel

10   really was irrelevant because defense counsel didn't know that

11   any options were available.  Neither did the Court.  The Court

12   couldn't do anything either, like make sure his deposition was

13   taken before he left or inquire further of the witness to see

14   what, if anything, the Court could do to accommodate the

15   witness here in the District of Columbia: such as calling him

16   out of turn, such as providing him with any necessary

17   assistance he may have needed while in the District of

18   Columbia, but no one was consulted.

19        So for that very precise, very definite period of

20   time, the government -- he was indeed arguably within the

21   exclusive control of the government.  And that's all I have to

22   say about that.  I'm not making a finding of fact or

23   conclusion, but it just strikes me as an issue that should be

24   addressed.  Enjoy your recess.

25            (Whereupon, court resumed after a recess as

1        follows.)

2              THE COURT:  All right.  How many other witnesses do

3        you have, counsel?

4              MS. MORRIS:  We have several, Judge, but before we

5        bring the jury in, can we just for a moment just discuss --

6              THE COURT: All right.

7              MS. MORRIS:  Judge, what we discussed briefly over

8        the break is we spoke to Mr. Williams since he's been back in

9        Alaska, but we haven't talked to him today.  Could we approach

10       just in case -- I don't know what for sure has been on the

11       record or not.

12             THE COURT:  Sure.

13             (Whereupon, a sealed bench conference took place at

14       this time as follows.)

15             (SPACE BELOW LEFT BLANK INTENTIONALLY)

16

17

18

19

20

21

22

23

24

25





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1

2                    (Whereupon, the sealed bench conference concluded at

3       this time.)

4                    THE COURT:  All right.  Call your next witness,

5       counsel.

6                    MR. BOTTINI:  Your Honor, our next witness will be

7       Daniel Johnston.  We will need the jury, certainly.

8                    THE COURT:  Oh, I guess it would be helpful.

9                    (Whereupon, the jury returns to the courtroom at

10      this time.)

11                   THE COURT:  All right.  Let's proceed.

12      *                *                    *                *

13             **DANIEL JOHNSTON**, called as a witness in this case,

14      after having been duly sworn, testified as follows:

15      *                *                    *                *

16                   THE COURT:  All right.  Good afternoon.  Just have a

17      seat.

18      **DIRECT EXAMINATION BY MR. BOTTINI:**

19      Q.   Sir, could you please state your name and spell your last

20      name for the record?

21      A.   My name is Daniel F. Johnston, Junior.  Last name,

22      J-O-H-N-S-T-O-N.

23      Q.   All right, Mr. Johnston.  Can you tell the ladies and

24      gentlemen here where you reside?

25      A.   I live in Waskola(Phonetic), Alaska.

1    Q.    How long have you lived in Alaska, sir?

2    A.    Since December 1991.

3    Q.    How are you presently employed?

4    A.    I work for North Star Electric as a journeyman

5    electrician.

6    Q.    How long have you been an electrician?

7    A.    Since 1992, approximately 17 years.  Sixteen, 17 years.

8    Q.    Did you ever work for company in Alaska called VECO?

9    A.    Yes, I have.

10   Q.    When did you work for VECO?

11   A.    I worked for VECO, October 2002 to March of 2003.

12   Q.    About five months or so?

13   A.    Yes, sir.

14   Q.    What did you to for VECO when you worked for them?

15   A.    I was assigned to a project; it was building a new

16   grocery story called Carr's.

17   Q.    What kind of company was VECO?

18   A.    VECO was an oil field company that did a lot of work out

19   on the slope, out in the bush, different kinds of work.

20   Q.    Why they were doing work on a grocery store?

21   A.    VECO was trying to expand into the local market into

22   Anchorage; it was booming back then, so they wanted to get a

23   piece of the work going on down there.

24   Q.    Particularly in the area of electricians, installation of

25   electric systems?

1    A.    My part of the job was electrical, yeah; they were doing

2    different types of stuff.

3    Q.    Did there come a time when you worked for VECO that you

4    were asked to go down to a location in Girdwood and do some

5    work?

6    A.    Yes.

7    Q.    Do you remember when that was?

8    A.    It was within the first couple of weeks of December, of

9    2002.

10    Q.    Tell us what happened.  Who asked you to go down there

11    and what did you do?

12    A.    Keith Johnston, my supervisor, which was also an older

13    cousin, sent me to go down there and meet a gentleman by the

14    name of Dave, and I was to go to the Senator's house to work.

15    A.    Did you meet Dave in Girdwood?

16    A.    I met him at a little convenience market on what was

17    Parks Highway down there in Girdwood -- excuse me, not Parks,

18    the Seward Highway down there in Girdwood, and then I was to

19    follow him to the Senator's house.

20    Q.    When you say the Senator's house, who are you talking

21    about?

22    A.    Senator Ted Stevens.

23    Q.    All right.  What was Dave's last name?  Do you know?

24    A.    I was told he was Bill Allen's nephew, so I assumed it

25    was Allen; but I'm not a hundred percent on that.

1    Q.    Okay.  So you met Dave; did you go to the Senator's house

2    then?

3    A.    Yes, sir.

4    Q.    What happened when you got there?

5    A.    When I got there, Dave showed me the work that I needed

6    to do.

7    Q.    Let me ask that Government's Exhibit No. 29 which has

8    already been admitted into evidence be displayed for us, Mr.

9    Johnston.  Do you recognize what Exhibit 29 shows?

10   A.    Yes.  That is the Senator's house.

11   Q.    All right.  Now, how did you get down there by the way?

12   What kind of vehicle did you drive?

13   A.    I drove a company work van.

14   Q.    A VECO truck?  A VECO van?

15   A.    Yes, it was a VECO van.

16   Q.    When you get down there, what work did you find out you

17   were needed to do?

18   A.    There was a few items I needed to do.  In the front of

19   the garage, there was a motion detector light they were having

20   issues with.  In the inside of the garage on the back wall,

21   there was a light switch that wasn't working properly, plus it

22   needed to have a plate put on it.  And then in the front of

23   the driveway, there was a 50 to 75' tree that they had

24   Christmas lights, and they were having issues with that.

25   Q.    All right.  Now, let's take those in order then.  You

1    said there was a motion detection light over the garage they

2    were having problems with; is that correct?

3    A.    Yes, sir.

4    Q.    Let me ask if Government's Exhibit No. 66 which is just

5    marked for identification at this time be displayed for you.

6    Mr.  Johnston, do you recognize what's depicted in that

7    photograph?

8    A.    Right.  Centered above the garage door is the motion

9    sensor light that I worked on.

10              MR. BOTTINI:  We offer 66 at this time, Your Honor.

11              THE COURT: Any objection?

12              MS. STEWART:  No, Your Honor.

13              THE COURT: Admitted.

14   BY MR. BOTTINI:

15   Q.    For the benefit of the jury here, Mr.  Johnston, can you

16   explain where that motion detector light is in relation to the

17   garage?

18   A.    It is above the center.

19   Q.    Okay.

20   A.    Top center.

21   Q.    Right here, basically?  (Indicating.)

22   A.    The white light there, yes.  (Indicating.)

23   Q.    What was the problem and were you able to fix it?

24   A.    To be honest with you, it's been a while.  I don't recall

25   what the problem was, but I did get it to work.

