1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF COLUMBIA

3   UNITED STATES DISTRICT COURT       CRIMINAL ACTION NO. 08-0231

4                                      WASHINGTON,D.C.

5   VERSUS                             TUESDAY, SEPTEMBER 30, 2008

6

7   THEODORE F. STEVENS                2:00 P.M.

8

9              **JURY TRIAL (DAY 7 – PM SESSION)**

10         **BEFORE THE HONORABLE EMMET G. SULLIVAN**

11            UNITED STATES DISTRICT COURT JUDGE

12

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF,                JOSEPH W. BOTTINI,ESQ.
                                       U.S. ATTORNEYS OFFICE
15                                     District of Alaska
                                       22 West Seventh Avenue
16                                     Federal Building and U.s.
                                       Courthouse
17                                     Anchorage, AK 99513-7567

18                                     NICHOLAS A. MARSH,ESQ.
                                       U.S. Department of Justice
19                                     10th and Constitution Ave.
                                       NW
20                                     Washington, DC 20530
                                       202-307-1049
21
                                       BRENDA MORRIS, ESQ.
22                                     EDWARD SULLIVAN,ESQ.
                                       U.S. DEPARTMENT OF JUSTICE
23                                     1400 New York Avenue, NW
                                       12th Floor
24                                     Washington, DC 20005
                                       (202) 514-1412
25

```
 1

 2     FOR THE DEFENDANT,                BRENDAN SULLIVAN, ESQ.
                                         ROBERT MADISON CARY,ESQ.
 3                                       ALEX G. ROMAIN, ESQ.
                                         BETH STEWART, ESQ.
 4                                       CRAIG SINGER, ESQ.
                                         WILLIAMS & CONNOLLY
 5                                       725 12th Street, NW
                                         Washington, DC 20005
 6                                       (202) 434-5000

 7

 8     REPORTED BY:                      WENDY C. RICARD, RPR, CCR
                                         OFFICIAL COURT REPORTER
 9                                       333 Constitution Avenue
                                         Room #6718
10                                       Washington, DC  20001
                                         (202)354-3111

11

12     Proceedings recorded by mechanical stenography.

13     Transcript produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **I N D E X**

2

3

4   **WITNESSES:**                                    **PAGE:**

5       **JERIE BEST**................

6           **BY:  MS. MORRIS**........        **5**

7           **BY:  MR. CARY**..........        **32**

8       **BILL ALLEN**................

9           **BY:  MR. BOTTINI**........        **52**

10

11

12   **EXHIBITS:**

13       **Government Exhibit 239(photo)**............... **28**
         **Government Exhibit 240(business card)**....... **30**
14       **Government Exhibit 1104(Alaska map)**......... **64**
         **Government Exhibit 1106(map)**............... **68**
15       **Government Exhibit 1094(photo)**............. **78**
         **Government Exhibit 609(copy of check)**....... **84**
16       **Government Exhibit 1105(photo)**............. **92**

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1  
2          (Whereupon, court resumed at this time after the
3    lunch recess.)
4          THE DEPUTY CLERK:  Please remain seated and come to
5    order.
6          THE COURT: Let's proceed.  Who's your next witness,
7    counsel?
8          MS. MORRIS:  Judge, at this time, the government
9    calls Ms. Jerie Best.
10          THE COURT: All right.
11          MR. CARY:  Your Honor, just that we may --
12    references to the Senator's son.
13          THE COURT:  Right.  I'm going to grant that motion.
14          MS. MORRIS:  Judge, I can stop you.  We weren't
15    to oppose it.
16          THE COURT:  I know you weren't.  All right.  It's
17    not a problem.  The witness has been told?
18          MS. MORRIS:  Yes.  It's not a problem.
19          THE COURT:  All right.  All right.  This testimony
20    also comes out through Allen, as well, the reference to the
21    Senator's son.
22          MS. MORRIS:  It doesn't come through this witness,
23    it only comes through Allen, Judge.
24          THE COURT:  Oh, okay.  And he's been told that?
25          MS. MORRIS:  Yes, sir.

1           THE COURT:  All right.  Good afternoon.

2           THE WITNESS:  Good afternoon.

3           THE COURT: They're going to come through that door.

4    Why don't you just step to the front.  They're going to come

5    through that door.  That's fine.  You're not in the way. All

6    right.  Thanks.

7           (Whereupon, the jury enters the courtroom at this

8    time.)

9           THE COURT:  All right, ladies and gentlemen.  Sorry

10   to keep you waiting.  We didn't break for lunch until after

11   one o'clock, so I'm sorry about that.

12   *              *              *              *

13           **JERIE BEST**, called as a witness in this case, after

14   having been duly sworn, testified as follows:

15   *              *              *              *

16           THE COURT:  All right.  Good afternoon.  There are

17   some people in another room listening to the testimony in this

18   courtroom so we ask the witnesses just to pull the microphone

19   down and try to speak into the microphone.

20           THE WITNESS:  Okay.

21   **DIRECT EXAMINATION BY MS. MORRIS:**

22   Q.   Good afternoon, ma'am.

23   A.   Good afternoon.

24   Q.   In a loud clear voice, will you state your name,

25   spelling your first and last name?

```
1    A.   My name is Jerie Best.  It's spelled:  J-E-R-I-E; middle

2    name is Jo, J-O; last name, Best, B-E-S-T.

3    Q.   Thank you.  Ms.  Best, where do you currently reside?

4    A.   I reside in Soldotna; spelled S-O-L-D-O-T-N-A; Alaska.

5    Q.   And for how long have you lived in Soldotna?

6    A.   Approximately 30 years.

7    Q.   And where is Soldotna in relation to Anchorage?

8    A.   Soldotna is about 155 miles south of Anchorage on the

9    Kenai Peninsula.

10   Q.   So driving, how much time?

11   A.   Two-and-a-half, three hours; an avalanche, 11 hours.

12   Q.   And ma'am, would you -- are you currently employed?

13   A.   No, I retired two years ago.

14   Q.   And what did you previously do?

15   A.   I've done various jobs.  I've taught as a professor at

16   the University of Alaska, the Kenai campus.  I was editor of

17   the Daily Journal of Commerce.  I worked in Berlin at the

18   Department of Army Civilian, and I retired out of the

19   Department of Fish and Game, Alaska State.

20   Q.   What did you teach?

21   A.   I taught computers, software.

22   Q.   All right.  Ms. Best, let me ask you, are you familiar

23   with the Kenai River Sports Fishing Association.

24   A.   Yes, I am.

25   Q.   And would you please describe for the jury what that is?
```

1    A.    Kenai Sports Fishing -- Kenai River Sports Fishing

2    Association is an organization that raises money to do habitat

3    research and build up the banks.  They build boardwalks to

4    provide better usage of the Kenai River and accessibility.

5    They do some education, they provide matching grants, for

6    example, to the city to improve parks along the Kenai River.

7    Q.    Is the Kenai River for just looking at or is fishing

8    allowed there, too?

9    A.    I'm going to boast here. The Kenai River is the greatest

10   fishing river in the entire United States.

11   Q.    And what kind of fishing can be done there?

12   A.    You know, it is varied.  Of course, we have the red

13   Salmon which is the commercial or sockeye Salmon; king Salmon

14   which the sports fisherman are really anxious to get; we have

15   humpees or "pinks", as we call them that come through.  Later

16   in the year, there are silvers, but you can catch a nice

17   Rainbow Trout.

18   Q.    Now, where is the Kenai River located in relation to

19   Anchorage?

20   A.    It is south about 158 miles.  It runs through Soldotna

21   and through Kenai, going out into Cook Inlet.

22   Q.    Were you ever affiliated with the Kenai River Sports

23   Fishing Association?

24   A.    Yes, I was.

25   Q.    Beginning when?

1    A.    Approximately 1994.

2    Q.    And what was your affiliation?  What did you do with the

3    organization?

4    A.    Originally I was asked to become a driver transporting

5    people who were fishing in their tournament each year.

6    Q.    Is there anything personal to you as to why you decided

7    to affiliate yourself with the Kenai River Sports Fishing

8    Association?

9    A.    I affiliated myself with them because I had been in a

10   wheelchair for 11 years having a bone disease.  My agreement

11   with the Kenai River Sports Fishing Association was if I came

12   and volunteered and did quite a bit of work for them, they

13   would make it a priority that accessible fishing spots would

14   be built on the Kenai River.  The Kenai River notoriously has

15   very high banks, and it is difficult to get down.  So for a

16   person with a disability, blind or in a wheelchair, it was

17   very difficult for them to avail themselves of the activity of

18   fishing on the river or even boating.  It was impossible to

19   get into a boat.

20   Q.    Ma'am, let me ask you what is the Kenai River Classic?

21   A.    Kenai River Classic is the main fundraiser of the Kenai

22   River Sports Fishing Association.

23   Q.    Is that commonly referred to as the "Classic"?

24   A.    Yes, it is.

25   Q.    And what exactly is the Classic?

1    A.    The Classic is a fishing tournament that is held

2    annually.

3    Q.    What time of year?

4    A.    It is generally around the 4th of July.  Now, it is not

5    going to be on the 4th of July because several U.S. Senators,

6    representatives, presidential cabinet members attend; so it is

7    determined either a few days before or a few days after so

8    that the congressional delegation can be in their home state

9    on the 4th of July.

10   Q    And how long is the event?

11   A.    The event runs about two-and-a-half days.

12   Q.    Now, is the event for individuals or is it corporately

13   sponsored?

14   A.    It's both.  There are indeed major corporate sponsors for

15   this event.  And individuals affiliated with the corporate

16   corporations are fishermen in the tournament.

17   Q.    Is there a fee associated with it?

18   A.    Yes, there is.

19   Q.    How much is that?

20   A.    When I left about it was about three to $5,000 per

21   individual.

22   Q.    And how many individuals participate in the Classic each

23   year?

24   A.    We generally had 65 guided boats with approximately four

25   people per boat.  So anywhere from around 300 to 500 people

1      participated.  There were some people who did not fish, so
2      there would be more people at a couple of the events.
3      Q.    How long has the Classic been in place?
4      A.    This was, I believe, their 14th year.
5      Q.    This year being --
6      A.    -- 2008.
7      Q.    So since roughly about 1994?
8      A.    Correct.
9      Q.    Okay.  When you mentioned earlier that you, when you
10     volunteered, you were driving, what did you mean by that?  You
11     were driving individuals?
12     A.    Part of the Classic was we would have -- in the earlier
13     days -- we would have people staying in different individuals
14     houses, bed and breakfast.  So to attend the different events
15     we would run vans that would go wherever the individual
16     participant was staying, pick them up, take them to the event,
17     and take them back.
18           For example, they usually went fishing at 5 A.M. in the
19     morning, so we would be there to pick them up to get them to
20     the boats at 5 A.M.
21     Q.    What type of individuals frequent or attend the Classic?
22     A.    Generally, they are CEOs of corporations or lobbyists for
23     those corporations.
24     Q.    You mentioned, ma'am, that there were members of Congress
25     that were there?

1    A.    Yes.   There would be U.S. Senators.   There would be

2    members of the presidential cabinet.   There would be U.S.

3    Representatives, and generally one or two sports or

4    entertainment.

5    Q.    Are you familiar with Senator Ted Stevens?

6    A.    Yes, I am.

7    Q.    And did he have any affiliation with the Classic?

8    A.    Yes.

9    Q.    And what was that?

10   A.    He was the honorary chairperson of the Classic and indeed

11   he made the arrangements for the Congressional delegation and

12   the presidential cabinet members to attend.   He provided the

13   Classic with a list of those invitees.

14   Q.    So it was Senator Stevens that would invite those

15   individuals?

16   A.    Yes.

17   Q.    And he was the official chairperson for how long?

18   A.    And the host, from the inception.

19   Q.    What was the name of the Classic basically?

20   A.    The Ted Stevens Kenai River classic.

21   Q.    What types of events would be held during the

22   two-and-a-half day period?

23   A.    The initial event would be the welcome dinner which was

24   held at Bob Penney's home on the Kenai River.   It was an event

25   where we would have everybody kind of congregate.   We'd have

```
 1      cocktails, a couple of Salmon, a couple of different salads,

 2      oysters on the half shell, and Dove Bars for dessert.  So

 3      there's some entertainment and kind of a welcome to everybody

 4      at that event.

 5      Q.   Who is Bob Penney?

 6      A.   Bob Penney is a real estate developer in Anchorage.

 7      Q.   What is Bob Penney's relationship to the Senator?

 8      A.   As far I know, they are very good friends.

 9      Q.   When the Classic was being held, where did the Senator

10      stay?

11      A.   The Senator and his wife always stayed at Bob Penney's

12      home.

13      Q.   Would the Senator and his wife attend every year?

14      A.   Yes.

15      Q.   What about any other family members?

16      A.   On one or two years, his daughter, Sue, came and helped

17      as a volunteer.

18      Q.   Staff -- what about the Senator's staff?

19      A.   I would see staff members.  They weren't always the same

20      individuals.  So my memory as to what their names is pretty

21      insufficient.  But there would be a staff member there.

22      Q.   When the Senator would come for the Classic, did he have

23      to pay an entry fee?

