```
1                  UNITED STATES DISTRICT COURT

2                      DISTRICT OF COLUMBIA

3    UNITED STATES DISTRICT COURT      CRIMINAL ACTION NO. 08-0231

4                                      WASHINGTON,D.C.

5    VERSUS                            THURSDAY, OCTOBER 2, 2008

6

7    THEODORE F. STEVENS               4:30 P.M.

8

9                 JURY TRIAL/HEARING (DAY 9 — PM)

10                     (Jury not present)

11            BEFORE THE HONORABLE EMMET G. SULLIVAN

12              UNITED STATES DISTRICT COURT JUDGE

13

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF,               JOSEPH W. BOTTINI,ESQ.
                                       U.S. ATTORNEYS OFFICE
16                                     District of Alaska
                                       22 West Seventh Avenue
17                                     Federal Building and U.s.
                                       Courthouse
18                                     Anchorage, AK 99513-7567

19                                     NICHOLAS A. MARSH,ESQ.
                                       U.S. Department of Justice
20                                     10th and Constitution Ave.
                                       NW
21                                     Washington, DC 20530
                                       202-307-1049
22
                                       BRENDA MORRIS, ESQ.
23                                     EDWARD SULLIVAN, ESQ.
                                       U.S. DEPARTMENT OF JUSTICE
24                                     1400 New York Avenue, NW
                                       12th Floor
25                                     Washington, DC 20005
                                       (202) 514-1412
```

```
 1

 2     FOR THE DEFENDANT,                    BRENDAN SULLIVAN, ESQ.
                                             ROBERT MADISON CARY,ESQ.
 3                                           ALEX G. ROMAIN, ESQ.
                                             BETH STEWART, ESQ.
 4                                           CRAIG SINGER, ESQ.
                                             WILLIAMS & CONNOLLY
 5                                           725 12th Street, NW
                                             Washington, DC 20005
 6                                           (202) 434-5000

 7


 8     REPORTED BY:                          WENDY C. RICARD, RPR, CCR
                                             OFFICIAL COURT REPORTER
 9                                           333 Constitution Avenue
                                             Room #6718
10                                           Washington, DC  20001
                                             (202)354-3111

11


12     Proceedings recorded by mechanical stenography.

13     Transcript produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2              THE DEPUTY CLERK:  Resuming criminal case 08-231,

 3      United States versus Theodore Stevens.  Would counsel identify

 4      yourselves, again, for the record?

 5              MS. MORRIS:  Yes.  Brenda Morris; Joe Bottini;

 6      Nicholas Marsh -- and that's it for the government.

 7              THE COURT: All right.  Good afternoon.

 8              MR. CARY:  Your Honor, Rob Cary; Craig Singer;

 9      Brendan Sullivan; Alex Romain; and Beth Stewart for Senator

10      Stevens.

11              THE COURT:  All right.  It's your motion.  I read it

12      and read the opposition.

13              MR. CARY:  May I, Your Honor?  Your Honor, through

14      nobody's fault but the government, the playing field in this

15      case is not even, and no penalty imposed by this Court can

16      even the playing field at this point.

17              THE COURT:  Nothing I can do?

18              MR. CARY:  Yes, Your Honor, and I'd like to explain

19      why.  The government has just now produced Brady material --

20              THE COURT:  If I dismiss the charges, you'd be happy

21      with that, wouldn't you?

22              MR. CARY:  I'd take that one, yes, Your Honor.

23              THE COURT: There is something I can do, right?

24              MR. CARY:  Yes.  Yes, Your Honor.

25              THE COURT:  I could dismiss the charges.  I could
```

1    declare a mistrial.  I could do something lesser than that.

2    You're concerned about the lesser of the sanctions, obviously.

3    You're asking for either dismissal or a mistrial, right?

4         MR. CARY:  Yes, Your Honor.  And the reason are that

5    we asked for Brady material the day after indictment in this

6    case.  It should have been produced promptly.  This

7    investigation had been going on for two years.  As they point

8    out in their brief, we produced 70,000 pages of documents; the

9    government -- indictment.  They resisted and they resisted,

10   and we came to court at least four times on Brady issues.

11        They finally sent us a letter on September 9th

12   purporting to summarize what was in the interview memos, and

13   I'd like to put up on the Elmo, if I could, the memos.

14   I'll go ahead and continue while waiting we're waiting for

15   that to warm up -- a letter in which they said:  Allen stated

16   that he believed the defendant would not have paid the actual

17   costs incurred by VECO, and that's the information the

18   government gave us as purported <u>Brady</u> material.

19        We, then, at 11:30 last night, get two 302s that are

20   absolutely 100 percent opposite.  One says:  If Rocky Williams

21   or Dave Anderson had invoiced Ted and Catherine Stevens for

22   VECO's work, Bill Allen believes they would have paid the

23   bill.  And another one, a 302 from February 28th, 2007:  The

24   source, presumably, Bill Allen, did not invoice Stevens for

25   the work that has been performed.  However, the source

1  believes that Stevens would have paid an invoice if he had

2  received one.

3         Now, Your Honor, what's all more the more remarkable

4  is we had to push and push and push to get the 302s in this

5  case, and, finally, Your Honor ordered them produced, and lo

6  and behold, they affirmatively redacted Brady material.  They

7  took the affirmative act of redacting Brady material out of

8  those  302s.  One of the 302s that they produced last night is

9  one that we had previously gotten in redacted form.  There it

10  is in redacted form.

11         THE COURT:  And the information that's redacted is

12  favorable, right?

13         MR. CARY:  Yes, Your Honor.  Favorable --

14         THE COURT:  So someone made a conscious effort to

15  shave favorably information.

16         MR. CARY:  Exactly, Your Honor.  Because this is the

17  same 302 with the other information in it.  Of course, we

18  still don't know what has been redacted otherwise.

19         Your Honor, government counsel --

20         THE COURT: You have received the redacted 302.

21         MR. CARY:  We have not received unredacted 302s. No

22  unredacted 302s yet, Your Honor.

23         THE COURT:  All right.

24         MR. CARY:  Government counsel said this morning more

25  times than I can count that the information they provided last

1    night was merely cumulative of what they produced in their

2    September 9th letter in Paragraph 17(c), and we were shocked

3    at that because it was actually complete the opposite, 180

4    degrees opposite.

5                THE COURT: New information.

6                MR. CARY:  New information.   All right.

7    Absolutely.

8                MR. CARY:  And the opposite information.  It's

9    certainly not cumulative.

10               THE COURT:  Right.  The trial is not over, though.

11   So I mean, hypothetically -- let's talk about this for a

12   second -- hypothetically, you could use that information,

13   couldn't you?

14               MR. CARY:  Maybe.  We could certainly use it --

15               THE COURT:  His direct examination hasn't concluded.

16   You certainly have the right to cross-examine him until your

17   heart's content about the information you have, as well as the

18   new information.

19               MR. CARY:  Your Honor --

20               THE COURT: Wait.  Wait.  Wait.

21               MR. CARY:  Oh, I'm sorry.

22               THE COURT:  If the Court weren't -- and I'm just

23   talking now -- if the Court weren't inclined to grant a

24   mistrial or dismiss, maybe the appropriate remedy, slash,

25   sanction, would be an opportunity to re-open your opening

1    statement along with an instruction by the Court to the jury

2    along these lines:  That the government had an obligation to

3    turn over information favorable to the defendant, but it

4    didn't, and for that reason the Court's going to allow the

5    defendant to reopen its opening statement either now or maybe

6    more appropriately at the commencement of the defendant's

7    case-in-chief.

8            Not to badger the government for what it didn't do

9    because the Court's already given an instruction, but for

10   defendant, if defendant wants to, to address the new favorable

11   information that he argues he couldn't have addressed because

12   he didn't have it.  What's wrong with that as a sanction

13   remedy?

