```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF COLUMBIA

 3   UNITED STATES DISTRICT COURT        CRIMINAL ACTION NO. 08-0231

 4                                       WASHINGTON,D.C.

 5   VERSUS                              MONDAY, OCTOBER 6, 2008

 6                                       (REDACTED/WITHOUT BENCH

 7                                       CONFERENCES)

 8   THEODORE F. STEVENS                 2:00 P.M.

 9

10               JURY TRIAL (DAY 10 - PM SESSION)

11           BEFORE THE HONORABLE EMMET G. SULLIVAN

12               UNITED STATES DISTRICT COURT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF,                  JOSEPH W. BOTTINI,ESQ.
                                         JAMES A. GOEKE,ESQ.
15                                       U.S. ATTORNEYS OFFICE
                                         District of Alaska
16                                       22 West Seventh Avenue
                                         Federal Building and U.s.
17                                       Courthouse
                                         Anchorage, AK 99513-7567
18
                                         BRENDA MORRIS,ESQ.
19                                       NICHOLAS A. MARSH,ESQ.
                                         U.S. Department of Justice
20                                       10th and Constitution Ave.
                                         NW
21                                       Washington, DC 20530
                                         202-307-1049
22
                                         EDWARD P. SULLIVAN, ESQ.
23                                       U.S. DEPARTMENT OF JUSTICE
                                         1400 New York Avenue, NW
24                                       12th Floor
                                         Washington, DC 20005
25                                       (202) 514-1412
```



1

2   FOR THE DEFENDANT,                    BRENDAN SULLIVAN,ESQ
                                          ROBERT MADISON CARY,ESQ.
3                                         ALEX G. ROMAIN, ESQ.
                                          CRAIG D. SINGER, ESQ.
4                                         BETH STEWART, ESQ.
                                          WILLIAMS & CONNOLLY
5                                         725 12th Street, NW
                                          Washington, DC 20005
6                                         (202) 434-5000


7

8   REPORTED BY:                          WENDY C. RICARD, RPR, CCR
                                          OFFICIAL COURT REPORTER
9                                         333 Constitution Avenue
                                          Room #6718
10                                        Washington, DC  20001
                                          (202)354-3111

11

12  Proceedings recorded by mechanical stenography.

13  Transcript produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2

3    **WITNESSES:**                              **PAGE**

4

5        **BILL ALLEN...................**

6            **BY MR. B. SULLIVAN........        3**

7

8

9    **EXHIBITS:**

10        **Defendant 408...............        18**

11        **Defendant 413...............        20**

12        **Defendant 4000..............        49**

13        **Defendant 561...............        52**

14        **Defendant 4000..............        53**

15

16

17

18

19

20

21

22

23

24

25

1                      P-R-O-C-E-E-D-I-N-G-S

2            THE COURT: All right.  Let's proceed.  A question to

3    the government or to both sides:  Is anyone aware of any case

4    addressing the materiality issue in which the Court, the

5    District Court allowed a witness to testify?

6            (Whereupon, the members of the jury entered the

7    courtroom at this time after the lunch recess.)

8            THE COURT:  All right.  Ladies and gentlemen, good

9    afternoon.  We'll proceed with cross-examination.

10   BY MR. B. SULLIVAN:

11   Q.   You regarded Augie Paone as a good contractor, good

12   builder; did you not?

13   A.   Yes.

14   Q.   And he was a decent guy in addition, wasn't he?

15   A.   I'm sorry?

16   Q.   And he was a very decent man in addition to that, wasn't

17   he?

18   A.   Yes.

19   Q.   And did you meet with Augie Paone and tell him that he

20   should, quote, eat, end of quote, his sixth bill?

21   A.   No.

22   Q.   Did you ever instruct David Anderson to inform him he

23   should, quote, eat, end quote, sixth bill?

24   A.   No.

25   Q.   Did you meet with Augie Anderson -- I'm sorry Augie Paone

1    and tell him that if he did not send the sixth bill to

2    Catherine Stevens, then you would make it up to him someday so

3    he wouldn't be stuck --

4    A.    No.

5    Q.    With an unpaid bill?

6    A.    No.

7    Q.    Did you indicate to Mr. Paone that Ted Stevens was a

8    personal friend and that you were going to oversee his project

9    and that all the bills should go through you and then be sent

10   to Catherine?

11   A.    Can you ask that question, again?

12   Q.    Yes, sir.  Did you tell Augie Paone that your overseeing

13   the renovation project for your friend, Ted Stevens, and that

14   all the bills should go through you to Catherine Stevens?

15          MR. BOTTINI:    Your Honor, I'm going to object.

16   It's a compound question.  I'm going to ask that it be broken

17   down.

18          THE COURT:  Won't you rephrase it for the witness.

19   IT might be easier for him.

20   BY MR. B. SULLIVAN:

21   Q.    Did you tell Augie Paone that he you would review his

22   bills?

23   A.    No.

24   Q.    Did you meet with Augie Paone at the beginning of the

25   project and tell him that you wanted the bills handled

```
 1   properly?
 2   A.    No.  Did you ever tell Augie Paone that because Senator
 3   Stevens was a public official that we should make sure that
 4   the billing records were correct and forward it onto him?
 5   A.    No.
 6   Q.    Did you have a meeting with Augie Paone in which he said
 7   to you that he wanted to make sure that all the bills are --
 8            MR.  BOTTINI:  Objection.  Hearsay.
 9            THE COURT: Sustained.
10   BY MR. B. SULLIVAN:
11   Q.    Did you ever tell Augie Paone that you wanted to make
12   sure all the bills were properly prepared and sent to
13   Catherine Stevens?
14   A.    No.
15   Q.    Did you ever tell Augie Paone that Senator Stevens has
16   some political adversaries and in order to make sure that
17   everything is done right,  his billing should be correct and
18   accurate?
19   A.    No.
20   Q.    Did you ever have a conversation with Augie Paone in
21   which he and you discussed the need to make sure that the
22   billing was kept clean so that --
23            MR.  BOTTINI:  Calls for hearsay.  It's asking for
24   --
25            THE COURT:  Why don't you rephrase that question,
```

1    counsel.

2    BY MR. B. SULLIVAN:

3    Q.   Did you ever inform Augie Paone that the bill should be

4    kept clean and proper because of the fact that Ted Stevens was

5    a government official?

6    A.   No.

7    Q.   Now, did there come a time when you permitted Augie

8    Paone to put some of his bills that related to the renovation

9    project on your own house bill?

10   A.   No.  It's just that one invoice.

11   Q.   Which invoice are you talking about?

12   A.   You -- you questioned me later -- before --

13   Q.   So, at any rate, in your memory, there was one invoice

14   about your house in which you permitted Augie Paone to reflect

15   charges there about -- that related to the renovation of Ted

16   Stevens' house; is that correct?

17   A.   Say that again.

18   Q.   You had a bill for your own house, did you not?

19   A.   Yes.

20   Q.   And did you see on your very own bill that there was

21   language that made it clear that some of the billing items

22   were related to the renovation of Ted Stevens' house?

23   A.   No.

24        MR. B. SULLIVAN:  Excuse me a minute, Your Honor.

25        THE COURT: Sure.

BY MR. B. SULLIVAN:

Q.   I'd like to hand you Defense Exhibit No. 10 for
identification.

          MR. B. SULLIVAN:  May I approach?

          THE COURT: Sure.

BY MR. B. SULLIVAN:

Q.   Sir, would you take look at that and tell me whether that
is a bill related to cost incurred in your remodeling?

A.   (Witness complies.)

Q.   I've helped you with a little highlighting there, sir, to
direct your attention to those portions I highlighted in the
yellow.  It might help you.

A.   Yeah, I see.  Yeah.  What was your question, again?

Q.   My question is is that a bill submitted to you by --
which reflects cost of your remodeling?

A.   At my house?

Q.   Yes.

          THE COURT: Do you know what that document is?

          THE WITNESS:  It's an invoice I guess from --

          THE COURT:  We don't want you to guess.  If you know
what it is, you can --

          THE WITNESS:  I don't, Your Honor, because I'll tell
you, I never see this numbers.

          THE COURT: The question is do you know what that
document is.

```
1              THE WITNESS:  I know it's an invoice, yeah.
2              THE COURT: Do you know what it's for?
3              THE WITNESS:  No.
4    BY MR. B. SULLIVAN:
5    Q.   Does it refresh your recollection in any way that you
6    told Augie Paone not to send a bill to Catherine Stevens and
7    that later you would permit him to put some of those costs on
8    your own bill?
9    A.   Well, I have never seen this right here(Indicating).
10             THE COURT: All right.  Now, listen to what he said,
11   though.  He said does it refresh your recollection in any way.
12             THE WITNESS:  You already asked me that about that,
13   and I told you that Rocky came to my house, and said -- Rocky
14   -- I mean -- Augie is not going to pay this, and so I said,
15   well, just put it on my bill is what you asked me to today
16   awhile ago, right?
17   BY MR. B. SULLIVAN:
18   Q.   Do you mean Augie wasn't going to pay it?  It was Augie's
19   bill, wasn't it?
20   A.   I'm not real sure, and I'll tell you why.  Can I do that?
21   Q.   Well, usually, I ask the questions.
22   A.   Well, okay.  Ask me some more, then.
23   Q.   Pardon me?  I missed that, sir.
24             THE COURT: He said, ask some more.
25             MR. B. SULLIVAN:  Fair enough.  I'll take your
```

1    advice.

2    BY MR. B. SULLIVAN:

3    Q.    You don't know what this is; is that right?

4    A.    No, I don't.

5    Q.    Okay.  You testified I think this morning about a porch

6    on the lower deck, lower deck on the Senator's house, I

7    believe; is that correct?

8    A.    Yeah.  It has been so long.  I think so, yeah.

9    Q.    And do you remember a young man named Brian Burn?

10    A.    Yes.

11    Q.    Was he one of carpenters that worked on the lower deck?

12    A.    Yes.

13    Q.    Now, did you visit the house one day and have a

14    conversation with Brian Burn?

15    A.    I don't remember.

16    Q.    Did Brian Burn suggest to you on a rainy day in which it

17    was rainy or dripping day --

18            MR. BOTTINI:  Objection.  Hearsay.

19            THE COURT:  Sustained.

20    BY MR. B. SULLIVAN:

21    Q.    Did you receive any suggestions Brian Burn about how the

22    roof over the lower deck --

23            MR. BOTTINI:  Same objection, Your Honor.

24            THE COURT:  Sustained.

25            MR. B. SULLIVAN:  It's not offered for the truth of

```
 1      the matter stated,  Your Honor.
 2               THE COURT: You can rephrase that, counsel.
 3      BY MR. B. SULLIVAN:
 4      Q.   Did you have a conversation with Brian Burn about the
 5      roof that was installed at the time the lower deck was built?
 6      A.   Okay.  I guess you asked me was -- the lower deck was
 7      already built,  and did he ask me about that -- the plastic
 8      roof.  I don't remember me talking to him, but I did talk to
 9      some people to -- and I don't know.  It might have been Ted.
10      It might have been Dave Anderson.
11      Q.   You just don't remember?
12      A.   Yes.  I remember about the -- that plastic roof, yeah.
13      Q.   My question is, sir:  Do you remember whether it was you
14      or Brian Burn who suggested a plastic roof might be nice to
15      stop dripping from the upper deck?
16      A.   I don't -- I don't know.  I don't think so.
17      Q.   But, at any rate, you were enthusiastic about the idea,
18      correct?
19      A.   The what?
20      Q.   You were enthusiastic about having a roof there built on
21      the lower deck?
22      A.   Yes.
23      Q.   And you thought it was a good idea?
24      A.   Yes.
25      Q.   And the concept behind the idea that the upper deck by
```

1    nature of the weather there always permitted the snow to drip

2    through and the rain to drip through for weeks after it had

3    stopped raining or snowing, right?

4    A.    Yes.

5    Q.    And so your idea -- well, someone's idea was that if the

6    roof was there,  the lower deck would be dry; am I correct?

7    A.    Yeah.  Somebody had an idea of it, and I thought it was a

8    good idea.  I don't know who done it, but --

9    Q.    And you and your -- just decided to have it done,

10    correct?

11    A.    I thought it was a pretty good idea, but I don't think I

12    just told them to go ahead and get it done.

13    Q.    Take a look at Government Exhibit 495 for a minute, sir.

14    We'll put it on the screen.  It's already admitted.  This is a

15    note card from Ted Stevens sent to you which you already

16    examined; am I right?  Can we blow up the top half?  That's

17    good.

18        Now, you were asked today about the reference to Mr.

19    Torrocelli which appears in the center, second paragraph, in

20    there.  Do you see that?  Could you highlight name

21    "Torrocelli" for us, Beth, please?  Can you see it, Mr.

22    Allen?

23    A.    Yes.

24    Q.    And you had read that in your direct examination, and a

25    question was asked today in your direct examination about Mr.

1    Torrocelli; am I right?

2    A.    Yes.

3    Q.    And the first time I think you testified you didn't know

4    what the reference to Mr. Torrocelli meant; am I correct?

5    A.    No, I didn't.

6    Q.    And since you testified before and some time between then

7    and today, this morning, you found out more about Torrocelli;

8    am I correct?

9    A.    It was some time after I got here in DC, yeah.

10   Q.    When you first testified the other day, you didn't know

11   what it was.

12   A.    Yeah.

13   Q.    What the reference was, you said that, I think; am I

14   right?

15   A.    I might have.

16   Q.    But today, you came in and explained it, didn't you?

17   A.    Yeah.

18   Q.    And what did you tell us?

19   A.    There was some guy that I don't know whether it was

20   modeling his house or a new one, but he was a -- I guess he

21   was going into the -- was going to be elected into the Senate

22   or elected or trying to be elected.  I don't know for sure.

23   Q.    Where did you get that new information?  Who told you?

24   A.    My lawyer.

25   Q.    Okay.  Now, let's look at the note.  You see the note

1    says:  Thanks for all the work on the chalet,  right?  Do you

2    see that part of it just above the yellow?

