<pre>
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF COLUMBIA

 3   UNITED STATES DISTRICT COURT      CRIMINAL ACTION NO. 08-0231

 4                                     WASHINGTON,D.C.

 5   VERSUS                           TUESDAY, OCTOBER 7,2008

 6                                    (REDACTED/WITHOUT BENCH

 7                                    CONFERENCES)

 8   THEODORE F. STEVENS              9:30 A.M.

 9

10           JURY TRIAL (DAY 11 - AM SESSION)

11        BEFORE THE HONORABLE EMMET G. SULLIVAN

12           UNITED STATES DISTRICT COURT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF,              JOSEPH W. BOTTINI,ESQ.
                                     JAMES A. GOEKE,ESQ.
15                                   U.S. ATTORNEYS OFFICE
                                     District of Alaska
16                                   22 West Seventh Avenue
                                     Federal Building and U.s.
17                                   Courthouse
                                     Anchorage, AK 99513-7567
18
                                     BRENDA MORRIS,ESQ.
19                                   NICHOLAS A. MARSH,ESQ.
                                     U.S. Department of Justice
20                                   10th and Constitution Ave.
                                     NW
21                                   Washington, DC 20530
                                     202-307-1049
22
                                     EDWARD P. SULLIVAN, ESQ.
23                                   U.S. DEPARTMENT OF JUSTICE
                                     1400 New York Avenue, NW
24                                   12th Floor
                                     Washington, DC 20005
25                                   (202) 514-1412
</pre>



```
 1
        FOR THE DEFENDANT,              BRENDAN SULLIVAN,ESQ
 2                                      ROBERT MADISON CARY,ESQ.
                                        ALEX G. ROMAIN, ESQ.
 3                                      CRAIG D. SINGER, ESQ.
                                        BETH STEWART, ESQ.
 4                                      WILLIAMS & CONNOLLY
                                        725 12th Street, NW
 5                                      Washington, DC 20005
                                        (202) 434-5000
 6

 7
        REPORTED BY:                    WENDY C. RICARD, RPR, CCR
 8                                      OFFICIAL COURT REPORTER
                                        333 Constitution Avenue
 9                                      Room #6718
                                        Washington, DC  20001
10                                      (202)354-3111

11

12      Proceedings recorded by mechanical stenography.

13      Transcript produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>I N D E X</u>

2

3   WITNESSES:                                      PAGE:

4         BILL ALLEN..................

5               BY MR. SULLIVAN......          23

6               BY MR. BOTTINI.......          79

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

<pre>
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            THE DEPUTY CLERK:  Criminal case 08-231, United
 3    States versus Theodore Stevens.  Would counsel please identify
 4    yourselves for the record?
 5            MS. MORRIS:  Yes.  Good morning, Judge.  For the
 6    government, Brenda Morris, Joe Bottini, and Grace Williams;
 7    and for the FBI Mary Beth Kepner.
 8            THE COURT:  All right.  Good morning, counsel.
 9            MR. SULLIVAN: Good morning, Your Honor.  Beth
10    Stewart, Alex Romain, Rob Cary, and Brendan Sullivan for the
11    defense.
12            THE COURT:  Good morning.  We had a delay this
13    morning.  Some of the technological equipment wasn't working
14    properly.  Thank goodness, John Cramer is always around when
15    we need him.  That's great.  John was able to fix whatever
16    needed to be fixed, so we're going to start.
17            I was looking over -- I was using the time to look
18    over some of the exhibits for the NSF witness, and I'll issue
19    the following rulings:  With respect to Government's Exhibit
20    770.001, the last paragraph in that document will have to be
21    redacted in view of speech and debate objections.
22            With respect to Government's Exhibit 771 -- 771.001,
23    I'm going to overrule the objection; that document is fine.
24    With respect to 772.001, the objection is sustained; that
25    document is inadmissible.  And with respect to 773.001, I'm
</pre>

```
 1        going to sustain the objection.  That document shall not come

 2        in.

 3               I need to hear some more argument at the appropriate

 4        time with respect to the 801(d)(2)(e) issue.  I've made

 5        rulings -- all right.  I need to here some more argument at

 6        the appropriate time with respect to the 801(d)(2)(e) issue as

 7        it pertains to Ladd, and maybe one or -- one additional

 8        government witness.

 9               I've ruled in the past that the common scheme -- a

10        common scheme was the effort to remodel the defendant's home,

11        and there were, indeed, some participants.  I've allowed some

12        of the out-of-court statements attributed to some participants

13        in that venture to become part of the evidentiary record.

14               The question that's nagging now is just how far does

15        that -- how encompassing is 801(d)(2)(e); does that allow any

16        statements attributed to any joint ventures as long as there

17        are two people who agree to do something in common.  If two

18        people decide to go to the store and get a newspaper, the

19        statements made during that alleged joint venture are

20        admissible under 801(d)(2)(e).  Where does that stop?

21               I recognize that our Circuit has said that there's

22        no longer a requirement that the Court find an illegal

23        enterprise and that, indeed, strictly legal ventures in which

24        statements are made are appropriate for admissibility of

25        statements under 801(d)(2)(e), but where does this stop.
```

1    There has to be some limit.

2         And the other nagging question is whether or not the

3    defendant can also be allowed to introduce statements pursuant

4    to the same theory in either cross-examination or as part of

5    the defendant's case-in-chief.

6         So at the appropriate time, I need to hear some more

7    argument on that before Ladd testifies, and there may be

8    another witness.  The proffer with respect to Ladd has to do

9    with something other than the common scheme or goal of

10   improving the defendant's home.  It has to do with arguably

11   another joint venture to get the defendant's son a job, maybe;

12   I don't know.

13        If that's the case, then does the Gewin decision in

14   801(d)(2)(e) stand for the proposition that any time you have

15   two people agreeing to do something in common, do the out-of-

16   court statements come in as 801(d)(2)(e) statements.  Maybe

17   that's the law, and, if so, maybe I'll be persuaded by that

18   argument, but it's -- I'm wrestling with that.  We can talk

19   about that at the appropriate time.

20        We'll proceed with the cross-examination of Mr.

21   Allen.  How long does the government anticipate redirect to be

22   for him?

23        MR. BOTTINI:  I would anticipate about a half an

24   hour.

25        THE COURT:  All right.  That's fine.  Anything

1  further we need to discuss before we bring the jury in?

2          MR. SULLIVAN:  Yes, Your Honor.  We have one

3  housekeeping matter, the admission of Defendant's Exhibit

4  4001.  Do you want me to do it in front of the jury or is it

5  okay to do it now?

6          THE COURT:  Which one is 4001?

7          MR. SULLIVAN:  That's the automobile sheet

8  reflecting 37,500 --

9          THE COURT:  That's right.  I believe the foundation

10 was laid.  There's a hookup with respect to the VIN numbers.

11 I believe I admitted that.

12         MR. SULLIVAN:  Somehow, our team thinks we didn't

13 offer it, and the government agrees it should come in, 4001.

14         THE COURT: I agree, it should come in.  You did lay

15 the foundation.  So if you'd like to offer it in the presence

16 of the jury, that's fine with me, and they can see it.

17         MR. SULLIVAN:  I don't need to.  Right now is fine.

18         THE COURT:  All right.

19         MS. MORRIS:  Well, Judge, just for the record, too,

20 I believe the stipulation that we joined in yesterday, I don't

21 know if that was officially introduced into the record.  We

22 read it to the jury and we had it signed and passed up --

23         THE COURT:  Is that the Torrocelli stipulation?

24         MR. MORRIS:  Yes, sir.

25         THE COURT:  I didn't know whether that was going to

1   be introduced as a joint exhibit, a government exhibit --

2   what's your pleasure?

3            MS. MORRIS:  We have it as a joint exhibit.

4            THE COURT: That's fine.  I told them to accept it as

5   true.  I told them that they'll see it again, and it should be

6   admitted, Carol.  We'll give it a number.

7            MS. MORRIS:  We have a number on it already, Judge.

8            THE COURT:  That's fine.

9            MS. MORRIS:  Just to let you know, it's 1113.

10           MR. CARY:  Your Honor, we do object to the title,

11  "Deputy Principal Chief Public Integrity", being on a witness

12  that goes to the -- being on an exhibit that goes to the

13  jury.

14           THE COURT:  Let me see it.

15           MR. CARY:  We don't need signatures with titles back

16  in the jury room.

17           MS. MORRIS:  Then, take it off.  I don't have a

18  problem with it.

19           THE COURT: All right.  Is Mr.  Bundy present? Mr.

20  Bundy, is he present?

21           MS. MORRIS:  He's not in the courtroom, no, Judge.

22           THE COURT: All right.  I'm still not sure what I

23  want to do with that issue.  Any --

24           MR. SULLIVAN:  Your Honor, I should disclose I

25  received a call from someone at his law firm last night, and

1    he asked me a simple question:  Do I object to Mr.  Bundy

2    being in the courtroom?  And, of course, having no authority

3    at all, I simply said, no -- I mean, yes.  I said, yes.

4             THE COURT: Where is he, is he standing in the

5    hallway?

6             MR. SULLIVAN:  I don't know.

7             THE COURT:  You know, if he's out there, he can come

8    in.  I have had some comments prepared for him.  I expected

9    him to be here.

10            MR. SULLIVAN:  Maybe I did him a favor.

11            THE COURT: I know what I saw.  I know exactly what I

12   saw, and I saw someone attempting to communicate with a

13   witness in a way that suggests -- that should suggest to

14   witness how an answer -- how a question should be answered,

15   and he was nodding his head left to the right as if to tell

16   the witness say "no", and it was clear to me, no doubt at all

17   in my mind, and he's fortunate he went out that door, instead

18   of the back door with the marshals yesterday.

19            But I wanted to have a discussion with him because

20   there may well be that it be appropriate to have him back in

21   with certain restrictions and certain understandings.  I don't

22   know.  Does the government have anything to say about that?

23            MS. MORRIS:  We didn't see it, Judge, so we can't --

24            THE COURT: I know you didn't.  I know what I saw,

25   though.  I couldn't believe what I was seeing.  The thought

1    occurred to me he might be the attorney, and then it was

2    confirmed, he is the attorney for Allen.  Allen is trying to

3    get a 5(k).  I mean that's borderline obstruction of justice

4    or it could be.

5            MS. MORRIS:  Again, we have nothing but good things

6    to say about Mr. Bundy.  He's been a stellar attorney, and I

7    would think that --

8            THE COURT:  And you know what, in fairness to him,

9    maybe he was shaking his head at disbelief of something else.

10   I don't know.  I doubt that very seriously, though, but if

11   he's out in the hall, if he wants to come in, we can have a

12   chat.

13           MS. MORRIS:  I believe he's in the building, Your

14   Honor, but my understanding is, again -- I didn't see it --

15   but Mr. Bundy has been nothing but a stellar, and I believe

16   he's very well-respected in the community, so I would find

17   that very hard to believe.

18           MR. SULLIVAN:  Your Honor, in candor, I think I

19   should disclose one more thing.  I didn't know this was going

20   to come up this morning, but I want you to know what I know.

21   Mr.  Bill Philips (Phonetic) who's an attorney-at-law and

22   represents Senator Stevens was in the audience yesterday, too,

23   sitting on the right side of the courtroom as you're looking

24   at it.

25           He saw Mr.  Bundy making so many signals, and he was

1    so distressed at what he saw that he got up and signaled one

2    of our young lawyers and took him out into the hall to mention

3    what had happened, and I think somehow, taking my general

4    advice that it's not appropriate to interrupt me or a lawyer

5    during cross-examination, the young lawyer didn't come forward

6    and tell me in the middle of it, and I think he made the right

7    decision about that, but that's additional background that you

8    might want to know.

9            I'm not -- I don't know what to do about it, Your

10   Honor.  Maybe I should question the witness about it.

11           THE COURT: I thought about that, as well, but, you

12   know what, there's some Fifth Amendment issues working here,

13   as well.  I didn't want to question Mr. Bundy.  I didn't want

14   to ask him anything.

15           MR. SULLIVAN:  Yes.

16           THE COURT:  The thought occurred to me I should send

17   it over to the US Attorney's Office -- clear whether there's

18   obstruction of justice, and I didn't want him to have to

19   defend his actions because of some concern on my part.  I

20   thought about asking the witness, but the same Fifth

21   Amendment issues would pertain to him and then his attorney is

22   also confronted with those issues, so what to do, and I said,

23   I'm not going to ask -- just have a seat.  I see you standing,

24   sir.  Just have a seat for a second.

25           And I thought about it, and I said, I'm not going to

1   ask the witness because that gets kind of murky.  I don't

2   want do get sidetracked from the ultimate objective of the

3   Court, which is to finish this trial.

4          MR. SULLIVAN:  Well, Your Honor, we felt the same

5   way.  We didn't want to get sidetracked.  I could ask -- I was

6   thinking -- wouldn't do it without permission of asking

7   questions of the witness; not inquiring about what was said,

8   but only about whether there were conversations or whether he

9   observed signals.

10          Now, of course, we can guess as to what the answer

11   to that is, but would you have objection --

12          THE COURT: Well, I don't think I would.  I think

13   I've told just about all the witnesses do not discuss your

14   testimony with anyone, and, especially, with him, I've told

15   him.  I've told him he can go to lunch.  He can take a recess.

16   He's under oath.  It would not be appropriate to discuss his

17   testimony.  I said that more than once with him.  Counsel.

18          MS. MORRIS:  Judge, just, basically, that I find

19   this curious that Mr.  Sullivan gets a phone call, and he

20   chooses to disclose that in open court rather than discuss it

21   with Mr.  Bundy then and tell him what he -- what someone

22   accused him, which is very outrageous to accuse him of doing

23   with -- to try to inflame the Court now.

24          I mean why wouldn't he tell Mr.  Bundy, then,  about

25   what his -- we could have approached, Judge, but these are

1    very outrageous allegations to make.

2              THE COURT: Well, they're serious.  They're serious.

3    I'm not sure they're outrageous.  They're serious

4    allegations, but, again, I don't want to get sidetracked.

5    This man has a burning desire to say something; yes, sir.

6              MR. MAGID:  Your Honor, I placed the phone call.

7    I'm Mr. Bundy's law partner.

8              THE COURT: What's your name, and why don't you come

9    forward if you're going to address the Court so that --

10              MR. MAGID:  Thank you, Your Honor.

11              THE COURT:  All right.

12              MR. MAGID:  I am counsel of record, also, for Mr.

13    Allen.  My name is Fred Magid.

14              THE COURT:  Why don't you come forward.

15              MR. MAGID:  Thank you, Your Honor.

16              THE COURT:  All right.  What's your last name?

17              MR. MAGID:  Magid;M-A-G-I-D.

18              THE COURT:  All right.

19              MR. MAGID:  Mr.  Bundy was not sure whether the

20    Court had intended to bar him from the courtroom, etcetera.

21    He certainly didn't want to cross any lines.  It was my call

22    to Mr.  Sullivan to see whether there was an objection, and I

23    would then have called the government to see whether there was

24    an objection for me then to approach the Court and ask for

25    permission for Mr.  Bundy to enter the courtroom when Mr.

1      Sullivan said that he did have an objection.

2            That's why I'm here because there are some issues,

3      obviously, that potentially could come up with Mr.  Allen, so

4      I would be in the courtroom.  I can tell you --

5            THE COURT:  And you're counsel for Mr.  Allen, as

6      well; is that correct?

7            MR. MAGID:  I am.

8            THE COURT:  Yes, sir.

9            MR. MAGID:  I prefer that Mr.  Bundy who has the

10     longstanding relationship were here, but we understand that

11     the Court perceived an issue.  I can tell you that Mr.  Bundy

12     is absolutely torn up by this; vehemently denies that there

13     was any such action, and this isn't the place to take this up.

14            I heard Your Honor say that Your Honor heard

15     something.  I wasn't here.  I can't speak to that.

16            THE COURT: Right.

17            MR. MAGID:  But --

18            THE COURT:  Well, now, I'm very troubled, though,

19     that I hear from Mr.  Sullivan that, apparently, an attorney

20     on their team also observed what that attorney perceived to be

21     some sort of coaching, and that confirms what the Court saw,

22     and I know what I saw.  I'm very concerned about that.

23            I would not go so far as to say you can't stay in

24     here.  It's great that Mr.  Allen has another skillful,

25     competent counsel here, and I'm certainly -- and you're

1   welcome to the Court.  You're welcome to stay here, but I'm
2   very concerned to hear what I consider to be confirmation of,
3   indeed, what the Court saw.
4             MR. MAGID:  And, of course, Your Honor I wasn't
5   here, I can't speak to it, but the troubling thing is is that
6   we now have in open court with the press a statement by a
7   defense counsel as to what somebody else supposedly saw, and I
8   know my partner, former United States Attorney for the
9   District of Alaska on the Ethics Board in Alaska, etcetera --
10  you can imagine what this means to him personally and his
11  reputation, and so even without him being present, having
12  shots taken at him and his integrity -- again, Your Honor, I
13  don't know what the solution is, but I would hope if this
14  becomes an issue, it is something that we could, perhaps,
15  discuss in chambers or whatever else, what people thought they
16  saw, etcetera, but to have shots taken at Mr.  Bundy and him
17  not in a position to defend himself, I think is fundamentally
18  unfair.
19            THE COURT:  That's a good point.  That's a good
20  point.  And at some point, the Court may direct that a
21  declaration be filed by the person who made the observations
22  on the defendant's legal team, and then I'll deal with that.
23  Again, I don't want to get sidetracked from the ultimate
24  purpose we're here for, and, that is, to get Senator Stevens a
25  fair trial.

1          MR. MAGID:  And that's why I'm here so that we don't

2     have a side show on this, and it can proceed, and I will do my

3     utmost to represent my client's best interest without impeding

4     it in any way, but I do appreciate the Court for giving me the

5     opportunity to --

6          THE COURT:  Sure.  Welcome to the Court.  You're

7     more than welcome to remain in the courtroom.  Thank you, sir.

8          MR. SULLIVAN:  If I could clarify, I guess the

9     record will reflect I did not raise the issue.  We discussed

10    this issue last night.  We were very troubled by it.  We

11    decided not raise it.  We just kind of took it and went on

12    with the case.  It was --

13         THE COURT:  I was troubled by it, too, and I

14    considered several scenarios.  I considered a referral to the

15    US Attorney's Office; a referral to the Grievance Committee;

16    issuance of an order to show cause; communication with the

17    judge in the -- presiding over the criminal case in Alaska;

18    and a couple of others.

19         MR. SULLIVAN:  But what I didn't want to do -- I

20    guess I'm being criticized by the government -- that's par for

21    the course.  I'm being criticized by guest counsel -- that's

22    par for the course.  I didn't ask for trouble here today.  I

23    didn't raise it.  I wasn't intending to raise it, but I don't

24    want to sit there and have the Court raise an issue that

25    you're concerned about without fully disclosing what I know.

1    That was my only thing.  I think I'm just acting responsibly.

2              THE COURT:  Well, let me ask you this; let me ask

3    you this.

4              MR. SULLIVAN:  But I'll tell you this, Mr.  Philips

5    is available.  He'll be happy to come in and talk directly

6    right now, or he usually is in court.  I don't know where he

7    is.  We can get him, and you can hear from him in chambers or

8    elsewhere.  I'd like you to now that they've made such an

9    issue about it and attested to his character.

10             THE COURT:  I want to proceed with the trial, but,

11   just a minute, let me ask you both, though:  Should the Court

12   request a declaration under seal with respect to the

13   information that Mr.  Sullivan has brought to the Court's

14   attention?  It's very troubling if, indeed, someone else saw,

15   indeed, what I know I saw.

16             Should I get a declaration under seal?  I'm not

17   going to stop this trial and pursue this investigation, but I

18   think there should be -- I think that what he saw or she saw

19   should be memorialized in some way.  Now, whether it's a

20   statement in court under seal; whether it's a statement in

21   open court -- I don't know.  I'm just asking at this point.

22             MR. SULLIVAN:  Your Honor, either way, I'd be happy

23   to have him write a declaration or go right up on the witness

24   stand.  He'll be happy to say what caused him so much distress

25   that he approached one of our lawyers and took him out in the

1     hall and explained what he saw.

2                    THE COURT:  Counsel.

3                    MS. MORRIS:  Judge, I think that it does require an

4     explanation from whomever is making the allegation, however, I

5     would just point out to the Court that I think the die is

6     cast.   It's already been done.  Now, the Alaskan papers are

7     going to be putting out there that Mr. Bundy has been accused

8     of doing something scurrilously, and he'll be getting hate

9     e-mails like I've been getting.

10                   So I really think this is just another attempt by

11    the defense to just keep trying to raise up things.  Again,

12    they were so troubled by it --

13                   THE COURT:  They didn't raise it, I raised it,

14    initially.

15                   MS. MORRIS:  I understand, Judge.

16                   THE COURT:  And I have an obligation to raise it

17    because it was very troubling what I saw --

18                   MS. MORRIS:  But they should have at least raised

19    it, at the very least, with Mr. Bundy's law partner when he

20    reached out to them to say that's why they objected, and if it

21    was such an objection as to bar Mr. Bundy from the Court here

22    today, which I think --

23                   THE COURT: I didn't bar him today.

24                   MS. MORRIS:  No.  No.  No.

25                   THE COURT:  I asked him to leave yesterday because I

1    just had about enough of him yesterday, and I asked him to

2    leave, which I think was appropriate.  I actually, quite

3    frankly, expected him to be here, and I was going to discuss

4    some issues with him, not necessarily asking him for an

5    explanation because of some nagging concerns about just

6    whether or not what he did was borderline criminal or not or I

7    just -- wasn't going to put him on the spot, but I was going

8    to have a discussion with him about whether or not he wanted

9    to remain in court.

10         MS. MORRIS:  I understand, Judge, that you raised it

11    today, but what I'm saying is that --

12         THE COURT: I asked the question was he here because

13    I was going to have that discussion with him.

14         MS. MORRIS:  Right.

15         THE COURT:  And then everything else happened.

16         MS. MORRIS:  I understand.  And that's just it.  If

17    it were such an issue, I think that the more appropriate way

18    of handling would have been to approach the bench.  There have

19    been a number of things, again, that the government has not

20    raised to the Court, which have been quite curious, and we

21    have not put that on the record in open court to try to

22    disparage anyone.

23         So I find this very troubling, and I'm sure that Mr.

24    Bundy is going to be very upset.  I'm sure I would.  Anybody

25    would with these kinds of allegations being aired.  So if

