UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES DISTRICT COURT | CRIMINAL ACTION NO. 08-0231 |
| | WASHINGTON,D.C. |
| VERSUS | THURSDAY, OCTOBER 16, 2008 |
| | **(REDACTED/WITHOUT BENCH** |
| | **CONFERENCES)** |
| THEODORE F. STEVENS | 2:00 P.M. |

**JURY TRIAL (DAY 17 – PM SESSION)**

**BEFORE THE HONORABLE EMMET G. SULLIVAN**

UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

| | |
|---|---|
| FOR THE PLAINTIFF, | JOSEPH W. BOTTINI,ESQ. |
| | JAMES A. GOEKE,ESQ. |
| | U.S. ATTORNEYS OFFICE |
| | District of Alaska |
| | 22 West Seventh Avenue |
| | Federal Building and U.s. |
| | Courthouse |
| | Anchorage, AK 99513-7567 |
| | |
| | BRENDA MORRIS,ESQ. |
| | NICHOLAS A. MARSH,ESQ. |
| | U.S. Department of Justice |
| | 10th and Constitution Ave. |
| | NW |
| | Washington, DC 20530 |
| | 202-307-1049 |

```
 1    FOR THE DEFENDANT,              BRENDAN SULLIVAN,ESQ
                                      ROBERT MADISON CARY,ESQ.
 2                                    ALEX G. ROMAIN, ESQ.
                                      CRAIG D. SINGER, ESQ.
 3                                    BETH STEWART, ESQ.
                                      JOSEPH TERRY, ESQ.
 4                                    WILLIAMS & CONNOLLY
                                      725 12th Street, NW
 5                                    Washington, DC 20005
                                      (202) 434-5000
 6


 7
      REPORTED BY:                    WENDY C. RICARD, RPR, CCR
 8                                    OFFICIAL COURT REPORTER
                                      333 Constitution Avenue
 9                                    Room #6718
                                      Washington, DC  20001
10                                    (202)354-3111

11

12    Proceedings recorded by mechanical stenography.

13    Transcript produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **I N D E X**

2

3      **WITNESSES:**                                    **PAGE:**

4

5              **CATHERINE STEVENS..................**

6                   **BY MR.  CARY.................. 5,78**

7                   **BY MS. MORRIS..................8,85**

8            **THEODORE STEVENS................ ....**

9                   **BY MR. B. SULLIVAN.............94**

10

11

12     **EXHIBITS:**

13           Government Exhibit No. 463.............42
             Defendant Exhibit No. 662..............82
14           Defendant Exhibit No. 675..............82

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1          (Whereupon, court resumed after the lunch recess.)

2          THE DEPUTY CLERK:  Please remain seated and come to

3     order.

4          THE COURT:  All right.

5          MR. CARY:  Your Honor, I just a few more questions,

6     but there's two questions I wanted to ask that I want to bring

7     to the Court's attention first.  I would like to ask Mrs.

8     Stevens whether she has been attending the trial, and, if not,

9     why not.

10         THE COURT:  What's the relevance of that?

11         MR. CARY:  My concern is that the jurors might draw

12    some inference from the fact that the she has not been

13    observing -- the spouse of the defendant has not been

14    observing the proceedings.  That's why I would like to ask

15    that.

16         MS. MORRIS:  Judge, I'd object to that.

17         THE COURT:  Well, they may wonder about that.  There

18    is rule on witnesses, they don't know that.

19         MR. CARY:  An instruction might work, as well, Your

20    Honor.

21         THE COURT:  There's another way to handle that.  Why

22    don't I just give them an instruction at the end that

23    witnesses were not seen in the courtroom prior to testimony

24    because it's not appropriate to have those witnesses.  That

1    covers the entire group.  So I'll handle it that way.  I don't

2    want to single her out because it pertains to all the

3    witnesses.

4              What's next?

5              MR. CARY:  That's it, Your Honor.

6              MR. CARY:  We're ready to proceed with the witness.

7              THE COURT:  Okay.  All right.  There are a ton of

8    instructions that we have to go over.  Don't let me forget to

9    give that one because it's important because it pertains to

10   all the witnesses, so the burden is on you.  All right.

11             MR. CARY:  Understood, Your Honor.

12             MS. MORRIS:  I'd only ask, Judge, with the proviso

13   that after they took the stand, they were allowed to remain in

14   the courtroom so they can understand why certain people stayed

15   in --

16             THE COURT: Sure.  No.  I'll do at as well.  Sure.

17   Did you enjoy your lunch?

18             THE WITNESS:  I did.  Beautiful view from

19   downstairs.

20             THE COURT:  Absolutely.  Best in town.

21             THE WITNESS:  It is.  Gorgeous.

22             (Whereupon, the members of the jury entered the

23   courtroom at this time.)

24             THE COURT: All right.  We can proceed.

25   BY MR. CARY:

Q.   Mrs. Stevens, when we left off before lunch, I think the puppies were at the -- up in Alaska at the Anchorage Airport. Can you tell me what happened to them next?

A.   We flew with them in a plane.  We shipped -- like you would check luggage, but we checked puppy, and we flew through Chicago, and they threw us off the airplane with the dogs because they didn't have the right temperature control. So we got on the next flight, and they came with us to Washington in their kennels.

Q.   And when they arrived in Washington, how did it work out with these puppies?

A.   It was a challenge having them here because they Alaskan sled dogs are work dogs.  They are not pets, and they're bred to pull.  So it became quite a challenge as they grew, which they grew very fast to -- you don't walk them, they walk you. You have them in harnesses.  We had to have -- we bought bigger kennels.  We bought outdoor kennels.

    They howl.  They're part wolf, usually, in their breeding, so there was a lot of howling and a lot of pulling, and they grew very fast.

Q.   Who in your family got walked by the dogs?

A.   I did most of the time, and Ted when he was in town would walk them.  Our daughter walked them.  I had lots of college kids staying at the house during that period of time when we had the dogs.

1    Q.   Do you have any memorable experiences with respect to

2    your husband walking the dogs?

3    A.   Yes.

4    Q.   Can you describe that for us, please?

5    A.   Yes.  He had been gone for a couple of weeks.  It was

6    during the big hurricane that hit Washington that year in

7    October, and he came back and took the -- we called him "Taz"

8    for the Tazmanian Devil, and Princess Keely(Phonetic) -- Taz

9    and Keely, took them out to walk, and we lived on a hill with

10   a park at the end of it, and he came back one morning all full

11   of grass and leaves, and the dogs howling because they'd

12   pulled him over on his face.  They were so strong.

13   Q.   What happened to the dogs?

14   A.   The dogs were -- we had the dogs about maybe six or seven

15   weeks, and I had an outstanding offer to send them to Susan

16   Butcher and her husband David Monson in Fairbanks.  They kept

17   -- they keep a hundred dogs.

18   Q.   Could I have Defendant's Exhibit 242 please?   I believe

19   this is already admitted.  Do you see Defendant's Exhibit 242?

20   A.   Yes.

21   Q.   What is that?

22   A.   It's a check to Susan Butcher.

23   Q.   And who wrote the check?

24   A.   I did.

25   Q.   And what is it dated?

1    A.    It's dated October 17th, 2003, in the amount of $500.

2    Q.    Why did you write this check to Susan Butcher?

3    A.    It says:  Taz and Keely, "TLC"; Tender Loving Care.

4    When I gave the dogs to Susan, I knew that they were

5    expensive.  They were not part of her breeding group, and so

6    it was to pay her to feed, do whatever she needed to do with

7    the puppies.

8    Q.    When you say "you knew the dogs were expensive", what did

9    you mean by that?

10   A.    Well, it's expensive to feed and train dogs.

11   Q.    And if we could have Defendant's Exhibit 404, please?

12   And what is Exhibit 404?

13   A.    It's another check that I wrote to Susan Butcher on

14   December 30th of 2003 for $100.

15   Q.    Why did you write that check?

16   A.    The same reason, I wanted to thank her for taking the

17   puppies and for their care and feeding.

18         MR. CARY:  No further questions, Mrs.  Stevens.

19   Thank you.

20         THE COURT:  All right.  Cross-examination.

21   **CROSS-EXAMINATION BY MS. MORRIS:**

22   Q.    Good morning, ma'am.

23   A.    Good morning.

24   Q.    Oh, afternoon.  Sorry.  Mrs.  Stevens, I'd like to go

25   back a little bit on your direct examination when you talked

1    about starting the renovations on your Girdwood home.

2    A.   Yes.

3    Q.   What role was Bob Persons playing?

4    A.   Bob Persons was helping us obtain permits and checking on

5    the place and overall being a eyes and ears for us since we

6    were 3,500 miles away.

7    Q.   And that was starting when?

8    A.   Well, he was helping us starting sometime in 2000, early

9    2000.

10   Q.   And how did it come to be that Bob Persons took on that

11   role?

12   A.   There are very few people living in Girdwood.  It's an

13   hour drive from Anchorage.  There is none of the resources

14   there.  He was a friend who was -- who lived there and could

15   check on some of the things that we needed done, he was a

16   personal friend.

17   Q.   Did you ask him?

18   A.   Did I personally ask him?  We talked to him about it, I

19   don't know if that's -- will you do this this year.  He's

20   someone who has done this for several years.

21   Q.   Did you ask him?

22   A.   Did I ask him?

23   Q.   Yes.  To take on that role.

24   A.   I did not ask him to take on the role.

25   Q.   Who asked him?

1       A.    He volunteered as far as I know.  He knew we were talking
2   about it, and he said he'd help us.
3       Q.    When you say "we", who are you referring to?
4       A.    My husband and I.
5       Q.    How did he know you were talking about it?
6       A.    How did he know that --
7       Q.    How did Bob Persons know that you and your husband were
8   talking about it?
9       A.    Because Bob had done some renovation on his own and was a
10  personal friend, and we would talk about the possibility of
11  renovating the chalet one day.
12      Q.    Now, ma'am, what form of communication did you normally
13  have with Bob Persons?  Did you talk to him on the phone?
14      A.    I talked to him on the phone, talked to him in person,
15  and once and a while, he would e-mail me.
16      Q.    How often would you talk to Bob Persons?
17      A.    During 2000?
18      Q.    Yes.
19      A.    I talked to him quite often when I was in Alaska, and
20  once in awhile on the phone.
21      Q.    Would Bob Persons be considered your friend or your
22  husband's friend?
23      A.    He's a friend of both of ours.
24      Q.    And how often did you talk to him before the Girdwood
25  renovation?

1    A.    Whenever we were at home at the chalet, we'd go to the

2    Double Muskey, his restaurant, and he was often there.   We

3    talked to him several times a year or depends on how often we

4    were home.

5    Q.    Had you ever had a meal alone with Bob Persons?   Just

6    the two of you.

7    A.    Bob Persons -- have I had a -- let's see, it's possible.

8    Q.    But you don't recall?

9    A.    No, I don't recall.

10   Q.    Now, he's known as "Walking Bob" in here.  Did you share

11   any --

12   A.    He is known as what?

13   Q.    "Walking Bob".  He likes to go on walks, five-mile walks.

14   You don't know that?

15   A.    I don't know his -- I don't call him "Walking Bob".   I

16   know he hikes from five to 10 miles a day up the mountain and

17   through the trails.

18   Q.    Did you share any walks with him?

19   A.    Maybe a couple of times.

20   Q.    Did your husband?

21   A.    Yes.

22   Q.    Often?

23   A.    I don't know how often because -- I really don't know how

24   often.

25   Q.    Now, directing your attention to 2000 -- Bob Persons

1    became the power of attorney on your house up in Girdwood.

2    A.    Yes.

3    Q.    How did that come to be?

4    A.    We needed to get a permit once we heard that the lifting

5    crew was available to lift the chalet.

6    Q.    And how did you hear about needing a permit?  How was

7    that communicated to you?

8    A.    I don't remember.

9    Q.    And how was it communicated to you that Bob Persons was

10   going to be the power of attorney?

11   A.    I know we gave him a power of attorney, and I signed the

12   power of attorney form because he had to get a permit.

13   Q.    What discussions did you have with him about that?

14   A.    I would have -- I'm trying to remember, and I was there

15   in August and in July, so at some point, I remember talking to

16   him about the need for a permit once we were getting the

17   chalet lifted.

18   Q.    When you say "in July or August", what year are you

19   referring to?

20   A.    2000.

21   Q.    Now, ma'am, to your knowledge, did Bob Persons have any

22   professional history in construction?

23   A.    Yes.

24   Q.    What was his professional history in construction?

25   A.    Well, I know that he had built a lot of his restaurant

1    and that he had houses that he had either renovated or worked

2    on.

3    Q.   Now, when he went and became the -- got the power of

4    attorney and applied for permits, what information did you

5    provide him so he could go and get these permits?

6    A.   In order to get the permit, I think we had to have some

7    basic drawings of our plans.

8    Q.   Where'd you get the drawings?

9    A.   A fellow who was an engineer drew some plans for us.

10   Q.   And who was that?

11   A.   I don't remember his name.

12   Q.   How did you find the engineer?

13   A.   I believe Bill Allen knew a fellow named --

14   Q.   Is it John Hess?

15   A.   That's it, John Hess.

16   Q.   And Bill Allen found him?

17   A.   Yes.

18   Q.   And did Bill Allen call you after he found this engineer?

19   A.   No.

20   Q.   Who did he speak to?

21           MR. CARY:  Objection.  Foundation.

22           THE COURT: If you know.

23           THE WITNESS:  I don't remember.

24   BY MS. MORRIS:

25   Q.   But did you have any conversations with Bill Allen about

1    the engineer?

2    A.    No.

3    Q.    Ma'am, let me ask you this.  Let me show you this, as a

4    matter of fact -- hold on one moment.  At the time that you

5    had Bob Persons become your power of attorney, who was your

6    contractor at that time?

7    A.    We didn't have a contractor, we had a person that was

8    going to lift our house.

9    Q.    Who was that?

10   A.    Tony Hannah.

11   Q.    And did you eventually get a contracto that did the work?

12   A.    Yes.

13   Q.    And who was that?

14   A.    Augie Paone who was the owner of Christensen Builders.

15   Q.    How did you find Augie Paone?

16   A.    We found Augie Paone by a reference from Bill Allen in

17   late -- early September of 2000.

18   Q.    And what conversations did you have with Bill Allen

19   regarding finding Augie?

20   A.    He said that I had a member meeting with him, and he had

21   this guy, Rocky, who he said would be available to work on the

22   renovation.

23   Q.    Bill Allen told you that?

24   A.    Bill Allen told me that and that they had a contractor --

25   he had a contractor that had been used that he liked -- I

1    can't see anything on here.  And there was a good builder, it

2    was Augie Paone from Christensen Builders.

3    Q.   Bill Allen told you about Rocky.  Did he introduce you to

4    Rocky?

5    A.   Yes.

6    Q.   And I thought you said on direct that you believed that

7    Rocky did work under Augie.

8    A.   He did.

9    Q.   Who paid Rocky?

10   A.   Christensen Builders.

11   Q.   I thought he worked for VECO.

12   A.   He did work for VECO.

13   Q.   So why would Christensen Builders be paying him?

14   A.   Because he was a seasonal worker for VECO.  He had

15   personal problems I was told, and he had time off.

16   Q.   From VECO?

17   A.   Yes.

18   Q.   So just to back up for a moment, ma'am, if I could show

19   you what has been entered into evidence as Government's

20   Exhibit 205.

21   A.   Is there a piece of paper I could look at or -- it's

22   fuzzy.

23   Q.   It's fuzzy?

24   A.   Fuzzy at the bottom.

25   Q.   Well, just let me ask you this, ma'am:  Have you ever

1      seen this piece of paper?  Have you seen it before?

2      A.   I don't think so.

3      Q.   Have you seen any --

4      A.   Could I see the top of it?  I can't see the top of it.  I

5      can't see what it is.

6      Q.   Sure.  Sure.

7      A.   I don't remember this, no.

8      Q.   Okay.  So you had nothing to do with this particular

9      piece of paper or any information that was on that particular

10     piece of paper?

11     A.   No.  I don't recognize this piece of paper.

12     Q.   And Bob Persons didn't tell you anything about this piece

13     of paper?

14     A.   I don't remember a conversation about this piece of

15     paper.

16     Q.   All right.  I'd like to back up for just a moment,

17     please.  Ma'am, when you had a conversation with Bill Allen

18     regarding the renovations to your home, what were those

19     conversations about and why with Bill Allen?

20     A.   He was a friend who was -- had a company that was

21     involved in construction, and he was someone that knew

22     construction companies.

23     Q.   What kind of construction was he into?

24     A.   I don't know all the construction he does.  He does all

25     kinds of construction.  They work on the North Slope.  They

1       build things.  They do oilfield service.  I don't know all the

2       things they do.

3       Q.   Does he build houses?

4       A.   He might.

5       Q.   You don't know?

6       A.   I don't know, but they work on the North Slope.  They

7       build -- there are all kinds of dwellings up there, so I they

8       do some construction of houses.

9       Q.   So when Bill Allen introduced you to John Hess, you knew

10      he worked for VECO, correct?

11      A.   I don't remember meeting John Hess.

12      Q.   The engineer?

13      A.   The engineer.  I know that he did the drawings, but I

14      don't remember if I met him or not.

15      Q.   Did you have communications, though, with John Hess?

16      A.   I don't remember communicating with him.

17      Q.   Did you see any drawings from John Hess?

18      A.   I saw a set of drawings that we needed for the permit.

19      Q.   And after you got those drawings, did you make any

20      adjustments or any suggestions or changes to that?

21      A.   I think I did a few when I met with the carpenters and

22      the people on site.

23      Q.   When you say "the carpenters and people on site", what

24      are you referring to?

25      A.   I'm referring to when the renovation was underway.

