1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF COLUMBIA

3   UNITED STATES DISTRICT COURT        CRIMINAL ACTION NO. 08-0231

4                                       WASHINGTON,D.C.

5   VERSUS                              TUESDAY, OCTOBER 21, 2008

6

7   THEODORE F. STEVENS                 2:00 P.M.

8

9                **TRIAL (DAY 21 – PM SESSION)**

10           **BEFORE THE HONORABLE EMMET G. SULLIVAN**

11              UNITED STATES DISTRICT COURT JUDGE

12

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF,                  JOSEPH W. BOTTINI,ESQ.
                                        JAMES A. GOEKE,ESQ.
15                                      U.S. ATTORNEYS OFFICE
                                        District of Alaska
16                                      22 West Seventh Avenue
                                        Federal Building and U.s.
17                                      Courthouse
                                        Anchorage, AK 99513-7567
18
                                        NICHOLAS A. MARSH,ESQ.
19                                      U.S. Department of Justice
                                        10th and Constitution Ave.
20                                      NW
                                        Washington, DC 20530
21                                      202-307-1049

22                                      BRENDA MORRIS, ESQ.
                                        EDWARD P. SULLIVAN, ESQ.
23                                      U.S. DEPARTMENT OF JUSTICE
                                        1400 New York Avenue, NW
24                                      12th Floor
                                        Washington, DC 20005
25                                      (202) 514-1412

```
 1
       FOR THE DEFENDANT,                  BRENDAN SULLIVAN, ESQ.
 2                                         ROBERT MADISON CARY,ESQ.
                                           ALEX G. ROMAIN, ESQ.
 3                                         CRAIG D. SINGER, ESQ.
                                           WILLIAMS & CONNOLLY
 4                                         725 12th Street, NW
                                           Washington, DC 20005
 5                                         (202) 434-5000

 6


 7     REPORTED BY:                        WENDY C. RICARD, RPR, CCR
                                           OFFICIAL COURT REPORTER
 8                                         333 Constitution Avenue
                                           Room #6718
 9                                         Washington, DC  20001
                                           (202)354-3111

10

11     Proceedings recorded by mechanical stenography.

12     Transcript produced by computer-aided transcription.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P-R-O-C-E-E-D-I-N-G-S

2              (Whereupon, court resumed after the lunch recess at

3    this time.)

4              THE DEPUTY CLERK:  Please remain seat and come to

5    order.

6              THE COURT:  Let me just say that over the lunch hour

7    --someone -- an employee of the Court turned in a notebook --

8    to -- brought it to chambers, and it appeared to be either a

9    reporter's notebook or one of the attorney's notebook, and it

10   was my intent at that time -- I looked at it, and I couldn't

11   read the writing, but it appeared to be -- they weren't jurors

12   notes which I was concerned about -- and my intent at that

13   time was to just bring it in and say -- hold it up and say

14   does this belongs to someone, but I understand the person has

15   received it.  Oh, good that's great.  Well, I'm sorry about

16   that.  We thought about that, and I said -- well, we were

17   going to give it to Shelly, and I said, well, I'll just bring

18   it in.  I'm sure the person is still here.  But I'm glad you

19   got it back.        I believe it was in the cafeteria, I

20   believe, in the cashier's line or something.  We didn't read

21   anything.  Your penmanship is like mine kind of.  I couldn't

22   read it if I wanted to.

23             THE DEPUTY CLERK:  Are you ready for the jury?

24             THE COURT: Yes.

25             (Whereupon, the jury entered the courtroom at this