1   Q.   Now you mentioned that you also worked on a switch in the

2   garage; is that correct?

3   A.   On the inside and the back of the garage, yes.

4   Q.   Let me ask if we can have Government's Exhibit No. 83,

5   which is only marked for identification at this point,

6   displayed for you.  Do you recognize what is depicted in

7   Exhibit 83?

8   A.   Yes.

9   Q.   All right.  And do you see the area where the switch was

10  that you were -- you were asked to fix?

11  A.   Yeah.  It's a little hard to see.  There is a piece of

12  exercise equipment right in front of where the switch is.

13          MR. BOTTINI:  All right.  We'd offer 83 at this

14  time, Your Honor.

15          THE COURT:  Any objection?

16          MS. STEWART:  None, Your Honor.

17          MR. BOTTINI:  Move to admit.

18          THE COURT:  Admitted.

19  BY MR. BOTTINI:

20  Q.   Now, Mr. Johnston, you were just explaining that

21  whatever you fixed in the garage there is obscured by a piece

22  of exercise equipment; is that correct?

23  A.   Yes, sir.

24  Q.   Do you see a door that appears to be partially open?

25  A.   Yes.

1    Q.    Where in relation to that door was the switch that you

2    were asked to fix?

3    A.    As we're looking at the  switch -- excuse me, at the door

4    --

5    Q.    Yes.

6    A.    -- the switch is to the left of the door.  Like I said,

7    the piece of equipment is shielding it.

8    Q.    All right.  Do you recall whether you were able to

9    successfully fix that problem?

10    A.    Yes, I fixed the switch and then I put a new plate on.

11          MR. BOTTINI:  I'm sorry, Your Honor.  I think I

12    offered 83, could we have it published to the jury?

13          THE COURT: Sure.

14          MR. BOTTINI:  Sorry about that.

15    BY MR. BOTTINI:

16    Q.    All right, Mr. Johnston.  Now, the jurors can see that

17    photograph.  We'll go back real quick.  There is a door that's

18    partially open there in the back wall of the garage; is that

19    correct?

20    A.    Yes, sir.

21    Q.    Where in relation to that door was the switch that you

22    fixed?

23    A.    As you are looking at it now, to the left of the door.

24    But you can't really see the switch because the exercise

25    equipment is right there.  There are a couple of outlets that

1     you can see, but you can't see the switch.

2     Q.   Got it.  Okay.  Thank you, sir.  Now, you mentioned also

3     that there was something related to lights in a tree that they

4     were having a problem with; is that correct?

5     A.   Yes, sir.

6     Q.   What was that problem again?

7     A.   There's two circuits ran out there and there was an issue

8     with they weren't working.

9     Q.   Okay, let me ask that Government's Exhibit No. 64 be

10    displayed; this is marked for identification only at this

11    point.  Do you see that, Mr.  Johnston?

12    A.   Yes, sir.

13    Q.   Do you see the location of the electrical problem that

14    you were asked to fix?

15    A.   Yes, that box that has two photo cells in it.

16         MR. BOTTINI:  All right.  We'd offer 64 at this

17    time, Your Honor.

18         THE COURT: Any objection?

19         MS. STEWART:  No, Your Honor.

20         THE COURT:  Admitted.

21    BY MR. BOTTINI:

22    Q.   Mr.  Johnston, can you explain to the jurors then where

23    this location was for the problem you were just talking about?

24    A.   The box right there that has the two photo cells on it

25    that are to the right of the garage door there.

1    Q.   Right there?  (Indicating.)

2    A.   Those are what control the lights, make them come on and

3    off.

4    Q.   What was the problem with that there; do you remember?

5    A.   I want to say one of the photo cells was not working

6    properly, but then again it has been awhile.  I don't remember

7    the exact problem.

8    Q.   Do you recall whether you were able to successfully

9    repair that problem?

10   A.   I do believe so.

11   Q.   Now, how much were you making at this time, Mr.

12   Johnston?  How much was VECO paying you?

13   A.   Between $30 and $32 an hour.

14   Q.   And this first -- the trip down to the house that we have

15   just been talking about here, as far as time spent driving

16   down and doing the work and driving back, do you recall what

17   that consumed?

18   A.   With all the travel and work included, it would be

19   between four and six hours.

20   Q.   All right.  Now, you said that the repair to this plug

21   there, the photo cells in the front of the garage, had

22   something to do with lights on a tree; is that correct?

23   A.   Yes, sir.

24   Q.   Let me ask that Government's Exhibit No. 55, which is

25   marked for identification only at this time, be displayed for

1    you.  Do you recognize what's depicted in Exhibit 55?

2    A.   Yes.  That tree right there, the tall, right there to the

3    front right of the driveway.  It was the tree that had all the

4    Christmas lights on it.

5           MR. BOTTINI:  We'd offer 55, Your Honor.

6           THE COURT: Any objection?

7           MS. STEWART:  None, Your Honor.

8           THE COURT: Admitted.

9    BY MR. BOTTINI:

10   Q.   And, again, for the jury's benefit, Mr. Johnston, you

11   just identified this as the tree that you recall the lights

12   being in; is that right?

13   A.   Yes, sir.

14   Q.   Can you see on the side of the house there, the

15   electrical plug that you were just talking about that had the

16   photo cells?

17   A.   Yes.  You can still see it.

18   Q.   Just to the right of that vehicle parked there?

19   A.   To the right of the vehicle, the right of the garage

20   door, still on the front of the house.

21   Q.   All right.  Where did -- did you have to use any

22   electrical components for these repairs?  Wires or switches,

23   plugs or things like that?

24   A.   Yes.

25   Q.   Where did those come from?

1    A.    Off of the van.

2    Q.    Okay.  Now was there a second occasion that you went down

3    the house and did some work?

4    A.    Yes, sir.

5    Q.    Tell us when that was in relation to this first trip that

6    you were just talking about?

7    A.    It was approximately two weeks later, a couple of days

8    before Christmas time of 2002.

9    Q.    All right.  And tell us about how you came to go down

10   there a second time?

11   A.    There again Keith Johnston, my boss, told me go down and

12   meet Dave there at the Senator's house.  They had some work

13   for me to do.

14   Q.    And did you meet Dave down at the house?

15   A.    Yes, I did.

16   Q.    How did you get down there the second time?

17   A.    I took a company vehicle again.

18   Q.    What happened when you get to the house?

19   A.    When I got to the house, I showed up, Dave showed me what

20   he needed me to do.

21   Q.    What did he need you to do?

22   A.    In the front of the house, there is a three Salmon

23   statue, and there's an outlet behind the house that the lights

24   that were put on the statue were plugged into.  They felt that

25   with the Senator maturing a little bit more, to be nice --

1    sorry, sir -- it would be easier to have a switch installed to

2    control those lights instead of having to try to plug in and

3    kind of fight working around the statue.

4    Q.   So they asked you to put in a switch where it could be --

5    the lights could be illuminated without having to bend down

6    and plug it in; is that correct?

7    A.   Yes, sir.

8    Q.   And did you do that work there at the house?

9    A.   Yes, sir.

10   Q.   Let me ask that Government's Exhibit No. 70 which has

11   been admitted into evidence be displayed for you.  Do you

12   recognize that, Mr.  Johnston?

13   A.   That is the statute.

14   Q.   And is that the lighting that you recall being affixed to

15   the statue?