24      A.   No.

25      Q.   What about his family?
```

1    A.    No.

2    Q.    Who is Bill Allen?

3    A.    Bill Allen was, at the last time when this was that I was

4    involved with the Classic, was the CEO of VECO, and a good

5    friend of Ted Stevens.

6    Q.    What about Bob Penney?  Was he a friend as well.

7    A.    Yes.

8    Q.    Of Bill Allen?

9    A.    Yes.

10    Q.    And when was the last year that you were affiliated with

11    the Classic?

12    A.    2004.

13    Q.    Now, ma'am, I believe you started with the types of

14    events that would be held, beginning with a dinner at Bob

15    Penney's house.  What other events would there be?

16    A.    Following the welcome dinner, the next thing would be

17    fishing, and we'd have the participants in the Classic at the

18    river by usually 5 A.M.  They had a breakfast burrito type

19    thing there for them, and they went out in the boats.  They

20    would fish approximately until noon.  They would have lunches

21    on the boats and that type of thing.  They would come back in

22    and we'd have some sort of a lunch -- additional lunch set up

23    at the River for them to eat.  From then on, they were kind of

24    free until the evening when there was the banquet and auction.

25    Q.    And when you say "auction", what type of auctions were

1    being held?

2    A.    Part of this event was, of course, to raise as much money

3    as possible.  So we had an outcry auction, and we would have a

4    silent auction, plus some other games.  We would put -- we

5    would have hat raffles, we'd have bucket raffles, etcetera.

6    Q.    When you say silent auction, would you explain to the

7    jury what you mean by silent auction?

8    A.    The silent auction usually involved four to five tables

9    dependent on the year.  We would have items placed on the

10    table, and bid sheets, and the participants in the Classics

11    would go to the tables, write down a bid amount -- we usually

12    had a minimum bid amount -- and sign their name.  And then the

13    next person might go and bid on it and raise up the price; so

14    the idea was to get as much money as we could for that item

15    obviously.

16    Q.    So whoever had the highest bid at the end of the night?

17    A.    Yes, we would close the tables at different intervals

18    because, you know, we'd say like -- we named all the tables

19    after fish.  So you would say the "Red" table is closing in 15

20    minutes; and then at that time we would take all of the

21    papers, the bid amounts, and then we would correlate them with

22    whoever had the last bid and maintained their account until

23    the end of the evening.

24    Q.    Now, explain to the jury what the live auction consisted

25    of?

A.    The live auction was always interesting.  It was
generally larger items that we always had a few surprises in
there.  It -- we would have items come up like an ATV,or a
Royal Caribbean cruise, or one year -- a couple of years we
had a Tote Ocean Express where they could ride the barge up
from Seattle to Anchorage which was kind of fun.  We would
have car leases.  We'd have motorcycles.  We'd have paintings,
etcetera.  We'd have an auctioneer; it was always Senator
Conrad Burns which most people don't realize is a professional
auctioneer, so we were very lucky to have him every year.

Q.    So this was live where Senator Burns would be --

A.    He'd be out there just like a cattle auction, and the man
can move his tongue like you wouldn't believe.

Q.    And the participants in the Classic, would there be any
type of welcome gift that was given to them?

A.    Yes.  We would put together a bag.  It was a duffle bag.
The outside of the bag would have a logo for the Kenai River
Classic on it.  A couple of years Alaska Pipeline Services did
it; VECO did it one year.  There would be the sponsor's name
who donated the bag itself, the duffle bag, and then we would
fill that bag with different items.

Q.    What type of items?

A.    Boeing generally did one of those really nice sweaters
that have like the shooter sweater, where you have the suede
on the shoulder, you know like sportsmen use.  There would be

1    a jacket, there could be rain gear if rain was predicted.

2    Gloves, hand warmers -- one year there was Vodka, gold coins

3    representing Alaska.  We had one done for the Kenai River

4    Classic -- binoculars; cameras; turtlenecks; books; puppets;

5    cameras; each year was different.

6    Q.   Were you responsible for gathering the items that went

7    into those gift bags?

8    A.   I did not gather the items but I did put the bags

9    together for a couple of years.  We had a crew that did that.

10    Q.   And where would these items come from?

11    A.   They would come from -- the items came from Boeing, so

12    many different of the corporate entities; Alaska Pipeline

13    Services, Tesoro, the Alaska Mint, Gold Enhance.   We had

14    some Vodka one year, I'm not sure where that came from,

15    Russian Vodka.

16    Q.   On average, what were the value of the bags?

17    A.   You know, it is pretty hard to guess values but when you

18    go out shopping you understand things are more than you

19    expect.  I would expect that the value of the bags are more

20    than --

21         MR. CARY:  Objection, Your Honor.  She said it's

22    hard to guess.

23         THE COURT:  Yeah.  We don't want you to guess.

24         MS. MORRIS:  If you know.

25         THE WITNESS:  I would say $500, in that

1    neighborhood.

2    BY MS. MORRIS:

3    Q.    Now, would each participant receive a bag?

4    A.    Yes.

5    Q.    Would Senator Stevens receive a bag each year?

6    A.    Yes.

7    Q.    Would his wife receive a bag?

8    A.    Yes.

9    Q.    Let me ask you this, ma'am.  Now, with regard to the

10   Senator and his participation each year, were you responsible

11   for providing a gift to the Senator?

12   A.    Yes.

13   Q.    And what was that?

14   A.    It varied.  I was told not to find a gift for more than

15   --

16   Q.    Ms. Best, without saying what you were told, what did you

17   do?

18   A.    I would look for a gift that was -- had a value of no

19   more than $250.  The most memorable one I remember is we had a

20   woman in Matsui(Phonetic) who was a thalidomide baby, and she

21   actually sews dolls with her feet, threads the thread and

22   sews dolls, and I had one of those made and put into a frame

23   for his office because I thought it was a wonderful item that

24   shows what disabled Alaskans can do.  But it would be an item

25   of something of that sort.  We looked for Alaskan themes so it

1    would be appropriate for his office.

2    Q.   Why at that dollar value?

3    A.   It is my understanding that any item over $250 received

4    by a Congressional delegation member needs to be reported.

5    Q.   By whom?

6    A.   By the Congressional member; the individual U.S. Rep or

7    the Senator.

8    Q.   Ma'am, were there -- on a regular basis, were there guns

9    auctioned at --

10   A.   Yes.

11   Q.   And what type of guns?

12   A.   I'm a full time -- not a hunter.  Usually, shotguns.

13   They would be given to the Classic, and I would immediately

14   contact the manufacturer and tell them you have to write up

15   what this is.  I am not good at fishing poles and guns, and so

16   they would give me a written description because I couldn't

17   tell you a rifle from a shotgun.  That's -- my expertise is

18   not there.

19   Q.   Were there handguns?

20   A.   On occasion -- I think there was an occasion there was a

21   handgun.  There were generally rifles.  You know, ones you

22   would shoot deer or moose or --

23   Q.   Hunting.

24   A.   -- birds -- hunting rifles, yes.

25   Q.   Ma'am, every year, were these guns auctioned?

1     A.    We would have one or two for auction, yes.

2     Q.    How much would they range in price?

3     A.    In the neighborhood of a thousand dollars.

4     Q.    Every year that you were given guns, was Senator Stevens

5     also given guns?

6     A.    Yes.

7     Q.    Was it the same type of gun that was being auctioned?

8     A.    Yes.

9     Q.    Was his different in any way?

10    A.    The presentation gun for Senator Stevens was engraved

11    with his name.

12    Q.    Ma'am, I'd like to direct your attention to 2002.

13    A.    Okay.

14    Q.    Did you participate in the Classic that year?

15    A.    Yes, I did.

16    Q.    Now, do you remember a particular item, a fish sculpture,

17    that was auctioned?

18    A.    Yes.

19    Q.    What was your involvement with getting that item to

20    auction?

21    A.    The fish -- this was a bone of contention and leading to

22    the end of me participating in the Kenai River Classic.  Kenai

23    River Classic purchased that item. Up until that point we had

24    solicited items, and the then executive director had actually

25    purchased this item and I was -- had some reservations for an

1    item that large, the value coming back because I worked very

2    hard to make sure there was a profit.

3    Q.   When you say an item that large, do you mean physically

4    that large or quantitatively value wise?

5    A.   Value wise.

6    Q.   And how much was it?  How much did you purchase the

7    sculpture for?

8    A.   It was purchased for $30,000.

9    Q.   And did that item go up for auction during the 2002

10   Classic?.

11   A.   Yes, it did.

12   Q.   Who purchased it?

13   A.   It was purchased by a consortium of different

14   corporations.  That night, one corporate lobbyist came to me

15   and said we're putting a consortium together to purchase this

16   fish sculpture for the Senator's library.

17   Q.   And the Senator would be whom?

18   A.   Ted Stevens.

19   Q.   And his library where?

20   A.   You know, I didn't really think about that that night;

21   that usually Senators don't have libraries.  Presidents do.

22   It just kind of went over my head so I had no idea where the

23   library was because I was not paying attention to that

24   particular statement.

25   Q.   How much did the sculpture sell for?

1    A.    In the neighborhood of $29,000.

2    Q.    Who were the individuals involved in putting together

3    money towards this statute?

4    A.    There were 10 -- I don't remember them all, it has been a

5    couple of years.  Bill McCay from Alaska Airlines.  He was the

6    lobbyist.  Carl Marrs; Bill Allen; Bob Penney, Sam

7    Kito(Phonetic)

8    Q.    Who is Sam Kito and who is Bill Marrs?

9    A.    Carl Marrs -- I'm sorry.

10    Q.    Carl Marrs.

11    A.    Carl Marrs is with Suri (Phonetic) and Sam Kito had an

12    import business, I believe.

13    Q.    If there were 10 individuals as part of this consortium

14    for a $29,000 purchase, roughly everyone put in $3,000?

15    A.    Roughly, yes.

16    Q.    And a $29,000, was that less than what the Classic paid

17    to get the item on auction?

18    A.    Correct.

19    Q.    Ma'am, I'd like to show you what's been marked -- or

20    entered into evidence as Government's No. 70.  Just a moment.

21    A.    Glad I'm not the only one in a classroom that had this

22    problem.

23    Q.    Now, while we're getting that up, Ms.  Best, let me ask

24    you this:  With regard to that statue, who was responsible for

25    getting the statue -- after it was purchased -- getting the

1    statue shipped somewhere?

2    A.    I was.

3    Q.    And how was that item physically transported?

4    A.    You have to understand, not only was it a big item, it

5    was a heavy item.  And so locating someone to ship it was a

6    bit of a problem.  I did -- in any time you're doing volunteer

7    work you pick on all your friends.  That's the easiest way to

8    get things done.  So I contacted River Sea Marine and asked

9    them to come over and crate it up because they know how to

10   crate and then I contacted Gary Foster of London Transport and

11   asked him if he could get it to the Anchorage area.

12   Q.    Where was the statue going?

13   A.    I understood that it was going to D.C.  My job was to get

14   it out of the sports center before they got the ice down for

15   the hockey rink.  Once it was crated, I contacted Gary Foster

16   and asked him to check with Kenai River Sports Fishing office

17   to get a delivery address.  He was to get it to the Anchorage

18   area, and from then I did not track it from there.

19         MS. MORRIS:  Could you hold on just a second,

20   please?

21         THE COURT:  If you want, counsel, you can use the

22   paper and put it on the Elmo.

23         MS. MORRIS:  Yes, I'll use the Elmo if I can.  This

24   is black and white.

25         MR. CARY:  We can put it up on ours, Your Honor.

1              MS. MORRIS:  If you don't mind, if you can, that

2     would be great.

3              THE COURT: Sure.  Thank you, counsel.

4              MS. MORRIS:  Thank you.

5              MR. CARY:  Ours isn't working either.

6              MS. MORRIS:  All right.  I'm going to go back to the

7     Elmo.

8              THE COURT: Maybe we need to call John.  Give John

9     Cramer a call.

10             MS. MORRIS:  All right.  This is --

11             THE WITNESS:  I actually didn't see it in all those

12    different views.

13             MS. MORRIS:  No, Judge, I wasn't supposed to use the

14    Elmo.  This wasn't supposed to be me.

15             THE WITNESS:  There you go.

16             MS. MORRIS:  Thank you, Rob.

17             THE COURT: Spirit of collegiality.

18    BY MS. MORRIS:

19    Q.   Ms. Best, looking at the -- what's been entered into

20    evidence as Government's Exhibit No. 70, do you recognize

21    this?

22    A.   I do, but I don't remember the lights being on it.

23    Q.   Okay.

24    A.   It did have the rock bottom and a wooden base.

25    Q.   And hopefully maybe before you get off the stand we can

1     show you a picture in color.  But would that be the statue

2     that was purchased back in 2002 at the Classic?

3     A.    That is correct.

4     Q.    This is a little better, but not much.  Okay, same thing,

5     right?

6     A.    Same thing.

7     Q.    We'll get you a better picture later.  Thank you.  Now,

8     Ms. Best, directing your attention to the year of 2003; did

9     you participate in the Classic that year?

10    A.    Yes.

11    Q.    And the same thing; were you involved in getting the gift

12    bags together that year?

13    A.    The gift bags that year?

14    Q.    Yes.

15    A.    No, I did not help with the gift bags that year.

16    Q.    Were the gift bags given out that year?

17    A.    Yes, they have always been given out.

18    Q.    Did you have any participation with regard to the auction

19    itself?

20    A.    Yes.

21    Q.    And the items that were put up for auction?

22    A.    I generally solicited all the items for the auction.

23    Q.    That year in 2003, were there guns auctioned that year?

24    A.    Yes.

25    Q.    And did Senator Stevens receive a gun that year?

1    A.    Yes.

2    Q.    Was his name engraved on that gun?

3    A.    Yes.

4    Q.    Was the same gun or a duplicate of that gun actually

5    auctioned off that year?

6    A.    That's correct.  It was always nice to have his name on

7    the gun because we knew which gun was which.

8    Q.    How much roughly did that gun go for that year?

9    A.    Probably around a thousand dollars.  It's been five years

10    so when your auctioning off 400 items, it is a little

11    difficult to remember which item went for what.

12    Q.    But a thousand dollars would be about the base?

13    A.    Generally, yes.

14    Q.    Ma'am, let me ask you: was there a particular item that

15    year, a dog, that was auctioned off?

16    A.    Yes.  One of the things about doing auctions when you

17    have the same people coming back each year is you have to find

18    new and exciting things.  You can only auction off so many

19    ATVs or two stroke motors or guns or trips, you know.  If you

20    have the same people coming back, you have to have something

21    new.  We always try to do some really Alaskan things.  I came

22    up with the brilliant idea of having an Iditarod puppy

23    auctioned off.

24    Q.    Would you please explain to the jurors what an Iditarod

25    puppy is?

1    A.    Well, the Iditarod is very important to Alaskans.  It

2    commemorates the dog sled team that took the diphtheria serum

3    from –– to Nome because the village of Nome had a horrendous

4    outbreak of diphtheria, and so the only way in the middle of

5    winter to get there was by sled dog, and each year we have an

6    annual race.  I think the mileage is 1,021 miles, and it

7    generally has a ceremonial start, usually in February from

8    Anchorage, and they actually get on the trail and race from

9    Wasilla to Nome.  The route is different each year but it is

10   the same miles.

11   Q.    So where did you receive this Iditarod puppy from?

12   A.    I contacted a friend that was also very involved in the

13   Kenai River Classic, our Alaska state balladeer, Jim Varsos,

14   and he has several friends who run the Iditarod.  In fact, Jim

15   wrote the theme song for the Iditarod, and he was able to

16   obtain a puppy for me.

17   Q.    Is he also referred to by Alaskans as "Hobo Jim?"

18   A.    That is Hobo Jim, yes.

19   Q.    And once you received this puppy, what did you do?

20   A.    Hobo kept it for a day or so.  We had it a couple of days

21   early.  We did not put it in the auction book; it was kind of

22   like the surprise item for that night.  I had a couple of

23   teenage girls who walked around with the puppy in a basket and

24   showed it off.  Everybody cooed, and they're really cute

25   puppies, and loved it a little bit.

1    Q.    And did anyone in particular take a liking to the puppy?

2    A.    Well, I did notice that the Senator liked the puppy.

3    Q.    Did the puppy actually sell?

4    A.    Yes, he did.

5    Q.    Did the puppy sell at the live or the silent auction?

6    A.    At the live auction.

7    Q.    And how much did the puppy sell for?

8    A.    The puppy sold for a thousand dollars.

9    Q.    Was it announced that the price of the puppy was a

10   thousand dollars?

11   A.    Yes, it was.

12   Q.    Who purchased puppy?

13   A.    The puppy was purchased by Bob and Jeanne Penney.

14   Q.    And did Bob or Jeanne Penney give the puppy to Senator

15   Stevens?

16   A.    Yes.

17   Q.    How do you know that?

18   A.    The Senators wife, Kathryn Stevens, came up to me and

19   gave me a business card with her home, her cell number, her

20   office number in Washington D.C.  So that when I made

21   arrangements for shipment of the puppy, I could let them now.

22   Q.    And you were going to ship that puppy where?

23   A.    To Washington, D.C.

24   Q.    To their home in Washington, D.C.?

25   A.    Yes.

1    Q.    Ma'am, I'd like to show you for identification what's

2    been marked as Government's Exhibit No. 239.  Could you blow

3    it up a little bit?  Good.

4         Ms. Best, is that exhibit up on your screen?

5    A.    Yes.

6    Q.    And do you recognize that?

7    A.    Yes.  It's the Kenai River Classic Auction '03 billing;

8    you'll notice that that is up in the upper left-hand corner,

9    to Robert Penney.  Bob was very busy with the Senator and

10   after the auction he would immediately take him back to his

11   own home, Bob Penney's home.  So every year we would have to

12   garner all of the items that he purchased and actually make

13   out a bill like this, and then take it to Bob Penney, the bill

14   and the items.

15   Q.    So are you talking about when -- garner up the items that

16   he purchased, are you referring to Mr.  Penney?

17   A.    Yes.  I'm referring to Mr.  Penney.

18         MS. MORRIS:  Judge, at this time I'd like to move

19   Government's Exhibit No. 239 into evidence and publish it for

20   the jury?

21         THE COURT:  Any objection?

22         MR. CARY:  No objection.

23         THE COURT: Admitted.

24         THE WITNESS:  You'll notice on the left-hand side

25   with the category number, there will be an (O), it says (O),

1    and there will be a dash and ten.  That means it was the

2    outcry or the live auction; if it had something like an (S)

3    that would be a Sockeye table or a (K) would have been the

4    King table.  As I stated before, we named the silent auction

5    tables after fish.

6    Q.   So on this particular -- during the 2003 auction, it

7    looks like Mr.  Penney purchased three items?

8    A.   That's correct.

9    Q.   One being a necklace, one being a puppy, and one being a

10   signed print.

11   A.   The signed print -- every year I got a print of the Kenai

12   River and at the welcome dinner had all of the Congressional

13   delegations and the sports figures that attended sign that

14   print, and then I would take it to a framer and they would

15   have it framed in time for the auction.  So it was kind of the

16   one time each year item.

17   Q.   So it's safe to say that that item would have all the

18   signatures of the members of Congress that were coming here?

19   A.   Yes.

20   Q.   And the second item being (O)-23?

21   A.   Correct.

22   Q.   Is that the Alaskan sled dog that we were talking about?

23   A.   That is correct.

24   Q.   And the worth or the value, fair market value, of the

25   puppy was how much?

1    A.    $500.

2    Q.    And this shows that it was actually auctioned off at what

3    amount?

4    A.    One thousand.

5    Q.    Do we have Exhibit No. 70?  We're going to show you now

6    Exhibit No. 70, Ms. Best, so that you can see that.  Now we

7    have a color picture.

8    A.    Ah!  That looks more like it --

9    Q.    That looks more like it.

10   A.    -- with the exception of the lights.  I do not remember

11   the lights.

12   Q.    All right.  Now, Ms. Best, let me show you what has been

13   marked for identification Government's Exhibit No. 240.  Ms.

14   Best, do you recognize that?

15   A.    Yes.

16   Q.    What do you recognize it to be?

17   A.    This is the business card that Senator Stevens' wife gave

18   me with the numbers to contact her when I had made

19   arrangements for the shipment of the puppy.

20        MS. MORRIS:  Judge, at this time the Government

21   would ask that Government's Exhibit No. 240 be entered into

22   evidence and published to the jury.

23        THE COURT: Any objection?.

24        MR. CARY:  None, Your Honor.

25        THE COURT: Admitted.

1    BY MS. MORRIS:

2    Q.    And let me just approach for a moment because I believe

3    that's a copy.  Ms.  Best, I'm showing you the original of

4    Government's Exhibit No. 240.  Now, what's on the screen is

5    what?  Compared to what I just handed you.

6    A.    Well, the upper portion is the front of the card and on

7    the back has the Anchorage office.

8    Q.    So that would be the bottom portion of the card --

9    A.    That would be the bottom portion of the card.

10   Q.    That's on the screen?

11   A.    Uh-huh.

12   Q.    Just one moment, please.  Going back to exhibit --

13   Government's Exhibit No. 70.  Ms.  Best, with regard to the

14   fish statue.

15   A.    Yes.

16   Q.    At the base of that statue there appears to be something

17   wooden; do you know what that is?

18   A.    That looks like the crate that we crated in, at least a

19   portion of the crate.

20   Q.    When you originally had it shipped from --

21   A.    From the sports center.

22   Q.    And it was your understanding that that item was going

23   where?

24   A.    My understanding it was going to the Senator's library.

25   My responsibility was to get it out of the sports center.

1    That was the big thing.  The Kenai River Sports Fishing

2    Association gave the transit company the address.  I had no

3    part of it; I got it boxed, got the shipping company, told

4    them to contact them for the exact shipping address.  I had no

5    idea if it was going to Alaska Airlines or FedEx, one of the

6    two, or whether it was going to the freight office or

7    whatever.  The Sports Fishing Association took care of the

8    address of where it was to be shipped.

9            MS. MORRIS:  Okay.  Thank you very much.

10           THE COURT: All right.  Any cross-examination?

11           MR. CARY:  Yes, Your Honor.

12   **CROSS-EXAMINATION BY MR. CARY:**

13   Q.    Good afternoon, Ms. Best.  My name is Rob Cary and I

14   represent Senator Stevens.

15   A.    Good afternoon.

16   Q.    The Kenai Sport Fishing Association was founded, you

17   said, in 1994?

18   A.    I believe 1994.

19   Q.    And Bob Penney was one of the founders,  right?

20   A.    Yes, he was.

21   Q.    And was Ted Stevens involved in the founding?

22   A.    It is my understanding that Senator Stevens was with it

23   from the beginning.  I came on a couple of years later.

24   Q.    Okay, and it was founded in order to protect the Kenai

25   River, correct?