14           MR. CARY:  Your Honor, every trial practice book

15   I've ever read talks about the principles of primacy and

16   recency.  People tend to remember the first thing they hear;

17   they tend to remember the last thing they hear.  And we

18   opened this case without this information, and opening

19   statements -- everybody knows were a very, very important

20   preview of what the evidence will be.  It can dampen what the

21   government's case is going to be --

22           THE COURT:  But the new information is not

23   completely new information.  I mean if you had not received

24   any of the information about the state of mind of Allen or the

25   state of mind of the defendant about paying the bill, if

1     received, etcetera, that's completely new information, and

2     maybe that rises to the level of -- maybe the sanction that's

3     appropriate in that case rises to the level of mistrial or

4     dismissal or something like that.

5          But this is arguably information that's similar to

6     information if the government's version of the events is

7     correct -- the government says on September the 17th, the

8     defendant was advised that Allen recalled that Ted Stevens

9     wanted to pay for everything he got.

10          Now, coincidentally -- I don't understand the

11     significance of this coincidence, but it is a coincidence --

12     but, apparently, the FBI agent was interviewed the same day,

13     September 17th, about -- I mean Allen was interviewed by the

14     FBI agent the same day I believe.  I'm not sure I understand

15     that.

16          MR. CARY:  I'm not sure I understand it either, and

17     I'm not sure how Ms. Morris can --

18          THE COURT:  Well, that's her declaration.  She says

19     on September 17th, you were given some information Allen

20     recalled, and the information you were given was that the FBI

21     agent contacted the source, and the source -- the source being

22     Allen I assume -- told the FBI agent on the same day this very

23     favorable information for your client.

24          MR. CARY:  No.  I think the --

25          THE COURT:  I'm sorry.  Maybe I misunderstood.  I'm

1    sorry.  September the 9th.  September the 9th of this year.

2    Right.  I think I saw it in an attachment.  I think it's the

3    government's attachment "A" to its submission.

4            MS. MORRIS:  Judge, if I may -- the actual state of

5    302 of Mr.  Allen is dated August 30th, 2006.

6            THE COURT: Right.  And that's arguably the first

7    time that the defendant was given -- that Allen was debriefed,

8    right?  Was he debriefed again this year, though, in

9    September, Allen?

10           MS. MORRIS:  I believe he has been. There's been

11   several.

12           THE COURT: Right.

13           MS. MORRIS:  There's been several.

14           THE COURT:  And the last debriefing was when,

15   September the 9th.

16           MS. MORRIS:  No.  No.  No.  September the ninth is

17   when the government turned over it's Giglio letter, Brady

18   letter to the defense.

19           MR. CARY:  It's two years in --

20           THE COURT:  All right.  The point I'm making is

21   this:  New information, but, arguably, not unrelated to the

22   information that you previously had;  it's not completely new

23   information, is it?

24           MR. CARY:  Your Honor --

25           THE COURT:  The information you received last

1    evening.

2          MR. CARY:  Your Honor, I don't I think -- I think it

3    is new, Your Honor, because Paragraph 17(c) of the September

4    9th letter is apparently based, we now learn, on a very, very

5    recent debrief of Mr. Allen in which he said that --

6          THE COURT: Right.

7          MR. CARY:  -- billed for something they would not

8    have been paid, and now we -- that's how what we opened on,

9    that's how we develop our theory of the case.  The government

10   takes us to task saying you chose your theory of the case on

11   Page 7 and suggest we kind of got to live with it.

12          We were entitled to that information before we

13   opened, before we started the case.  We're really entitled to

14   right after indictment, and it's diametrically opposed, and it

15   was very important, and Mr.  Sullivan I'm sure would be happy

16   to address why it's very important to his opening.  This goes

17   right to heart of the case, especially given the government's

18   theory that this is a conspiracy of sorts, a joint venture of

19   sorts.

20          The very dramatic testimony that they elicited over

21   hearsay objection because it went to Bill Allen's state of

22   mind or was subject to a co-conspirator exception to the

23   hearsay rule that Bill was not sent because Bob Persons said

24   Ted Steven's was, quote, just covering his ass, and that is

25   completely the opposite of what is in this Brady.

1            Now, through no fault of the Court or the defense,

2    that is the testimony that is lingering in the jury's mind

3    while we take this break that's been necessitated by the

4    government's own conduct.

5            THE COURT: All right.  So I just want the record

6    clear:  Defendant is not interested in the instruction along

7    the lines that the Court proposed, and the defendant is not

8    interested in making a renewed opening statement.

9            MR. CARY:  We don't think it's sufficient, Your

10   Honor.

11           THE COURT: I just want to -- so you reject those two

12   suggestions then; is that correct?

13           MR. CARY:  Yes.

14           THE COURT:  All right.  That's fine.

15           MR. CARY:  Your Honor, you couple this and with --

16           THE COURT: You certainly can't argue with the fact

17   that you can use that information in cross-examination?

18           MR. CARY:  It is true we can now use what came

19   across the lines last night at 11:30.

20           THE COURT: Would you like a continuance to give

21   further thought to your defense and here our defense theory at

22   this point and your theory for cross-examining Allen?

23           MR. CARY:  Under normal conditions, yes, Your Honor,

24   but we're very concerned about the lingering impression that

25   the jury is going to have while we --

```
 1              THE COURT:  So you reject that?  I want the record

 2      clear you reject that, then, that suggestion?  The Court would

 3      be more than happy to accommodate you and give you the weekend

 4      or more time if you need more time the consider how you wish

 5      to weave this arguably new information to your theory of

 6      defense and prepare to cross-examine Allen.  You're not

 7      interested in that?

 8              MR. CARY:  We do not need it.

 9              THE COURT: I heard a "no" on the right side.

10              MR. CARY:  We don't -- I sense that we don't need

11      it.

12              THE COURT:  All right.  Mr. Sullivan said, no.  He's

13      not interested in that.

14              MR. CARY:  It was a stage whisper there, Your Honor.

15              THE COURT: Do you have any suggestions you'd like to

16      make to the Court for the Court's consideration with respect

17      to a sanction or imposition of a sanction, indeed, remedy

18      short of mistrial and/or dismissal?

19              MR. CARY:  No, Your Honor.

20              THE COURT: All right.

21              MR. CARY:  The -- Your Honor, we suggest that this

22      is a pattern of conduct.  We -- the letter that was sent to us

23      and the Court last night suggested that this was part of an

24      ongoing review of materials in connection with Bill Allen's

25      testimony.  In fact, we learned this morning upon question
```

1    from the Court that it's because Michelle Pluta is going to be

2    a summary witness at the end of the case, and her 302s are

3    going to be <u>Jencks</u> in this case that that's how this was

4    uncovered, and they were going to have to give us those 302s

5    as <u>Jencks</u>, and, Your Honor, we just got lucky again just like

6    we did with Rocky Williams, and the $188,000 VECO bills was a

7    big part of the government's case in the beginning.  We didn't

8    know about it until Mr.  Williams is back in Alaska.  We were

9    deprived as we formulated our case of this important

10   information that goes right to the heart of it especially

11   given the government's theory that there was some sort of

12   conspiracy or joint venture or combined conduct between Mr.

13   Allen and the Senator.

14           THE COURT: Let me ask you this:  In focusing on an

15   appropriate sanction and/or remedy, assuming the Court finds a

16   <u>Brady</u> violation, should the Court also take into consideration

17   the Williams -- I'll call it "episode" -- the Williams' series

18   of events?

19           MR. CARY:  Yes, Your Honor, it should.

20           THE COURT:  Why?  Why?

21           MR. CARY:  Because that was <u>Brady</u> information that

22   we got, once again, because we were lucky.  It was not

23   disclosed to us.  It wasn't until we were able to talk to Mr.

24   Williams on a Sunday when he was back in Alaska that we

25   learned this <u>Brady</u> information for the first time.  We got

1     lucky once.  We got lucky again.  And we may find that when

2     all the 302s are produced, maybe, we're going to get lucky a

3     lot more, but we think there's a pattern, especially given the

4     great resistance that the government gave to giving us this

5     information; there's a pattern of <u>Brady</u> violations.

6          And the trial, Your Honor, in our view is broken,

7     and it can't be fixed.  It's -- you can't -- it's been played

8     on an unlevel playing field.  We're well through it, and we

9     were entitled to this information before the trial started,

10    and they filed an opposition this afternoon that's like on a

11    different planet from what we saw this morning when we came in

12    that suggests, well, you had information.  You chose your

13    theory of the case, and that's just our point, Your Honor, is

14    we've been trying one case, and now we find information that

15    should have been produced right after indictment that wasn't,

16    and now we've got to try a different case, and it is

17    favorable, Your Honor, but it would have changed things.