3    A.   Yes.

4    Q.   Okay.  Do you remember getting this note?

5    A.   Yes.

6    Q.   Okay.  And then the next sentence says:  You owe me a

7    bill; doesn't it?

8    A.   Yes.

9    Q.   And then it says:  Remember Torrocelli?

10   A.   Yes.

11   Q.   And you see the line beginning with the word

12   "friendship"?  It says friendship is one thing; you see that?

13   A.   Yeah.

14   Q.   And, of course, he's talking about your friendship with

15   him, isn't he?

16   A.   I think he is, yeah.

17   Q.   It says:  Friendship is one thing, dash, compliance with

18   the --

19          THE COURT: I'm not so sure he can testify about what

20   was in the writer's mind.

21          MR. B. SULLIVAN:  I'm sorry,  Your Honor?

22          THE COURT:  You don't know what the writer was

23   thinking when he wrote that word, do you?

24          THE WITNESS:  No.

25          MR. B. SULLIVAN:  I'm only asking what he

1    understood, Your Honor.

2    BY MR. B. SULLIVAN:

3    Q.   Just what you understood, not what was in -- okay, Mr.

4    Allen?  Only what you think.  Did you understand that Ted

5    Stevens was talking about your friendship between you and him

6    when he said, friendship is one thing?

7            THE COURT: What did you understand that to mean, if

8    anything?

9            THE WITNESS:  Like a friendship is one thing and

10   whatever this other -- what's the next word there?  I can't --

11           MR. B. SULLIVAN:  "Compliance"; does that help?

12           THE WITNESS:  Compliance.  And --

13   BY MR. B. SULLIVAN:

14   Q.   Could we start by -- let me read it and see if you agree

15   with me.

16   A.   Okay.

17   Q.   Compliance with the ethical rules is entirely different;

18   you agree with that?

19   A.   Yes.

20   Q.   Okay.  Then the next sentence says:  I asked Bob "P" to

21   talk to you about this, so don't get "p-o'd" at him.

22   A.   Yes.

23   Q.   Is that correct?

24   A.   Yes.

25   Q.   He's asking you don't get angry at Bob Persons if he

1    raises this issue; do you see that?

2    A.   Yes.

3    Q.   You understood that at the time, right?

4    A.   Yes.

5    Q.   And then his last -- next to last line is quote:  It just

6    has to be done right, end of quote; do you see that?

7    A.   Yeah.

8    Q.   So you did understand the meaning of the memorandum when

9    you received it, did you not?

10   A.   Yes.

11   Q.   Now, look at Government's Exhibit 509.  Now, here, is

12   another note from Ted Stevens about a month later; am I right?

13   A month later was the other note we just saw, isn't it, sir?

14   A.   I guess so.

15   Q.   Okay.  And I'm just addressing your attention to the

16   paren(Phonetic) in there.

17   A.   The what?

18   Q.   The parenthesis, and I'll highlight it for you.  Just the

19   parenthesis.  And I'll read it for your convenience:  Quote,

20   don't forget we need a bill for what's been done out at the

21   chalet, end of quote; do you see that language?

22   A.   Yes.

23   Q.   And did you receive that document from Ted Stevens?

24   A.   Yeah.

25   Q.   I think, sir, in your direct testimony you were shown a

1    picture of the cabin with an ice overhanging on the roof

2    marked -- I don't know what the government exhibit is, but

3    it's Defendant's 408.  Do you see that?  Do you remember

4    discussing that?

5              MR. BOTTINI:  Your Honor, I'm not sure this actually

6    has been admitted into evidence.

7              MR. B. SULLIVAN:  I believe it was.

8              THE COURT: I believe he was shown a government's

9    exhibit.  This is Defendant's Exhibit 408.

10             MR. B. SULLIVAN:  It's the same one, Your Honor.

11             MR.  BOTTINI:  It may have been entered through

12   another witness.  I don't think it was Mr.  Allen.

13             MR. B. SULLIVAN:  Oh,  I'm sorry.  It was Cecil

14   Dale.

15   BY MR. B. SULLIVAN:

16   Q.   Do you know Mr.  Dale?

17             THE COURT: Just a second.  I don't think it was

18   admitted.

19             THE WITNESS:  I think he's an electrician; am I

20   right?

21             THE COURT:  No.  The Defendants Exhibit 408; I don't

22   think --

23             MR. B. SULLIVAN:  We'll mark this as defendants

24   because I know it's in through the government.

25             THE COURT: All right.  That's fine.

1    BY MR. B. SULLIVAN:

2    Q.   Do you see that?   Do you see that, sir.

3    A.   Yeah, I see it.

4    Q.   Do you recognize that as Ted Stevens' home?

5    A.   Yes.

6    Q.   And that's an ice overhang on the roof which was talked

7    about; am I correct?

8    A.   Yes.

9          MR. B. SULLIVAN:  Could we publish that to the jury,

10   Your Honor.

11         THE COURT:  Any objection to its admissibility?

12   You're offering it into evidence?

13         MR. B. SULLIVAN:  Yes.

14         THE COURT:  All right.  Any objection.

15         MR.  BOTTINI:  No objection.

16         THE COURT: Admitted.

17   BY MR. B. SULLIVAN:

18   Q.   You spoke in your direct examination about a problem with

19   the roof, correct?

20   A.   Yes.

21   Q.   And it is a fact, isn't it, that there was a design flaw

22   in the roof?

23   A.   Yes.

24   Q.   And you felt badly about the fact that it had been

25   designed poorly and caused the problem we see in the

1    photograph, correct?

2    A.    Yes.

3    Q.    And the fact of the matter is that that much heavy ice on

4    a roof is a dangerous condition, isn't it?

5    A.    Yes.

6    Q.    Because it can fall off.  Eventually, it will fall off

7    and hit whatever is underneath it, right?

8    A.    Yes.

9    Q.    And you learned that in fact a piece of it did fall off

10   and it did damage to the garage roof, made a dent in it,

11   pushed the lights out of the ceiling, and broke some wall

12   board; am I correct?

13   A.    I don't know about the inside of it, but I know that it

14   hit the roof.

15   Q.    Right.  Take a look at Defendants 413; only the witness

16   for identification, please.  Is that the same shot, basically,

17   with the ice a little more advanced?

18   A.    It looks like it, yeah.

19         MR. B. SULLIVAN:  I ask that 413 be --

20         THE WITNESS:  Yes.  Yes.  Yes.

21   BY MR. B. SULLIVAN:

22   Q.    It is?

23   A.    Yeah.

24   Q.    Thank you.

25         MR. B. SULLIVAN:  I ask that 413 be admitted.

1                THE COURT:  Any objection?

2                MR.  BOTTINI:  No objection.

3                THE COURT: Admitted.

4     BY MR. B. SULLIVAN:

5     Q.   Ice is a little thicker here, isn't it?

6     A.   I can't remember the other one how thick it was, but it's

7     probably thicker.

8     Q.   Okay.  And I think you used the term "glacier" when you

9     first discussed it.

10    A.   Glacier.

11    Q.   Glacier.  Ice.  Glacier.

12    A.   If I you've got a roof and it glaciers.

13    Q.   Yes.

14    A.   That's what it was doing.

15    Q.   Okay.  In other words --

16    A.   Now, you're not trying to get me mad, are you?

17    Q.   No, I'm trying to --

18    A.   I think you are.

19    Q.   No.  I'm not.  I want you to be happy.

20    A.   You're not going to get me mad.

21    Q.   No.  You'd usually know if I'm trying to.

22    A.   Okay.

23    Q.   It's a glacier.  It's a term, I guess, you use a lot in

24    Alaska, right?

25    A.   Yes.

1    Q.    Down here in Washington, once and awhile, we get our

2    gutters to freeze.  Nothing like that.  All right.  So that's

3    a very heavy piece of snow and ice, isn't it?

4    A.    Yes, it is.

5    Q.    And it created a problem which you tried to solve; am I

6    right?

7    A.    Yes.  But it -- after we finally got it done the right

8    way, it worked.

9    Q.    Okay.  And the solution that was chosen was to run this

10   heat tape up and down the roof, up and down the roof, all over

11   the roof to generate some heat, correct?

12   A.    Yes, that's right.

13   Q.    And that's to solve the problem; is that right?

14   A.    Yes, uh-huh.

15   Q.    And do I understand correctly that you felt badly about

16   the fact the roof was designed poorly to create this

17   condition, and that would not be something that you would want

18   to send a bill for to Ted Stevens or any other homeowner,

19   would you?

20   A.    No, I wouldn't.

21   Q.    But -- and the decision not to charge Ted Stevens for

22   putting heat tape on a roof that was badly designed was your

23   decision, right?

24   A.    Not directly.  You know, I didn't design the roof, but

25   what's the old saying, Truman, the buck stops here.

```
1    Q.    Right.

2    A.    Okay.

3    Q.    Great president.

4    A.    Yeah.  So, yeah --

5    Q.    But you're trying to -- strike that.  You wouldn't have

6    ever thought to send a bill for the heat tape and the

7    installation of the heat tape and repair of the heat tape

8    because you just think it is not right to do so, right?

9    A.    It was a mess up.

10   Q.    It was a mess up.  And you don't send a bill for someone

11   else's mess up?

12   A.    That's right.

13          MR. B. SULLIVAN:  May we see Government Exhibit 272,

14   please?

15   BY MR. B. SULLIVAN:

16   Q.    This is admitted by the government and shown to you

17   during your direct testimony, sir, and I just want to direct

18   your attention to a couple of things; number one, the very top

19   roof -- this, of course, is in the summertime.  No ice

20   visible, right?

21   A.    Yeah.

22   Q.    And you notice the top roof there, can you see the gutter

23   pull off the house?

24   A.    Yes.

25   Q.    And is that the result of the snow that we see that,
```

1    obviously, can be so heavy that it rips off a gutter that's

2    installed?

3    A.   You don't want any questions from me, so, but I'll tell

4    you what I think happened.

5    Q.   Okay.

6    A.   Is that all right?

7    Q.   Sure.

8    A.   Okay.  The first time with the heat tape, it wasn't right

9    because they had a snow meter, and it would make a switch so

10   the heat of the tape reached the heat -- the tape -- heat

11   tape, and it would come on as soon as it started snowing.  And

12   we got it where it would work, and before this, it was a

13   picture -- maybe it is the same picture -- but I haven't seen

14   it for a long time, but the first one screwed up all this the

15   first time, and the next time when we figured out the gauge

16   was gone and it wasn't in the right place, then it really

17   worked.

18   Q.   Uh-huh.

19   A.   Now, either the electricity wasn't on or something

20   because that heat tape worked, and it was a automatic deal

21   where it would --

22   Q.   Okay.  I think I understand that.  What you're saying,

23   basically, is that the sensor, a little sensor, was too close

24   to the heat tape the first time.

25   A.   No.  No.  No.

```
1    Q.   No?

2    A.   It was in the right place for -- it was a snow gauge.

3    Q.   I see.

4    A.   As soon as it got snowing, then it would flip the

5    electricity on the heat tape, and it worked.

6    Q.   I understand.

7    A.   Okay.

8    Q.   Thank you.  And directing your attention to the bottom

9    half, I see a sign there that says "private party"; do you see

10   that?  Down below to the left of the generator.

11   A.   What does it say?

12   Q.   Full picture if you would.  See that white sign, "private

13   party" and some day just stuck in the back of the house there?

14   A.   What does it say?

15   Q.   It says "private party", Tuesday; Tuesday, Thursday,

16   whatever.  I just wanted to ask:  Have you gone to various

17   fundraisers at the chalet for from time to time over the

18   years?

19   A.   Yes.  We had used Ted's chalet right before it was built

20   -- it wasn't jacked up on the symphony.  We done that I think

21   two times, and we used Ted's cabin.

22   Q.   Okay.

23   A.   The only one that I know of was a fundraiser after it was

24   over -- it was some kind of a fundraiser for somebody.  I

25   can't remember who the somebody was, but that was Ted's
```

1     fundraiser.  He had done the fundraiser.

2     Q.    And you've been there for those kinds of functions in

3     order to raise money for some good cause?

4     A.    Yeah.  But I haven't used the house after it was built.

5     Q.    I understand.  Did you say -- were you active in raising

6     money for the symphony orchestra?

7     A.    Yeah.  But that was before we jacked it up.

8     Q.    I understand.  And from time to time, there were

9     fundraisers there that you participated in?

10    A.    Just the other one -- the other one is the only one I can

11    tell you.

12    Q.    All right.  Now, you testified about the rope lighting in

13    your direct examination.

14    A.    The what?

15    Q.    The rope lighting.

16    A.    Uh-huh.

17    Q.    The lighting.  And I believe you testified that this was

18    your idea; am I correct?

19    A.    Yes.

20    Q.    And,  in fact,  Ted called you as a friend and asked you

21    if you'd put up his Christmas lights.

22             MR.  BOTTINI:  Objection.  Hearsay.

23             THE COURT:  Rephrase that.

24             MR. B. SULLIVAN:  Your Honor, I'd remind that all of

25    their testimony is coming in because of a so-called rule that

1    permits it, so let me rephrase.

2              THE COURT: Why did you put up the Christmas lights

3    without telling us what anyone else said?

4              THE DEFENDANT:  I'm sorry, Your Honor.

5              THE COURT:  Why did you put up the Christmas lights?

6              THE WITNESS:  Because I thought it was a good -- it

7    was right before Christmas, and I wanted to put the lights up

8    because I thought Ted would really like it.  He didn't ask me

9    to do it.

10   BY MR. B. SULLIVAN:

11   Q.   You were just being nice.

12   A.   It was all mine.  It was my idea.

13   Q.   Your idea.  In fact, I think you testified it was a

14   pretty neat idea.

15   A.   That what?

16   Q.   I think you testified -- I have your testimony here from

17   the other day that it would be a neat idea.

18   A.   Yeah.

19   Q.   Neat.  But it was your idea, right?

20   A.   Yes.  Yes.

21   Q.   And you didn't ask Ted or Catherine Stevens about it,

22   right?