```
1        there is some kind of observation that took place, I think it

2        should be -- to not further fan it, but it should be addressed

3        with the Court, and so I guess it should be under seal, but I

4        think somebody should --

5                  THE COURT: Should we invite Mr. Bundy back?  Should

6        we invite him back in?

7                  MS. MORRIS:  Well, Judge, I think that he is the

8        counsel for Mr. Allen.

9                  THE COURT:  Well, that doesn't give him a

10       constitutional right to be here.

11                 MS. MORRIS:  No.  He can have any competent counsel

12       represent him, but I just think that this is just kind of

13       gotten out of control to the point --

14                 THE COURT:  But the question is should we invite him

15       back.

16                 MS. MORRIS:  Judge, I can't speak to that.  I don't

17       represent Mr. Allen, and I can't speak to --

18                 THE COURT:  Well, the government has an opinion

19       about everything else.  This is the government's star witness.

20       Do you want him back in or not?

21                 MS. MORRIS:  I think it's been answered.  The

22       defense has already said that they objected.

23                 THE COURT:  All right.

24                 MR. SULLIVAN:  I was just trying to avoid trouble.

25       The lawyer called me and said do I object.  I thought it would
```

solve the problem if he's not here today, he can't do what he

did yesterday, and I came to court not raising the issue, but

now that it's been made --

THE COURT:  But the bottom line is Mr.  Allen is

represented by counsel of his choice, and he's present, and

he's welcome.  I don't know where Mr.  Bundy is, and I'm not

going to take a recess to find out where he is in the

building.

At some point, I'd probably want to get a

declaration from the person made the observations.  I think

that's appropriate.  These are very serious -- it's serious

what I saw, and it's certainly serious what I'm hearing that

others saw, as well.

MR. SULLIVAN:  And I would say it is probably two

declarations because he brought the young lawyer out into the

hall and related to him there, so I have two declarations for

you.  If you want to make a big deal about it, I'd love to

make a big deal about it.  I wasn't going to make a big deal

about it.

MR. MAGID:  Your Honor, the troublesome spot, again,

here without Mr.  Bundy, we have more and more accusations

about what he vehemently denies doing, which is a matter of

his personal integrity.  I think the appropriate thing at --

that's presumptuous of me to tell a judge what the appropriate

thing is, but my suggestion is --