```
 1    Q.   What time frame?

 2    A.   September, October, December 2000.

 3    Q.   And when you say September, October, and November of

 4    2000.

 5    A.   December.  December.

 6    Q.   Okay.  December.

 7    A.   I'm not sure if I was there in November.

 8    Q.   Okay.  Was Dave Anderson there?

 9    A.   I remember meeting Dave Anderson once when he introduced

10    me to his son.

11    Q.   And what was his son doing at the site?

12    A.   I don't know.  He was just outside with him.

13    Q.   So he was just hanging out there?

14    A.   I have no idea.  I was just coming or going, and he

15    introduced me to his son.

16    Q.   Well, going back, ma'am, you were talking  -- you called

17    him an engineer, John Hess, the person who provided the

18    drawings.

19    A.   I believe he was an engineer.

20    Q.   You don't remember having any kind of communication or

21    any faxing and back and forth communication with Mr.  Hess?

22    A.   I don't remember talking to him.

23    Q.   Did you check out any references for Mr.  Hess?

24    A.   No.

25    Q.   Why not?
```

```
 1      A.    Well, I didn't need to.  We just needed a set of plans

 2      from what we wanted to -- how we wanted to do our renovation

 3      and had to have someone draw them up so we could get a permit.

 4      Q.    Did you have a contract with Mr.  Hess?

 5      A.    No, I don't think so.  I don't know so.

 6      Q.    So you just found someone or someone was referred to you

 7      and they drew up these drawings for free?

 8      A.    No.

 9      Q.    Who who paid Mr.  Hess?

10      A.    I assume we did.

11      Q.    How do you assume that?

12      A.    --  we did.

13      Q.    Weren't you responsible for the Girdwood renovations, for

14      paying for that; wasn't that your testimony?

15      A.    Yes.

16      Q.    So are you assuming you paid for it or do you know if you

17      paid for it

18      A.    I assumed that it was part of the contract when we were

19      paying for the construction of the chalet.

20      Q.    Ma'am, what contract did you have?

21      A.    I did not have a contract with Christensen Builders.  I

22      engaged them.

23      Q.    And you're a lawyer, correct?

24      A.    I am a lawyer.

25      Q.    And this is your home, your only home in Alaska, correct?
```

```
1     A.   Right.

2     Q.   And your husband loves that house, doesn't he?

3     A.   Yes, he does.

4     Q.   And so you contracted with an architect or you didn't

5     conract with an architect.

6     A.   No.

7     Q.   You just took drawings from someone you never met.

8     A.   Right.

9     Q.   And you relied on them?

10    A.   Yep.

11    Q.   And you gave them to the permitting people through Bob

12    Persons?

13    A.   Yes.  With the power of attorney from us.

14    Q.   And you never met this man?

15    A.   I don't know if I met him or not.  I can't remember if I

16    met him.

17    Q.   You never checked out his work.

18              MR. CARY:  Objection.  Asked and answered.

19              THE COURT: It has been asked and answered, the last

20    question.

21    BY MS. MORRIS:

22    Q.   Was he contracted?  Was he bonded?

23    A.   I believe he was if they -- if he was able to use his

24    drawings for the permit process.

25    Q.   And what did you base that on, because of the permit
```

1      process, this --

2      A.    Yes.

3      Q.    -- person was bonded?

4      A.    Yes.  I believe you can't go in with your handwritten

5      sketches to get a permit, and that's what we had had, we had

6      sketches of what we wanted.

7      Q.    So what if his work was architecturally unsound, how

8      would you go about having anything in writing that you

9      actually had contracted this person; you had some kind of

10     agreement with him?  It sounds like a favor.

11             THE COURT: Rephrase that question, counsel.

12     BY MS. MORRIS:

13     Q.    What if the drawings were architecturally unsound?

14     A.    If they were unsound, I assume that during the

15     construction the contractor would realize that.

16     Q.    Did you check?

17     A.    Did I check with the --

18     Q.    With other architects.

19     A.    No.

20             MR. CARY:  Objection.  Asked and answered.

21             THE COURT: That question has not been.  Overruled.

22     BY MS. MORRIS:

23     Q.    Why didn't you have Augie Paone or Christensen Builders

24     do the drawings?

25     A.    Augie Paone, I engaged after we got a permit, and we got

1    a permit because our house was in the middle -- we were

2    lifting the house because Tony Hannah was available.

3    Q.   But you had a contract with Tony Hannah, correct?

4    A.   I don't know if we had a contract with him.  He said he

5    would do the work, and I don't remember a formal contract.

6    Q.   You had something on paper with Tony Hannah that you knew

7    what he was going to be doing, what kind of work he was going

8    to be performing for you, correct?

9    A.   I don't remember seeing a piece of paper from Tony

10   Hannah.

11   Q.   But you paid him; you remember that?

12   A.   Yes.

13   Q.   But Mr. Hess, the architect, you don't remember paying

14   and you don't remember having any formal conversations with

15   him?

16          MR. CARY:  Objection.  Compound.

17          THE COURT:  Sustained.  It's a two-part question.

18   Rephrase it.

19          MS. MORRIS:  I'll move on, Judge.

20   BY MS. MORRIS:

21   Q.   Now, ma'am, you stated that you met Rocky through Bill

22   Allen, correct?

23   A.   Yes.

24   Q.   Now, who was Rocky -- when was he introduced to you?

25   A.   I don't remember.

Q.   Was it --

A.   I remember -- I know for sure that I saw him in early

September, but I don't know if I ever saw him before that.

Q.   And that's 2000?

A.   Yes.

Q.   And your understanding or -- withdrawn.  Was Rocky out

there when the house was being jacked up?

A.   I don't remember.  I don't know.

Q.   Did you make any --

     MR. CARY:  Objection.  Lack of foundation.

     THE COURT: Well, she can tell us.  She said she

doesn't know.

BY MS. MORRIS:

Q.   Now, ma'am, you had frequent contacts with Rocky; isn't

that correct?

A.   I had frequent contact with Rocky when I was in Alaska

and once -- and in a period of several months.

Q.   Well, ma'am, I'd like to show you what's been moved into

evidence as Governments Exhibit 463.  It's going to pop up on

your screen in just a moment.  I'm sorry.  Just one moment.

It's on the Elmo still.  I'll check on that.  I'm sorry.

Let me direct your attention then, ma'am, to -- one of the

things you said about Bob Persons on direct, I believe, is

that it made it easier to use Bob Persons because it was

difficult to get mail in Girdwood; is that correct?

1      A.   Well, there's no mail delivery in Girdwood.  You have to

2      have a P.O. Box.

3      Q.   Where was the rest of your mail delivered from Girdwood?

4      Where did you receive mail?  Didn't you receive mail at your

5      Girdwood residence or for your Girdwood residence?

6      A.   No.

7      Q.   So --

8      A.   There's no mail delivery.  There's no -- it's woods.

9      There's no mailboxes at houses.  There's no -- the mailman

10     doesn't go around the roads in Girdwood.  You have a P.O. Box.

11     Q.   So why didn't you have your stuff go to your P.O. Box?

12     You have a P.O. Box?

13     A.   Not at Girdwood.

14     Q.   How did you get your mail from Alaska?

15     A.   From Alaska, we have a P.O. Box in Anchorage or we have a

16     physical address in Washington.

17     Q.   Isn't your P.O. Box or your mail service that you use

18     your husband's Senate office mail?

19     A.   Well, he gets Senate office mail.  We have a P.O. Box in

20     Alaska, and we have a residence in Washington.

21     Q.   Well, you have utilities on at your Girdwood residence,

22     don't you?

23     A.   Yes.

24     Q.   And how do you pay your utilities?

25     A.   They go to the P.O. Box, and then they get sent down to

1    Washington.

2    Q.   You mean they go to your husband's Senate office in

3    Anchorage?

4    A.   No.   There is a P.O. Box.   We have a personal P.O. Box

5    in Anchorage, and then the mail gets forwarded from there to

6    Washington.

7    Q.   Do you maintain -- going back to 2002, 2001, 2002, 2003,

8    2004, and 2005, did you maintain the bills for the Girdwood

9    residence as far as utilities?   Did you pay them on a regular

10   basis?

11   A.   No.

12   Q.   Who did that?

13   A.   That was sent through -- it came to the Senate office

14   eventually because we had a checking account, a personal

15   checking account, and kept track of bills through that.

16   Q.   And who maintained your checking account?

17   A.   Well, it's maintained at the Senate, and it is different

18   people will work on it because of reimbursements and official

19   travel and that sort of thing that runs through the checking

20   account.

21   Q.   Ma'am, back then, wasn't it Barbara Flanders who worked

22   in your husband's personal office?

23   A.   She was one of -- at that point in the early 2000, she

24   worked there, yes.

25   Q.   And your utility bills for Girdwood being your water,

1    your power, your cable, that all went through the Senate

2    Office Building and came down here to DC and Barbara Flanders

3    paid for it, correct?

4    A.   It came to the P.O. Box in Alaska, and then got forwarded

5    down.  Then after 2001, it was even more difficult because it

6    usually came to the house because the Senate mail was being

7    screened, and it would take weeks to get mail.

8    Q.   So going back, again, ma'am, the mail came from Alaska to

9    Barbara Flanders to the Senate office, correct?

10   A.   Yes.

11   Q.   And Barbara Flanders maintained your personal checkbook,

12   correct?

13   A.   I had another personal checkbook, but she maintained the

14   checkbook for the residence.

15   Q.   For your residence in Alaska and for your residence in

16   DC?

17   A.   Yes.  So everything was in one checkbook.

18   Q.   And then before Barbara Flanders, there was a woman by

19   the name of Barbara Clement(Phonetic); is that right?

20   A.   Clements(Phonetic).

21   Q.   Clements; and she was on your husband's staff, as well,

22   correct?

23   A.   Yes.

24   Q.   Now, you asked some of -- or you had your husband's staff

25   maintain personal things for you; isn't that correct?

1    A.    I don't know what you're talking about.

2    Q.    Pay your credit card bills?

3    A.    We had a checking account, which I could write on or my

4    husband or whoever was on the staff, and it was in one

5    checking account, but I had my own checking account, as well.

6    Q.    Didn't they, your husband's staff, pay your credit card

7    bills?

8    A.    Sometimes they would pay some of those credit cards.

9    Q.    And didn't Barbara Flanders balance your checkbook?

10   A.    She didn't balance my checkbook, she balanced the

11   checkbook that was maintained at the Senate in the Federal

12   Credit Union.

13   Q.    By you and your husband; it was an account that you and

14   your husband were on?

15   A.    Yes.  It's one I inhereded when I married my husband.

16   Q.    And Barbara Flanders maintained that checkbook, correct?

17   A.    At some point, yes.

18   Q.    And didn't Barbara Flanders pay all utility and insurance

19   bills for the chalet?

20   A.    Yes.

21   Q.    And didn't Barbara Flanders complete all your insurance

22   policy applications, renewals, and updates?

23   A.    She would do that in consultation with us, yes.

24   Q.    And didn't Barbara Flanders walk your dogs?

25   A.    Walk my dogs?