```
 1    time.)
 2             THE COURT:  All right.  Ladies and gentlemen, we'll
 3    proceed with defendant's closing argument.  You know, I regret
 4    I didn't think of this earlier, but at any time if anyone
 5    wants to stand up and stretch, you can do that.  From time to
 6    time, I do that.  There's nothing wrong with that, just stand
 7    up, and -- it's a long day.  I understand that.
 8             We'll take a 15-minute recess in about a
 9    hour-and-a-half.  If you feel like stretching, there's nothing
10    wrong with that.
11             MR. B. SULLIVAN:  It wouldn't bother me either.
12             Before lunch, I mentioned an e-mail, and I didn't
13    remember the number.  I'd like to show it to you now;
14    Government Exhibit 1032.  This is the e-mail if you --
15    highlight the words --
16             THE COURT: Mr. Sullivan, the court reporter can't
17    hear you.  Is your --
18             MR. B.  SULLIVAN:  I now have it on.  I'm sorry.
19             THE COURT:  Is it on?  Okay.  All right.
20             MR. B. SULLIVAN:  I'd like -- Beth, highlight the
21    words "and the only new work".  Again, I want to take you back
22    and ask you to go back and live at the time, not eight years
23    later, and after Ted Stevens gets an e-mail on September 17th
24    or 18th saying:  Catherine will love the porch.  Then take a
25    look at this e-mail that comes on October 2nd.  This is Bob
```

1    Persons.  He's on the scene.  Ted's 3,000 miles away, and he

2    says:  And the only new work is the porch.

3           What happens next?  Exhibit 495, four days later;

4    here it is.  This is the exhibit they want you to believe is a

5    cover-your-ass letter, according to Bill Allen.  Let's blow it

6    up with our -- just to focus on it.  And could you put the

7    little headings on that, too, or not, on the slides?  There it

8    is.

9           All right.  These are the thoughts.  The writing's a

10   little hard to read, but it's manageable.  Here's the first

11   thought:  You owe me a bill.  Second:  Remember Torricelli, my

12   friend.  Third:  Friendship is one thing, compliance with the

13   ethics rules is entirely different.  Fourth:  I asked Bob P.

14   to talk to you about this so you don't get pissed off at him.

15   And last:  It just has to be done right.

16           Thank you.

17           Now, the reason that Bill Allen has to deliver to

18   you the pertinent testimony about cover your ass is you can't

19   escape the meaning of that letter, it's right there.  It was

20   written at the time.  It shows good intent.  You can't

21   possibly have willful, knowing intent to do anything wrong

22   when you write that letter, but there's more to prove that

23   it's a lie.  Let me show you what it is.

24           Let's look at Exhibit 497.  This is an e-mail the

25   very next day back from Bob Persons.  Look at what it says.

1    This is Exhibit 497. Now, highlight spoke to Bill.  As the

2    Senator indicated, he also talked to Persons about getting a

3    bill for the new work on the porch, and Persons is writing

4    back to him the very next day, quote:  Spoke to Bill about

5    your concerns, and all is well.

6              Then now go to Exhibit 509, government.  Once again,

7    if you're covering your ass on October 6th, why a month later

8    are you asking for the bill again?  Unless you have serious

9    intent to do the right thing.  Look at what it says; quote:

10   Don't forget we need a bill for what's been done at the

11   chalet.        Now, let's go to Defendant's Exhibit 526, which

12   is in December; another month goes by.  This is an e-mail from

13   Ted Stevens to his staff, Barbara.  Listen to this, this

14   proves the sincerity of the October 6th memo.  Let me read the

15   key quotes.  He's saying to his staff member:  There will be

16   bills coming in.  I do not expect them before the first of the

17   year, they're not done yet.  Bob Persons is riding herd to

18   make certain we get charged for what they've done.  Some of it

19   they just did,  I didn't order it.  Thanks, Ted.

20             Part of a master conspiracy?  Multiple

21   cover-your-ass letters or does it reflect the sincerity of a

22   man trying to do the right thing, not to get something for

23   nothing.  Let's look at another one.  Defendant's Exhibit 390,

24   same day.  E-mail from Barbara Flanders, the staff person,

25   back to Ted.  She says:  Catherine, CAS, thought there would

1    be some bills coming in for the work done at the chalet.  And

2    then on the next day, 526, Defendant's 526 of December 18th,

3    Barbara, the staff member writes to Ted's e-mail, the day

4    before referring to it,  and says:  Senator, I'll watch for

5    the bills and show you everything before payment is made.

6            That's what you call evidence of intent.  Right

7    there at the time, you can see the intent of Ted Stevens.  You

8    can see how it bounces off Persons.  You can see how it

9    relates to the staff member, Barbara, and his wife is

10   included; four people.  But the government presents a witness

11   to you that says:  Don't pay attention to the key document in

12   the case that shows this man's intent.  He was just trying to

13   cover his ass.  He made up the statement, and Persons came to

14   court here and told you that he didn't say it.

15           But I'm not -- the defense doesn't have prove

16   anything, but I'm going to prove to you that it is a lie.  I'm

17   going to take that burden even though I don't have to prove a

18   thing.  They have to prove the case beyond a reasonable doubt.

19           First off, I want you to remember how the testimony

20   was delivered.  It was delivered because you just couldn't

21   leave such a document, 495, standing there, unanswered.  So

22   here's what's happened.  The testimony from Mr.  Allen went

23   like this:  He was directed to look at the Exhibit No. 495 --

24   just put the regular straight exhibit up, Beth, if you would.

25   This was on the screen at the time he's asked the question,

1  and then he's asked; question:  Mr.  Allen, up at the top

2  there, do you see the date?  Answer: Yes.  It's 10/6/'02.  And

3  then they go to read the document.  He's asked to read the

4  document.

5       And then the question is:  Question:  You said you

6  didn't send Senator Stephens a bill; is that correct?  Answer:

7  That's right.  And then this question and answer; here it is.

8  Here is the delivery to you, ladies and gentlemen.  Of a

9  bombshell in a courtroom.  Because cover-your-ass statement

10  would be regarded by anybody as a bombshell.  It came right

11  before the break.  So when you got up and walked out for your

12  break, it was ringing in your ears.  Here's how it was

13  delivered:  Question:  Mr.  Allen, do you remember having a

14  conversation with Mr.  Persons after you got the note from

15  Senator Stevens?  Answer: Yes.  Question:  What did Mr.

16  Persons tell you?  Answer:  He said, oh, Bill, don't worry

17  about getting a bill, he said.  Ted is just covering his ass.

18  Bang!  Out of nowhere.

19       Now, how do we know it's a lie?  Want more?  I'll

20  show you more why it's a lie.  Because Bill Allen had been

21  asked on other occasions why he didn't send bills to Ted

22  Stevens, and he offered three reasons, and among the three,

23  there was never cover your ass.  So we know that testimony is

24  recently created.  Here is what he said when asked about why

25  he didn't send bills on earlier occasions.  Question:  Did you

1    indicate that part of the reason you didn't send a bill was

2    that you felt VECO costs were higher than they needed to be?

3    Answer:  I probably told them that, yeah.

4              Question:  And isn't it a fact that you also told

5    them that the other rationale for not sending a bill was

6    simply that you wanted to do work for the Senator?  Answer:

7    Yeah. I wished that I could have just done it and didn't have

8    to because he -- because I really did like him.  Question:

9    And isn't it also true that the third reason was that you

10   weren't sure how to go about it and produce a fair bill?

11   Answer:  Right.  Now, it would be a hell of a time to get that

12   done.  So, on a previous occasion, he's asked about why you

13   don't send a bill, he offers up three reasons; but when he

14   comes to talk to you to convict the Senator, he says, I didn't

15   send the bill after I got this letter on the screen because

16   Persons told me that's just Ted covering his ass.

17             There's more.  Believe it or not, he forgot the lie.

18   Shortly after in his testimony, he's asked about the next

19   exhibit shown to him, Exhibit 509; 509 is on the screen.

20   Please, Beth.   That's the one with the little parentheses.

21   Quote:  Don't forget, we need a bill for what's been done out

22   at the chalet.  So look what happens in this insidious

23   delivery to you; testimony that's false.

24             Questions to him on the stand with this 509 on the

25   screen.  Okay, Mr.  Allen, let me ask you if we can, have

1     Exhibit 509, Government's Exhibit 509, which is only marked

2     for identification at this point, displayed for you.  Answer:

3     All right.  Question:  Can you read that okay on the screen,

4     Mr. Allen? Answer:  Yes.  Question:  All right.  Do you

5     recognize what it is?  Just tell me whether you recognize it.

6     Answer:  Yes.  Question:  What is it, then?  Answer:  That's a

7     note from Ted to me.  Question:  Is there a date on the top of

8     that note?  Answer --

9              MS. MORRIS:  Judge, may we approach?

10             THE COURT:  All right.

11             (Whereupon, there was a bench conference at this

12     time.)

13             MS. MORRIS:  Judge, I believe that before we started

14     that counsel said he wasn't going to read from transcripts and

15     that he would refer to transcripts.  This is a third reference

16     in that he started reading from a transcript, and I believe

17     the other transcript wasn't even from this trial.

18             MR. B. SULLIVAN:  I did not say I wouldn't read from

19     a transcript.  I said I wouldn't cite a page.  I have to read

20     these questions and answers.

21             THE COURT:  He can do it.  And I'll just let them

22     know it's their recollection of the evidence that controls.

23     He can do it.

24             (Whereupon, the bench conference concluded at this

25     time.)

1          MR. B. SULLIVAN:  You can't here.  Thank you for

2     saying so.  Would you like one of the devices? (Speaking to a

3     juror.)  My voice is too low?  Okay.  I will speak up.  I have

4     this on.  I'll move this up.  Thank you very much for telling

5     me.

6          THE COURT:  All right.  Ladies and gentlemen, it's

7     your recollection of the evidence and the testimony that

8     controls in this case, and your recollection only.

9          MR. B. SULLIVAN:  So Mr.  Allen's on the stand, and

10    this 509 is on the screen.  Question:  All right.  Do you

11    recognize what it is?

12          THE COURT: Excuse me a second.  Maybe the battery --

13    I think the battery has to be replaced.

14          MR. B. SULLIVAN:  We need a new battery?

15          THE COURT:  Yes.  You're trailing off a little bit.

16          (Whereupon, the battery was replaced in the

17    microphone.)

18          MR. B. SULLIVAN:  So the question is asked to Mr.

19    Allen.  All right.  Do you recognize what this is?  Just tell

20    me whether you recognize it or not.  Answer:  Yes.  Okay.  And

21    what is it?  And what is that?  Answer:  That's a note from

22    Ted to me.  Question:  All right.  Is there a date on the top

23    of that note?  Answer:  Yeah; 11/8'02.  There it is.

24          He continues.  Question:  Mr.  Allen, this one says:

25    Dear Bill, many thanks for all you've done to make our lives

1    easier and our home more enjoyable.  The Christmas lights top

2    it all.  Something -- foot tree lighted to the highest point.

3    Did you understand what that was a reference to?  Answer:

4    Yes.  And then they go on talking about the Christmas lights.

5    It continues.

6            Okay.  And then the parentheses.  It says:  Don't

7    forget we need a bill for what's been done at the chalet.

8    Question:  Did you send Senator Stevens a bill after you

9    received this note?  Answer:  No.  Question:  Why not?

10   Answer:  I don't know why.  He'd forgotten that before the

11   break he said  the reason he didn't send a bill to the earlier

12   note was because of the cover-your-ass statement.  Now, watch

13   how he remembers it.

14           The question was:  Why not?  Answer:  I don't know

15   why.  Question:  All right.  Do you remember when you had had

16   this conversation with Mr.  Persons that we had talked about

17   just before the break?  Answer:  Yes.  Question:  When you

18   had that conversation with Mr.  Persons?  Answer:  I don't

19   remember -- oh, you mean -- okay.  The other note, when was

20   that?  Right there, it comes very fast though when you're a

21   juror.  It comes very fast.  He remembers right on the spot

22   with the words:  I don't remember.  Oh, you mean -- okay.  The

23   other note, when was that?

24           Then the question is:  Let's put it back on the

25   screen, and they go back to 495.  Can you see the date at the

top?  Answer:  Yes.  Question:  All right.  Do you recall

whether you had that conversation with Mr.  Persons after you

received this note that we see?

Exhibit 495.  Answer:  Yes.  I would have seen it

right after.  Question:  Okay.  Let's go back to 509.  The

second note, you see at up at the top, the date?  Answer:

That was November, isn't it?  Question:  Why didn't you --

here comes the question, again, now.  He's got in mind what

he's got to say.  Question:  Why didn't you send Senator

Stevens a bill, after you got this note in November, 2002?

Answer:  Because I had talked to Bob Persons before this, but

I thought, well, it's the same thing, you know.

What was delivered right here in order to make you

think that the evidence written by the Senator, in his own

hand in October of 2002 and November, 2002, somehow wasn't

real; didn't mean what it said.  The overwhelming evidence is

that it meant what it said.  Mr.  Persons comes to court.

He's asked this question.  Did you say to Bill Allen:  Bill,

don't worry about getting a bill?  Ted is just covering his

ass.  Did you say that to Bill Allen?  Answer:  No.  Crazy.

And then Mr.  Persons was asked whether anyone had ever asked

him whether he had made such a statement.  When an explosive

testimony is presented in a courtroom and it's attributed to

another person, you would think someone would go ask that

other person whether they made the statement, and here's Mr.

1    Persons' response.  Question:  How many days did you testify

2    before the grand jury?  Answer:  Two days.  Question:  Did the

3    government there -- were government attorneys there?  Answer:

4    There were.  Question:  Were there any defense attorneys

5    there?  Answer:  No.

6         Question:  Were you asked about the comment that you

7    allegedly made to Bill Allen about Ted just covering his ass