16   A.   Yes, that was already installed before I was there.

17   Q.   Okay.  Let me ask that Government's Exhibit No. 68 which

18   is only marked for identification at this point be displayed

19   for you.  Do you recognize what is depicted there?

20   A.   Yes, sir.

21   Q.   Is that the fish statue?

22   A.   Yes, sir.

23          MR. BOTTINI:  We'd Offer No. 68, Your Honor.

24          THE COURT: Any objection?

25          MS. STEWART:  None, Your Honor.

1    BY MR. BOTTINI:

2    Q.   Mr.  Johnston, do you see anything in this photograph,

3    Exhibit No. 68, that was part of your handiwork there on the

4    second trip?

5    A.   Yes, sir.

6    Q.   Where do you see that?

7    A.   To the right of the statue, on the deck and against the

8    wall of the house, there is a piece of conduit down low.  I

9    ran that conduit.

10   A.   Right there?  (Indicating.)

11   A.   Yes, sir.

12   Q.   Let me ask that Government's Exhibit No. 69 which is also

13   only marked for identification at this point be displayed for

14   you.  Mr.  Johnston, do you recognize what's depicted in

15   Exhibit No. 69?

16   A.   Yes, sir.

17   Q.   What do we see there?

18   A.   There again is the statue, but you can see the rest of

19   the work that I did; the conduit that goes up to the switch by

20   that post on that window.

21   Q.   All right.  Would this be the switch that you put in,

22   right there then?

23   A.   Yes, sir.

24   Q.   Now, on this occasion, did you have to use any supplies,

25   electrical components such as wires and things like that?

1    A.   Yes, I did.

2    Q.   What do you remember having to use on this second trip?

3    A.   I used a couple of weather proof boxes, a couple of

4    conduit connectors, conduit, wire, and a switch.

5    Q.   All right.  Now, you've been an electrician for about 16

6    years, you said?

7    A.   Yes, sir.

8         MR. BOTTINI:  I'm sorry.  We'd offer No. 69, Your

9    Honor, and ask that it be published.

10   BY MR. BOTTINI:

11   Q.   Going back to the photograph there, Mr.  Johnston, where

12   the circle is up there in the upper right-hand corner, is that

13   the switch that you put in for the lights?

14   A.   Yes, sir.

15   Q.   And the wires or the conduit trailing down from there, is

16   that part of your work that you did?

17   A.   All that is mine.  All right.  Now, the components that

18   you used on this second trip to wire the switch to the lights

19   on the statue, based on your experience as an electrician over

20   16  years in Alaska, can you estimate what the value of those

21   items were?

22   A.   There was probably roughly $200 worth of materials.

23   Q.   Now, you said you met Dave down at the house on this

24   second trip; is that correct?

25   A.   Yes, sir.

1    Q.    Did you wind up meeting anyone else at the house?

2    A.    Yes, sir.

3    Q.    Tell us about that.

4    A.    I met Senator Stevens and I met his son, his wife, and

5    there was a couple of grandchildren.  Then there was another

6    lady there that I would assume was his son's wife.

7    Q.    Did Senator Stevens arrive after you had started work?

8    A.    I was just getting ready to start when he arrived.

9    Q.    Do you recall how he arrived?

10   A.    Senator Stevens and grandchildren came on a fire truck.

11   Q.    Did you meet him at that time?

12   A.    Yes, I did.

13   Q.    How were you introduced to him?

14   A.    Dave said that this is Dan, he's here to do some

15   electrical work for us.

16   Q.    Do you recall what Senator Stevens said, if anything, in

17   response to that?

18   A.    Shook my hand, said nice to meet you, and then proceeded

19   into the house.

20   Q.    Do you recall whether Dave indicated to Senator Stevens

21   that you had any association with VECO or with him?

22   A.    He said he works for us.

23   Q.    Okay.  Now, did you go ahead then and do the insulation

24   of that switch after that?

25   A.    Yes, sir.

1    Q.   Where did Dave go?

2    A.   He went in the house with the Senator and his family.

3    Q.   Did you make any observations about Dave and whether he

4    appeared to have any relationship to the Senator and any

5    members of his family?

6    A.   It seemed to me that he knew them.

7    Q.   How long did this second job take you down at the house?

8    A.   There again with travel time and everything, it was

9    approximately four to six hours.

10    Q.   And how did you get to and from this job?

11    A.   VECO van.

12    Q.   All right.  The VECO van that you have talked about

13    driving down to Girdwood, to and from, did that have any kind

14    of logo or other identifying marks showing that it was a VECO

15    vehicle?

16    A.   Yes, sir.  It had a round sticker on both sides

17    approximately this big in diameter.  (Indicating.)

18    Q.   How did you account for your time and the materials that

19    you spent on each of these two occasions that you've talked

20    about?

21    A.   On my time card, I don't recall exactly what it was,

22    either Stevens or Girdwood, and then for materials, I just

23    used a plain line piece of paper to write down what I used and

24    then I was to turn it in with my time card.

25    Q.   All right.  Now, Mr.  Johnston, you've been an

1     electrician for 16 years, part of that time in Alaska; is that

2     correct?

3     A.   All that time has been in Alaska.

4     Q.   All that time in Alaska.  All right.  Are you familiar

5     with the rates that electricians charge, private electricians,

6     those who are in business for themselves?

7     A.   Yes, I am.

8     Q.   And back at this time in 2002, were you familiar with the

9     rates that were being charged back then?

10    A.   In 2002, somebody was probably charging between $75 and

11    $85 an hour.

12          MR. BOTTINI:  Mr. Johnston, that's all the questions

13    that I have for you, sir.  Thank you.

14          THE COURT: All right, counsel?

15    **CROSS-EXAMINATION BY MS. STEWART:**

16    Q.   Good afternoon, Mr.  Johnston.  My name is Beth Stewart,

17    and I represent Senator Stevens, and I just have a few

18    questions for you.

19    A.   Okay.

20    Q.   You testified that you went out to the house in Girdwood

21    and you met Dave there; is at right?

22    A.   Yes, ma'am.

23    Q.   And you're not sure who Dave worked for; is that right?

24    A.   I assumed --

25    Q.   Don't assume -- if you know.

```
 1     A.    I'm not a hundred percent sure.

 2     Q.    You don't know.  Okay.  And Rocky wasn't there at that

 3     time -- there wasn't anyone named Rocky there; is that

 4     correct?

 5     A.    No, nobody by the name of Rocky was there.

 6     Q.    And the first time you went out to Girdwood, you were

 7     asked to fix a motion sensor at the garage; is that correct?

 8     A.    Yes, ma'am.

 9     Q.    You've been in construction for awhile, right?

10     A.    Yes, ma'am.

11     Q.    So you can probably tell new construction from old

12     construction, right?

13     A.    Probably.

14     Q.    And could you tell that that garage was pretty much brand

15     new?

16     A.    It looked fairly new.

17     Q.    And you were there to fix what was a broken motion

18     sensor; is that right?

19     A.    Ye ma'am.

20     Q.    And you were also there to fix an electrical outlet in

21     the garage; is that right?

22     A.    It was a switch, but yes.

23     Q.    A switch?

24     A.    Yes, ma'am.

25     Q.    And in fact that switch didn't even have a cover on it,
```

1    did it?