```
 1    A.   And habitat, yes.  And do educational.  They were very
 2    big into education and as time went on they established a
 3    scholarship for students.
 4    Q.   Could you tell me about that scholarship just a little
 5    bit?
 6    A.   The scholarship was a little bit later.  It's, you know,
 7    for a student I believe that wants to go into biology.  You
 8    know, it was somewhere in the 2000s when it was established.
 9    It wasn't right at the beginning.
10    Q.   Sport fishing is an important part of the Alaskan
11    culture?
12    A.   Yes, it is.  It's one of three major fishing endeavors on
13    the Kenai Peninsula; there's commercial, personal use and
14    sports fishing.
15    Q.   I would have missed the personal use, but, okay, got it.
16    A.   Yes, sir.
17    Q.   So commercial fishing are the people who go out with nets
18    and whatnot and make a living fishing, correct?
19    A.   Yes.
20    Q.   And sport fishing or say maybe –
21    A.   Would be you and I with a reel down there getting wet
22    trying to get a Salmon.
23    Q.   And sometimes with a guide, perhaps?
24    A.   Yes, with guides sometimes.
25    Q.   And personal use, Alaskans are allowed to keep and smoke
```

1    and --

2    A.    Alaskans are allowed, residential Alaskans, you have to

3    have been in the state a year, are able to get a sport

4    personal use permit; the first individual in the family is

5    allowed 25 Salmon and each additional member, 10, and it's

6    generally also called "dip netting".  They'll go in -- with

7    nets out -- usually out into the mouth of the Cook Inlet and

8    dip fish either from shore or from their boats.

9    Q.    So -- but the purpose of the -- the charitable purpose of

10    the Kenai Sport Fishing Association was to preserve sport

11    fishing, right?

12    A.    Preserve sports fishing, yes.

13    Q.    And I think you mentioned several species of Salmon, the

14    King Salmon, correct?

15    A.    Correct.  That's the largest of the Salmon, and the most

16    -- the one that everybody wants to catch.

17    Q.    There's also another one known as Chinook Salmon?

18    A.    Yes, Chinook, or Pink.

19    Q.    There was concern about preserving those species,

20    correct?

21    A.    Yes.  Kenai River Sports Fishing Association actually did

22    a couple of programs along that line.  One was a lot of

23    education and there was another one called Release a Hog; and

24    if you catch a big one which they call hogs, the Kenai River

25    Sports Fishing Association would pay $800, I believe, towards

1    having a replica made of that fish.

2    Q.    So it got released and -- you take pictures, release it

3    --

4    A.    Yes.  Pictures, measurements, released, and then they

5    would build a replica.

6    Q.    You also mentioned accessibility to fishing with people

7    with disabilities?

8    A.    That's correct.  That's correct.

9    Q.    And I guess it is fair to say that the purpose of the

10   Kenai Sport Fishing Association was to make sure that that

11   beautiful Kenai River is there for future generations,

12   correct?

13   A.    Yes.  That's the habitat work they're doing, and

14   education in the schools.

15   Q.    And every year they have this event to raise as much as

16   money as possible for these charity purposes?

17   A.    That's correct.

18   Q.    You mentioned an auction.  It sounded like a lot of

19   people with substantial means go to that auction?

20   A.    Yes.

21   Q.    And a lot of them are not people that necessarily need to

22   buy things there but are spending money for a good cause,

23   right?

24   A.    That's correct.

25   Q.    Mr.  Penney, you said, was one of the -- do you know who

1   the other founders were besides Mr. Penney and Senator

2   Stevens?

3   A.   I believe Ellen Norvil(Phonetic) was involved in it and

4   I'm guessing at names at this point in time.

5            THE COURT: Yeah, we don't want you to guess, ma'am.

6   If you don't know, don't --

7            MS. MORRIS:  We don't want you to guess.

8   BY MR. CARY:

9   Q.   Mr. Penney was very generous over the years with the

10  Kenai Sport Fishing Association, right?

11  A.   Yes, he has.  He served as chairman, several years on the

12  board of directors.

13  Q.   I guess he was generous with his time, correct.

14  A.   That's correct.

15  Q.   He was board member?

16  A.   That's correct.

17  Q.   And chair of the board?

18  A.   That's correct.

19  Q.   And he was generous with his money as well, right?

20  A.   Yes.

21  Q.   And he contributed his house for a dinner every year?

22  A.   That's correct.

23  Q.   And you testified that he paid a thousand dollars for a

24  puppy in I believe it was 2003?

25  A.   Yes, I believe it was.

1    Q.   And as somebody who was a board member and a chair, he

2    certainly had the ability to give that puppy back to the Kenai

3    Sport Fishing Association if he wanted to, didn't he?

4    A.   He could have.

5    Q.   Who is Ron Rainey?  Do you know that name?

6    A.   Rob Rainey is retired; he was the CEO of Homer Electric

7    Company.

8    Q.   Was Ron Rainey the chair of the Kenai Sport Fishing

9    Association at one point in time?

10   A.   Yes.

11   Q.   And as the chair, he certainly had the ability to

12   contribute -- give the puppy to Senator Stevens from the Kenai

13   Sport Fishing Association, correct?

14   A.   If he had purchased the puppy, yes.

15   Q.   If the puppy belonged to the Sport Fishing Association,

16   then he could give it to Senator Stevens, true?

17   A.   I would guess that would be true.  Bob Penney is the

18   person who purchased the puppy.

19   Q.   Do you recall that Bob Penney gave the puppy back to the

20   Association and Mr.  Rainey gave it to Senator Stevens on

21   behalf of the Association?

22   A.   No.

23          MR. CARY:  May I approach, Your Honor?

24   BY MR. CARY:

25   Q.   I've handed you what's been marked for identification

1    only at this point as Defendant's Exhibit No. 2561, and my

2    question for you, ma'am, is do -- have you seen that document

3    before?

4    A.    No.

5    Q.    Even though you haven't seen it before, does that

6    document refresh your recollection that the Kenai Sports

7    Fishing Association, in fact, gave the puppy to Senator

8    Stevens?

9              MS. MORRIS:  Objection, Judge.

10             MR. CARY:  I'm just asking if it refreshes

11   recollection.

12             THE COURT: Let me ask you this:  Do you have a

13   recollection?

14             THE WITNESS:  No.

15             THE COURT: You have no recollection?

16             THE WITNESS:   I have never seen this document --

17   that night --

18             THE COURT: Just a minute before we get to that.  So

19   that document doesn't refresh your recollection?

20             THE WITNESS:  No.  I have never seen it.

21   BY MR. CARY:

22   Q.    There was a business card before that was just put into

23   evidence.  Do you know what in fact happened to the puppies

24   after the night of the auction?

25   A.    Yes.  Hobo Jim, Jim Varsos(Phonetic) took the puppy; I

1    had made arrangements with  Bill McKay from Alaska Airlines to

2    ship the puppy to Washington D.C.  I actually snagged Bill

3    that night and said will you ship the puppy for me, and he

4    said yes.  Jim put the puppy on the plane to go to D.C.

5    Q.    And Jim is -- you call him Hobo Jim?

6    A.    Hobo Jim.  Yes.

7    Q.    And he's -- is he kind of the most famous singer from

8    Alaska?

9    A.    Yes.

10   Q.    At least these days?

11   A.    Yes.

12   Q.    And his real name is Jim Varsos, I take it?  As opposed

13   to a stage name.

14   A.    Uh-huh.

15   Q.    Do you know where he acquired the puppy that he in fact

16   donated?

17   A.    Yes.  I am trying to thing if Mackey is the insurer's

18   last name.  I am not sure, I think it is Lance Mackey.  He is

19   out of the Nelcheck (Phonetic) Clam Gulch area.

20   Q.    Does the name "Dean Osmar" mean anything to you?

21   A.    Yes.

22   Q.    Any chance that Dean Osmar --

23   A.    It could have been Dean Osmar -- I'm sorry.  This was

24   five years ago.  I don't remember totally who he got it from

25   but he had picked it up.