18          THE COURT:  Why is the case different, though?  Why

19    is the case different?  Why is this information that you just

20    received materially different from the information you

21    previously had?

22          MR. CARY:  One, it is no new news that Bill Allen,

23    apparently, said at one point in August 30th, 2006, that Ted

24    Stevens wanted to pay for everything, but the notion now that

25    if he had sent the invoices, it goes to his state of mind

1       completely contradictory to the case they have been trying is

2       something we were entitled to know, and it would have changed

3       things.

4                THE COURT:  But why are you not precluded -- you're

5       not precluded from, if you wanted to, to go before the jury

6       and say:  And yet and still, ladies and gentlemen, there's

7       another reason why the government is to going to fail its case

8       beyond a reasonable doubt and make that very same pitch

9       because you'll hear from the government's own chief witness,

10      star witness, that had the bills been sent this witness had

11      every reason to believe that the bills would have been paid,

12      and he'll tell you that, and if he doesn't tell you that, then

13      you can call the FBI agent who interviewed him, can't you?

14                MR. CARY:  Yes, Your Honor.

15                THE COURT: You can have a law enforcement agent in

16      your case-in-chief.  That's the defendant's day, isn't it?

17                MR. CARY:  Yeah.  Just what we dream about, Your

18      Honor.  Yeah.

19                THE COURT:  Right.  Right.  Right.  Yeah.  But I

20      mean if he spins you around on the stand, and he's probably

21      capable of doing that, you're not without a remedy there

22      because you can call that FBI agent.

23                MR. CARY:  We can do that, Your Honor.  But we are

24      way down -- this train has left the station a long time ago --

25                THE COURT:  I'm just trying to ameliorate any

1    prejudice or any concern that you're addressing, and I think

2    that there are ways to deal with that short of a mistrial and

3    short of a dismissal, and I think that's what trial judges

4    should focus on:  Can the information be used?

5            It's not as if the trial is over.  It's not as if,

6    heaven for bid, the man testified and became suddenly

7    unavailable and then you learned about the information and he

8    can't be called back to the witness stand, his direct hasn't

9    -- they haven't completed his direct examination yet.  He can

10   be crossed.  He can be crossed with all the information you

11   had before last evening and all the new information.

12           You can use that, and if you wanted to make a new

13   opening statement, I'd certainly afford you the opportunity,

14   and I'd be prepared to give that instruction that the

15   government failed in its obligation to turn over all favorable

16   information to you, and that's the reason why you're hearing

17   from me -- that's the reason why they're hearing from you

18   again, but you rejected that, and I just want the record

19   clear, you're not interested in that as a sanction?

20           MR. CARY:  Because, in our view, Your Honor, this

21   trial's been going on too long on an unlevel playing field

22   without full information to the defense that should have been

23   provided, and it cannot be made even now short of a dismissal

24   --

25           THE COURT:  Is there --

1          MR. CARY:  Or a mistrial.

2          THE COURT: Is there any Circuit authority -- is

3     there any Circuit authority -- I'm not talking about District

4     Court opinions -- any Circuit authority anywhere that might

5     persuade the Court that based upon the showing you've made

6     this afternoon it would be error for this Court not to declare

7     either a mistrial or dismiss the indictment?

8          MR. CARY:  I was just about ready to cite you to the

9     Lyons(Phonetic) case, but you asked for a Circuit Court

10    authority.  The Chapman case, Your Honor, states very clearly

11    that in egregious circumstances, dismissal is an appropriate

12    sanction.

13         THE COURT:  But what are the egregious circumstances

14    in Chapman, though?  What were they?

15         MR. CARY:  They were, Your Honor --

16         THE COURT:  They were more egregious than what

17    happened here, weren't they?

18         MR. CARY:  They were quite egregious, Your Honor.  I

19    agree with that.

20         THE COURT: Right.  Can the Court really -- can this

21    Court draw an analogy between the admittedly egregious

22    circumstances in Chapman and what occurred here?  Is it

23    analogous here?

24         MR. CARY:  Your Honor, we submit that this is quite

25    egregious.  And can I argue that it's the same, no, I can't.

Can I tell you that <u>Chapman</u> stands for the proposition --

    THE COURT:  No.  I appreciate your candor.  I don't think it is the same, so that's why I was -- if it's analogous, you probably get the same remedy that was provided in <u>Chapman</u>, but I don't think it's analogous, and I appreciate your candor in that regard based upon this record before this court at this stage of the proceedings, you know, where direct is still ongoing.

    I have to make that assessment now.  What can be done?  Can they use this information?  How can I level the playing field that they're concerned of, and I've come up with three suggestions that have been rejected.  I've asked for other suggestions short of a mistrial and dismissal without waiving your right to ask for one, but you don't have any other suggestions to make at this point.

    MR. CARY:  And Your Honor --

    THE COURT:  And I'm not saying that being critical, but I'm asking -- I'm reaching out to you.

    MR. CARY:  Our position is that it's broken, and it can't be fixed, Your Honor.  That's just very clearly.

    THE COURT:  All right.  Thank you.  Let me hear from government counsel.

    MS. MORRIS:  Yes, sir.

    THE COURT:  Why isn't he right?  Why isn't he right it's broken, it can't be fixed, and why shouldn't I dismiss

1       this?

2              MS. MORRIS:  Because, Judge, I think you hit on the

3       key word here when discussing this with Mr. Cary, materiality.

4       This is nowhere close to being material, Judge, in that,

5       Paragraph 17(c), which we talked about before when it stated

6       -- Allen stated the defendant probably would have paid a

7       reduced invoice if he received one from Allen or VECO.  That's

8       in there, in addition to --

9              THE COURT:  But that statement was made very late by

10      Allen, though, wasn't it; that statement?

11             MS. MORRIS:  No, Judge.  It was, actually, Mr.

12      Allen -- there were like five different 302s that we pulled

13      form to get the information that was in 17(c), and you asked

14      that I submit an affidavit -- we were having some trouble,

15      some difficulty getting it filed, our computer system kept

16      crashing, but I think we have copies to pass up to the Court.

17      What I'd like to bring to your attention, Judge, is that

18      information was in the September 9th, 2008 letter that I sent

19      to Mr. Romain, but on September --

20             THE COURT:  Was Allen interviewed that day?

21             MS. MORRIS:  No. No.  He was not interviewed that

22      day.

23             THE COURT:  He was not interviewed.

24             MS. MORRIS:  That was when we compiled the letter

25      that had the -- it was the six-page -- five-page letter.

1          THE COURT:  Because a reader would look at that and

2     say, well, Allen was just interviewed by the FBI agent, isn't

3     that --

4          MS. MORRIS:  No, sir.  It was in 2006 and beyond

5     when those statements were made, but in -- September 17th of

6     this year -- September 17, '08, pursuant to your order to

7     provide them the redacted 302s, the government gave the

8     defendant a 302, a redacted 302 --

9          THE COURT: I'm sorry, but this 302, this 1023 or

10    whatever it is, says the contact date was September 9th, 2008.

11    It appears to be an interview with Allen by an FBI agent

12    September the 9th of this year.

13         MS. MORRIS:  I'm not sure, but I'll double check,

14    Judge, but if I could just explain to you what was provided to

15    them.

16         THE COURT:  All right.

17         MS. MORRIS:  On September 17th, '08, this year,

18    pursuant to your order to provide them with the redacted

19    materials, the defendant was provided a 302 of Allen from

20    August 30th, 2006, which said:  Allen described -- well, I

21    won't say that part, I'll hand it up.  Well, it's open.  Allen

22    described Anderson as a drunk.  Allen recalled that Ted

23    Stevens wanted to pay for everything he got.  Rocky Williams

24    was assisting with the remodeling project, but Williams had a

25    drinking problem.

1              In that very sentence there, Judge --

2              THE COURT:  But that disclosure to the defendant was

3      made September 17th, but that information was in the

4      government's files well in advance of that date; is that --

5              MS. MORRIS:  Yes, sir.  It was part of the 302s that

6      were compiled from Allen, and there are others, as well,

7      Judge.  We have given those as exhibits to our motion that we

8      filed today.