23   A.   No.

24   Q.   Apparently, you were putting up some rope lights on your

25   house for Christmas and maybe your son's; am I --

1   A.    No.  I didn't do any of mine, but on his house, I

2   probably did.  But like I said, my testimony -- I think it was

3   there -- that Anchorage, the mayor liked all these lights so

4   they made Anchorage look prettier.

5   Q.    I see.

6   A.    They had lights all over the trees and everywhere, and

7   that's where I got the idea.

8   Q.    Okay.

9           THE COURT:  All right.  Before you ask that

10  question, let me just speak with counsel at the bench.  You

11  can remain there.  You don't have to get up.

12          (Whereupon, there as a bench conference at this

13  time.)

14          **(SPACE LEFT BLANK INTENTIONALLY)**

15

16

17

18

19

20

21

22

23

24

25

1              (Whereupon, the bench conference concluded at this

2       time.)

3              THE COURT: All right.  If you want to pursue that,

4       again,  you can, and with any other 802(d)(2) witness.  That's

5       fine.

6       BY MR. B. SULLIVAN:

7       Q.   Okay.  I asked a few minutes ago, do you remember -- if

8       you can't hear,  just give me a wave.

9              THE WITNESS:  Would you give me another one of

10      those?

11             (Whereupon, the deputy clerk gave the witness

12      another headset.)

13             THE WITNESS:  Thank you.

14      BY MR. B. SULLIVAN:

15      Q.   Okay.  I'll test it for.  How's that?  Sound all right?

16      Does it sound okay; one, two, three, four?

17      A.   Yeah.  Uh-huh.

18      Q.   Do you remember Ted Stevens asking you as a friend

19      whether you put up the Christmas lights that he had at his

20      house in the garage?

21      Q.   Do you remember such a request at about the same time?

22      A.   No.  I can't remember that.

23      Q.   All right.  So not only was this your neat idea, but you

24      wanted it to be a surprise, too, right?

25      A.   Yes

1    Q.   So you certainly didn't ask for permission of Catherine

2    or Ted to put up the lights; am I right?

3    A.   No.

4    Q.   And you had a lot of workers, and you told someone to go

5    out and buy the lights and put them up, right?

6    A.   Okay.

7    Q.   And this is a big project, isn't it?

8    A.   I don't think a big project, but it -- I think the tree

9    was too much, but the other, I don't think it was very big.

10   Q.   The tree was too much you think?

11   A.   It was too much.  I shouldn't have done that.

12   Q.   Okay.  Let's see Government's Exhibit 59 I think which

13   was shown yesterday and already admitted.  There's the base of

14   the tree.

15   A.   Yeah.

16   Q.   And you're the one that said the light should go up to

17   the top of the tree.

18   A.   Yep.

19   Q.   And had to buy enough to do it?

20   A.   Had to --

21   Q.   You had to buy enough to supply 60, 70, 80' in the air,

22   right.

23   A.   Yeah.

24   Q.   Okay.  Now -- and then you needed a truck or something to

25   get them up there, one of these lifts, a man lift.

1     A.    Right.

2     Q.    Right.  And you told them to do all of that, right?

3     A.    Yeah.

4     Q.    And this is part of the -- you had to send an electrician

5     out there?  And these are the cords hanging off the tree;

6     cords and boxes and all that kind of stuff(Indicating)?

7     A.    Yes.  That's where you plug it in, yeah.

8     Q.    Okay.  Can you think of anything else you could have

9     nailed to that tree?

10    A.    No.  That's all it needed.

11    Q.    Looks to me like about eight plugs and two boxes; am I

12    right?

13    A.    Yeah.

14    Q.    And this was going to be -- and all this was good-hearted

15    on your part, and the Christmas spirit to do something fun,

16    right?

17    A.    Yeah.

18    Q.    And, of course, you never sent a bill for that, did you?

19    A.    No.  I wouldn't have ever done that, no.

20    Q.    Never done that?

21    A.    No.  It was my surprise.

22    Q.    My surprise.  Okay.  And if we looked at Government 37,

23    that shows some of the lights wrapping around the poles and on

24    the house; am I right?

25    A.    Yes.

```
1    Q.   At one point soon after they were up, did you learn that
2    there was a complaint from some neighbors that it was so
3    bright that part of it had to be taken down?
4    A.   No.  I think some neighbor did say that about the tree.
5    I seem to kind of remember that, but I don't think the rest of
6    the lights around the house; I don't think it was.
7    Q.   Okay.  Let's look at Government Exhibit 52, please.  You
8    remember you talked on direct examination when you were shown
9    this picture -- and it's been admitted, Your Honor -- do you
10   remember that picture in your direct examination?
11   A.   Yes.
12   Q.   This shows at the lowest part of the picture a steel
13   grate; am I right?
14   A.   Yeah.
15   Q.   And well behind it are those steel stairs that we're
16   talking about, right?
17   A    Right.
18   Q.   And I gather you thought it would be good idea to put
19   those kind of steps in and that kind of grate on the house,
20   right?
21   A.   You mean on the top of the front of the deck?
22   Q.   Well, originally, I gather your idea was to have the
23   steel run all --
24   A.   Yes, that's right.
25   Q.   -- on the deck, right?
```

1    A.    Uh-huh.

2    Q.    Of course, you like steel because you work in steel,

3    right?

4    A.    Yeah.

5    Q.    And Dave Anderson, who you sent out there, he was a

6    welder, right?

7    A.    Uh-huh.

8    Q.    And so because you always work in steel, I guess it

9    occurred to you maybe it would be nice to have a steel deck?

10   A.    No.

11   Q.    No?

12   A.    No.  I thought that the deck in the front of the house

13   would be a pretty good deal for Ted because when you see those

14   -- the grates, you put the snow on it and, you know, it will

15   come down.  It will come through the grate, and so Ted

16   wouldn't have to shovel his deck.  That's the reason that I

17   thought that would be a good way to do it.

18   Q.    I see.  And did you learn that Catherine didn't want a

19   steel deck?

20   A.    Yes.  Ted told me, he said, man, she don't want that.  It

21   looks like a platform or a rig or something, and the other

22   thing is -- and it is right, too, that some women wear their

23   -- they put their high heels would go in there and mess them

24   up or get stuck, so Cathy was right.

25   Q.    Sometimes the ladies have an idea that's better than

1    ours, right?

2    A.    Yeah.

3    Q.    So you didn't put a steel deck up there?

4    A.    No.

5    Q.    But there was some steel put on the stairs and in that

6    lower area, right?

7    A.    Well, see, I don't think -- Cathy was going to come down

8    to those steps and that platform.  That would be Ted's job to

9    get the wood up to the wood stove.

10   Q.    And that is the kind of steel you actually use out there

11   on those oil platforms, isn't it?

12   A.    Yeah.

13   Q.    Now, today the government showed you some pictures of

14   some furniture.

15   A.    Uh-huh.

16   Q.    Some black furniture that you'd had in your condo, right?

17   A.    Yeah.

18   Q.    If we could put it up; I'm showing Government Exhibit

19   285.  There are a couple of pieces of that black furniture.

20   How long was that furniture used by you in your apartment

21   before you moved into your new house?

22   A.    Probably, seven years or something like that.

23   Q.    I see.  And when you were moving into your new house, you

24   didn't want it and were looking for a place to distribute it

25   and get some use out of it; is that a fair consideration?

1   A.   Yeah, uh-huh.

2   Q.   And did you have some other furniture that you were going

3   to send to your children or other people?

4   A.   I think I was.

5   Q.   Uh-huh.  You were just trying to get rid of it,

6   basically, get some use out of it?

7   A.   No.  I know that I thought that Cathy and Ted probably

8   need something for awhile.  I thought they were in good shape.

9   But they said there was a cigarette in it, and so maybe Cathy

10  didn't like them at all.  I don't know, but I thought it was a

11  good idea just to -- where they could use their house, they

12  could put more furniture in, whatever they wanted.

13  Q.   Once again, just reacting naturally, thinking, I'll be a

14  good guy, here's a good place to send it?

15  A.   Yeah.  But, you know, you could have sold the damn thing;

16  wouldn't have got much, but I wasn't trying to get -- take it

17  off from me to them so didn't have to take it to the junk.

18  Q.   No.  I don't mean anything like that by it.

19  A.   Okay.

20  Q.   You just thought you were being a good guy, you didn't

21  have a use for it, and so you'd just ship it down there.

22  A.   Yeah.

23  Q.   But you didn't ask Catherine about it beforehand, whether

24  she might like that kind of furniture in her house, right?

25  A.   No.

```
1    Q.   Take a look at some of the lighter color furniture that
2    come up next on the exhibits.  Do you have them handy, Beth?
3    Do you see this chair that's in the far corner here?  Right
4    close to the picture of a light colored chair; you actually
5    see a footstool, and then to the left of it, a chair.
6    A.   Uh-huh.
7    Q.   Do you see the arm of the chair on the screen?
8    A.   Yes.
9    Q.   Now, you're a big man, and you like big furniture; am I
10   right?
11   A.   Yeah.
12   Q.   This is big furniture for a little house, isn't it?
13   A.   Yeah, it is big furniture.
14   Q.   It's big furniture, and you're not an interior decorator,
15   are you?
16   A.   No way.
17   Q.   You're a steel man out there in the cold, right?
18   A.   Yeah.
19   Q.   And did Ted ever tell he can't even sit in the chair
20   because his feet don't reach the ground?
21   A.   No.  Because he thought just like you give somebody and
22   they don't like it, you know, you don't ever say -- no.  He
23   didn't tell me that.
24   Q.   Ted is polite to a fault, isn't he?
25   A.   Yeah.  Yeah.
```

1    Q.    If he didn't like it, he finds it hard to say it, right?

2    A.    Yeah.

3    Q.    But what did you do with Catherine's furniture that was

4    in there?

5    A.    It was in the warehouse as long -- and then, of course,

6    when we saw -- when we sold VECO, I think the Hill people, the

7    people that bought VECO, I think they must have took it out or

8    something.

9    Q.    Just threw it away not knowing --

10    A.    I don't know what they done with it.

11    Q.    Now, you also testified about some tools; do you remember

12    that?

13    A.    Uh-huh.

14    Q.    Do you remember Ted calling you and telling you that the

15    workman had left tools there and someone should come get them?

16    A.    No.

17    Q.    Do you remember that big thing on the top of a red chest,

18    a Dewalt(Phonetic) tool or something?

19    A.    Yeah.

20    Q.    Now, you know Ted has his own tools, right?

21    A.    Yeah.

22    Q.    And I mean, you can only use one hammer at a time, can't

23    you?

24    A.    I don't know.  He's pretty fast.

25    Q.    Is he?  Does he do it with both hands?

37

```
 1      A.   Yes.
 2      Q.   Yes.  Okay.  But that, again, was another idea of trying
 3      to be nice to somebody, right?
 4      A.   Yes.
 5      Q.   He didn't ask for them, did he?
 6      A.   No.
 7      Q.   And he even told you at one point that they should be
 8      returned to the workmen, didn't he?
 9      A.   I can't remember if he did.  But he probably -- he
10      probably did -- the thing on top, that was a drill, I think.
11      Q.   Uh-huh.
12      A.   Maybe he did ask me that, and I said, no, you keep that
13      drill because you need to have a drill.  I don't think he had
14      a drill.
15      Q.   Uh-huh.  Do you recall saying anything to the effect
16      that, well, if workmen come back and have to do some work,
17      maybe they could use the drill?
18      A.   I can't remember.  But he could have, yeah.
19      Q.   Okay.  Now, this morning we looked at some pictures of
20      the grill on the deck.  Do you remember that?  Do you have
21      those, Beth, handy?
22      A.   Uh-huh.
23      Q.   Do you know when these pictures were taken?
24      A.   It was about the time when we were about done, I think,
25      on the house.
```

1    Q.   Do you think you took those pictures?  Or your people?

2    A.   Those pictures?

3    Q.   Do you think your people took the pictures?

4    A.   I don't think so.

5    Q.   Were these taken in recent years?

6    A.   Yes.

7    Q.   Do you know they were taken in 2007?

8    A.   Probably were, yeah.

9    Q.   Okay.  Now, if we could hone in on the attachment to the

10   house there, please, Beth; right down there (Indicating) if we

11   could.  I think you testified today that when that grill

12   showed up, Ted said he didn't want it, you could leave it

13   there, but consider it yours; is that right?

14   A.   Yes, he did.

15   Q.   And not only that, did you understand that Catherine was

16   afraid of the gas; were you told that?

17   A.   No.

18   Q.   But what you do know is that they put a lock on it so it

19   couldn't be used; is that right?

20   A.   That's true.

21   Q.   That's the lock right there in the center, isn't it?  The

22   bright shiny part -- I don't know whether you can put an arrow

23   on that, but all these computers -- there it is.

24   A.   Now, make it --

25   Q.   There you go.  That's the lock, right?  The shiny part?

1    A.    Yes, it is.  Yes, it is.

2    Q.    That's a lock.

3    A.    Uh-huh.

4    Q.    And then just up to the left of it is the lever that's

5    locked; am I correct?  The lock prevents the lever from being

6    turned on so the gas can't be turned on; is that correct?

7    A.    That's true, yes.

8    Q.    I think you also told us in your direct testimony, sir,

9    about the fish sculpture the first day you were testifying; do

10   you recall that?

11   A.    Yeah.

12   Q.    Do we have a couple of pictures of that handy?  That's

13   what we were talking about, right?

14   A.    Yes.

15   Q.    And the fish sculpture sits in the base of the box that

16   it came in; am I correct?

17   A.    That's right.

18   Q.    Now, did you testify that you and a couple of guys moved

19   that there onto the front deck?  Or am I mistaken?

20   A.    Ask it one more time.

21   Q.    Did you put that there on the front deck?

22   A.    Yeah.

23   Q.    You did?  And did a couple of guys lift it or did you

24   need a machine to lift it?