```
 1              THE COURT:  Well, no.  No.  I invited some input.
 2              MR. MAGID:  But my suggestion is at a time when we
 3     can all speak in chambers and so that this is not played out
 4     -- this was all played out in the --
 5              THE COURT:  Well, there's not going to be any
 6     off-the-record discussion I can tell you.  If there's any
 7     discussion, it will all be on the record.  Now, the record
 8     will be sealed, but it's been years since I've had an
 9     off-the-record discussion with attorneys about any case, and
10     I'm not going to start it here.
11              MR. MAGID:  Right.  whatever the case is.  But I
12     think the unfortunate thing this morning is Mr. Bundy's
13     reputation is being bandied back and forth here with the press
14     fully present.  It was reported in the Anchorage Daily News as
15     of last evening, and I think this is piling on.  I'm here.
16     I'm prepared to represent the witness.
17              THE COURT:  That's fine.  All right.  And he's
18     comfortable with that -- Mr. Allen is comfortable with your
19     representation, correct?
20              MR. MAGID:  He is.  Thank you very much.
21              THE COURT:  All right.  That's fine.
22              MR. MAGID:  Thank you very much, Your Honor.
23              THE COURT:  All right.  Let's proceed.
24              MR. CARY:  Your Honor, I have one more
25     precautionary; could we make another inquiry to make sure that
```

1    the no subpoenaed witnesses -- again, we're doing our best to

2    --

3              THE COURT:  Sure.  Sure.  If there are any witnesses

4    who are present in court pursuant to a subpoena, you need to

5    just raise your hand and let me know that you're here because

6    you'll have to stay in another room.  To put it another way,

7    if there are any people who have been informed that you're a

8    potential witness in this case, whether you have a subpoena or

9    not, you need to let me know, as well.  All right.

10             MR. CARY:  Thank you, Your Honor.

11             THE COURT:  Sure.

12             (Whereupon, the jury entered the courtroom at this

13   time.)

14             THE COURT:  All right.  Ladies and gentlemen, good

15   morning.

16             THE JURY PANEL:  Good morning.

17             THE COURT:  We had some technological issues this

18   morning, this  technological -- you can have a seat, Mr.

19   Allen.  The equipment breaks down every now and then.  It

20   decided it wanted to break down this morning before we

21   started, so that was the reason we're delayed in starting.

22   We'll start now.  We'll resume with cross-examination of Mr.

23   Allen.

24   BY MR. SULLIVAN:

25   Q.  Good morning, Mr. Allen.

1     A.   How are you?

2     Q.   Can you hear me all right, sir?

3     A.   Yes.

4     Q.   I'd like to direct your attention to Government Exhibit

5     1075, which we looked at previously yesterday, and I'd like to

6     put it on the screen.  It's already admitted.  I guess we're

7     still having those technological problems; 1075.

8               THE COURT: Mine is on.  Now, it's showing.

9               MR. SULLIVAN:  Thank you.

10    BY MR. SULLIVAN:

11    Q.   Do you see Exhibit 1075 on the screen, sir?

12    A.   Yes.

13    Q.   All right.  Now, I'd like to show you Page 20, which we

14    looked at yesterday, I believe, and if you'd look at the very

15    top where the handwriting is, just above the Home Depot

16    receipt -- if you could blow that up, please, Beth.  You

17    looked at that yesterday; am I correct?

18    A.   Yes.

19    Q.   And do you see your signature down at the bottom

20    left-hand corner?

21    A.   Yes.

22    Q.   And it says to the right of that total, $2,000 cash,

23    right?

24    A.   Yes.

25    Q.   And if you go to the top of the receipt, it says purchase

1    of use, building supplies, and it lists a number of items

2    including door, door, a gas heater, and an earth stove with an

3    adapter; am I correct?

4    A.    Yes.

5    Q.    And you do you understand that that's an expense report

6    for Rocky Williams, which you signed and approved?

7    A.    Okay.

8    Q.    Now, if you'd look, sir, at Page 18, which I'll put on

9    the screen.  That's an expense report used by your company

10   with the name Rocky Williams up on the left-hand corner; am I

11   correct?

12   A.    Yes.

13   Q.    And if you go down to the date, January 10th on the left

14   side, you see Mr. Williams' name there.  Would you highlight

15   that?  Do you see that?

16   A.    Yes.

17   Q.    And it says, R. B. Williams; that's Rocky Williams,

18   correct?

19   A.    Yes.

20   Q.    And that's $2,000 way over to the right; am I correct?

21   A.    Yeah.

22   Q.    So what this does is Rocky is submitting an expense to

23   the company for $2,000 that he paid, and you are authorizing

24   reimbursement of that amount from the company, correct?

25              MR. BOTTINI:  Objection to the way question is

1     phrased.  Counsel is testifying rather than asking --

2              THE COURT: Rephrase that, counsel.

3     BY MR. SULLIVAN:

4     Q.    Do you see the expense report?

5     A.    Yes.

6     Q.    Is Rocky Williams seeking a reimbursement from the

7     company of $2,000?

8     A.    Yes.

9     Q.    And do you see your name on the very bottom approving

10    that expenditure, approving that reimbursement, by the

11    company?

12    A.    Yes.

13    Q.    Now, isn't it a fact that because you did not carry a

14    checkbook that you asked Rocky Williams to purchase those

15    materials from Catherine Stevens?

16    A.    You know, I can't remember if I did or I didn't.

17    Q.    Well, do you have a sister named "Peggy"?

18    A.    Yes.

19    Q.    And does she or a child of hers live at Anchor Point?

20    A.    Yes.

21    Q.    All right.  I'd like to show the witness for

22    identification 5238, Defendant's Exhibit 5238, please.  And I

23    ask you to go to Page 3 of the document, the bottom two lines,

24    and would you read those to yourself, sir, and then go to the

25    next page.  Just to yourself.  Can you see it okay?

1    A.   Yes.

2    Q.   All right.  And then if we go to the next page, please,

3    Beth, and read the top part which is highlighted.

4             MR. BOTTINI:  Your Honor, we would object to

5    refreshing the witness' recollection with a statement from

6    someone else.  This is the danger of --

7             THE COURT:  It's overruled.

8    BY MR. SULLIVAN:

9    Q.   Just highlight all but the last sentence, please, Beth.

10   Just read that part to yourself, sir, and then answer my

11   question whether it refreshes your recollection that the

12   materials that were listed on the exhibit were sent to your

13   sister or a child of your sister.

14   A.   Okay.

15   Q.   Does that refresh your recollection that the materials

16   which we saw listed ended up being used by someone in your

17   family that you were trying to help out?

18   A.   You know, I don't remember this.  I know --

19            THE COURT:  All right.  You've answered the

20   question.  Next question.

21   BY MR. SULLIVAN:

22   Q.   Now, sir, I want -- in your direct examination, you were

23   asked by the government about some of the things that Senator

24   Stevens or his office assisted you or your company in.  Do you

25   recall that testimony?

1    A.    Tell me one more time.

2    Q.    During your direct examination when asked by government

3    counsel, you were asked about how Senator Stevens or his

4    office helped you or VECO from time to time; am I right?

5    A.    That's right.

6    Q.    The Senator assisted you in various matters; is that

7    right?

8    A.    Yes.

9    Q.    One of them was Pakistan; am I correct?

10    A.    Yes.

11    Q.    And with respect to Pakistan, do I understand correctly

12    that VECO had invested in a pipeline project as you testified

13    about many years ago; am I correct?

14    A.    Yes.

15    Q.    And as early as 1996, Pakistan had breached the agreement

16    with you and wasn't fulfilling its contract obligation even

17    back in 1996; am I right?

18    A.    As -- '96 or '97, somewhere in there, I guess.

19    Q.    And what was Pakistan not doing that you believed they

20    should be doing in connection with their contract obligations

21    to you and your company?

22    A.    They were supposed to give us a dividend.

23    Q.    Okay.  And you sought the help of not only Senator

24    Stevens, but the other senator and the congressional

25    representative at that time, so that all the members of the

1    Alaskan delegation were attempting to assist your company; am
2    I right?
3    A.   I wasn't in the middle of it very much. I did -- I think
4    I did talk to Ted; the other two, that's the first time I
5    heard that.  This pipeline was more or less Pete Leathard's
6    project.
7    Q.   I see.
8    A.   I've never been over there with Pakistan.  Pete, he's the
9    one that started that.  That's his baby, and so I do remember
10    talking to Ted or notice or something, but I don't remember
11    the other two being in the middle of it.
12    Q.   Now, in 1999, as the chief executive officer of the
13    company, you learned that the government of Pakistan was once
14    again, a second time, breaching its obligations to your
15    company; am I correct?
16    A.   You know, the way I remember it, we didn't get a dividend
17    until, I guess, '99.  We never had a dividend until finally
18    the World Bank went over and talked to the Pakistani
19    government.
20    Q.   Okay.  And do you recall that Ted Stevens attempted to
21    get the World Bank involved in the matter in order to help the
22    Alaskan company?
23    A.   Yes.
24    Q.   In fact, from time to time, other high ranking officials
25    in the United States got involved, such as the Secretary of

1    Energy, in order to assist an American company located in

2    Alaska;  am I correct?

3    A.    You know, I don't know.

4    Q.    You, also, during your direct examination were asked

5    about a project which involved the construction of some prison

6    somewhere on a plot of land, correct?

7    A.    Yes.

8    Q.    And I think you said that your company wanted to put the

9    prison on a certain plot of land and there was some negative

10   reaction to that, and you tried to enlist the help of Senator

11   Stevens to assist you in that matter; am I correct?

12   A.    Yes.

13   Q.    And he indicated he did not want to do that, correct?

14   A.    That's right.

15   Q.    That was your testimony; am I right?

16   A.    Yep.

17   Q.    So despite the fact that you're a friend or you're an

18   Alaskan company, when Ted Stevens doesn't think it's good for

19   Alaska or the people involved, he doesn't grant your request,

20   does he?

21          MR. BOTTINI:  Objection, Your Honor.

22          THE COURT: Sustained.  Disregard it.

23   BY MR. SULLIVAN:

24   Q.    In that matter, did you personally speak to the Senator

25   about that issue?

1     A.    Yes.

2     Q.    And he told you he wasn't going to do it, correct?

3     A.    He said he'd think about it, but I don't think he ever

4     did.

5     A.    Now, you also talked on direct examination about the

6     National Science Foundation; do you recall that testimony?

7     A.    Uh-huh.

8     Q.    Is it a fact that your company originally won the

9     National Science Foundation contract in 1999?

10    A.    I think that's right.

11    Q.    And then there was a renewal years later in 2004 that you

12    were seeking; am I correct?

13    A.    Yes.

14    Q.    Now, with respect to the 1999 contract, you took pride in

15    the fact that your company performed very well on that

16    contract, correct?

17    A.    Yes.

18    Q.    And, in fact, you received high grades from the National

19    Science Foundation for the work you did in supporting that

20    effort; am I right?

21    A.    Yes.

22    Q.    And when the 2004 renewal came up, you thought, one, you

23    wanted it, and two, you deserved that contract; am I correct?

24    A.    It wasn't me, but someone did, yes.

25    Q.    You're the only one that can testify.  You do know about

1    it, don't you?

2    A.    Yes, I did.

3    Q.    Okay.  So having done a good job on the original

4    contract, you wanted to continue your work on the 2004

5    renewal, correct?

6    A.    Yes, uh-huh.

7    Q.    And this was a contract in which Ted Stevens couldn't

8    award; am I correct?

9    A.    No.  Yeah, he couldn't.

10   Q.    He couldn't do it.  You had to win a competition in order

11   to get that renewed contract, didn't you?

12   A.    Yes.

13   Q.    In fact, the decision to recommend your company was made

14   by a panel of National Science Foundation technical

15   specialists; isn't that true?

16   A.    Yeah. I wasn't in the -- in all of that, but, you know,

17   it is like the buck comes back to me I guess.  But I don't --

18   I wasn't a lot of the details of that.

19   Q.    You testified about it on direct, but you don't know a

20   lot of the details?

21   A.    I don't.

22   Q.    Okay.  Do you know, for example, that a contract was

23   awarded to you for the renewal in 2004?

24   A.    Yes.

25   Q.    And do you know it was awarded to you because the panel

1      at the National Science Foundation found your company to be

2      the best qualified?

3      A.    I didn't know that, no.

4      Q.    Isn't that the way things usually get awarded?

5      A.    Yes.

6              MR. BOTTINI:  Objection to facts not in evidence,

7      and he's testifying.

8              THE COURT: Sustained.

9      BY MR. SULLIVAN:

10     Q.    Do you not know that the reason you got the contract was

11     because the National Science Foundation experts thought that

12     your company was the best one to give it to?

13     A.    Must have.

14     Q.    You also talked on your direct examination about the

15     Sakhalin Island project; am I correct?

16     A.    Yes.

17     Q.    Do you know anything about that one?

18     A.    Yes.

19     Q.    You were involved in that more personally than the

20     others?

21     A.    Yes.

22     Q.    And this was a project of yours in which you wanted to

23     train Russian workers to develop skills; am I correct?

24     A.    Yes.

25     Q.    And the purpose of Russian workers developing skills was

1    so when they went home to Russia, they would be there in

2    Russia, and they could assemble some of the product that you

3    would bring over to Russia; am I correct?

4    A.    Well, not exactly, but we had some modules there in

5    Anchorage, and we're talking about modules.

6    Q.    Yes.  And remind us what a module is.

7    A.    It's -- they build it's like a box; it's about boxes.

8    You build it where it is -- like if you build it up on the

9    Slope, for example, it's a lot easier and cheaper if you build

10   each part of it where it is so it's not so hot or cold, and

11   you can get your labor at a different place.  And then you

12   build each block, and it's shipped up to the Slope.  In this

13   case, it was going to do that to Sakhalin, and then you hook

14   them together.

15   Q.    Is it reasonable to almost think of modules as Lego

16   blocks, you put one on top of another?

17   A.    Yes.  It's about the same idea.

18   Q.    Same thing.  And you can put as many together as you

19   want?

20   A.    Yeah.  Usually, it's bigger, you know, two or three parts

21   of it.  Then they put it on a barge, and then they ship it to

22   where they're going to.  And then they put it on pilings, and

23   the other block will fit right into that one.

24   Q.    Okay.  And that was a project that I think you said Exxon

25   actually thought of as a good project to benefit business in

1    Alaska; am I right?

2    A.   Yes.

3    Q.   And Ted Stevens was supportive of that project?

4    A.   Yes.

5    Q.   And --

6    A.   Can I explain it a little bit more?

7    Q.   Sure.

8    A.   Okay.  We had some modules that we were working on for

9    the Slope.  So we already -- you know, we had, they could look

10    at them, the modules, the Russians could, and would see how it

11    really is worked.  And so we were going to take the Russians

12    and tell -- to show them how to learn the Western way and how

13    modules are worked.  It would have been perfect.  And then

14    after they really get enough experience, they would build

15    their modules in Sakhalin.

16    Q.   Okay.  Thank you very much for that.  And there were a

17    lot of people interested in getting this project going.  And

18    when you met over there, Senator Stevens was present along

19    with representatives from the U.S. Embassy in Moscow; am I

20    correct?

21    A.   Yes.

22    Q.   And the Commerce Department?

23    A.   Yes.

24    Q.   Correct?  And the purpose of the trip was to develop a

25    wide range of Alaskan business interests; am I correct?

1      A.   Yes.

2      Q.   And certainly your competitors -- you knew your

3      competitors would benefit from this program as possibly you

4      would; am I right?

5      A.   Yes.

6      Q.   And, as a matter of fact, the way this turned out, there

7      was no actual benefit for VECO, was there.

8      A.   No.

9      Q.   And matter of fact, did the Russian/American Center get

10     involved in this matter?

11     A.   Yes.

12     Q.   And did they eventually do something with respect to

13     this?

14     A.   They -- I think they picked Peak(Phonetic), I think, so

15     we didn't get anything.

16     Q.   Okay.  So Peak is a competitor of yours?

17     A.   Yes.

18     Q.   So that this idea that you and Senator Ted Stevens were

19     spending time actually traveling over to Sakhalin, you didn't

20     get anything, VECO got nothing, but your competitor ended up

21     getting something, right?

22     A.   Yeah.  And it makes me mad.

23     Q.   Not too bad.

24     A.   No.  No.

25     Q.   Well, you'll get the next one, right?

1      A.    Okay.

2      Q.    But that's what a businessman does, you look for -- as a

3      CEO of your company, you're looking for many opportunities and

4      many different places to grow your company, keep your people

5      employed, keep the contracts and the money coming in; am I

6      right?

7      A.    Yes.   There's one more thing -- I don't want to talk too

8      much about it, but I think everybody needs to know this.   They

9      didn't -- Exxon didn't do that -- and I don't know -- it was

10     '99 or somewhere in there because they said they were going

11     to, and then I guess they didn't have their deal like they

12     wanted with the Russian government.   So, finally, they finally

13     done it, and it started in '94, '95, and they put the modules,

14     they built the modules in Korea.

15     Q.    Uh-huh.   Okay.   Again, describing the international

16     nature of the business.

17     A.    I'm sorry?

18     Q.    That describes the international nature of your business.

19     A.    Yeah.

20     Q.    You work in many places besides Alaska, right?

21     A.    Yeah.   But none of us, nobody from Alaska, got to build

22     the modules.

23     Q.    Okay.   Now, you were also asked in your direct

24     examination some questions about the natural gas pipeline.

25     A.    Yes.

1    Q.   All right.  Would you explain to us exactly what is the

2    idea of the natural gas pipeline?

3    A.   They, the big oil companies, they know you have to have a

4    lot of volume to sell that natural gas on the Slope, and right

5    now I think they got 23 trillion gas.  It's just been pumping

6    out of the ground, and then back up and round again, and it's

7    it takes a lot of energy to do that.  So if you -- if we could

8    get a big enough volume and go down to in the middle of the

9    U.S., the economics works.  And they -- the pipeline at one

10   time, I think it still is 33 -- 33 miles -- how long it is.

11   Q.   3,300?

12   A.   Yes.  From Prudhoe all the way down to, say, Chicago.

13   Q.   Three-thousand-three hundred miles you think it is?

14   A.   Yes.

15   Q.   That's as far as from here to Alaska?

16   A.   Yes, that's right.

17   Q.   That's how long the pipeline would be?

18   A.   Yes.  It's a big, big job.

19   Q.   All right.

20   A.   The only reason that they could do it now where there is

21   a new steel, and it has to be real high pressured.  And if you

22   had the old steel, that wall and the pipe would have to be

23   that thick (Indicating); but they got a new metal now that you

24   can do it in about 1" instead of having three or four inches.

25   So that makes the economics work.  So it's a big deal for

Alaska, and it's a big deal for the nation, but the state has

1   to okay it, and I can go on and on on this thing, but --


Alaska, and it's a big deal for the nation, but the state has
to okay it, and I can go on and on on this thing, but --
Q.   Let me ask you a question:  You said, I think, on direct
testimony that this is a good deal for everybody in Alaska; am
I correct?
A.   Yes.
Q.   And you made this statement that there would be more
royalties?
A.   Yes, I did.
Q.   Would you explain to the jury what you meant when you
said there would be more royalties for the people of Alaska?
A.   Like, for example, oil that we've been producing a long
time.  We get -- Alaska gets -- about a third of the
royalties, if you add it all up with all their taxes, they get
about 30 percent of the production.
Q.   And is there a fund called the "Permanent Fund Dividend"
in Alaska?
A.   Yes.
Q.   Would you explain to us what that is, sir?
A.   When we really started -- when Alaska started getting the
money, so much money, they -- and not to just spend it, they
more or less put a lot of the money into the bank, and it was
nobody could touch it.  They could take the water -- the money
and put them in Wall Street.  They could transfer it wherever
they want to, whoever was over that bunch of people that was

1    over the dividend.

2    Q.    I see.  In other words, as a result of the oil pipeline

3    and royalties, certain monies are taken from the profits and

4    put into a fund to benefit every citizen in the State of

5    Alaska; is that correct.

6    A.    Well, as it started, it was good for a rainy day.

7    Q.    Uh-huh.

8    A.    You know because sometime we're going to run out of oil,

9    and then we can keep it or whatever they needed.  Then they

10    decided to give a dividend to every person, man, woman, kid,

11    the whole thing.

12    Q.    In other words, every man, woman, and child in Alaska

13    gets a thousand or $2,000 a year from this fund?

14    A.    Yes.

15    Q.    Because they live in Alaska?

16            MR. BOTTINI:  Your Honor, I'm going to object on

17    relevance grounds at this point.  I don't think it's

18    particularly relevant.

19            THE COURT: Well, I'll allow some questions.

20            MR. SULLIVAN:  Your Honor, they brought out the

21    issue of more royalties, but it wasn't explained.

22            THE COURT:  I'll allow it.

23    BY MR. SULLIVAN:

24    Q.    So that if I understand it correctly, if you lived in

25    Alaska for a year or so --

1    A.   Yeah.

2    Q.   -- you're entitled to get this check from this fund.

3    A.   Yes.

4    Q.   Which last year for example amounted to $2,000 a person;

5    am I right?  Roughly?

6    A.   More than -- well, yeah.  They gave them some more for

7    gas.

8    Q.   Okay.  Gave them some more for gas, but there is a body

9    that decides how much each citizen will get?

10    A.   Yeah.

11    Q.   And so a family of five --

12          THE COURT: That's enough on that point.  Let's move

13    on.

14          MR. SULLIVAN:  Your Honor, I wanted to -- that's the

15    oil pipeline, and his reference was to the gas pipeline.  May

16    I ask a follow-up question?

17          THE COURT: Yes, you may.

18    BY MR. SULLIVAN:

19    Q.   So this gas pipeline that they're talking about building,

20    right?

21    A.   Uh-huh.

22    Q.   Hasn't been built yet, has it?

23    A.   No.

24    Q.   And Senator Stevens has been for this for 25 more years,

25    hasn't he?

 1     A.   Yes.

 2     Q.   And you've been for it for all that period of time as you

 3     worked to get something accomplished up there?

 4     A.   Yes.  Uh-huh.

 5     Q.   Now, you described the fact that from the oil pipeline

 6     citizens get money out of this fund, and you referenced in

 7     your direct testimony that there would be more royalty if

 8     there was a gas pipeline, correct?

 9     A.   Right.

10     Q.   And what you mean by that is now if there's an oil

11     pipeline over here and a gas pipeline over here that goes

12     3,000 miles, then there may very well be another fund and

13     another check based on part of the profits from the gas line;

14     am I correct?

15           MR. BOTTINI:  Your Honor, object.  Huge speculation

16     on --

17           THE COURT:  Just one moment.  I don't want you to

18     speculate about it.  Disregard the question and the answer.

19     Ask another question.

20     BY MR. SULLIVAN:

21     Q.   When you said on direct examination -- you can explain it

22     yourself, I won't even suggest what it is, sir -- when you

23     suggested, and I think you used the words "there would be more

24     royalty" --

25     A.   Uh-huh.

1    Q.    Tell the jury what you meant.

2    A.    They would have part of the natural gas, and that is

3    called "royalty".

4    Q.    And were you suggesting that the citizens of Alaska would

5    be similarly benefited by that royalty?

6    A.    Yes.

7    Q.    Sir, in your direct examination after you were asked to

8    explain those matters in which Senator Stevens or his office

9    assisted you and the things we've discussed, you were asked by

10   the government about the time you were confronted by the FBI

11   in August 30, 2006.  Do you recall those questions?

12   A.    Yes.

13   Q.    And you were asked about various -- you were asked to

14   describe the fact that part of the legal issues that you faced

15   focused upon the fact that there had been campaign

16   contributions that the government believed were from the

17   corporation, not from individuals; am I correct?

18   A.    Right.

19   Q.    And you explained I believe in your direct examination

20   that you were told you broke the law by engaging in a practice

21   of having your employees make political contributions and then

22   reimbursing them; am I correct?

23   A.    Yeah.  Sometimes we would give them the money before.

24   Q.    I understand.

25   A.    Okay.

1    Q.   And you knew that the law was that a corporation cannot
2    give a political contribution, correct?
3    A.   That's true.
4    Q.   So what you did to get around that you were told that day
5    was, of course, illegal, was that you would have individuals
6    in your company give individual contributions and then
7    reimburse them with company funds, correct?
8    A.   Yes.
9    Q.   And I think you called that maybe a special bonus
10   program, correct?
11   A.   Yes.
12   Q.   Now, I think you also testified that if an individual in
13   your company wanted to come forward and give 5,000 to a
14   campaign, assuming the limit was okay, they could do that if
15   they wanted to, correct?
16   A.   Yeah.
17   Q.   And you understood there was nothing illegal about that,
18   right?
19   A.   Yeah.
20   Q.   If it's on their own.
21   A.   Yeah.
22   Q.   And they're not reimbursed, you understood, didn't you,
23   that that's lawful?
24   A.   Yes.
25   Q.   But what you were told that day, August 30 of 2006, was

1     that since the company had reimbursed these individuals, there

2     were all kinds of federal crimes that had been committed in

3     the view of those speaking to you, correct?

4     A.     Yeah.

5     Q.     And they told you there were tax violations?

6     A.     Yes.

7     Q.     Because, in essence, you would have reflected an employee

8     as getting, say, a $50,000-salary, and you would have deducted

9     that as a business expense, and under the IRS rules, you were

10    not entitled to, correct?

11    A.     That's right.

12    Q.     And this was, basically, explained to you that day in

13    order to make you understand you had some legal jeopardy,

14    correct?

15            MR. BOTTINI: Your Honor, I'm going to object to the

16    phrasing of the question.  He's testifying.

17            MR. SULLIVAN:  It's cross-examination.

18            THE COURT: It's overruled.

19            MR. SULLIVAN:  Sorry.  Do you remember the question?

20            THE WITNESS:  Yeah.  Say it again.

21    BY MR. SULLIVAN:

22    Q.     Yes.  I have to remember it to say it again.  The

23    question was you were told that there was an IRS liability

24    because of the way these political contributions had been

25    made, correct?

1    A.    Yeah.

2    Q.    And that if you, say, deducted, say, a $50,000-salary

3    from an employee, but included a special bonus of $10,000 to

4    deal with campaign contributions, that would be a tax

5    violation?

6    A.    Yes.

7    Q.    And you have explained that you entered -- you decided

8    right there and basically right on the spot that day to

9    cooperate; am I correct?

10   A.    Not -- I wasn't explained like that on that first day.

11   It was later that I figured out that that wasn't -- that that

12   was illegal, not on that day whenever I --

13   Q.    Okay.  One of the things you testified to on direct was

14   that you pled guilty to a conspiracy count regarding the IRS,

15   and I think you said, I couldn't write it off, and you

16   mentioned the special bonus.

17   A.    That was way down the road.

18   Q.    I understand.  All right.  But one of the counts involved

19   an IRS violation that you pled to; is that right?

20   A.    Yes, uh-huh.

21   Q.    Now, sir, I'd like you to look at, please, Defendant's

22   Exhibit -- I think -- 3372 only for identification for the

23   moment.  Would you just take a minute to look at the heading

24   of that?  If you could just do the top half for us, please,

25   Beth.

1      A.    The plea agreement?

2      Q.    Yes, sir.  Don't read it out loud.  Take a look and I'm

3      going to ask you if that's plea agreement which you signed,

4      and I'll go to the last page of it in a minute.

5      A.    Yes.

6      Q.    All right.  Just to be sure, could you go to Page 18?

7      Does that bear your signature?

8      A.    Yes.

9      Q.    And that was the plea agreement you actually signed many

10     months after the summer of '06?

11     A.    Yes.

12     Q.    This would be on May 2nd, 2007?

13     A.    Yes.

14            MR. SULLIVAN:  Ask that it be admitted, Your Honor.

15            THE COURT: Any objection?

16            MR. BOTTINI:  No objection.

17            THE COURT: Admitted.

18     BY MR. SULLIVAN:

19     Q.    Now, I'd like to turn to Page 15 of the document if we

20     could, sir, and I'd like to blow up the bottom half.  Do you

21     see Paragraph (D) there called, "Other Representations?"

22     A.    Yes.

23     Q.    And this is one of the paragraphs in the document that

24     you signed and that you're attempting to live by; am I

25     correct?

1    A.    Yes.

2    Q.    Okay.  Now, I'll read it just so it's clear, and you tell

3    me -- if I've mistaken anything, you interrupt me:  Although,

4    he was not made any specific promises -- you're the "he"

5    there, right?

6    A.    Yes.

7    Q.    Although, he was not made any specific promises in

8    exchange for his cooperation, Bill Allen was advised by the

9    government that if at the completion of Allen's cooperation

10   the government determines that Allen has fully cooperated with

11   the government's investigation and that Allen's full

12   cooperation has provided substantial assistance to the ongoing

13   investigation, the government will -- excuse me -- the

14   government, one -- do you see where I am?  Right at the

15   bottom.  Are you reading along with me?

16   A.    Yes.

17   Q.    I'm at paren(Phonetic) one; do you see that?

18   A.    Yeah.

19   Q.    Quoting:  Will not charge Allen's son, Mark Allen, or

20   other family members of Allen with any criminal offenses

21   arising out of the government's investigation, or -- we'll go

22   to the next page right at the top, sir -- that have been

23   disclosed to the government, and, number two, will view

24   Allen's cooperation as also being cooperation on the part of

25   VECO.  Is that accurately read?

1    A.    Yes.

2    Q.    And does that accurately represent what is called, quote,

3    Other Representations, end of quote, seen in that document?

4    A.    Can I read it, again?

5    Q.    Surely.

6    A.    Okay.  (Witness complies.)

7    Q.    That is an accurate statement of the representations made

8    to the government -- made by the government in this document,

9    correct?

10   A.    Yes.

11   Q.    The answer is yes?

12   A.    Yes.

13   Q.    Now, in connection -- in connection with the sale of your

14   company, there was a contract entered into, wasn't there?

15   A.    You mean with the Hill people?

16   Q.    Yes.  You eventually did sell your company as you

17   testified on direct-examination?

18   A.    Yeah, uh-huh.

19   Q.    And, basically, I think you testified that the total

20   consideration for the sale of your company to -- we'll call --

21   we'll use your term, the "Hill" people, okay?

22   A.    Yeah.

23   Q.    The Hill people was about $380 million, correct?   And

24   that the purchase price itself was about 350 million, as

25   reflected in the contract.  Would you like to see it?

1    A.    I thought it was 380.

2    Q.    Yes.

3    A.    And I gave the employees 15 million.

4    Q.    Uh-huh.

5    A.    So that would have been 365, wouldn't it?

6    Q.    Let me give you the contract so you don't have to guess.

7    We have a hard copy of the contract.  It would be easier to

8    look at and I'll also put it on the screen for you, sir.

9         MR. SULLIVAN:  Okay.  Your Honor, may I approach

10   with the contract?

11        THE COURT: Sure.  Absolutely.

12        MR. SULLIVAN:  I'm handing you 3491, defense

13   exhibit, sir.

14   BY MR. SULLIVAN:

15   Q.    That's -- do you recognize that as a copy of the contract

16   which you signed that relates to the sale of your company to

17   the Hill people?

18   A.    Yes.

19        MR. SULLIVAN:  Your Honor, I ask that it be

20   admitted.

21        THE COURT: Any objection?

22        MR. BOTTINI:  No objection, Your Honor.

23        THE COURT: Admitted.

24   BY MR. SULLIVAN:

25   Q.    Now, if we look at the front page, there is a lot of

1    legal gobbledygook in here, but we'll try to sort it out.  It

2    says the stock purchase agreement between the Hill company and

3    VECO corporation; do you see it?

4    A.    Yes.

5    Q.    All right.  Now, could you turn to Page 2 of the

6    agreement, sir.  Do you have on the bottom -- can you find

7    that page that's on the screen?

8    A.    Oh.

9    Q.    And I'll try to blow up part of it for you.  Could you go

10   up a little bit, Beth, and find a price there.  Could I see

11   your contract, sir, for a minute?  I have marked these maybe

12   to -- if you notice on the contract, for your convenience, I

13   have put some green stickers.  Do you see those?

14   A.    Yeah.

15   Q.    That will help us go through and find the information.

16   Would you go to the first, second green sticker there.

17   A.    Second one or first one?

18   Q.    The second one.  Does it have a section 2.3 called

19   "Payment of Total Consideration"; 2.3?  Can I help you find

20   it?

21   A.    I think I've got it, yeah.  It's in here.

22   Q.    Let me start you off.

23   A.    Twenty-three?

24   Q.    Let me start you off by making sure we're looking at the

25   same thing.  Here we are, Page 2, at the bottom; do you see

1    that?

2    A.    Oh, yes.

3    Q.    Okay.  And we're looking at Page 2 of the exhibit; if you

4    go up to the top, 2.3, it says "Payment of Total

5    Consideration,  correct?

6    A.    Okay.

7    Q.    All right.  If you look there, it says -- I'm going to

8    round the figures off if it is okay, Mr.  Allen.  It says 380

9    million is what they call total consideration, right?

10    A.    Yeah.

11    Q.    And then right below that, 350 million, they call the

12    purchase price; is that right?

13    A.    All right.

14    Q.    And then they have the $15 million -- plus, $15 million

15    there, and a second $15 million just below that; do you see

16    that?

17    A.    Yeah.

18    Q.    And one of those is the employee gift that you made

19    because of your appreciation to the people in your company at

20    the time this sale was made; am I right?

21    A.    Yeah.

22    Q.    Is that correct?

23    A.    Yeah.

24    Q.    Now, let's go to the next paragraph which is paragraph

25    (A) and if we could highlight just the first -- up to the word