```
1    Q.   Yes.
2              MR. CARY:  Objection, Your Honor.  I don't know what
3    the relevance is.  I'll allow it.
4              THE WITNESS:  I don't know what you're talking
5    about.
6    BY MS. MORRIS:
7    Q.   Didn't Barbara Flanders feed your cats?
8    A.   Not that I know of.
9    Q.   Did Barbara Flanders pay your Saks Fifth Avenue bills?
10   A.   She could have if I sent them down, and they were being
11   paid on the main credit -- on the main account.
12   Q.   And your other personal credit card bills like Neiman
13   Marcus or Nordstrom's?
14   A.   She could have.
15   Q.   And didn't staff for your husband cut your grass?
16             MR. CARY:  Objection, Your Honor.
17             THE COURT: I'll allow it.
18             THE WITNESS:  Cut the grass?
19   BY MS. MORRIS:
20   Q.   At your DC residence?
21   A.   If they did, they were paid for it.
22   Q.   Did they pay your parking tickets?
23   A.   My parking tickets?
24   Q.   Yes, ma'am.
25   A.   Who paid my parking tickets?
```

1    Q.    Staff of the Senator.

2    A.    Would pay my parking tickets?

3    Q.    Both of yours.

4    A.    Not that I know of.

5    Q.    Did Barbara Flanders write checks to Blockbuster Videos

6    for overdue amounts?

7    A.    I have no idea.

8    Q.    Did she wrap your Christmas gifts and send gifts to your

9    husband and family?

10            MR. CARY:  Your Honor, objection.

11            THE WITNESS:  I have no idea.

12            THE COURT:  Let me speak with counsel at the bench.

13            (Whereupon, there was a bench conference at this

14    time.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8          (Whereupon, the bench conference concluded at this

9     time.)

10          THE COURT: All right.  The objection is overruled.

11     The objection is overruled.  I'll give counsel some leeway.

12     BY MS. MORRIS:

13     Q.   Now, ma'am, with the Senate credit union account that you

14     and your husband were on here in Washington, DC, did you tell

15     notes to Barbara Flanders to tell her you needed cash, and she

16     would send cash home to you by your husband's briefcase that

17     you said he'd take home every night?

18     A.   Yes.

19     Q.   So, in essence, she was your human ATM machine?

20          MR. CARY:  Objection, Your Honor.

21          THE COURT: Why don't you rephrase that.

22          THE WITNESS:  No.

23     BY MS. MORRIS:

24     Q.   Did you have an ATM card?

25     A.   No.

1    Q.   So she was your human ATM machine?

2    A.   No.

3    Q.   If you needed cash, you got it from Barbara Flanders by

4    sending a note, correct?

5    A.   All income came to our one account for disclosure

6    purposes so all of our income, salaries, or whatever, go in

7    there.  So we kept one account for income.

8    Q.   Well, for this particular account for the National Bank

9    of Alaska that you got to write the checks on for the

10   renovations, Barbara Flanders got all that paperwork together;

11   did she not?

12   A.   Because it was filed at the Senate, yes.

13   Q.   What was filed at the Senate?

14   A.   Disclosure statements; tax returns; that sort of thing.

15   Q.   To your knowledge, tax returns are filed with the Senate

16   is correct?

17   A.   They have to have them for our accountants to go over

18   when they do disclosure statements and for preparing taxes.

19   Q.   So it's your understanding that the Senate maintains each

20   Senator's tax returns?

21   A.   I have no idea.

22   Q.   But isn't that what you just testified to?

23   A.   I said that's what we did.

24   Q.   Barbara Flanders worked for your husband on and off since

25   the 1980's; isn't that correct?

1    A.    Yes.  She was a press person for him.

2    Q.    Initially.

3    A.    Yes.

4    Q.    And then when came back on another time when she came

5    back to work for your husband, she worked on his personal

6    staff working on invoices and paying things; isn't that

7    correct?

8    A.    At some point, she came back, and that was part of her

9    responsibilities I think.  I didn't -- I don't know what all

10   her responsibilities were.

11   Q.    Well, part of her responsibilities was answering to you;

12   you talked to her on a regular basis did you not?

13   A.    Yes.

14   Q.    And you used Barbara Flanders as your own personal

15   assistant; did you not?

16   A.    No, I did not.

17   Q.    When you talked to her on a regular basis, you were

18   talking to her, safe to say, everyday?

19   A.    No.

20   Q.    How often were you talking to her and about what?

21   A.    I don't know how often I was talking to her.  I mean I

22   would talk to her because we maintained the financial records

23   through the Senate, and I did a great deal with my husband on

24   Senate activities.

25   Q.    All right.  I'm going to jump forward just for a minute,

1      but I'll come back.  Jumping forward, you stated in 2004, you

2      recall that there was a media inquiry regarding the

3      renovations that had been done to the Girdwood residence?

4      A.    Yes.

5      Q.    And it involved Courtney Boone who the press secretary at

6      that time?

7      A.    Yes.

8      Q.    And Barbara Flanders worked in the office at that time,

9      but she was not the press secretary, correct?

10     A.    That's right.

11     Q.    And she was working in your husband's personal office

12     paying stuff.

13     A.    I believe that's right.

14     Q.    So when this inquiry came in from the press, you stated

15     that you had to -- you were shocked, and you had to find the

16     file.

17     A.    Yes.

18     Q.    When did you locate the file?

19     A.    I had a file on the chalet expenses that I paid.

20     Q.    Didn't you get the file from Barbara Flanders because she

21     mained the file at the office?

22     A.    I don't think so.

23     Q.    You don't recall?

24     A.    I don't believe I did.

25     Q.    Well, what do you know you did?

A.    I believed that I had copies that I had of the chalet

expenses that I kept myself, and she probably had a copy, as

well, but I didn't ask her for the copy at the time.  I don't

think.  I don't remember doing that.

Q.    Why would Barbara Flanders maintain a copy of those

files?

A.    Because everything that we did, we would copy all

financial documents would go up to our accountant every year

for both taxes and for disclosure.

Q.    So it's your belief that Barbara Flanders keeping your

financial records was part of her duties and responsibilities?

A.    Yes.

Q.    And paying your Neiman Marcus card and your Nordstrom

card  --

A.    No.  She had a checking account where she had authority

to sign it.  I could sign it myself.  I could do checks myself

on the same account.

Q.    And that is true, ma'am, Barbara Flanders did have

authority to sign on many of your accounts; isn't that

correct?

A.    Yes -- no.  Not many of our accounts, no.  We had one

credit union checking account.

Q.    Well, she had power of attorney over --

A.    She is one of the three -- my husband, myself, and she

could sign checks.

Q.    Signatory authority.

A.    Yes.

Q.    But she also had power of attorney authority over some
your insurance policies; isn't that correct?

A.    I don't know that.

Q.    Isn't it true that, ma'am, that Barbara Flanders was
actually keeping your checkbook every month' your joint
checkbook. your husband and yours joint checkbox at the Senate
credit union.

A.    Credit union account.

Q.    And that she in fact would keep your husband updated on a
monthly basis as to where his money was going and where his
money was coming from; isn't that correct?

A.    I don't know.

Q.    Well, ma'am, isn't it true that you would contact Barbara
Flanders when you needed money and ask Barbara to transfer
money into certain accounts for you?

A.    Yes.  Because the income all came into the Federal Credit
Union account.

Q.    So Barbara was maintaining your funds, as well?

A.    The income came into one account for disclosure so that
we would could keep track of income.  It's been that way since
Ted and I had were married that income would always go into
that account.

Q.    It's your understanding that his personal checking

1    account was made available for the public?

2    A.   I don't understand your question.

3    Q.   You're saying that -- well, let me ask you, you clarify.

4    You're stating that Barbara Flanders or that the records were

5    maintained by Barbara Flanders because of what, why?

6    A.   Because for disclosure in the Senate, you have to all of

7    your income disclosed, and the only way that my husband --

8    from the time we got married, it was not my system -- he had

9    always maintained one account that all of the income, salary

10    or whatever would go into an account, so it was easier once

11    you came to disclosure to figure out what the income was.  So

12    in order for me to get money, I had to have money either

13    transferred into any other account I had.

14    Q.   So it was very important to maintain accurate records to

15    to report to the Senate about your finances?

16    A.   Whatever was covered in the Senate rules for my husband's

17    disclosure.

18    Q.   Well, you had to disclose, as well; your husband was

19    responsible for putting your income on those financial

20    disclosure forms, correct?

21    A.   But it is not my disclosure, it's his disclosure.  I'm

22    the spouse; it's a big difference.

23    Q.   It's his responsibility.  I totally agree with you.  It's

24    his resonsibility, correct?

25    A.   Yes.  It's not my disclosure.

1    Q.   Yes.  And you don't have to sign those forms; do you not?

2    A.   That's right.

3    Q.   Now, let me ask you, ma'am, one of the reasons for that

4    form to be accurate with those forms is that you want to make

5    sure that everyone sees that you are aboveboard?

6              MR. CARY:  Objection, Your Honor.

7              THE COURT: If she knows.

8              THE WITNESS:  Everyone sees that we're -- the

9    question is whether they -- you're complying with whatever the

10   rules of the Senate are.  There are certain requirements, and

11   that's -- you know, we maintain records so that we can

12   accurately report whatever is required.

13   Q.   Accurately report your income?

14   A.   My income?  My income is reported as any other Senate

15   spouse --

16   Q.   Your income with your husband's.

17   A.   -- on the form unless you -- you can elect when -- you

18   can elect when you're married, and I don't know if you can do

19   it afterwards.  You can elect to keep total separate finances,

20   and I don't know if you can do it afterward -- you can elect

21   to have total separate finances and not have anything to do

22   with -- then the Senator doesn't have to report anything to do

23   with his spouse.

24   Q.   Well, you didn't --

25   A.   But I didn't do that when we got married.

```
1     Q.   So you didn't elect that, and you had to report --

2     A.   I didn't elect that so, therefore, we had a joint account

3     so the categories that relate to the spouse are on a form that

4     the Senator reports.

5     Q.   And the Senator's responsible for reporting him and his

6     spouse's income?

7     A.   In categories.

8     Q.   And any gifts you received?

9     A.   Yes.

10    Q.   And any of the debt --

11    A.   Yes.  That I received and that he received.

12    Q.   And any debts that you may have over a certain amount of

13    money.

14    A.   I think there is a liability section.  I don't --

15    Q.   So it was important that your salary that you made from

16    Mayer Brown that you -- that was reported on your husband's

17    financial disclosure form, that source of salary?

18    A.   The sources of income; any source of income.

19    Q.   Uh-huh.  And from 2000 on, isn't it safe to say that you

20    and your husband were making well over hundreds of thousands

21    of dollars of year, and you could have afforded a personal

22    assistant; isn't that correct?

23         MR. CARY:  Objection, Your Honor.

24         THE COURT:  Why don't you rephrase that question,

25    counsel?
```

BY MS.MORRIS:

Q.   Did you hire a personal assistant, ma'am?

A.   Do I have a personal assistant?

Q.   Yes.

A.   No.  I do not have a personal assistant.

Q.   Because you use the Senator's staff, correct?

A.   No. I work with the Senate staff when I'm required to talk to them about whatever it is, payments through the joint checking account, or for other things.

Q.   So it is your testimony that the only thing you really do through the Senator's staff is your checking account?

A.   No.

Q.   Because you have used them to ship packages, personal packages, for you, correct?

        MR. CARY:  Your Honor, I must object.  This has gone far afield.

        THE COURT:  All right.  Let's move on to another area, counsel.

BY MS. MORRIS:

Q.   Ma'am, let me just ask you this:  As far as -- getting back to Rocky Williams.  Now, you stated that you met Rocky Williams through Bill Allen.  And you weren't -- you believed that he did some work for Bill Allen, but he was basically working for you through Augie Paone; is that correct?

A.   No.

1     Q.   All right.  Well, you tell me.

2     A.   He didn't work for Bill Allen.  I didn't say he worked

3     for Bill Allen;  he had been an employee of VECO.

4     Q.   And wasn't Bill Allen VECO?

5     A.   I don't know what Bill Allen did at VECO.  He seemed to

6     be retired the whole time I've known him.

7     Q.   He owned VECO.

8     A.   He founded VECO, and he was an owner there.  I don't know

9     what he did.  He seemed to have nothing but time on his hands.

10    Q.   Because he was wealthy.

11    A.   He is a very rich guy.

12    Q.   So, ma'am, I'd like to show you what has been marked as

13    Government's Exhibit 463.  Do you see that, ma'am?

14    A.   Yes.

15    Q.   And do you recognize that?

16    A.   It's a FedEx.

17    Q.   It is a two-page document, correct?

18    A.   I'm seeing one page.  Can I see the paper?   Is it

19    possible to see a piece of paper or a blow up or something?

20    Q.   Actually, I do have a piece of paper, yes.

21              MS. MORRIS:  Judge, may I approach?

22              THE COURT: Sure.

23              THE WITNESS:  Thanks.

24    BY MS. MORRIS:

25    Q.   Now, Mrs.  Stevens, you testified on direct examination

1    that you believe that Rocky Williams was doing work under

2    Christensen Builders, correct?

3    A.    Yes.

4    Q.    When he performed work for you?

5    A.    Yes.

6    Q.    Now, ma'am, you also I believe testified to various

7    kitchen appliances and knobs and various things like that you

8    bought at Restoration Hardware; you testified to that on your

9    direct?

10   A.    Not kitchen appliances -- knobs and hardware.

11   Q.    Hardware for kitchens?

12   A.    Here in Washington, D.C.

13   Q.    And you bought that here in Washington, D.C. and had it

14   sent to Alaska?

15   A.    Yes.

16   Q.    For the chalet?

17   A.    Yes.

18   Q.    Who did you sent send it to?

19   A.    I sent it to Rocky Williams.

20   Q.    Now, looking back at Government's Exhibit 463, what is

21   that?  Do you recognize that?

22   A.    Well, it is a -- it's a note or writing with Rocky, care

23   of Bill Allen, VECO, and then there is a typed note that says:

24   "Hi, Rocky," -- and from Barbara Flander.  And then there is a

25   FedEx Bill of Lading here to Rocky, care of VECO.

1    Q.   And what is the date of that, ma'am?

2    A.   It is March 12th, 2001.

3    Q.   Now, would that be the FedEx -- or I believe on direct

4    you stated that that was the way you expressed mailed these

5    knobs to Rocky?

6    A.   Yes.

7          MS. MORRIS:  Judge, may I have Government's Exhibit

8    -- it's a two-page document, 463, entered into evidence?

9          THE COURT: Any objection?

10         MR. CARY:  No objection.

11         THE COURT: Admitted.

12   BY MS. MORRIS:

13   Q.   Now, ma'am, that's the -- on the screen now, that's the

14   second page.  Could you go to the first page for a moment?

15   A.   Yes.

16   Q.   Do you recognize that handwriting to be -- that's Barbara

17   Flander's handwriting, correct?

18   A.   I have no idea.

19   Q.   Is that your handwriting?

20   A.   Nope.

21   Q.   But that -- go to the second page.

22   A.   Uh-huh.

23   Q.   Now, if we could blow up the very top for just a moment.

24   Now, the phone number at the bottom next to Barb Flanders, do

25   you recognize that as being Barb Flanders' phone number when

1    she worked for your husband?

2    A.   Yes.

3    Q.   So Barb Flanders wouldn't be sending anything to Rocky on

4    her own, correct?

5    A.   That's right.

6    Q.   And how would Barb Flanders know to send some knobs that

7    you purchased at Restoration Hardware to Rocky Williams?

8    A.   I must have had a conversation with her.

9    Q.   And as a matter of fact, that's what this note says; that

10   she had a conversation with you and that she'd be happy --

11   you'd be happy to talk with him some more about various things

12   happening in the kitchen; isn't that correct?

13   A.   I wouldn't say various things in the kitchen.  These are

14   about the knobs that I was trying to get up there before the

15   college boys arrived.

16   Q.   But it was about the kitchen and it was about the

17   bathroom knobs, right?

18   A.   Knobs.  Knobs.  There were no knobs, there were no pulls

19   on any of the doors.

20   Q.   And you can go down to the bottom of the page, please.

21   It looks like this was FedEx'd to Bill Allen with the

22   attention of Rocky Williams at VECO; isn't that correct?

23   A.   Yes.

24   Q.   And how would Barb Flanders know to send that to Rocky

25   Williams at VECO?

1    A.   Because I told her that's the address that Rocky gave me.

2    Q.   That's not Christensen Builders, is it?

3    A.   No.  They were finished with the project pretty much by

4    then.

5    Q.   That's exactly right.  They were pretty much finished the

6    project by March 12th, '01; isn't that correct?

7    A.   Right.  They were supposed to be through in December and

8    it was  -- they had finished pretty much in February.

9    Q.   Ma'am, now, you stated that on direct examination I

10    believe that Rocky was very good about traveling back and

11    forth with you from the chalet into Anchorage because there is

12    really no stores in Girdwood, correct?

13    A.   No.

14    Q.   So you stated it was about an hour with good traffic?

15    A.   Not with good traffic, with good weather.

16    Q.   Good weather, okay.  So during those back and forth

17    trips, that's at least two hours that you're spending on the

18    road with Rocky Williams, correct?

19    A.   When I came into town, I would often stay at my mother's

20    house downtown in Anchorage, so he might meet me in there.  I

21    wouldn't be driving back and forth with Rocky.

22    Q.   Well, you're spending time though with Rocky?

23    A.   Yes, I spent some time with him.

24    Q.   And it is your understanding or testimony here today that

25    Rocky worked for Christensen Builders?

1    A.   He was doing work for Christensen Builders on the chalet

2    renovation, yes.

3    Q.   And you were paying for all of Rocky's time through

4    Christensen Builders?

5    A.   Yes.

6    Q.   Those invoices that you were shown by the defense

7    counsel, did they have any time or labor on there for Rocky

8    Williams?

9    A.   There's no itemization for labor.  It just says "labor".

10   Q.   Let me direct your attention -- let me go back for a

11   second to Defendant's Exhibit 980.  We just introduced it

12   earlier this morning with Ms.  Stevens' testimony.  Could you

13   guys put that up?  We don't have a hard copy.

14        Now, on this particular item, ma'am, and this has been

15   entered into evidence, I believe you testified on direct

16   examination that this was something that you had purchased,

17   you had purchased, at the auction at Kenai River Classic in

18   the year 2000?

19   A.   I don't remember saying that.  I know it was airline

20   tickets that we had -- over the years we bought lots of

21   tickets at auction.  I don't know, I can't remember if it says

22   what year.

23   Q.   And with that particular --

24   A.   2000; it says 2000.  I'm sorry.

25   Q.   No, that's okay.  On that particular item, ma'am, what

1      did you do with that?  Who received those tickets?

2      A.   We received the tickets and --

3      Q.   But you testified on direct that you gave those tickets

4      to Rocky Williams?

5      A.   Yes.

6      Q.   What did you give it to him for?

7      A.   I gave him that and a check for $2,000 as a bonus for the

8      extra time that he had spent working with us on the chalet.

9      Q.   Did you give Augie Williams(Phonetic) a bonus?

10     A.   No.  I thought I paid a pretty full price for the chalet.

11     It was rather expensive.

12     Q.   Did Augie Paone tell you that he worked for Rocky

13     Williams?  I'm sorry -- did August Paone tell you that Rocky

14     Williams worked for Christensen Builders?

15     A.   I didn't have any conversation with him about his

16     laborers.

17     Q.   Well, who told you that Rocky Williams worked for

18     Christensen Builders?

19     A.   Rocky said he was working on the project.  when I'd go

20     there, he'd be there with the other workers.

21     Q.   You just assumed?

22     A.   I didn't think he was working for free; he was working

23     with Christensen Builders.

24     Q.   But you met him through VECO, Bill Allen?

25     A.   No.  I met him -- Bill Allen said he was a worker that

1    was off.  He was off the job, and he had personal problems and

2    was available to work on the renovation.

3    Q.    Ma'am, let me direct your attention to--  how many

4    checks, I'll go back -- how many checks did you pay to

5    Christensen Builders?

6    A.    I would have to look at them.  I don't know.  I think

7    there -- I don't remember.  Whatever the invoices were.  I'm

8    not sure I --

9    Q.    Well, how did you know --

10   A.    -- off the top of my head I don't remember how many I

11   wrote.

12   Q.    How did you know when to pay Christensen Builders?

13   A.    I'd pay the invoices.

14   Q.    And didn't they come through Bill Allen?

15   A.    No.

16   Q.    How did you receive them?

17   A.    I received them -- I got some I think faxed, some I

18   picked up when I was there at the chalet, and I think I got

19   some from Bob Persons.

20   Q.    And when you got them faxed, where did you get them faxed

21   from?

22   A.    Christensen Builders, I believe, Augie faxed some

23   directly to me and Bob Persons might have faxed some to me.

24   Q.    Now, ma'am, as far as the electricians and the plumbers

25   were concerned with doing the work at the chalet --