8    during any of those 2 days?  Answer:  No.  Question:  Were you

9    asked that?  Answer:  No.  How many times you've been

10   interviewed by the FBI?  Answer:  Three.  On any of those

11   three occasions, were you asked about the comment that you

12   supposedly made to Bill Allen, quote, Ted is just covering his

13   ass?  End of quote.  Answer:  Absolutely not.  Nobody ever

14   asked me that question.

15        He was further asked; question:  During your May,

16   2008 meeting with the government, did the government ask you

17   whether Bill Allen ever said to you don't worry about the

18   bills.  Ted is just covering his, quote, unquote, ass.

19   Answer:  Say that again.  Question:  In May of 2008, we're in

20   2008.  It's not that long ago.  In May 2008, sir, were you

21   asked by the government whether Bill Allen -- whether you ever

22   said to Bill Allen, quote, don't worry about the bills.  Ted

23   is just covering his ass.  Answer.  No.

24        I asked Bill Allen, well, when is the first time you

25   came up with that?  He couldn't remember.  Question:  When did

1   you first tell somebody?  Answer:  Huh?  Question:  When did

2   you first tell a government agent?  Answer:  Hell, I don't

3   know.  I don't know what day it was.  Ted Stevens denied that

4   he ever said anything to Persons about ignoring that October

5   6th letter to Bill Allen.  Bill Allen actually did come up

6   with two other conversations; one at Wickenburg, in which he

7   suggested bills were discussed, and also made up a

8   conversation outside the Musky.  Ted Stevens denies any of

9   those conversations took place.

10          Now, I'd like to show you why Bill Allen is so

11   receptive -- do we have the plea agreement, please?

12   Defendant's Exhibit 3372, ladies and gentlemen, is the actual

13   plea agreement that Bill Allen signed, and you'll see in the

14   plea agreement at Page 15 why he -- what his obligations are

15   to the government, and I'd like you to just -- look at this

16   for a moment, if you could.  It's a very short section that

17   we're pulling out of those pages, which you can see it in

18   there is that -- although, he was not made any specific

19   promises in exchange for his cooperation Bill Allen was

20   advised by the government, that if, at the completion of his

21   cooperation -- it's not complete yet -- at the completion of

22   his cooperation, the government determines that Allen has

23   fully cooperated with the government's investigation and --

24   and -- that Allen's full cooperation has provided substantial

25   assistance to the on-going investigation, the government will

1    not charge Allen's son, Mark Allen, or other family members of

2    Allen with any criminal offenses arising out of the

3    government's investigation or that have been disclosed to the

4    government and will view Allen's cooperation as also being

5    cooperation on the part of VECO.

6           So you can see the stakes that he has, and the

7    testimony was that not only is he cooperating in the hopes of

8    preventing his son and family from being charged, but that

9    he's cooperating so that, hopefully, the government will not

10   indict his company.   There are no promises to that effect,

11   but that is his hope.

12          And, you know, the other thing that was interesting?

13   He asked -- he was asked on his examination the following

14   question:  Was the term of the plea agreement related to your

15   family something that you asked for, Mr.  Allen?  The answer

16   was:  No.  You guys asked for that.

17          In addition, look at the business agreement that is

18   in evidence, and if you'd put that up in that little -- so we

19   can see it a little better.  The VECO stock purchase agreement

20   was put into evidence for a couple of reasons, and I'll point

21   out just a couple of those important points.  You remember

22   there was testimony that in that agreement, whereby, he sold

23   his company, he promised to cooperate with the government.  So

24   in addition to his own plea agreement, he has got a contract

25   with a purchaser of his company to cooperate with the

1    government.  There is even a provision --

2              THE COURT:  Excuse me.  One second.  Someone has a

3    telephone on.  Please, we're having problems up here with the

4    equipment, so please turn your phones off.

5              MR. B. SULLIVAN:  Here is one section, 2.5.  It's a

6    big document, and I just wanted to point it out to you.  This

7    references the $70 million dollars.  You see that in there?

8    That was held back for a lot of different reasons, but if the

9    company were indicted, some of that millions -- some millions

10   would be sucked out of that $70-million pot.

11             Interestingly enough, of course the company hasn't

12   been indicted yet; don't know whether it would be.  No

13   indication one way or other.  In September, while you were

14   coming to serve as the jurors and filling out questionnaires,

15   he collected 12 million out of the pot.  So the pot is now

16   sitting there.  It's got -- they used -- it was really 30, but

17   he got 12.  Some of the balance was used for something else,

18   but there's still 40 million in the pot.  And if his company

19   is not indicted, and other events don't happen, he has a shot

20   of getting the 40 million in the year -- on the anniversary

21   year, third anniversary year, in 2010.

22             Let's look for a moment, if we could, at Section

23   10.11, Beth, please.  This is the section that says:  Bill

24   Allen shall honor his obligations under his plea agreement

25   entered into by the United States Department of Justice,

including the addendum regarding cooperation and good faith to the extent of his abilities.

The point of the instruction that you'll hear from the Judge about being weary and being warned about cooperating witnesses is because they have a benefit, and the law recognizes that jurors should be warned when witnesses have a benefit. For example, I couldn't go pay a witness a thousand dollars to give good testimony, could I? But the government -- lawfully can give certain benefits to a witness. And then the question is, in your mind, that you have to decide is the witness telling the truth or are the benefits and the inducements so high that he wants to help too much? And in this case makes up a statement that's just a cover-your-ass letter.

I'd like to address so-called gifts that were talked about by the government. They have spent a great deal of time this morning on the generator. The generator is not charged in this case. It's not part of an allegation that there's a crime related to the generator, but the generator is a very simple and straight story. In a an e-mail, Ted comments that he has asked Bill Allen to hook up a generator for Y2-K. Now, most literal readings of "hook-up a generator for Y2-K" would mean just that. It doesn't mean hook it up for the year, the month, two years, three years, or five years. As we all may remember, Y2-K presented a problem and -- that scientists and

geniuses who write computers started to tell us that when the

year switched at that very last moment between '99 and 2000,

maybe all the computers wouldn't come up right.  Maybe there

would be no power.  The world would stop, and the -- there'd

be no traffic lights and so forth.

And you heard testimony that Ted was involved in

Y2-K issues in his official responsibilities.  So being

sensitive to the fact, he ask his friend if he could get him a

generator for the weekend, for Y2-K.  That house, ladies and

gentlemen, had been there for 17 years and never needed a

generator.  And so, Ted Stevens, when he see the generator,

he's amazed that Allen has gone out and hooked up a machine

that could work at some commercial operation, and he told him

he didn't want and to take it out.  Remember this is 2000.

He's there only two days in the year.  So he goes home after

the weekend -- '99 switches to 2000 -- he assumes his friend

would do the -- what he asked and take it out, but he didn't.

He comes back at the end of the year, and he

complains to Bill Allen that it's still there.  He still

hadn't taken it out, and Allen convinces him to leave it there

for the new project and to include it in the cost of the new

project.

And that's what happened.  Ted believed that he paid for it,

that it was included in cost, in the $160,000; that's what he

believed at the time.  He didn't ask for that kind of a

1    generator.  He had no use for that kind of a generator, and

2    it's not charged as a crime; any more than he had any use for

3    the steel stairs.

4          You remember the testimony on the steel stairs.

5    There was -- apparently, Bill Allen had the sense -- he's got

6    a little sense, I guess -- he asked Catherine if he she wanted

7    the deck out in front of the living space to be steel, and she

8    said, no, and so the deck was not made of steel.  End of

9    issue.  The next time the Stevens see the house, it's got the

10   steel stairs.

11         Now, you've been told to use your common sense.

12   Who'd want a house with steel stairs that looked like an oil

13   platform in the Gulf of Mexico?  And, by the way, talk about

14   common sense; suppose you were buying one.  And you came up to

15   look at that house and you had children; do you think that

16   that would be a value --  a positive thing or would you move

17   onto the next house that's for sale?  Because most sane people

18   don't want steel staircases.

19         The grill -- the testimony on the grill is pretty --

20   the same -- much the same from everybody.  Even Bill Allen

21   says that the minute Ted saw the grill, he didn't want it.

22   Here's his testimony:  Okay.  Do you recall anything about a

23   gas grill being purchased for the Stevens home?  Answer:  Yes.

24   Question:  Tell us about that.  First words out of his mouth

25   on his answer; answer:  Ted didn't ask that.  And then he

testified that Ted said, it's not mine, it's yours.  You're
going to use it, not me.  Remember, Bill Allen used this
place.  He used it for himself.  You heard testimony about him
being there overnight.  When Ted's daughter came by, she had
to sleep on the sofa and the five bedrooms in the house were
filled.  It's not unusual or part of a conspiracy to say, I
don't want it. I don't use it.  If it's here, it's yours.  You
could use it for fundraisers, if you want.

And then what did the Stevens do?  Mrs. Stevens was
so upset about it, she demanded that a lock put on it so it
couldn't be turned on.  This is a place where they spend 20
nights a year, at most.  And some guy wants to leave a grill.
He told him he didn't want it.  You know, when you're not
looking at something eight years out, it might even be polite
to someone, to say, I don't want it, I can't use it.  You can
leave it.  You know, think about it, you're not living with it
everyday.  He leaves it, and it is used for fundraisers.
You've heard that testimony; for the symphony and for other
fundraisers and where they have large groups.  The family
doesn't need that kind of a grill.

The government talks about the chair.  You know, once
again, there are three e-mails that show you the intent of the
persons at the time with respect to the chair. Let's look at
them; Government Exhibit 451.  This is an e-mail Bob Persons
sends, and he says, when speaking with the Brookstone

1    representative, he advised me that he needed a local

2    contact in case he had trouble delivering my chair.

3         Why does he say "my chair"?  You know, we want to

4      change

5    this.  We want to make this a conspiracy.  You'd have to have

6    three people conspiring to get the chair and call it a gift in

7    2001.  That's not the way life works.  Read it literally.  He

8    calls it "my chair" at the time.  That's what Bob Persons

9         says.

10            Now, let's look at Government Exhibit 461.  You

11   weren't told about this in closing.  This is the view of

12   someone else that has no stake one way or the other, this is

13   Barbara Flanders, the staff person.  Look at this.  She writes

14   to the Senator:  Mr.  Persons said he talked to you about

15   having the chair delivered to your home and keeping it there

16   for a little while.  Why in the world would someone say

17   "keeping it there for a little while" if that wasn't their

18   intent in 2001 when they wrote it.

19            You're being asked to believe that in 2001 there's

20   some conspiracy going on to characterize an e-mail that

21   Barbara Flanders writes to Ted Stevens where she says "keeping

22   it there for a little while".  These things happen in life.

23   Maybe Ted is too polite.  Maybe he should have boarded the

24   house up and sent the chair back.

25            That's not what this case is about, though.  The

1    government is saying that he willfully, knowingly committed a

2    crime.  About that chair -- they want to brand him a felon

3    because he didn't disclose the chair that Bob Persons said is

4    my chair, that the staff person says Persons said he's keeping

5    it there a little while.

6          Lastly, let's look at government Exhibit 462.  This

7    is one the government showed you.  Now, they want to make the

8    words into a conspiracy, but how about just for a second

9    pretending he meant them.  What did he say:  Bob, the chair

10   arrived.  I tried it out last night.  It's great.  I can't

11   tell you how much I enjoyed it.  Catherine and Beth tried to

12   get me out of it.  I just went to sleep in it.  Thank you and

13   thanks to Bill.  It will be a God send this year.  Why this

14   year? Why would anyone say "this year" in an e-mail if he

15   wasn't under the belief that it was there temporarily.

16         Look at the next one.  It is just a loan, but I

17   really appreciate it being here now.  Why in 2001 would one

18   say that?  You heard testimony from Catherine Stevens that

19   they anticipated a shipment of furniture from their home in

20   Washington to Alaska.  They even had someone come in and make

21   an estimate, what it would cost to ship furniture to Alaska.

22   It was contemplated it would be going to him.  But guess what,

23   they didn't do the shipment because Bill Allen, unbeknownst to

24   them, put furniture in the house out there; without

25   permission, took theirs out.  And so the shipment was never

1    made.

2              Now, tell me at what point in time if you have a

3    chair that the parties have agreed in good faith to loan and

4    you intend to send it back -- well, does it become a crime

5    after it has been there three months and you don't get it back

6    or does it become a crime after a year and three months?  When

7    does it morph into this acceptance of a gift?  You've heard

8    the testimony from Ted Stevens about that.  You've heard the

9    testimony that he's a truthful person.

10             Stain glass -- the government makes a great deal out

11   the stain glass.  Let me have Defendant's 3642, which is in

12   evidence.  This is the artist studio.  It's located outside

13   the Double Musky Restaurant right in the same parking lot.  If