2    A.    Correct.

3    Q.    And the final thing that you fixed on that first trip

4    were tree lights, the Christmas lights in the tree; is that

5    right?

6    A.    Ye ma'am.

7    Q.    The photo cells, specifically?

8    A.    Yes, ma'am.

9    Q.    And did you have any awareness that those lights had just

10    been put up within the last couple of weeks?

11    A.    No idea.

12    Q.    You didn't know that?

13    A.    No, ma'am.

14    Q.    You testified that your first trip took about four to six

15    hour in total; is that fair?

16    A.    Yes, ma'am.

17    Q.    And you turned in your time card?

18    A.    Yes.

19    Q.    And did you ever check to see how VECO billed your time?

20    A.    No.  We're usually out of the loop when it comes to that.

21    Q.    So you left that to them; is that right?

22    A.    Yes, ma'am.

23    Q.    You also offered testimony that you were asked to go out

24    to Girdwood a second time, and I believe the word you used was

25    "they" asked me to install a switch for the fish statue; do

1    you recall using the word "they"?

2    A.    No, I don't recall that.

3    Q.    When you say "they", you mean Dave, right?

4    A.    I mean Dave.

5    Q.    Senator Stevens never asked you to install a switch on

6    this statue, did he?

7    A.    No, ma'am.

8    Q.    Okay.  And could I actually have GX-69 if it's not still

9    up on the screen?  I see it here.  Is that still up?  Now,

10   this fish statue, it looks to me like it's in a crate; is that

11   right?

12   A.    Yes, ma'am.

13   Q.    And did you happen to notice while you were there that if

14   you just walk around the porch, in fact the top half of that

15   huge crate is still sitting on the porch?

16   A.    No, ma'am.  I never went around the side.  I was always

17   in the front of the house.

18   Q.    Never noticed it.  But you do see that this is in a

19   crate, right?

20   A.    Yes, ma'am.

21   Q.    But you went ahead and installed sort of a permanent

22   light fixture to it; is that right?

23   A.    Nothing is attached permanently to the statue.  The

24   statue's lights plug in; so I attached the outlet that was

25   already on the house.  I extended it out --

1    Q.    Right.

2    A.    -- to where they can plug it in and out still.

3    Q.    Okay, but fair to say you put in a conduit for a statue

4    still in the box; is that right?

5    A.    Yes, ma'am.

6    Q.    And you said again that this trip also took you about

7    four to six hours; is that right?

8    A.    Yes, ma'am.

9    Q.    And once again you didn't check to see how VECO billed

10    that time, did you?

11    A.    Correct, I did not check on that.

12    Q.    And I just want to go through one more time with your

13    interaction with the Senator; Dave introduced you to him; is

14    that right?

15    A.    Yes, ma'am.

16    Q.    And he shook your hand?

17    A.    Ye ma'am.

18    Q.    And he said, nice to meet you, I imagine?

19    A.    Ye ma'am.

20    Q.    And do you recall in fact that Mrs.  Stevens offered you

21    lunch?

22    A.    Yes, she did.

23    Q.    And you declined that?

24    A.    I definitely declined it.

25    Q.    And then Senator Stevens and his wife and their grandkids

1    went back into the house; this was right around Christmas,

2    right?

3    A.    Yes, ma'am.

4    Q.    And you went back to electrifying the Salmon; is that

5    right?

6    A.    Yes, ma'am.

7            MS. STEWART:  Thank you.  I have no further

8    questions.

9            THE COURT: Redirect?

10   **REDIRECT EXAMINATION BY MR. BOTTINI:**

11   Q.    When everybody else went into the house and you were out

12   there on the deck putting the lights on or the switch for the

13   lights on, where did Dave go?

14   A.    Dave went in the house with them.

15   Q.    Now, the switch that you fixed out in the garage, you

16   were asked about whether there was a plate on it or not.  Do

17   you recall that?

18   A.    Yes.

19   Q.    And you said there was not a plate on it; is that right?

20   A.    There was not a plate on it.

21   Q.    Do you have any idea whether there had been a plate on it

22   or whether somebody had taken it off?

23   A.    No idea.

24           MR. BOTTINI:  That's all the questions I have, Mr.

25   Johnston.  Thank you.

```
1            THE COURT: All right.  Thank you, sir.  You may step
2    down.  Please do not discuss your testimony with anyone.
3            All right.  Any other witnesses?  We have -- if the
4    direct is going to take more than 15 minutes, we'll just do it
5    tomorrow.
6            MR. MARSH:  It will be right around 15 or 20
7    minutes.
8            THE COURT: All right.  No more than 20 minutes?  I'm
9    not trying to curtail, but -- we'll take the direct
10   examination and -- well, the witness has to come back anyway
11   tomorrow, so let's just take the direct examination tomorrow
12   because they won't be able to finish cross-examination if
13   direct is going to take 20 minutes.  I don't want to keep the
14   jurors past 4:45.
15           All right, ladies and gentlemen, we did accomplish a
16   lot today.  We'll start at 9:30 tomorrow.  Enjoy your evening,
17   and again please leave your books.  Please do not discuss any
18   aspects of the case.  Please avoid any media reports you may
19   read, see, or hear about the case.  Thank you, and have a nice
20   evening:
21           (Whereupon, the jury exited the courtroom at this
22   time.)
23           THE COURT:  Who is your next witness?  What's the
24   lineup for tomorrow?
25           MR. MARSH:  Your Honor, we plan to start with either
```

```
1    John Fugate or Clint Murdock; one of those orders.  Then we're
2    going to go to Jim Kaiser.
3              THE COURT:  How do you spell the surname?
4              MR. MARSH:  K-A-I-S-E-R.
5              THE COURT:  All right.
6              MR. MARSH:  And Jack Billings.
7              THE COURT: All right.
8              MR. MARSH:  Next, Courtney Boone, B-O-O-N-E, Your
9    Honor; Heather Resz, R-E-S-Z; Jeri, J-E-R-I, Best, B-E-S-T.
10   And I think at that point we'd like to --
11             THE COURT: How long do you estimate just your
12   portion, just your direct examination of those people?  Entire
13   day or --
14             MR. MARSH:  No, Your Honor.  May I ask the Court's
15   brief indulgence?
16             THE COURT:  Sure.
17             MR. MARSH:  Two-and-a-half hours on direct.
18             THE COURT: All right.  Let me ask defense counsel,
19   are you familiar with these people and if so do you have a
20   calculated prediction as to how long your cross might take?
21   I'm just trying to factor in Allen's testimony, the objections
22   I have to resolve to certain aspects to direct or
23   cross-examination.
24             MR. CARY:  We're generally familiar, and they should
25   be relatively short crosses, Your Honor.  I do have a concern,
```

1          and I am sorry we didn't put in the e-mail this weekend, but

2          as to whether Heather Resz has anything to offer that is not

3          hearsay.  I understand she is a reporter, but it should be a

4          relatively short cross, Your Honor.

5                    THE COURT: Can you give me a proffer as to what

6          Reese is going to testify to?  I'm sorry.  Is that Heather

7          Reese; R-E-E-S-E?  Is that her name?

8                    MR. CARY:  Actually I think it's R-E-I-S-Z, I

9          believe, Your Honor.