```
1     Q.   Did you ever check with Dean Osmar to see what the value
2     of the puppy was?
3     A.   Jim listed the puppy for me.  I never talked to Dean
4     Osmar, if he was the donor, directly.
5     Q.   And, ma'am, do you know for a fact whether Senator
6     Stevens in fact disclosed this puppy on his Senate financial
7     form?
8     A.   I would have no way of knowing.
9     Q.   Now, the puppy that night received attention from a lot
10    of people, correct?
11    A.   That's correct.
12    Q.   And there was no one special person who gave it more
13    attention than others, was there?
14    A.   No.  Once the puppy had been purchased, Senator Stevens
15    carried him around the room for quite awhile.
16    Q.   After it had been purchased?
17    A.   Yes.
18    Q.   You testified about some guns that were engraved?
19    A.   Yes.
20    Q.   Was it your understanding that once those guns were
21    engraved they lost their retail value?
22    A.   I was told that they were.  I didn't believe it but I was
23    told they were.
24    Q.   That was your understanding?
25    A.   I was told that that was the truth.  I did not believe
```

1    it.  But that's what I was told.

2    Q.    These guns that were presented to Senator Stevens, there

3    was a matching gun that was usually auctioned off; is that

4    correct?

5    A.    That's correct.

6    Q.    And the idea of presenting a gun to Senator Stevens was

7    to generate more enthusiasm for the other gun; is that

8    correct?

9    A.    I don't think so.  I just think the other gun was

10   auctioned off first and they would give Senator Stevens the

11   gun.

12   Q.    Was -- part of the purpose of the gun was to recognize

13   Senator Stevens for helping to found this Classic and being a

14   good supporter for so many years?

15   A.    The gun was always donated by the manufacturer.  I never

16   felt that it was something that the Classic -- the Kenai

17   Sports River Association solicited.  It was more the

18   manufacturer wanted to present Senator Stevens with a gun.

19   Q.    And that was done at a presentation every -- in front of

20   lots of people, correct?

21   A.    It was done at the auction, yes.

22   Q.    And how many people attended the auction usually?

23   A.    Three, 400.  There would be local mayors, there would be

24   other individuals that were not necessarily part of the

25   tournament but were local quote unquote "dignitaries" that

1     would attend that.

2     Q.    Now, you mentioned presidential libraries; you have heard

3     of presidential libraries?

4     A.    Yes.

5     Q.    And those are traditionally places where former

6     presidents keep their papers; is that what you --

7     A.    That's correct.

8     Q.    And it is true, is it not, that Senator Stevens has been

9     Alaska's Senator for 39 years or so, I think?

10    A.    I believe it is 40 years.

11    Q.    Pretty much 40 years?  And is it also true that -- your

12    understanding anyway that even before he was a Senator from

13    Alaska, he helped draft the legislation that allowed Alaska to

14    become a state about 50 years ago?

15          MS. MORRIS:  Objection, Judge.

16          THE COURT: Sustained.

17    BY MR. CARY:

18    Q.    In the 40 years or so that the Senator has been a United

19    States Senator, he probably has acquired lots of papers and

20    documents; would that be your understanding?

21    A.    I would imagine that any U.S. Senator has a lot of

22    documents.

23    Q.    And, ma'am, does it make sense that there in fact should

24    be library --

25          THE COURT: I think it is argumentative, counsel.  It

1      is argumentative.

2      BY MR. CARY:

3      Q.   Do you know whether or not there is foundation that

4      exists that has raised money to build and dedicate a library

5      or dedicate space for a library in honor of Senator Stevens?

6      A.   I had not heard of that.

7              MR. CARY:  No further questions, Your Honor.

8              THE COURT: Any redirect?

9              MS. MORRIS:  Just one question.

10     BY MS. MORRIS:

11     Q.   Ms.  Best, is Senator Stevens a charity?

12     A.   Pardon me?

13     Q.   Is Senator Stevens a charity?

14             MR. CARY:  Your Honor --

15             THE COURT: It's fair question.

16             THE WITNESS:  Not that I know of.

17             MS. MORRIS:  Nothing further, Judge.

18             THE COURT: All right.  You can step down.  Watch

19     your step stepping down.  You may be excused, and please do

20     not discuss any aspect of your testimony with anyone, all

21     right? Have a safe trip back.  Be careful stepping down.

22             Ladies and gentlemen, we're going to start the

23     testimony of the next witness in 15 minutes.  It wouldn't make

24     sense to start it and then give you a recess in 15 minutes.

25     So we'll take a recess a little bit earlier and we'll take a

1    15 minute recess.  I will not keep you past 4:45 but we're
2    going to start with the next witness in 15 minutes.  I need to
3    speak with the attorneys for a few minutes.

4            All right?  We'll see you in 15 minutes.

5            (Whereupon, the jury exits the courtroom for a brief
6    recess.)

7            THE COURT: All right, counsel, before I forget, with
8    respect to the business cards posted on the Court's ECF
9    system, I think it's appropriate that the witness' office
10   address and cell number be redacted.  I think that document is
11   important so you can -- so that's one thought that occurs to
12   me.  It could be sealed for the record, the original document,
13   but if it is going to be posted, just redact the cell number
14   and the law firm name and number.

15           MS. MORRIS:  Judge, I think the law firm name and
16   number are kinda out there in the public, but with regard to
17   her specific numbers, if it's a direct line to her and it's a
18   direct to her cell, we'll take that off.

19           THE COURT: All right.  That's fine.

20           I need to make a few rulings with respect to the
21   Speech and Debate issue, and I have already addressed the
22   Senator's son.  And it is clear that the witness will refer to
23   him as what, Witness (B), or which one?  I'm talking about
24   Allen.  Allen is the next witness; is that correct?

25           MR. BOTTINI:  I'm sorry.

1            THE COURT:  Allen is the next witness?

2            MR. BOTTINI:  He is, sir.  Yes.  When we get to that

3    topic, I plan to just ask Mr.  Allen if he pled guilty to

4    bribing multiple state legislators and just leave it at that.

5            THE COURT: If you need to lead him over there,

6    that's fine.  He's aware that he should not mention that name

7    though, correct?

8            MR. BOTTINI:  He is aware of that, yes.

9            THE COURT:  With respect to the Speech and Debate

10   issues, I have reviewed the government's proposed exhibits and

11   the objections.  I don't see any Speech or Debate issues with

12   respect to Government Exhibits No. 167, 416, 846, 847, 848,

13   and 849; , though, there was a best evidence objection made.

14           My understanding is that the government has the

15   original document; is that correct?  Assuming you do, then you

16   can utilize it.

17           MR. BOTTINI:  We're not going to go through 849

18   with Mr.  Allen.

19           THE COURT: All right.  That's fine.  With respect to

20   343 though, I think that I don't find any Speech or Debate

21   violation.  I just don't think it's necessary to admit into

22   the evidentiary record Page 2 of 343.

23           Page 343 -- Exhibit 343 is fine with the exception

24   of the last paragraph that does refer to legislation.  I don't

25   think that detracts from the government's exhibits, but I'll

1       direct that that last paragraph on Page 343.01, be redacted,

2       and that Page 002 of that exhibit not be presented to the

3       jury.

4              With respect to the e-mail evidence, I find that the

5       government can introduce the e-mail evidence pursuant to

6       801(d)(2)(E) of the Federal Rules of Evidence.

7              With respect to the statutory rape investigation, my

8       understanding is that there were two for Allen; is that

9       correct?

10             MR. BOTTINI:  I'm sorry, Your Honor.

11             THE COURT: The statutory rape investigations, there

12      were two for Allen?

13             MR. BOTTINI:  That's correct.

14             THE COURT: All right.  I'm not sure if the

15      government plans to go into that area but if you do, proceed

16      very carefully.  You may inquire if you want; I'd be surprised

17      if you go into that area.  But if you do go into that area, I

18      don't want any references to the nature of the charge because

19      I think that the nature of those charge might tend to inflame

20      the prejudices or bias of those jurors.

21             I think it's fair for both sides and the same

22      restriction goes to defense counsel;  you can inquire about

23      those two investigations, but the nature of the offense,

24      indeed, any reference to statutory rape will not be permitted

25      because that would tend to inflame prejudices or biases.  But

1    I think it's fertile ground for an inquiry about the witness'

2    state of mind and what he would like the government to do in

3    an effort to curry favor.  I think that goes to his bias, his

4    motivation to speak the truth or not.  I will allow that

5    examination.  With respect to the appropriate scope of any

6    further cross-examination, I'll deal with that after direct

7    examination is concluded.

8              MR. BOTTINI: Understood.

9              THE COURT: I don't think I need to make any

10   additional rulings.  Is anyone asking for any additional

11   rulings before we hear from Mr.  Allen?

12             MR. CARY:  Your Honor, may we place a continuing

13   objection on the Speech or Debate issue.

14             THE COURT: Absolutely.  You have noted your

15   objection, absolutely.  Are you asking for any appropriate

16   instruction at this time?

17             MR. CARY:  We do have that instruction that we gave

18   that we would like presented, and I think I gave the docket

19   numbers last night.

20             THE COURT: Are you asking that the Court give it at

21   any point during the testimony or just in final?

22             MR. CARY:  I think it would be appropriate the first

23   time that it is -- that official acts are raised in this

24   testimony, I believe, Your Honor, or maybe at a break,

25   scattered throughout.

1                    THE COURT:  What's your request?  I need to know

2          what your request is.

3                    MR. CARY:  Our request, Your Honor, is when that

4          particular --

5                    THE COURT: I know you don't want it in, that's your

6          request.  Keep their evidence out.

7                    MR. CARY:  Yes, that's our first request.  Our

8          second request is when that evidence is first presented that

9          an instruction be read.

10                   THE COURT: That's fine.  I don't know if I can put

11         my hands on that right now.  Was that submitted over the

12         weekend?  We can get a copy of it.

13                   Any objection?   Any objection?

14                   MR. MARSH:  I apologize, Your Honor.  Nicholas Marsh

15         for the government.  We did have an objection to the proposed

16         instruction.  As the Court -- we filed an alternative

17         instruction of our own which was filed I think --

18                   THE COURT: Well, we're going to take a short recess.

19         I'll look at both of them over the recess.  Anything else?

20         Any additional requests?

21                   MR. CARY:  Just to clarify, our continuing objection

22         is to the exhibits that we've identified.

23                   THE COURT:  I know.  It's clear.  You filed your

24         e-mail objections.  You can object for the record.  You can

25         say the words "Speech and Debate", and I'll overrule it for

1    the record.  You preserved your objection and, you know, you

2    have not waived your continuing objection to the Speech and

3    Debate evidence.

4              MR. CARY:  And, Your Honor, our preference is not to

5    interrupt the witness' testimony and simply to have a

6    continuing objection.

7              THE COURT:  That's fine. That's clearly noted.  All

8    right.  I have not given any -- I've given curative

9    instructions, maybe one or two, when I thought it was

10   appropriate.  I may or may not give -- I probably will give

11   the witness -- strike that -- the instruction with respect to

12   the conviction of the witness so that the jurors can evaluate

13   as they listen to his testimony -- he has, what, one prior

14   felony conviction or how many?

15             MR. BOTTINI:  He's pled guilty to three separate

16   felonies.

17             THE COURT:  All right.  I'll give the instruction.

18   You plan to bring that out in your case-in-chief I assume?

19             MR. BOTTINI:  Certainly, yes, sir.

20             THE COURT: I'll give the instruction after that.

21   We're going to take a shorter recess than the jurors,

22   counsel.  I'll give you a 10-minute recess, and we'll proceed

23   as far as we can with Mr. Allen, and we'll have to bring him

24   back tomorrow.  There's no need to stand.  We'll stand at  a

25   short recess.

1                    (Whereupon, there was a brief recess at this time.)

2                    THE DEPUTY CLERK:  Please remain seated and come to

3      order.

4                    THE COURT: Counsel, my recollection is that the

5      Government said about five -- five-and-a-half hours for

6      direct?

7                    MR. BOTTINI:  More or less, Your Honor.

8                    THE COURT: We can probably -- let's see.  A lot of

9      the testimony will be something other than speech or debate

10     questions then?  Why don't we stick with that area other than

11     speech or debate.  I would like the government to search its

12     files and provide the court, as well as defense counsel, with

13     a copy of the speech or debate instruction that was given in

14     the Rostenkowski, a 1995 case, as well as the Cisneros case.

15     I believe that was a case tried before Judge Urbina.

16                    I'd like to take a look at both of those

17     instructions.  I'm not enthusiastic about either of the

18     submissions, but I would like to take a look at instructions

19     that have been given in cases that have been appealed and

20     withstood appellate scrutiny.  If there are other cases, I

21     don't think Safavian was a 10-01 case, was it?

22                    MS. MORRIS:  Yes, it was, Judge.

23                    THE COURT: It was -- all right.  But not Speech or

24     Debate issues, but those two cases -- I think Cisneros, and

25     definitely Rostenkowski, and I'm pretty sure Cisneros was --

1    involved some Speech or Debate Issues.  I believe.

2         MS. MORRIS:  I know we may have some issue with

3    finding Rostenkowski.  I've already put out there we're

4    looking for a Rostenkowski instruction, but we haven't had

5    luck so far, but we'll still keep looking.

6         THE COURT: We'll take a look, and it's an old case.

7    It's not on ECF system.  We might still have the case jacket

8    here, I just don't know.  We'll take a look, as well, this

9    evening.

10        MS. MORRIS:  Some of the prosecutors are still

11   around, Judge.  I have asked, no one has it so far.

12        THE COURT: Any other cases prosecuted recently in

13   this jurisdiction within the last 10 years, Speech or Debate

14   issue cases?  Brewster was a Supreme Court case.  I think it

15   was -- all right.  Any help you can give me -- I have already

16   contacted Judge Urbina, as well, to see if he has a copy of

17   the Cisneros instruction.  I want to take a look at both of

18   those.

19        MS. MORRIS:  All right.  Thank you.

20        THE COURT:  All right.  Good afternoon, sir.  How

21   are you today?

22        THE WITNESS:  Good.  How are you?

23        (Whereupon, the jury enters the courtroom at this

24   time.)

25   *              *              *              *

1          **Bill Allen**, called as a witness in this case, after

2     having been duly sworn, testified as follows:

3     *                    *                    *          *

4               THE DEPUTY CLERK:  Have a seat.

5               THE COURT: Good afternoon.  You're going to have to

6     keep your voice up and just speak into that microphone, okay?

7               THE WITNESS:  All right.

8     **DIRECT EXAMINATION BY MR. BOTTINI:**

9     Q.   Sir, let's start by having you state your name and spell

10    your last name for the record.

11    A.   Bill James Allen; A-L-L-E-N.

12    Q.   Mr. Allen, can you here me okay?

13    A.   Yes.

14    Q.   All right.  How are old are you?

15    A.   I'm 71.

16    Q.   Sir, how old are you?

17    A.   Where were you born?

18    A.   Socorro, New Mexico.

19    Q.   What's your date of birth?

20    A.   April 6th, 1937.

21    Q.   Where do you live right now?

22    A.   In Anchorage, Alaska.

23    Q.   How long have you lived in Alaska, Mr. Allen?

24    A.   About 40 years.

25    Q.   Before we go any further, sir, let me ask you, were you

1    involved in an accident here about six or seven years ago

2    involving a motorcycle accident?

3    A.    Yes.

4    Q.    Can you tell the jury what happened to you?

5    A.    I was going from Anchorage to Palmer and I was doing

6    about 50, 55, and I looked up and seen there was a camper that

7    didn't have any lights and it was real close.  I tried to go

8    out on the right side and it was the guard -- road guard, and

9    I tried to go on the other side and the cars were coming this

10   way, so I had to lay it down.  Before I hit the car, the

11   banker -- the company -- the camper, and so I laid it down

12   where we wouldn't hit it.

13   Q.    Did you sustain a head injury as a result of that

14   accident?

15   A.    Yes.

16   Q.    Do you remember the date of that accident?

17   A.    I'm sorry?

18   Q.    Do you remember the date of that accident?

19   A.    I think it was 2 0 1 -- It was in January -- July -- some

20   where around 20 -- July the second -- July the 21.

21   Q.    All right.  And in 2001?

22   A.    Yes.

23   Q.    Now as a result of the accident, did you sustain a brain

24   injury?

25   A.    Yes.  They said that there was about a quarter in my

1    speech -- about a quarter over in my speech part of your brain

2    and about a quarter was -- had died.

3    Q.    You are indicating the size of about a --

4    A.    A quarter.

5    Q.    Coin.

6    A.    Yes.

7    Q.    And you said that it is in an area of your brain that

8    affects your speech; is that correct?

9    A.    Yes.

10   Q.    How does that brain injury actually affect your ability

11   to speak?

12   A.    It does.  It was pretty bad there for three to four

13   months, and then as you go along, I guess your brain rewires

14   itself.

15   Q.    Okay.  Do you still have trouble expressing yourself

16   sometimes?.

17   A.    Sometimes, I can see the word or the picture and

18   sometimes it won't go through my lips.

19   Q.    The transmission lines between your brain and your

20   expressing yourself through your speech, that's what's

21   affected?

22   A.    Yes, uh-huh.

23   Q.    Have you had any problem with your memory as a result of

24   this accident?

25   A.    No, I don't think so, none.

1    Q.    Now you said you were born in New Mexico.  is that

2    correct?

3    A.    Yes.

4    Q.    What size family do you come from?

5    A.    There was four girls and four boys.

6    Q.    And where did you fall in the line up there?

7    A.    I was about in the middle.

8    Q.    Did you grow up in New Mexico?

9    A.    No.  We took off New Mexico and went to Oregon.

10    Q.    How old were you when you moved today Oregon.

11    A.    I think about eight, nine, something like that.

12    Q.    At that time when you moved to Oregon, what did your

13    folks do to provide for the family?

14    A.    We were worked on the fields -- in the fields.  We picked

15    up picked fruit and sometime we hoed a little bit, you know,

16    like with a -- weeds.  We hoed some weeds.

17    Q.    Before you left New Mexico, had you already started

18    school?

19    A.    Yes.  When you got to Oregon, did you continue with your

20    schooling?

21    A.    No.  I think about a year, year-and-a-half, I didn't go

22    to school.

23    Q.    Why was that?

24    A.    Because we were work -- we had to make money to live.

25    Q.    Now, how old were you when you started back to school?

1    A.   I think I was in the fifth grade; that would be about

2    what?  Ten -- nine or ten, something like that.

3    Q.   Could you read and write at that point?

4    A.   No.

5    Q.   When you started back to school, were you able to catch

6    up?

7    A.   Yes.  I had a couple of real good teachers and by the

8    time I was out of the seventh grade, I was right at the top of

9    the class.

10   Q.   How long did you live in Oregon, Mr.  Allen?

11   A.   Until I was about 15 and we left and went back to Gallup,

12   New Mexico.

13   Q.   When you moved back to New Mexico, did you continue with

14   your schooling?

15   A.   No, I couldn't.

16   Q.   What happened?

17   A.   I had to support my mother and other brother and sisters.

18   Q.   How old were you at that time?

19   A.   15.

20   Q.   What kind of work did you find at age 15?

21   A.   I got a job helping a welder.

22   Q.   All right.  You -- helping a welder, can you explain a

23   little bit more about that?  What did you actually do?

24   A.   Well, every welder has a helper, and you have to do a lot

25   of grinding on the bevels, clean the slag off the weld.  And

1    go get fillings -- fittings and things like that.

2    Q.    Okay.  Now when you quit school, you said you were 15

3    years old;  is that right?

4    A.    Yes.

5    Q.    Is that as far as you went in school?.

6    A.    Yes.

7    Q.    Were you working for a particular company when you

8    started out as a welders helper?

9    A.    Yes.  El Paso Natural Gas.

10   Q.    What type of projects were you working on then?

11   A.    On compressor stations and some of those little

12   refineries where they take all the liquids out of the natural

13   gas.

14   Q.    El Paso Natural Gas, I take it, was in the natural gas

15   industry; is that correct?

16   A.    Yes.  They had a long -- a real long, a good size long

17   pipe; from it -- it came from in Texas, went through New

18   Mexico, Utah, Idaho, and went up into Oregon.

19   Q.    How long did you work as a welder's helper for  El Paso

20   natural gas?

21   A.    For about two years.  I broke out as a welder and with --

22   El Paso Natural Gas.

23   Q.    You say you broke out as a welder.

24   A.    You have to test, you have to test with pipe -- high

25   pressure pipe and they bend the roots, face, necks, so

1     whenever that pipe is gone, it is gone.  They test everything.

2     Q.    Okay.  How old were you when you passed that test?

3     A.    17.

4     Q.    Did you continue working for El Paso Natural Gas as a

5     welder after that?

6     A.    Yeah, I did, for a year, year and a half.  And then

7     something happened, I don't remember why that always happened.

8     But they said that Natural that El Paso couldn't do their own

9     construction for some reason.  I don't know what the rule was

10    that  -- so then Fish Engineering got the -- they done all the

11    work for on the construction side for El Paso.

12    Q.    Okay.  So you went to work for Fish Engineering at some

13    point.

14    A.    Yeah.

15    Q.    At some point, Mr. Allen, after you became a welder, did

16    you get promoted to a supervisory position

17    A.    Yeah, I was about 21, as a foreman.

18    Q.    Okay.  What type of work were you doing at this point?

19    A.    It was over pipe -- that's all -- I really, really worked

20    because I did really love a pipe.  It's -- it is a real good

21    skill.

22    Q.    All right.  Now, what parts of the United States were you

23    working in at this time?

24    A.    It was all over New Mexico, Texas, Oklahoma, Louisiana,

25    up in Idaho, -- did I say Oklahoma?  Yeah, that's about it.

1    Q.   At some point in there, did you get married and start a

2    family?

3    A.   Yes, it was in 1930 -- 1957.

4    Q.   How old were you when you got married?

5    A.   20.

6    Q.   Did you and your wife have children?

7    A.   Yes.

8    Q.   How many children did you have?

9    A.   Three.

10   Q.   Now, at some point, Mr. Allen, did you move to Los

11   Angeles, California?

12   A.   Yeah.  We would move quite a bit.  I'd have to pull a

13   trailer house, for example, like from Odessa to Shreveport

14   Arizona -- Louisiana.  And it was real -- it was too much on

15   my family.  So I went into the union and I was a member of 250

16   Fitters and Welders, and I think I got -- I got there about

17   '80 -- '62, '63 some where in there.

18   Q.   When you moved to Los Angeles?

19   A.   Yes.

20   Q.   How long did you live in Los Angeles?

21   A.   I stayed there until I went up to Alaska in 1968.

22   Q.   What brought you up to Alaska?

23   A.   My wife wanted to go up to Alaska because her mother was

24   up there and I -- to save my marriage I said, okay, I will.  I

25   didn't want to go to Alaska because I thought I had it pretty

1  well there in L.A.  because there was a lot of companies that

2  always wanted me as the supervisor on all their pipes and

3  refineries, and plants like that.

4  Q.   All right.  But you did move up to Alaska?

5  A.   Yes.

6  Q.   And did you find work up there right away?

7  A.   Yes.  Who did you go to work for?

8  A.   Wagley(Phonetic).

9  Q.   What kind of a business was Wagley?

10  A.   They were a roustabout about and welders -- it was a

11  service company for the oil companies.

12  Q.   Okay.  Where in Alaska did you start working?

13  A.   Right out of Kenai, on the Cook Inlet.  The King Salmon.

14  Q.   "King Salmon", what's that?

15  A.   That's a platform.

16  Q.   When you say platform, what are you talking about?

17  A.   It is a platform that is out in the middle of the Cook

18  Inlet right out of Kenai.  You start drilling the oil field

19  that's underneath the platform, and then after they get most

20  of the drilling done, then you push it over to a production

21  package so they can produce oil.

22  Q.   What kind of work were you doing out there on the

23  platform?

24  A.   We were doing all the mechanical end of it like pipe, for

25  sure.  We done more of than that than -- pipe -- than anything