9              And in addition, too, Judge, if you look at the

10     motion that we filed today, we go through and tick off all the

11     different parts from people like Augie Paone and people like

12     Bob Persons who gave information that was still along the same

13     lines and even more favorable to the defendant along those

14     lines that he didn't receive a bill, that if he had received

15     a bill, he would have paid the bill; but, again, this is from

16     Mr.  Allen that they had in their possession that said Allen

17     recalled that Ted Stevens wanted to pay for everything he got.

18             They were in possession of that long before opening

19     statements, Judge, and that is far less -- I mean what we gave

20     today is far less material than that statement that he wanted

21     to pay for everything he got.

22             So, Judge, again, I would just reiterate to the

23     Court that this is nowhere close to being a Brady violation.

24     It's not material in that Mr.  Allen -- Mr. Allen, I think,

25     you could -- it's for the jury to decide, but I don't think

1     Mr. Allen is anything -- you see what you get.  He is trying

2     his best to not paint or gloss over anything.  He's testified

3     as truthfully as he can about what his memory is.  I believe

4     part of his testimony has been why did you do certain things;

5     he said because I like Ted.  I mean he's not trying to say

6     that there was something nefarious or he's trying to say that

7     something was hidden.

8          So far, Your Honor, the notes that were provided

9     into evidence or entered into evidence from the government, we

10    got those from the defense.  I mean the defendant was in

11    possession of more than enough information.  So, again, I hear

12    them saying that their opening statement would be different,

13    but they're not really saying how it would be different.  It's

14    a distinction without a difference.

15         They're just -- it's kind of like the whole thing,

16    Your Honor, has been a water-seeking kind of defense.  They go

17    into any crack like a water and try their best to widen it

18    open it up, widen it open.  There's no crack here to seep

19    into, Your Honor.

20         THE COURT:  Isn't the information they received last

21    evening completely opposite the information that they received

22    on prior occasions?

23         MS. MORRIS:  No, Your Honor, especially in light of

24    this particular 302 and others.  But just to highlight how

25    that just hammers it home, Allen recalled that Ted Stevens

1    wanted to pay for everything he got.  How is that any way

2    we're hiding the ball.  Everything that they could ask Mr.

3    Allen -- everything right there sums it up.  You're now going

4    to cross -- they can cross-examine him and say you're now

5    going to say that Ted Stevens didn't want to pay for anything.

6    Didn't you say he wanted to pay for everything he got.  They

7    had that well before their opening statement.

8         THE COURT:  Right.  But the statement they received

9    last night is that the source believes that Stevens would have

10   paid an invoice if he had received one, correct?

11        MS. MORRIS:  Well, that's with regard to Mr.  Hess.

12        THE COURT:  Right.

13        MS. MORRIS:  I believe the architect.  And they can

14   ask him questions with regards to that.  Mr. Allen, I mean he

15   -- let his memory dictate.  I don't think that there's going

16   to be anything wavering or anything different by receiving

17   that statement yesterday that couldn't -- that wouldn't be

18   encompassing this because Mr. Hess' bills would have been

19   encompassed in this, Your Honor, because that was everything

20   they got, and I believe Mr.  Hess' testified, as well as --

21        Well, Mr.  Hess testified that Mr.  Stevens asked me

22   for a bill.  I believe Mr.  Allen testified that he didn't

23   know, that he didn't know if he sent him a bill or not.  They

24   can go right ahead, but he doesn't believe that they were paid

25   when asked did Mister -- or did Senator Stevens pay.  He says,

1    I don't think so.  So let them have at it.  I don't see where

2    there's anything different or anything more that they gain,

3    and I think it's evident, Your Honor, that they don't want to

4    readdress it in opening statement because it's not really

5    going to change anything.  It's not going to change anything

6    with the way they're going to approach this witness.

7              THE COURT:  All right.  Counsel.

8              MR. CARY:  Your Honor, they have come to the Court

9    and said that evidence -- hearsay evidence comes in.  They did

10   it with the Persons' comment the other day because there's a

11   joint venture, a conspiracy.  They also said that Bill Allen's

12   state of mind is different.  Mr. Sullivan opened on the issue

13   that Ted wanted to pay the bills.  That's not news, that's

14   nothing new.  The fact that on two different occasions, two

15   different instances -- one with Rocky Williams and Dave

16   Anderson and one with John Hess -- Mr. Allen told the

17   government that if the bills had been presented, he believes

18   Ted Stevens would have paid them.  That is news.  That is new

19   news, and Mr. Sullivan would have used it in opening

20   statement.  It's fundamental.  It goes to the heart of the

21   case.

22             THE COURT:  And you're telling you are unable to use

23   it now if I allow you to reopen and make a supplemental

24   opening statement.

25             MR. CARY:  It is too weird to reopen now.  This jury

should have heard about that fundamental point at the very

beginning of the case, and we should have been able to

formulate our defense with that fundamental information.

On September 9th, the Court -- the government sent a

letter to defense counsel where they purport to summarize

their Brady information about Allen.  There's nothing about

what they're trumpeting now in their most recent brief as the

reason that this information is cumulative.  It's not there.

They left it out.  They told us we had all Brady information,

and we pushed and pushed and pushed for the 302s and then we

did get some 302s, and we did get that one statement that they

make much about now.  We did get it, and Mr.  Sullivan used

that in his opening statement, but then --

THE COURT:  What's the date of the document where

the Brady material is actually crossed out?

MR. CARY:  The date of the interview or the date it

was provided, Your Honor?

THE COURT:  The date it was provided and the date of

the interview.

MR. CARY:  September 17th is the date it was

provided.  Well, there are a couple of different 302s, but

September 17th, I believe, is the date that the redacted 302s

were provided.  We were in court on September 16th.

MS. MORRIS:  Well, Judge, that is the one that said

Allen recalled that Ted Stevens wanted to pay for everything

1    he got.  That is what they had.  Also, Your Honor, if I may --

2              THE COURT:  Wait a minute.  Let him finish.  Let him

3    finish or had you; did you finish?

4              MR. CARY:  Well, the point is this is a recurring

5    pattern; the September 9th letter, we did not have all the

6    Brady in it.  We finally get the 302s.  They affirmatively

7    redact out Brady, and it's only because we got lucky because

8    Ms. Pluta, Special Agent Pluta, was going to be a summary

9    witness, and they looked at their Jencks there and they've got

10   to turn it over, and then lo and behold, we get it.

11             MS. MORRIS:  Judge --

12             THE COURT: What about that Brady information that

13   someone took the time to blacken out?

14             MS. MORRIS:  Judge, again, it's my understanding --

15             THE COURT:  That's favorable information, right?

16             MS. MORRIS:  Yes.

17             THE COURT:  It's shaded.  It was kept from the

18   defendant.

19             MS. MORRIS:  I -- yes, Judge.

20             THE COURT:  And the question is why?

21             MS. MORRIS:  Your Honor, my understanding is that

22   the information was believed to have been given to the defense

23   and that this was new in this -- the part that hadn't been

24   shaded was new or different in that that kind of information

25   had been given before like in that statement where --

```
1              THE COURT:  Wait.  Wait.

2              MS. MORRIS:  it says Allen agreed to pay for

3      everything -- I mean Mr.  Stevens.

4              THE COURT:  Wait.  Wait a minute.  What you're

5      telling me is that someone recognized it was favorable

6      information, but shaded it because that person thought the

7      favorable information had previously been disclosed to the

8      defendant?

9              MS. MORRIS:  I don't want to misrepresent it because

10     I'm not a hundred percent sure.

11             THE COURT: I just want an answer as to why someone

12     sat down with a black felt pen --

13             MS. MORRIS:  It was a mistake.

14             THE COURT:  -- and struck through favorable

15     information.

16             MS. MORRIS:  Judge, it was a mistake.  Again, if it

17     was in any way intentional, we could have explained this away

18     or rationalized it away as to why it didn't have to be turned

19     over, and that's not -- no, it was a mistake, but again --

20             THE COURT:  That goes to whether or not the

21     government is taking its obligations as the gatekeeper very

22     seriously.

23             MS. MORRIS:  I understand that.

24             THE COURT:  I mean the government does have an

25     obligation, --
```

1                MS. MORRIS:  I understand that.

2                THE COURT:  -- otherwise, favorable information is

3       never disclosed to defense attorneys.