25   A.    No.  We had it on a forklift.

```
1    Q.   You had a forklift.  And I think your testimony was that
2    at the annual charity on the river, every year in July, that
3    that was an item that some people bid or bought on -- bid or
4    bought; is that correct?   Let me ask the question again:  You
5    said you testified to the purchase of this in order to pay the
6    artist, right?
7    A.   I didn't remember that.   There was a guy that asked me
8    did I want to go in this deal with Ted, and this would be a --
9    if they ever got a building for Ted or like a library -- a
10   library with books -- and they would put that in that building
11   whenever that happens.  And I said, yeah, I'll go with you.
12   Q.   Okay.  And I think you testified you thought there were
13   three or four people that went in on it?
14   A.   Yeah.
15   Q.   Has anyone informed you that as many as 18 people
16   contributed to that?
17   A.   At the time when -- I thought it was just maybe four
18   people.
19   Q.   I see.
20   A.   But after, nobody told me how many people got in on it.
21   Q.   I think you testified, as well, that you thought the
22   price might have been as high as $40,000; am I right?
23   A.   The guy that invited me in there told me it would be
24   about that.
25   Q.   Was that part of an effort to raise money for the
```

1    charity, as well?

2    A.    I'm sure it is, yeah.

3    Q.    It is a charitable function, isn't it?

4    A.    Yeah.

5    Q.    And is it fairly stated that a couple of people got

6    together and try to enlist a large number of people to make a

7    contribution to that charitable function?

8    A.    I'm sorry.  Say that one more time.

9    Q.    Isn't it the case that someone tried to organize a large

10   group of people to put a contribution into the charity in

11   connection with that sculpture?

12   A.    No, I don't.

13   Q.    You don't know?

14   A.    I don't remember that, no.

15            MR. B. SULLIVAN:  Thank you, Beth.

16   BY MR. B. SULLIVAN:

17   Q.    Now, you indicated in your testimony that you had a

18   conversation with Ted Stevens, and you engaged in a

19   transaction for a Mustang; am I correct?

20   A.    Yes.

21   Q.    And Ted -- that was a situation in which Ted made a

22   $5,000 check payable to you; am I correct?

23   A.    Right.

24   Q.    Gave you the Mustang; am I right?

25   A.    Yes.

1    Q.    And are you a classic car gentleman that knows and
2    understands cars?
3    A.    Yes, I do pretty good.
4    Q.    And that's a hobby of yours?
5    A.    Yes, it is.
6    Q.    And you collected some over the years, different cars?
7    A.    Yes.
8    Q.    And is this a car particularly that you thought was a
9    lovely car to have in your collection?
10    A.    Yes.
11    Q.    And, indeed, you told Ted, I believe, that you wanted the
12    car for a girlfriend of yours at the time; am I right?
13    A.    Yes.
14    Q.    And someone you were dating?
15    A.    Yeah.  Yeah.
16    Q.    And, in fact, you got the car, and I think gave it to the
17    girlfriend, didn't you?
18    A.    No.  I didn't ever let her have it because the brakes
19    weren't good enough.
20    Q.    I see.  In other words, in some of these classic cars,
21    you should drive around the neighborhood, not on Route 95?
22    A.    Yeah.  Until you get it better brakes.
23    Q.    Okay.  Well, the brake issue is actually -- Ted informed
24    you about the fact they were not new brakes on the car; am I
25    right?

```
 1      A.    Yeah.
 2      Q.    And how much did you say you paid for the Land Rover?
 3      A.    Somewhere around $44,000.
 4      Q.    Do you have any records which show what you paid for it?
 5      A.    No.  I don't have it, no.
 6      Q.    Have you researched in any way to find out what the value
 7      of the car was?
 8      A.    Yeah.  The guy that -- Stepbrothers is where I bought it.
 9      Q.    I see.  Did you do some research?
10      A.    I didn't, no.
11      Q.    How do you know 44?  Where do you come up with that
12      number?
13      A.    Because the other one was just -- I had a twin, there's
14      two twins.  One for my -- and I have two -- well, my two --
15      Q.    Grandsons?
16      A.    Grandsons.  And it was -- they were identical, they were
17      the same color, everything.  And so the one that was Landon's,
18      it was the same thing, it was 44.
19      Q.    Uh-huh.  And do you have any of those records?
20      A.    No.  Not in my back pocket, no.
21      Q.    I didn't know whether -- you have been in town here how
22      long waiting to testify?
23      A.    Too long, I'll tell you that.
24      Q.    A couple of weeks?
25      A.    Yeah.
```

```
 1    Q.   Well, you knew you were going to come and testify about
 2    the car, right?  Right?
 3    A.   Yeah.
 4              MR. BOTTINI:  Objection, Your Honor.
 5    BY MR. B. SULLIVAN:
 6    Q.   And did you bring any records with you that would show
 7    the value?
 8    A.   No, I didn't.
 9    Q.   Now, Stepbrothers is a car dealership, isn't it?
10    A.   Right.
11    Q.   And you're friends with John Step?
12    A.   Yes.
13    Q.   And you buy a lot of cars there, right?
14    A.   Not anymore.
15    Q.   Not anymore.  At the time, you bought a lot of cars
16    there?
17    A.   Yeah.
18    Q.   You were a good customer,  weren't you?
19    A.   Yes.
20    Q.   In fact,  a couple of weeks before you bought the two
21    cars for your two grandsons, I think you bought two other
22    cars; a Land Rover and a Lincoln Town Car.  Am I right?
23    A.   No, not a Lincoln.
24    Q.   Oh --
25    A.   No, I didn't.  No.  It wasn't new.  The Lincoln wasn't
```

1    new.

2    Q.    But you bought it?

3    A.    Yeah.

4    Q.    Did you buy a Lincoln?

5    A.    I don't know if I bought that or if Bill Tobin(Phonetic)

6    did.

7    Q.    Did you buy a Land Rover prior to the time that you

8    bought the two cars for your two grandsons?

9    A.    I bought one, a Range Rover.

10    Q.    A Range Rover.  Right.  I misspoke.

11    A.    Uh-huh.

12    Q.    The Range Rover is the top of the line car.

13    A.    Yes.

14    Q.    And you got one of those a couple of weeks before you

15    bought these two Land Rovers which are not --

16    A.    I think it was -- I don't think it was two.  The Land

17    Rover was -- I mean, the Range Rover was -- I don't think -- I

18    had it there for quite awhile before I bought the other two

19    Land Rovers --

20    Q.    Uh-huh.

21    A.    -- for my grandsons.

22    Q.    Okay.  And in terms of your grandsons,  did you decide

23    that one of them was deserving of the car and the other

24    wasn't?

25    A.    Yes.

1    Q.    And so you had an extra car on your hands?

2    A.    Yes.

3    Q.    And had the car been driven a little bit?

4    A.    No.  I don't think so.

5    Q.    Did it have 591 miles on it?

6    A.    I don't know.

7    Q.    You wouldn't know that?

8    A.    No.

9    Q.    But you could be sure you got the best price from the

10   dealer, right?

11   A.    I'm not sure that I did, no.  I think -- I don't know.

12   Q.    Well, you're a generous man,  but you usually go in and

13   get a decent price for the cars you're buying, don't you?

14   You're not trying to help out the dealer, you're just trying

15   to get a car.

16   A.    They probably stuck it to me.  I don't know.

17   Q.    Well, if we had your records, maybe we could figure that

18   out.  But let me show you, just the witness, for

19   identification, Defendant's Exhibit 4001 -- not to the jury

20   yet.  Take a good look at that, sir.

21            MR. B. SULLIVAN:  And Your Honor, I offer a

22   certification regarding business records regarding this and

23   the next exhibit.

24            THE COURT: Any objection?

25            MS. MORRIS:  Judge,  I'm sorry.  We've never seen

```
1      this before.
2                  MR.  BOTTINI:  Your Honor, we're going to object
3      unless there's some foundation established that this is the
4      same --
5                  THE COURT:  Let me speak with counsel at the bench.
6                  MR. B. SULLIVAN:  It is the same.
7                  (Whereupon, there was a bench conference at this
8      time.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23                  (Whereupon, the bench conference concluded at this
24      time.)
25                  THE COURT:  All right, counsel.  You can lay your
```

1    foundation or try to.

2    BY MR. B. SULLIVAN:

3    Q.   Do you have 4001 right in front of you, sir?

4    A.   It moved, but --

5    Q.   Don't read from it, just read it yourself.  Do you want

6    to come in closer?

7    A.   Yeah.

8    Q.   Could we come in closer at the top, please, Beth?   All

9    right, sir.  Let me direct your attention to the top left.

10   A.   Yeah.

11   Q.   Do you see the dealer there?

12   A.   Yeah.

13   Q.   And look down at the vehicle identification number right

14   there (Indicating); highlight it, Beth, please.

15   A.   Yeah.

16   Q.   All right.

17          MR. B. SULLIVAN:  And, Your Honor, may I approach

18   with this exhibit?

19          THE COURT: Sure.

20   BY MR. B. SULLIVAN:

21   Q.   You have in your hands 4000, Defendant's Exhibit 4000.

22   A.   Yeah.

23   Q.   Okay.  And is that for a Land Rover?

24   A.   Yes.

25   Q.   All right.  Now, look back at the screen for a moment and

1    tell me whether the vehicle identification number --

2    A.    Yeah.

3    Q.    -- is the same on Exhibit 4000 as 4001?

4    A.    Yes.

5           MR. B. SULLIVAN:  And I ask that they be admitted,

6    Your Honor.

7           THE COURT: Any objection?

8           MR. BOTTINI:  Same objection, Your Honor, unless it

9    is established it's the same vehicle that was purchased --

10          THE COURT: Let me speak with counsel.

11          (Whereupon, there was a bench conference at this

12    time.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Whereupon, the bench conference concluded.)

2              THE COURT: While you're doing that, counsel, we'll

3    take our 15-minute recess for the afternoon.

4              MR. B. SULLIVAN:  All right, Your Honor.

5              THE COURT: We'll start promptly at 3:45.

6              (Whereupon, there was a brief recess at this time.)

7              THE DEPUTY CLERK:  Please remain seated and come to

8    order.

9              MR.  CARY:  Your Honor, I have one preliminary

10   matter, and that is that over the weekend we read the grand

11   jury transcripts, and through our hard work we were able to

12   determine that there was some missing grand jury testimony.

13   We received that today at 2:10 p.m. right after the lunch

14   break.  It appears to be full <u>Brady</u> material, and I just

15   needed to put that on the record.

16             (Whereupon, the jury entered the courtroom at this

17   time.)

18             THE COURT: All right.  Please have a seat. Let's

19   proceed.

20   BY MR. B. SULLIVAN:

21   Q.   All right.  Mr.  Allen, I'd like to have you see on the

22   screen another exhibit marked Defendant's Exhibit 561,

23   please, and if you'd look at the top left-hand corner of the

24   document -- if you'd bring it up, Beth, so we can see it.  Do

25   you see your name on the document?

1     A.    Uh, yes.

2     Q.    And do you see a vehicle identification number?

3     A.    Yes.

4     Q.    If you'd move up the screen, Beth, please.  Is this the

5     State of Alaska certificate of vehicle title in your name for

6     the Land Rover?

7     A.    Yes.

8     Q.    If you could go to the second page of it, Beth, please.

9     A.    Do you know what?  Do you still have your (Indicating) --

10     Q.    Yes, it's on.

11     A.    Is it?

12     Q.    Do you want a new hearing aid, want to try a new one?

13     A.    Yes.  I guess so.

14     Q.    How is that, better?   Sound better to you?  Okay;

15     testing, one, two, three, four, five.

16     A.    That's better.

17     Q.    Okay.  Beth, could you show him the second page of the

18     document?  Does your signature appear on there, sir?

19     A.    Uh-huh.

20     Q.    That's the title on the vehicle you talked about; is it

21     not?

22     A.    Yes.

23     Q.    All right.

24            MR. B. SULLIVAN:  Your Honor, could we publish that

25     to the jury, please?

1                    THE COURT: Any objection?

2                    MR. BOTTINI:  No objection.

3                    THE COURT:   Admitted.

4        BY MR. B. SULLIVAN:

5        Q.   All right.  Beth, if you'd show the first page first,

6        please, and this is 561 we're showing, Beth -- 561.  Bear with

7        me.  Too loud, sir?

8        A.   No.  A little louder for you, I guess.  I can hear myself

9        when I do that.

10       Q.   Am I too loud for you?

11       A.   No, it's okay.

12       Q.   Let's give it a try.  That's the certificate of title; it

13       is a two-page document.  It has your signature on the back of

14       the document, doesn't it?

15       A.   Yes.

16       Q.   And if you'd look, Beth, if you'd come in close to the

17       vehicle identification number, it begins with the word

18       "Salty", and then has a lot of numbers after it, right?

19       A.   Right.

20       Q.   Would you look back at the document that you have up

21       there, Exhibit 4000, Defendant's 4000, and tell me whether

22       that's the same vehicle number and whether that's the poster

23       that would normally appear on the window of the car?

24       A.   Yes.

25       Q.   It appears to be the same vehicle, doesn't it?

1    A.   Yes.

2    Q.   All right.  Beth, could you publish -- could we publish,

3    Your Honor?  I ask that it be admitted.

4              THE COURT: Any objection?

5              MR. BOTTINI:  No objection.

6              MR. B. SULLIVAN:  Publish 4000 to the jury, please.

7    BY MR. B. SULLIVAN:

8    Q.   Now, does it have the same vehicle identification number

9    as the title?

10   A.   Yes.

11   Q.   And does it appear to have the same equipment on it as

12   the vehicle that you purchased at that time?

13   A.   There might have been more on it but -- because it

14   doesn't really tell you what the option stuff, but --

15   Q.   All right.  Would you look at the very bottom of the

16   sheet and tell me is there a dealer invoice number on there?

17   A.   Yes.

18   Q.   What is that number that you see at the very bottom?

19   A.   $42,125.

20   Q.   All right.  Excuse me a minute, Your Honor.

21             THE COURT: All right.

22   BY MR. B. SULLIVAN:

23   Q.   Could we put up 4001, please?  All right, Beth.  Would

24   you look at the very bottom?  Do you see a dealer invoice

25   number at the bottom, sir?