```
 1    "holdback."

 2    A.    Yeah.

 3    Q.    A little bit further down.  I just want to direct your

 4    attention.

 5    A.    Yeah, I see that.

 6    Q.    Do you see that?  That $70 million is what is called the

 7    holdback amount; am I correct?

 8    A.    Yes.

 9    Q.    And the reason there was a holdback amount of the cash

10    that was distributed and -- let me strike that -- it was not

11    all cash.  The cash amount was around 145 million, right?

12    A.    Yeah.

13    Q.    Okay.

14    A.    I guess.  I'm sure whatever is on here is going to be

15    right.

16    Q.    I just want to focus you on the $70 million holdback.

17    A.    Yeah.

18    Q.    You understand there was a $70 million holdback, correct?

19    A.    Yes.

20    Q.    And that was a holdback by the people that were paying

21    the money, the Hill people, because of the uncertainty about

22    whether or not your company would be charged with a crime,

23    correct?

24    A.    Oh, there's more stuff in there than that.

25    Q.    Okay.  In other words, a holdback is to allow for
```

1    contingencies that might happen and affect the value of the

2    company just bought by these people for 380 million, right?

3    A.    Yeah.

4    Q.    Okay.  Now, if you turn to the next --

5    A.    Wait.  Can I ask you something?

6    Q.    Well, technically, I don't know.  I may not know the

7    answer.

8    A.    But you said this 70 million are just what happens with

9    the legal end of it, and that's not true.  There was a lot of

10    taxes.

11    Q.    Uh-huh.

12    A.    And there's a lot of environmental stuff.

13    Q.    Right.

14    A.    So it's not just what you just said.  There is a lot more

15    that's in that 70 million.

16    Q.    Okay.  What you're saying is that that's an amount that

17    all the parties agreed to deal with contingent liabilities?

18    A.    Yes.

19    Q.    Contingent liabilities means no one really knows what's

20    going to happen, right?

21    A.    Yeah.

22    Q.    Okay. It may be that nothing happens and there's no draw

23    down on the 70 million.

24    A.    Yeah.

25    Q.    It may be that all heck breaks loose, and all the 70

1    million disappears, right?

2    A.   Right.

3    Q.   Okay.  That's what a holdback is, right?

4    A.   Yeah.

5    Q.   All right.  Let's look at Page 4 for a moment; right at

6    the bottom, Section (B); do you see where it says "on the

7    first anniversary"; way at the bottom?

8    A.   Yeah.

9    Q.   All right.  Let's highlight that language.  You knew that

10   the contract provided some dates on which the holdback money

11   would be released to you if certain things happened or didn't

12   happen; am I correct?

13   A.   Are you looking there at (C)?

14   Q.   (B), sir.

15   A.   (C)?

16   Q.   As in "Boston".  Could I come and point it out to you?

17   We're looking at Page 4-- may I approach?

18   A.   Oh, no.  No.  No.  I'm --

19            THE COURT: Mr. Allen, look at the screen.  Mr.

20   Allen, look at the screen.

21            THE WITNESS:  Four.  Okay.  Yeah.

22            THE COURT: Mr. Allen, look at the screen.

23            THE WITNESS:  Okay.

24   BY MR. SULLIVAN:

25   Q.   All right.  You see that, sir?  You can read it on the

1      screen; it's pretty big.

2      A.    Uh-huh.

3      Q.    I'll read it.  Quote:  On the first anniversary of the

4      closing day or if such day is not a business day, the first

5      business day, thereafter, subject to Section 516, paren,

6      payments to designated persons, close paren, CH2M Hill shall

7      release $30 million of the --  go to the top of the next page

8      -- holdback amount to sellers; do you see that?

9      A.    Yes.

10     Q.    That be the top of Page 5, right?

11     A.    Yes.

12     Q.    So that was a provision that if certain things hadn't

13     happened, they'd actually give you $30 million of the 70

14     million on the first anniversary of the closing of the

15     transaction; am I correct?

16     A.    Yes.

17     Q.    And the transaction closed on September 7, '07, right?

18     A.    Yes.

19     Q.    And one year from that day is September 7, '08, this

20     year, right?

21     A.    Yes.

22     Q.    And the contract provides that at that first anniversary

23     that there would be a release of 30 million of the $70

24     million, right?

25     A.    Yes.

1    Q.    That was just last month, was it?

2    A.    Yes.

3    Q.    And did they release it?

4    A.    No.  They got -- they gave us, I think, 12 billion, and

5    they're still holding back and mostly $12 million, and mostly

6    it is environmental.  They're putting a lot of things in there

7    that the building, the elevator wasn't working right;

8    everything that they could stick in there, that's what they're

9    doing.

10   Q.    Okay.  So you got the 12 million and not the 30 million

11   that you believed you should have gotten?

12   A.    Yes.  Well, we knew that the 30 million there was some

13   more tax.  We knew that.

14   Q.    Okay.  Now, let's look further.  If you turn to Page 5,

15   let's look at Section (C); do you see that language up there?

16   I'll read it to you.  I'll just highlight it for you.

17   A.    Yeah.

18   Q.    Do you have in it your book?

19   A.    Yeah.

20   Q.    Section (C) says, quote:  On the third anniversary of the

21   closing day subject to section 516, paren, payments to

22   designated persons, close paren, or if such date is not a

23   business day, the first business day thereafter, close paren,

24   CH2M Hill shall release the balance of the holdback amount to

25   the sellers, etcetera; right?

```
1    A.    Uh-huh.

2    Q.    And so what you anticipated when you signed this contract

3    was on the first anniversary, there would be $30 million of

4    the holdback available to you, assuming things worked out, and

5    there's nothing on the second anniversary; but on the third

6    anniversary, depending upon what happens on the contingencies,

7    you'd be getting $40 million, plus interest; am I correct?

8    A.    Yes.

9    Q.    Or whatever the balance is due at that time?

10   A.    Yes.

11   Q.    All right.  And that would be in September 7th in the

12   year 2010; am I correct?.