```
 1     A.    Yes.
 2     Q.    -- how did you find them?
 3     A.    They were working -- they worked on the chalet with the
 4     contractor and I think at some time Bill Allen had found some
 5     guys that were available that were going to go down and work
 6     on the project with Augie.
 7     Q.    And who paid for the electricians and the plumbers?
 8     A.    I did.
 9     Q.    And what contract did you have with them?
10     A.    I had a contract -- I had an engagement of a general
11     contractor who handled all the subcontractors.  I mean, any of
12     the guys that were working there in the different trades were
13     part of the general contractor's responsibiliy.  I got bills
14     for them and I paid them.
15     Q.    And who told you that?
16     A.    Who told me that I -- well, if I had an invoice, I paid
17     it.  I didn't have a conversation about any particular
18     tradesman that I recall.
19     Q.    Did Augie Paone tell you that he was the general
20     contractor for whole project?
21     A.    He was the general contractor.
22     Q.    That's not my question.
23     A.    I talk -- I don't remember when I had a first
24     conversation with Augie Paone, but I engaged Christensen
25     Builders to do it and was sent a bill the first month; he was
```

1    the contractor.

2    Q.   Did Augie Paone tell you that he was the general

3    contractor for the project?

4    A.   I don't remember that conversation with him, no.

5    Q.   So you left your husband's only true home that he felt

6    was his only home, the repairs and renovations, to people that

7    you didn't contract with, you didn't really know, and you

8    assumed were doing the work?

9         MR. CARY:  Objection, Your Honor.  Argumentative and

10   compound.

11        THE COURT: It is definitely compound.  Rephrase the

12   question, counsel.

13   BY MS. MORRIS:

14   Q.   Ma'am, what investigation did you do?  If you were

15   responsible for this project, what investigation did you do to

16   make sure this project was going to be done correctly?

17   A.   Well, first of all, in Alaska that's how you do projects.

18   You do references, you have friends, people that build.  It's

19   not easy to find people that are going to work in Girdwood.

20   We had a friend, Bob Persons, who was there who was helping us

21   with permiting.  We had this fellow Bill Allen who said he had

22   worked with a contractor that could build houses.  And that's

23   the way it works.

24   Q.   What contractor did Bill Allen say he had?

25   A.   He -- Augie Paone, Christensen Builders.  He recommended

1    them as the general contractor.

2    Q.   Well, when -- you testified on direct about those

3    horrible, ugly metal stairs.

4    A.   Yes.

5    Q.   You called Augie Paone and told him, get those things out

6    of here, didn't you?

7    A.   No.  I told whoever was on the job site at the time when

8    I saw them.

9    Q.   Who was that?

10   A.   Whoever was there at the job at the particular time.

11   There were a lot of people working there.  I don't remember if

12   Rocky was there or other people were there, but I was

13   horrified to see those.

14   Q.   So Augie Paone was responsible for putting those metal

15   stairs there?

16   A.   Yes.

17   Q.   When you whoever was there at that time -- and when was

18   that time?

19   A.   I don't remember.  It was some time during the

20   renovation.

21   Q.   Well, when you told whoever that was there at whatever

22   time that was that these horrible steps are dangerous and

23   ugly, why are they still there?

24   A.   They never took them out.

25   Q.   Did you get a refund?

```
 1     A.   Not that I know of.

 2     Q.   Did you ask for one?

 3     A.   No.

 4     Q.   So they weren't that bad?

 5     A.   Yes, they were that bad.  They are still that bad.

 6     Q.   But you didn't contract for them?

 7     A.   No.  I contracted for steps.  I asked for wooden steps.

 8     Q.   So steps were included, as far as you know?

 9     A.   Yes.

10     Q.   From your invoice from -- with Augie Paone?

11     A.   Yes.  Stairs, steps, yes.

12     Q.   Are on that invoice; if I were to show you that, you

13     could point out where the steps are on there?

14     A.   I don't know.

15          MR. CARY:  Objection.  Argumentative.

16          THE COURT: It's not argumentative.

17     BY MS. MORRIS:

18     Q.   Okay.  We'll show it to you. Let me just ask you this:

19     Now, that furniture that's in your house --

20     A.   Yes.

21     Q.   -- at the chalet; you just showed up one day and they

22     were there?

23     A.   Yes.

24     Q.   And your furniture was gone?

25     A.   Yes.
```

```
1     Q.   And you were mad?

2     A.   Yes.

3     Q.   Why are they still there?

4     A.   Because I could not get Bill Allen to move his stuff out

5     of there.

6     Q.   Ma'am, you make close to a half million dollars a year;

7     why can't you get that out of there?

8              MR. CARY:  Objection, Your Honor.

9              THE COURT: Why don't you rephrase that, counsel?

10    BY MS. MORRIS:

11    Q.   Why does Bill Allen have to get it out of there?

12    A.   Well, because he knows where it goes.  I was going to

13    send it to the dump or give it away,  do anything with it, but

14    he's a friend of my husband.  And once he hit his head in

15    2001, it was almost impossible to have a conversation with

16    this man.

17    Q.   Then send it to the dump, he wouldn't know any

18    difference.

19             MR. CARY:  Objection.  Argumentative.

20             THE WITNESS:  He has my furniture.

21             THE COURT: Rephrase the question.  Disregard the

22    question.

23    BY MS. MORRIS:

24    Q.   Ma'am, let me direct your attention to 2001.  Do you

25    remember that Brookstone chair that came to your house in D.C.
```

1    from Bob Persons?

2    A.   Yes.

3    Q.   And that your husband asked you where is a good spot to

4    put the chair?

5    A.   No.

6    Q.   You didn't have any conversations with your husband about

7    whether to put the chair in the basement?

8    A.   No.

9    Q.   What was your understanding of what that chair was?

10   A.   I remember getting a message that Bob Persons got a chair

11   that he was going to leave at our house.

12   Q.   You got a message from whom?

13   A.   I don't remember.  There was going to be a delivery to

14   the house of a chair that Bob Persons had bought and wanted to

15   leave it there for awhile.

16   Q.   And who was delivery going to be from?

17   A.   I don't remember.

18   Q.   It was a brand new chair, though, right?

19   A.   I guess.  I just know he said he had a chair that he

20   bought that was being delivered to the house.

21   Q.   It's one of those massage chairs that does the shiatsu

22   and all that kind of stuff to you?

23   A.   Something like that.

24   Q.   So you never enjoyed the chair?

25   A.   No.

Q.    But your husband did?

A.    No.  He would sit in it once in a while because it's a rather large piece of furniture that took up more room than I was happy with at my house.

Q.    You do not like big furniture.

A.    I do not.

Q.    Why didn't you get rid of that?

A.    Well, I didn't get rid of it because Bob Persons lives in Alaska, and I knew it was something I was going to have to ship.

Q.    Ship it to him; why wouldn't you ship it to him?

A.    I would ship it to him, but it's very heavy and very expensive to ship.

Q.    So your husband, though, enjoys this chair; where is the chair now?

        MR. CARY:  Objection.  Compound. There was a statement and then --

        THE COURT: Where is the chair now?

        THE WITNESS:  The chair is on the first floor of our house.

BY MS. MORRIS:

Q.    So it's still there.

A.    It's still there.

Q.    Seven years later.  Seven years later, correct?  You got it in 2001?

```
 1    A.    Uh-huh.

 2    Q.    What kind of loan is that?

 3    A.    It is Bob's chair, and it's sitting still in Washington,

 4    D.C., much to my great dissatisfaction.

 5    Q.    So when do you return the chair?

 6    A.    Whenever I send a bunch of furniture north.

 7    Q.    Your husband sleeps in the chair sometimes, correct?

 8    A.    He doesn't use it very often.  But it's there in the

 9    house.

10    Q.    So what are the terms of this loan for the chair?

11    A.    I don't know that there any terms of a loan.  He's a

12    friend, an Alaskan, that left this stupid chair there that I'm

13    not happy about.

14    Q.    Well, Bob Persons is in town now; did you tell him to get

15    that chair out of there?

16    A.    I told him that before.

17    Q.    And the chair is still there?

18    A.    It's there.

19    Q.    All right.  Now, let me ask you about the stained glass.

20    Your friend, Jeanne Penney gave it to you?

21    A.    Yes.

22    Q.    She just gave it to you?

23    A.    Yes.

24    Q.    Not to your husband?

25    A.    No.
```

1    Q.    And you had no idea how much it cost?

2    A.    Absolutely none.

3    Q.    Ma'am, don't you or didn't you work for the Endowment for

4    the Arts?

5    A.    Yes.

6    Q.    And don't you have an art background?

7    A.    Well, I've worked in the arts, yes.

8    Q.    Well, that frame alone was like $300; isn't that correct?

9    A.    I have no idea.

10   Q.    Well,  --

11   A.    I know it's a wood frame.  It's probably a couple of

12   hundred dollars.

13   Q.    Well, you do that Mr.  Kaiser made it from scratch,

14   correct?

15   A.    I know that he -- I don't know if he made the frame.  I

16   know he did the stained glass.

17   Q.    And his art work, it was probably just for one piece was

18   probably over $300, correct?

19   A.    I have no idea what his art sells for.  I've never seen a

20   price on his art.

21   Q.    Well, the Double Muskey has some of his art in there,

22   doesn't it?

23   A.    It has some of his art, there's a lot of stained glass

24   and some of it is his art.

25   Q.    So the first -- there were two, correct; you acknowledged

 1    that on direct?

 2    A.   Two?

 3    Q.   Stained glasses?

 4    A.   No, I saw design of one.

 5    Q.   You never -- you didn't see -- Mr.  Keiser never showed

 6    you the actual stained glass for the second one?  I mean the

 7    first one, I'm sorry.

 8    A.   I didn't know he did a stained glass for the first one.

 9    Q.   Well, you mentioned that there was something about a

10    flag.

11    A.   I remember seeing a design of a flag.

12    Q.   And that wasn't to your liking?

13    A.   It was not something that I was -- I particularly related

14    to, no.

15    Q.   Well, where is that stained glass now; the one that was

16    given to you?

17    A.   We hung it at the chalet.

18    Q.   And when you say "we" --

19    A.   I had one of the laborers hang it up for me.

20    Q.   The chalet is -- the -- oh, wait a minute.  Now, one of

21    the laborers, what laborer?

22    A.   Oh, somebody that was around.  I can't remember.  It's

23    been awhile ago.

24    Q.   Bill Allen?

25    A.   No.  Bill Allen is not a laborer.

Q.   Dave Anderson?

A.   I don't believe so.  I don't know.  Somebody that was around helped me hang it, and I don't know who it was.

Q.   What about Rocky Williams? Did he hang anything?

A.   I don't think so.  I haven't seen Rocky Williams since winter, early winter of 2001.

Q.   Well, that's when you got the stained glass, right, in 2001?

A.   I don't know when it came it.  It was -- I think I was late in 2000.  I don't remember.

Q.   Well --

A.   I remember Jeanne and I talking about it, but I don't remember when.

Q.   It hangs prominently in the chalet, does it not?

A.   Yes.

Q.   And it's there to this day, correct?

A.   Yes.

Q.   And it is -- do you have any displeasure with that one, with that piece of art, now, that you have?

A.   I don't have any displeasure with it, no.

Q.   And when you say it is hanging in the chalet, you and your husband own the chalet, right?

A.   Yes.

Q.   So Jeanne Penney didn't just give it to you, wasn't it a housewarming for the chalet after all the renovation?

1    A.   No.  She gave it to me.

2            MR. CARY:  Objection, Your Honor.

3            THE COURT: Just a minute.  Was it a gift for the

4    housewarming?

5            THE WITNESS:  No.  It was something she gave me, but

6    gave it to hang in the house.

7    BY MS. MORRIS:

8    Q.   As a housewarming?

9    A.   I don't remember her ever using that term "housewarming".

10   Q.   Wasn't it after the renovations had been completed?

11   A.   It was.

12   Q.   And it was the time frame that Rocky Williams was still

13   around that you received this stained glass?

14   A.   I don't -- I haven't seen Rocky since --

15   Q.   Thates not the question, ma'am.

16           MR. CARY:  Objection.

17           THE WITNESS:  Then, I don't understand.

18           MR. CARY:  Objection.  Finish the answer.

19           THE COURT:  Just a minute.  Do you understand the

20   question?

21           THE WITNESS:  I don't.

22           THE COURT:  Repeat the question, then.

23   BY MS. MORRIS:

24   Q.   In 2001, that's when you received the glass, correct?

25   A.   Sometime in 2001, yes.

1    Q.   And in 2001, that's when the renovations to the chalet

2    were -- at least the first part of the renovations were

3    complete, correct?

4    A.   Most of them were complete, I think, by early 2000;

5    sometime in the spring of 2001.

6    Q.   And sometime thereafter in in 2001, that's when you

7    received the stained glass, correct?

8    A.   Yes.

9    Q.   And after you received it is when you hung it prominently

10   in the chalet, correct?

11   A.   Yes.  Because I told the artist that we would help him

12   with his art, so we could show it in the window.

13   Q.   So you did have a conversation with Mr.  Kaiser

14   (Phonetic)?

15   A.   Mr. Kaiser?

16   Q.   Yes.

17   A.   The artist.

18   Q.   When?

19   A.   He came over some time when the stained glass was in the

20   window so he could take a picture of it.

21   Q.   You never talked to him prior to or while he was making

22   the glass?

23   A.   Jeanne and I might have talked to him once.  I remember

24   meeting him in his little cabin.

25   Q.   And your husband had nothing do with that?

1    A.    No.

2    Q.    Now, you never had any conversations with your husband

3    about where that stained glass came from?

4    A.    I don't remember having any conversations with him about

5    where it came from.

6    Q.    You just hung it up?

7    A.    Yes.

8    Q.    You just got a worker that you can't remember to hang it

9    up?

10   A.    Pardon me?

11   Q.    You just got a worker that you can't remember to hang it

12   up?

13   A.    It might not have been a worker.  It might have been a

14   friend.  I really don't remember.  It was somebody that could

15   get up on a ladder and hang it.

16   Q.    But you do remember that Jeanne Penney only gave it to

17   you?

18   A.    Yes.

19   Q.    All right.  Let me ask you this, ma'am:  In 2002, did you

20   go to the Kenai River Classic?

21   A.    I don't know if I did or not.

22   Q.    Well, do you go to the Kenai River Classic?  It's a

23   fundraiser, correct?

24   A.    It's a fundraiser to benefit the habitat, but I don't go

25   every year.

Q.   Do you go on a regular basis, though?

A.   I've missed many of them.  I don't know -- I don't know how many I've been, but I've missed quite a few.  I've been to some, and I've missed some.

Q.   When you go, where do you stay?

A.   With the Penney's.

Q.   And that would be Jeanne and Bob Penney?

A.   Yes.

Q.   And Jeanne Penney the one who gave you the stained glass?

A.   Yes.  She's been a friend for 25, 30 years, I guess. Since before Ted and I were married.

Q.   When they have the outcry auction, the live auction.

A.   Yes.

Q.   Is that a dinner event?

A.   It's in a big sports arena in Kenai; Soldotna.

Q.   And do you sit at a table?

A.   Yes.

Q.   And it's a dinner event?

A.   Yes.  It's a community dinner fundraiser for the habitat.

Q.   And when you go, do you usually sit at table with the Penney's?

A.   I sit wherever I'm told.

Q.   And that's with the Penney's?

A.   No.   Wherever they tell me.  They tell us where to sit, and we sit wherever.

1    Q.   Well, let me ask you this, ma'am, in 2002, were you there

2    when there was a big bronze fish statue there?

3    A.   No.

4    Q.   Do you have a big bronze fish statue on your porch in

5    Girdwood?

6    A.   Sitting in the half a crate, yes, I do.

7    Q.   And has that been sitting there since 2002?

8    A.   It's been sitting there since some period of time.  I

9    don't remember when it arrived on my front doorstep.

10   Q.   Do you like it?

11   A.   No.

12   Q.   It's big.

13   A.   It's very big and very heavy.

14   Q.   And you haven't gotten rid of that, have you?

15   A.   It's not mine to get rid of.

16   Q.   Let me ask you this, ma'am.  You mentioneded the sled dog

17   puppy.

18   A.   Yes.

19   Q.   And that was at the Kenai River Classic, as well?

20   A.   Yes.

21   Q.   In 2003?

22   A.   If that was the year, the puppies, we had the puppies.

23   Q.   Ask you recall your husband was holding it.

24   A.   Yes.

25   Q.   And the next thing you know, you are owning it.

1    A.    Yes.

2    Q.    So you don't know how it was purchased?

3    A.    I thought at the time we purchased it.  I was horrified

4    my husband was bidding on this dog.

5    Q.    Why did you think you purchased it?

6    A.    Because he was bidding on it.

7    Q.    Did you see in your canceled check registry anything

8    about --

9    A.    When we bought things at the Kenai Classic, they'd give

10   you one bill at the end of the evening for anything you bid

11   on, whether it's silent or live auction.

12   Q.    When did you find out you didn't pay for it?

13   A.    I think some time later.

14   Q.    Like when?

15   A.    It was given -- I don't remember, some years later, that

16   the Kenai classic had given it to us.

17   Q.    Who is Jeri Best?

18   A.    I don't know.

19   Q.    You don't recall Jeri Best working closely with the Kenai

20   River Classic every year?

21   A.    I know I recognize the name, but I would have to -- it's

22   not bringing up -- I can't remember the -- who that is.

23   Q.    You don't recall giving Jeri Best your business card with

24   your phone number in DC and your cell phone number to have the

25   dog shipped to DC?