14   it were dinner time, you'd see cars parked all over the place

15   in back there.

16             This is what we call struggling artists.  Maybe when

17   we're all dead, he'll be known as Rembrandt.  I don't know.

18   Maybe his art is wonderful, but the facts here are very

19   straightforward:  Ted Stevens had nothing to do with this

20   stained glass.  He doesn't give one darn about stained glass

21   or any other piece of art.  He said in an e-mail Bob Persons

22   tried to send him an e-mail, and Ted said -- if I can find it

23   -- you know, like a husband would, I don't want to hear about

24   stained glass.

25             It was Catherine's thing to do with her friend that

she had known for more than 30 years; the artist,
Kaiser(Phonetic), testified that she was the one that decided
about the design.  Ted was approached by the artist in the
parking lot and said to him, my wife takes care of that.
Jean Penney said, the housewarming gift for Cathy; something
that Cathy would enjoy.

          Jim Kaiser asked to speak to Cathy, and he did speak
to Cathy.  And in Exhibit 654, Ted writes to Bob Persons --
there's the exact quote -- I don't think I want to ask about
the stained glass.  Why doesn't he want to ask?  Well, here, I
guess eight years later, he doesn't want to ask because he
knows something's wrong with the stained glass or is it a
husband saying my wife is being my wife.  She was interested
in art.  She had worked for the National Endowment for the
Arts as you may remember from her testimony, and I think it
was Jean and Catherine who said they thought they were doing a
favor for the artist by hanging it in their home so the artist
could say I made a piece of art, it hangs in a senator's home.
How can we get from there to a criminal courtroom?  How?

          The furniture, the evidence on the furniture is
quite clear, as well.  The Stevens never asked for it.  It was
Allen's used furniture.  His testimony is interesting.  He
said -- he came in and testified he wanted to get rid of it.
He said, yeah, but, you know, you could have sold the damn
thing, wouldn't have got much, but I was trying to get -- take

1    it off from me to them so didn't have to take it to the junk.

2    And the most amazing part of it all is whatever goes on in

3    Bill Allen's head, he doesn't have the understanding, the

4    decency, the triggers, I don't know what you want to call it,

5    that he has to talk to the lady of the house before he takes

6    the furniture out of the house.  What kind of thinking is

7    that?

8          And you heard them say they wanted their furniture

9    back.  In fact, some of it was sentimental because it belonged

10   to Ted's first wife.  Even Allen confirms that he took it out

11   and put it in a warehouse.  He says it was in the warehouse as

12   long -- and then, of course, when we saw it, when we sold VECO

13   -- I think the Hill people, the purchasers, the people that

14   bought VECO -- I think they must have took it out or

15   something.

16         Years later, when they want to get rid of the

17   furniture, Ted writes an e-mail and suggests maybe his son

18   could use the furniture, and he even asks him -- hope it's

19   okay.  Hope it's okay.  What's that mean to us in real life?

20   It was Bill Allen's furniture.  It stayed there, and he's even

21   asking Bill Allen if he could get rid of it and pass it onto

22   someone else.

23         By the way, no evidence of value is there?   The

24   furniture taken out could have been as valuable as the

25   furniture he brought in.  And, again, how do we get from there

1    to here and make it part of the criminal charge?  Certainly is

2    no intent.  There's no proof beyond a reasonable doubt that he

3    intended to hide that, that he made an intentional decision

4    not report it on a form.  There's no proof of knowledge or

5    intention, and that's what it has to be to be a criminal case.

6            And then there are the tools.  Once again, uniform

7    testimony.  He didn't want them.  He didn't use them.  This is

8    Bill Allen.  It was left there and pushed into the corner of

9    the garage.  But since he didn't report it, the government

10   argues that he's a felon.  He had his own tools.  And by the

11   way, you want to know the real Ted Stevens?  Remember the

12   picture I showed you with the little wooden box in the picture

13   from his grandfather.  That was his toolbox.  He's a person

14   who can live 84 years and be perfectly happy with a wooden

15   toolbox that was built -- imagine how many years ago that a

16   wooden toolbox was built.

17           The fish sculpture -- there's the wooden toolbox

18   right there(Indicating)  That's Ted Stevens; fish; read; think

19   -- he's got his toolbox.

20           You know, if you don't ask for it and you reject it,

21   I'd suggest to you that commonsense thing is you didn't take

22   it as a gift, and if you don't report it on a form it's not a

23   crime because you didn't have the knowledge or the willfulness

24   or the intent to hide anything.

25           Now, let's look at the fish sculpture for a moment.

1        I think this shows the general weakness -- and I was hoping

2    that we wouldn't even show that fish because we're all sick of

3    the fish.  We all know what it looks like at this point, but

4    think about this, ladies and gentlemen, the testimony is

5    absolutely uniform that this fish sculpture was given for a

6    Ted Stevens library.  It's been -- the fact of the library

7    has been talked about for years.  They filed formal papers.

8            You saw the woman from Alaska came in here and

9    testified they would like to receive from Ted Stevens his

10   papers which he has meticulously saved over 40 years.  It's

11   just generally known.  You saw the testimony that Ted has

12   actually spoke that there will be a library with his papers

13   and memorabilia in the library.

14           From day one when he first laid eyes on this

15   sculpture -- if you'll see, for example, GX-239.  It says on

16   239, Page 2:  The following is the breakdown on the Kenai

17   Classic needs to bill to the consortium that bid on the bronze

18   for the Ted Stevens library fund.  It was always thought of as

19   part of the library.  How did it get to his porch?  He didn't

20   ask for it.  It went got from the Classic to his porch.  Some

21   do-gooder that wanted to deliver it where they thought it

22   would eventually get to some function, some library later.

23           Even Bill Allen testified on direct examination that

24   the sculpture was for Ted's library.  He said, I'm sure there

25   will be a library or some kind of building for Ted, and that

1   was going to go into the building.  He testified further in

2   his testimony that it would go into like a library or

3   something like that.  You see it sits in the box, and you saw

4   the box, the big box that sits on the side of the porch.

5   Martha Stewart came here and testified she works at the

6   University of Alaska in Anchorage.  She said:  They had two

7   ideas coupled to the possibility of the university having a

8   Ted Stevens library as a component of the university's

9   library.

10          Interestingly enough, the government even today said

11  that it was a $29,000-gift.  I guess it's not important to be

12  accurate when a man is on trial for his whole life and

13  reputation because the official board minutes show that --

14  look at 3620 -- show that the Classic only paid $14,000 and

15  made $14,000 for the charity itself.

16          You can't forget the dogs.  Ted and the dogs.  There

17  they are for their short visit in Washington before they were

18  shipped back to Alaska.  You've seen the two checks that Mr.

19  and Mrs.  -- that Catherine Stevens sent back to the person

20  who was to take the dogs; thousand dollars to help with the

21  food.

22          Now, they call the e-mails that you have here --

23  what did they call them; a paper trail.  A paper trail is the

24  common ordinary word that if you don't document something at

25  the time that you create the documents afterwards so that

there is a paper trail.  It's not a bad word.  It's not a

conspiratorial word, it's something human beings do when they

live, and that's what happened here.  The e-mail traffic

attempts to show what happened in the past.  And you heard

testimony from a man that came all the way from Alaska that

said what was in the e-mail that he created was accurate.

Wouldn't it be natural if you brought the sister or

the brother of the first dog and paid 250 for it to consider

the real value of the first dog, 250.  Just because Bob

Persons paid a thousand dollars for the dog and gave it back

to charity -- I think we know in commonsense that when people

go the to a charity fundraiser, they often bid high numbers

that bear no relationship to the value of the thing they're

buying.  The gentleman came in from Alaska to tell you -- he's

a musician, I guess.  I don't know of him.  He came in to tell

you that he once put up his hat which is worth 65 bucks, and

he got multiple hundreds for the hat.  People do that at

auctions.  They over bid to have fun and to give a gift.

So Bob Persons pays a thousand.  The documents

themselves from the Classic had an estimated value of 500; so

what?  Who made that value?  What do they know about the value

of dogs?  But to deal with this potential felony, we brought

people from Alaska.  You heard for example from Dean Osmar

that this particular dog was a runt, given away for free by

her breeder.  He said the dog really wasn't worth anything to

me.  He said probably could have got 50 or a hundred bucks for it.  He recalls that he sold the Senator the dog "Taz" for $200.  Maybe that's a crime.  You know, maybe he should have reported 200, not 250, as he did, on his forms.  He also testified that Taz was a more valuable dog than the first dog.

We also heard from a man named David Munson, who traveled the 3,000 miles to tell us the dog was so incredibly noisy -- never heard of this before -- they had to put ear protection on to even get to feed the dog because of its screaming howl.

Ron Rainey came here from Alaska from the sports fishing association and explained how it got to be a thousand dollars at the auction with Bob Persons who's making a charitable donation.  He also talked about the fact that the $500 listed on the form was just a guess.  He said this is a good faith estimate by our organization and doesn't reflect market value.  He further testified that nobody at the Classic had experience in determining fair market value.  It was an amateur guess.  And so we've had several witnesses traveling.  You spent days listening about the dog.  I'd suggest to you that when he reported the dog at a value of 250 on his form, that was an honest statement.

The lighting at the house does not need much explanation at this point.  Bill Allen thought it would be pretty neat.  He didn't ask for anyone's permission.  He put

1      up the lights only as Bill Allen could do.  He even admitted

2      in his testimony finally, once, in the whole trial to be

3      notable that he went too far.  His testimony was I don't think

4      a big project, but I think the tree was too much.  Thank you,

5      Bill Allen.

6              Ted asked him to put up his Christmas lights; just

7      the kind that you and I have at home, the little

8      twinklies(Phonetic) that all get wrapped in a knot, and you

9      hate to undue them.  Glad you did once you get them up.  And

10     what does Bill Allen do?  Buys all the rope lights in Alaska

11     and puts them up an 80 foot true.  Is this a gift that has to

12     be reported or what should he do, go and hire a crane, take

13     them down?

14             In fact they were taken down.  Remember the

15     testimony that the neighbors complaining about them.  Someone

16     came back and took some of them down, and, eventually, Ted did

17     take them down.  The government referenced today lights and

18     heat tape in the same very close proximity talking about, you

19     know, I suggest I guess that there was 40 or $50,000 worth

20     done if you combine the heat tape, roof fix, and the lights.

21     Could be.

22             Now, do you think Ted Stevens in the world that he

23     exists in thought that he had to report a fix on the roof.

24     He's testified that Catherine paid all the bills.  They

25     believed that Hess was paid among the $160,000.  It's clear

the roof was defective.  Everybody says the roof was

defective, and Bill Allen and his crew found a solution called

"heat tape".  By the looks of the e-mail traffic, even that

was defective.

So they make light of the fact that, oh, you get

something for free, and now there's warranty work.  That's

easy to do eight years away.  But what about when you lived

it, and you thought you bought something for your $160,000 and

that you wanted it done right, and you thought the roof

shouldn't be defective, and as I suggested before, what about

the next buyer that comes out -- talk about value; they want

you to think it's so valuable -- and they see the steel

stairs, and they look up the at the roof, and it has this

black wire running all over it. That wire says "roof problem".

Why should anybody buy that house?  I wonder what that house

will be worth when some sensible buyer comes along and decides

whether to buy steel stairs and a roof.

Everybody admits -- Mr.  Dale testified; he said it

was poor planning; Bill Allen testified, said it was design

flaw.  It was a mess up.  Even Hess, the architect, testified

the roof design was a concern.  By the way, to show how far

removed they are from that -- no one ever told them about the

problem of the roof design.  Ted didn't know about it until he

learned they were fixing it with heat tape.  Even Augie Paone

was concerned about that.  He wanted it redesigned, but it was

just too late.  The heat tape never worked.  Fugate was out
there in 2004 saying that it didn't work because it causes the
breaker to trip out.  Bill fixed the tape in 2005.  The
government makes light of this fixing, I guess, because
somehow you can't go back and understand what Catherine and
Ted Stevens lived through then.

I found the quote over the lunch break when I was
trying to remember this morning about Ted:  You know, remember
when he wrote the words:  Catherine was never happy with the
chalet.  To me, it was a place to get away, chop wood, read,
and think.

There was evidence in this case about the official
acts of Ted Stevens and whether he somehow because of his
relationship with Bill Allen, not with VECO, but with Bill
Allen, that somehow he did favors for the company or worked in
the company's interest.  The government tried to show among
other things that Louise Johnson, who worked with him for
years, was somehow doing something wrong when she decided to
help a Russian family of a VECO employee.

They tried to show that Senator Stevens' 30-year
quest to get a gas pipeline somehow related to VECO.  They
tried to show that the training program on the Sakhalin
Islands over in Russia somehow related and tied in to Ted
Stevens or provide a reason why he wouldn't want to report
something if he thought something was a gift or a benefit.