10                   THE COURT:  Oh.  All right.

11                   MS. MORRIS:  R-E-S-Z.

12                   THE COURT:  R-E-S-Z.  All right.

13                   MS. MORRIS:  Your Honor, Ms. Resz will be testifying

14         with regard to contact she had with Senator Stevens' press

15         secretary, Courtney Boone.  Courtney Boone is the witness

16         right before her.

17                   MR. CARY:  I think that's going to be hearsay, Your

18         Honor, contacts with the press secretary.

19                   THE COURT: I don't know.  What's the exception?

20                   MS. MORRIS:  Well, Your Honor, Senator Stevens

21         actually directed Courtney Boone in a response that was given

22         to Heather Resz.  So it is the exception of 801(d)(2)(D).

23                   THE COURT: This is still pursuant to the

24         government's conspiracy theory?  What is the exception?  We

25         were talking about out of court statements offered for the

1     truth of --

2              MS. MORRIS: Your Honor, it's not so much the

3     conspiracy as much as she is an agent of a party opponent.

4     Senator Stevens directed Ms. Boone, and Ms. Resz had contact

5     with Ms. Boone. So we think that Ms. Boone would be able to

6     give direct testimony, and Ms. Resz will be able to respond

7     accordingly.

8              THE COURT: And the authority you're allowing is

9     801(d)(3) then; is that correct?

10             MS. MORRIS:  Yes.

11             THE COURT:  Any response to that?  I'll take a look

12    at the --

13             MR. CARY:  Now, that I understand that, Your Honor,

14    we'll look at it tonight.  It may well be an appropriate

15    exception.

16             THE COURT: What about Allen?  We have some time,

17    it's only 4:30.  Maybe I should focus on Allen.  My

18    recollection is that direct was going to take five-and-a-half

19    hours or so.  I'd really prefer not to break it up, but if we

20    have to, we will.  Do you have any other witnesses you could

21    call tomorrow?  If we're talking two and a half hours, three

22    hours, we're at lunch time and then coming back, that will be

23    three hours into direct.  I mean, I can break it up that way.

24    My preference would be to try and finish all of direct or all

25    of cross, as opposed to breaking it up.

1          MS. MORRIS:  Judge, it looks like -- even if we put

2     witnesses ahead of him, they still would be relatively short

3     so we'd end up breaking up his testimony.  He would start

4     probably tomorrow anyway to give a full day.  So we prefer to

5     stop with those witnesses that we have suggested already and

6     then go into Mr. Allen because again --

7          THE COURT:  Okay.  Recognizing that he may still

8     have to be called back to finish direct examination.

9          MS. MORRIS:  Yes, sir.

10          THE COURT: All right.  That's fine.  I don't really

11     have any problems with that.  Let's talk about -- we can use

12     this time -- it is only 4:30 -- we can use this time to talk

13     about the government's motion to limit cross-examination.

14          I think I said the other day that in all likelihood

15     there are probably calls I will have to make after hearing

16     direct testimony.  I have given a lot of thought to the

17     uncharged criminal acts that were the subject of

18     investigations in Florida -- I mean, Alaska, and I think the

19     most recent filing suggests that he may have been the subject

20     of investigations on two occasions for criminal activity; but

21     he has not been charged with.

22          It seems clear to me that -- and pursuant to the

23     Blunt authority from our D.C. Court of Appeals, and I

24     recognize it is not controlling but the rationale is certainly

25     persuasive, it seems to me that pursuant to Blunt, if the

1      question comes up with regard to what the witness would want

2      the government to do, that is a fair line of inquiry, I would

3      not allow probably testimony into the nature of the charges.

4      Suffice it to say those are felony charges, I assume,

5      correct?

6              MS. MORRIS:  I believe so, yes, Your Honor.

7              THE COURT: So if I allow any examination with

8      respect to what the witness would like the government to do

9      insofar as those state uncharged acts are concerned, I'd

10     probably limit it to cross-examination with regards to

11     uncharged felony investigations and what the witness may want

12     the government to do, as opposed to going into the nature of

13     the crimes.  You follow me?

14             MS. MORRIS:  Not quite.  Are you saying, Judge, that

15     you would or would not?

16             THE COURT: I probably would.  Absolutely, pursuant

17     to the Blunt case from the D.C. Court of Appeals.  I probably

18     would allow inquiry.

19             MR. MARSH:  Your Honor, very briefly.  We do

20     respectfully disagree that Blunt compels that result.  Blunt

21     related to situations in which, as the Court is aware, there

22     were pending charges at the time and --

23             THE COURT: They were on the stet docket, though.

24             MR. MARSH:  They were on the stet docket and --

25             THE COURT:  As inactive and that is what we have

1    here, if I understand it correctly.  We have two

2    investigations: one as recently as within the last year or so

3    and the one some time ago.

4          MR. MARSH:  We do respectfully disagree with the

5    Court and if I may briefly say why.  Charges on the stet

6    docket, just like they are over in Superior Court, those are

7    situations in which the governing body has determined they've

8    got sufficient evidence to bring a charge.  And when a case

9    gets put on the stet docket, it's a form of alternative

10   dispute resolution, basically.

11         Here -- and Blunt went into great detail and

12   explained how the stet docket wasn't different than a pending

13   charge because it was still in fact pending.  Here what we

14   have are different circumstances.  There are situations that

15   have not yet led to a sovereign determining there is

16   sufficient evidence to bring charges, and on that level we do

17   submit that Blunt is different and these are in different

18   situations.

19         THE COURT: Do you agree though that the charges

20   could be brought against him, either or both, that there's

21   that possibility?

22         MR. MARSH:  Your Honor, I can tell you I'm not

23   familiar at all with the actual charges, whatever they would

24   be, but certainly it's possible that charges could be -- I

25   mean, anything could happen.  But we do submit that Blunt

```
1    seems to be pretty clear in talking about it's the pendency of
2    the criminal charges that give the issue -- for instance, if
3    the Court were to conclude that it's the other way around,
4    being able to explore in great detail all of the possible
5    things that the defendant might think that a witness might
6    conceivably consider being charged with, could be an exception
7    that would swallow the rule, and we submit that Blunt makes
8    sense.  Blunt says if a sovereign has said probable cause to
9    charge, then you get to inquire as -- very generally as Blunt
10   says, but if not -
11             THE COURT: Let me ask you this:  Has the state
12   government told the witness that the state government will not
13   proceed against him as a target for either or both of those
14   investigations?
15             MR. MARSH:  Brief indulgence?  Your Honor, I
16   believe we don't know, and I believe the witness also does not
17   know.
18             THE COURT:  So he's not been told that he will
19   never be prosecuted for either of those, then?
20             MR. MARSH:  I believe that's correct.  I also
21   believe it's fair to say he has had no contact either way.
22             THE COURT:  All right.  Pursuant to a bench
23   conference, the Court -- and the Court may have said so in
24   open court as well Friday, that in all likelihood the Court
25   will wait to see just what is brought out on direct
```

1    examination and the manner in which it is brought out on

2    direct examination; and then conclude what's appropriate or

3    not with regards to the cross-examination.