```
 1    else.  Structural beam, structural like beams, and we --
 2    structural beams, you know, every time you put something new
 3    on that platform, you have to put more beams and structure
 4    where you put your new pumps up or whatever you're going to
 5    do.
 6    Q.   Okay.  How long did you work for Wagley?
 7    A.   It wasn't very long.  It was a couple of months and they
 8    -- I guess I was real lucky.  They didn't have very good hands
 9    in Alaska at that time; they -- particularly on pipe.  So they
10    could see that I could do that and they wanted me to go in the
11    business and so I was on the King Salmon.
12    Q.   When you say "they" wanted you to go into business --
13    A.   Arco.
14    Q.   Arco?
15    A.   Yeah.  They were an oil company.  I think ConocoPhillips
16    has got part of Arco and part of BP.
17    Q.   You said Arco wanted you to go into business?
18    A.   Yeah.
19    Q.   What did they want you to do?.
20    A.   Stay right there on the platforms, at that time; because
21    they had a lot of little -- not a little but they had to put
22    more generators in.  They had the gas pipe lift, and water --
23    water, you have to push the water down into the wells and push
24    the pressure on the reservoir where you still have pressure --
25    water flood is what it's called.
```

1     Q.   Did you start your own business at that time?

2     A.   Yes.

3     Q.   Did you wind up going into partnership shortly

4     thereafter?

5     A.   Yeah.  With a guy named Veltree(Phonetic), Wayne Veltree.

6     Arco had another platform called "The Sparks".

7     Q.   All right.

8     A.   And whenever you had a shut down, I'd have to go over and

9     help him; of if we had a shut down on the King Salmon, he'd

10    have to come over and help me.  So they asked us why didn't we

11    just go together and so we did.

12    Q.   All right.  What was the name of the business that you

13    and Mr. Veltree formed?

14    A.   He went to town to get it done and he wasn't real good,

15    or as good as I was, I think, was on pipes.  So we had a shut

16    down coming and so I stayed there and fabricated pipe.  And

17    when he came back it was Veltree Enterprises and I said, well,

18    I don't know if I like that.  But I said I'll come back.  I'll

19    go back and get it, he said.  It is easy to do it if we just

20    -- how about VE Construction?  And I said that's fine.

21    Q.   All right.  We'll finish the story here in a minute; but

22    was that the genesis of a company called VECO that you owned?

23    A.   Yes, uh-huh.

24    Q.   When you went into business with Mr. Veltree, how many

25    employees did you have?

1    A.   Oh, we had about 10, 12.

2    Q.   At some point did you buy Veltree out?

3    A.   Yes, he wanted to get off the platforms because sometimes

4    you couldn't -- it would take you -- sometimes I wouldn't even

5    go to town for two to three months.  And so he got tired of

6    that and he wanted to buy him out.  We had a 50/50 deal so I

7    bought his half.

8    Q.   When you bought him out, did you keep the name of the

9    business as VE Construction?

10   A.   Yes.

11   Q.   Now, that name changed at some point; is that right?

12   A.   Yeah.  After we grew and I bought a drilling company in

13   Grand Junction, and we done some engineering and so it didn't

14   really fit.  So I took VE Construction and shortened it and it

15   came out VECO.

16   Q.   All right.  Now, going back to when you bought out Mr.

17   Veltree, were you still just basically doing business on the

18   platforms in Cook Inlet?

19   A.   Yeah, we did, and then Arco asked me if I would come up

20   and line -- lay a fuel pipe over to their new camp, and that

21   was about a -- I guess, four miles or something like that.  I

22   remember it was a 4" pipe.

23   Q.   What year was that?

24   A.   It was about '71, '72.

25   Q.   And what part of Alaska was this in?

1    A.    That was on the Slope, Prudhoe Bay.

2    Q.    Let me ask if I could for Government's Exhibit No. 1104

3    which is marked only for identification at this point to be

4    displayed for you, Mr. Allen.

5         Mr. Allen, I just handed you an exhibit marked as

6    Government Exhibit No. 1104; do you see that?

7    A.    Yeah.

8    Q.    Do you recognize what's depicted in that exhibit?

9    A.    Yeah, the State of Alaska.

10    Q.    Is that, as far as you know, an accurate depiction of the

11    State of Alaska?

12    A.    Yes.

13         MR. BOTTINI:  We'd offer 1104 at this time, Your

14    Honor.

15         THE COURT: Any objection?

16         MR. SULLIVAN:  None.

17         THE COURT: Admitted.

18         MR. BOTTINI:  May this be published to the jury?

19         THE COURT: Sure.

20    BY MR. BOTTINI:

21    Q.    Now, Mr. Allen, you said you branched out to working up

22    on the North Slope in about 1971 or two; is that correct?

23    A.    Yeah.

24    Q.    Where I have indicated with my pen here on the north

25    coast of Alaska, is that what we refer to in Alaska as the

1      North Slope?

2      A.    Yeah.  Uh-huh.

3      Q.    What significance does that have, if any, to oil

4      production in Alaska, that area?

5      A.    Well, that was the biggest oil field in the world when

6      Arco discovered it right there at Prudhoe.  We -- they are

7      still producing, Prudhoe a lot. I think when they really --

8      I'm probably talking too much -- in the future.  But this was

9      the best thing for the nation even was because of when they

10     really developed Prudhoe, we were producing or the oil

11     companies were producing about 2 million barrels a day.

12     Q.    All right.  Now, this work that you got up there in 1971,

13     1972, was that the first work you had up on the North Slope?

14     A.    Yeah.  You know, I think it was more like '70, '71.

15     Q.    Okay.  Were you still working on the platforms down at

16     Cook(Phonetic) Inlet?

17     A.    Yes.  Yes, we were.

18     Q.    Once you started getting work up on the North Slope, did

19     you continue doing work up there throughout the history of the

20     company?

21     A.    Yes.

22     Q.    At some point in the 1970's, did you branch out and get

23     work over in the North Sea between Norway and Scotland?

24     A.    Yes.

25     Q.    Tell the jury about that.

1    A.   We had a hard time getting that permit for the oil pipe-

2    line, and so I could see it was really shortened.  I was

3    really going to be bad and a lot of people didn't make it.  so

4    I took off and went to the North Sea, and I had a partner,

5    BTR, a British outfit, and they put the money up, and I built

6    the company.

7    Q.   All right.  Now, what kind of work were you doing over

8    there?

9    A.   The same thing we were doing, mostly offshore.

10   Q.   And how long did you work over in the North Sea?

11   A.   We -- I started there about '72 and about '77, the

12   Norwegian companies -- I mean the company -- the country,

13   Norway decided to start taxing everything and because, you

14   know, they didn't know anything until we got over there.  I'm

15   talking like Americans mainly, and in '77, they started really

16   taxing us.  So I sold my part back to BTR.

17   Q.   Was that a profitable venture for you, the North Sea

18   operations?

19   A.   Yes, it was.

20   Q.   What did you do with the money you made there?

21   A.   I took that and put it up on the Slope.  I built some

22   camps and shops and so that we could really help the oil

23   companies up there on the Slope.

24   Q.   All right.  Now, by this time, by 1977, how large had

25   your company grown to as far as numbers of employees?

1     A.    Probably, 1,500.

2     Q.    Who were your primary clients at this time?

3     A.    BT -- BP and ConocoPhillips and Exxon.

4     Q.    All right.  Were they the primary oil producers in

5     Alaska?

6     A.    Yes, uh-huh.

7     Q.    Now, you mentioned that at some point your company

8     branched out -- let me ask you, at some point did you branch

9     out from just construction into engineering?

10    A.    Yes.  Right.

11    Q.    When was that approximately?

12    A.    We bought a company out of Bellingham, Washington,

13    Christensen, and I think that was about '90, something like

14    that.  When we really got into engineering, we had already

15    done some engineering, but we needed better engineers, and

16    that's why we bought that -- or why I bought that.

17    Q.    Okay.  Did you branch out into doing business in other

18    parts of the United States other than just Alaska?

19    A.    Yes.  We went to Canada and the Lower 48.  And we won a

20    little bit of work in Mexico that didn't pan out so good, but

21    we had a big bunch of work in California, and later -- I think

22    a couple more -- later, I went to Sakhalin, Sakhalin, Island,

23    which is part Russia.

24    Q.    All right.  What was going on over in Sakhalin Island?

25    A.    They had a big oil field and gas, and at one time

1    whenever I went to Sakhalin, I knew the guy that was over

2    Exxon and the guy that was over Marathon that now -- now

3    Marathon had sold to Shell.  And they were talking about they

4    were going to spend about 25 billion in about two years, so I

5    thought, man, I'm going to go really -- so I started the

6    company in Sakhalin.

7    Q.   What time frame are we talking about, Mr. Allen?

8    A.   About '95, '96.

9    Q.   Are we able to do display, Government's Exhibit 1106, for

10   Mr. Allen.  It's marked for identification only at this

11   point.  All right.  Mr. Allen, do you see what's on your

12   screen there?

13   A.   Yes.

14   Q.   What do you see there?

15   A.   It's Sakhalin Island north of Japan.

16          MR. BOTTINI:  We'd offer 1106 at this time, Your

17   Honor.

18          THE COURT:  Any objection?

19          MR. SULLIVAN:  None, Your Honor.

20          THE COURT:  Admitted.

21   BY MR. BOTTINI:

22   Q.   Mr. Allen, for the benefit of our jurors who can now --

23          MR. BOTTINI: May this be published?

24   BY MR. BOTTINI:

25   Q.   For the benefit of the jurors who can see this now, can

1    you explain where Sakhalin Island is in relation to the
2    country of Russia?
3    A.   It's east of Russia.  It's an island.  And it's north of
4    Japan.
5    Q.   All right.  Now, Mr. Allen, you changed the name of the
6    company to VECO; is that correct?
7    A.   Yes.
8    Q.   Do you remember roughly when that name change occurred?
9    A.   When I bought the drilling company, and I think that was
10   '70 -- '77, '78.
11   Q.   Now, you've explained about how you branched out to do
12   business around the United States and around.  By the time we
13   get to the year 2000, how big was VECO in terms of employees
14   worldwide?
15   A.   Well, at one time -- oh, in 2000, I'm sorry.  Probably
16   about 4,000 to 5,000.  It would go up and down.  It would
17   depend on what jobs you had.
18   Q.   Okay.  And how many of those would have been working in
19   Alaska?
20   A.   Probably, I'd say 3,000.
21   Q.   Had your Alaska operations always been the backbone of
22   the company?
23   A.   Yes.
24   Q.   By this time, was VECO one of the largest private
25   employers in the State of Alaska?

1    A.    Privately, yeah.  We probably were.

2    Q.    Now, can you explain a little bit about the corporate

3    structure of VECO.  Did you have subsidiary companies under

4    VECO Corporation?

5    A.    Yeah.  We called them "regions".

6    Q.    Can you explain a little bit about that to the jury?

7    A.    The regions thas was in -- the Lower 48 was a region;

8    the region that was in Canada; the region that was over the

9    Middle East -- I forgot to tell you we were in the Middle East

10    -- we still are.  And we called our Sakhalin and Russia was

11    underneath -- it was an Alaska region.  So we called Sakhalin

12    and Russia and Alaska region is all together.

13    Q.    Okay.  Did you have a management team at VECO to help you

14    run the company?

15    A.    Yes.

16    Q.    By the way, were you the Chief Executive Officer of the

17    company?

18    A.    Yes.

19    Q.    Can you tell the jury who your management team was at

20    this time around the year 2000?

21    A.    Pete Leathard.

22    Q.    What position did he hold?

23    A.    He was president.

24    Q.    All right.  Who else?

25    A.    Roger Cohn (Phonetic).

1    Q.    What did he do?

2    A.    He was over all of our financial end of it and tax, over

3    tax.

4    Q.    Okay.  Anybody else?

5    A.    Tom Corkran.

6    Q.    What did he do?

7    A.    He was underneath Roger.  And had Rick Smith.

8    Q.    And what was Mr.  Smith's job?

9    A.    He was over the government end of it.

10   Q.    You said the "government end of it".

11   A.    Mostly with Alaska.

12   Q.    Anybody else?

13   A.    Yeah.  Jamie Slack.

14   Q.    What did Mr.  Slack do?

15   A.    He was over insurance and the employees.

16   Q.    Okay.  Now, Mr.  Allen, after the motorcycle accident

17   that you told us about, did you continue to run the company as

18   the Chief Executive Officer?

19   A.    Yes.

20   Q.    Did any of your children fill any management roles at the

21   company?

22   A.    Mark did.

23   Q.    Who is Mark?

24   A.    That's my son.  I'm sorry.

25   Q.    And what did Mark do?