4                MS. MORRIS:  You're absolutely correct.

5                THE COURT: And someone took -- you know, very easy

6       to get a black felt tip pen and say, I'm going to hide the

7       ball here.

8                MS. MORRIS:  No.  No.  No.  I don't believe that.  I

9       firmly do not believe that.

10                THE COURT:  Then why would that -- no one can

11      disagree that information is favorable.  No reasonable person

12      could disagree, right?

13                MS. MORRIS:  That's correct.

14                THE COURT:  All right.  So someone made a conscious

15      effort to shade that information and keep defense counsel from

16      learning of it, and I just reject the answer that that was

17      done because that person believed that the favorable

18      information had already been disclosed to the defendant.

19                MS. MORRIS:  No.  No.  Judge, please, I don't --

20      I'm not-- I can't explain away something that --

21                THE COURT:  Well, is there someone on your team who

22      can explain it?

23                MS. MORRIS:  Judge, I don't believe that there

24      should be, Judge.  All I can tell you is that it wasn't

25      material.

```
 1                    THE COURT:  How does --

 2                    MS. MORRIS:  It was just a mistake.  It was bad

 3          judgment.

 4                    THE COURT:  How does the Court have any confidence

 5          that the Public Integrity Section has integrity?

 6                    MS. MORRIS:  You're right.

 7                    THE COURT:  How do I have that confidence?

 8                    MS. MORRIS:  Well, you know, Your Honor, I've never

 9          --

10                    THE COURT:  It's about integrity.  It's about --

11                    MS. MORRIS:  It certainly is.  It certainly is.

12                    THE COURT:  -- officers of the Court looking at

13          information and saying, you know what, I've got a duty to

14          disclose favorable information to the defendants.

15                    MS. MORRIS:  And that's what we did.

16                    THE COURT:  As opposed to, in the still of the

17          night, getting a black felt tip pen and crossing out favorable

18          information and then saying, well, one reason it was probably

19          done, Judge, was because they already had it.  That's --

20                    MS. MORRIS:  Judge, there was no nefarious intent in

21          there.  There was no nefarious intent in there.

22                    THE COURT:  Then why did it happen?

23                    MS. MORRIS:  But, Judge, it's unfair to say in the

24          still of the night or however you just phrased it, Judge.  It

25          was just a matter of -- it was a matter of us trying to
```

1    provide information, and it was hastily done.  That's the best

2    explanation I can give is that it was hastily done.

3         THE COURT:  That's not good enough, counsel.

4         MS. MORRIS:  But, Judge, please understand that,

5    again, it was not a material omission.  It was not something

6    -- it may have been bad judgment.  I think you're right, and

7    that's why we thought, let's turn it over.  But at the same

8    time, Your Honor, they had that information and more in the

9    sense that Allen has already said that he wanted to pay for

10   everything, and I think that the materiality issue is

11   something that should not be just wished away.

12        I understand, Your Honor, that this is a very

13   serious -- and the Court takes it very seriously, we take it

14   very seriously.

15        THE COURT: I don't know if the government is taking

16   it seriously.

17        MS. MORRIS:  No, Your Honor, we are.  No, Your

18   Honor, we are.  This is not something we take lightly at all.

19   And this is not something that's not done lightly or without

20   stress.  This is causing us undue stress.  We are really

21   worried about this because --

22        THE COURT:  The government should be worried about

23   it.

24        MS. MORRIS:  That's right.  It is our words -- stop

25   laughing.  This is our word, Your Honor.  We are career

1    prosecutors here, and I -- you know, we don't want our

2    integrity -- and I think any trial attorney that I've been up

3    against in all my years from state court through federal will

4    tell you that my word is my bond.  Mr.  Sullivan can tell you

5    that.  Mr.  Sullivan I don't think will deny that.  He may not

6    agree with it right now in this forum, but I think he knows

7    that.

8            THE COURT:  The Court's not attacking anyone

9    personally.  I'm just very disturbed that --

10           MS. MORRIS:  I understand.

11           THE COURT:  -- that this happened.

12           MS. MORRIS:  And we're not taking it lightly, Your

13   Honor, not at all.  Not at all.  But I do want to be make sure

14   that the Court does understand that there is a weighing here

15   in the sense of what was material and that this doesn't in any

16   way, in any way, come close to material.  We're not saying

17   that it shouldn't have been turned over.  I think that was

18   just -- it should have been turned over.  I can't -- I can't

19   say anything about that other than we should have done it, but

20   it was a mistake that was realized, and we're going back.

21           THE COURT:  But at some point, you can't explain it

22   that way, though.  You've got a federal judge telling you on

23   more than one occasion, you're aware of your obligations.

24   Everyone knows what the Brady doctrine stands for.  I cite it

25   to Circuit opinions, District Court opinions.  I did it more

1   than once.  I take this very seriously.  I said, you're aware,
2   you're aware, you're aware.
3                MS. MORRIS:  I understand.  Uh-huh.
4                THE COURT:  Everyone knew what they had to do.
5                MS. MORRIS:  Right.
6                THE COURT:  But, nevertheless, the government didn't
7   do it.
8                MS. MORRIS:  We made a mistake.
9                THE COURT:  The public has to have some confidence
10  in these proceedings.  The defendant is entitled to his fair
11  day in court.
12               MS. MORRIS:  That's absolutely right, and he -- we
13  have -- that's absolutely right.  And, Your Honor, I know that
14  you don't know me.  I know you don't know the rest of the
15  members on this team.  I do.  I've worked with them for years
16  now, and I can tell it was a mistake.  I can just tell you it
17  was a mistake.  Nobody had any, any conscious decision or any
18  malintent (phonetic) to come forward with this Court to try to
19  deliberately deprive this defendant of any, any information or
20  this Court of any order that it issued.
21               We understand the stakes are too high.  Whether or
22  not this man was a sitting senator or whether or not he was
23  someone who just walked in off the street and nobody knew, we
24  take our responsibility very, very seriously.  And we've got
25  people -- the Justice Department is watching us.  The Justice

1    Department is asking what's going on.

2              We not only take our duty and our responsibility as

3    officers for the Court, but we like our jobs.  We do this not

4    for the money, Judge, we do it because we love our jobs, and

5    we do believe in justice, and that's what we're trying to get

6    done here.  And I don't believe that the defendant should be

7    able to take a mistake, a mistake, because they are not

8    harmed, they are not prejudiced in any way, but they keep on

9    wanting to drill it home because they know they see a

10   weakness, they see an Achilles heel for us right now, and

11   they're trying to drive a wedge into us.

12             THE COURT:  Why shouldn't they?

13             MS. MORRIS:  I don't blame them.  I said that this

14   morning.  I don't blame them, it's their job.

15             THE COURT:  But they have to rely upon the integrity

16   of the government in order to get this information.

17             MS. MORRIS:  That's absolutely right.  That's

18   absolutely right.

19             THE COURT:  And it's only the government who knows

20   that this favorable information exists.  That's why the stakes

21   are so high here.

22             MS. MORRIS:  And that's why we turned it over.

23   That's why we turned it over.  That is why there is absolutely

24   no way that we tried to rationalize it or tried to say, oh,

25   well, if it went to an appellate kind of issue -- because you

1      can rationalize that there was no harm, no foul; but, no, it

2      was making sure, yeah, we had to come in here and let the

3      Court know.  We had to come in here and let the Court know and

4      let the defense know.

5               And, again, it wasn't because of late last night the

6      thing went out that we waited around, it's  because we were

7      going through everything to try and make sure --  I was hoping

8      that we could go through and do a complete 302 review, but we

9      couldn't get it accomplished in the time frame.  We couldn't

10     do it all within the time frame, but we understood that this

11     was severe.  We understood the ramifications of it, and we had

12     to step up and take our medicine, and that's what we've done.

13     That's what we've done.

14               And, Judge, it's not easy.  I don't know what -- how

15     this is going to be portrayed, but I know people who know me.