1    A.    Yes.

2    Q.    And do you understand by purchase of cars with some

3    frequency that the 44 is the sticker price on the vehicle?

4    A.    I'm sorry?

5    Q.    The 44,000 on the Exhibit 4000 is the sticker price,

6    isn't it?

7    A.    Yeah.

8    Q.    And the figure that you are seeing on the screen now on

9    the exhibit is $37,515, correct?  Do you see the figure?

10   A.    Yeah.

11   Q.    Do you understand that to be the dealer invoice figure on

12   the car that you purchased, sir?

13   A.    The 37  --

14   Q.    Yes.  That's the dealer invoice price; is it not?

15   A.    I guess so.

16   Q.    Now, sir, in your testimony today you discussed the

17   repair of the boiler in 2006; do you remember that testimony?

18   A.    Yes.

19   Q.    And you remember that you had Jack Billings hire a

20   plumber named "Charlie Hart" to do the work?

21   A.    Yes.

22   Q.    And Charlie Hart's company is called Chugach Sewer and

23   Drain; am I correct?

24   A.    Right.

25   Q.    Chugach is the name of an area of mountains up there?

1    A.    Yes.

2    Q.    And you indicated that the pump had been put in

3    backwards, unfortunately, by pure mistake.

4    A.    Yes.

5    Q.    And that you felt since you had selected the plumber, you

6    felt badly about that and you wanted to pay the labor cost; am

7    I correct?

8    A.    Right.

9    Q.    And so what you did was you talked to Mr. Charlie Hart,

10    and you told him to send to Ted Stevens only the bill that

11    related to the materials or for parts; is that correct?

12    A.    Yes.

13    Q.    Could we see that exhibit, please, 204 -- Government 204,

14    already admitted.  Now, that's the bill that was sent to you

15    that you discussed for the labor portion of the bill which was

16    around $2,000, right?

17    A.    Yeah.

18    Q.    And that was sent to you by your instruction; am I

19    correct?

20    A.    Yeah.

21    Q.    And you instructed the plumber to send to Ted Stevens

22    only the materials part of the bill, which is exhibit --

23    Government 203, which I'll show you on the screen.

24    A.    Okay.

25    Q.    Am I correct?  You see how it is addressed to Ted Stevens

1    up there?

2    A.    Yeah.

3    Q.    And the amount is $1,118 down at the bottom for a balance

4    due, correct?

5    A.    Right.   Uh-huh.

6    Q.    And you know Ted Stevens paid the bill when he received

7    it, correct?

8    A.    Yes.

9    Q.    And there is a notation on there:  Labor paid by Bill,

10   just in the middle of the bill.

11   A.    Yeah.

12   Q.    And when Ted Stevens saw that, he called your secretary

13   and told your secretary to tell you to send him a bill, didn't

14   he?

15            MR. BOTTINI:  Objection, Your Honor, hearsay.

16            THE COURT: I'll allow it.  You can answer it.

17            THE WITNESS:  I can answer it?

18            THE COURT: Yes.

19            THE WITNESS:  Okay.  Tell me the question one more

20   time to make sure I'm right.

21   BY MR. B. SULLIVAN:

22   Q.    When Ted Stevens saw that notation on the bill that he

23   got in Washington, he called your secretary, Linda

24   Croft(Phonetic), and told her to tell you that he wanted the

25   full bill.

1    A.    Yep.

2    Q.    Didn't he?

3    A.    Uh-huh.

4    Q.    That's a "yes"?

5    A.    Yes.

6    Q.    Okay.  And your secretary called you and told you exactly

7    what Ted said, namely, that he wanted the rest of the bill; am

8    I correct?

9    A.    Yes.

10    Q.    In addition, when you met with Jack Billings some time

11    earlier than receiving the bill, he told you that the bill for

12    all of it, labor and material, was $2,000, and you indicated

13    to him, that's a lot of money; didn't you?

14    A.    Yes.

15    Q.    And you told him right then that you'll be sure and get

16    Ted Stevens the bill?

17    A.    The what?

18    Q.    That you will be sure and send Ted Stevens the bill; you

19    told that to Jack Billings when you talked to him about the

20    repairs on the boiler, didn't you?

21    A.    I'm sorry, sir.  But tell me one more time.

22    Q.    I'm sorry.  That's all right.  Jack Billings was the

23    fellow --

24    A.    I know who Jack is.

25    Q.    -- that you sent out to be with Charlie Hart when the

1    boiler was repaired.

2    A.    Yes.

3    Q.    And Jack returned and told you that the whole bill was

4    going to be about $2,000.

5    A.    After he got back, yeah.

6    Q.    Yes, after he got back.  And you said to him right then

7    and there when you heard that amount -- that's a lot of money.

8    I'm going to send it to Ted Stevens right away.

9    A.    That I was going to --

10   Q.    My question is:  Did you say that to Jack Billings?

11   A.    No.  I never told him that I would -- I'm not going to

12   tell -- I guess I'm not understanding what you're saying.  I

13   don't know.

14   Q.    Let me just ask it simply.  Did you make any statement to

15   Jack Billings to the effect that you would send the bill to

16   Ted Stevens?

17   A.    No.

18   Q.    You were asked, Mr. Allen, about Ted Stevens' son, and

19   you testified -- apparently, you had a conversation with Dick

20   Ladd about the fact that Ted Stevens' son is out of work.  Do

21   you recall that?

22   A.    Yes.

23   Q.    Now, how old was Ted Stevens' son when you had that

24   conversation, approximately?

25   A.    How old he was?

```
 1     Q.   Yes, his son Walter.

 2     A.   He was probably 50, somewhere in there.

 3     Q.   Fifty years old.  And has a family to support, several

 4     daughters, right?

 5     A.   Yeah.

 6     Q.   And a wife?  And a wife?

 7     A.   Yes.

 8     Q.   And where was he living at the time that he was looking

 9     for employment?

10     A.   Phoenix, Arizona.

11     Q.   Pardon me?

12     A.   Phoenix, Arizona.

13     Q.   So an inquiry, apparently, came to you from Mr.  Ladd

14     about whether you knew of any opportunities for this young --

15     well, this gentleman, 50-year old gentleman, to have a job in

16     the area in which he had a home, right?

17     A.   Yes.

18     Q.   And you said to him:  I don't have anything out there.

19     So I don't have any jobs in Arizona; am I correct?

20     A.   Right.

21     Q.   Now, how many people do you think you have gotten jobs

22     for over the years?  You personally involved in getting them a

23     job; would it exceed 500?

24     A.   No.

25     Q.   No?
```

1     A.    No.

2     Q.    I know you didn't hire all 4,000 employees --

3     A.    No, I didn't.

4     Q.    You, from time to time, get people jobs because you like

5     to help people out, right?  If they're hard workers I think

6     you said.

7     A.    Yeah.

8     Q.    Is that a true statement?

9     A.    Yep.

10    Q.    All right.  So the Senator didn't talk to you directly

11    about this, did he?

12    A.    No.

13    Q.    Someone that knew the Senator talked to you about the

14    fact that Dick Ladd knew his son was out of work.

15    A.    I'm sorry.  Can you say it one more time?

16    Q.    Yes, sir, no problem.  It was Mr.  Ladd that raised the

17    issue, not Ted Stevens himself.

18    A.    That's right.

19    Q.    And so you decided that you'd like to try to help out

20    this gentleman, and you looked around for opportunities in

21    your company, didn't you?

22    A.    Not until I talked to Walter, I didn't.

23    Q.    Okay.  You talked to Walter; that's a normal thing to do.

24    Did you, in that conversation, find out he was out of work?

25    A.    Yes.

```
1    Q.    And he wanted a job?
2    A.    Yes.  But you know when I talked to him to begin with, I
3    got him off by himself.  I got Walter over by his self.  And I
4    said, Walter, I think I can get you on the Slope, and he said,
5    well, I don't -- I don't think I can go up there because of my
6    family.  I have to be close around them.  So I said, okay.
7    Q.    How far is it from where he lived in Arizona to the Slope
8    where this potential job was located?
9    A.    Probably 30 -- I mean 3,000 miles.
10   Q.    Three-thousand miles.  So it's -- I guess you assumed it
11   was only natural that a man might think twice before going to
12   a job 3,000 miles away, right?
13            MR. BOTTINI:  Objection, it's argumentative.
14            MR. B. SULLIVAN:  You don't have to answer.
15            THE WITNESS:  Okay.
16            THE COURT: Sustained.
17   BY MR. B. SULLIVAN:
18   Q.    So I gather there came a time when Walter needed a job
19   badly enough that he took the job out there on the North
20   Slope, right?
21   A.    Yes.
22   Q.    How soon after that was it from your conversation you
23   just described?
24   A.    He called me -- me and Ted were in the boot camp and in
25   the house and Ted said:  Walter wants to talk to you.  And so
```

1      I said, okay, and he called me and said:  I think I'll take

2      that job on the Slope.

3      Q.   Okay.  So he decided to travel 3,000 miles to go to work?

4      A.   Yeah.

5      Q.   When he went up there to the Slope, how many weeks does

6      he work on and how many does he get to go home to be with his

7      kids?

8      A.   I think he was on -- two weeks on and two weeks off.

9      Q.   Okay.  And he is still, as far as you know, working up

10     there on the North Slope, right?

11     A.   As long as, yeah.  I've wondered if he's still up there.

12     Q.   Not easy to work up there, is it?  Unless you like steel.

13     A.   Well, there is -- I -- a lot of people like it up there.

14     Q.   Do they?

15     A.   Because when you are up there, you get -- they take care

16     of your room, your bed, you don't have to do anything, and

17     they feed you.

18     Q.   Okay.

19     A.   And so all you have got to do is work and sleep, and a

20     lot of people like it.

21     Q.   Okay.  Now, there was also testimony about the fact that

22     you helped out Ted Stevens' grandson, right?

23     A.   Yes.

24     Q.   And this is a young boy -- what, just a teenager or --

25     A.   I think he was.

1    Q.    Early 20s?

2    A.    I think he was 19 or something like that.

3    Q.    Nineteen years old.  And one of the reasons you reached

4    out to help him was because you knew that there was some

5    heartbreak involving that young boy who had some trouble with

6    drugs; am I right?

7    A.    Yes.  But I didn't start the ball running on -- with

8    John.  It was Pete Leathard who done that.

9    Q.    I see.  Pete Leathard was an executive in your company?

10   A.    Yes.

11   Q.    So was it Pete that helped him get a job rather than you

12   in this case or did you help out before a decision was made?

13   A.    Well, I guess I knew John was on the Slope, and then he

14   went home and he never did come back.  And then Pete thought

15   that it would be a good idea for John because he likes to be

16   -- he'd like to be a mechanic, a diesel mechanic.  And so

17   after that, Pete had already started on the school, and then

18   he told me after that, and I said, yeah, that's great.  Maybe

19   he can -- maybe he'll make it, get away from his -- his other

20   life that he did.

21   Q.    So this was an effort on the part of Pete Leathard, an

22   executive in your company, and you to try to help a young boy

23   who had some problems; am I right?

24   A.    Yeah, you're right.

25   Q.    Now, I believe the government asked you about an exhibit

1    called 1-0-7-5.  Do you recall testifying about this in your

2    direct examination, sir?

3              MR. BOTTINI:  Your Honor, I don't think it's been --

4              THE COURT: I don't think so, either.

5              MR. B. SULLIVAN:  Take it off the screen for a

6    minute.

7    BY MR. B. SULLIVAN:

8    Q.   Sir, let me ask you a question:  Do you recall that Rocky

9    Williams had purchased some unwanted materials from the

10   Stevens' renovation project; in other words, old equipment or

11   cabinets that were being removed from the house because of the

12   new renovation?   And if it helps you that he wrote a check or

13   paid $2,000 for some materials that were being taken out of

14   the renovation and no longer needed by the Stevens.

15   A.   No.

16   Q.   No recollection of that?

17   A.   I -- I --

18   Q.   Let me ask you this.

19   A.   Yeah.

20   Q.   Let me ask you this:  Do you recall giving some materials

21   to your sister, or a child of your sister, that came out of

22   the Stevens' renovation, some used material that was still

23   good enough to be used?

24   A.   You mean like a niece or something?

25   Q.   Yes.

1    A.    No.

2            MR. B. SULLIVAN:  I'd like to approach the witness,

3    Your Honor.

4            THE COURT:  All right.

5    BY MR. B. SULLIVAN:

6    Q.    I ask you whether -- just read the highlighted portion.

7    Tell us whether it refreshes your recollection.

8            THE COURT: What's the number on that, counsel?

9            MR. B. SULLIVAN:  1095 on the first page, Your

10   Honor.  1075?  I can get you the number, Your Honor.  May I

11   see the first page, sir, Mr. Allen?  Could I see the first

12   page a minute?  1075.

13           THE WITNESS:  Don't.

14   BY MR. B. SULLIVAN:

15   Q.    It does not refresh your recollection.

16   A.    No, I don't.

17   Q.    I'll take it back.  Isn't it a fact, sir, that you had

18   many dinners and lunches with Ted Stevens?

19   A.    Yes.

20   Q.    And many of them at that restaurant you guys used to hang

21   out in?

22   A.    The Double Muskey(Phonetic).

23   Q.    The Double Muskey.

24   A.    Yeah.

25   Q.    Many dinners up there.

1    A.    Yep.

2    Q.    Small groups; large groups?

3    A.    Yes.

4    Q.    And isn't it true that on every occasion you had a meal

5    with him, he insisted on paying his share?

6    A.    Yes, he did.

7    Q.    nd isn't it true that on occasions when he flew with you

8    on some private jet that he would pay his share of the cost as

9    required by the government, namely, first class fair rates?

10    A.    Yes.

11    Q.    And isn't it also true that you were in a couple of

12    investments with him where a bunch of guys threw some money

13    into purchase of a horse or two or three?

14    A.    Yes.

15    Q.    And isn't it true that with respect to those little

16    ventures that you had that Ted Stevens always insisted on

17    paying all of the money that was properly his share?