13   A.    Yes.

14   Q.    All right.  Now, if you turn to Page 52 of the document.

15   A.    Fifty-two.

16   Q.    And look at Section (B) for me.

17   A.    (Witness complies.)

18   Q.    And if you'd highlight, please, the first couple of

19   sentences there, Beth, ending with the words "VECO does

20   business"; about the fifth line down.  All right, sir.  Now

21   this is a further paragraph in your contract; am I correct?

22   A.    Yes.

23   Q.    And it indicates in there -- and I don't have to read all

24   of it to you -- but that the Hill Company would engage in a

25   special due diligence designated to address its and its
```

1     auditors reasonable concerns related to the conduct of the

2     acquired company's operations in various investigations

3     currently under way by the Department of Justice, the Internal

4     Revenue Service, and other government agencies where VECO does

5     business.  Do you see that?

6     A.     Yes.

7     Q.     And you knew that -- and they stated, the buyers, that

8     they were concerned about what was going on with respect to

9     the Department of Justice and the IRS; am I correct?

10    A.     Yes.

11    Q.     And if you'd turn now, sir, to Page 75, and look at

12    Section 10.2, there is a title there which reads, quote,

13    Indemnification and Payment --

14    A.     Wait.  Wait.  Which --

15    Q.     I'm sorry.  I'm reading Page 75; there is a tab there.

16    A.     Okay.  Seventy-six.

17    Q.     Seventy-five; do you see it?

18    A.     Oh, okay.

19    Q.     You got that?  Do you see the title at 10.2 there?

20    A.     Yes.

21    Q.     And that reads, quote:  Indemnification and Payment of

22    Losses by Sellers, General; do you see that language?

23    A.     Yes.

24    Q.     And you're the seller, you and VECO, the seller,

25    correct?

1    A.   Yes.

2    Q.   And you know what an indemnification is, generally?  An

3    indemnification is, basically, a promise to pay something if

4    something goes wrong or some event happens, right?

5    A.   Right.

6    Q.   All right.  Now, let's turn to Page 76 and find what's

7    listed under there at section (G).  You understood, did you

8    not, from your contract that the sellers, you, had an

9    obligation to indemnify or protect the new buyer if certain

10   things occurred, correct?

11   A.   Yes.

12   Q.   And one of the things is there at Section (G), which

13   reads, quote:  Any criminal proceedings involving VECO or any

14   of the acquired companies arising from any acts or omission of

15   any director, officer, or employee of VECO, or any acquired

16   company prior to the closing date, paren, a criminal claim,

17   end of quote. Do you see that language?

18   A.   Yes.

19   Q.   So that you knew that -- first off, you were an officer,

20   a director, and an employee of VECO, weren't you?

21   A.   You know, this is first time I've ever seen this, really.

22   Q.   Uh-huh.

23   A.   And the reason was when I said that I was guilty, I

24   couldn't go in the room when -- I couldn't do my own -- not

25   agreement.  But, yeah, I couldn't do anything because every

1    once in a while they would call and tell me it was.  But

2    getting all this, the contract, I never got to see any of

3    that.  I really didn't because, mostly, I think, it was the

4    accountant said I can't be -- they can't be in the same room

5    because he's guilty.

6    Q.    Right.  Now, look, and I know that was disappointing to

7    you at this stage in your life, but my question is:  This is

8    your contract, right?

9    A.    Yes.

10   Q.    And you hired a lot of lawyers and paid them a lot of

11   money to read this for you, didn't you?

12   A.    Yes.

13   Q.    And you signed it, right?

14   A.    Yes.

15   Q.    And you're doing your best to live by your obligations

16   under the contract, right?

17   A.    Yes.

18   Q.    Okay.  And you knew generally that you had a holdback of

19   $70 million.

20   A.    Yes.

21   Q.    And that you had an obligation to the buyer if this

22   company was indicted because of your prior conduct, right?

23   A.    Yeah.

24   Q.    Okay.  Now, sir, if you turn to Page 87, and if you'll

25   notice just one more part of this at Section (B), right there

1    --

2    A.    Wait.  Wait.  Let me find it -- you're quicker than I am.

3    Q.    Take your time.  Do you see it?

4    A.    Yeah.

5    Q.    Look down there at Section (B).  I'll read it while you

6    think about it.  It reads, quote:  In addition to the

7    provisions of section 10.10, paren, H, close paren; paren,

8    procedure for indemnification third party claims, close paren;

9    Bill Allen shall honor his obligations under his plea

10    agreement entered into with the United States Department of

11    Justice, including the addendum regarding cooperation and good

12    faith to the extent of his abilities; right?

13    A.    Yeah.

14    Q.    So you understood that not only do you have an obligation

15    to the government pursuant to the plea agreement that we

16    looked at a few minutes ago, but you also have an obligation

17    consistent with your contract to fully cooperate with the

18    government consistent with the plea agreement,  correct?

19    A.    Yeah.

20    Q.    Now, in connection with the sale, do you recall that the

21    -- there was a provision whereby you were able to get $500,000

22    of legal fees in order to support you in your -- to provide

23    legal fees during this period?

24    A.    Yes.  Yes.

25    Q.    And that was a provision, the company pays those legal

1    fees?

2    A.    Yes.

3    Q.    So that if you incur legal fees in connection with your

4    cooperation, like bringing your lawyer to meetings and so

5    forth, those fees are reimbursed by the company under the

6    provision that provided you reimbursement of the legal fees

7    you spent up to a maximum of $500,000, right?

8    A.    Right.

9    Q.    And you have had a lawyer present in 95 percent of these

10   meetings, have you not?

11   A.    Yes.

12   Q.    Mr. Bundy?

13   A.    Yeah.

14   Q.    And he was here in the first row yesterday?

15   A.    Yeah.

16   Q.    Is he here today?

17   A.    No.

18   Q.    And you told us originally, I think another day, that you

19   had had many, many meetings with the government, correct?

20   A.    Yes.

21   Q.    And it would be customary for your lawyer to come to

22   those meetings and represent you at those meetings; am I

23   right?

24   A.    Yes.

25   Q.    And, sir, when you prepared your -- when you answered

1    questions or prepared your testimony, your lawyer would be

2    present, correct?

3    A.    Yeah.

4    Q.    And, of course, he'd be incurring legal fees, and you

5    would pay him for his services, right?

6    A.    Yeah.

7    Q.    And, for example, did you in fact prepare for your

8    testimony here while you've been in town?

9    A.    Yeah.  Uh-huh.

10   Q.    Did you have sessions where you sat down and the

11   government would ask you questions and you'd give answers?

12   A.    Who now?

13   Q.    I'm sorry.  Did you have meetings in which the government

14   would go through you and prepare your testimony?  For the

15   court here?

16   A.    You mean here or where?  I don't know where.

17   Q.    Well, maybe, I'm confusing with the place.  How long have

18   you been in location?  How long have you been in D.C.?  How

19   long have you been here in town?

20   A.    About two or three weeks.

21   Q.    And have you prepared your testimony for court by sitting

22   down with the government and their having asked you questions

23   and you give them answers?

24   A.    Yes.

25   Q.    You have?

1    A.    Yes.

2    Q.    Do you call those preparation sessions?

3    A.    Call them what?

4    Q.    What do you call -- are those just meetings?  Are they

5    preparation sessions?  What do you call them?

6    A.    Meetings.

7    Q.    Meetings.  And in meetings, did the government ask you

8    questions like they ask in court?

9    A.    They -- they asked me, yeah.

10   Q.    Yes.  And they gave you an exhibit and ask you about the

11   exhibit just like we do in court.

12   A.    Yes.

13   Q.    And did they have a little screen there so you could see

14   the exhibit on the screen to get used to it?

15   A.    No.

16   Q.    At any rate, how many times did you meet to prepare your

17   testimony?

18   A.    From here or the whole -- you know --

19   Q.    Let's say, first, within the last two or three weeks you

20   have been in town.

21   A.    Yeah.  How many?

22   Q.    Yes.

23   A.    I think two, maybe three.

24   Q.    Okay.  Before you got to D.C., did you have similar

25   meetings?

1    A.    Sure.

2    Q.    How many?

3    A.    I don't know.

4    Q.    Now, when you were in court on the witness stand

5    yesterday, did you see your lawyer in the front row?

6    A.    Yeah.

7    Q.    And did you see him nodding his head when you gave

8    certain answers?

9    A.    No.

10    Q.    You didn't?

11    A.    No, he did not do that.

12    Q.    Okay.  Now, I want to direct your attention back to the

13    last part of your direct examination, sir, which dealt with

14    the tapes that the government played yesterday.  Do you

15    remember that?

16    A.    Yes.

17    Q.    And I think you were asked on direct examination about --

18    that directed you back to that day again, an awful day, August

19    30, 2006, right?

20            THE COURT: Before we get to that day, counsel, we're

21    going to take a 15-minute break, a morning recess, and we'll

22    start at 11:45.

23            MR. SULLIVAN:  Thank you.  Okay.

24            (Whereupon, the jury exited the courtroom at this

25    time.)

1          THE DEPUTY CLERK:  This Honorable Court is again in

2     session.  Please be seated.

3          THE COURT: All right.  I think we're missing some

4     lawyers.

5          (Whereupon, the jury returned to the courtroom at

6     this time.)

7     BY MR. SULLIVAN:

8     Q.   Can you hear me okay, sir?

9     A.   Yeah.

10    Q.   Okay.

11    A.   Yeah.

12    Q.   All right.  Just let me ask you a few more questions, and

13    we'll be finished this morning.  At the end of your direct

14    examination yesterday, I believe the government played three

15    tapes; am I correct?

16    A.   Yes.

17    Q.   And they had you authorize -- they had you look at an

18    exhibit which was a disc, a CD.

19    A.   Yes.

20    Q.   Correct?

21    A.   And you said, yes, those were the tapes that I made; am I

22    right?

23    A.   Yes.

24    Q.   And the last tape we heard, which is I think marked

25    Government's Exhibit 650, perhaps, was dated October 18th,

1    2006, which was several months after that August day when you

2    agreed to cooperate, right?

3    A.    Yeah.  Now, I'd like you to focus on that time period

4    generally, October 18th, 2006, and around that period.  It's

5    Fall, maybe even snowing up there.  Does it snow up there that

6    time of year, mid-October?

7    A.    Sometimes, yeah.

8    Q.    It was a difficult time for you because you were being --

9    reading in the newspaper about the investigation; am I right?

10    A.    Yeah.

11    Q.    And there were articles about the political contributions

12    that VECO or its employees had made to various persons; am I

13    right?

14    A.    Probably right.  I guess you're right.

15    Q.    And it was an uncomfortable time in which VECO and you

16    kind of took center stage there in Anchorage, Alaska as the

17    investigation became known and people started talking about

18    the investigation in the newspaper, right?

19    A.    Yes.

20    Q.    And at that time, a lot of the talk focused upon VECO's

21    political campaign contributions; am I right?

22    A.    Probably were.

23    Q.    And it mentioned your executives and who were involved in

24    making contributions and so forth; am I correct?

25    A.    I'm sure that that's right, but I can't -- I guess, yeah.

1    Q.   Okay.  And at any rate, it is fair to describe that there

2    was a lot of heat in the press about the campaign

3    contributions.  Indeed, some people that had received campaign

4    contributions were returning them.

5    A.   That's true.

6    Q.   And it was all happening there around late September and

7    into October, including October 18th, right?

8    A.   Yeah.

9    Q.   Now, sir, I want to direct your attention to the day

10   before October 18th, which is October 17th.   Did you on that

11   day in connection with your cooperation with the government

12   send an e-mail to Ted Stevens indicating to him that you just

13   wanted to talk to my friend?

14   A.   Not an e-mail.

15   Q.   What would it have been?

16   A.   Probably been -- probably been on the phone.

17   Q.   Okay.  For Mr.  Allen, alone, let's put up for

18   identification the Defendant's Exhibit 3003.

19   A.   3003.

20   Q.   I'm sorry, sir. I'm mentioning a number.  It's okay.  I'm

21   going to put something up on the screen, and I'd like you to

22   take your time and just read it and see whether it refreshes

23   your recollection that an e-mail was sent to Ted Stevens that

24   day as part of the investigation where you were urged by the

25   government to send the e-mail.

1    A.    (Witness complies.)  That's -- only time that I ever

2    talked to Ted was on a phone.  I thought -- I never -- I don't

3    make -- I don't do e-mails.

4    Q.   I understand you don't use them, but does it refresh your

5    recollection that in connection with your cooperation in order

6    to get Ted on the phone and tape him that the government

7    wanted to set it up so that you could talk to Ted on the

8    phone?

9            MR. BOTTINI:  Your Honor, I object to that

10   characterization.

11           THE COURT: It's cross-examination.  You can answer

12   it.

13           THE WITNESS:  In 206 --

14   BY MR. SULLIVAN:

15   Q.   Would you like me to ask another question and maybe we

16   can get back to this?

17   A.   Yeah.  Because I'm not -- it's -- I can't -- I don't

18   think I have ever seen this, and I don't think I done it, but

19   maybe -- I don't know.  I can't --

20   Q.   Let's focus on the 18th, which is the day you made the

21   tape recording on the CD that we heard played yesterday, the

22   last tape; do you remember that one?  Do you remember the one

23   in which Ted Stevens said, remember Martha Stewart.  Don't do

24   anything improper?

25   A.    Yeah.

1    Q.   Do you remember that?

2    A.   Yes.

3    Q.   And he told you not to obstruct justice, things like

4    that, giving you advice as a friend.

5    A.   Yes.  Yes.

6    Q.   Well, that -- when you made that call, were agents of the

7    government with you making the call?

8    A.   I don't think so.

9    Q.   Was it arranged so that they could listen in on the call?

10   A.   Well, they had all my cell phones, yeah.  They could

11   have.

12   Q.   Well, sir, wasn't -- the government asked you whether you

13   signed certain consent forms to have your phone monitored and

14   to have body wires, things like that; do you remember that

15   question from the government?

16   A.   Yes.

17   Q.   Yesterday, right?  Yesterday?   They asked you that

18   yesterday?  I'm sorry.  Is your system working okay?

19   A.   Yeah, I'm fine.

20   Q.   Did they ask you --

21   A.   They asked me yesterday.

22   Q.   Did they ask you yesterday whether in fact you signed

23   consent forms permitting the government to monitor your

24   telephones?  Let me ask it another way.

25   A.   Okay.

1    Q.    Do you remember indicating yesterday that you gave the

2    government permission to listen in on your phones?

3    A.    No.    They hadn't told me that they -- they had my phone

4    wired for over a year.

5    Q.    I understand.

6    A.    Okay?

7    Q.    They had --

8    A.    So they didn't tell me anything, whether they could or

9    they couldn't.

10    Q.    Before August 30th, 2006, they listened to your phone

11    without you knowing it, correct?

12    A.    Right.

13    Q.    But after that when you became a cooperating witness, you

14    cooperated and you signed forms that said they could listen to

15    your phone in the future.

16    A.    Yeah, that's true.    I guess that's true.

17    Q.    Okay.    You remember that; you signed forms that say you

18    can wiretap my phone, right?

19    A.    I don't know.    I know they had all kinds of forms.

20    Q.    All kinds of forms and you signed them letting them --

21    A.    I probably did, yeah.    I'm sure I did.

22    Q.    You had your lawyer there, and you had 500,000 to pay,

23    right?

24    A.    Not in 20-- we didn't get the 500,000 until we made the

25    deal with the Hill people.

1    Q.   Okay.  So you got the money later, but you had your

2    lawyer working with you as a cooperating witness?

3    A.   Okay.  Say it again.

4    Q.   Okay.  Let me go about it this way.  You had a CD on the

5    witness stand, right?

6    A.   Yeah.

7    Q.   The CD had to be made by somebody, right?

8    A.   Yes.

9    Q.   Who was it made by?

10   A.   The FBI.

11   Q.   The FBI.  And at the time you made the call, were the

12   agents in the room with you?

13   A.   No.

14   Q.   You just made the call on your own?

15   A.   I think it was at my house when I talked to Ted.  It was

16   just by myself.  I think that's right.  You know, it seems

17   like to me that's the way it was.

18   Q.   And did you have suggestions from the agents about how

19   you should conduct the call?

20   A.   No.  Not on the that one, no.

21   Q.   Did you have any suggestions about trying to keep him on

22   the line?

23   A.   No.

24   Q.   No suggestions at all?

25   A.   No.

1  Q.   Did you inform the FBI that you were going to make the

2  call?

3  A.   After the call, I probably told Ted to call me.

4  Q.   Well, in this call you called him.

5  A.   Did I?

6  Q.   Yeah.  After perhaps you had sent him some kind of a

7  communication that you just wanted to talk to him.  Do you

8  remember that?

9          MR. BOTTINI:  Your Honor, I'm going to -- that

10  actually is not the case.  Mr. Allen did not initiate the

11  call.

12          THE COURT: Well, you can't testify.  You can --

13          MR. BOTTINI:  I understand, but --

14          THE COURT: -- you can redirect him.  Do you

15  understand the question?

16          THE WITNESS:  Yeah, I do.

17          THE COURT: What's your answer?

18  BY MR. SULLIVAN:

19  Q.   Do you understand that question, sir?  Is it your

20  recollection that this tape that was played yesterday was not

21  the result of you making several efforts to get a hold of Ted

22  to talk to him on the phone?

23  A.   I can't remember this e-mail, but I know -- are you sure

24  that I called Ted or he called me?

25  Q.   Well, let me ask it this way, because I'm not supposed to

1      give answers.

2      A.    Okay.  Okay.

3      Q.    Let's go back to 3003, Defendant's Exhibit, just for you.

4      Here it is on the screen.  Did you or did you not either send

5      yourself or have an e-mail sent to Ted Stevens on the day

6      before; namely, October 17th, 2006?

7      A.    You know, I can not remember it.

8      Q.    All right.  Let's go to Defendant's Exhibit 3525.  Take a

9      look at this, sir, for a moment.  Did you place the call that

10     is reflected there in that document?  Take a moment to look at

11     it.  It is just a page-and-a-half.

12     A.    Okay.  (Witness complies.)

13     Q.    Let me ask the question:  Does that refresh your

14     recollection that you were trying to have a conversation with

15     Ted in order to make a recorded conversation, sir, on October

16     17th or 18th?

17     A.    Okay.  This one that you just -- you can't -- it is

18     really, really hard to hear if I don't have that Blue Tooth

19     going just right so -- but I guess I called him or he called

20     me on that.  So we couldn't hear, that's for sure.  He

21     couldn't, I couldn't, I guess, or what it just said there.

22     Q.    Sir, you were a cooperating witness at this time,

23     correct?  In October?

24     A.    Yes.

25     Q.    You know why your calls were being taped, right?