```
1    A.   I don't remember.  I mean I don't remember.  I would have
2    -- I didn't have -- I didn't ask for the dog to be shipped
3    because the dog had to go back to its mother.  So I don't
4    remember a conversation about shipping dogs because I wouldn't
5    have -- that's not the way I work.  I would not have done
6    that.
7    Q.   How would you have gotten the dog home?
8    A.   Well, first of all, I wasn't sure I was going to take the
9    dog home because I was not happy about having a sled dog in
10   Washington.  So I wanted to have an opportunity to not have
11   that sled dog come to Washington.
12             MS. MORRIS:  Just one moment.
13             THE COURT: Sure.
14   BY MS. MORRIS:
15   Q.   All right, ma'am, let me ask you this:  In 2002, when the
16   house was originally -- the renovations, it was jacked up,
17   correct?
18   A.   Yes.
19   Q.   And there was a deck put around the top floor, correct?
20   A.   There was a deck on the top floor when it was jacked up.
21   Q.   So it was already there, it was just now prominent
22   because it's on the second floor instead of on the first
23   floor.
24   A.   Yes.
25   Q.   Before we get to that -- ma'am, we found it; Government's
```

1    Exhibit 240.  Could I show that to you, ma'am?  Could you zoom

2    in on this?  Ma'am, do you recognize this?  This has been

3    moved into evidence already.

4    A.   Yes.  That's my old card with a cell phone and an Alaska

5    phone and an Anchorage office phone.

6    Q.   Are those accurate phone numbers?

7    A.   Yes.

8    Q.   And handwriting that's on it.

9    A.   That's mine.

10   Q.   Okay.  All right.  And you don't recall giving that to

11   Ms.  Best the night of the auction?

12   A.   I don't recall it, but I may have given it as a contact.

13   Q.   So if Ms. Best had it in her possession, it's possible

14   that you could have given it to her?

15           MR. CARY:  Objection, Your Honor.

16           THE COURT: It calls for speculation.  Sustained.

17   BY MS. MORRIS:

18   Q.   Ma'am, okay.  So 2002, there is no deck on the first

19   floor, but a deck gets built in 2002; do you recall that?

20   A.   Yes.

21   Q.   Who built the deck?

22   A.   I don't know who built the deck.

23   Q.   Who paid for the deck?

24   A.   We paid for deck, I thought.

25   Q.   When did you pay for the deck?

1    A.   Well, I remember that we were -- we had work done in

2    2002, and I asked -- I called down to the office to ask where

3    the -- whether we had gotten any bills in for the work that

4    was being done that fall.

5    Q.   So who paid for the deck?

6    A.   I assumed that we paid for it, that a bill came in.

7    Q.   From whom?

8    A.   From whoever was doing the work.

9    Q.   Weren't you responsible for paying the renovations at the

10   chalet?

11   A.   Yes.

12   Q.   So who sent you a bill that you thought you paid?

13   A.   I thought a bill was coming in for those renovations,

14   that work on the first floor, and I asked -- called down to

15   the Senate to see if the bill had come in.

16   Q.   So did a bill come in or did a bill not come in?

17   A.   I don't know that a bill came in.

18   Q.   But you checked?

19   A.   I asked if it was coming in, and then I forgot about it

20   and didn't check again, which I should have checked.  I

21   assumed the bill came in.

22   Q.   The bill from whom?

23   A.   From whoever was doing the labor on the -- and the

24   materials on the first floor.

25   Q.   Did you contract with someone to do that?

A.   I didn't have a contract, but there was someone who was going to be doing the construction.  I thought it was some of the same laborers that worked on renovation.

Q.   Okay.  Let's back up.  When did you first find out that you were going to have a deck on that first floor?

A.   Sometime in the late summer or fall of 2002, I remember having conversation, I guess, with -- I'm trying to remember. Perhaps, it was Bob Persons about trying to finish off the first floor because all that were there were steps, and they had never put in the wood walkway on the first floor next to the foundation of the house.

Q.   So it is your your memory that Bob Persons built the deck?

A.   No.

Q.   Who built the deck?

A.   I don't know who built the deck.  They were going to find someone to finish the work.  I assumed it would be Augie Paone's people.

Q.   Who's "we".

A.   Bob Persons; my husband; myself.

Q.   So your husband may have had conversations about building a deck?

A.   He might have.

          MR. CARY:  Objection.  Move to strike.

          THE WITNESS:  I don't know.

1          THE COURT:  I'll strike it.  That's just a guess on

2     your part?

3          THE WITNESS:  It is a guess.

4          THE COURT:  All right.  I'll strike it.

5     BY MS. MORRIS:

6     Q.   Ma'am, let me ask you this:  Your last check to

7     Christensen Builders was in March of 2001, correct?

8     A.   Yes.

9     Q.   So how could you think you paid him for a deck in 2002?

10    A.   I didn't think I paid him for a deck in 2002, but I

11    thought there was finish work done on the first floor.  This

12    is the wintertime.

13    Q.   So when did you have a conversation with Augie then about

14    this deck on the first floor?

15    A.   I did not talk to Augie about the deck, no.

16    Q.   So how did you come to the assumption that Augie was

17    going to do the work on the deck?

18    A.   I thought maybe some of the laborers that worked on that

19    project would be working on the first floor walkway or deck.

20    Q.   So, ma'am, you don't have --

21    A.   I didn't do it directly.  I don't remember having a

22    conversation about that.

23    Q.   You don't recall having a conversation about the deck,

24    correct?

25    A.   No.  Just that it was -- at some point, I talked to --

1    and it may have just been Bob that it was unfinished on the

2    first floor.

3    Q.   You don't recall or you don't have a contract for the

4    deck in 2002; is that correct?

5    A.   No.  But somehow I learned that they were actually going

6    to finish -- we got someone to finish the first floor and that

7    there was going to be a bill ing in for it.

8    Q.   And you looked for a bill?

9    A.   I did look for a bill.

10   Q.   And didn't find a bill?

11   A.   No.

12   Q.   But you had a deck?

13   A.   I found out later that I had a deck put on.

14   Q.   So you came home one day, and a deck was there?

15   A.   Yes.  We didn't live there year round, I came up, what,

16   December, I guess.

17   Q.   You didn't about the deck?

18   A.   I didn't ask about the --

19   Q.   To Bob Persons, where did this deck come from?

20   A.   I didn't ask Bob Persons where the deck came from.  It

21   was built.

22   Q.   Because you said Bob Persons was going to check on the

23   first floor that was unfinished.

24   A.   No.  He knew we were going to get help to get it

25   finished, to finish off the first floor.

1    Q.    And then you came, and there was a deck.

2    A.    Yes.  And I was looking for a bill.

3    Q.    Because you found a deck?

4    A.    No.  I think I was looking for a bill before that.

5    Q.    Ma'am, let me just ask you about --

6              THE COURT:  Before we get into that area, let's take

7    a 15-minute recess, ladies and gentlemen.

8              MS. MORRIS:  Okay.

9              (Whereupon, the jury exited the courtroom at this

10   time.)

11             THE COURT: Mrs.  Stevens, you don't have to stay

12   there.  You can take a 15-minute recess.  I have to ask you

13   not to discuss your testimony with anyone during the recess.

14   All right.

15             THE WITNESS:  Okay.

16             THE COURT:  We'll start promptly at 4:45 -- at 3:45,

17   counsel.

18             (Whereupon, court resumed after a recess.)

19             THE COURT:  I'm not trying to curtail you, counsel.

20   How much more time do you need, though?

21             MS. MORRIS:  Five minutes, Judge; not long.

22             THE COURT: How much time do you need for redirect,

23   counsel? Again, I'm not trying to curtail you, I'm just --

24             MR. CARY:  Five minutes, Your Honor.

25             THE COURT: All right.

```
1            MR. CARY:  Maybe a little longer, but not much.

2            THE COURT:  Then we could -- any additional

3    witnesses after this witness?

4            MR. CARY:  Yes, Your Honor; Senator Stevens.

5            THE COURT: We can start with the Senator's testimony

6    this afternoon, then.  Take advantage of some time this

7    afternoon.  All right.

8            (Whereupon, the jury enters the courtroom at this

9    time.)

10           THE COURT: All right, ladies and gentlemen.  We are

11   going to proceed.  Ms.  Morris?  You can have a seat.

12           THE WITNESS:  Thank you.

13   BY MS. MORRIS:

14   Q.   All right, Mrs.  Stevens.  Now, I'd like to direct your

15   attention to 2002.  I believe on direct examination -- I mean

16   2004.  I believe you testified on direct examination with Mr.

17   Cary that there was a press inquiry from Anchorage -- from the

18   Anchorage Press or Alaskan Press regarding work performed on

19   your home.

20   A.   Yes.

21   Q.   And you got a call from Courtney Boone; isn't that

22   correct?

23   A.   Yes.

24   Q.   And what is it that you recall Courtney Boone telling

25   you?
```

1    A.   I believe she said that there was an inquiry from the

2    Anchorage Press saying that VECO had done the renovation work

3    on our chalet.

4    Q.   And I believe your testimony on direct was that VECO had

5    not done any work on your chalet, correct?

6    A.   To my knowledge, VECO had not worked on the chalet, no.

7    Q.   Can I get the Elmo, too, please, Carol.  I'm sorry.

8    That's a little fuzzy.  Can you see that, Mrs.  Stevens?

9    A.   It is a little fuzzy.

10   Q.   Can you see who that --

11   A.   I'm trying to read it.

12   Q.   That's Government Exhibit 570 that's already been entered

13   into evidence.  Ma'am, do you see who that is from?

14   A.   It says from Boone, Courtney, signed by Courtney.

15   Q.   And what is the date of that?

16   A.   It is December 3rd, 2004.  Just a minute -- I'll have to

17   -- 'cause I don't --

18   Q.   Let's see.  I think we have it.  If we can get it a

19   little clearer.  I'm sorry.  All right, great.  Can you see

20   that a little better?

21   A.   Yes, this is better.

22   Q.   So now we have an e-mail from Courtney Boone on Friday,

23   December 3rd, 2004 at 7:36 A.M., correct?

24   A.   Yes.

25   Q.   And the subject is deck construction?

1    A.    I see that subject line, yes.

2    Q.    And it's addressed to you and your husband; isn't that

3    correct?

4    A.    Pardon me?

5    Q.    The e-mail is to Senator and Mrs. Stevens, correct?

6    A.    Yes.  But it's sent to my husband's BlackBerry.

7    Q.    But it's referencing a phone call -- well, why don't you

8    read that for us, please?

9    A.    "Senator and Mrs. Stevens:  I'm sorry I didn't answer

10   the phone.  I did not have it here last night as it actually

11   was on vibrate.  Bob Persons called gave me a full rundown on

12   who was used on the deck, Christensen Brothers, and also told

13   me about the used pipe from VECO.  I've asked the reporter to

14   give us a day so that we can get to the bottom of this.  Also

15   should know that Wendi Dow called Bill Allen and told him

16   about the call, and he knows who the employee is that's

17   talking.  It's a disgruntled foreman who was fired a couple of

18   years ago.  Hope that helps.  Courtney."

19   Q.    Who is Wendi Dow?

20   A.    Wendi Dow is a young woman that Bill Allen supported

21   somehow.

22   Q.    She worked for your husband, correct?

23   A.    Yes.

24   Q.    All right, ma'am.  Now, looking at that e-mail, it states

25   right in that e-mail that there was used pipe from VECO,

```
1     according to Courtney and according to Bob Persons that was

2     used on your deck; is that correct?