```
 1            The reality of the evidence which we had to go out,

 2    find people, bring some from Alaska, bring some here.  The

 3    fact of the matter is Louise Johnson testified she was never

 4    told by Ted Stevens to treat requests from Bill Allen special.

 5    No, never, she said.  She worked on over 500 constituent

 6    requests per year, responded to every single one of them.

 7    Orie Williams who was a CEO of one the native corporations

 8    that Ted Stevens created through his work over the years so

 9    that people in remote parts of Alaska could have a viable way

10    to make a living and benefit from the resources in the state.

11            Orie testified he is always given access whether it

12    was a small corporation or a small non-profit or a large

13    company, his access has always been unlimited.  Ted has never

14    refused access whether he agreed with me or not.  Helvi

15    Sandvik, President of NANA Development Corporation testified

16    he's there to represent the interest of Alaskans, and he's

17    listened to the Alaskan native community,  as well as other

18    groups, and as a result, he has advocated on their behalf.

19    The labor leader, Mano Frey, testified that labor leaders had

20    access to Stevens to work on issues that were against the

21    interest of VECO, which was a non-union shop, basically.

22            Jim Sampson testified as well that Senator Stevens

23    worked on issues opposed to those of VECO or Bill Allen.  With

24    respect to the gas line, it's clear from the evidence that Ted

25    has been fighting for the gas pipeline for 30 years before he
```

1    even knew Bill Allen.  People who testified here said the gas

2    pipeline is good for all of Alaska.  Every witness either

3    called by the government or defense testified that it is --

4    that it is good for Alaska.

5            In the federal legislation related to the pipeline,

6    Senator Stevens required that certain benefits be made

7    available so that union workers could build the pipeline; that

8    was against the interest.  And the Sakhalin Islands -- Ted

9    actually visited Sakhalin Islands because he thought it would

10   be good to have training programs so that Alaskan companies

11   could sell products to that part of the world.

12           Russ(Phonetic) Howell testified.  He's the director

13   of the American Russian Center.  He ran the program.  He said

14   that Senator Ted Stevens repeatedly emphasized the program

15   should be open to all companies.  Russ Howell testified that

16   VECO never participated in this program, but one of the native

17   corporations did.

18           You heard the testimony about the National Science

19   Foundation.  They tried to make some deal about that because

20   the Senator wrote a letter on behalf of VECO.  It turns out

21   VECO was a good company and performed well, and the National

22   Science Foundation selected them.  You saw the exchange of

23   letters between the Senator and the director of National

24   Science Foundation.

25           You heard about Pakistan because Pakistan government

wasn't paying certain dividends to VECO.  Ted Stevens gets
involved because VECO is a company with 4,000 employees, and
he works lots of his time doing what's best for companies and
the people of Alaska, and, indeed, Pakistan was persuaded by
the efforts that were made, and it was a successful effort,
and the president of the World Bank joined.

         You've learned a lot about Ted Stevens, Ted Stevens,
the man.  There was a great book written by Tom Brokaw called
*The Greatest Generation*.  It's really about people his age,
not about him.  It's about people his age that lived here in
this country during the difficult times of the Depression, a
war, a post war, build lives for themselves.  He's the kind of
guy they write books about for what he's done.

         He struggled as a youngster; worked at age six
selling newspapers; went to high school; failed the eye test
so he could have gone about his life and not been shot at, but
he went and took eye exercises so he could get back in, fly
airplanes on dangerous missions; that's Ted Stevens and was
awarded numerous medals for his service in the war.

         He gets out after the war, and he embarks upon a
life of public service.  That's what he's done his whole life.
Didn't go into business to get rich; didn't go to Wall Street;
didn't go back to Alaska to cash in on oil money.  He decided
to serve, and that's what he's done for 40 years.  You heard
about a him as a Senator.  He talked about the three hats he

1    wears.  One is for Alaskans, the people themselves, responding

2    to constituent responsibilities.  You saw a lovely woman who

3    for her career handled those kind of constituent issues;

4    700,000 people as I mentioned in opening about what we are in

5    the District.  Ted Stevens has been there 40 years serving

6    them.

7    His second hat is he runs three Senate committees

8    and on many subcommittees because of his seniority in the

9    Senate.  He's the only Senator that has the status of being

10   able to hold three such positions.  His third hat is an

11   international hat where he focuses on the world issues.  He's

12   been there at every crisis, every trauma, as a public servant.

13   You've heard his focus in the Senate.  He just

14   doesn't focus on constituent problems, but he focuses on

15   things like the Alaskan oil pipeline or the gas pipeline,

16   which benefits not only Alaskans, but the nation.   On the

17   lore of the sea, extends the miles out into the sea so fish

18   are not depleted.  He fights for Alaska, and he works hard to

19   serve his country, as well.  This is the person that in

20   opening statement the government says flies under the radar,

21   that is involved in an 8-year conspiracy.   What are we

22   talking about?

23   You see how he works with people, he trusts people.

24   When -- not only is he truthful and says he believed he paid

25   for things that he received, but he trusts people to do their

1    work as Louise said -- as Louise Johnson said; as Gwen Sykes

2    said, the young lady that worked for him for many years and is

3    now in a responsible position up at Yale.  She said to you he

4    was so extremely busy that he had to rely on his staff to

5    insure that we provided him true support and did our jobs well

6    to make sure that we could support him through his time frame.

7    He was doing a lot of work.  You heard he was a work

8    alcoholic.  He's known as the work horse of the Senate.  He

9    has the right to do that.  He has the right to decide with his

10   wife who manages that renovation project out there.  He trusts

11   his staff.

12       It's true all the bills didn't come through because

13   Bill Allen hid them, killed the sixth bill of Augie and hid

14   the work of some of the people he sent out there.  That's not

15   Ted Stevens' crime.  They have to prove beyond a reasonable

16   doubt that he did so knowingly, intentionally, that he

17   intended to commit a crime.  Gwen said I was always amazed

18   some of the things he would allow me to do or entrust me to

19   do.  The trust he place in me honestly helped me to become the

20   person I am today.

21       You heard character testimony, character testimony

22   from five witnesses.  The law will instruct you that character

23   testimony is important.  We didn't just parade in these people

24   for a show so that you get to see Senator Inouye or Colin

25   Powell.  They came here because the law will tell you, the

1    judge will tell you, that character testimony is significant.

2    I'll tell you how significant it is.  As jurors, you can rely

3    on that character testimony to create a reasonable doubt

4    alone.  Take the character testimony, cup it in your hands,

5    weigh it against all this other stuff you've seen in this

6    case.  That alone permits you to say I have a reasonable

7    doubt.  I will not convict.   Alone.  To the five of them.

8         That's what the law says.  You know why; because the

9    law thinks that a good life is worth something, and it permits

10   that kind of evidence so you can rely upon it when you have to

11   go in that room and make a decision that affects his life.

12        The instruction, among other parts, will be the

13   circumstances may be such that evidence of good character may

14   alone create reasonable doubt as to the defendant's guilt.

15   And what was that character testimony?  Daniel Inouye -- I can

16   sure you his word is good as far as I'm concerned.  Can't

17   imagine Ted Stevens ever telling a lie to me or anyone.  I

18   have never known him to lie.  I trust him with my life.  Would

19   you trust his words on matters of national security?

20   Absolutely.

21        And his reputation for truthfulness and integrity is

22   what, sir?  Absolute.  Okay.  You want to believe him or do

23   you want to believe Bill Allen?  Could you sleep after

24   believing Bill Allen?  Could you wake up the next day and say,

25   oh, my goodness.  Do you accept the word of that man when he

1    tries to wipe from the board the letter of October 6th, 2002?

2              Colin Powell came in here, knows Ted extremely well;

3    known him for 25 years.  And he testified, Ted Stevens is the

4    kind of person that, as we say in the infantry, this is a guy

5    you want to take on a long patrol.  Everybody knows that,

6    where your life is on the line, you want a man with you, or a

7    woman with you, that you can depend upon.  What is his

8    reputation for truthfulness and integrity?  In a word,

9    "sterling".  He was a trusted individual.  He was someone

10   whose word you could rely upon.  I never heard in all of those

11   years a single dissenting voice with respect to his integrity,

12   with respect to his forthrightness.

13             Orrin Hatch, a Senator for 32 years.  Ted Stevens

14   has been, in my opinion, one of the strongest, toughest, most

15   decent, honorable people I've known.  And he comes here in his

16   84th year and is called a criminal?  I've been in the Senate

17   32 years; I'd rate him at the top.  He's one of the true lions

18   of the Senate, along with my friend Ted Kennedy.  Everybody

19   knows that there.  If he gives you his word, he will keep it.

20   He's totally honest, totally straightforward.

21             Gwen Sykes, the young lady from Yale: Definitely a

22   trusting character and a trusting sole.

23             Character evidence is not rebutted here.  They could

24   have brought in someone who said, no, he's not truthful,  he's

25   a liar, but they didn't do it.  You don't have to think twice

1    about the value of that testimony, but don't think for a

2    minute that it's not important testimony because the law tells

3    you it is important when it says to you that on that alone you

4    can conclude that the government has not proven its case

5    beyond a reasonable doubt.

6         Why?  Because honest, truthful men like that don't

7    engage in six-year conspiracies; don't conceal; don't

8    intentionally decide to file false statements; don't act

9    criminally.

10        I want to tell you something else that is so

11   important.  Do you know that we're so frightened in this

12   country of convicting a man wrongfully that we have the most

13   amazing rule that you don't find anywhere in life, the rule of

14   unanimity.  A person cannot be convicted in this country if

15   one juror says no.  Why is that?  Because we're scared to

16   death about making mistakes.

17        Think about it.  We grow up in a democracy.  If

18   there are three kids in the family and two want to get ice

19   cream and one wants to go to the movie, you don't get ice

20   cream.  It's a democracy.  We learn it young; when in school.

21   In business, boards of directors vote all the time eight to

22   five.  Courts upstairs vote two to one all the time.  The

23   Supreme Court votes on life or death in this country, five to

24   four; five to four.

25        There is no democracy in that room because we're so

scared -- those of us who devote our lives to this are so
scared of a wrongful conviction that it takes every one juror,
and if your conscience cannot say guilty, if your conscience
says the government hasn't proved its case beyond a reasonable
doubt on each element, each one, each count, then it's your
duty to say no.

        Without sufficient evidence, the government comes
here late in the night of a good man's life, and they try to
brand him a criminal.  The evidence won't permit it.  The law
won't permit it.  And your gut won't permit it.  Because you
have here a man that lived 84 years honorably, truthfully,
abiding by the law and serving people.  By this conviction,
they ask you to brand him a criminal, to tarnish everything he
has done for 84 years, despite the fact that the evidence is
unrefuted that he is an honorable, truthful man.

        He says -- they say to you that he engaged in a
scheme to conceal, to falsely report.  He would not do so, as
shown by evidence.  All of us go through life, no matter what
our jobs are, without any real power, except now.   You have
the power.  You have the power to do what's right.  You have
the power to say "not guilty" seven times.  You have the power
to weigh the evidence.  You have the power to discard the
theory that this is some grand conspiracy.  You cannot believe
what you read in the four corners of a document; that's what
this case is based upon.

1              Based on the evidence, based on the government's

2      failure to prove their case beyond a reasonable doubt, I ask

3      you to return seven "not guilty" verdicts for this very decent

4      man.

5              THE COURT: All right.  Ladies and gentlemen, on

6      behalf of everyone, thank you for your patience and your

7      attention.  We're going to take a 15-minute recess, and then

8      we'll hear the final argument for the day.  I told you the

9      government has a chance to speak to you twice, and then we'll

10     hear the final argument, and we'll break for the evening, and

11     we'll see you tomorrow.

12             (Whereupon, the jurors exited courtroom at this

13     time.)

14             THE COURT: All right, counsel.  At 3:28, we'll

15     start.

16             (Whereupon, there was a brief recess at this time.)

17             THE COURT:  Please turn your phones off in the

18     courtroom.  That means BlackBerries, as well.  It really

19     interferes with our ability to prepare an appropriate

20     transcript.  If you don't want the Marshal to take your phone,

21     please turn it off.  Thank you.

22             (Whereupon, the jury entered the courtroom at this

23     time.)

24             THE COURT: All right.  You can proceed.

25             MS. MORRIS:  Thank you.  May it please the Court,

counsel, ladies and gentlemen of the jury.  What!  Were we at the same trial?  Because the evidence that I saw was totally different than that imaginative display we just sat through. Because the trial I sat through told me that no one is above the law:  Not a teacher; not a social worker; not a lawyer; and, certainly, most certainly, not a sitting United States Senator from the State of Alaska who thinks he is entitled to break the law whenever he thinks it's to his benefit.

The defendant, the man, Ted Stevens, knowingly and repeatedly violated the law because he believed he was above the law.  The law simply didn't apply to him.  Now, finally, the evidence has been presented, and the case will now be turned over to you, the jury.  You are the triers of the facts, and you must pass judgment on what you interpret those facts to be.

Now, you know by now, ladies and gentlemen, this is not a complicated case.  It's not.  It's just that it had a lot of moving parts to it.  The important facts are simple and straightforward.  The defendant accepted multiple gifts which were easily valued over $260 to $305.  That's all we're talking about.