4           If the government wants to make any additional

5    points, I have already addressed Blunt.  If you want to say

6    any additional argument regarding Blunt or any of the other

7    reasons that you advanced for the Court's consideration on

8    limiting the cross-examination, I guess now is the time to do

9    so, as opposed to delaying the case after direct examination

10   and taking up argument now.  So if there is any additional

11   argument you wish to make, I'll certainly considerate it.  If

12   your best argument has been stated in writing, then that's all

13   you need to tell me, but if there are any principal points you

14   wish the Court to consider in addition to everything you've

15   raised in writing, then --

16          MR. MARSH:  Your Honor, I believe we're prepared to

17   stand on the papers, but we did have one clarification, we'd

18   like to request the Court.

19          THE COURT: Sure.  Sure.

20          MR. MARSH:  What we interpreted the Court's

21   inclination to be is that questions may be asked, but that

22   they would be limited to the concept of felony charges.

23          THE COURT: Absolutely.  Absolutely.  I think the

24   nature of the felony charges may tend to have a different

25   impact on the jurors, and an impact on the jurors that I don't

1     think is appropriate.  In other words, I'm talk publicly now,

2     this is public information.  The jurors are not going to hear

3     this but the inquiries were of sex crimes involving a minor, I

4     believe or -- correct?

5            MR. MARSH:  I believe that's correct, Your Honor.

6            THE COURT: I don't think that the jurors need to

7     know that for purposes of the inquiry.  I think that the

8     jurors need to know, and I feel almost comfortable about this,

9     the jurors need to know that indeed there were investigations

10    for potentially other felony offenses and that he has probably

11    not been told that the government will not proceed -- that the

12    state government will not proceed against him; and I think it

13    is appropriate to inquire about his state of mind and what he

14    would like the government to do, if anything, with regards --

15    he may say I don't want the government to do anything.  I can

16    handle myself; he may say that.

17           MR. MARSH:  And, then, fair for us to infer that

18    that line of questioning would end the questioning.

19           THE COURT: I'll hear from defense counsel.  I think

20    so.  We're not going to have a mini-trial about the nature of

21    charges and who said what.  That's not appropriate.  It's just

22    the fact that maybe they're open, maybe they're closed.  I

23    think it's significant that he's not been told that these

24    matters are closed, you're no longer a target, and the

25    government has closed the book on those.  That's significant.

1    The nature of the charges, I think that would that would tend

2    to inflame potential prejudices and biases on the part of the

3    jurors, and that's not part and parcel of this examination.

4           What's really relevant is what this witness' state

5    of mind is and what he would like the government to do.  He's

6    trying to get a deal, he's trying to get a 5(k)(1), and I

7    think it's very appropriate for counsel to inquire with

8    respect to these other pending felony investigations what, if

9    anything, he wants the government to do; whether the

10    government has promised him anything, and what he believes the

11    government is going to do on its own.

12           And I think that's very appropriate in order to

13    enable the jurors to assess his bias, his willingness to curry

14    favor or not with the government, his motivation for speaking

15    truthfully or not speaking truthfully.  So along those lines,

16    I think it's a fair inquiry, but getting into the nature of

17    who said what, I don't think it's appropriate at all.  But

18    I'll hear from defense counsel.

19           MR. CARY:  Your Honor, the only thing I would add

20    two points.  One is the very, very –

21           THE COURT: One other thing is, too -- I am sorry, I

22    didn't mean to cut you off -- I think it's appropriate to

23    measure how if at all that line of inquiry is proceeded with

24    by the government.  It may well be that the government ask

25    questions to take the sting out that.  I don't know.  I am not

1    suggesting that you do that.  But I'm going to assess how, if

2    at all, that line of inquiry is pursued on direct examination.

3         Now, that's mindful though of the defendant's right

4    of effective cross-examination.  So it may well be you can't

5    say enough without the Court giving -- affording the defendant

6    an opportunity to reasonably cross-examine.  But there are

7    ways to take the sting out of things and oftentimes the

8    government will do it.  The government can ask as a first

9    question, have you been convicted of -- to take the sting out

10   of cross-examination of that line of inquiry by defense

11   counsel.  So I leave it up to you.  You may be able to do it

12   and take some of the sting out which will inform the Court

13   about how far defense counsel can go with respect to that line

14   of inquiry.

15         I leave it up to you.  That is why I'm thinking it

16   makes more sense to assess the appropriate scope of

17   cross-examination after I have heard what the government has

18   in mind, vis-a-vis direct examination.  Go ahead.

19         MR. CARY:  And I was going to make a related point,

20   Your Honor, that I think once again Mr. Sullivan needs to

21   assess the witness and, certainly, we can represent that we

22   won't go into those areas without approaching the bench, and

23   then the other point I would make just to put a bit of a

24   marker down is that the very serious nature of the charges may

25   have something to do with his state of mind above and beyond

1    simply felony charges, but we can raise that issue once we --

2            THE COURT:  Well, I thought about that, as well, and

3    I appreciate that, and I haven't closed the door on that.  It

4    may well be that it may be an appropriate line of inquiry

5    about the name of the charge; it's not a robbery offense.

6    It's a certain type of offense, though, that I have to be

7    mindful of, might tend to inflame the prejudices or biases of

8    jurors, and I don't want that.  I want to avoid that.

9            Maybe the name of the charge or the charges is

10   appropriate; I don't know.  Maybe there is some case authority

11   that you want to bring to the Court's attention that will

12   reflect on that, the name of the charge.  I'm concerned about

13   a mini-trial though, especially about charges that have not

14   been brought, because I don't want to raise the issues of

15   those potential prosecutions for the wrong reasons.

16           I don't want to inflame any prejudices or biases

17   that jurors may have if they hear about the nature of the

18   charges, and about who said what.  That's not the purpose of

19   this inquiry.  The purpose of this inquiry is about other

20   felony uncharged criminal acts at this point is, what does

21   this man want the government to do, if anything.  Maybe he

22   doesn't want anything; maybe he will tell us, I can handle it

23   myself.  I don't know.

24           MR. CARY:  Understood, Your Honor.

25           THE COURT: But I think it's probably a fair line of

1    inquiry.  I mean, what about their argument that that issue is
2    different from the issue raised in Blunt?   Do you agree?
3              MR. CARY: No, Your Honor.  The stet docket as I
4    understand is the stet docket, and I think it's drawing a very
5    fine line.  These are in fact investigations that he could be
6    charged under any day.  And in some ways, these may be far
7    more active than something that's on the stet docket, and I
8    don't think that distinction makes a difference.
9              THE COURT:  Well, the stet docket means, though,
10   that's it's basically on an inactive docket, which is unlike
11   here, though.  I don't know if it's an inactive docket where
12   these charges are.  The fact of the matter is -- and I don't
13   think anyone disputes it -- is that at some point there were
14   two investigations, one very recently commenced and concluded
15   with no finality.  Now, I don't know, is that equal to a stet
16   docket?  I don't know.  He has not been told that the State of
17   Alaska is not going to proceed against him.  And no one
18   disputes that, right?
19             MR. CARY:  Correct.
20             THE COURT: So in that regard, maybe it is somewhat
21   analogous to a stet docket.  I just don't know.  There's been
22   no finality.  If there is no finality -- I mean if there is
23   finality, then there's probably no line of inquiry because the
24   government can't do anything to help him if the books have
25   been closed on those criminal activities, right?

1              MR. CARY:  If there were finality, yes.

2              THE COURT: If there were finality, right.  But he

3      has not been told that.