```
1    A.   He was kind of underneath me where he could really
2    understand the business.  Mark had been in the horse business
3    before, and, anyway, I got him to go up and take my place
4    someday.
5    Q.   Did that work out?
6    A.   No.  He didn't like -- he wanted to get back with his
7    horses and so it didn't work.
8    Q.   Now, by the time the year 2005 rolls around, Mr.  Allen,
9    what kind of revenues was VECO making on an annual basis?
10   A.   It would be between 800 million to billion.
11   Q.   To a billion dollars?
12   A.   Yeah.
13   Q.   Did you sell VECO at some point?
14   A.   Yes.
15   Q.   When did you sell the company?
16   A.   September the 7th of 1907.
17   Q.   1907?
18   A.   Uh-huh.
19   Q.   September the 7th of what year?
20   A.   Two-0-seven.
21   Q.   2007.  All right.  Who bought the company?
22   A.   "C"-"H"-"U" -- I call them the "hill" people.
23   Q.   All right.  How much did you sell VECO for to CH2M Hill?
24   A.   It was about 380 million.
25   Q.   All right.  And were there any kind of disbursements made
```

1     to the employees of the company --

2     A.    Yes.  I give the hands 15 million.

3     Q.    Now, you say -- you say -- you've used the words "hands"

4     a couple of times --

5     A.    I mean all the employees.

6     Q.    Is that what you mean when you say "hands"?

7     A.    Yes.  When I say that, yeah.

8     Q.    All right.  Now, let me ask you Mr.  Allen, do you know

9     United States Senator Ted Stevens?

10    A.    Yes, I do.

11    Q.    Is he here in the courtroom today?

12    A.    Yes.

13    Q.    Can you just generally indicate where he is sitting?

14    A.    Yes.  (Indicating) Ted is right over there.

15    Q.    Now, do you remember how you first met Senator Stevens?

16    A.    Last time I remember seeing -- first was when Ted was

17    trying to help Frank Makowsky.  He was running for the Senate.

18    Q.    All right.  Frank Makowsky was running for the United

19    States Senate.

20    A.    That's the first time I saw Ted, yeah.

21    Q.    Do you remember when that was?

22    A.    I guess it was in '82 I guess.

23    Q.    Now, at some point, did you start getting actively

24    involved in politics in Alaska?

25    A.    Yes.  About -- I think about '84.

Q.   All right.  And how did you start getting involved in politics?

A.   I hired a guy that was a -- whose name was Ed Dankworth(Phonetic), and he was my lobbyist in Juneau.

Q.   Okay.  And Juneau is what in relation to the State of Alaska?

A.   It's the capital of Alaska.  It's south of Anchorage.

Q.   Okay.  Now, backing up to when you first met Senator Stevens, you said you met him when he was trying to help Frank Makowsky get elected to the US Senate.

A.   Yeah.  Right.

Q.   Do you remember where you met him?

A.   Oh, it was different times.  There was a lot of social -- I think maybe fundraisers, too.  I don't know, but it was everybody was -- they were going to different houses, different people around Anchorage.

Q.   Okay.  What's a fundraiser?

A.   That' when you get people over and give the guy that's going to have an election and try to see if you can get him elected.

Q.   Okay.  Now, when you started getting more involved in politics in Alaska, did you start seeing Senator Stevens more often?

A.   Yeah.  I think seen Ted a lot more after I bought the Anchorage Times.

```
 1      Q.   All right.  What's the Anchorage Times?