16     I know people who know all of us prosecutors here and know

17     good and well we did not do this intentionally.

18               THE COURT: Anything else?

19               MR. CARY:  Yes, Your Honor.  On September 9th, it

20     was purported to be full Brady information was provided to the

21     defense.  We now know that it was not full Brady information.

22     September 17th, they provided 302s.  They were affirmatively

23     redacted; Brady information.  September 22nd, they sent Rocky

24     Williams home to Alaska and did not -- and he had Brady

25     information that was never disclosed to us.  We only got it

1    because we were lucky.  We got <u>Brady</u> information last night

2    because they were going to put on Special Agent Pluta who's a

3    -- and they needed to provide her <u>Jencks</u> material.  We got

4    lucky again.

5            But we -- and I think I speak for the entire defense

6    team, we don't have confidence that we've gotten all the

7    <u>Brady</u>.  We don't have confidence in these proceedings.  There

8    have been numerous -- there's a pattern of critical <u>Brady</u>

9    failures, and we submit that the appropriate sanction here is

10   dismissal or mistrial in the alternative.

11           THE COURT:  All right.  And if I am not persuaded

12   that those are the appropriate sanctions, then when do you

13   want to proceed?  You don't want a continuance.  You're not

14   asking me for a continuance.  I'd be more than happy to give

15   you one.  You're not asking for that, right?

16           MR. CARY:  Right.

17           THE COURT:  All right.  So you're not asking for any

18   other sanctions, right?  You want to give it some thought?

19   I'm going to take about a 10-minute recess.  Do you have any

20   other sanctions you're interested in short of mistrial or

21   dismissal?  You don't want to reopen opening statement.  You

22   don't want any instruction.  Anything else I can do?

23           MR. B. SULLIVAN:  To answer your question, Your

24   Honor, the answer is thank you for asking, but we believe that

25   there should be a dismissal; if not a dismissal, then a

1    mistrial.  If the Court does not agree, then it seems to me

2    that after the government follows your order to produce all

3    302s and everything else in the file, we'll look at the volume

4    of it.

5            THE COURT: I didn't say everything else.  I said

6    302s.

7            MR. CARY:  Well, 302s.

8            THE COURT:  Right.

9            MR. B. SULLIVAN:  We'll look at it then, and

10   depending upon the volume of it, we'll be prepared to proceed

11   on Monday if we have to.  I certainly hope --

12           THE COURT:  So you're not asking to proceed

13   tomorrow, then; is that correct?

14           MR. CARY:  I don't know yet, Your Honor.  If they

15   show me what the volume is.  You've ordered material produced.

16   We still don't have it.  I don't know where it is; how much is

17   it.

18           THE COURT: Well, in fairness, they're probably

19   working on their response to your motion -- at three o'clock.

20           MR. B. SULLIVAN:  I know.  Let's assume that they

21   couldn't get to it.  How much volume is it?  You've ordered

22   it; we're waiting.

23           THE COURT: I have to assume there's more than one

24   copy of 302s around.

25           MR. B. SULLIVAN:  I don't know.  When we see it,

1      I'll be able to answer that question.

2              THE COURT:  I did order it produced forthwith.

3      What's the status of the production?

4              MS. MORRIS:  It's on its way to the Court, Judge.

5      They'll have it before they leave this courtroom.

6              THE COURT: How many 302s are we talking about?

7              MR. CARY:  Mr. Sullivan originally -- the other --

8              MS. MORRIS:  Oh, it went to their offices, Judge.

9      It didn't come here.  It went straight to their office.

10             MR. CARY:  When we were trying to get the 302s, Mr.

11     Sullivan, for the government, suggested there were hundreds of

12     302s in the case.  So I am concerned about the volume.  He

13     did.

14             MS. MORRIS:  With regard to all of the

15     investigations.  Mr. Romain called me.  He laughed on the

16     phone about that.  He says, oh, there are hundreds of 302s in

17     this, huh?  And I said, no, you know he meant all of the

18     investigations.  And, Judge, there's no secret, there has been

19     multiple related investigations.

20             With regard to this case specifically involving the

21     Senator, the universe is much smaller, and I made that very

22     clear on the phone to Mr. Romain and so did Mr. Sullivan.

23     Again, this is that whole water thing, Judge, they're just

24     trying to make a hole and seep into a crack as best they can.

25     They're making much to do about nothing.

```
 1               THE COURT:  Don't you think they have good reason to
 2      do that?
 3               MS. MORRIS:  I think, Your Honor, you're right.
 4               THE COURT:  Then why be critical of them if you
 5      think they do have good reason to do it?
 6               MS. MORRIS:  I'm not being critical.  I also said I
 7      would have done the same thing if I was in their shoes.  But
 8      what I'm trying to point out is that it just really isn't the
 9      material part that they are trying to make it out -- I don't
10      fault them for trying to be advocates for their client.  I
11      don't fault them for that.  I understand that.  I'm just
12      saying the reality.
13               THE COURT: You agree, do you not, that the defendant
14      was provided with otherwise material exculpatory evidence
15      after Mr.  Williams left the District of Columbia?  Do you
16      agree with that statement?
17               MS. MORRIS:  After Mr.  Williams left?
18               THE COURT: Right.
19               MS. MORRIS:  We gave him his grand jury testimony.
20      We gave them Mr. Williams' grand jury testimony.
21               THE COURT:  I understand that.  And do you agree
22      that that contained otherwise discoverable material,
23      exculpatory material that they had not previously been
24      provided with?
25               MS. MORRIS:  Mr.  Williams was all along considered
```

1    a favorable witness for us, and in that letter, in the

2    September 9th letter or September 8th letter, we stated in

3    there the information about -- that Mr. Williams had given

4    that may have arguably Brady or exculpatory or favorable to

5    them; but, no, Judge, the whole grand jury within itself --

6    I'm sorry, Judge.

7            THE COURT:  No, go ahead.  Go ahead.

8            MS. MORRIS:  We'll let Mr. Marsh talk about the

9    grand jury.

10            MR. MARSH:  On this very limited point, Your Honor,

11    there were four things that were claimed for Mr. Williams:

12    The first was the statement about the check.  As we noted to

13    the Court, we produced all the stuff with that.  There was a

14    second one about Catherine being happy.  We believe there are

15    ample testimony that Catherine was being happy. The third

16    thing, Your Honor, is something that honestly we -- the third

17    thing is this issue about the basis of the check, it being for

18    full value.

19            Now, the Court has Mr. Williams' grand jury

20    testimony, and the Court has, in particular, the 9/26/'08 302

21    -- I believe it's the first paragraph, last page -- in which

22    those two documents -- and I'm not sure if I can -- I'll speak

23    with respect to the 302, and the Court can look at the grand

24    jury to see whether it's consistent.  It's the last page of

25    the grand jury.  But Mr. Williams told the government that it

1    wasn't a fair deal.

2            Now, the fourth one is with respect to the hours Mr.

3    Williams worked.  Certainly, Mr. Williams said he worked in

4    the grand jury 24, possibly more; to be honest, we've gotten

5    into it.  He's been a little bit -- you know, in the recent

6    debriefs with us he said, 2000.  It's hard to tell; but two

7    points, Your Honor, very brief:  Number one, it's not material

8    to the case because the case is not about $70 worth of work.

9    It's about a whole lot more.

10           And second, Your Honor, as the Court will note

11   produced from Mr. Paone, in particular.  Mr. Paone talked at

12   great length about how Mr. Williams was, in his view, drunk

13   on the job and not very efficient.  The Court is aware of the

14   other material that we will produce by the defendant

15   indicating that Mr. Williams would work on all kinds of other

16   projects.

17           And so we submit that the issues that they raised

18   with respect to cross-examination about Mr. Williams' hours,

19   all that material was absolutely provided and -- above and

20   beyond the fact that we submit it is not material.  I just

21   wanted to answer that factual thing.  Thank you, Your Honor.

22           MR. CARY:  Your Honor, it was not in the -- Ms.

23   Morris is just wrong.  It was not in the September 9th letter.

24   None of the four issues with respect to Rocky Williams when

25   the September 9th letter purporting to summarize the Brady.