18    A.    Yes.

19    Q.    The government asked you a couple of times to direct your

20    attention to that day on August 30, 2006 when you were

21    confronted by the FBI and you went over to their office; do

22    you recall that day?

23    A.    Yes.

24    Q.    Were you just walking down the street and then all of a

25    sudden, they came?

1    A.    No.

2    Q.    Did they ask you to go over there?

3    A.    No.

4    Q.    How did you meet up with them?

5    A.    There was a state Senator -- they asked me -- he called

6    me and said, I got a good deal for you.  And so I thought

7    maybe he was going to come over and help with the natural gas

8    pipelines is what I thought.  So he picked me up in the

9    morning, and I got on -- in with his pickup, and I thought we

10    were going to a restaurant to have breakfast, and he looked

11    over and said:  You need to talk to these guys.

12    Q.    I see, that was a bit of a setup.

13    A.    I'm sorry?

14    Q.    A bit of a setup, a plan.  They had sent this gentleman

15    to you to go over to them.

16    A.    Yep.

17    Q.    You thought he was coming for one thing, but the fact of

18    the matter is the FBI sent him over and said:  Bring Mr.

19    Allen over to us.  Is that the way it worked?

20    A.    I guess they did.

21    Q.    Okay.  But at any rate, without the details at the

22    moment, on that day you went to the FBI office, right?

23    A.    Yes.

24    Q.    And that's the day that they told you if you cooperated,

25    they would not charge your children criminally, right?

```
1       A.    Yes.

2       Q.    And that's the day that they suggested that if you

3    cooperated, they would not indict your company?

4       A.    No.   They didn't tell me they wouldn't do that.

5       Q.    I didn't say negative.   Understand.

6       A.    Huh?

7       Q.    You were concerned about your children first and your

8    company second, right?

9       A.    Right.

10      Q.    And they never said to you that they would not indict

11   your company, did they?

12      A.    Indict?   Say that one more time.

13      Q.    They did not tell you that they would not indict your

14   company.

15      A.    That's right.

16      Q.    But you wanted a promise that they would not indict your

17   company, but they wouldn't give it to you, right?

18      A.    Right.

19      Q.    But there was a suggestion that if you cooperated, you

20   would have several weeks or a month at least to complete the

21   sale transaction on your company?

22      A.    A month.

23      Q.    A month.   And did they tell you that the first day?

24      A.    Yes.

25      Q.    So at least you learned two things that first day: If you
```

1    didn't cooperate, your children could be charged, and your
2    company could be indicted.
3    A.    Yes.
4    Q.    And you knew if your company was indicted, there would be
5    no chance of selling that company for $385 million or more,
6    right?
7    A.    You know what?  We could have liquidated VECO.  It would
8    have took a little bit of time, but we would have some pretty
9    good money just to liquidate it.  But I worried about my --
10    all the material -- I mean my employees and that.
11    Q.    But there were basically three benefits to cooperation.
12    A.    Three?
13    Q.    Pardon me?
14    A.    Two.
15    Q.    Your children and your employees.  What were the two, you
16    tell us.
17    A.    I'm sorry?
18    Q.    You tell us what the two benefits were in your own words.
19    A.    The only one that I really had any -- know for sure, that
20    would just be my kids.
21    Q.    Kind of held your kids hostage, right?
22         MR. BOTTINI:  Your Honor, I object to that term.
23         THE COURT: Sustained.
24    BY MR. B. SULLIVAN:
25    Q.    There was a benefit to cooperating in that you hoped to

1     get a month to sell your company, right?

2     A.    They said maybe they could; they didn't tell me for sure.

3     Q.    Okay.  But any way, that day, August 30, summer day,

4     2006,  was the first time you talked to the FBI and, indeed,

5     that day they asked you about Senator Stevens; am I right?

6     A.    Yes.

7     Q.    And isn't it a fact on that very day in the offices of

8     the FBI with many people around in attendance that you told

9     the government agents that if you'd sent Ted Stevens a bill

10     that he would have paid it?

11     A.    On the same day?

12     Q.    On that very first day, sir; on that very first day.

13     A.    I don't think they asked me that.  They did later.

14     Q.    What was your answer?

15     A.    I said, yeah, if you had -- if you put an invoice to Ted,

16     he would -- but he wouldn't have because I wouldn't have done

17     that.  I wouldn't have -- I wouldn't have given him an invoice

18     that was too -- everything is what's fair and what's not.  And

19     I had no idea how much, but if it had been an invoice that was

20     fair, I think Ted would have paid it.

21     Q.    Isn't it a fact that on August 30, 2006, you told the

22     assembled agents that Ted Stevens wanted to pay for everything

23     he got?

24            MR. BOTTINI:  Asked and answered.

25            THE COURT: That's a different question.  You can

1    answer it.

2              THE WITNESS:  Okay.  What did he say?

3    BY MR. B. SULLIVAN:

4    Q.   Isn't it a fact, sir, that on that day, August 30th, 2006

5    --

6    A.   August the 30th.

7    Q.   You told the agents as follows:  Ted Stevens wanted to

8    pay for everything he got.

9    A.   I don't remember that, but if you got anything -- it was

10   what date did you say?

11   Q.   August 30th, 2006.

12   A.   Tell me -- tell me that, again.

13   Q.   Isn't it a fact that on that day you said to those

14   agents, quote, Ted Stevens wanted to pay for everything he

15   got?

16   A.   I probably said that.  I'm not sure I did, but --

17   Q.   Well, for the witness only for identification, look on

18   the screen at Defendant's Exhibit 5127, sir.  Look at Page

19   four.

20             MR. BOTTINI:  Your Honor, I would object to this

21   line of trying to refresh Mr.  Allen's --

22             THE COURT:  Sustained.  Sustained.

23             MR. B. SULLIVAN:  I'd like to approach the bench,

24   Your Honor.

25             THE COURT:  All right.

1              (Whereupon, there was a bench conference at this

2      time.)

3

4

5

6

7

8

9

10             (Whereupon, the bench conference concluded at this

11     time.)

12             THE COURT: The objection is sustained.

13     BY MR. B. SULLIVAN:

14     Q.   Isn't it a fact that you said on August 30, 2006, that

15     you recalled that Ted Stevens paid all of the invoices from

16     the contractor who was working on the house?

17     A.   Yes.  No.  Let me ask that again.  Okay.  You're saying

18     that -- make sure that I got the answer right.  And in 206 and

19     I told the agent with the FBI that Ted paid all the invoices

20     that Augie had?

21     Q.   I've asked you two questions.  I asked you that question;

22     you just said, yes.

23     A.   Okay.  Okay.

24     Q.   And I asked you the other question which is:  Did you not

25     tell the agents that Ted Stevens wanted to --

1    A.    Well, give me your first answer.  This list -- you got

2    two questions, so let me answer the first one.

3    Q.    All right.  If you want me to ask it again.

4    A.    Yes.

5    Q.    The first question is:  Isn't it true that when you met

6    with the agents that day you told the agents that Ted Stevens

7    wanted to pay for everything he got?

8    A.    That's the Number One question; yes.

9    Q.    The answer is "yes".

10   A.    Uh-huh.

11   Q.    And the second question is, Number Two:  That Ted Stevens

12   paid all of the invoices from the contractor who was working

13   on the house.

14   A.    Well, you know I -- yeah, he did.

15   Q.    Now, you also met with the agents for a very lengthy

16   meeting on December 11th and 12th, 2006.  Do you recall that

17   December 11th and 12th, 2006, and at that time, you told the

18   agents that if Rocky or David Anderson had invoiced Ted and

19   Catherine for VECOs work, you believed they would have paid

20   the bill?

21              MR. BOTTINI:  Objection to the way the question --

22              THE COURT: Sustained.  Sustained.

23              THE WITNESS:  That would not have worked.

24              THE COURT: Disregard the answer, and the objection

25   to the question is sustained.

BY MR. B. SULLIVAN:

Q.   Did you not tell the agents that, in your opinion, had a bill been sent it would have been paid?

A.   Well, first of all, I would have looked at the invoice and see if it was -- if it was right, and then I would have -- I wouldn't have let Rocky or Dave to do that.  I would have done it myself, and I would have took it to our person or Cathy or something because it was too important to not let those two guys -- they didn't know what was happening on -- when it come to the money end of it.

Q.   So what you're saying is if you had sent them the bill which you had reviewed and made fair, they would have paid it?

A.   Yes.

Q.   And, indeed, had you reviewed the bills, made them fair, cut out excessive time and things like that, you would have sent it to Persons for his input and then on to Catherine Stevens, correct?

A.   You know, it was so important that probably I would have just got the invoices, and I would have talked to Cathy or Ted.

Q.   Now, in a meeting with the government agents on February 28, 2007, you did in fact tell the agents that you did not invoice the Stevens' family for the work that Hess performed?

          MR. BOTTINI:  Object to the way the question was phrased.  He should ask if he recalls making the statement.

1            THE COURT: Sustained.

2     BY MR. B. SULLIVAN:

3     Q.   Do you recall making this statement to the agents at any

4     time that you did not send a bill for Mr.  Hess' architectural

5     services, but you believed that Ted would have paid the bill

6     had you sent it?

7     A.   With Hess?

8     Q.   Yes.

9     A.   Yes, he would have.

10    Q.   And you told the agents that, correct?

11    A.   I guess I did.

12    Q.   Now, you didn't send a bill from VECO, adjusted or not

13    adjusted, fair or unfair, did you?

14    A.   No.

15    Q.   And the reason you didn't send the bill was, first, you

16    were not sure how to produce an invoice; isn't that true?

17    A.   Say it one more time?

18    Q.   Isn't it a fact that you did not send an invoice to the

19    Stevens because you were not sure how to produce an invoice or

20    a bill?

21    A.   Oh, I could do -- produce an invoice, but I had to have

22    the numbers to do it.

23    Q.   Well, didn't you testify today that it would be a big

24    problem because of Mr.  Chan --

25    A.   Yes.  That's exactly what I'm saying to you right now.

```
 1              THE COURT:  Excuse me.  Don't interfere with the
 2     question, sir.  In the first row with the notepad;
 3     you(Indicating), right.  That's correct.
 4                    Okay.  Go ahead.
 5     BY MR. B. SULLIVAN:
 6     Q.   Let he ask, again, sir.  I want to be sure because I --
 7     isn't it accurate --
 8              THE COURT:  Don't make any gestures to the witness
 9     on the witness stand.
10              MR. B. SULLIVAN:  Is that counsel -- could the
11     record reflect, Your Honor, whether that's counsel for the
12     witness?
13              THE COURT: We'll talk about that at the recess.
14     BY MR. B. SULLIVAN:
15     Q.   Let's start again.
16     A.   Okay.
17     Q.   Isn't it a fact that you provided three reasons to the
18     government why you did not send a bill?  First reason; that
19     you're not sure how to produce a bill.
20     A.   You're saying that I'm not smart enough to make an
21     invoice?
22     Q.   No, sir.  You are very smart.
23     A.   What are you talking about?
24     Q.   Did you have a telephone call with an FBI agent on
25     September 9th just about within the last couple of weeks, a
```

1   telephone call in which you were asked questions?  September

2   9th is 15 days prior to trial.  It is not that far away.

3   A.   Okay.

4   Q.   Did you get a telephone call when an agent called you up

5   and asked you questions?

6   A.   You know, it could have.  There are so many

7   conversations, I don't -- I don't know.

8   Q.   Let's start again, sir.

9   A.   Okay.

10  Q.   Did you indicate that part of the reason you didn't send

11  a bill was that you felt VECOs costs were higher than they

12  needed to be?

13  A.   I probably told them that, yeah.

14  Q.   And isn't it a fact that you also told them that the

15  other rationale for not sending a bill was simply that you

16  wanted to do the work for Ted Stevens?

17  A.   Yeah.  I wished that I could have just done it, and

18  didn't have to -- because he -- because I really did like him.

19  Q.   And isn't it also true that the third reason -- you have

20  agreed to two -- the third reason was that you weren't sure

21  how to go about it and produce a fair bill?

22  A.   Right now it would be a hell of a time to get that done,

23  you know.

24  Q.   It would have been a hell of a time to do it then, too,

25  wouldn't it, because you have Rocky out there and Mr.

1        Anderson --

2        A.    No.  No.  No.  No.  It wouldn't -- wasn't Rocky.  It

3        would have been Dave -- I mean it wouldn't have -- Roger Chan.

4        Q.    Roger Chan, the internal accountant, would have been --

5        A.    No.  He was over the whole thing.  He --

6        Q.    You just didn't want to deal with Roger Chan and explain

7        to him what had to be done; is that what?

8        A.    Say it again.

9        Q.    Bad again?  Want another set?

10       A.    Yes, sir.  Are you sure your batteries --

11       Q.    I'm not sure of anything.  Am I working?   It sounds

12       okay.

13                (Whereupon, the deputy clerk gave Mr. Allen another

14       headset at this time.)

15       BY MR. B. SULLIVAN:

16       Q.    Shall I ask you, again?

17       A.    Yeah.

18       Q.    I was asking you about Mr.  Chan.  Is that the correct

19       way to pronounce his name?

20       A.    Yes.

21       Q.    He was the chief financial officer?

22       A.    Yes.

23       Q.    And you testified today on direct examination you didn't

24       want to deal with Mr.  Chan, right?

25       A.    Yes, that was true.  Yes.

```
1    Q.    And you couldn't rely upon Rocky or Dave Anderson because

2    they don't --

3    A.    -- know.

4    Q.    So you were the only guy in the whole world who could

5    figured out a fair bill, right?

6    A.    That's right.

7    Q.    You knew it wasn't fair on the books and records; am I

8    right?

9    A.    Right.

10   Q.    You couldn't have sent him the bill that was reflected on

11   the books and the records, some $188,000.  That wouldn't be

12   right, now, would it?

13   A.    Yes, that's right.

14   Q.    Could I have that exhibit?   Remember this letter we

15   looked at with the Torrocelli in it and so forth and so on in

16   October.

17   A.    Yeah, uh-huh.

18   Q.    Then you remember the letter that came a month later

19   where he put in paren, send me a bill?

20   A.    Yeah.

21   Q.    Well, you came in here the other day on your direct

22   examination, and you said, well, despite the fact that I saw

23   this letter, I heard from Mr.  Persons I shouldn't send a bill

24   because this was just Ted covering his ass; do you remember

25   that testimony?
```

1    A.    That's exactly right.

2    Q.    When did you first tell that story?   When did you first

3    say those words?  Was it in the last -- since September 9th?