```
 1      A.    Yes.
 2      Q.    And you reached out to have a phone call with Ted, right?
 3      A.    Yes.
 4      Q.    And the government wanted you to do so, right?
 5      A.    I can't remember it, but they probably did, you know.
 6      Q.    Sir?
 7      A.    Yes.
 8                  THE COURT:  Wait a minute.  Did you finish your
 9      answer?
10                  THE WITNESS:  Ask me one more time.
11      BY MR. SULLIVAN:
12      Q.    You have been cooperating, say, all of September and all
13      of October up to the 18th.  That's six weeks; am I correct?
14      A.    Yes.
15      Q.    You -- part of your cooperation was to tape everybody
16      that the government wanted you to tape, right?
17      A.    True.
18      Q.    And so when you placed a call trying to get Ted, you knew
19      that what you said would be taped, right?
20      A.    Yes.
21      Q.    And so when you reach out for him to make an effort to
22      chat with him, you know it is being taped.
23      A.    Well, I probably was.  But you're trying to say every
24      little phone call, and I'm telling you that I couldn't
25      remember every that -- that's what I was trying to tell you.
```

1      Q.    I understand.

2      A.    And, you know, it --

3      Q.    It's hard to remember every one of these.

4      A.    Yeah.

5      Q.    But the one thing you can remember is that you knew that

6      what you were saying on the phone was being taped?

7      A.    Yes.

8      Q.    And you knew it was part of the investigation?

9      A.    Yes.

10     Q.    You didn't just make a call to Ted and forget all of a

11     sudden no one is listening, right?

12     A.    Right.

13     Q.    And you reached out to him and had a conversation bearing

14     in mind you were a cooperating witness, right?

15     A.    Yes.

16     Q.    It was part of your job, wasn't it?

17     A.    Huh?

18     Q.    It was part of your job to be cooperating, wasn't it?

19     A.    Well, I guess so.

20     Q.    You agreed to do so, right?

21     A.    Yeah.

22     Q.    You knew everybody was -- that you talked to on the phone

23     was being taped, including your friend, Ted, right?

24     A.    But you know, when you call me about -- okay.  I already

25     said that, but every little phone call, and I can't -- I can't

1    remember exactly when and what because there was a bunch of

2    them.

3    Q.    I understand.

4    A.    Okay.  All right.

5    Q.    And the government gave you guidance as to who to call

6    and when.

7    A.    You know, there is lot of time they didn't; people would

8    just call me.

9    Q.    I understand.

10    A.    And they didn't tell me to do that.  People just called

11    my phone.

12    Q.    Well, my question, sir, is do you remember reaching out

13    to Ted on this occasion?

14    A.    You know, that's what I'm telling you.  Probably, I did,

15    but I can't remember every -- on that phone call.

16    Q.    Let's look at the call on the 18th for just a minute, and

17    we'll wrap up.

18    A.    Okay.

19    Q.    Could I have on the screen, just for the witness, please,

20    Defendant's Exhibit 3036?  Is this the conversation about what

21    --

22    A.    I'm sorry?

23    Q.    Could you take look if this is the conversation?  Does

24    this remind you that it's the conversation and maybe the best

25    way to look at it, Mr. Allen, is down there where you see

1     Martha Stewart's name.  Do you see that maybe right near the

2     -- could you circle that for us or highlight it?

3     A.   Yeah, that I see it.

4     Q.   Does that -- do you remember having that conversation?

5     A.   Yes, I do.

6     Q.   With the Senator at that time.

7     A.   Yes, uh-huh.

8     Q.   And was it at the request of the government that you

9     talked to Ted?

10    A.   Yes.

11              MR. SULLIVAN:  Thank you.  No further questions.

12              THE COURT: Redirect.

13    **REDIRECT EXAMINATION BY MR. BOTTINI:**

14    Q.   Mr.  Allen, let me start by asking you some questions

15    about what you talked about this morning here on

16    cross-examination.  Mr.  Sullivan asked you about your

17    cooperation with the government as part of your plea

18    agreement.  Sir, has your cooperation with the government

19    involved a number of different investigations?

20    A.   Yes.

21    Q.   All right.  Approximately how many investigations have

22    you cooperated in?

23    A.   Well, two trials, and I guess -- some more people that --

24    Q.   Now, he also asked you about this clause or provision of

25    the plea agreement that talks about your family, including

1    your son, Mark, and about possible charges there.  Do you

2    recall that term in the plea agreement?

3    A.   Yes.

4    Q.   Was that something that you asked for?

5    A.   No.  You guys asked for that.

6    Q.   Now --

7    A.   That came from you guys first and then I said, yeah.

8    Q.   Right.  He asked you several questions about the sale of

9    VECO corporation --

10   A.   Yes.

11   Q.   -- to the Hill people.  Was the government involved in

12   any way in the negotiations to sell VECO?

13   A.   No.

14   Q.   Did the government help you sell VECO?

15   A.   No.   I done it.

16   Q.   All right.  Now, you also said, however, that you were

17   precluded or you were barred from taking part in the actual

18   negotiations; is that right?

19   A.   That's right.

20   Q.   And why was that?

21   A.   Because they -- I couldn't -- mainly with the

22   accountants, they said they couldn't be in my room because

23   I've already -- that I was guilty -- already said I was

24   guilty, and so I couldn't even go in the room.

25   Q.   All right.  Had you already pled guilty to the charges

1    you talked about?

2    A.   Yes. Yes.

3    Q.   Now, Mr. Sullivan asked you about this $70 million, this

4    holdback of that money from the purchase price; do you recall

5    that?

6    A.   Yes.

7    Q.   I think this is clear, but let me just ask you now.  What

8    all was involved as far as issues relating to that $70

9    million?

10   A.   Tax, with environmentalists; they say that one of our

11   buildings that they bought, something has -- what the heck is

12   it -- they -- something to do with elevators, for example.

13   They also said that the sewerage on our -- camp wasn't right

14   which is -- I don't think is right.  I mean, they were working

15   good.  But, anyway, this kind of stuff that they wanted to

16   make sure that they had -- that's what the holdback was.

17        Also, it was -- we still had a contract in Russia, and

18   they weren't paying us the money back.  We had a lot of money

19   in this contract, and the Russians were not paying us back.

20   So it's things like that.

21   Q.   All right.  A number of different issues.

22   A.   Yes.

23   Q.   Mr. Sullivan asked you about the -- there's a clause in

24   the agreement where you had $500,000 reserved for your

25   attorneys' fees; is that correct?

1    A.    Yes.

2    Q.    Were you the only VECO executive that had that clause?

3    A.    No.  Pete Leathard had that and Greg Charles (Phonetic),

4    he had that.

5    Q.    Now, yesterday, Mr.  Sullivan asked you some questions

6    about -- a number of questions about the remodel to Senator

7    Stevens' home, and he asked you whether VECO had ever paid any

8    contractors in regards to the work done on the home.  Did VECO

9    pay any contractors?

10   A.    I did one, yeah.

11   Q.    And who was that?

12   A.    That was Mark Tyree's company.

13   Q.    And remind us of who Mark Tyree was?

14   A.    He was a plumber.  He plumbed the house.

15   Q.    Did he do all the plumbing in the house?

16   A.    Yes.

17   Q.    And VECO paid for that; is that correct?

18   A.    Yes.

19   Q.    Now, what about in regards to any repairs that had been

20   done at the house, including any components like generators?

21   Has VECO ever paid a contractor to do that?

22   A.    No.

23   Q.    Now, you said yesterday when he asked you about the house

24   being raised or jacked up that you thought VECO had jacked it

25   up; is that correct?

1    A.    Yeah.

2    Q.    Why did you think that?

3    A.    Because Ted and I were talking about it, and I thought we

4    had jacked it up, and Rocky was there, so I figured that we

5    had jacked it up.

6    Q.    Were you actually down there when the house was jacked

7    up?

8    A.    No.  No.

9    Q.    Did you find out later that VECO in fact hadn't done that

10   work?

11   A.    Finally, yeah.

12   Q.    Who did the raising of the house?

13   A.    Redmond.

14   Q.    Now, you were asked some questions about this plastic

15   roof underneath the upper deck and above the lower level deck.

16   Do you recall having any discussions with Senator Stevens

17   about the need for some sort of barrier there?

18   A.    Yeah.  He said that we had that and then we could smoke

19   our cigars there on the deck.  It would be a pretty good deal

20   so --

21   Q.    Was that why you had the thing built?

22   A.    Well, no.  It was -- you know, it -- you couldn't use the

23   deck -- if you wanted anything on the bottom deck, you

24   couldn't set it there if water could destroy it.

25   Q.    Now, you were asked some questions about whether VECO

1     purchased any materials that went into the remodel of the

2     house or provided any materials for the remodel.  Did you know

3     every detail about what VECO purchased as far as materials for

4     the house?

5     A.    No.

6     Q.    Now, we've talked at great length about components on the

7     house such as the steel stairs and the metal fabrication.

8     A.    Yeah.

9     Q.    Did VECO have any involvement in that?

10    A.    Yes.

11    Q.    Let me ask you this:  The furniture that you gave to

12    Senator Stevens, do you recall when you gave that furniture to

13    him?

14    A.    Probably 201 or 202.

15    Q.    Did Senator Stevens know that you gave him that

16    furniture?

17    A.    Yes.

18    Q.    Did he ever offer to pay you for it?

19    A.    No.

20    Q.    And you never asked him to pay for it, though, did you?

21    A.    No.

22    Q.    You also said that you purchased a new bed for the house;

23    is that correct?

24    A.    Yes.

25    Q.    Did Senator Stevens know that you had done that?

1     A.   Yes.

2     Q.   Did he offer to pay you for the new bed?

3     A.   No.

4     Q.   Now, you were asked some questions about Augie Paone, the

5     contractor, and there was a last bill that he submitted and

6     there was issue about that; do you recall that?

7     A.   Yes.

8     Q.   And what was the problem with that last bill?

9     A.   That was material and what -- I think Rocky put the cover

10    on the counter, and I think Rocky put all that in, and he got

11    all of the materials, and so I don't think -- I don't think

12    Augie even -- I don't think he worked on it, and I don't think

13    he put any material in it.  So that's why he didn't want to

14    pay that bill.

15    Q.   All right.  Now, you say he didn't want to pay that bill;

16    who are you talking about?

17    A.   Well, you know, the only time I felt that -- heard that

18    was when Rocky came to my house and said, we got to take care

19    of this bill.  And he -- Augie didn't want to pay for that,

20    and I said, well, if he don't, just put it over on my house.

21    Q.   Is that what actually happened?

22    A.   Yes, it did.

23    Q.   So did Mr. Paone get paid?

24    A.   Yes.

25    Q.   How was he paid finally?

1  A.   You know, I'm not sure of that, but I don't know if -- I

2  think -- I just don't know.  I just told Rocky to put it on my

3  bill; how he got it, I don't know.

4  Q.   All right.  That's fine.  Now, you were asked some

5  questions about some of the other components at the house and

6  Mr. Sullivan showed you a picture of a gutter that was coming

7  detached from the roof.  Do you remember looking at that

8  picture yesterday?

9  A.   Yes.

10  Q.   All right.  And I believe he asked you some questions

11  about the heat tape and whether there had been mechanical

12  problems with the heat tape that could have caused that issue;

13  do you remember that question?

14  A.   Yes.

15  Q.   Are you aware of whether Senator Stevens would ever turn

16  the electricity off at the house when he was gone for extended

17  periods of time?

18  A.   Yeah.

19  Q.   If the electricity was turned off at the house, would the

20  heat tape work?

21          MR. SULLIVAN:  Objection.

22          THE COURT:  I'll allow it.

23  BY MR. MR.BOTTINI:

24  Q.   If the electricity was off at the house, would the heat

25  tape work?

1     A.    No, it wouldn't.

2     Q.    Now, he asked you about some questions about this grill

3     that you bought for Senator Stevens, the grill on the deck

4     there, and showed you the picture of the valve being locked;

5     do you remember looking at that picture?

6     A.    Right.

7     Q.    Who had the key for that lock?

8     A.    I guess Ted had it or he could have a key inside the

9     house.  I don't know.

10    Q.    Did you have the key for it?

11    A.    No.

12    Q.    All right.  Now, you were asked several questions about

13    this trade, the Mustang trade, that you entered into with

14    Senator Stevens, and Mr.  Sullivan showed you some documents

15    related to the purchase of the Land Rover yesterday; do you

16    remember looking at those?

17    A.    Yes.

18    Q.    Now, how much do you recall paying for the Land Rover?

19    A.    I thought it was 44, but I guess it is 42, now.

20    Q.    Well, do you remember every penny of the purchase price?

21    A.    No.

22    Q.    Let me show you what we have marked for identification as

23    Government's Exhibit 1122.  If you take a look at that for a

24    moment, Mr.  Allen; do you recognize what that is?

25    A.    Yes, that's my check.  It says $44,000.

```
 1    Q.    Forty-four-thousand even or --

 2    A.    $44,339.51.

 3    Q.    Does that refresh your recollection as to how much you

 4    paid for the Land Rover?

 5    A.    Yeah.

 6    Q.    How much did you pay for the Land Rover?

 7    A.    Well, that check.

 8    Q.    And what's the amount of the check, again?

 9    A.    $44,339.51.

10          MR. BOTTINI:  We'd offer Government's Exhibit 1122,

11    Your Honor.

12          THE COURT: Any objection?

13          MR. SULLIVAN:  None.

14          THE COURT: Admitted.

15    BY MR. BOTTINI:

16    Q.    Now, Mr. Sullivan asked you some questions about the

17    roof design and your belief that the design of the roof was

18    causing the icing problem; do you remember those questions?