3     A.    I see what that says.

4     Q.    So you have no knowledge of that?

5     A.    That -- I don't know -- used pipe from VECO, I don't know

6     what that means.

7     Q.    This is the first time you've heard about that?

8     A.    I don't recall seeing anything about used pipe from VECO,

9     no.

10    Q.    I believe on your direct testimony, ma'am, you stated

11    that when this inquiry came up that you went and found the

12    file to show Courtney that you had paid invoices.

13    A.    I went to the file to find out the name of the builder.

14    I couldn't remember Christensen Brothers -- Christensen

15    Builders.  I only remembered Augie Parone's(sic) -- Paone's

16    name.  I couldn't remember the name of the company.

17    Q.    Well, ma'am, isn't it true that Barbara Flanders is

18    actually the one who got the file and showed it to Courtney?

19    A.    I don't know if she showed it to Courtney.

20    Q.    Well, ma'am, isn't it true that besides the -- your

21    personal bills and the National Bank of Alaska account that

22    Barbara Flanders took care of all and maintained all of your

23    bills; isn't that correct?

24    A.    I don't think she maintained all of our bills, no.

25    Q.    Well, she paid your mortgage here in D.C., correct?
```

1    A.    We had an automatic deduction for our mortgage.

2    Q.    She paid your utility bills?

3    A.    Again, some of those were automatic deductions.

4    Q.    And the ones that weren't, she paid?

5    A.    She paid.  Sometimes I would pay bills.

6    Q.    Ma'am, Barbara Flanders is the one who maintained the

7    files even on this Girdwood property; isn't that correct?

8    A.    She had a set of files at the office, yes.

9    Q.    And outside of you writing the checks on that National

10   Bank of Alaska account, Barbara Flanders is the one who

11   maintained the bills and maintained the paperwork on that

12   account, correct?

13            MR. CARY:  Objection.  Compound.

14            THE COURT: Why don't you rephrase it, counsel; break

15   it up.

16   BY MS. MORRIS:

17   Q.    Besides writing checks on that account, ma'am, what did

18   you do with it?

19   A.    What did I do with --

20   Q.    The National Bank of Alaska account.

21   A.    It was a checking account, and it was a line of credit

22   account.

23   Q.    And besides writing those few checks on it, what did you

24   do to maintain the account?

25   A.    I would put money in once and awhile to keep the account

1    going.

2    Q.   Barbara Flanders did that, didn't she?

3    A.   No.  I would put money in there, too.

4    Q.   Barbara Flanders transferred money into that account; did

5    she not?

6    A.   She might have.

7    Q.   Barbara Flanders maintained the files for that account;

8    did she not?

9    A.   Not for that account, not for the National Bank --

10   Q.   The National Bank of Alaska records and then turned to

11   Wells Fargo, they came to the Senate Office Building to her

12   office, didn't they?

13   A.   Are you talking about the loan account?

14   Q.   Yes.

15   A.   The loan got closed by that time, by 2004.

16   Q.   When the loan was open.

17   A.   When it was open, she had a set -- she had a set of the

18   accounts.

19   Q.   Because they went directly to her, correct?

20   A.   I don't know what the address was on it.  I'd have to go

21   look at an account.

22   Q.   But they didn't come directly to you, correct?

23   A.   I don't know what address was on it.  I don't know if was

24   our home address in Washington, the P.O. Box -- I don't know

25   what address was on it.  I'd have to look at it.  I just don't

1      remember.  She had a set of the files, yes.

2                MS. MORRIS:  All right.  Thank you, ma'am.

3                THE COURT:  All right.  Redirect?

4      **REDIRECT EXAMINATION BY MR. CARY:**

5      Q.   Mrs.  Stevens, I hand you what's been marked as

6      Defendant's Exhibit 381.  And I ask if you can identify that,

7      please?

8      A.   It is a check register for a checking account at the

9      National Bank of Alaska which later became Wells Fargo.

10     Q.   And what checking account is that?

11     A.   It's a checking account that I've maintained at the

12     National Bank of Alaska/ Wells Fargo, and this starts in the

13     year 2000.

14     Q.   And whose handwriting is on that check register?

15     A.   Mine.

16                MR. CARY:  Your Honor, we offer Defendant's Exhibit

17     381 into evidence.

18                THE COURT:  Over objection, I'll allow it.  And,

19     ladies and gentlemen, it comes in again not for the truth of

20     the matter asserted, but to show, for your consideration,

21     state of mind.

22     BY MR. CARY:

23     Q.   Is this the account -- which account is this?  Is this

24     the account that we have been referring to?

25     A.   This is the checking account.

1    Q.   And why was that checking account set up?

2    A.   It was set up so that I could write local checks in

3    Alaska on -- for work done on the chalet and for other things,

4    other -- other expenses that I might have in Alaska.

5    Q.   Did Barbara Flanders maintain that check register?

6    A.   No.

7    Q.   Who maintained that check register?

8    A.   I did.

9    Q.   Remind us again when you were married, Mrs. Stevens?

10            MS. MORRIS:  Objection, Judge.  Asked and answered.

11            THE COURT: I --

12            MR. CARY:  I can try it another way.

13            THE COURT:  That's fine.  She can answer that

14   question.

15   BY MR. CARY:

16   Q.   When were you married?

17   A.   1980.

18   Q.   How long had your husband been in the United States

19   Senate when you were married?

20   A.   Let's see, he had been in there for -- he was elected in

21   '68.  So, what, 12 years.

22   Q.   Does 22 years sound correct?

23   A.   Okay.  You do the math.

24   Q.   Mrs. Stevens, you don't have to look at the check

25   register anymore.  I've moved past that.

A.   Yes.  Sorry.

Q.   Was there a system in place -- can you tell us whether or not there was a system in place for how the finances were handled in the office when you married your husband after he had been in the Senate for 22 years?

A.   Yes.

Q.   What was that system?

A.   It was a system whereby we had a -- there was a personal checking --

THE COURT: I think the math is incorrect, I think. You said 22 years.  Had he been in the Senate for 22 years?

THE WITNESS:  He had been in since 1968.

THE COURT: And you were married in what year?

THE WITNESS:  1980.

MR. CARY:  Maybe it was 12 years.

THE WITNESS:  I thought I was right.

BY MR. CARY:

Q.   I'm off by 10.  So forgetting the math, don't listen to me on the math.  In the 12 years, what system was in place?

A.   It was a -- they had a -- there was a personal checking account that had Ted's name and his wife's name on it, at the time.  It would have been Ann Stevens.

Q.   And what was your understanding as to why that system was in place?

A.   My understanding was that the Senate in the earlier days

1          had a system whereby the member would personally have to

2          advance funds to staff for travel and then seek reimbursement.

3          It was -- and I don't know all the details, but I know that

4          there was a system which at the time made no sense to me, but

5          it was a Senate system in place and then the rules changed

6          over the years as to how those reimbursements were handled.

7          Q.   And from your perspective, what was the effect of that in

8          terms of having that one account?

9          A.   It meant that all of the -- first of all, all of the --

10         our income, taxable income, would have to go into the one

11         account so they can keep track of what the income was.  And so

12         the majority of the income was there; any other accounts that

13         we had, we'd have to transfer money unless it was other money

14         that was not income.

15         Q.   Did you in fact have separate accounts beyond that one

16         account?

17         A.   Yes.

18         Q.   If I could have Defendant's Exhibit 662 not in evidence,

19         please.  If we could try to rotate that.

20              Mrs.  Stevens, what is Defendant's Exhibit 662?

21         A.   It's a side view of the chalet showing the wooden deck

22         area on the first floor.

23              MR. CARY:  Okay.  Your Honor, we move Defendant's

24         Exhibit 662 into evidence.

25              THE COURT: Any objection?

1              MS. MORRIS:  No, sir.

2              THE COURT: Admitted.

3    BY MR. CARY:

4    Q.   Is this the lower deck that was referred to in direct and

5    cross-examination?

6    A.   Yes.

7    Q.   Is this what you had in mind when in the late summer of

8    August 2002 you made an inquiry about something being done on

9    the first floor front of the house?

10   A.   No.

11   Q.   Did you approve this in advance?

12   A.   No.

13   Q.   Could I have Defendant's Exhibit 675, please? Not in

14   evidence.  What is Defendant's Exhibit 675?

15   A.   Oh, what is it?

16   Q.   Yes, what is it?

17   A.   It a view of the back of the chalet.

18             MR. CARY:  Your Honor, we move Exhibit 675 into

19   evidence.

20             THE COURT: Any objection?

21             MS. MORRIS:  No, sir.

22             THE COURT: Admitted.

23   BY MR. CARY:

24   Q.   Is there anything -- let me ask, what is in the top of

25   that picture?

A.    It is a platform at the -- on the -- that comes out of

the door area on the third floor.

Q.    Did you approve that platform before it was put in?

A.    I don't remember a platform.  I don't remember when I saw

the platform.

Q.    Did you approve it in advance?

A.    I don't believe so.

Q.    What was your understanding as to who was going to

maintain the account for the renovation?

A.    I was.

Q.    Could we have Defendant's Exhibit 331, please?  Do you

see Defendant's Exhibit 331, Mrs.  Stevens?

A.    Yes.

Q.    And is that one of the invoices that we looked at on

direct examination?

A.    Yes.

Q.    Could we go to the 27th page, please?   Could we have it

published, Carol, please?

THE COURT: Sure.

BY MR. CARY:

Q.    And could we go to the 27th page?  Do you see up there?

Is this part of the backup to 331 which is an invoice from

Christensen Builders?

A.    Yes.

Q.    Can you tell me whose general account this is?

1    A.    Christensen Building(sic).

2    Q.    Can you look in the lower left-hand corner and tell me

3    who signed?

4    A.    It looks like Rocky Williams.

5    Q.    Could we go to 20th page, please?  Whose general account

6    is this?

7    A.    It says Christensen Building, Inc.

8    Q.    And who signed?

9    A.    Rocky Williams.

10   Q.    Next page, please?  And, again, whose general account?

11   A.    Christensen Building, Inc., and it is Rocky Williams.

12   Q.    And the 33rd page, please?  Who signed?

13   A.    General account; Christensen Building; Rocky Williams.

14   Q.    And the next page; whose account?  There's actually two

15   of them there.  Let's go to the lower one.

16   A.    Again, Christensen Buildings Inc., signed by -- it looks

17   like Rocky Williams, again.

18   Q.    And the next page, please?  Whose account?

19   A.    It's Christensen Buildings Inc.; Rocky Williams has

20   signed it, again.

21   Q.    And the next page; whose account?

22   A.    Christensen Buildings.

23   Q.    Whose signature?

24   A.    Rocky Williams.

25   Q.    And the next page?  Whose account?

1    A.   Christensen Buildings Inc.

2    Q.   And whose signature?

3    A.   Rocky Williams.

4    Q.   And the next page?  Whose account?

5    A.   Christensen Buildings Inc.

6    Q.   And whose signature?

7    A.   Rocky Williams.

8         MR. CARY:  Thank you, Mrs. Stevens.  That's all I

9    have.

10        THE COURT: All right.  Any other questions?

11        MS. MORRIS:  Just very briefly.

12        THE COURT:  All right then, sure,

13   **RE-CROSS-EXAMINATION BY MS. MORRIS:**

14   Q.   Ma'am, that platform that defense counsel just showed

15   you, Number 675?

16   A.   Yes.

17   Q.   That was included in Mr. Hess' plans, the plans that Bob

18   Persons took to the permitting office?

19   A.   Yes.  I just don't remember it.

20   Q.   Did you pay for it?

21   A.   I assume so.  It was part of the construction.

22   Q.   And what about the address that the defense counsel

23   showed you just all those invoices signed by Rocky Williams,

24   signed by Rocky Williams, signed by Rocky Williams; is the

25   address on there VECO?

1     A.   It says "Christensen Building".

2     Q.   Right.  You sent other items to VECO for Rocky Williams,

3     right?

4     A.   I sent some knobs to him from Restoration Hardware.

5     Q.   To VECO, and not to Christensen Builders, correct?

6     A.   Right.

7     Q.   Thank you.

8          THE COURT: All right.  It's your witness.  Do you

9     want to close?  It's your witness.

10         MR. CARY:  Nothing further, Your Honor.

11         THE COURT: Mrs.  Stevens, thank you.  You may step

12    down.  Watch your step.  Ladies and gentlemen, I need to speak

13    with the attorneys for just a minute or two.  We have some

14    time left this afternoon.  So let me give you a very short

15    recess, and we'll bring you back in just a few minutes.

16         (Whereupon, the jury exits the courtroom at this

17    time.)

18         THE COURT: Senator Stevens, would you join --

19    where's the Senator?

20         MR. SULLIVAN:  He stepped out.

21         THE COURT: Oh, he did.  I need to talk to him again.

22    Just a colloquy to let him know he's under no obligation.  You

23    don't need to bring him back.  I'll talk to him when he gets

24    back.  I just need to talk to him, let him know he's certainly

25    under no obligation to testify.

1          But while the jury is out, let me focus on the

2     objections to the many, many, many objections to exhibits that

3     -- unless you want -- do you want your client back for this

4     discussion?  All right.  There are many, many exhibits --

5     strike that -- many, many objections to e-mails, presumably,

6     authored by Senator Stevens.  This is a hearsay objection.

7          Let me just share a couple of thoughts.  First is

8     this:  The reason for the hearsay rule is that more often than

9     not the declarant is not available for cross-examination, and

10    no one can test the truthfulness of the out-of-court

11    statement.

12         Let's assume that all of these e-mails are hearsay,

13    and they probably are; let's assume there was no exception to

14    the hearsay rule that enabled those rules to legitimately

15    become a part of the evidentiary record.  The Senator is

16    available for cross-examination, so the first question to the

17    government would be, assuming there's no exception, how are

18    you prejudiced because he is going to testify; he's available

19    for cross-examination; he's available to enable the government

20    to test the veracity of, indeed, the out-of-court declaration.

21    That's the first point.

22         The second point is this:  If there is an exception

23    and, arguably, there is an exception because those e-mails

24    come in to show his state of mind and with the appropriate

25    instruction, the jurors are told, don't consider them for the

1      truth of the matters asserted, they come in to show his state

2      of mind; how is the government prejudiced?  So I need your

3      reaction to both of those.

4              MR. MARSH:  I think it's me, Your Honor.  With

5      respect to the first one, there's -- if I may shift it

6      slightly, Your Honor.

7              THE COURT: You can shift it after I get my answer.

8      You can shift it anyway you want to.

9              MR. MARSH:  I was trying.  I was trying, Your Honor.

10             THE COURT:  You can put it any way you want, but I

11     still need an answer to my question, though, because,

12     presumably, he is the author for most of these e-mails.

13             MR. MARSH:  We're prejudiced in this sense:  We

14     can't cross-examine the e-mail.  What we can cross-examine is

15     the witness.  Now, the witness is here.  If the witness

16     doesn't remember something, his recollection can be refreshed

17     by an e-mail or correspondence, and then he can testify to

18     that.

19             We can cross-examine that, but if the e-mail comes

20     in, effectively in lieu of his testimony, we can't cross that

21     the same way.

22             THE COURT:  No.  My understanding is the e-mails are

23     being offered in connection with his testimony.  That's my

24     understanding.  That's the reason why -- well, let me be clear

25     about that, that's my understanding, correct?  This is your

1        last witness.  I assume that's what's going to happen.  That's

2        what I'm saying, there's no prejudice to the government,

3        that's assuming there is no -- am I correct?

4                MR. SULLIVAN:  You are correct.

5                THE COURT: Let's assume there is no exception.

6                MR. MARSH:  Uh-huh.

7                THE COURT:  They come in; he's available for

8        cross-examination.  You can test the truthfulness of the out-

9        of-court declaration.

10               MR. MARSH:  Certainly, Your Honor, to some degree,

11       but, on the other hand, I respectfully submit I don't think

12       we're being a little too picky in here, but, seriously, if the

13       witness remembers something, the witness can testify.  We can

14       cross-examine the witness' statement, but the e-mails -- in

15       that circumstance become in some way superfluous.  They become

16       -- they are not subject to the same cross-examination.