The government's evidence proved that the defendant received extravagant gifts year after year after year and that he repeatedly failed to disclose those gifts as he knew he was knew was required to do by law.  If it happened once, ladies

1    and gentlemen, maybe it's a mistake, maybe it's an oversight,

2    but this happened repeatedly.  This was a scheme as Count 1 of

3    the indictment sets out to you, ladies and gentlemen.  This

4    was a pattern of willful deception on the part of the

5    defendant.  He perpetrated these crimes over a span of years.

6            I submit to you, ladies and gentlemen, that when

7    you're telling the truth, you only have to remember one story.

8    When someone's not telling you the truth, then they have to

9    remember all the stories.  That's when things get complicated.

10   That's when things get confused, and even someone who's very,

11   very careful like the defendant, who's a very deliberate

12   person in his public life, slips up and makes mistakes, and

13   that's what this defendant did.

14           There were a set of facts that the defendant and his

15   wife put out there early on, ladies and gentlemen.  They were

16   stuck with that story, although, the story didn't quite hang

17   straight.  The story was that Catherine Stevens was in charge

18   of the renovations at Girdwood.  She dealt with the

19   contractor.  She wrote the checks to the contractor.  The

20   defendant had little involvement.  That's how it started.

21           Although, that -- the story the defendant will have

22   you believe now in 2008, the emails and the tape-recorded

23   conversations tell a much different story of what happened in

24   2000 through 2006.  They tell you what the defendant knew and

25   when he knew it, and his version of the facts totally

1    contradict what he'd have you believe in this courtroom here

2    today.

3              I told you during opening statements, ladies and

4    gentlemen, don't leave your common sense at the door.  If

5    someone told you this exact same story sitting across your

6    kitchen table, you'd go, "What?" "Uh-uh."  And it doesn't

7    change just because you've been coming in here everyday and

8    leaving out everyday and having lunch and coming back everyday

9    to hear the facts in this kind of artificial setting; but if

10   you heard this same story outside the courtroom,  there

11   wouldn't be a question.

12             In this case, ladies and gentlemen, defendant's own

13   witnesses contradict each other.  Augie Paone says VECO ran

14   the show.  Bob Persons said that Augie ran the show.  Persons

15   said that Rocky Williams worked for Bill.  Catherine Stevens

16   said that Rocky worked for Augie.  And, ultimately, yesterday,

17   the defendant told you on cross-examination that Rocky worked

18   for him.  None of these stories stand, ladies and gentlemen,

19   and the defense collapses like a house of cards.  I submit to

20   you that what the defendant would have you believe is

21   incredible and defies common sense.

22             Now, do you recall the testimonies of Augie Paone,

23   Bob Persons, and his wife, Catherine Stevens?  Did they appear

24   to have one story that they wanted to portray, to project, to

25   you, the jury, during their direct examinations?  And did

things change a little bit during cross?  You have the ability
to weigh the credibility and the candor of each witness that
took that stand, and if you believe that someone is
deliberately trying to overly complicate the story or to
explain something away, you should ask yourself why.  And you
determine what is the proper weight to give that particular
witness' testimony.

Now, if you would believe the defendant, he
testified here on Friday that his wife explained herself quite
well.  Well, ladies and gentlemen, I would submit to you that
that woman, Catherine Stevens, is still recovering from the
bus he through her under.  I can't imagine -- I initially told
you during the opening statement that the defendant was old
school; he's not old school because he's not standing up.
Catherine Stevens, on the other hand, is trying to be the
cover for her husband, but this is something she chose a long
time ago, ladies and gentlemen, because this was the story
they set out when they opened that account with the National
Bank of Alaska.

Now, when you look at all of the evidence that the
defendant presented -- and he didn't have to present a case,
but he chose to.  He didn't have to testify, but he chose to.
I submit to you, ladies and gentlemen, that Catherine Stevens,
Bob Persons, and Augie Paone all tried to cover the
defendant's butt regardless of what he's trying to tell you

today and now.

You should also consider the defendant's testimony. You see how he tried to distance himself from all the things that would be VECO, tried to make a distinction between Bill Allen and VECO. Notice that when asked about that steel staircase, he realized at first he said, well, it was just discarded junk from VECO, and I said, so you did accept something from VECO. He started back-pedaling big time. Started saying, well, no, no, no, no. It was junk. It was junk. So it was junk of VECOs? No. It was junk of Bill Allen's. So Bill Allen has this junk pile of stairs and steel that that's okay? He never answered that question. He caught himself, ladies and gentlemen, but it's too late.

If you also notice his testimony, ladies and gentlemen, he was perfectly eloquent when it came to discussing all matters about himself. The words just flowed. As soon as you started asking him about those renovations and how they got paid -- umba(Phonetic), rumba(Phonetic), butta(Phonetic), uh, umba, rumba -- he started stuttering and sputtering. It was a whole different story when you took him out of his element, ladies and gentlemen,  because he can't answer that because what he was telling you was nonsense, and it is unreasonable.

Ladies and gentlemen, the defendant intended to conceal and to provide false information on his financial

disclosure forms; it's clear.  Now, here's how the defendant
attempts to distance himself from the renovations at the
chalet.  First, he said he spoke with Bill Allen and Bob
Persons at the July 2000 Kenai River Classic.  Bill was only
to provide workers.  Second, he knew that Rocky Williams and
Dave Anderson worked for Bill Allen, but they didn't work for
VECO when they worked for him.  Third, his wife, Catherine
Stevens, was in charge of the renovations.  She kept the
checkbook, she maintained the records, and it was Catherine
who had the contact with the contractor; that would be Augie
Paone of Christensen Builders.

Now, ladies and gentlemen, you know what the best
evidence would be for the defendant on his behalf?  If he
actually paid a dime to VECO or to Bill Allen.  There was no
intent to pay.  There was never any real attempt to pay.  I
submit to you, ladies and gentlemen, this thing about, well, I
asked for a bill that that's fine.  Tell that to the telephone
company next month, okay?  I didn't get the bill, catch me
next month.  That'll work.  It doesn't work here.

But, ladies and gentlemen, the defendant's story
doesn't hang true because in 2002, the first floor deck
appears at the chalet.  There are no Christensen Builders
there.  There are no checks outstanding to Christensen
Builders.  Catherine can't say she paid for it, she can just
tell you, I thought I paid.  The defendant told you, I assumed

1    it was paid for, when the last check to Christensen Builders

2    was in March of 2001.

3           The defendant would also have you believe that he

4    had no idea that there was no involvement by VECO.  He

5    purposely distanced himself from the renovations, but the

6    e-mail traffic, the handwritten notes, all in his own words,

7    tell the true story.

8           Now, ladies and gentlemen, the defense counsel kept

9    talking about Government's Exhibit 495 or Defendant's Exhibit

10   495 and that was that October 6th, 2002 handwritten note from

11   the defendant to Bill Allen.  I submit to you, ladies and

12   gentlemen, that handwritten note to Bill Allen came seven days

13   after Senator Torricelli had been censored by the Senate

14   Select Committee on Ethics.  He knew full well; he was trying

15   to paper the trail.  This is a very smart man.

16          The defendant would have you believe, oh, no, he

17   would never start doing something like that, you know, for way

18   back then and that he never thought that this day would come.

19   He never hoped this day would come.  This was direct cover,

20   ladies and gentlemen, because if he can write that in his

21   handwriting, he can write a check, but that didn't happen.

22          Now, ladies and gentlemen, they mentioned on closing

23   for the defense about that punch list that came from Augie

24   Paone's -- one of Augie Paone's workers that was on VECO

25   stationery, and he said that the worker, I believe it was Mr.

1    Luther, said he picked up just a scrap piece of paper that was

2    laying around when he was doing the renovations and just

3    jotted out the punch list of what was left to be done.  Well,

4    ladies and gentlemen, if it's VECO's stationery, doesn't that

5    tell you that VECO was there?  I mean, it defies common sense

6    what he would have you believe.

7            Now, I was thinking about this for awhile because I

8    really do believe you just got to break this stuff down to its

9    common denominator.  Break it down to what is just -- on its

10   common sensical(Phonetic) terms.  And I was talking to a

11   friend, and he was telling me that this reminds him of his

12   little six-year-old son.  He likes to play hide-and-go-seek,

13   but what he likes to do is he likes to cover his eyes and then

14   keep one eye open, you know, looking through his fingers, and

15   then when you say, hey, hey, I see you, he goes, no, no, no, I

16   don't see you.  I'm not looking.  You know, you tell him he's

17   cheating and then he starts laughing.

18           Well, ladies and gentlemen, I submit to you that the

19   defendant is not a six-year-old, and his actions aren't cute,

20   but that's the same thing he would have you believe here;that

21   he didn't see what was going on, but you see from the e-mails

22   Bob Persons was keeping him apprised of every little detail

23   that's going on.  He knows that when the paint is being picked

24   out.  He knows that there are photos coming because, remember,

25   there were e-mails talking about Rocky's friend was sending

1    pictures.  He knows everything that's going on.

2            How is Catherine involved?  The only way that

3    Catherine Stevens is involved is because she's writing the

4    checks, and I submit to you, ladies and gentlemen, that's all

5    she was doing with that account.  You saw on the defendant's

6    own exhibits that they put up even during their closing today,

7    Barb Flanders is the one who does all their finances.  Barb

8    Flanders was the one who was responsible for paying their

9    monthly bills, even the bills up at Girdwood, but, all of a

10   sudden, now they have these renovations, Barb Flanders isn't

11   on the Bank of Alaska account.  Not on the account to pay the

12   checks, but Barb Flanders gathered all the information that

13   opened the account.

14           Barb Flanders was in communication with the Bank of

15   Alaska to get the account opened.  Barb Flanders is the one

16   who got their notarized signature to the bank to get the

17   account opened.  Barb Flanders maintained the files of

18   cancelled checks at the Senate office on the Bank of Alaska.

19   The only thing Barb Flanders didn't do is write the checks.

20           Now, I'm going to ask you, ladies and gentlemen,  to

21   think of it again in common terms.  I spoke to another friend

22   of mine who heard the defendant's testimony on Friday, and

23   what he told me about the defendant's testimony was that --

24           MR. B. SULLIVAN:  Objection.

25           THE COURT: This is argument.  It's not evidence.

1          MS. MORRIS:  -- is that the gifts from Bill Allen

2     that appeared at the defendant's chalet without the

3     defendant's knowledge -- he said, well, you know, Brenda,

4     maybe since the defendant lives so close to the North Pole,

5     that maybe Santa and his elves came down and did this work and

6     completed it, and it was -- you know, he had no idea.  He had

7     been very, very good.

8          Ladies and gentleman, that would be funny but for

9     the fact that this is so serious.  The defendant admits that

10    Bill Allen built that deck in 2002.  The defendant admitted in

11    writing twice in 2002 in his own handwriting that he owed Bill

12    Allen.  Again, the only thing that's not in his handwriting is

13    a check.

14          Now, ladies and gentlemen, what the defendant would

15    have you believe is unreasonable and just plain ridiculous.

16    I'm going to ask you not to fall for it.  You weren't born

17    yesterday and certainly wasn't -- the defendant wasn't either.

18    He knew full well what was expected of him on those financial

19    forms; in his own words, you saw how he worked so hard to hide

20    a dog's true value.  If he's going to go to those lengths for

21    a dog to not provide the truth when he knew full well what the

22    truth was with regard to how much the dog was worth and who

23    gave him the dog -- look at those forms, ladies and gentlemen.

24    He changed both of that.  He changed the value, and he changed

25    who the dog came from.  If he'll go to those lengths, ladies

and gentlemen, for a dog, you know what he's going to do about thousands and thousands and thousands of dollars that was poured into his house.  The little things prove the big things because the intent is the same.

Now, the defendant can try to argue that there is something wrong with the VECO spreadsheet and that, you know, the dollars fluctuated with regard to how much VECO actually spent on this project.  Well, you heard Bill Allen.  Bill Allen was trying his best to keep this contained.  He said he could make an invoice, but he didn't want to have to go to a secretary.  He didn't want this out there in the public for a lot of people to know.  He was trying to keep it contained, but the project kept getting bigger and bigger.  So then finally they had to open a specific coding for Girdwood; still didn't mention Senator Stevens.  It just said "Girdwood".

But, ladies and gentlemen, when you start building a house, people talk.  The workers knew it was Senator Stevens' house, whether they saw him there or not, they knew whose house it was.  So I submit to you, ladies and gentlemen, it's not about the final number of how much VECO paid, Bill Allen paid, for this renovation and the gifts that the defendant received, it's the fact that he knew he got it.  He knew he got the deck.  He knew he didn't pay, and he knows he didn't report.  That's what it comes down to.

1            Now, ladies and gentlemen, regarding the official

2    act that we talked about during the government's direct case

3    and also during the defense case -- now, regarding the

4    official act the defendant took on behalf of VECO, the

5    government has not charged the defendant with bribery.  So

6    we're not saying that he did something in exchange necessarily

7    for anything that he did in his official capacity for VECO or

8    Bill Allen.  What we are saying, ladies and gentlemen, is that

9    -- it's kind of like this -- again, I totally believe in

10   breaking it down to its most simplest terms, and it's kind of

11   like this:

12           Ladies and gentleman, if you had a gentlemen friend

13   that liked to give you stuff, nice expensive gifts, you could