4              MR. CARY:  Correct.

5              THE COURT:  All right.

6              MR. CARY:  Your Honor, a related issue that I think

7      will allow us -- a couple of related issues -- well, actually

8      one is related, somewhat related, and another is I wanted to

9      put some objections on the record that we filed on Saturday

10     that might make things go more smoothly with Mr. Allen.

11             THE COURT: Sure.

12             MR. CARY:  The first issue is this; I don't know if

13     the government intends to make reference to his plea agreement

14     on direct examination, but if they do I assume there's

15     reference in there to state Senator (A) and state Senator (B),

16     and I assume that they are simply going to refer to the state

17     uncharged people as state Senator (A) and state Senator (B);

18     and if they do so, that's my first inquiry that we may have.

19             MR. BOTTINI:  Well, we're certainly planing to ask

20     Mr. Allen what he pled guilty to and who he pled guilty to

21     bribing, by name, not by reference to state Senator (A) or

22     state Representative (A).

23             THE COURT:  And that is a matter of public record, I

24     assume, in Alaska.

25             MR. BOTTINI:  It is.  Yes.  He's testified about it

1    twice before.

2              THE COURT: Right.  I see nothing wrong with that.

3    Is there an objection to that?  And what's the standing to any

4    objection?

5              MR. CARY:  Your Honor, I believe that one of the

6    state Senators -- I'm not certain of this myself -- is our

7    United States Senator's son, Ben Stevens, who has not been

8    charged, has not been charged, and --

9              THE COURT: That may be true, but if --

10             MR. CARY:  -- that's highly prejudicial, Your Honor.

11             THE COURT:  -- that may be true, but if the

12   defendant, if he appeared in court and pled guilty to that

13   offense and as part of the government's proffer that he agreed

14   with, that's what he did and that person was named, then I see

15   no way to insulate that.

16             MR. CARY:  Your Honor, in the proffer he's not

17   named.  That's the point.

18             THE COURT: He is not named?

19             MR. CARY: He's not named -- the actual indictment

20   itself I believe refers to him as state Senator (B).

21             THE COURT:  What about the plea colloquy?  Is there

22   anything that names him?

23             MR. CARY: No, Your Honor.  I don't believe so.

24             MR. BOTTINI:  My recollection is in the plea

25   colloquy I think he did admit to --

1          THE COURT: Well, there shouldn't be any guess work

2     about it.  We have a transcript of that, don't we?

3          MR. BOTTINI:  The two prior trials that Mr. Allen

4     has testified in we have gone through this examination with

5     him about what he pled guilty to and who he pled guilty to

6     bribing, and he has mentioned the legislators by name.

7          THE COURT: And the transcript will support that?  If

8     it is out there, and it has already been publicly stated, then

9     I see no --

10          MR. CARY:  Your Honor, but his father is a defendant

11     in this case, and we're worried about Rule 403 prejudice.  And

12     the plea agreement itself is very careful simply to state

13     Senator (B).  That's what the plea agreement said.

14          THE COURT:  What about the transcript of the

15     proceedings?  That's what I want to look at.  What was said in

16     open court.  Plea agreements often refer to people by names

17     and -- by names other than their real names, but what does the

18     transcript of the proceedings say?

19          MR. BOTTINI:  The two trials that Mr. Allen has

20     previously testified in, we have those transcripts.  We can

21     provide them to you to show how the examination went

22     concerning the --

23          THE COURT: And they weren't under seal; is that

24     correct?

25          MR. BOTTINI:  They were not.

1          THE COURT: And you're telling me that the Senator's

2    son was mentioned?

3          MR. BOTTINI:  Yes.

4          THE COURT: But he has never been charged?

5          MR. BOTTINI:  He has not been charged.

6          THE COURT:  I mean if it's a matter of public record

7    already, if that's a given, what are you asking me to do, to

8    seal the name now?

9          MR. CARY:  No.  No, Your Honor.  It's not a matter

10   of confidentiality.  It's a matter of this courtroom, this

11   trial, this jury, this defendant, and Rule 403.

12         THE COURT: I understand that.  What are you asking

13   me to do?

14         MR. CARY:  I'm asking that they refer to -- when

15   they refer to the plea agreement, they refer to state Senator

16   (B), just as they did when they drafted the plea agreement and

17   just as they did when they drafted the factual stipulation;

18   State Senator (B) -- it refers to state Senator (A), state

19   Senator (B).

20         THE COURT: The point they're making though is

21   everything is a matter of public record now even though he may

22   have been referred to as state Senator (B) in a document

23   drafted, what the government is telling me now is that in

24   court proceedings under oath, the testimony was that it was

25   the Senator's son.  I don't know that to be the fact.  I

1  accept what counsel is proffering, if it's already out there

2  in the public domain, I'm sensitive to the issue you raise,

3  but you're asking me to redact something that is already a

4  matter of public information.

5          MR. CARY:  No.  I don't think, Your Honor.  I'm not

6  asking to redact anything.  I'm simply suggesting that if they

7  use the plea agreement --

8          THE COURT: When I say redacted, I mean refer to him

9  by name but refer to him as -- is there some authority for

10  this?  When you say Rule 403?  Balancing the prejudicial

11  impact?

12          MR. CARY:  Yes, Your Honor,.  There is no probative

13  value --

14          THE COURT:  The other side of the coin is Senator

15  Stevens was not a part of that state prosecution.

16          MR. CARY:  Your Honor, it is actually a Federal

17  prosecution in Alaska.

18          THE COURT: It is Federal?

19          MR. CARY:  It's a Federal prosecution that Mr.

20  Allen has pled guilty in.  The plea agreement refers to state

21  Senator (A), state Senator (B), and it's not a matter of

22  confidentiality or whether it's a matter of public record.

23  It's a matter of what the prejudice is to this defendant and

24  in this courtroom when Mr.  Allen brings out that he has pled

25  guilty to charging -- to bribing his son.

1              THE COURT: Maybe the appropriate --

2              MR. CARY:  And there have been no charges.

3              THE COURT: Maybe the appropriate instruction at that

4      time is that Senator Stevens has never been charged with a

5      criminal activity in that proceeding and is not the subject of

6      any criminal prosecution by the federal authorities in that

7      Alaska district.  Maybe that's the appropriate instruction.  I

8      don't know.  I'm just sharing a thought with you.

9              MR. CARY:  Your Honor, there's -- it adds nothing to

10     this proceeding to name him by name.  It has no probative

11     value to the charges for financial disclosure against United

12     States Senator Stevens at all, no probative value.  On the

13     other hand, the prejudice is very high because they're father

14     and son.  That's the issue, and they ought to be able to stick

15     with the plea agreement that they drafted.

16             THE COURT: Still when it comes to the issue of being

17     able to cross-examine the government witnesses, you want me to

18     allow you to inquire about the nature of the offense, the

19     nature of that sexual offense, vis-a-vis that witness.  You

20     want that, right?

21             MR. CARY:  We want the right to do it, and we said

22     we'll go to the bench and ask before we do it, but, yes,

23     because that goes to his state of mind as a cooperating

24     witness.

25             THE COURT:  Right.  But that certainly would tend to

1    inflame the prejudices of the jurors if I allowed that,

2    wouldn't it?  Sure.

3              MR. CARY:  The sexual -- that's unfair --

4              THE COURT: If they hear about sexual improprieties

5    with a minor, of course, they're going to reach the wrong

6    conclusion, and that's why judges don't allow that.  But

7    you're telling me here, don't do that, don't allow the inquiry

8    about the son.