 2      A.   It was a newspaper.

 3      Q.   Is it now defunct, it doesn't exist anymore?

 4      A.   That's right.

 5      Q.   Do you remember when you bought the newspaper?

 6      A.   I think it was '89 or '90.

 7      Q.   Why did you start seeing Senator Stevens more frequently

 8      after you bought the newspaper?

 9      A.   Well, he and Bob Atwood were good friends.

10      Q.   Who was Bob Atwood?

11      A.   He was the guy who owned the Anchorage -- the newspaper

12      that I bought, the Anchorage Times.

13      Q.   Did you eventually become friends with Senator Stevens?

14      A.   Yes.

15      Q.   Can you explain to the jury sort of how that kind of

16      developed?

17      A.   Well, we kind of really liked each other, had the same

18      thoughts.  Ted was a -- I mean he -- Ted really worked hard.

19      Ted loved Alaska, and I loved Alaska.

20      Q.   Did you find you had other things in common?

21      A.   Yeah.  We liked to go fish.

22      Q.   How about politics, did you have a common interest in

23      that?

24      A.   Yeah.  Yeah.  But most of my politics were the state

25      politicians.
```

```
1    Q.   That's where your interest was?

2    A.   Yeah.

3    Q.   Okay.  We'll talk about that in a little bit, Mr.  Allen.

4    But did you have a common group of friends, yourself and

5    Senator Stevens that you socialized with?

6    A.   Yeah.

7    Q.   Give us some names of people that were in that common

8    group.

9    A.   Oh, Eddie Rasparson(Phonetic);Carl Marrs; Bob

10   Person(sic).  Let's see, there's more.  There's a lot more.

11   Q.   Who is Bob Persons?

12   A.   Bob person is a -- he has a real fine restaurant in

13   Girdwood.

14   Q.   And you said Carl Mars, who is Carl Mars?

15   A.   Carl used to be over Suri(Phonetic), the native

16   corporation.

17   Q.   And you said, Eddie Rasparson, who was that?

18   A.   They had the biggest bank in Alaska.  They sold it now to

19   Fargo.

20   Q.   To Fargo, Wells Fargo?

21   A.   Wells Fargo, yeah.

22   Q.   Did you know a guy by the name of "Bob Penney"?

23   A.   Yeah, Bob Penney was one.

24   Q.   And what kind of a business -- was Mr.  Penney associated

25   with any kind of a business?
```

```
 1      A.   I think he's in real estate.

 2      Q.   Now, did your friendship with Senator Stevens get to a

 3      point where you actually traveled to certain events together?

 4      A.   Yeah.

 5      Q.   Can you tell the jury a little more about that?

 6      A.   I don't know.  When I'd be in -- come into to D.C., maybe

 7      Ted would be going back to Alaska.   We would go fishing in

 8      the lower 48 like Arkansas.  We went to Florida -- I don't

 9      know if I ever went with Ted to Florida, but I went down there

10      when some of this stuff.

11           I don't know it's -- we've been on a plane quite a few

12      times, but I can't remember exactly -- what -- where we were

13      going or how many times I have done it, but I have been there

14      with him in planes quite a bit.

15      Q.   Okay.  Did you at some point start to travel together to

16      what you would refer to as "boot camp"?

17      A.   Oh, yeah.  We'd do that.  I forgot about that.  Yeah.

18      Q.   Tell the tell the jury what that was all about.

19      A.   It was -- every year Ted and I would go to -- we called

20      it a "boot camp", and we would walk and we wouldn't have any

21      hard liquor, hard liquor.  We would just we drink wine, and

22      we'd have a cigar now and then, and we wouldn't -- wouldn't

23      eat very much trying to get some pounds off, and I don't know

24      how many times we done that, five or six or something like

25      that.
```

1    Q.    Where were these boot camps located at?

2    A.    Well, the first ones were in Palm Springs, and everybody

3    was trying to always talk to Ted, and so it was a lot better

4    to go to Wickenburg in Arizona.

5    Q.    In Arizona?

6    A.    Yeah.

7    Q.    All right.  So you started going To a boot camp there?

8    A.    Yeah.

9    Q.    Now, can I ask that Government's Exhibit 1094 which is

10   marked for identification only at this point be displayed?

11   Mr. Allen, do you see what's on the screen there in front of

12   you?

13   A.    Yes.

14   Q.    All right.  What do you see there?

15   A.    Ted just got a king Salmon, and I was holding the net,

16   and --

17   Q.    I'm sorry.

18          MR. BOTTINI:  We'd offer 1094, Your Honor.

19          THE COURT:  Any objection?

20          MR. B. SULLIVAN:  No, Your Honor.

21          THE COURT:  Admitted.

22          MR. BOTTINI:  And may be published.

23          THE COURT: All right.

24   BY MR. BOTTINI:

25   Q.    All right.  Mr. Allen, can you tell the jury now that

1      they can see that photograph what's depicted there?

2      A.    Ted had just caught a King Salmon, and I was holding the

3      net, and the way that they -- you don't -- you take the

4      Salmon, and you measure how big he is, and if you put it back

5      in the water, then you get 10 percent more, and then who --

6      they have a competition to see who got the biggest fish when

7      this is over.

8      Q.    Now, was this picture taken during a certain event?

9      A.    Yes.  This was a Classic.  It was -- I don't know how

10     many -- it's been a long time since, a lot of years, and they

11     would come to the Classic, and the money was going to try to

12     help the Kenai River to help the Salmons to make sure that

13     they can spawn and everything.  It was a pretty big job.  I

14     mean a pretty big -- it was a lot of people came.

15     Q.    All right.  Now, the individuals that we see in this

16     photograph, Mr. Allen, you say you were holding the net; is

17     that correct?

18     A.    You know what, I think this thing is running out of juice

19     (Indicating the headset).

20     Q.    You need a new one?

21     A.    Yes.

22     Q.    Can you hear me okay?

23     A.    Yeah, uh-huh.

24     Q.    Now, the individuals that we see in this photograph, you

25     said that you are the guy holding the net; is that correct?

1    A.    Yeah.

2    Q.    Where is Senator Stevens in relation to you?

3    A.    He's helping with the net.

4    Q.    Okay.  Did your friendship with Senator Stevens develop

5    to the point where you considered it a close personal

6    friendship?

7    A.    Yes.

8    Q.    Mr.  Allen, let me ask you, sir, do you recall whether or

9    not you and Senator Stevens entered into a vehicle trade, a

10   trade for automobiles at some point?

11   A.    Yes.

12   Q.    When do you recall that occurring?

13   A.    I think the first time I was with -- was 99.

14   Q.    Okay.  And how did this come up?

15   A.    Ted knew that I liked older cars, and he had a 64 and-a-

16   half Mustang convertible.

17   Q.    Okay.

18   A.    And he asked would I like -- would I buy the Mustang, and

19   I said, yeah, I like Mustangs.  And he said, well, I need to

20   cell it because I need a new car for Lillie.

21   Q.    Who is Lillie?

22   A.    That's Ted's daughter.

23   Q.    Now, when he told you he needed a new car for Lillie,

24   what happened after that?

25   A.    I said, you know, Ted I got a brand new Land Rover.  I

1    had two of them, and I have two grandsons.  They're about --

2    they are two months apart, and I had already give one of them,

3    Landon, and Chad, he wasn't doing what I thought he should, so

4    I didn't give Chad his.

5    Q.    Okay.  Now, you said you bought two Land Rovers; is that

6    correct?

7    A.    Yeah.

8    Q.    Where did you buy these vehicles at?

9    A.    Stepbrothers.

10   Q.    Okay.  What's Stepbrothers?

11   A.    They were a dealer for Land Rovers.

12   Q.    And where were they located at?

13   A.    In Anchorage.

14   Q.    All right.  So you bought two Land Rovers from

15   Stepbrothers?

16   A.    Yes.

17   Q.    Do you remember how much you paid for each of them?

18   A.    I don't know.  Somewhere around 44,000; something like

19   that.

20   Q.    Were they basic model Land Rovers or did they have a lot

21   of add-on's?

22   A.    No.  They were loaded.

23   Q.    Okay.  So you gave one of the Land Rovers you purchased

24   to your grandson, Landon; is that correct?

25   A.    Yes.

1      Q.    But you didn't give the other one to your grandson, Chad.

2      A.    No.

3      Q.    All right.  And that's the vehicle you told Senator

4      Stevens you had available; is that correct?

5      A.    Yeah.  Uh-huh.

6      Q.    So what was then the terms of the trade that you worked

7      out?

8      A.    Well, I think the Mustang was -- at that time, I thought

9      it was probably worth 15, maybe 20, but I knew that they would

10     be better because it's a rare Mustang.  It's a 64 1/2, and

11     there's not very many convertibles in the 64 1/2.  A 64 1/2

12     also had a 389 -- motor, and the 64's were about 260's, and so

13     they're pretty -- particularly, if it's a convertible, and

14     it's a 64 1/2, it's a pretty good -- it will always be worth a

15     lot of money.

16     Q.    Now, the Land Rovers that you bought in Anchorage, the

17     one that you did not give to your other grandson, did you take

18     that thing home or was it still at the dealer?

19     A.    I think it was at the dealers is the way I remember.

20     Q.    Had it been driven at all?

21     A.    Probably, just -- I had never -- I don't think anybody

22     had ever drove it.

23     Q.    Now, you said you figured the Mustang was worth about 15

24     to $20,000 at that time?

25     A.    At that time.

1    Q.   Was there any other terms of this trade for the Mustang

2    and the Land Rover?  In other words, was Senator Stevens going

3    to give you anything else?

4    A.   Yeah.  He gave me a check.

5    Q.   How much was that for?

6    A.   5,000.

7    Q.   Now, the Land Rover that you traded -- did you also enter

8    into that agreement with Senator Stevens to trade those

9    vehicles?

10   A.   Yes.

11   Q.   Now, the Land Rover that you traded to Senator Stevens,

12   was that still at the dealership to your recollection?

13   A.   I think it was, yes.

14   Q.   Let me show you what we've marked for identification as

15   Exhibit No. 609.  Could you display that, please?  This is on

16   your screen there, Mr. Allen.  Can you see it okay?

17   A.   Yes.

18   Q.   Do you recognize what that is?

19   A.   Yes.

20   Q.   What is that?

21   A.   That's the 5,000 -- the check, the 5,000 check.

22   Q.   All right.  And what else --

23   A.   And it kind of expands what the Mustang had.  Somebody

24   had went -- they had painted it.

25   Q.   Let me just stop you right there.  Do you recognize this?

1     A.    Yes, I do.

2     Q.    Is that a letter from Senator Stevens to you?

3     A.    Yes, I do.

4           MR. BOTTINI:  We'd offer 609 at this time, Your

5     Honor.

6           THE COURT:  Any objection?

7           MR. SULLIVAN:  No objection.

8           THE COURT:  Admitted.

9           MR. BOTTINI:  And may it be published, please.

10           THE COURT:  All right.

11    BY MR. BOTTINI:

12    Q.    Mr. Allen, you said what we see here is a check for

13    $5,000 from Senator Stevens to you; is that correct?

14    A.    Yeah.  I'm sorry that I got ahead here, but, yeah.

15    Q.    It's okay.  There we go.  And do you see the date of the

16    check there?

17    A.    Yeah.  June the 24th.

18    Q.    What year?

19    A.    1999.

20    Q.    Okay.  Can we go back to the full letter, please?  Can

21    you blow up the letter, the text there?  Okay.  The letter,

22    Mr. Allen, says:  Dear Bill, I'm delighted we could work out

23    a trade for the 1964 1/2 Mustang.  It's been a quote,

24    two-owner car -- two-owner, quote, car.  Senator Ted Moss

25    owned it until 1980.  I've had it since then.

1          After I go it, I had it substantially rebuilt.  It was

2     taken right down to the frame, and everything was checked.  We

3     replaced the leather; reinforced the floorboards; had a full

4     bake job on the paint; and checked all the wiring and

5     software.  I thought about putting in power brakes, but

6     didn't.  The brake pedal may need to be raised a little for

7     Rita to drive it.  We've not used it on freeways, it's been a

8     town car for us.

9          Now, did you understand who Rita was that Senator Stevens

10     is referring to there?

11     A.    Yes.  She was -- I went with her for awhile, and she

12     worked for VECO.

13     Q.    All right.  Now, were you intending to give this car, the

14     Mustang, to Rita?

15     A.    Yes.

16     Q.    All right.  It continues:  Enclosed is my check for

17     $5,000, in addition to the Mustang and trade for your 1999

18     Land Rover which I understand is almost new.  The Mustang is

19     in mint condition and is worth $25,000.  The cost associated

20     with detailing the car and shipping it to you in Seattle will

21     run about $2,170.  I figure the total, including, the Mustang,

22     I'm sending you is $32,170.

23     Q.    Now, he represents there Mr. Allen that the Mustang was

24     in mint condition and was worth about $25,000.  Did you

25     consider the Mustang to be in mint condition?

1   A.   There is a different -- there's a number one, number two,

2   number three, number four.

3   Q.   All right.

4   A.   And I would think that the Mustang was probably between

5   two and three, which is pretty good.

6   Q.   What would --

7   A.   Which is pretty good.

8   Q.   Okay.   What would mint condition be?

9   A.   That would be a number one.

10  Q.   All right.  And continues there with that sentence:  The

11  Mustang is worth $25,000,  Did you believe that the Mustang

12  was worth that much money when you traded it?

13  A.   At that time, I didn't think it was that much.

14          MR. SULLIVAN:  Objection, Your Honor.  It's not what

15  he thought, it's what he said.

16          THE COURT:  Did you understand the question?

17          MR. BOTTINI:  Well, I asked Mr. Allen if he

18  believed that the Mustang was worth $25,000 when he traded for

19  it.  I think it's fair for him to answer it.

20          THE COURT:  Answer it.

21          THE WITNESS:  I think it was a little bit high, but

22  I think it was probably 15 -- about 15,000 to 2000 -- 22.

23  BY MR. BOTTINI:

24  Q.   All right.  And then it continues on, it says, the cost

25  associated with detailing the car and shipping it --

1          THE COURT: I'm sorry.  Wait.  You said you think it

2     was a little bit high, but you thought it was probably

3     something.  It didn't come through clearly.  What was your

4     answer?

5          THE WITNESS:  I'm sorry, Your Honor.  I can't hear

6     you.  I'm sorry.

7          THE COURT: I don't think your answer was clear to

8     the last question.  Do you recall the last question?

9          THE WITNESS: Yes.

10          THE COURT: All right.

11          THE WITNESS:  I think it was -- when I got it it was

12     probably 15,000 to probably 20,000.

13          THE COURT:  All right.

14     BY MR. BOTTINI:

15     Q.   Okay.  And it continues on to say that the cost of

16     detailing the car and shipping it to Seattle would run about

17     $2,170; is that correct?

18     A.   That's probably right, yeah.

19     Q.   And then Senator Stevens concludes here -- I figure the

20     total including the Mustang I'm sending you is $32,170.

21     A.   See if I can get this (Indicating to headset) -- talk

22     some more to me.

23     Q.   Can you hear me okay now?

24     A.   Nope.

25     Q.   All right.  How about now, can you hear me okay?