1    We found that information out from Mr. Williams, and then

2    asked for the grand jury testimony. Mr. Marsh originally

3    said, no, and then they did provide it. That's how we got it

4    because Mr. Williams called us. It was not disclosed. This

5    -- you couldn't count on this September 9th letter.

6            MS. MORRIS:  Paragraph 15, Judge, in the September

7    9th letter:  On September 1, 2006, Robert Williams stated

8    there were no formal plans for the addition at defendant's

9    residence and that Williams sketched the plans for the

10   additions based upon conversations with defendant. Williams

11   also stated that, although, he was the general contractor on

12   the project, he did not deal with the expenses and did not

13   recall reviewing Christensen Builders' invoices.

14           In a memorandum and interview from the same meeting,

15   a federal law enforcement agent noted that Williams estimated

16   that 99 percent of the work was done by Christensen Builders.

17   In a subsequent interview, Williams stated that he did not

18   recall ever saying that Christensen Builders performed 99

19   percent of the work and that such a figure was inconsistent

20   with what he knows to have occurred.

21           So, Judge, we did -- we tried to give them any

22   information we believed was Brady.  That was more than enough

23   information.  We ended up calling Mr. Williams.  They could

24   cross Mr. Williams on an infinite amount of issues, but Mr.

25   Williams overall was a positive.  He was a good witness for us

1    because of the issues, you know, we brought to the Court, it

2    was, and I submit to you, Your Honor, based on the information

3    that we have received since was -- we were acting in good

4    faith, and it was a good judgment to get him back.

5          There is significant issues.  The only thing we have

6    new to add to that, Your Honor, is that he has, apparently,

7    signed a waiver so that we can talk to his doctors should the

8    doctors -- he says that the doctors are willing to let him

9    come back.  We would talk to the doctors first, but our

10   understanding is that that's not going to be the case.  But he

11   has signed a waiver that we can talk to the doctors, but we

12   haven't been in contact with them today because of all the

13   activity that's been going on.

14         THE COURT:  Was your declaration filed before you

15   came over or did you bring it with you?

16         MS. MORRIS:  We actually filed it before I got over,

17   but I have a copy, the original, I can hand up to the Court.

18         THE COURT:  All right.  Did you get a copy of it?

19         MR. CARY:  We did.  We got it off the ECF system

20   when we got here.

21         MS. MORRIS:  Your Honor, I have to tell you, your --

22   the copy that I have for you, it has redacted 302s and

23   unredacted 302s, but this copy does not have redacted personal

24   information, your copy.  The reason why we didn't file -- we

25   were trying to hurry to get everything filed, and we realized

1    the 302s had unredacted personal information like personal

2    information to the individual.  So we didn't file on ECF the

3    302s that are attached, and I think we since have filed it

4    since I ran over here; but your copy, just be aware, Your

5    Honor, doesn't have that redacted portion.

6            THE COURT:  All right.  Mr. Cary, anything further?

7            MR. CARY:  Yes, Your Honor.  To go back to Rocky

8    Williams, Your Honor.  The Paragraph 15 that Ms. Morris just

9    read in the September 9th letter is completely unrelated to

10   the Brady information that we obtained from Mr. Williams on

11   September 15th regarding the number of hours that he worked on

12   the project; Senator Stevens' limited interest in the project;

13   the $2,000 check -- you can read Paragraph 15 of the September

14   9th letter as many times as you like, and it's not in there.

15           THE COURT:  All right.  I'm going to take a 10-

16   minute recess.  Anything further from the government?

17           MS. MORRIS:  Just a moment, Judge.  Can I confer?

18   Judge, just briefly, and there are a lot of moving parts here

19   because the letter does sum up certain things, but also there

20   was production.  In addition to the letter, there was

21   production that was made and what my colleagues are trying to

22   make sure I convey to the Court, and my thoughts are kind of

23   racing right now so I want to make sure I get it straight.

24   But bottom line is that the Brady letters was not the be all

25   and end all.

1            There were other productions that were made along

2     with the Brady letter, and one of the things that was said was

3     that Bill Allen qualified the statement about -- in various

4     parts that have been given to the defense.  In one instance,

5     he said that he wouldn't have given Ted Stevens a full bill

6     because he didn't want him to pay it or he didn't think that

7     he would pay the full bill because it was too much.

8            So there are moving parts here, but the bottom line

9     is that the one statement that Ted Stevens would have paid

10    everything, that was given to him, and that's, I think, the

11    whole thing without any qualifiers.  He was given the

12    qualifiers along --

13            THE COURT:  I understand that, but you must agree

14    that the statement, the most recent statement, is, indeed, a

15    new statement, correct?

16            MS. MORRIS:  It was a statement, Judge, that needed

17    to be turned over.

18            THE COURT:  Right.  But it was not disclosed.

19            MS. MORRIS:  There's no way around that.

20            THE COURT:  Let me be clear before I take a recess.

21    What are you asking me to do?  Are you telling me that you

22    don't know whether you want to proceed to trial tomorrow, that

23    you don't know whether you'll be in a position to do that

24    until you've seen the information that the government is going

25    to turn over to you that's at your office waiting for you?  Is

1       that what you're telling me?  Because I need to know whether I

2       should -- as an accommodation to the defendant either schedule

3       a status hearing at nine o'clock or tell everyone that we're

4       proceeding to trial with direct examination of Allen tomorrow.

5       What's your pleasure?

6               MR. B. SULLIVAN:  Your Honor, I think the most

7       practical thing if you deny our motions is to let us look at

8       these materials to see whether there are any other issues and

9       whether we're prepared to resume on a Monday.

10              THE COURT:  Whether you're prepared to resume on a

11      Monday.  When do you plan to tell me --

12              MR. B. SULLIVAN:  In other words, I would say we

13      should resume on Monday.  If you deny our motions, put us back

14      here in this courtroom to fight it out, then I would think

15      Monday would be the most practical time.  If I go back to the

16      office and I see that there's nothing in these materials that

17      you've ordered, I suppose I could call you up in an hour after

18      I've read them and say, I'll be ready to go tomorrow.

19              Our point is their conduct has imposed upon us this

20      circumstance of delay.  We're not responsible for one minute

21      of this delay so far.  I want to see their materials.  And

22      then if we have to, we'll continue to defend our client as

23      best --

24              THE COURT: What probably makes more sense then for

25      the Court to consider just scheduling the status hearing

```
 1     tomorrow at nine o'clock just to find out how you'd like to
 2     proceed, as opposed to going through telephones, and then
 3     having to get other people on the phone.  It makes more sense.
 4     If we have to bring the jury in, that's fine.  They will
 5     understand if we can't proceed tomorrow.  They won't know the
 6     reasons why.  They seem to be pretty content.  And if we have
 7     to bring them back on Monday, we'll bring them back on Monday.
 8               MR. SULLIVAN:  Well, Your Honor --
 9               THE COURT:  Any objection to that approach?
10               MR. SULLIVAN:  No, Your Honor.  The Court should do
11     what it thinks best.  My understanding --
12               THE COURT:  No.  I want to focus on what your
13     suggestions are, though.  You said you need some time.  That's
14     fine.  I may give you that time, but I don't want to just
15     leave it up in the air, and maybe it makes more sense just to
16     bring everyone back at 9:00 A.M. to say I've had a chance, how
17     would you like to proceed now or then?
18               MR. B. SULLIVAN:  Either that or simply tell them to
19     come back Monday.
20               THE COURT:  I'm asking you what's your preference,
21     counsel.  I'm trying to accommodate you.
22               MR. B. SULLIVAN:  I know you are and I wish I could
23     say.  If I could only see those things that I don't have, you
24     know.  I don't have them.  I don't want to mislead the Court.
25     I could get back there and we could have another explosion
```

1    because we haven't had Brady material.

2              THE COURT: That's predictable.  That's predictable.

3              MR. B. SULLIVAN:  Well, it could be.  You're right

4    about that, Your Honor, given the history of Brady here.  Yes.

5    Because I frankly -- I bet you even money we're going to find

6    more in there.

7              THE COURT:  I don't know.  I'll take a 10-minute

8    recess.  Anything further from anyone?