4    Was it since September 9th?

5    A.    It's been so long that I can't tell you how many days

6    before I talked to him, but I did, and I asked him, hey, I got

7    to get something done.  I've got to get some invoices.  And he

8    said, hell, don't worry about the invoices.  Ted is just

9    covering his ass.  That's exactly what he said.

10    Q.    My question to you, sir, is when did you first tell the

11    government that because on September 9th, 2008, you were

12    giving them three other reasons why you didn't send the bill.

13    A.    I don't know.

14    Q.    When did it come to you, sir?

15    A.    What?

16    Q.    When did you first tell the government that Persons tol￼l

17    you Ted was covering his ass and these notes were meaningless?

18    It was just recently, wasn't it?

19    A.    No.  No.

20    Q.    On September 9th, you didn't tell them that, did you?

21    A.    Hell, I don't know whatever --

22    Q.    You gave them reasons why you didn't send a bill.  You

23    answered you simply wanted to do the work was one of them, and

24    another was part of the reason was that the costs were higher

25    than they needed to be.  You didn't tell them then about

1    Persons' conversation with you, did you?

2    A.    You know what, I don't know when I talked to them, but I

3    did talk to him, and it's been quite aback, quite awhile back.

4    Whether you like it or you don't.

5    Q.    When did you first come up with this, sir?

6    A.    When did I come up with it?

7    Q.    When did you first tell somebody?

8    A.    Huh?

9    Q.    When did you first tell a government agent?

10   A.    Hell, I don't know I don't know what day it was.

11             R. SULLIVAN:  Your Honor, is this a good time for a

12   break?

13             THE COURT:  How much longer do you have?

14             MR. B. SULLIVAN:  Pardon me?

15             THE COURT:  How much longer do you have?

16             MR. B. SULLIVAN:  Your Honor, probably, an hour.

17   Your Honor, I assume this is normal break time, isn't it?

18             THE COURT: All right.  Ladies and gentlemen, we'll

19   break for the evening.  Please do not discuss any aspect of

20   this trial with anyone.  Please be leave your notebooks there,

21   and please avoid any media reports you made read or hear about

22   the case.  Enjoy your evening.

23             (Whereupon, the jury exited the courtroom at this

24   time.)

25             THE COURT:  Who are you, sir?  The gentleman -- have

1      a seat please.  Who are you?  For the record, you were nodding

2      to the witness before he gave an answer.

3                  MR. BUNDY:  My name is Robert Bundy.

4                  THE COURT: Who are you?

5                  MR. BUNDY:  I'm Mr. Allen's attorney, and, Your

6      Honor --

7                  THE COURT:  Well, let me tell you one thing:  Don't

8      you ever come in this courtroom and nod to any witness in an

9      effort to influence an answer; do you understand me?

10                 MR. BUNDY:  I absolutely do.  I had no --

11                 THE COURT:  Well, I'm -- issue an order to show

12     cause why you shouldn't be held in contempt of court.   Now,

13     have a seat, and don't you ever do that again.  Sit down.

14                 MR. BUNDY:  Yes, sir.

15                 THE COURT:  What's your name, again?

16                 MR. BUNDY:  Robert Bundy.

17                 THE COURT:  How do you spell your last name?

18                 MR. BUNDY:  B-U-N-D-Y.

19                 THE COURT:  Let me hear from counsel with respect to

20     that.  It was clear to the Court that he was signaling an

21     answer.  You're excused for the evening, and don't talk to

22     anyone about this case; do you understand that?

23                 THE WITNESS:  Yes.

24                 THE COURT:  You heard that, didn't you?  Did you

25     hear what I just said?

1          THE WITNESS:  Yes,  I did.

2          THE COURT:  All right.  You're excused for the

3    evening.

4          THE WITNESS:  You want me to go?

5          THE COURT:  For now, you can.  And you can leave, as

6    well; to the attorney.  Yeah, you; for now.

7          Anything you want to put on the record?

8          MR. B. SULLIVAN:  Your Honor, I appreciate your

9    raising it.  Of course, I didn't see it.  I don't know how bad

10   it was on how continuous it was.

11         THE COURT:  I saw it once.  I can't say that I

12   watched him.  If I had seen it earlier, I would have said

13   something to him.

14         MR. B. SULLIVAN:  I'm sorry. I didn't --

15         THE COURT: Well, you don't have eyes in the back of

16   your head.  You weren't expected to see it.  Any comment,

17   counsel?

18         MS. MORRIS:  Judge, I'm sorry.  I didn't see it,

19   either.

20         THE COURT:  It's entirely inappropriate.  I can't

21   imagine an attorney doing that, but -- any request from anyone

22   about that?  All right.  Let's talk about other matters.

23         Assuming we finish -- well, we will finish, it

24   sounds like,  with Mr. Allen tomorrow.  I need to know the

25   names of the remaining government witnesses and the order in

1      which you plan to call them because there are some objections

2      with respect to witnesses and exhibits remaining, and I just

3      want to get a feel for who you plan to call and when.

4               MS. MORRIS:  Sorry, Judge.  Just one moment.  Judge,

5      there'll be Charlie Hart, Mr.  Hensel; Barbara Flanders;

6      Lawrence Bateman; and FBI Agent Harrod(Phonetic) and Pluta.

7               THE COURT:  All right.

8               MS.  MORRIS:  I'll get you the spelling.

9               THE COURT:  How long do you estimate the -- your

10     portion of the remaining testimony, the direct portion, for

11     those witnesses?

12              MS. MORRIS:  It's possible, Your Honor, we could be

13     finished tomorrow by the end of the day or if it should spill

14     over into Wednesday, the first thing Wednesday morning.

15              THE COURT: All right.  Let me just -- I'm inviting a

16     response from counsel.  Let me just ask you for your input

17     regarding the motion that was filed last evening.  As I

18     indicated earlier today, the government has until 8:00 p.m.

19     to file its response, and I've directed that the defendant

20     file a reply by 8:00 a.m. tomorrow.

21              A couple of thoughts -- one thought is that I could

22     address the issue raised by that motion after the government

23     has rested.  That's one thought that occurs to the Court.  I

24     don't want to get sidetracked from this trial.  That's,

25     obviously, an important issue that's raised.  Another thought

1   would be that the Court could entertain that issue either much

2   earlier than when the jury plans to continue to hear testimony

3   which would be 9:30 on any given day or towards the end of

4   tomorrow at 5:00.

5          I guess a preference would be to address that issue

6   probably at the time the government rests, but I'm inviting

7   your response to those thoughts, and maybe someone has another

8   thought that he or she would like to share about that issue.

9   I do want to hear some argument with respect to that issue.

10         MS. MORRIS:  Judge -- yes, sir.  I guess our

11  preference would be if you were inclined to go past tomorrow

12  to allow it to happen just prior to the government resting in

13  case we have to call any additional witness in any kind of

14  curative fashion.

15         THE COURT: As opposed to after the government

16  closes.

17         MS. MORRIS:  As opposed to after the government

18  closes; yes,sir.

19         THE COURT: It probably makes more sense to do it

20  that way.  Now, you know about the scope of direct -- I mean

21  of redirect.  You have some idea of how much time you're going

22  to spend with Mr.  Allen, and notwithstanding your redirect of

23  Mr.  Allen and your direct, you think there's a likelihood or

24  possibility that the government could come close to resting

25  tomorrow; if not tomorrow, early Wednesday, then.

1           MS. MORRIS:  Yes, sir.

2           THE COURT: So maybe just thinking out loud, maybe

3   tomorrow at five o'clock to deal with that or earlier; maybe

4   four o'clock.  Maybe I'll let the jury go earlier and deal

5   with that issue.

6           I do want to read your response.  I read your

7   preliminary response.  I do -- strike that.  I did give the

8   defendant a chance to file a reply.  That's going to be filed

9   by 8:00 a.m., and I want to read it, and I want to reflect on

10  it, and, obviously, if it's 50 pages, I'm not sure if I'll

11  have time to do it between 8:00 a.m. tomorrow and the close of

12  business.  That's why I'm raising all of these time issues and

13  asking for your input?   What do you have to say to that?

14          MR. CARY:  Your Honor, the schedule proposed by the

15  government is fine with us.

16          THE COURT:  Shortly before the government rests?

17          MR. CARY:  Yes.  Yes, Your Honor.

18          THE COURT:  Maybe what I'll do -- maybe what I'll do

19  is we'll go as far as we can tomorrow, and maybe I'll deal

20  with that issue, the issue raised by the motion; maybe

21  Wednesday morning.  But I think this is kind of a work in

22  progress.  We'll play it by ear.  I want to read your

23  response.  If it's 50 pages, of course -- I guess I could

24  limit you to five pages.

25          MR. CARY:  It won't be 50 pages.

1            THE COURT:  I wouldn't do that.  I wouldn't limit

2     you to five pages, but whatever it is, I want to read it.

3            MR. CARY:  Yes, Your Honor.

4            THE COURT:  And I want to focus on the authorities

5     raised by it.  So I may not be in a position to deal with

6     motion and proceed with trial tomorrow, but we'll just play it

7     by ear for awhile.

8            MR. CARY:  That's fine, Your Honor.

9            THE COURT:  All right.

10           MR. CARY:  A couple of other preliminary matters or

11    I guess not preliminary, end of the day matters.  The

12    government, apparently, intends to put in a number of

13    additional tapes or audio intercepts -- none of those --

14    Senator Stevens isn't on any of those, and just so the record

15    is clear -- I'm a little confused because there was a pleading

16    that they filed and then a letter that I think was a little

17    different, but we object on hearsay grounds, relevancy

18    grounds, and if they are going to be played, we --

19           THE COURT: What's the proffer, the tapes are between

20    whom; do you know?

21           MR. CARY: I think there's a variety of tapes.

22           THE COURT: All right, counsel.

23           MR. BOTTINI:  A variety.  There are a couple of

24    recordings that involve Mr. Allen and Bob Persons discussing

25    the issues related to the boiler repair; issues related to a

1    partnership that they're in with Senator Stevens, and this is

2    part of the briefing we that we had earlier submitted --

3        THE COURT: 803(d)(2) -- 802(d)(2) issue;furtherance

4    of the common goal.

5        MR. BOTTINI:  Correct.  Yes, sir.

6        THE COURT: How long are those tapes?

7        MR. BOTTINI:  One of them is quite lengthy, and what

8    we had proposed is to limit the clip to the relevant part of

9    the conversation because there was a lengthy discussion

10   between the two of them about issues related to the horse

11   partnership that really don't have much to do with what we

12   feel is relevant, and we provided the transcripts where we

13   proposed to cut and limit the play time.

14       I have not heard back yet as to whether that is

15   acceptable or not.

16       THE COURT:  And your proffer is that you're offering

17   this pursuant to the Gewain authority; is that it?

18       MR. BOTTINI:  Yes, sir.

19       THE COURT:  From our Circuit?

20       MR. BOTTINI:  Yes, sir.  Yeah.  There's a handful --

21   there's about three recordings involving Mr.  Allen and

22   various family members that were captured during the period of

23   electronic surveillance.  We would offer those as prior

24   consistent statements of Mr. Allen, and in those

25   conversations, for instance, he is telling his family members

that he believes that David Anderson, his nephew, had to the press and provided information about VECO providing work on Senator Stevens' home.

So in our view, those prior consistent statements are captured well before Mr. Allen was ever confronted by the government showing what his mind set was at that time; that he was concerned about this information coming out, about the work they had done.

There is the conversation between Mr. Ladd and Mr. Allen, wherein, Mr. Ladd passes on to Mr. Allen Senator Stevens' request concerning whether Mr. Allen knows of any work in the Phoenix, Arizona area for his son Walter.

We would offer that statement under Gewin as a joint venture statement, 801(d)(2)(e). There is a conversation between Mr. Allen and Mr. Persons related to the boiler repair where they discuss the problem on that billing that we talked about today. Charlie puts on there: Labor paid by Bill, and they were talking about their concern about that and ways in which they might be able to cover the fact that Mr. Allen had in fact paid for the labor.

Again, we would offer that under the Gewin authority, 801(d)(2)(e).

THE COURT: All right. Counsel, I've already ruled with respect to that authority. Indeed, at the bench, I told defense counsel that what's good for the government in that

1  respect is good for defense counsel, and I think that the

2  Gewin authority can be and should be interpreted to mean that

3  those statements can come in for either side.

4          MR. CARY:  Understood, Your Honor.  The Dick Ladd

5  conversation with Mr. Allen, it's unclear what that has to do

6  with any sort of joint venture or conspiracy or agency

7  relationship.

8          THE COURT: What's that proffer, counsel, with

9  respect -- is it Glad or Ladd?

10         MR. BOTTINI:  It's actually Ladd;L-A-D-D.  Your

11 Honor, that particular conversation we feel is not only a

12 joint venture statement.  The common goal here being to obtain

13 employment for Mr. Walter Stevens.  It's also admissible under

14 801(d)(2)(d) as a statement, basically, authorized by Senator

15 Stevens. Or Mr. Ladd says that Senator Stevens had asked him

16 to call Bill Allen, and so it is our view that it's admissible

17 under that exception to hearsay rule, as well.

18         THE COURT:  Counsel.

19         MR. CARY:  Your Honor, Mr. Ladd doesn't speak for

20 Senator Stevens.  There's no independent evidence of an agency

21 relationship at all.  It's simply not true.

22         THE COURT:  All right.  I'll take that one under

23 advisement.  Anything else?

24         MR. CARY:  And Your Honor, my last point is if they

25 are going to be played --

1          THE COURT:  Go ahead.  With respect to the exhibits

2     for Ladd, is there a transcript that's been furnished to the

3     Court that I can read this evening?  There's a tape for Ladd;

4     is that correct?