19    A.    Yes.

20    Q.    Now, who was it that had designed the plans for remodel?

21    A.    That was John Hess.

22    Q.    And Mr. Hess worked for who?

23    A.    VECO.

24    Q.    All right.  To your knowledge, did Senator Stevens ever

25    pay for Mr. Hess' services in designing those plans?
```

1   A.   No.

2   Q.   Did -- but, nevertheless, you felt responsible because of

3   the faulty design?

4   A.   Yes.

5   Q.   Have you ever heard of anyone offering a warranty on a

6   free item?

7   A.   No.

8   Q.   Now, you were asked some questions about lights that you

9   decided to put on Senator Stevens' house; do you remember

10  those questions?

11  A.   Yes, uh-huh.

12  Q.   Was Senator Stevens aware that you had done that, put

13  those lights on the house?

14  A.   I don't think he did.

15  Q.   Was he aware after you put the lights on that you were

16  the one who had put the lights on the house?

17  A.   Yes.  Do you recall whether he thanked you for that?

18  A.   Yeah.

19  Q.   Now, you were asked some questions about the toolbox and

20  the tools that were left at the house; do you remember those

21  questions?

22  A.   Yes.

23  Q.   Did Senator Stevens know that it was you that had left

24  that toolbox and the tools at the house?

25  A.   Yeah.

1    Q.   At some point, did he thank you for that?

2    A.   Yes.

3    Q.   Now, you were asked some questions about the fish

4    sculpture or fish statue on the lower deck of the house; do

5    you remember those questions?

6    A.   Yes.

7    Q.   All right.  And you were asked about whether that statue,

8    the fish sculpture, was purchased for a charity; do you

9    remember those questions?

10   A.   Yes.

11   Q.   All right.  Was the sculpture purchased for a charity?

12   A.   No.  I thought it was going to go into Ted's -- some kind

13   of a building that -- what all Ted had done for the state,

14   like a library or something like that is what they told me

15   when I put the money in.

16   Q.   And there were a number of questions about this repair to

17   the boiler that was done by Charlie Hart.  Do you remember

18   talking to Mr.  Sullivan about that?

19   A.   Yes.

20   Q.   Was Senator Stevens aware that you had paid for the

21   labor?

22   A.   Not until he got the -- that invoice, I don't think.

23   Q.   All right.  And you were asked whether he asked whether

24   Senator Stevens had asked you to send him a bill; do you

25   remember that?

```
 1    A.    Did Senator Stevens ask you to send him a bill?

 2    A.    Yes.

 3    Q.    Did you do that?

 4    A.    No.

 5    Q.    Did Senator Stevens at any time after asking you to send

 6    him a bill ask you to send him a bill again or offer to pay?

 7    A.    I think -- no.  He didn't, but he wanted to get it done.

 8    I know that.

 9    Q.    Do you know whether Senator Stevens ever contacted

10    Charlie Hart and asked him how much he owed?

11    A.    No.

12    Q.    In relation to the home remodel, did you have contact

13    periodically with Senator Stevens concerning what was going

14    on?

15    A.    Yes.

16    Q.    How about Catherine Stevens; did you have contact with

17    her concerning the home remodel?

18    A.    A couple of times.

19    Q.    Between the two of them, between Ted Stevens and

20    Catherine Stevens, who did you have most of the contact with?

21    A.    Ted.

22    Q.    You were asked some questions yesterday about some

23    earlier testimony in a different trial that you had given

24    about the things that you had provided Senator Stevens not

25    being a gift; do you remember that?
```

1    A.   Yeah.

2    Q.   When you said that in your earlier testimony at that

3    other trial, what did you mean when you said it was not a

4    gift?

5    A.   Well, when Ted talked to me about John Rubini,  and he

6    said I -- you've got to do something on your invoices.  You've

7    got to get something done because I don't want you in the

8    middle of like John Rubini did.  He said it took -- it took

9    his legal bills was probably two to three million dollars, and

10   so I knew I had to do something, and that's why I said it's

11   not a gift.

12   Q.   And now when did you have that conversation with Senator

13   Stevens about you being --

14   A.   I think it was in -- we were in the boot camp there at

15   Wickenburg (Phonetic).  I think it was 206.

16   Q.   Up until that point in time, up until the time that you

17   had that conversation with Senator Stevens, did you consider

18   all the things you had done for him to be a gift?

19   A.   Well, I'll say it this way, I wished that it would have

20   been.  I could have done it.

21   Q.   Do you recall ever having any conversations with Senator

22   Stevens about the amount of work that VECO had done on the

23   house?

24   A.   The only thing that I recall -- we were out at the Double

25   Muskey (Phonetic), and he said, you know, I know you've done a

1    lot of work, more than what your -- so he said -- he kind of

2    thanked me.  He said, I know your put more work in there than

3    what you're saying.

4    Q.   Do you remember when that happened, when that

5    conversation was?

6    A.   I don't know what year.  It was right outside the Double

7    Muskey, getting into my car.

8    Q.   Now, Mr. Sullivan asked you yesterday whether Senator

9    Stevens always paid for things like meals when you were out to

10   dinner together.

11   A.   Yes, uh-huh.

12   Q.   You said that that was true.  Was that always the case,

13   that he always paid for meals?

14   A.   In the last two, three years, I didn't -- he didn't

15   really push that hard, and in the last few years, yes, he did.

16   Q.   Now, you were asked several questions again about various

17   aspects of the home remodel, or items associated with the

18   house.  Do you recall whether Mr. Sullivan asked you any

19   questions about the generator?  Any questions about the

20   generator?

21   A.   No, I don't think he did.

22   Q.   Did he ask you any questions about the electrical work

23   that had been done on the house?

24   A.   No.

25   Q.   Did he ask you any questions about the plumbing work that

1     had been done on the house?

2     A.     No.

3     Q.     You were asked some questions about the natural gas

4     pipeline or the effort to have a natural gas pipeline

5     constructed in the state; do you remember that discussion with

6     Mr. Sullivan?

7     A.     Yeah.

8     Q.     Was that issue, the construction of the natural gas

9     pipeline, something that you frequently talked to Senator

10     Stevens about?

11     A.     Yes.

12     Q.     Was it just within the past couple of years or has this

13     been an ongoing issue for a number of years?

14     A.     A long, long -- a lot of years.

15     Q.     Do you remember any situation or circumstances in which

16     Senator Stevens gave you information that was helpful to you

17     about the natural gas pipeline?

18     A.     Yeah.  He -- he knew Jim Mulva.

19     Q.     Who was Jim Mulva?

20     A.     He was the CEO of ConocoPhillips.

21     Q.     And so what do you mean by that, that Senator Stevens

22     knew Jim Mulva, how does that help with to you?

23     A.     Well, he would tell me that -- it would tell me that

24     ConocoPhillips really wanted the gas pipeline, and Jim Mulva

25     -- I don't think Ted told me this, but Jim Mulva was the other

1    two oil companies got together on the PTT.

2    Q.   And is that that tax issue you talked about --

3    A.   Yes.

4    Q.   -- about earlier?

5         MR. BOTTINI:  Your Honor, I believe I moved the

6    admission of -- Government Exhibit 1122, but have not asked to

7    publish to the jury at this time.  May I do that at this time?

8         THE COURT: Sure.  Go ahead.

9    BY MR. BOTTINI:

10   Q.   All right.   Mr. Allen, now that we have this up on the

11   screen, take a look again at the check that is on your screen.

12   Is that the check that you used to purchase the Land Rover

13   that you traded to Senator Stevens?

14   A.   Yes.

15   Q.   May I have just a moment, Your Honor?

16        THE COURT: Sure.

17        MR. BOTTINI:  Mr. Allen, thanks.  That's all

18   questions I have for you.

19        THE COURT: All right.  I'm going to excuse the

20   witness.  Any objections?

21        MR. SULLIVAN:  No, Your Honor.

22        THE COURT: You may step down, sir.  Please do not

23   discuss your testimony with anyone.

24        THE WITNESS:  I can't hear you, sir.  I'm sorry.

25        THE COURT: I said thank you.  You may step down.

1     Please do not discuss your testimony. You are excused.  You

2     can return to Alaska if you'd like to.

3              All right.  It is almost lunchtime, ladies and

4     gentlemen.  It probably makes more sense to let you go to

5     lunch a few minutes earlier before we start with another

6     witness, and we'll start back at two o'clock.  I thought you

7     might like that.  All right.  Enjoy your lunch.  Again, please

8     leave your books there.  Thanks.

9              (Whereupon, the jury exited the courtroom at this

10    time.)

11             THE COURT: All right, counsel.  I just need to find

12    out who's next.  Who's the next witness?

13             MR. BOTTINI:  Our next witness will be Charlie Hart,

14    Your Honor, and he's relatively short, about 20 minutes.

15             THE COURT:  All right.  And after him?

16             MS. MORRIS:  Ms. Flanders; Barbara Flanders.

17             THE COURT:  Flanders.  All right.  And who's after

18    her?  There's Charlie Hart; Ms. Flanders.

19             MR. MARSH:  Your Honor, I think it's

20    Harrod(Phonetic); Bateman; and Pluta; and we're still

21    considering whether we need Mr. Hensel; so we may not call

22    him.  And Your Honor --

23             THE COURT:  I'm sorry.  Who -- what are the last two

24    names?  You had Hart, Flanders,and who?

25             MR. MARSH:  Harrod;Bateman; and Pluta.

```
1                 THE COURT:  All right.

2                 MR. MARSH:  It's possible that Harrod and Bateman

3       might flip.

4                 THE COURT:  All right.

5                 MR. MARSH:  And, Your Honor, one other; there's a

6       document custodian from the Natural Science Foundation who --

7       she'll -- he or she will be a document custodian.  We're --

8       I'm not sure that that person -- I think the person is

9       arriving around one, so with -- if it's okay, we --

10                THE COURT:  There's objections to documents?

11                MR. MARSH:  Yes.  That's correct.

12                THE COURT: All right.  Can't get a stipulation

13      there?  You need a custodian for documents?  Is there

14      something, Carol.

15                THE DEPUTY CLERK:  Kurt is making a call.  The alarm

16      is on.

17                THE COURT: Oh, the alarm.  All right.  Okay.

18      Counsel.

19                MR. CARY:  We may want to cross-examine the witness.

20                THE COURT:  All right.  With respect to the witness'

21      position as custodian of the documents?

22                MR. CARY:  Yes, Your Honor.  In fact, they got a lot

23      of documents from this custodian and we may want to try to put

24      some in ourselves.