17               The best evidence in this case is the witness'

18       testimony, not the e-mail.  So to the extent that the Court

19       has been presented with the concept that the e-mails come in

20       in connection with the testimony, we submit the best evidence

21       is the testimony itself.

22               THE COURT: I understand that.  I understand that,

23       but how are you prejudiced, though?

24               MR.  MARSH:  We're prejudiced because it gives -- it

25       could be viewed as double weight.  It's not just the fact that

1  the witness has said it.  It's also here in an e-mail.  It's a

2  double attempt at being able to establish this evidence.  We

3  submit that the witness can testify to his own recollections.

4  He can refreshed --

5          THE COURT: So it's improper bolstering through use

6  of an e-mail?

7          MR. MARSH:  You know, I have never seen that in

8  cases, Your Honor, but -- and I will fully submit that this is

9  not something I focused on before the argument so -- but to me

10  it does seem like that would be a concern for the government.

11          Now, with respect to state of mind, again, the

12  concept of state of mind normally comes in to show what a

13  defendant or what a witness was thinking at that time.

14          THE COURT:  Intent.  Motive.

15          MR. MARSH:  Absolutely.

16          THE COURT:  Well, let me add something to that

17  question, also.

18          MR. MARSH:  Sure.

19          THE COURT: Because if, indeed, the documents come in

20  to show his intent to pay the bills, send me the bills, I want

21  to pay the bills, he's not indicted for not having paid bills.

22  He's indicted and standing trial because the government has

23  alleged, and the government has the burden of proving, that he

24  intentionally falsified documents to be filed with the U.S.

25  Senate.  So there's a relevance argument there.

1              MR. MARSH:  Absolutely there is a relevance

2      argument, and, certainly, we understand why the defense has --

3      why the defense is being interposed, but we do submit that it

4      is not -- Your Honor, I can't say that.  Actually, I do have

5      to concede that it is relevant, it is a relevant --

6              THE COURT:  All right.  I was waiting for that

7      concession.  I was waiting for that.  No.  I applaud your

8      candor.

9              MR. MARSH:  I'm sorry.  It is.  I it.  And,

10     certainly, not with some legal theories, but to other ones, it

11     is.

12             THE COURT: Right.

13             MR. MARSH:  And with respect to the thing about the

14     e-mails, Your Honor, it may very well be that those are

15     properly viewed as prior consistent statements, prior

16     consistent statements of the witness.  The witness testifies

17     --

18             THE COURT:  Absolutely.  So another exception.

19             MR. MARSH:  Exactly.  But it's an exception down the

20     road, not an exception on direct.

21             THE COURT: Right.  All right.  I'll -- over

22     objection, and, certainly, because the e-mails are indeed an

23     exception with respect to state of mind, I'll allow them.  I

24     also find -- I don't think there's any prejudice.  The

25     declarant is available for cross-examination, and that's the

1    primary reason why hearsay is kept out because there is no

2    ability to cross-examine the declarant; but I agree also there

3    is another independent basis and that would be admissibility

4    of the documents as prior consistent statements after an

5    appropriate foundation was laid.

6            Senator, I just need to ask you a couple of

7    questions with your lawyer present at the microphone.

8            MR. STEVENS:  Yes, sir.

9            THE COURT:  How are you today?

10           MR. STEVENS:  Fine.  Thank you.

11           THE COURT:  Good.  You don't have your -- the

12   hearing -- do you need your hearing device?

13           MR. STEVENS:  I have directional hearing.  I can

14   hear you when I look at you.

15           THE COURT:  All right.  That's fine.  I just want to

16   remind you, you're an attorney, and I know you know that, but

17   I still have an obligation to tell you that you have

18   absolutely no obligation indeed to testify in this case.

19   That's your privilege.  No one can force you to; if you tell

20   me you don't want to testify, no one is going to make you

21   testify.  Do you understand that?

22           MR. STEVENS:  Yes, sir.

23           THE COURT:  And your attorney has indicated you wish

24   to testify in this case, and that's your decision, correct?

25           MR. STEVENS:  And it's a privilege and a duty.

1          THE COURT:  All right.  That's fine.  Do you have

2    any questions about your rights?

3          MR. STEVENS:  Pardon me?

4          THE COURT: Do you have any questions about your

5    Constitutional rights?

6          MR. STEVENS:  No, sir.  Thank you.

7          THE COURT:  Thank you, Senator.  Okay.  It's 4:20.

8    I mean we could take some testimony.  I assume there's going

9    to be some background questions.  I assume we could make some

10   use of this time.

11         MR. B. SULLIVAN:  We can just do a little warm-up.

12         THE COURT: A warm-up.  How much warming up time do

13   you need?

14         MR. B. SULLIVAN:  Like infield batting practice.

15         THE COURT: All right.  We'll start and we'll stop

16   promptly at 4:45, and --

17         MR. B. SULLIVAN:  I'll look for a good point within

18   a minute or two.

19         THE COURT:  All right.  That's fine.  Fair enough.

20         (Whereupon, the jury returned to the courtroom at

21   this time.)

22         (Whereupon, the court reporter had a computer

23   technical difficulty at this time that was resolved;computer

24   had to be shut down and a new file had to be

25   started/generated.)

1        THE COURT: All right.  We'll proceed.

2        MR. B. SULLIVAN:  We call Senator Ted Stevens.

3

4    *          *          *          *

5        **THEODORE STEVENS,** called as a witness in this

6    case,  after having been duly sworn, testified as follows:

7    *          *          *          *

8        THE COURT: Good afternoon, Senator.

9        THE WITNESS:  Good afternoon.

10   **DIRECT EXAMINATION BY MR. B. SULLIVAN:**

11   Q.   Senator, when you signed those Senate disclosure

12   financial forms, and you've seen them in this case, did you

13   believe they were accurate and truthful?

14   A.   Yes, sir.

15   Q.   Did you ever intend to file a false statement with the

16   United States Senate where you've served for 40 years?

17   A.   No, I did not.

18   Q.   Did you engage in any scheme with any person to conceal

19   anything from the Senate?

20   A.   No, sir.

21   Q.   Now, with the few remaining moments of the day, I'd like

22   to tell the jury a little bit about your background.

23   A.   All right.

24   Q.   When were you born and where?

25   A.   I was born in Indianapolis, Indiana, in 1923.  I'll be 85

1    a month from Saturday.

2    Q.   And where did you grow up, sir?

3    A.   For my first 14 years, I grew up Indianapolis, except for

4    about three years, we went to Chicago.  I think it was about

5    1928 and came back in 1930, really.  My father had been

6    partially blind.  He recovered his sights primarily with the

7    heavy glasses, but he got a job in Chicago.  We moved to

8    Chicago and then came home right after the big crash in 1929.

9         THE COURT:  Senator, we're going to have to ask you

10   to pull that microphone down and speak --

11        THE WITNESS:  Yes, sir.  Thank you.  Sorry.

12        THE COURT: All right.  Sure.

13   BY MR. B. SULLIVAN:

14   Q.   And Senator, when you say "crash", you're talking about

15   the Depression?

16   A.   The Depression started in 1929, and we moved back in

17   1930.  My father had been out of work for about a year.

18   Q.   And how -- did you work during the Depression?

19   A.   Yes, sir.  I started selling newspapers when I was about

20   six years old, and we had -- we had many jobs.  There were no

21   jobs. I lived with my grandmother and grandfather.  I failed

22   to mention my father and mother got divorced when they came

23   back from Chicago, and I went to live with my grandmother and

24   grandfather.  My grandfather was out of work, too.  I lived

25   there with my older brother for awhile and my cousin,

1    Patricia, who is my father's sister's child, who is a Down

2    syndrome child.

3    Q.   Now, in approximately 1938, did you move to California?

4    A.   Yes.  My grandmother had tried to survive there in

5    Indianapolis, and we -- my grandfather died about 1930 -- just

6    about 1935.  We lived finally together there, just the three

7    of us, my cousin, my grandmother, and myself, and I did odd

8    jobs and various things, but she finally decided she could not

9    survive, and we moved out to live with her daughter, my aunt,

10   who was Patricia, my cousin's, mother.

11   Q.   How old were you when you got to California and began

12   high school?

13   A.   I was 14, and I started high school at a place called

14   Redondo Beach, California.  We lived in Manhattan Beach,

15   California, but, at that time, these beach towns, Redondo,

16   Hermosa, and Manhattan, were summer towns, and most people

17   moved back in town because there was so few people that lived

18   year round.

19        They had what they called the Union High School in

20   Redondo, and the young people from -- the children from

21   Manhattan Beach and Hermosa went to Redondo Union High School.

22   Q.   How many years of high school did you attend in

23   California?

24   A.   I attended four years there, and I graduated from

25   Redondo High School in 1942.

Q.   Did you work during your high school days to support your
family?

A.   Yes.  My aunt and uncle both worked, and I worked.   I
worked at a bakery in the morning before I went to school, and
I had a newspaper route in the afternoon.  And then on Friday
nights and Saturday nights and Sunday afternoons, I was an
usher in a local theater.

Q.   How old were you when Pearl Harbor occurred?

A.   I was just 18.

Q.   And did you go on to college after you graduated from
high school?

A.   Yes.  I had -- my aunt had asked for a promise, and I did
promise her I would not enlist until I was 19.  So I went to
Oregon State College which was a very inexpensive in
Corvallis, Oregon, for September, October, and November of
1942, and on my birthday, I tried to enlist.

Q.   How old were you when you tried to enlist?

A.   Just 19.  It was on my birthday in 1940 -- this is '42.

Q.   And how many months had you spent in college before you
enlisted?

A.   Just three months.

Q.   And in what service did you enlist at age 19?

A.   Well, I enlisted with several of my friends there in the
Marine Air Corps at the Recruiting Center, and I took the
examination all the way through, and when I got to the eye

1    test, I didn't pass it.  I was studying aeronautical

2    engineering there, and we were -- and also working and, it was

3    my eyes were strained, and I did not pass it, and at that

4    time, if you didn't pass the whole test, you were not

5    enlisted; so I returned to California.

6    Q.   And what did you do, if anything, to reenlist again?

7    A.   Well, I discovered that there was a person in Los

8    Angeles, California, which is about an hour bus ride from

9    where we lived, who did -- gave what we called "eye

10   exercises".  It was a very interesting thing, but I went down

11   to this person's office.  He was a doctor, and took eye

12   exercises, mostly with stereoptic slides.  I don't know if

13   this generation has ever seen them, but they would move these

14   -- by moving the slides up and down, it would stretch your

15   eyes out, and I did that for about two months, and then I went

16   into the Army.

17   Q.   And were you able to subsequently pass a test for your

18   eyes?

19   A.   Yes.  That was the acid test eye -- when I went into the

20   Army, I asked to be given the test to go in the Army Air

21   Corps, and I did pass the eye test, and I was assigned to the

22   Army Air Corps as a U.S. Army Cadet.

23   Q.   Now, would you explain to the jury your military service

24   beginning at that time?

25   A.   Well, we had a slight assignment to what we called

1    "college training detachment".  I went to Montana State

2    College in Bozeman, Montana, and was part of the college

3    training detachment.  They gave a test after being there a

4    month to see if people, the cadets, had to stay through the

5    whole two years, and, luckily, the test was primarily about

6    the things I had just studied at Corvallis, and I passed and I

7    was able to leave after -- Montana State College CTD, College

8    Training Detachment, and I was assigned to go to the

9    California training for pilots.  I went immediately to a

10   training unit.

11   Q.   And then did you eventually become a pilot?

12   A.   Yes, I did.  I went through all three of the processes,

13   three different assignments to basic, advanced basic, and

14   advanced training after primary training, and I received my

15   wings at Douglas, Arizona, in what they called a Fifth Class

16   of 1943.

17   Q.   What kind of airplanes did you fly at that time?

18   A.   Well, I was flying what they call the "AT-9", which was a

19   very heavy plane, a metal plane, that was side-by-side

20   training.  It's supposed to -- front and rear seats in it, and

21   it was basically designed to, we believed, for training for

22   the P-38s.

23   Q.   And did you eventually get an assignment overseas?

24   A.   Yes.  I went down to Bergstrom Field in Texas, and after

25   awhile, we were moved from there to Malden, Missouri, and we

thought -- I was trained to fly gliders and then towed gliders

for about two or three weeks.  We thought we were going to go

to Europe with the Invasion, but I then got one -- I was one

of 12 pilots that was picked out and sent to Chicago; then to

Miami, Florida; down to South America; across Africa, across

India.

        At Indochina, I was assigned to the Fourteenth Air

Force Transport Section to serve under General Claire

Chennault in the Fourteenth Air Force.

Q.   What were the nature of your duties once you were in an

overseas assignment, Senator?

A.   Well, when we first arrived, we were all co-pilots.  So I

was a co-pilot for awhile, but I became a first pilot very

quickly, and we were assigned with a crew to carry in a C-47

to begin with -- which was the Douglas C-47  -- some people

called it a DC-3, but it was a C-47  to us.

        And we carried ammunition, troops, supplies, fuel, to

isolated bases in China, and we flew across enemy lines into

areas where we had resistance from either the Chinese

Nationalist Army or from OSS or from some of the marine

detachments that were assigned, particularly, on the China

east coast.

        And I -- we then got into C-46s at a later time, which

are much larger, but still a twin-engine cargo plane.

Q.   How long did you serve in that capacity, and when were

1    you discharged?

2    A.   I served in China until December of 1945, and then I

3    returned to California.  I was discharged on March 13th of

4    1946.

5    Q.   And did you receive awards for your service in the

6    military?

7    A.   Yes, sir.

8    Q.   What did you receive?

9    A.   I received two Distinguished Flying Crosses, two Air

10   Medals, and what we call the Yuan Hai award from the Chinese

11   government.  That was the equivalent of their top medal.

12   Q.   Now, after the war, would you trace the years beginning

13   in '46  to '47; what did you do then after you left the

14   service?

15   A.   Well, I immediately went to U.C.L.A.  I was living again

16   with my aunt and uncle in Manhattan Beach, and I went and took

17   a lifeguard exam as a matter of fact and passed, became a

18   lifeguard, and went to U.C.L.A. in what we called "the

19   accelerated course".

20   Q.   And what degree were you seeking at that time?

21   A.   When I started out to seek one in economics and ended up

22   by being in basically political science and economics, and I

23   graduated, I got my degree from U.C.L.A. in 1947, August 1947.

24   Q.   And what was your degree in?

25   A.   That was in political science.

1    Q.   Political sentence.  And after you -- did you work your

2    way through college and have the G.I. Bill?

3    A.   Yes, sir.  I primarily worked myself -- worked my way

4    through -- that was, again, a state school, very inexpensive

5    to go to U.C.L.A. in those days, and I was working as a

6    lifeguard.  I paid, primarily, all my expenses because I

7    decided I was going to go to law school.  I saved that G.I.

8    Bill for law school.

9    Q.   All right.  And when did you go to law school and where?

10   A.   I went to Harvard Law School in Cambridge, Massachusetts.

11   Q.   All right.  And when did you get your degree from law

12   school?

13   A.   I got my degree from Harvard in 1950.

14   Q.   And did you also work your way and have jobs during law

15   school?

16   A.   I did work quite hard in the first two years.  I borrowed

17   $5,000 from my uncle, so I didn't have to work the last year.

18   I was there full-time.

19   Q.   What kind of jobs did you have during law school?

20   A.   Well, whatever is available.  I lived the first year with

21   a blind couple that had two children.  They had advertised for

22   someone who might know something about living with blind

23   people, and I had lived with my father, so I stayed there with

24   them for the first semester, but I moved in the dorm by the

25   second semester.

Q.   Did you eventually pass the Bar?