14   tell everyone and anyone who would listen, oh, he's just a

15   friend, but I submit to you, ladies and gentlemen, people

16   might not think that relationship was so innocent.  So that

17   you wouldn't get that kind of criticism, so you would still

18   get those gifts coming, you might keep your personal business

19   to yourself.  You might not tell everybody who is giving you

20   those gifts.  You wouldn't want to draw that negative

21   speculation to your private life.

22           Now, in that same vein, gentlemen and ladies, if you

23   had someone that was really special and you wanted to give

24   them nice things, not that you particularly were looking for

25   something in exchange for the nice gifts you were giving, but

1    if the subject ever came up, you sure would hope they would

2    remember those awful purty(Phonetic) things you gave them.

3    That's what happened here.  It's just that simple, ladies and

4    gentlemen.

5            Bill Allen liked Ted.  That's what he testified to.

6    Bill Allen wanted to give things to Ted.  That's what he

7    testified to.  The defendant wanted to take the gifts; that's

8    what the facts prove.  And the defendant didn't want anyone to

9    know that he was looking out for Billy.  He had to keep that

10   public appearance of distance while privately he's still

11   accepting all these things.

12           Now, ladies and gentlemen, what I'd like for you to

13   remember is that the defendant goes to great lengths to talk

14   about a chair and how a chair that was given to him -- Bob

15   Persons said:  I gave it to him.  I wanted to give it to him,

16   but he said he couldn't accept it, so it turns into a loan.  I

17   submit to you, ladies and gentlemen, that the chair wasn't a

18   loan; the deck wasn't a loan; the grill wasn't a loan; the

19   furniture wasn't a loan.  All the things that the defendant

20   has admitted Bill Allen gave him, he has to deny now.  He

21   admits what he has to, but denies what he has to.  Because he

22   doesn't want to be found guilty of a crime.  He wouldn't have

23   come in here to take all this time to testify and tell you all

24   the things that he took the time to tell you about.

25           The government's burden in this case, ladies and

1    gentlemen, is beyond a reasonable doubt.  Now, that's not

2    beyond all doubt because that would be impossible, and this

3    isn't TV, so things aren't like mystically solved within an

4    hour.  This is beyond a reasonable doubt.  And I will state to

5    you, ladies and gentlemen, I submit that the government has

6    met its burden.  The government's evidence is consistent and

7    is reasonable.  And what the defendant would have you believe

8    is inconsistent and unreasonable.

9         Let's talk about Hess.  The defendant would have you

10   believe that Bill Allen just introduced you to his architect

11   from VECO, John Hess.  He knew that Hess worked for VECO, but

12   VECO wasn't doing the work for the defendant.  The defendant

13   assumed that Catherine paid for the work Hess provided even

14   though Hess provided the drawings in the summer of 2000.  The

15   National Bank of Alaska account wasn't even opened until

16   November of 2000.

17        And if it's the Alaskan way not to get contracts or

18   estimates, why did he get a proposal and a contract from

19   Hannah to lift the house.  Why did you see all those e-mails

20   from Bob Persons to the defendant about how concerned they

21   were about how much Hannah was charging and how he wasn't

22   going to pay Hannah certain amounts of money?  It was because

23   Bob Persons was conscious about spending the defendant's

24   money.  Because as that 1997 letter stated, the defendant had

25   wanted for some time to lift the house and do all the things

1    he wanted to do.  He just didn't have the money.  So the money

2    that he intended to use for the house -- he had a budget.  He

3    didn't want to go beyond that budget.  And I submit to you,

4    ladies and gentlemen, that Bob Persons knew that and knew not

5    to make the cost run so high.  Bob Persons took that upon

6    himself to assist the defendant.

7              Now, let's look at -- that alone, ladies and

8    gentlemen, is inconsistent and unreasonable, what the

9    defendant would have you believe about Mr.  Hess.  Let's look

10   at Rocky and Dave.  The defendant would have you believe that

11   Rocky Williams and Dave Anderson worked for VECO, but

12   moonlighted to provide the work at the chalet.  Again, the

13   defendant testified that Catherine Stevens paid for Rocky and

14   Dave's services through Augie Paone.

15             Well, ladies and gentlemen, the purpose of yesterday

16   of walking through all those e-mails with the defendant when

17   we first started off yesterday morning was to demonstrate how

18   for almost three months, Bob Persons is sending e-mails on a

19   regular basis to the defendant updating him on the work at the

20   chalet, and he only mentions Rocky, Dave, and Bill Allen.

21   There's no mention of Augie.  There's no mention of Augie

22   because Augie didn't exist at that time.  What the defendant

23   would have you believe is inconsistent with the facts and

24   unreasonable.

25             Now, the defendant would have you believe that there

is some distinction between the man, Bill Allen, and VECO.
You know just about everyone who took that witness stand told
you that Bill Allen was VECO.  Bill Allen built the company.
Bill Allen ran the company.  And they would even try to make
you believe that Bill Allen because of his motorcycle accident
had some issue, that his brains were scrambled.  Bill Allen
may have a speech affect, but I submit to you, ladies and
gentlemen, he's got plenty of common sense.  And the only
thing that he is guilty of with regard to this defendant is
standing up and telling the truth because it was the
defendant's responsibility to report this on his financial
disclosure forms, not Bill Allen.  Bill Allen could give him
those things, but it was the defendant who was responsible for
reporting them.

So the distinction that the defendant tries to make
between which gifts he took from Bill Allen, the man -- like
the generator -- and not from VECO, that's inconsistent with
the facts and just totally unreasonable.

I submit to you, ladies and gentlemen, that the
defendant would have you believe that his wife, Catherine, was
solely responsible for the renovations to the chalet.  You saw
all those e-mails between the defendant and Bob Persons
discussing the work on the chalet.  Bob Persons sent those
e-mails to the defendant, not his wife.  There were times, a
few, that the defendant forwarded those e-mails on to

1    Catherine.  And what information, ladies and gentlemen, did

2    you see coming directly from Catherine Stevens?  You saw a

3    FedEx handbill to Rocky Williams, addressed to VECO, and it

4    was from Barb Flanders, the defendant's assistant in his

5    Senate office, and that was dated March 12th of 2001, and in

6    it, basically, Barb is saying Catherine wanted me to convey to

7    you that she wants starfish knobs on the cabinets.

8              So I submit to you, ladies and gentlemen,  Catherine

9    Stevens wrote some checks and picked starfish knobs and paint.

10   She had nothing to do with the electrical work that went into

11   that renovation.  She had nothing to do with the plumbing work

12   that went into that renovation, and, ladies and gentlemen,

13   when you look at the bills that they had submitted from Augie

14   Paone, they were for supplies, they weren't for the plumbing,

15   the actual plumbers.  They weren't from the electricians who

16   did the electrical work.  You heard from just a sampling of

17   them here in this courtroom, ladies and gentlemen.  Their time

18   was between $25 and, in some instances, $35-an-hour,

19   generally, and they were being paid by VECO.  That's

20   reasonable, ladies and gentlemen.

21             Now, Barb Flanders wasn't here, but what you heard

22   was testimony that she worked on the defendant's Senatorial

23   staff and was responsible for all the Stevens' joint finances.

24   She even paid Catherine's personal credit card bills when she

25   was asked to do so and acted as Catherine's human ATM machine.

Why all of a sudden, now, is Catherine going to be responsible for this renovation?  She now is spearheading, according to the defendant, this whole renovation.  She's the mover and shaker of this, but all you see her name on it is associated with the starfish knobs and paint.

I would submit to you, ladies and gentlemen, that when the defendant testified about Catherine was responsible for the things that happened in the home and that he was responsible for things that happened outside the home, why is it that Catherine didn't have a say with that big black ugly furniture that's been sitting up in her house all this time?  Why didn't she have a say about that big ugly chair that's down in her basement here in D.C. all this time?  Because, ladies and gentlemen, what the defendant would have you believe is incredible and unbelievable.

The defendant would have you believe that he only referred to Bob Persons as a contractor in an e-mail as a joke.  However, Bob Persons is the one that's keeping the defendant up to date with all the renovations to the chalet.  He's the one that's filing for all the necessary permits, and I submit to you, ladies and gentlemen, it was Bob Persons who was giving the defendant all the updates, the daily updates, on the chalet.  You saw Bill Allen; he's not the kind of person that's going to be sitting down -- he told you, he doesn't send e-mails.  They went through his secretary.  Bob

Persons, though, he believes in them.  He's sending e-mails on
a regular basis.

        If it were such a joke that Bob Persons was just
sent out there as a contractor, why in 2004 when that press --
when the press makes an inquiry about the chalet's renovation,
the defendant directs Courtney Boone to Bob Persons?  Why
wasn't Courtney Boone directed to Augie Paone?  He was the
contractor.  Now, why was there no mention in that statement
that was released to the reporter, Heather Reese(Phonetic), no
mention of Bill Allen?

        The defendant admitted in this courtroom that he
found out about Augie Paone through Bill Allen and Rocky, but
yet when you look at that statement, ladies and gentlemen,
there's no mention of Bill Allen.  There's no mention of Rocky
Williams.  There's no mention of Dave Anderson.  What the
defendant would have you believe is inconsistent with the
facts and unreasonable.

        So even if, ladies and gentlemen, you were to
believe the defendant's testimony that he consented to Bob
Persons being a representative to get the necessary permits,
but he distances himself from Bob Persons when he wrote on
that paperwork that the owner was the contractor.  The
defendant would have you believe that he had no idea what his
wacky friend, Bob Persons, was putting down on that permit
work, even though he and his wife gave Bob Persons the

1    authority to get this permit for him.

2              Now, when Bob Persons goes to get that permit,  he

3    doesn't put down Augie Paone.  He put down Hannah, and then he

4    scratched it out, and then he put "owner."  I submit to you,

5    ladies and gentlemen, that he knew then back in July of 2000

6    that this day may come, just maybe, and if it did, we got to

7    lay the paper trail then.  Because maybe, just maybe, the

8    defendant being who he is, maybe, just maybe, that would be

9    enough to throw people off the scent.  So I submit to you,

10   ladies and gentlemen, that what the defendant would have you

11   believe is inconsistent and unreasonable.

12             Now, also remember in 2006, that Chugiak(Phonetic)

13   sewer bill or drain bill, that a bill got sent to the

14   defendant and said, "labor paid by Bill"?  There was a phone

15   conversation, and in that phone conversation -- it was in 2006

16   -- and at that time, Bob Persons nor Bill Allen knew they were

17   being recorded, and that conversation if you recall went like

18   this:

19             (Whereupon, the audio of the above-mentioned

20   conversation is played at this time.)

21             MS. MORRIS:  Ladies and gentlemen, I submit to you,

22   that is reasonable.  That's Bob Persons, raw and uncut.

23             Now, if you want to compare Bob Persons' credibility

24   from Bill Allen's credibility, there is nothing that the

25   defense has presented to you that contradicts Bill Allen's

credibility and what he submitted to you, ladies and

gentlemen.  But Bob Persons -- that could be defined in one

word: Psychedelic.  That was a display.  Keep that in mind.

Consider the source when you go back in that jury room.

Now, ladies and gentlemen, the defendant would have

you believe that the price he thought he paid for the

renovations was reasonable, considered the assessed value of

the chalet.  Now, first, the assessment was made before the

house was even finished, and, second, the assessment was based

on the word of one of the daughters who came to the door and

said something to the effect that she lived there.  It didn't

appear that any official actually went into the house, that no

one actually knew all the work that was done, but yet the

defendant wants you to believe that that's a reasonable

determination for his belief.  That's unreasonable given the

amount of work that went inside the chalet's renovation and

defendant's displayed wants for detail.

Isn't it remarkable, ladies and gentlemen, how the

defendant can have such a command of the assessed value of the

house?  He has such a command of how his bills are being paid

on a monthly basis.  You see Barb Flanders is sending him

memos about can I pay this; can I do this?  And he's writing

back, Okay, "T", on these memos.  He has such a command of the

complicated trust that he terminated to get $50,000 out with

his old buddy, George, so that he could help finance the

chalet's renovation and all of its upgrades, but he has no

real knowledge on what was going on with the actual

renovations, and he has no knowledge of what checks were paid

when because that was his wife's responsibility, not his.

Now, the defendant would have you believe that he

doesn't know how to get a bill because on that Chugiak Sewer

and Drain bill, he said, well, he called Bill Allen -- he

called Bill Allen's secretary and faxed the bill to his

secretary to find how much he owed.  Well, couldn't he have

just called Chugate?  Couldn't he have found out how much the

labor was?  No.  Everything has to go back to Bill Allen

because he doesn't want to pay.  He doesn't have any intention

to pay.  So, really, if you believe the defendant, then I ask

you to believe this:  You've got to believe that the lion of

the Senate, that the once head of the Senate Appropriations

Committee, the man that all these people came in here as

character witnesses and said they looked up to, that he was

remarkable, they are who made them who they are now today,

didn't know how to get his key back, didn't know how to pay a

bill, and didn't know how to stop a crazy man from putting

stuff all up in his house.

I'll tell you, ladies and gentlemen, you know,  that

was wild, and I could have sworn, did he not -- did defense

counsel say something about Bill Allen going wild?  That was

really wild.  I submit to you, ladies and gentlemen,  that the

defendant's story is ever-changing to suit whatever needs he
needs at the time.

What is consistent with the defendant's story is
everyone is to blame but the defendant.  It was Bill Allen's
fault for not sending him a bill.  It was his wife's fault
because she kept the records on the chalet.  It was his
secretary's doing because she sent that bill to -- she sent
that thank you note to John Hess at VECO.  It was also the
secretary's doing because that John Fugate(Phonetic) got a