9              MR. CARY:  The question is what is in this witness'

10   head right now?  Is he worried about that other investigation?

11   That adds -- that's very probative to what we're talking about

12   here, his credibility.  When it comes to the fact that he pled

13   guilty to bribing a state Senator who happens to be this

14   United States Senator's son, that is not probative.  It could

15   be any state Senator.

16             THE COURT: And you don't think that the Court's

17   instruction, curative instruction, at that time, that Senator

18   Stevens was never charged in that federal proceeding; he is

19   not the subject of any investigation of that federal

20   investigation; and the fact that his son was the subject of

21   should not factor into their decision at all in weighing the

22   testimony of this witness; you don't think that's appropriate?

23             MR. CARY:  It doesn't go all the way.  And by the

24   way, State Senator Stevens has never been charged either.

25             THE COURT: All right.  Counsel, if you want to

1    provide some -- I don't know if you did over the weekend or

2    not, if you provided any authority on that point.

3            MR. CARY:  I don't think we have, and we will.

4            THE COURT:  Basically, the Rule 403 issue that you

5    raised; prejudicial values -- probative values outweighed by

6    the prejudicial impact.  All right. I'll certainly consider

7    whatever authority you wish me to read.

8            MR. CARY:  And I have a suggestion that might save

9    some time, maybe it won't.  But we sent an e-mail to chambers

10   this weekend with some speech or debate objections, and if

11   it's all the same, and it preserves the record, we'd be happy

12   to file those on the court docket  --

13           THE COURT: That's fine.

14           MR. CARY:  -- if they're sufficient to preserve the

15   record, then we don't need to take up court time with a

16   colloquy here.

17           THE COURT: That's fine.  You can do that.  Now,

18   assuming that the Court disagrees with your instructions, with

19   your argument, is there a curative instruction that you're

20   asking for?

21           MR.  CARY:  There is, Your Honor.  And the curative

22   --

23           THE COURT: And you submitted that, as well, with

24   your e-mail?

25           MR. CARY:  We did, and I can tell you what -- it's

1      Document No. 74 on the ECF system, and the government's

2      objection was Document No. 82.

3                THE COURT: That's fine.

4                MR. CARY:  And the reply -- our reply was Document

5      No. 84.

6                THE COURT: All right.  That's fine.  Anything else?

7                MR. CARY:  One other issue, Your Honor.  They intend

8      to play three audio tapes during Mr.  Allen's direct, and they

9      want to just play portions.  We believe that the whole thing

10     should be played in total with these three audio tapes.  We

11     think it will only add 15 minutes, and it's appropriate under

12     the Rule of Completeness to put them into context.

13               THE COURT: I was hoping this issue wouldn't come up

14     again.  I think I don't have any problem with that, but there

15     was another underlying problem that dealt with publication of

16     those tapes.  Have you folks talked about how that can be done

17     in a fair manner?  If you haven't -- we talked the other day

18     about me ordering DOJ to post them on its website; I'm not

19     enthusiastic about that.

20               Maybe the solution is this with respect to the

21     tapes; maybe the solution is this:  Whatever is published is

22     going to be published on ECF, the ECF system.  Actually it

23     won't be, it won't be available.  Other than in transcript

24     form and the transcript is not the evidence.  Have you given

25     any further thought to it?

1                MS. MORRIS:  No, Your Honor.

2                THE COURT:  And, again, I'm not trying to create any

3       precedent in this case or any other case.  But they didn't ask

4       to be parties to this case; they didn't volunteer to be

5       defendants in this case.  If you are going to publish portions

6       of the tape, you know, query whether the portions of the tapes

7       that are favorable to the defendant shouldn't be published in

8       some medium, and I don't think it is appropriate to say, well,

9       go build a website.  I don't think that's fair.

10               And maybe the solution is to tell the government if

11      you're not willing to publish both portions, then don't post

12      it on your website since this is a public trial.  The

13      documents we filed on the Court's website -- maybe that's the

14      appropriate response, just don't post them up there.

15               MS. MORRIS:  Judge, there is also the other

16      alternative which we mentioned the last time is actually

17      having it downloaded onto a CD and giving it to -- if press

18      requests, they can have a copy --

19               THE COURT: If you both want to do that, that maybe,

20      but I don't want to impose on our court staff to do that.  I

21      don't know.  You can think about it and talk to Shelly and

22      Jenna; maybe there's a way to do that.  But I'm trying to

23      avoid an imposition on our court personnel as well. I don't

24      know how you would give to the media?  Who would you pick out

25      to give it to?  I mean, the hands go up, how do you fairly do

1      that?

2              MS. MORRIS:  I believe that's how they did it in

3      Libby.

4              THE COURT:  I think they posted everything.  They

5      had a website.  I think everyone looked to the government to

6      post everything on the website.  That's my recollection.  may

7      be wrong but I think that's what happened in Libby.  There was

8      -- he was a special prosecutor, I believe, and he had a

9      separate website other than DOJ's, and they just posted

10     everything up there.

11             MS. MORRIS:  That's right, sir.  And I think that --

12     I don't think there were audio tapes now that I think about it

13     in Libby, but I know I got somewhere that we could put it on a

14     CD and give it out.

15             THE COURT: I wasn't going to raise it, but you

16     raised it about the tapes, so keep thinking about it.  There

17     has to be a fair way to do this.  There has to be.  And,

18     again, I'm not trying to give the government a hard way to go

19     and create a precedent.

20             Look, I know you're looking down the road and there

21     will be some case where you have hundreds of hours of tapes in

22     it, you don't want to do it, and I can appreciate that, but

23     there has to be some way to fairly get the defendant's version

24     out there without the defendant having to incur the expense of

25     creating a website.  Has to be.  We're just aren't

1    technologically there, I don't think yet, with the ECF system,

2    but we will continue to think about it.  Jenna is in court.

3    I'm not trying to create work for her.  You may want to speak

4    with her at some point.  We'll continue to think about that.

5            There was another related alcohol/drug related issue

6    that you raised about cross-examination of Allen.  We can talk

7    about that at the bench after direct examination as well; if

8    you want some latitude to inquire about issues, though, did

9    you not, about Allen?

10           MR. CARY:  Yes, Your Honor.

11           THE COURT: All right.  What's -- do you have

12   anything you want to add to your written submission?  I have

13   considered it.  Do you have anything want to add to it?

14           MR. CARY:  As it relates to Speech or Debate, no,

15   Your Honor.

16           THE COURT:  Not Speech or Debate, just the

17   alcohol/drug related component of cross-examination here.

18           MR. CARY:  No, Your Honor.

19           THE COURT: All right.  All right, counsel.  We'll

20   start at 9:30 tomorrow.  Thank you.  No need to stand.  Thank

21   you.

22           THE DEPUTY CLERK:  This Honorable Court now stands

23   in recess.

24

25

C E R T I F I C A T E

       I, Wendy C. Ricard, Official United States Court Reporter in and for the District of Columbia, do hereby certify that the foregoing proceedings were taken down by me in shorthand at the time and place aforesaid, transcribed under my personal direction and supervision, and that the preceding pages represent a true and correct transcription, to the best of my ability and understanding.

_____

Wendy C. Ricard, CCR, RPR

Official U.S. Court Reporter