```
1    A.   Yeah.  Good.  Yeah.

2    Q.   Okay.  The letter there, Mr.  Allen, concludes with

3    Senator Stevens saying I figured the total including the

4    Mustang I'm sending you is $32,170.  Did you consider this to

5    be an equal trade for the brand new Land Rover that you had

6    bought?

7    A.   Not at that time, no.

8    Q.   Okay.  Why not?

9    A.   Well, about -- the Mustang right now would probably be

10   about 32,000 at that time -- right now.

11   Q.   But back then, you didn't think it was worth that much?

12   A.   Not really.

13   Q.   Why did you go ahead and enter into this agreement?

14   A.   Because I like Ted.

15   Q.   Now, at some point, Mr.  Allen, did you enter into

16   another agreement with Senator Stevens to trade the Mustang

17   back to him?

18   A.   Yes.

19   Q.   Tell the jury about that.

20   A.   He didn't -- Cathy didn't like guns, and he had some

21   guns, and he said why don't we have a trade, you take the

22   guns, and I'll get the Mustang back, and I said, fine.  So I

23   got the guns and was going to give Ted the Mustang.

24   Q.   Do you remember when that was?

25   A.   Hum.  I guess about 205, something like that.
```

1     Q.    When you say "205", you mean 2005?

2     A.    2005, yeah.

3     Q.    Okay.  Now, you said the arrangement was for you to get

4     some guns from Senator Stevens and you would trade the Mustang

5     back to him?

6     A.    Yes.

7     Q.    All right.  And you said you got the guns; is that

8     correct?

9     A.    Yes.

10     Q.    How many guns did you get?

11     A.    You know, I thought there was about five, six, but I

12     can't remember.  I know I had all of them in my hands -- in my

13     arms.

14     Q.    Okay.  So you actually got physical possession of the

15     guns, you had them in your arms?

16     A.    Yeah.  Right.

17     Q.    What kind of guns were they?

18     A.    They were rifles, and I think there was a shotgun or two.

19     I'm not really a good gun guy, really, but Mark, my son,

20     really collects guns.

21     Q.    Any idea what the guns were worth that you took

22     possession of?

23     A.    No.  I really don't, but I would guess --

24               MR. SULLIVAN:  Objection.

25               THE COURT:  Don't guess if you don't know

1    BY MR. BOTTINI:

2    Q.    Did you wind up delivering the Mustang back to Senator

3    Stevens?

4    A.    No.

5    Q.    Why not?

6    A.    I said, Ted, we shouldn't do that until you get out of

7    the Senate.

8    Q.    All right.  What was your concern about that?

9    A.    What people would look at, think about it.

10   Q.    What do you mean by that?

11          MR. SULLIVAN:  Objection.  Mental processes are not

12   relevant.

13          THE COURT:  Sustained.  Sustained.  I'll sustain

14   that.

15   BY MR. BOTTINI:

16   Q.    At some point, did you learn Senator Stevens did want the

17   Mustang from you?

18   A.    Yes.

19   Q.    All right.  When was that?

20   A.    Bill Vittner(Phonetic) came over to the house, and said

21   we'd like to get the Mustang.

22   Q.    Now, earlier you made reference to someone named

23   "Cathy".  Who is Cathy?

24   A.    Cathy is Ted -- Ted's wife.

25   Q.    All right.  Who is Bill Vittner?

1    A.    That is Bill Vittner is Ted's brother-in-law.

2    Q.    Brother-in-law?

3    A.    Yeah.

4    Q.    When was this that Mr. Vittner told you that Senator

5    Stevens wanted the Mustang?

6    A.    I think it was about 2-0; about 2-0-7.

7    Q.    About 2007.

8    A.    Uh-huh.  I think so.

9         MR. BOTTINI:  May I have just a moment, Your Honor?

10        THE COURT: Sure.

11   BY MR. BOTTINI:

12   Q.    Mr. Allen, when you traded Senator Stevens the Land

13   Rover for the Mustang, did you actually take possession of the

14   Mustang?

15   A.    No.  Ted shipped it to Seattle.

16   Q.    And where did it go to in Seattle?

17   A.    In Rita's garage in Seattle.

18   Q.    And what happened to it after it went into the garage?

19   A.    It's still in that garage.

20   Q.    Has it been sitting there for several years?

21   A.    Yes.

22   Q.    Has it been driven, to your knowledge?

23   A.    No.  I think they started it up once or twice, but I

24   don't think anybody has ever drove it.

25   Q.    Now, when Mr. Vittner came by and said Senator Stevens

1    wanted the Mustang back, did you give him the Mustang back?

2    A.    No.  My lawyer was there --

3    Q.    Without going into what your lawyer said, is it still --

4    to your knowledge is the Mustang still in Seattle in the

5    garage?

6    A.    Yes, it is.

7    Q.    All right.  Now, let me ask, Mr.  Allen, that

8    Government's Exhibit No. 1105 which is just marked for

9    identification at this time be displayed.  All right.  Do you

10   see that on the your screen?

11   A.    Yes.

12   Q.    Do you recognize what's depicted there?

13   A.    Yes.

14   Q.    What do you see there?

15   A.    It's the Anchorage Bowl, Girdwood.

16        MR. BOTTINI:  We'd offer 1105 at this time, Your

17   Honor.

18        THE COURT:  Any objection?

19        MR. SULLIVAN:  No objection.

20        THE COURT: Admitted.

21        MR. BOTTINI:  And may it be published?

22        THE COURT:  It shall be.

23   BY MR. BOTTINI:

24   Q.    Mr.  Allen, you said this was the Anchorage Bowl; is that

25   correct?

1     A.    Yeah.

2     Q.    What do you mean by that?

3     A.    Well, they call it the "Bowl".  It's where the town of

4     Anchorage is at.

5     Q.    And you said you see Girdwood on there; is that correct?

6     A.    Yes.

7     Q.    All right.  I'm sure the jurors can see this, but where

8     in relation to this diagram is Girdwood?

9     A.    It's south, southeast; southeast.

10    Q.    Okay.  Of Anchorage?

11    A.    Yes.

12    Q.    How far is Girdwood from Anchorage?

13    A.    I don't know, 40, 45 miles.

14    Q.    To your knowledge, did Senator Stevens own a home in

15    Girdwood, Alaska?

16    A.    Yes.

17    Q.    How do you know that?

18    A.    Well, because I've been there.  I've been to his house,

19    and I helped him build a house there.

20    Q.    All right.  How long has Senator Stevens owned that

21    house; do you know?

22    A.    You know, I don't know.  They had it for quite a long

23    time.

24    Q.    Did you have occasion to visit his home down there in

25    Girdwood during the 1990's?

1    A.    Yes.

2    Q.    How often were you down there?

3    A.    I don't know; three or four times.  We had a -- a deal

4    for the sympathy -- symphony.

5    Q.    Symphony.

6    A.    A fundraiser a couple of times; three times.  I can't

7    remember.  And we used Ted's cabin.

8    Q.    Let me ask that Government's Exhibit No. 2, which has

9    already been admitted into evidence be displayed.  Do you

10   recognize what we see in that photograph there, Mr.  Allen?

11   A.    Yes.

12   Q.    What is that?

13   A.    That's Ted's house in Girdwood.

14   Q.    Okay.  And you said that you helped to build a house for

15   him; is that correct?

16   A.    With him, yeah.

17   Q.    Is this what the house looked like before there was any

18   construction done?

19   A.    Yes.

20   Q.    All right.  Now, Mr.  Allen at some point, did you have

21   VECO buy a generator for Senator Stevens' home in Girdwood?

22   A.    Yes.

23   Q.    Tell the jury about that.

24   A.    It was I think in 2000 Ted was worried about Y2K, and

25   everybody -- the computers might -- wouldn't work, and so he

1    needed a generator to make sure that he would have

2    electricity, and so I went and got a generator and put it in.

3    Q.   All right.  Now, did he ask you for this?

4    A.   Yeah.  He said he needed the generator, yeah.

5    Q.   What kind of a generator did you have VECO buy?

6    A.   I think it was about a 7-K.  I can't remember the --

7    whether it was a Honda or a -- it wasn't a Honda, but it had

8    there model like a Ford or a Chevy, but it was a -- and I

9    can't tell you what they -- what it was called, but it was

10   about I think a K, point, five.

11   Q.   And when you say 7-K or --

12   A.   That's how much it would generate for electricity.

13   Q.   And when you say "K", what are you referring to?

14   A.   That's like -- it's how -- I can't say it.  It's a

15   measurement of electricity.

16   Q.   Okay.  The output?

17   A.   Yes.

18   Q.   How much did that generator cost; do you recall?

19   A.   I think it was around five, 6000.

20   Q.   Was the generator installed at Senator Stevens' house in

21   Girdwood?

22   A.   Yes.

23   Q.   Who did that?

24   A.   I think it was Derrick and an electrician.

25   Q.   Who is Derrick?

1    A.   He is kind of a -- he uses -- he buys some of the littler

2    equipments, and he takes care of -- he's kind of an expeditor,

3    really.

4    Q.   Who did he work for?

5    A.   VECO.

6    Q.   All right.  How about the electrician, who did he work

7    for?

8    A.   VECO.

9    Q.   Now, let me ask that Government's Exhibit No. 5, which

10   has already been admitted into evidence, be displayed, Mr.

11   Allen.  Do you recognize what we see in that photograph?

12   A.   That's the generator.

13   Q.   That's the generator there?

14   A.   Yeah.

15   Q.   All right.  Now, how is this generator designed to work?

16   A.   Well, if the electricity quit, the regular electricity --

17   the generator would start up and generate electricity.

18   Q.   All right.  Was this designed to happen automatically?

19   A.   Yes.  Yes.

20   Q.   Were there other components that were needed for this

21   generator to work?

22   A.   Yeah.  You'd have to another switch to make sure that the

23   regular electricity would have -- you've got to make sure

24   that's off and then flip the switch that that would open and

25   then the generator could start and generate electricity.  If

1    you didn't, it would below it up.

2    Q.   All right.  Was something like that purchased by VECO, as

3    well?

4    A.   Yes.

5    Q.   Any idea how much that cost?

6    A.   No.

7    Q.   Now, did Senator Stevens ever pay you back for this

8    generator?

9    A.   No.

10    Q.   To your knowledge, did he ever pay VECO back for the

11    generator?

12    A.   I don't know.  I don't think so.

13    Q.   At some point, Mr. Allen, did you learn that Senator

14    Stevens was interested in building onto his home in Girdwood?

15    A.   Yes.

16    Q.   All right.  Do you remember when you first heard about

17    that, when that first came up?

18    A.   Probably, I don't know in '99.  Ted said that he needed

19    more room, and all he wanted to do was jack-up that house, the

20    cabin, before -- jack it up and then just put a room

21    underneath it because he said if Lillie or some of his

22    grandkids and they come up there to ski, there wasn't enough

23    room, and I thought that was a pretty good idea.

24         MR. BOTTINI:  Your Honor, we're about to launch into

25    a lengthy area.  Would this be a good place to stop for the

1     day?

2          THE COURT:  It probably would be.  Ladies and
3     gentlemen, it's about 20 of.  We're going to break for the
4     evening.  We'll start promptly tomorrow with Mr. Allen at
5     9:30.  Enjoy your evening.  Again, you can leave your books
6     there, and, again, please avoid any press, radio, or media
7     reports you may see or hear about the case.

8          All right.  Thank you.  Enjoy your evening.

9          THE COURT:  Are there any matters we need to talk
10    about before 9:30 tomorrow.  All right.  If so, let me know
11    by 8:00 or so.  I don't think I have anything on my list to
12    talk to counsel about.

13         Oh, we did locate the Rostenkowski transcript for
14    jury instructions, and with a little bit of luck, we'll be
15    able to find the instructions.  So we'll try to scan them in
16    and send them to you.

17         MS. MORRIS:  Great.  Thank you, Judge.

18         THE COURT:  All right.  Have a nice evening.

19         MS. MORRIS:  Thank you.  You, too.

20         THE COURT:  And Mr. Allen, you're still under oath.
21    It would not be appropriate for you to discuss any aspect of
22    the case with anyone.

23         THE WITNESS:  Okay.

24         THE COURT:  Be careful stepping down.  Watch your
25    step.

```
 1                    [End of proceedings]

 2

 3

 4                    C E R T I F I C A T E

 5

 6          I, Wendy C. Ricard, Official United States Court

 7     Reporter in and for the District of Columbia, do hereby

 8     certify that the foregoing proceedings were taken down by

 9     me in shorthand at the time and place aforesaid,

10     transcribed under my personal direction and supervision,

11     and that the preceding pages represent a true and correct

12     transcription, to the best of my ability and

13     understanding.

14

15

16

17                        _____

18                        Wendy C. Ricard, CCR, RPR

19                        Official U.S. Court Reporter

20

21

22

23

24

25
```