9              MR. B. SULLIVAN:  No, Your Honor.  But I can

10   accommodate either way you want to go.  I could do it Friday

11   or I could do it Monday, but please understand I haven't seen

12   the material.

13             THE COURT:  Give me an idea on what you delivered,

14   counsel; what you delivered to them?  How many boxes?

15             MS. MORRIS:  I think it was approximately a hundred

16   302s, Judge, but some of them are like a page or -- so not all

17   of them -- I mean four pages was about the most -- no.  There

18   was one, I think, that was 10 pages or 11 pages.

19             THE COURT:  All right.

20             MR. B. SULLIVAN:  Thank you for the clarification.

21   I think if I've got a hundred 302s, I want to look at them and

22   study them.  I'll be prepared to go Monday if this Court

23   decides in its wisdom we should go Monday.

24             THE COURT: Is there anything else I can do to

25   accommodate the defense team short of dismissal or mistrial?

```
 1        Anything else you want me to do or consider?

 2                MR. B. SULLIVAN:  I can't think of a thing.  You

 3        have done the best you could.  You have been on top of Brady.

 4        You have done everything to make this work, but it hasn't

 5        worked.  That's what I want the Court to realize.  I represent

 6        as an officer of this court that it has put me in a position

 7        that I cannot adequately defend this man.  You know I -- if I

 8        had that material on opening, it would have been a substantial

 9        part of my opening.

10                THE COURT:  Well, there's still a way you could use

11        it if you wanted to reopen.  I'd be more than happy to let you

12        reopen.

13                MR. CARY:  Oh, Your Honor, if you handcuffed me and

14        made me try the case on one leg, I'd do my best.

15                THE COURT:  Well, no.  No.  I'm not going to force

16        you to reopen, I'm just saying there is a way -- and I have

17        already crafted what I believe is a very powerful instruction

18        to the jury, and the instruction would be the government had

19        an obligation, the United States had an obligation, to turn

20        over favorable information, and it didn't, and, therefore, I'm

21        giving Mr.  Sullivan and his colleagues an opportunity to talk

22        to you for a few more minutes at the beginning of his case-in-

23        chief.  But you don't want that?  You don't want to do that?

24        You don't want that instruction?

25                MR. B. SULLIVAN:  Your Honor, if you don't mind, I
```

1    think it is a little slightly unfair to make us choose that.

2              THE COURT:  All right.  How would you improve on

3    that?

4              MR. B. SULLIVAN:  If you come and tell me that, no,

5    I reject your motions, would we then think about the

6    possibility of that?  Yes.  But it turns my stomach to think

7    that at this stage in the process that --

8              THE COURT: But I want to take a recess and weigh all

9    the options.  I haven't ruled yet.

10             MR. B. SULLIVAN:  No, I understand.

11             THE COURT:  But if I'm inclined to deny the request

12   for a mistrial and to deny the request to dismiss, I've posed

13   several suggestions -- you're not interested in it.  But if

14   I'm  inclined not to grant you the ultimate relief you're

15   seeking, I need to know from you if there's anything else

16   you'd like the Court to consider doing without waiving your --

17   you've made your record.

18             MR. B. SULLIVAN:  Right.  Wouldn't it be better for

19   -- once you've ruled, then let us consider your offers and

20   say, yes, we should do this or maybe modify it in some way.  I

21   think isn't that the fair thing to --

22             THE COURT: That's fine.  I just want to consider any

23   input you want me to take back.  I'm going to take a short

24   recess.  I just wanted to be up front with you and let you

25   know that if I'm not inclined to grant that relief -- and

1        quite candidly, I'm not inclined to grant it because I think

2        you can use that information.  You can use it.  I'm just

3        trying to think of ways to further accommodate you.  I think

4        there's probably been a Brady violation here, but you can use

5        that information.  And one thought that occurred to me was let

6        you have another opportunity to speak to the jury with an

7        appropriate instruction.

8                MR. B. SULLIVAN:  Well, the only thing I'd ask, Your

9        Honor, is that it is true you have a perspective from up there

10       about how defense counsel can use it, but I'm down here on the

11       other side of the bench, and I'm representing to the Court

12       that the integrity of this proceeding has been breached.  I

13       have been denied the ability to use a powerful piece of

14       information that I should have had.  I know I would have used

15       it.  It fit with my opening.  I said to them, I paraphrased

16       the e-mails, one after another, when he'd look for the bills

17       and look for the bills and made an effort to get a mortgage

18       and paid the bills he got.

19               If I had been able to use that, I would have come

20       home with it, and I'll tell you something else, and I don't

21       think it's fantasy.  If I had that information they wouldn't

22       have dared put that witness up there to give that statement

23       about "cover your ass."  They wouldn't have dared it.  You

24       want a change?  You want to know the difference?  That's the

25       difference.  Over.  They wouldn't have done it, and I wouldn't

1    have had to contend with a guy on the witness stand that's an

2    absolute liar on that statement.  That's the difference.

3    Thank you.

4              THE COURT: You're welcome.  All right.  I'm going to

5    take a 10-minute recess, counsel.  No need to stand.

6              (Whereupon, there was a brief recess at this

7    time;thereafter court resumed.)

8              THE COURT: All right.  Although the Court is

9    persuaded that there is a Brady violation, the Court is not

10   persuaded that a declaration of a mistrial or dismissal of the

11   charges are appropriate remedies.  I've directed the

12   government to produce the 302s that it has.  I'm also going to

13   direct the government to produce the MOIs for defense counsel

14   because this Court has no confidence in the ability of the

15   government to discharge its Brady obligations to either the

16   defendant or the Court.  If I understand defense -- having

17   ruled, what's your request now for further proceedings?

18             MR. B. SULLIVAN:  Monday morning, Your Honor.

19             THE COURT: All right.  What we'll do is my courtroom

20   deputy will contact the jurors and tell them not to come in

21   tomorrow, that they will be told to report to court at the

22   appointed time on Monday, and, hopefully, we'll be in a

23   position to proceed to trial.  If not, then we'll proceed as

24   appropriate.  Yes.

25             MS. MORRIS:  Well, Judge, I think it's just

1    important to let the Court know, based upon what you said just

2    prior to the break, the prosecution team has self-reported to

3    OPR because that's a very serious accusation, and we

4    understand, so we have to make sure that our Office of

5    Professional Responsibility is aware.

6            THE COURT:  So -- so what?

7            MS. MORRIS:  I just want to make sure that you know

8    that we have now reported a violation, a <u>Brady</u> violation, to

9    our Office of Professional Responsibility on behalf of the

10    team.

11            THE COURT:  All right.  That's fine.  I expect the

12    MOIs to be turned over forthwith, as well.

13            MS. MORRIS:  Yes, sir.

14            THE COURT:  And we'll proceed -- yes.

15            MS. MORRIS:  Those have been turned over, those are

16    --

17            THE COURT:  The MOIs?

18            MS. MORRIS:  The 302s and the MOIs.

19            THE COURT:  All right.  That's what I thought I said

20    earlier.  I just wanted to be clear.

21            MS. MORRIS:  It is.

22            MR. CARY:  Your Honor, we have one additional

23    request which is grand jury testimony, as well.

24            THE COURT:  What's your response?

25            MS. MORRIS:  Judge, I don't think we're in a

1       position to say no.  If you want us to turn over the grand

2       jury, we will.

3               THE COURT:  Fine.  Turn it over.  Turn it over.

4       Anything further?  We'll proceed at nine o'clock.  There will

5       be a status hearing promptly at nine o'clock, and maybe we'll

6       be able to proceed to trial at 9:30, maybe not.  Thank you.

7       There's no need to stand.  Thank you.

8               THE DEPUTY CLERK:  This Honorable Court now stands

9       at recess.

10                      [End of proceedings]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          I, Wendy C. Ricard, Official United States Court

5     Reporter in and for the District of Columbia, do hereby

6     certify that the foregoing proceedings were taken down by

7     me in shorthand at the time and place aforesaid,

8     transcribed under my personal direction and supervision,

9     and that the preceding pages represent a true and correct

10    transcription, to the best of my ability and

11    understanding.

12

13

14

15                              _____

16                              Wendy C. Ricard, RPR, CCR

17                              Official U.S. Court Reporter

18

19

20

21

22

23

24

25