5          MR. BOTTINI:  I believe it has, Your Honor.  We will

6     double check.  If we have not, I will get them to your post

7     haste.

8          THE COURT: All right.

9          MR. CARY:  All right.  And then, Your Honor, in

10    terms of everything being played, just one example:  There was

11    talk about the horse partnership, and they want to play a

12    little clip from the horse partnership about Catherine says

13    Ted gets hysterical when he has to spend his own money and

14    they laugh.

15         What they're not going to play is where Mr. Persons

16    says we always bill Ted Stevens first.  He always says I have

17    to pay my share, and I always said, I'll bill you first.  It's

18    completely misleading.  If they're going to be played, the

19    entire tapes ought to be played.

20         THE COURT: I agree.  They shall be.  Anything else?

21         MR. CARY:  Yes, Your Honor, another matter is when

22    Barbara Flanders comes and testifies, I think there have been

23    pleadings filed on this.  There may be more exhibits that have

24    been -- that they have suggested that they might want to play,

25    as well, in an e-mail.  There are many, many exhibits that

1      they want to put into evidence that have absolutely nothing to

2      do with the Girdwood residence, that have to do with the

3      Senator and his --

4                THE COURT:  Barbara Flanders was the person who paid

5      the bills?

6                MR. CARY:  Yes, Your Honor.

7                THE COURT: I thought about this.  And, actually, I

8      was going to propose to counsel something along these lines

9      and see whether or not you can stipulate in good faith.  I'm

10     just throwing it out.  That she was asked -- that, indeed, she

11     paid all bills for the Senator, personal bills for the

12     Senator, and was never asked to pay a bill associated with the

13     Girdwood renovation expenses; is that a fair stipulation?

14               MR. CARY:  Well, it's not entirely because there

15     were a lot of checks that were paid, although, they were paid

16     by Mr. Stevens on --

17               THE COURT: A lot of this is extraneous.  They show

18     the bills she paid for educational expenses.

19               MR. CARY:  Yes.  That's our point.

20               THE COURT: And it seems to me that the parties

21     should be able to stipulate -- is it -- let me ask you this:

22     Is it the Senator's position that she did pay expenses

23     associated with Girdwood?

24               MS. CARY:  Well, I think she did pay some, Your

25     Honor, but that's not -- I don't think that's what they want

```
1     to offer this for, frankly, Your Honor.  I think they want to
2     offer it for some other reason having to do with the finances.
3     We're not entirely sure ourselves.
4              THE COURT:  I assume the purpose they want to offer
5     it is to show that she basically wrote all the checks for the
6     Senator and his family; for their household expenses; living
7     expenses; family expenses.
8              MR. CARY:  I don't know.
9              THE COURT:  Is there a way that you think the
10    parties can stipulate?  A lot of this is extraneous.  It
11    really is, and it's time-consuming.
12             MS. MORRIS:  It is time consuming, Judge, I will
13    admit that.
14             THE COURT:  What's your proffer?  Why do you need
15    her testimony, for the reasons I stated.
16             MS. MORRIS:  For the reasons you stated, however,
17    there's one little piece that's important, a little further
18    that, in that it shows how meticulously and in the weeds the
19    Senator was with his finances.  He had been even asking that
20    cable bills that are like $20 and periodical magazines that
21    would be subscriptions that were too much to pay on a monthly
22    basis, he was always -- he was in the weeds on all of his
23    finances.
24             So it is a matter of her just showing that she paid
25    all of their bills and took care if their monthly finances.
```

1    However, to show that she wasn't doing it on her own, she was

2    always giving input it was a two-way street between her and

3    the Senator.

4            THE COURT: Maybe something along the lines that

5    pursuant to all requests made by Senator Stevens to pay bills,

6    she paid all the bills, but never any associated with

7    Girdwood; is that fair and reasonable?

8            MR. CARY:  Just because Catherine Stevens paid them.

9    That's our point, and, perhaps,  if that's part of the

10    stipulation.  Otherwise, it's misleading --

11            THE COURT:  If that's consistent with what her

12    testimony will be.  We're talking about Senator Stevens,

13    though.  I don't know whether Catherine had authority to ask

14    her to pay or not.  I just don't know.

15            MS. MORRIS:  If I could, Your Honor, just give a

16    little time to think about.  There may be a way we could --

17            THE COURT: It may be a good point.  We'll be here

18    for a half hour dealing with all sorts of other expenses and

19    some privacy issues, as well; some very sensitive privacy

20    issues with respect to some educational expenses.

21            MS. MORRIS:  I think that's right, Your Honor.  I

22    can --

23            THE COURT:  We don't need to -- I don't think anyone

24    disputes those payments, but educational expenses for someone

25    attending college somewhere.  Do we really have to put that on

1          the public docket?

2                    MS. MORRIS:  Well, Your Honor, again, you've given

3          me just the night to think about it.  I think if counsel

4          sounds like they're amenable to some type of stipulation,

5          there may be some way to we can cobble something together.

6                    THE COURT:  All right.  That's fine. I encourage

7          counsel to try and do that.

8                    Ms. MORRIS:  That's fine.

9                    THE COURT:  I think it's relevant testimony.  I jut

10         encourage you to try and reach a stipulation if you can do so

11         in good conscience.  Yes, counsel.

12                   MR. MARSH:  Good afternoon, Your Honor.  I wanted to

13         respond very briefly to a point that Mr. Cary raised about a

14         grand jury transcript that was provided to him this afternoon.

15         I just wanted to give the Court what was the other side of the

16         story, if you will.

17                   Consistent with the Court's order, we produced over

18         a hundred 302's, and I think more than 50 grand jury

19         transcripts.  Yesterday, we learn -- yesterday afternoon, we

20         inadvertently left one out.  So we got it and copied and it

21         and gave it to defense counsel today.  Now, it is in fact the

22         summary grand jury testimony of Agent Kepner, and what she

23         does is she introduces all the other grand jury transcripts

24         that we've already given; she introduces all of the exhibits

25         already to the grand jury that we've already provided, and she

1    summarizes them for the grand jury.  We just wanted to let the

2    Court know that it was an inadvertent production, but on the

3    other hand, it's a summary of the information that they've

4    already received.

5              THE COURT: So it's not new information, then.

6              MR. MARSH:  Your Honor, I don't believe there's any

7    new information in there, and, certainly, it comes from the

8    whole investigation that comes from --

9              THE COURT: Absolutely.  That's -- looking back, I

10   think the problem -- one of the problems has been with respect

11   to summaries may query whether judges ought to allow summaries

12   in the future in any case and query whether the redacted

13   document itself should be produced as opposed to these

14   summaries.  It depends on the people who are doing the

15   summarizing as to whether or not there are problems.

16             MR. MARSH:  We understand and realize, Your Honor.

17   We just wanted to point out that this in particular was her

18   going through all the grand jury testimony that we've already

19   given.  Thank you, Your Honor.

20             THE COURT:  All right.  With respect to the ability

21   of an attorney to give fresh recollection by the use of a

22   document, I haven't pulled the rule up recently, but my

23   recollection is that, essentially, any document can be used to

24   refresh recollection, whether it was prepared by the person

25   being examined or not, and if that's the case, then why can't

1          -- why shouldn't the memorandum of interview be utilized since

2          it's a document prepared by non-participants; Allen didn't

3          prepare it.  But if the rule means any document can be used to

4          refresh recollection, then why shouldn't he be allowed to use

5          the MOI?   If the rule states otherwise, tell me, but I think

6          that's an accurate statement of what the rule says.

7                    MR. MARSH:  Your Honor, we agree with the Court

8          that, technically, anything can be used to refresh a witness'

9          recollection.

10                   THE COURT: All right.

11                   MR. MARSH:  No surprise.

12                   THE COURT:  Thank you.

13                   MR. MARSH:  Your Honor, may I raise one other

14         matter?

15                   THE COURT:  --  you want to use it tomorrow?

16                   MR. MARSH:  But we do -- Your Honor --

17                   THE COURT: I think you're absolutely correct.  I

18         think you caught me off guard when you made reference to Judge

19         Giselle (Phonetic) and his story, but sitting here and

20         thinking about it, that's what the rules says, any document,

21         and there is a reason for that because documents not prepared

22         by a witness could be used to jog someone's memory.

23                   So you can use it tomorrow if you want to.

24                   MR. MARSH:  Absolutely, Your Honor.  But at the same

25         point, there is a very thin line that could be crossed to

1    getting into where a witness adopts a statement that he or she

2    didn't write, and we just want to be --

3            THE COURT:  That's a little bit different.  That's a

4    little bit different, though.

5            MR. MARSH:  Right.

6            THE COURT:  But he can certainly be shown that

7    document and say take a look at this and read that and put it

8    aside, and tell me does it refresh your recollection or not.

9    He may say, no, it doesn't.  Then you're getting into

10   something else about the utilization of that document itself.

11           MR. MARSH:  Right.

12           THE COURT:  But that's not the issue before the

13   Court, the issue is whether MR. B. SULLIVAN can use that with

14   Mr.  Allen, and I think he could probably could; and if he

15   wants to tomorrow, he can.  Anything else?  Yes, Counsel.

16           MR. MARSH:  Your Honor, one final point, with

17   respect to the Court's ruling about Gewin  and co-conspirator

18   statements, we respectfully point the Court to the first part

19   of 801(d)(2) --

20           THE COURT:  Are you talking about Ladd now?

21           MR. MARSH:  Well, Your Honor, we're talking in

22   general, and the 801(d)(2) statements are -- there are a

23   number of  different categories; there are statements of the

24   defendant, but I believe it is always as used against a party

25   opponent, and so, unfortunately -- we ask the Court that we

1      believe that the rule is that it's actually not's what sauce

2      for the goose is sauce for the gander, that in this context

3      the co-conspirator statements --

4              THE COURT:  Now, keep in mind, your colleague didn't

5      object to it at the bench.  He didn't object to it.

6              MR. MARSH:  I -- oh, it's --

7              THE COURT: I just asked him why doesn't Rule

8      801(d)(2)(e) allow defense counsel to do it, and he said -- I

9      don't want to quote him, but he didn't object to it.  I'll

10     just simply say that.

11             MR. MARSH:  I understand.

12             THE COURT:  You have a different view of that?

13             MR. MARSH:  Well --

14             THE COURT: Apparently, you do.

15             MR. MARSH:  I'll get in trouble.  I think --

16             THE COURT: If you want to give me some authority

17     tonight.  I think <u>Gewin</u> the basis just says the participants

18     in a common scheme; statements of a common scheme can be

19     offered pursuant to 801(d)(2)(e).  It doesn't say by whom, and

20     it doesn't say only by the government.

21             MR. MARSH:  I believe what it says is that a

22     statement is offered against a party and is among other things

23     a statement by a co-conspirator of a party during the --

24             THE COURT: You may be correct.  I'll take another

25     look at that.

1          MR. MARSH:  And Your Honor, I'm not as up to speed

2     on Rule 806, but --

3          MR. CARY:  If I may borrow back my rule book, I'd

4     also ask the Court to take a look at Rule 806 which says when

5     a hearsay statement or statements defining amongst others

6     801(d)(2)(e) has been admitted into evidence, the credibility

7     of he declarant may be attacked, and the attack may be

8     supported by evidence which would be admissible for those

9     purposes if declarant had testified as a witness.  Then it

10    goes on to say that hearsay is admissible -- as well; Rule

11    806, as I understand it.

12         THE COURT:  All right.  I'll do that.  If you want

13    to take a look at any other authority on that point, counsel,

14    just let my office know and let your opponent know.

15         MR. CARY:  And Your Honor, I noticed that

16    the NSF custodian and Mr.  Richardson(Phonetic) are no longer

17    on the witness list, and I just wanted to confirm that.

18

19         MR. MARSH:  Your Honor, with respect to the NSF

20    custodian, we need to make sure -- there might be one or two

21    custodians.  We'll get back to the Court tomorrow morning.

22    I believe there are two government witnesses that were on our

23    list that we'd like to be able to release; one is Mr.

24    Wrightson (Phonetic). We don't believe we want to -- we need

25    to get into that.

1              THE COURT: Who is he?

2              MR. MARSH:  He's an individual who will talk about

3       one of the automobile trades, the subject of our 404(b).

4              THE COURT:  You want to release him?

5              MR. MARSH:  We'd like to.

6              MR. CARY:  I'd have to talk to my colleagues before

7       any witnesses leave.

8              MR. MARSH:  All right.  That's fine.  And the other

9       is Clint Murdock.  He's another one of the gentlemen who

10      worked at VECO.  We've previously informed defense counsel we

11      think he is cumulative.  We'd like to send him home, and w

12      just need some --

13             MR. CARY:  We will talk about that tonight and let

14      them know.

15             THE COURT: All right.  Anything further, counsel?

16      I'm really disturbed that an attorney would sit out there and

17      attempt to communicate with a witness, and it was clear to me

18      what I saw.  It was very disturbing.  I don't know how long it

19      was going on, and in fairness to him, maybe it was the only

20      time, but I doubt it, but it's very disturbing.

21             MR. BOTTINI:  Your Honor, again, I don't think we

22      saw that, what you saw, but I do know Mr. Bundy, and I would

23      be quite surprised if that was an intentional gesture on his

24      part.  I just want to say that on the record.

25             THE COURT:  All right.  All right.  Anything

1    further, counsel?  All right.  Have a nice evening.

2              MR. CARY:  Thank you.

3                    [End of proceedings]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3              I, Wendy C. Ricard, Official United States Court

4    Reporter in and for the District of Columbia, do hereby

5    certify that the foregoing proceedings were taken down by

6    me in shorthand at the time and place aforesaid,

7    transcribed under my personal direction and supervision,

8    and that the preceding pages represent a true and correct

9    transcription, to the best of my ability and

10   understanding.

11

12

13

14                              _____

15                              Wendy C. Ricard, CCR, RPR

16                              Official U.S. Court Reporter

17

18

19

20

21

22

23

24

25