25                THE COURT:  All right.
```

1          MR. MARSH:  And, Your Honor, to that extent, too,

2     we'd also at some point -- we filed a motion in limine for the

3     admission of the Carrol Walk documents over the objection

4     by defendant, and I think when we come back, we'd like to

5     formally move those -- I don't believe the Court has ruled --

6     we'd like to formally move those in over objection.

7          And I am also prepared to talk about the Gewin

8     801(d)(2)(e) issue at the Court's convenience.

9          THE COURT:  Why don't we do it now?

10          MR. MARSH:  Okay.  Your Honor, this may be one of

11     the few times I'll admit that something is -- well, to some

12     degree, it is a little bit unfair the way the rules work if

13     you think about it because it should be that what's good for

14     the goose is what's good for the gander.  As one of my

15     professors used, sauce for the goose, sauce for the gander.

16          But we submit that the rule and the commentary are

17     absolutely explicitly clear that the exceptions that come

18     under 801(d)(2), the five exceptions, a, b, c, d, and e, only

19     apply when they're admitted against party opponent.  As the

20     commentary to the rule notes, it's because those exceptions

21     are based, quote, on the theory that their admissibility and

22     evidence is the result of the adversary system, rather than

23     satisfaction of the conditions of the hearsay rule.

24          THE COURT:  So that's the key, then, it has to be

25     against a party opponent.

1          MR. MARSH:  That's correct.

2          THE COURT: So your argument then is that the

3     defendant -- unless the defendant is able to too introduce

4     statements against the United States, right?

5          MR. MARSH:  Your Honor, I believe there's some

6     technicalities that relate to that.  I'm not -- that wasn't

7     something I'm prepared to discuss at this point.  We can take

8     a look at it, but, certainly, with respect to these, it does

9     have to get admitted against a party opponent.

10          THE COURT:  A party opponent.

11          MR. MARSH:  And that raises the Court's second

12     consideration which is what's a scheme?  What is a common

13     venture?  What's a joint venture?  And we believe that Gewin

14     deals with that pretty clearly, and defines that any time a

15     group of people, two or more people, get together and have a

16     common goal, a joint venture, and take steps down the road to

17     bring them to fruition.

18          And we absolutely agree with the Court's instinct_

19     that at some point, that gets to be a problem.  At some point,

20     it's you don't have a common venture when you're talking to

21     the cashier at a grocery store getting your groceries passed

22     through.

23          But on the other hand, what we submit with,

24     particularly, Mr. Persons and his conversations -- Mr.

25     Allen, Mr. Persons, the defendant all were working together,

1    as the Court knows from testimony and from e-mails, to get the

2    house remodel done.  They were also working together among

3    other things do the horse venture.  It's a classic joint

4    venture.  It's actually a legal demarcation.  They had a

5    corporation.  They had a couple of them.  And that one of the

6    things was to do the horse partnership.  So statements made in

7    connection with those, we believe, plainly admissible with

8    respect under Gewin.

9            Now, with respect to Mr. Ladd, it certainly is more

10   difficult we concede to view Mr.  Ladd as a joint venturer in

11   the context of what the subject matter of the conversation

12   was.  It was the subject matter of the conversation in which

13   now Mr.  Ladd and the defendant are, obviously, a joint

14   venture themselves; Mr. Ladd, Northern Lights Pack (Phonetic);

15   the defendant, Northern Lights Pack(Phonetic), but it would be

16   difficult to, we concede, to loop those kinds of statements,

17   statements of Mr.  Ladd to Bill Allen, into that joint

18   venture.

19           However, it's not the only obstacle that we have.

20   We cited yesterday 801(d)(2) -- I believe we cited "d", but we

21   also point to (d)(2)(c); that is, a statement by person

22   authorized by the party to make a statement concerning  the

23   subject.

24           Now, it's in contrast to (d)(2)(d), which is a

25   statement by the parties' agent or servant.  Now, certainly,

1    we've got no evidence to suggest that Mr. Ladd and the

2    defendant were in a principal agent relationship with respect

3    to trying to get Walter Stevens a job.  However, the

4    intercepted telephone conversation makes plain Mr.  Ladd

5    represents that the defendant asked him to contact Bill Allen

6    on a very specific topic.  Defendant asked Mr.  Ladd a

7    specific topic.  That to us is a statement by a person,

8    authorized by the subject to make that statement, and,

9    certainly, Senator Stevens' internal statement is admissible

10   as a statement of a party opponent.

11          Mr.  Ladd's statement, we believe, is admissible as

12   a statement of a party opponent.  Mr. Ladd's statement we

13   believe is admissible under 801(d)(2)(c) to the extent the

14   Court has concerns about 801(d)(2)(c), Mr. Ladd's statement

15   can come in simply for context or for state of mind.  The core

16   there is the fact that he is on a mission; he's been asked to

17   do something by the defendant.  He carries that mission out

18   and contacts Mr.  Allen on the defendant's behalf which he

19   recommends again in the telephone recording when nobody knew

20   that they were being recorded that this is what's been asked

21   of him.  Thank you, Your Honor.

22          THE COURT:  All right.  Counsel.

23          MR. CARY:  Yes, Your Honor.  This is just what the

24   hearsay rules are for.  If Mr. Ladd -- they want to put in

25   something about Mr.  Ladd and claiming an agency relationship,

1    and he cites the rule, and then he says, well, we really don't

2    have that.

3            I don't understand where the evidence is that

4    Senator Stevens was part of some sort of joint venture. We

5    think this goes far afield in any event, but this is exactly

6    what the hearsay rule is for.  If they want Mr. Ladd to

7    testify about this, they ought to bring Mr. Ladd in.

8            THE COURT: Counsel.

9            MR. MARSH:  Thank you, Your Honor.  Mr. Cary,

10   respectfully, got two of the three parts of our argument.

11   There's the co-conspirator joint venture part; that is one

12   part of the theory to get things in.  There is the agent

13   servant part.  That's 801(d)(2)(d).  But there's a third part;

14   it's any statement made by a person authorized by the party --

15   in this case, the party is the defendant -- to make a

16   statement concerning the subject.

17           So the statement -- the person here is Mr. Ladd.

18   The party is the defendant.  The subject and the statement

19   authorized to make is, hey, ask Bill Allen if he knows where

20   my son, Walter, can get a job.  So it's different.  It doesn't

21   have to be agent/servant.  One would submit that that's

22   playing by the rule because if it did have to be agent and

23   servant, you wouldn't have to "c" if you had "d".

24           So it's got to be something different, something

25   less than an agency relationship, and there's good reason for

1    that because what "c" talks about is a specific allegation of

2    authority to contact on a certain point; make a statement for

3    me, and those are -- although, the hearsay rules are

4    absolutely designed to keep out-of-court statements from the

5    jury, they are also designed to allow those kind of statements

6    when there's sufficient indicia as defined by the rules to

7    permit the Court and the system to understand that these are

8    reliable statements, and we submit this is one of those.

9         THE COURT: So the Court would still, nevertheless,

10   have to find that there is a reliability by the preponderance

11   of the evidence?

12        MR. MARSH:  I believe that's correct, Your Honor,

13   and that the reliability comes from -- and this is assuming

14   that Court believes it needs to address the subject matter of

15   Mr. Ladd's statement on its own.  We submit that it's -- that

16   the Court could very well conclude that Mr. Ladd's recounting

17   of the defendant's statement, Mr. Ladd's representation comes

18   in.

19        On the other hand, we do submit that the --

20        THE COURT: They had nothing to did with the home

21   improvements at all, though, did it?

22        MR. MARSH:  That's correct. That's correct.

23        THE COURT: Nothing to do with that scheme.

24        MR. MARSH:  That's right.

25        THE COURT:  The government's argument is that the

common scheme or the common purpose is the job for Senator

Stevens' son, correct?

MR. MARSH: Your Honor, I think we discuss it

differently. I think when we discuss it differently. I

think there could be an argument made that when the defendant

contacts Mr. Ladd and tells him, go talk to Bill Allen and

see if he can get my son a job, that once steps get made down

that road, I think that argument could be made; but I believe

the stronger one, we submit to you, is that you don't even

have to get there because it's a very specific brand of

authority, a very specific request made by the defendant to

Mr. Ladd, talk to Bill Allen about my son and getting a job.

That's why we think that the Court can sidestep all

of the Gewin issues in trying to figure that out by focusing

on the fact that what Mr. Ladd's statement to Mr. Allen are

statements made by Mr. Ladd at the defendant's request.

THE COURT: So just the traditional agency theory,

then, I assume then or not?

MR. MARSH: No, Your Honor. Respectfully, no. You

don't even have to get to an agency theory; 801(d)(2)(2) talks

about statements made by the agent or servant in the context

of an agent/principal relationship; (d), subsection (d)

requires the Court to find an agency relationship. Sub-

section (c) talks about it in different terms; statement made

by a person directed by the party.

1          So by definition, (c) has got to mean something less

2    than (d) or otherwise the rules committee wouldn't have put

3    them both in there.

4               THE COURT: All right.  Why isn't he correct?

5               MR. MARSH:  Thank you, Your Honor.

6               THE COURT: Why isn't he correct?

7               MR. CARY:  Because, Your Honor, there's no

8    independent evidence that Mr.  Ladd -- Senator Stevens

9    authorized Mr.  Ladd to make this statement, and in fact, in

10   the 302 that we just got over the weekend, Mr.  Ladd said

11   exactly the opposite.  It was just a passing comment.  They've

12   got to have independent -- separate than the hearsay that they

13   want to introduce.  They've got to have independent evidence

14   that it was authorized and whether it's an agency relationship

15   or authorized representation or maybe it may be a subtle

16   difference, but they have to have independent evidence of

17   that, and, otherwise, it's hearsay.

18              THE COURT:  What about that counsel, there's no

19   independent evidence at all?

20              MR. MARSH:  Your Honor, it's a -- I believe this is,

21   basically, a Borjalie (Phonetic) issue, and I note the Court

22   to the comments --

23              THE COURT:  What page?

24              MR. MARSH:  -- of 801, comments to Rules 801, 1997

25   amendment.  The Court must also consider the circumstances

1        surrounding --

2                THE COURT:  What book are you read from, counsel?

3                MR. MARSH:  344 of the green book; second paragraph.

4                THE COURT: All right.

5                MR. MARSH:  It says -- this is five lines down --

6        the court must consider in addition the circumstances

7        surrounding the statements, such as, the identity of the

8        speaker, the context in which the statement was made, or

9        evidence corroborating the contents of the statement in making

10       it's determination as to each preliminary question.

11               This statement was captured on a wiretap --

12               THE COURT: Right.

13               MR. MARSH:  -- authorized by the Court.  Mr.  Allen

14       indicated he had no idea anyone was listening at the time.  We

15       have no evidence that Mr.  Ladd was also similarly aware, but

16       we believe that in and of itself provides the Court with the

17       circumstances and the nature and the indicia and reliability

18       to know that there's stuff there.

19               THE COURT: All right.  All right.  I'll think about

20       it over the lunch hour.  Anything further on that last point;

21       indicia, reliability, the wiretap, the court order.

22               MR. CARY:  On this 302, it says Ladd  -- senator to

23       say things from time to time or concerns on his mind or

24       passing thoughts that were not necessarily directed at Ladd

25       for --  Ladd advised that sometimes the Senator just needed

1    someone to talk to, mention his thoughts to and concerns out

2    loud.  Ladd took the comment about Walter needing a job as

3    more the Senator's comment on the situation.

4              It's contrary to evidence that we should have had,

5    and it is not an authorized statement, and, Your Honor, I'm

6    not sure if it's clear, but we do object to the Carrol Walk

7    documents coming in en masse pursuant to the business

8    certification relevancy and hearsay grounds.

9              THE COURT:  All right.  With respect to Cooper, is

10   that -- is it still contemplated that you want to call Cooper

11   to testify or not?

12             MR. MARSH:  I'm scared to come up again on this

13   issue, Your Honor.  We'd like to.  We believe there is a

14   basis.  We understand the Court's concerns.  We do still

15   believe it's proper.  We anticipate the Court is going to

16   disagree.  So --

17             THE COURT: Does the government believe that -- is

18   the government of the opinion that without his testimony you

19   can't prove materiality?

20             MR. MARSH:  No, Your Honor.

21             THE COURT: Then, why do you need him, then?

22             MR. MARSH:  We believe that -- well, for two

23   reasons; number one we think that we can -- we, respectfully,

24   submit given how quickly we are moving and given he is a short

25   witness, adding sprinkles on the ice cream cone is always a

1    good thing.  Number two, Your Honor -- that's probably one of

2    the worst statements I've ever made in open court, so I

3    apologize.

4              But the other thing, Your Honor, we believe there

5    are two different types of materiality, and the second part,

6    Your Honor, is the fact that this was -- and Mr. Singer and I

7    had a very heated debate on this, and I think we're never

8    going to agree -- but we do submit that this is a different

9    type of 1001 and a different type of structure than submission

10   of forms to the FDA or submission of forms to HUD or HHS.

11             THE COURT:  Why is it different?

12             MR. MARSH:  Because this particular form was passed

13   by Congress.  It's a it a law that requires public disclosure

14   of it.  It's not just a form that goes to an agency and gets

15   put into some file and processed and into a computer system

16   and just gets spit out.  This is a form that is designed by

17   the people who wrote the law to go to the public, and we

18   submit that evidence of how that's used on a material basis by

19   the people out there coming from a person that has been

20   working in that field for 30-some-odd-years and has an

21   intimate knowledge of how these forms come to be and how he

22   disseminates and what he's seen from --

23             THE COURT:  But it's not an expert, you're not

24   offering him as an expert.

25             MR. MARSH:  That's right.  Absolutely.

1          THE COURT:  He's not worked on the -- he's never

2    worked on Hill, has he?

3          MR. MARSH:  I believe he did work on the Hill for

4    two years, but it was very early in his career.

5          THE COURT:  It had nothing to do with the financial

6    disclosure office, though, did it?

7          MR. MARSH:  Your Honor, I --

8          THE COURT:  -- a fact witness with no knowledge of

9    the facts of the case, and I keep going back to that, why then

10   do the jurors need to hear from him?  If you concede that you

11   don't need him to prove materiality.

12         MR. MARSH:  He does have personal knowledge in the

13   sense that he knows on the other side how these forms get

14   used, not this particular form, but these other forms, and we

15   again submit to the Court that what separates an expert from

16   everyone else is not -- it's the mental processes used to be

17   able to make the statements, and there's nothing technical or

18   expert or Ph.D necessary to be able to allow Mr.  Cooper to

19   make the statements.  He can use his own -- I mean his own

20   human reason and logic.  He sees these things, and he's been

21   involved in it, and he can tell the Court and the jury why it

22   is's useful and why it matters.

23          THE COURT:  All right.  With respect to Flanders, we

24   talked a little bit about that yesterday.  Any progress there

25   on the stipulation or not?

1          MR. MARSH:  We tried a couple times back and forth.

2     I don't think we're there yet.  Our last proposal we thought

3     was -- would address the concerns which was to do heavy

4     redactions from the public filings of all the "PI", personal

5     identifiable information.

6          One thing I to want to point the Court to is we do

7     believe these are material and relevant.  We believe they are

8     relevant and simply because one of the big points in the

9     defendant's opening statement was that when it comes to the

10    "TP", the defendant is not involved.  And what these documents

11    show -- it's not that the government wants to be able to show

12    that tuition payments were made for a child of the defendants

13    and the amounts of that, it's simply the fact that on a very

14    periodic basis, the defendant was getting memoranda from his

15    staff telling him that and that he frequently wrote notes in

16    response to the memoranda, asked for certain information, was

17    kept in the loop on a pretty frequent basis about the state of

18    his finances, and we believe that's highly relevant especially

19    given what the defense has articulated to.

20          We're happy to stipulate to their admissibility.  We

21    believe they're absolutely business records.  Many of them

22    have the defendant's handwriting.  Those can come in as

23    adopted admissions.  There are a lot of ways to get them in,

24    and we're willing to work with defense counsel if we can come

25    up with a way --

1             THE COURT:  What's the stumbling block?  Maybe I can
2    help you, if you know.
3             MR. MARSH:  We don't know, and it may be we haven't
4    talked about it enough.  We haven't really sat down and kicked
5    it around.  We don't know.
6             MR. CARY:  The stumbling block is they shouldn't be
7    able to drag all of Senator Stevens' family's personal
8    finances through a public courtroom.
9             MR. MARSH:  And we don't want to do that, and we're
10   happy to do whatever we can.  It's not -- we don't have to go
11   -- certainly, the jury gets to see it, and the jury is
12   entitled to see that kind of stuff, but we have no desire and
13   no interest in allowing the public to know the amounts of the
14   bank account, the checking accounts.  I mean --
15             THE COURT:  Yeah.  Let me invite counsel to the
16   podium, but you both can stay there.  But all the more reason
17   to try to work out a stipulation.  I think there's some
18   relevance.  There's certainly a high degree of relevance with
19   respect to the proffered testimony.  All the more reason for a
20   stipulation if you can do so in good conscience that -- I mean
21   she was responsible for paying his bills.
22             MR. CARY:  Not the bills on -- for the original
23   renovation, Your Honor, but the -- it's not relevant.  There
24   are -- what the Senator's daughter's college tuition was is
25   not relevant; how much he paid for an exercise device that he

1    ordered is not relevant.  We're taking a tour through his

2    personal life towards no relevance at all, and I asked for a

3    proposal, and if they have a proposal as to what they -- it's

4    hard for me to imagine --

5             THE COURT: Give me a proffer as to what the

6    relevance of her testimony would be.  She worked for the

7    Senator, correct?

8             MR. MARSH:  That's correct.

9             THE COURT: Does she still work there?

10            MR. MARSH:  No.

11            THE COURT: She worked there and her responsibility

12   was to do what?

13            MR. MARSH:  She had a number or responsibilities.

14   One part of it was to be in charge of the Senator's

15   family's finances.

16            THE COURT: Did that include the renovation expenses

17   for Girdwood?

18            MR. MARSH:  A little bit.  And when I say by that is

19   it's certainly true we do not dispute the fact that she did

20   not write the checks for the account, but there are a number

21   of documents that we will seek admission of that relate to her

22   sending the defendant copies of the check register saying, for

23   instance, here's what's happening in the account that you've

24   got for the chalet; is this okay? It's not what you told me.

25            Conversations and e-mails back and forth with the

1    defendant in which they talk about is it okay if I forward

2    $2,000 here? Can I forward $2,000 from the chalet account;

3    memoranda setting forth the defendant's comprehensive

4    financial state at a particular date, which talks about, among

5    other things, the balance in the loan account.

6         So there is some contact with that, but above and

7    beyond, it -- and we agree with Mr. Cary, the fact that the

8    amount of a daughter's loan pavement is not relevant at all,

9    but what is relevant that the defendant being kept aware on a

10   very periodic basis of what was going to the point that he

11   actually would frequently write handwritten notes back to his

12   assistant; check on this.  How much is this? I'm refinancing

13   my house in DC.  What are the interest rates?  Call this

14   banker and tell them.

15        And that all establishes the financial

16   sophistication and knowledge of the defendant about his

17   personal finances, and given that one of the --

18        THE COURT:  What about a stipulation along those

19   lines that you suggested, and what would your objection be to

20   that?

21        MR. CARY:  Well --

22        THE COURT:  They're offering it to show that he was

23   on top his finances to a certain extent.

24        MR. CARY:  To a certain extent, yes.

25        THE COURT:  Right.  Exactly.

1           MR. CARY:  If we can agree on what that certain

2    extent is, we may be able to come up with a stipulation.

3           THE COURT:  I think he just captured it.  He just

4    captured it.  It should be difficult.  He just captured what

5    the certain extent is; he's checked on this.  He was on top of

6    certain expenses.  It wasn't as if everything was just

7    delegated to someone else.  That's the point.

8           MR. CARY:  We'll work on it, Your Honor.

9           THE COURT:  All right.  Okay.  I'll allow it.  I

10   agree that where the children are attending college and what

11   the amounts of loans were, I mean we're getting into some

12   privacy issues that they shouldn't be burdened by.  I'm not

13   going to allow that.  I mean where the child was attending

14   college, for instance, and how much the tuition payment to the

15   college and the loan payments to --

16          MR. MARSH:  Right.  The problem that we have is that

17   these documents, there's no way to break them out.  I guess,

18   theoretically -- what we would be prepared to do and what

19   we would have done anyway that should the Court decide that

20   they're admissible, we don't see any reason that that stuff

21   should be -- it is personal identifiable information that is

22   not something that should be publicly released, but we do

23   believe it's those kinds of statements and his knowledge of

24   that are relevant to the jury's determination because, for

25   instance -- can we approach, Your Honor?

```
1              THE COURT:  Sure.  You may approach.

2              (Whereupon there was a bench conference at this

3     time.)

4              (SPACE LEFT BLANK INTENTIONALLY/REDACTED B/C)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          (Whereupon, the sealed bench conference concluded at

3     this time.)

4          THE COURT:  All right.  We'll take a short -- we'll

5     take a lunch break, and we'll start again at two o'clock.

6               [End of proceedings]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4            I, Wendy C. Ricard, Official United States Court

5     Reporter in and for the District of Columbia, do hereby

6     certify that the foregoing proceedings were taken down by

7     me in shorthand at the time and place aforesaid,

8     transcribed under my personal direction and supervision,

9     and that the preceding pages represent a true and correct

10    transcription, to the best of my ability and

11    understanding.

12

13

14

15                              _____

16                              Wendy C. Ricard, CCR, RPR

17                              Official U.S. Court Reporter

18

19

20

21

22

23

24

25