A.   I did.  I returned to California in 1950, and I passed
the California Bar Association.  I had been offered a position
here in Washington, D.C. so I came back here and passed the
D.C. Bar Association the same year.

Q.   Now, after you passed the Bar, would you trace for the
jury your career beginning as a young lawyer?

A.   I joined a law firm here in Washington, D.C. that
represented the State of California in water law, primarily.
It was called "Law Office of Northcutt Ely at 14th and K."
And we, primarily, represented the State through the Attorney
General, at the time, and we had quite a few cases, including
a Supreme Court case that was pending.  It was Arizona versus
California.  But I worked there on a lot of other things.

     They represented some of the areas involved in interstate
oil and gas compacts, and we represented other states with
regard to water rights, but it was, primarily, water rights
and natural resources law.

Q.   And after you worked in the D.C. law firm for awhile,
what did you then do?

A.   Well, one of the clients that Northcutt Ely had was a
coal company in Fairbanks, Alaska.  The mine was actually in
Healy, Alaska, and the owner of that mine, Emil Usibelli -- I
handled some of the work for the office with this client, and
he had told me about -- he had told his attorneys in Fairbanks

about me and suggested that maybe they might ask me to come up and join their firm in Fairbanks, and we did get an invitation to go.

I had been married in 1952 to Ann Cherrington who was from Colorado.  She was a college graduate, and we talked about it, and I left Northcutt Ely, and we moved to Fairbanks, Alaska at the end of 1952.

Q.   And did you meet your wife here in the District of Columbia?

A.   Yes.  She was working at the State Department when I first met her, and her father had been in the State Department in the Roosevelt Administration.  So she was very well acquainted with Washington, D.C.

Q.   All right.  So you moved to Fairbanks in 1952.  What did you do there?

A.   I joined the Law Office of Collins and Clasby, a small firm that was -- it had just five of us in it.  The senior member, Collins, A.B. Collins, was the first Speaker of the State of the Territorial Legislature in 1913 in Alaska, a very famous gentleman who had walked after the Gold Rush collapsed in Nome, he walked from Nome to Fairbanks and became a janitor in a law office and read law and finally became a lawyer, and he formed this firm, Collins and Clasby.  I was very proud to be part of that firm.

Q.   How long were you there?

1    A.    Well, now, that's a strange story because I really

2    started practicing there the first few months in 1953, and in

3    September 1953, the federal judge called me to his office and

4    told me he had suggested that the U.S. Attorney resign because

5    he was an alcoholic, and he had to appoint someone to take his

6    place immediately, and he asked me to take the job.  So I was

7    appointed the U.S. Attorney in Fairbanks, Alaska in 1953.

8    Q.    And what were the nature of your duties as U.S. Attorney

9    in Alaska?

10    A.    We were still a territory, so we had general jurisdiction

11    from everything from city cases to all the way up to federal

12    cases, territorial cases.  We had a territorial government,

13    but we prosecuted cases in front of the federal judge who had

14    appointed me, Judge Pratt.

15    Q.    Was there only one district in the --

16    A.    There were four districts and three U.S. Attorneys in

17    Alaska.

18    Q.    How long did you have the --

19    A.    Alaska, you've got to remember now, is a gigantic place.

20    I think the jury has seen it outlined where Catherine had her

21    jurisdiction.  Well, strangely enough, mine was that

22    jurisdiction 20 years before she was the District Attorney.

23    That was the U.S. Attorney's jurisdiction, too.

24    Q.    All right.  And how many years did you serve in

25    government as a U.S. Attorney?

A.   About three years.  I got a call from a friend of mine

down here in Washington that I had known.  He said that there

was an opening in the Department of Interior, and he thought

that I ought to be able to fill it and wondered if I would

take a call from the Secretary of Interior to come down and

join the Department of Interior.

        And that was -- they offered me the job of being

Legislative Counsel to the Department of Interior to handle

legislation and to represent the Department before Congress in

the legislation, and I came down and the children -- we had

children in the two years of '54, '55, -- we had -- '56, and

then she came down after me.  I came down here alone and

joined -- then she followed at the end of the school year.

Q.   Who was the President of the United States at the time

you came to Washington?

A.   Dwight D. Eisenhower.

Q.   How long did you serve at the Interior Department?

A.   I served until January of 1961, and I was successively

the assistant secretary and legislative counsel and then the

chief counsel or Solicitor of the Interior Department in 1959.

The President appointed me to that position.

Q.   While you were there, did you work on the issues of

statehood for Alaska and Hawaii?

A.   That was the primary reason they asked me to come down

was to work on the statehood acts that were pending.  Alaska

and Hawaii had sought statehood for a very long time, and my

boss, the Secretary of Interior, had been an appointed senator

from Nebraska, Fred Seaton.  He'd only made one speech in the

Senate when he was a Senator, and that was why Alaska should

become a state.

     So I was very pleased to join him, and he assigned me the

task of making studies to find out why Alaska had never become

a state, and when I worked on that very, very -- we also

worked with Hawaiians because one of the problems was every

time Hawaii sought statehood, the Alaskans would oppose it,

and every time Alaska sought statehood, Hawaiians would oppose

it.  They both wanted to be admitted first.  We did work out

an arrangement with the Hawaiians and guaranteed that if we

got statehood at that period of Congress, we would fight and

take their case before the same Congress, and we did that.

Q.   And in what year did Alaska become a state?

A.   Alaska, actually, became a state, and Hawaii, too, on

January 3, 1959, but our statehood Bill passed in July and

theirs passed in October.

Q.   After you worked in Washington in the Interior

Department, is the solicitor the chief lawyer in the Interior

Department?

A.   Yes, sir.  He has jurisdiction over all of the lawyers in

the Interior Department nationwide.

Q.   And after you worked in that capacity, what did you then

do in your career?

A.   Well, I returned to Alaska after the election in 1960,
and I left here in January 21st, as a matter of fact, in 1961,
after I greeted my successor, and then I drove to Alaska, and
I decided to open a law office in Anchorage.

     Now, the reason for that was there was a conflict of
interest statute that I could not represent anything that had
anything to do with the Department of Interior.  If I had gone
to Fairbanks, almost everything around Fairbanks is affected
by the Department of the Interior because the federal
government owns, at that time, 97 percent of Alaska's land.
It still owns 67 percent.  But I could not practice law in
Fairbanks because I wouldn't have any clients.  So I moved to
Anchorage and opened a law office in Anchorage in January
1961.

Q.   And did you practice law and then get into state politics
and begin a political career?

A.   Yes, sir, I did.  I practiced law there, and I'd only
been there about a year, and the local people encouraged me to
run for the Senate.  And I ran for the Senate and lost that
election; that was '62.  In '64, I ran for the state
legislature and was elected; and in 1966, I ran for the state
legislator and was elected and became a majority leader of the
state legislature.

     And then in December of 1968, my predecessor died, and

1    our existing governor appointed me to be a United States

2    Senator.

3    Q.   So your first term in the United States Senate here in

4    Washington was by appointment, not by election; is that

5    correct?

6    A.   That's correct.

7    Q.   And once you were appointed to the United States Senate,

8    how many years did you serve before you had to run for

9    election?

10   A.   Under state law at that time, you had to run for the next

11   general election and the succeeding general elections until

12   the final six-year term was available for that seat.  They

13   were six-year terms, and my successor died in the first two

14   years, the end of the first two years in December of '68.

15       So I served from December '68 to '70, was elected in

16   1970; than I ran, again, in '72 and was elected in '72, and

17   I've been elected every six years since then.

18   Q.   How many times have you been elected to the United States

19   Senate, as of today?

20   A.   I think it's seven times.

21   Q.   Now, I'd like to focus on your family for just a few

22   moments and be finished in a minute.  Let's backtrack; in

23   1950, you said you were 27 years old, practicing in D.C., you

24   met your wife, Ann; is that correct?

25   A.   Yes, sir.

1    Q.   How long were you married to Ann?

2    A.   For over 26 years.

3    Q.   How many children?

4    A.   Five.

5    Q.   And then --

6    A.   There was one each year, starting in 1954.

7    Q.   All right.  And then what were the circumstances of Ann's

8    death?

9    A.   Ann and I had returned from a trip overseas with Senator

10   Jackson, and we returned to the United States and went to

11   Juneau, Alaska to attend an inauguration of the then-governor,

12   Governor Hammond, and we had arranged a fly in a private jet

13   with friends to go to Anchorage to attend a fundraising event

14   for what we call the "Citizens for Management of Alaska's

15   Land" in Anchorage, And that jet crashed going into Anchorage

16   in December.

17   Q.   How many people were killed in the crash?

18   A.   There were five people on board -- seven people on board,

19   five were killed, and two of us that survived are in this room

20   right now.

21   Q.   How did you meet Catherine?

22   A.   Pardon?

23   Q.   How did you meet Catherine?

24   A.   Well, I had a group of Canadian Senators.  We had what we

25   call a "Canadian Parliamentary Conference", and this one year

1    I was chairman, and we went for one meeting in Canada, and

2    then I convinced the Air Force to fly us all up to Anchorage

3    to have a meeting so they could see what was going on in

4    Anchorage from the point of view of military.  We have two big

5    military bases there.  And we had a dinner for that

6    Canadian/U.S. Parliamentary Conference the year after Ann

7    died, and my two daughters, who are here now, told me that I

8    ought to have someone -- I ought to escort someone to that

9    dinner, I should not go alone.  And so they -- I had a blind

10   date with Catherine.

11   Q.   And how long have you been married?

12   A.   I have to count my fingers.  I think it's 27 years.

13            MR. B. SULLIVAN:  All right.  That's a good breaking

14   point, Your Honor.

15            THE COURT: All right, ladies and gentleman. It is

16   4:45.  Enjoy your evening.  Please, again, do not discuss any

17   aspects of the case with anyone.  Please avoid any press,

18   radio, or television.  We'll see you tomorrow.  We'll start at

19   9:30, and we're going to work on that issue.  All right?

20            (Whereupon, the jury exited the courtroom at this

21   time.)

22            THE COURT:  All right, counsel, before you go --

23   I think the jurors have gone back through the door.  They

24   can't hear us.  At some point, I assume that at the close of

25   the case, the defendant will make a motion for judgment of

acquittal.  I expect that and I want you to focus -- I want

both sides to focus on the issue of whether it is more

appropriate after a lengthy trial for a district judge to take

under advisement the motion for judgment of acquittal, and

send the case back to the jury.

I think there are some -- there is probably some

precedent from our Circuit, there may not be.  I'm sure there

are precedents from other Circuits, and I know there are some

from the D.C. Court of Appeals.  But I want you to focus on

that issue with respect to your respective arguments for and

against judgment of acquittal.

All right.  Anything else we need to talk about

before we go?

MR. CARY:  Yes, a couple of rebuttal issues, Your

Honor.  The government has informed us of three rebuttal

witnesses; two are F.B.I. agents.  Just our guesswork is they

were both present for interviews of Bob Persons.  We assume

it's a 613(b) issue, and if it is, just as occurred in our

case with our 613(b) evidence, we'd like to have a proffer at

an appropriate time, but what that is, we can determine

whether that seems appropriate or not.

The third witness appears to be a document custodian

from Wells Fargo Bank, and the document that is listed as an

exhibit is Government's Exhibit 394, which is one of the

undifferentiated files, and we'd also ask for a proffer at an

1    appropriate time, sooner rather than later, of exactly what

2    they want to use out of this and --

3              THE COURT: Is this the document we talked about

4    three weeks ago?

5              MR. CARY:  I think it's -- in fairness, I think it's

6    a little different.  It's not as -- I'm holding it now.  It's

7    not the super big one, but it's --

8              THE COURT:  It's part and parcel of the --

9              MR. CARY:  I think it's a complete production from

10   Wells Fargo.  It's an entire mortgage file.

11             THE COURT: Right.  And I think several weeks ago, I

12   raised the question of whether or not the parties could

13   stipulate as to what the records show and what they don't

14   show.  You're not able to do that?

15             MR. CARY:  I don't know what the point is here.

16             THE COURT: Yeah. I don't know.  If you are, it seems

17   to me you could stipulate to that.

18             MR. MARSH:  Your Honor, I think we're still in the

19   process of figuring out whether we need to call that witness.

20   If we do, we'll provide the Court with a proffer a little bit

21   later.  Thank you.

22             THE COURT: That's fine.  And with respect to the two

23   agents, I will wait until defendants rest, and then it's

24   appropriate to inquire about rebuttal phase, and I'll ask for

25   a proffer at that time.

1           Anything else?  I assume everyone is working hard on

2    the instructions, trying to agree on the instructions; are

3    you?  In your spare time, are you?  Are you making any

4    progress?

5           MR. SINGER:  Your Honor, quite a bit, actually.

6           THE COURT:  Great.

7           MR. SINGER:  I hope that we will be able to file at

8    least a partial set on the -- hopefully, this evening since --

9    I may be promising more than -- without checking with Mr.

10   Marsh, but I think we're close on that one.

11          THE COURT: What's the current status -- I was

12   reading some instructions last evening -- what's the current

13   status in this jurisdiction of the character evidence

14   instruction?  Is it still the law in this jurisdiction that

15   that instruction should include the language that evidence of

16   good character can provide reasonable doubt solely?

17          MR. SINGER:  Absolutely, Your Honor.  That is in the

18   2008 Red Book, and I think both parties have agreed to --

19          THE COURT: So there's no dispute there.  I just

20   raised it, I was looking at the commentary.  I wasn't clear as

21   to what -- that is still the current law in this jurisdiction?

22          MR. SINGER:  It is, indeed.

23          THE COURT:  All right.  Do you agree you're making

24   some progress on the instructions?

25          MR. MARSH:  We're trying, Your Honor.  We're doing

1    the best we can.

2             THE COURT: All right.  I need to know sooner or

3    later, though, just what your disputes are because -- unless

4    I'm really off base, I think we're going to finish this trial

5    tomorrow before noon.  That would be my guess.

6             MR. MARSH:  It's entirely possible.  I do think it's

7    fair to say that we are making progress to identifying where

8    we agree, where we disagree, and being able to present most of

9    those arguments to the Court in a pretty clear fashion.  There

10   may be some things that we'll need to talk through with the

11   Court, but we should be able to put you in a good position.

12            THE COURT: Mr.  Sullivan, what's your best

13   prediction of the length of your direct?  I'm not trying to

14   curtail you, obviously, but how much time do you think you'll

15   need for your direct?

16            MR. SULLIVAN:  Two hours, maybe three; but no more

17   than three I'm pretty sure.

18            THE COURT: All right.  I still think we'll have some

19   time tomorrow to spend on instructions.  So I really need to

20   know sooner than later where you disagree so I can start

21   focusing on those instructions.  Anything else we need to talk

22   about at this point?

23            MS. MORRIS:  No, sir.

24            THE COURT: All right.  Enjoy your evening.

25                    [End of proceedings]

C E R T I F I C A T E

I, Wendy C. Ricard, Official United States Court
Reporter in and for the District of Columbia, do hereby
certify that the foregoing proceedings were taken down by
me in shorthand at the time and place aforesaid,
transcribed under my personal direction and supervision,
and that the preceding pages represent a true and correct
transcription, to the best of my ability and
understanding.

_____

Wendy C. Ricard, CCR, RPR

Official U.S. Court Reporter