thank you, too, at VECO.  He didn't know where to send it.  It
just happened to slip his mind that Fugate gave him a little
card that said VECO.  I said, well, he gave you his card,
didn't he?  He says, well, he didn't give it to me.  He left
it on the counter.

Ladies and gentlemen, this is a lawyer.  This is a
man who knows details, and it's everyone's fault but his.  I
even submit to you, ladies and gentlemen, that based on the
defendant's reaction, it's the government's fault for having
the audacity to accuse him of actually taking responsibility.
It's the government's fault for actually making sure he lives
up to his duties.  Now, everyone and anyone is to blame but
Ted Stevens.

Well, the defendant testified, ladies and gentlemen,
that he knew the importance of the financial disclosure forms.
It's only one of three forms that needs his actual signature

on it per year.  He testified that he knew the Senate Ethics

Committee would investigate any false or incorrect information

submitted on those forms, and the defendant recognized that

Senator Torricelli's problems came with his accepting gifts in

2002, and I again submit to you, ladies and gentlemen, that's

what triggered that handwritten note to Bill Allen.

Now, when I asked the defendant, he testified that

he knew he couldn't accept that chair, that massage chair,

from Bob Persons.  He said he knew he couldn't accept it as a

gift unless he reported it.  So, voila', the Brookstone chair

becomes a loan.  The defendant said it; so shall it be done.

The defendant recognized that the financial disclosure forms

are accessible to the public, and transparency in government

is important.

Now, again, going back to 2004, Heather Reese --

that reporter from Wasilla.  Heather Reese testified that she

had gotten the allegation that there had been some repairs

done or renovations done to the defendant's home in Girdwood,

and that VECO was responsible for it.  She had searched every

way she could publicly to see some kind of link to VECO,

couldn't find it.  So since she hadn't found it, she said she

had looked for months, she just picked up the phone and called

his Washington D.C. office and spoke to his press secretary,

Courtney Boone.

Now, she had testified that she had spoken to

Courtney Boone on the other occasions and that Courtney was always pretty helpful and would get back to her quickly.  On this particular one, Courtney said she had to investigate it because as Heather Reese testified to you, these were serious allegations to be making against the senior senator of their state.

Now, there was no mention in that statement -- after Courtney Boone did her due diligence, she talked to the defendant; the defendant said talk to my wife; she talked to the wife.  And then she gets that e-mail, that BlackBerry message first thing in the morning.  She responds back because the defendant told her to get in touch with Bob Persons.  She got in touch with Bob Persons, so she thought she had all her bases covered.  So she puts out that statement that both the defendant and his wife testified in this courtroom that was their statement.  Courtney said it was unusual to have to confer with Mrs.  Stevens, but, you know, this required it.

I submit to you, ladies and gentlemen, that once Courtney gave that statement to Heather Reese -- you heard Heather Reese -- the story was shut down.  She hit a brick wall; it was over.  And that was exactly what it was intended to do, shut it down.

This case has been a long time in coming, ladies and gentlemen, and in the words of Dave Anderson, this marks the end of a long road for all of us.  There will be no winners

1   here because this trial has exposed the truth about one of the

2   longest sitting senators, about the gifts he received, what he

3   tried to conceal, and the lengths that he would go to keep his

4   secrets hidden.

5        Now, crime by its very nature, ladies and gentlemen,

6   is secretive.  You can't afford to have a lot of witnesses

7   around, but when you do, you keep it tight.  You keep it

8   tight, and you keep it close to the people that you know are

9   going to be loyal to you.  Those are the people you can trust.

10  And when you are dealing with politicians, that's a whole

11  different ballgame because politicians are used to the

12  constant scrutiny of their lives.  They carry themselves

13  differently.  They talk differently.  They're much more

14  guarded, and they talk in a way so not to expose their

15  vulnerability; very much like that statement that Courtney

16  Boone put out there.

17       The defendant is a powerful politician.  He makes a

18  living off his sharp, sharp mind and off his influence.  The

19  defendant lives off his reputation, and I submit to you,

20  ladies and gentlemen, that the defendant did not want to be

21  known out there as the senator that had the house that VECO

22  built.

23       Now, the defendant would have you believe that Bill

24  Allen is such a liar; that he came in here and be

25  self-serving, but yet he admits that Bill Allen told the truth

about the grill.  Bill Allen told the truth about the fish

statue.  Bill Allen told you the truth about the lights that

went up there.  Bill Allen told you the truth about the

furniture.  The only thing that he says that Bill Allen lied

about is things that the defendant can't admit to.

I said during my opening statement that Bill Allen

and the defendant were old school.  Well, we found out that

that's not true.  You had an opportunity to see and hear Bill

Allen, and he told you how he had to step up and take

responsibility to look out for his family and for the

employees of his company because he testified a couple of

times, the buck stopped with him.

That's not the defendant.  He is a career

politician, and he blames Bill Allen, his wife, and anybody

else that he needs to just so that it doesn't stick to him.

He even denies that a chair that's been in his house for seven

years is a loan.  If the defendant didn't ask for it, if he

didn't authorize it, it wasn't a gift.  I submit to you,

ladies and gentlemen, as my co-counsel, Mr.  Bottini, told

you, a gift is something you don't ask for.  And even if -- he

says it was a bill so therefore it should be a liability, the

liability carries over year after year.  I submit to you,

ladies and gentlemen, if you owe $10,000 one year and you

didn't pay it, you're going to owe it the next year, usually

with interest.  So whether he calls it a gift or whether he

1    calls it a liability, he knew he had to report that, but he

2    decided not to because Ted Stevens said so.

3           Now, ladies and gentlemen, a deliberate man like the

4    defendant whose very existence in the Senate has been

5    contingent on his ability to remember facts and details, he

6    chooses his words very carefully.  He knows exactly what he's

7    saying, when he's saying it, and who his audience is.  The

8    defendant knew full well what the message was he was sending

9    to Bill Allen that time when he talked to him on the phone and

10   he said, hang in there, Billy, and let's fight.  They can't

11   kill us, it's not Iraq.  What's going to happen?  We may rack

12   up a little lawyers' fees or do a little jail time.  He was

13   communicating to Bill Allen, I'm not giving in, and he was

14   communicating to Bill Allen, don't you either.

15          Now, I submit to you, ladies and gentlemen, that

16   that horse racing business that the defendant was involved in,

17   that was a great side business for him because the defendant's

18   a gambler.  He gambled that maybe, just maybe, this day

19   wouldn't come.  The defendant gambled that maybe, just maybe,

20   his name and his bringing in big name character witnesses here

21   to vouch for him would possibly sway you.

22          Well, ladies and gentlemen, I submit to you that no

23   matter how many Olympic swimmers he brings in here that tells

24   you they met Wilma Rudolph and the basketball team and

25   Muhammad Ali, who used to be Cassius Clay,  that that means

1    nothing.

2              I submit to you, ladies and gentlemen, that the

3    defendant is not going to commit crime with the likes of Colin

4    Powell.  Those witnesses see the public Ted Stevens, not the

5    private Ted Stevens who only his closest of friends know.

6    Also, the defendant makes much about Alaska being way up

7    there, and us being way down here, and it's such a big place

8    up there.  Well, ladies and gentlemen, isn't that more reason

9    for the defendant to be honest on his financial disclosure

10   forms?  Because it's not like Colin Powell and his wife are

11   going to be riding by his house one day and go, oh, look, the

12   Stevenses are doing some work, I wonder who's doing it.

13   That's not going to happen here, ladies and gentlemen.  None

14   of the defendant's character witnesses know the private Ted

15   Stevens.  They know what he tries to project in the public,

16   but I submit to you, ladies and gentlemen, you've been

17   introduced to the real Ted Stevens.

18             The defendant thought maybe, just maybe, he could

19   convince you that the Alaska way is such a far and foreign

20   place that they don't ask for bills and estimates in Alaska,

21   you just pay what they ask.  The defendant thought maybe, just

22   maybe, his asking out loud for bills might convince you enough

23   that he didn't mean anything, he didn't mean anything wrong,

24   or it was intentional.  He asked for a bill.  The defendant

25   thought maybe, just maybe, he could convince you that this

happened the way he said it happened and don't question him.
Don't pay attention to what the documents say.  Or what
witness after witness testified to you about the work they
performed at his home.  He told you how it is and that's good
enough, you better accept it.

I ask you, ladies and gentlemen, find the defendant
guilty because he gambled and he lost.  I ask you to do
something that very few people have done, it's to stand up to
him because at the end of the day behind that growling and
that snappy comeback and all that righteous indignation, he's
just a man.  And you know what?  He needs to stand up and take
responsibility like any other defendant that would walk into
this courtroom.  Make him responsible, ladies and gentlemen,
just like any other defendant would be.  Find him guilty of
intentionally scheming and filing false financial disclosure
forms, year, after year, after year, after year.

The evidence is what it is, and no amount of double
talk from the defense will ever change that.  Thank you.

THE COURT: All right.  Thank you, counsel.

All right.  You've heard all the arguments you're
going to hear, ladies and gentlemen.  It's early, you're going
to leave early.  I'm not going to keep you here.  Tomorrow
you'll hear the instructions of the law at 9:30, and this
evening, there's nothing you need to do to prepare for that.
I'll give you all the instructions that you need to resolve

1    any issues in this case.  You've heard a lot about

2    credibility, believability.  It's not my job to determine

3    credibility.  It's not the attorneys' job to determine

4    credibility.  It's not the spectators' job.  It's your job to

5    determine credibility.  We'll talk more about it tomorrow

6    along with all the other instructions.

7              Have a wonderful evening.  We'll see you tomorrow,

8    and we'll start promptly at 9:30.

9              (Whereupon, the jury exited the courtroom at this

10   time.)

11             THE COURT: All right, counsel.  Anything else we

12   need to talk about before I let you go?  I think because there

13   are some members of the media present and because they have a

14   -- actually, you know what?  I need to just step back there

15   one more time.  I always remind them not to read any press,

16   radio, TV reports -- any objections to me doing that?  Any

17   problems with that?  I need to tell them to do that.

18             MR. CARY:  No objection.

19             MS. MORRIS:  No objection.

20             THE COURT:  All right.  Just one second, I'll be

21   right back.

22             (Whereupon, Judge Sullivan went to the jury room to

23   speak with the jury at this time;thereafter, he returned to

24   the courtroom.)

25             THE COURT:  All right.  They told me unanimously

1    that they know that.  But for the benefit of the media, let me

2    just say that after instructions tomorrow -- and I should be

3    finished by 11 a.m. -- they're going to -- we're not going to

4    keep the jurors past 4:45, five o'clock in the evening.

5            With respect to questions, the attorneys will be on

6    a 15-minute call if we have any questions.  Our office will

7    send out an e-mail notice, probably to Shelly's office, and

8    we'll alert you to questions, but there'll be a 15-minute

9    call.

10           With respect to the verdict, any verdict, there'll

11   be a 15-minute call to the parties for a verdict, as well --

12   for the return of the verdict, as well, and we'll send out an

13   e-mail notice of any return of verdict.

14           Now, with respect to alternates -- and since we have

15   a little bit of time -- I think I told the attorneys the other

16   day that I'm going to excuse the four alternates.  I'm going

17   to tell them and plead with them that they should not talk

18   about this case at all because -- because of all the

19   uncertainties in life and the uncertainties in everything we

20   do, there could be a need to call an alternate back.

21           We will -- and I will have to -- I'll have to get

22   them to commit to do that.  We're going to excuse them, and

23   we're not going to keep them here.  They will be allowed to go

24   home, and I will ask them not to say anything about the case

25   until they hear from me.  And I'll personally let each

1    alternate know when he or she wants to discuss the case, if

2    that person wants to discuss the case at all.

3             Are there any additional requests with respect to

4    any instructions to the alternate jurors?

5             MR. CARY:  No, Your Honor.

6             THE COURT: All right.  All right.  I have nothing

7    else to say at this point.  I'm going -- we have the

8    instructions.  I will tell the public also that once the

9    jurors have been instructed, then a copy of the instructions

10   will be posted on -- in the case on our ECF system.  I'm not

11   going to post them until I give the instructions, but just as

12   soon as I've completed them, I'll post them.  They're quite

13   lengthy, but they won't be posted until I have finally

14   instructed the jurors.

15            Anything else we need to talk about, counsel?

16            MS. MORRIS:  No, sir.

17            THE COURT: All right.  Have a wonderful evening.

18   There's no need to stand.  Thank you.

19            Oh, let me just -- I'm going to pass the case until

20   9:15 tomorrow.  I'm going to do it at 9:15, so if there's

21   anything I need to talk about, it won't be at 9:30, it will be

22   at 9:15 because I'm going to promptly start instructing the

23   jurors at 9:30 tomorrow morning.  Thank you.

24                      [End of proceedings]

25

1

2                    C E R T I F I C A T E

3

4             I, Wendy C. Ricard, Official United States Court

5       Reporter in and for the District of Columbia, do hereby

6       certify that the foregoing proceedings were taken down by

7       me in shorthand at the time and place aforesaid,

8       transcribed under my personal direction and supervision,

9       and that the preceding pages represent a true and correct

10      transcription, to the best of my ability and

11      understanding.

12

13

14

15                              _____

16                              Wendy C. Ricard, CCR, RPR

17                              Official U.S. Court Reporter

18

19

20

21

22

23

24

25