```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,      .
                                      .
 4              Plaintiff,            .
                                      .   CR No. 08-231
 5         v.                         .
                                      .
 6     THEODORE F. STEVENS,           .   Washington, D.C.
                                      .   Wednesday, August 13, 2008
 7              Defendant.            .   2:05 p.m.
                                      .
 8     . . . . . . . . . . . . . .    .

 9

10                    TRANSCRIPT OF STATUS HEARING
              BEFORE THE HONORABLE EMMET G. SULLIVAN
11                 UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13     For the Government:          BRENDA K. MORRIS, ESQ.
                                    EDWARD SULLIVAN, ESQ.
14                                  NICHOLAS MARSH, ESQ.
                                    United States Department of Justice
15                                  1400 New York Avenue, N.W.
                                    12th Floor
16                                  Washington, D.C.  20005
                                    202-514-1412
17
                                    JOSEPH BOTTINI, ESQ.
18                                  United States Attorney's Office
                                    District of Alaska
19                                  222 West Seventh Avenue
                                    Federal Building and U.S. Courthouse
20                                  Anchorage, Alaska  99513-7567
                                    907-271-5071
21
       For the Defendant:          ALEX ROMAIN, ESQ.
22                                 SIMON LATCOVICH, ESQ.
                                   Williams & Connolly, LLP
23                                 725 Twelfth Street, N.W.
                                   Washington, D.C.  20005
24                                 202-434-5000

25
```

Court Reporter:                    JACQUELINE M. SULLIVAN, RPR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6720
                                   333 Constitution Avenue, NW
                                   Washington, D.C. 20001
                                   202-354-3187


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

COURTROOM DEPUTY:  Please remain seated and come to order.

Criminal case 08-231, <u>United States</u> versus <u>Theodore Stevens</u>.

MS. MORRIS:  Good afternoon, Judge.  Brenda Morris, Nick Marsh, and Ed Sullivan for the government.

MR. ROMAIN:  Alex Romain on behalf of Senator Stevens.  I entered a Notice of Appearance this morning.  And with me is Simon Latcovich.

THE COURT:  All right.

The attorney on the phone?  All right, who is on the phone?

MR. BOTTINI:  This is Assistant U.S. Attorney Joe Bottini in Anchorage.

THE COURT:  Good afternoon.

Everyone knows why we're here except me.

MR. ROMAIN:  I'm about to tell you.

THE COURT:  All right.

Can you hear us counsel on the phone?

MR. BOTTINI:  I can.  Thank you.

MR. ROMAIN:  Thank you, your Honor.  Thank you very much for meeting with us on such short notice.

THE COURT:  For the record, I think Ms. Morris or someone from your office telephoned chambers.  I have no idea

1  why you're here, other than the representation was I believe --

2  I don't want to misspeak -- a discovery dispute, and it seemed

3  to me the better part of wisdom was, since everyone was

4  available, we understood, and I was available, that I should

5  bring you over and find out just what the problem is, if there

6  is one.

7          MR. ROMAIN:  Thank you, your Honor, and we appreciate

8  it.

9          I do believe that we have a problem that we need to

10  address.  We heed the Court's admonition to try to raise these

11  issues as soon as possible, so let me give the Court a little

12  background.

13          Last Thursday evening we received a significant amount

14  of discovery material from the government.  That production has

15  not yet been completed.  We expect it to be completed by Friday.

16  But there are two issues at the least that have arisen with

17  respect to that production.

18          First, the production consists of 67,000 pages of

19  documents that were scanned electronically and then produced in

20  electronic form, in addition to at least 2,800 audio files of

21  wiretap surveillance, along with a significant amount of video

22  files of additional surveillance.  Now, we have not yet been

23  able to determine how many hours of video surveillance there is

24  or how many hours of audio surveillance there is, but let me

25  begin with the problems around the paper or the electronic

1    production.  That is one issue.

2            THE COURT:  67,000 pages of documents?

3            MR. ROMAIN:  Yes, your Honor.

4            THE COURT:  That you've received in paper format as

5    well as electronic format?

6            MR. ROMAIN:  Well, the paper format has been sent to a

7    vendor, and the electronic format is what we received initially.

8            THE COURT:  All right.

9            MR. ROMAIN:  And the reason, the problem that occurred

10   with that initial production is that essentially the electronic

11   version does not contain the electronic equivalent of any

12   staples, paper clips, binder clips; in other words, we are left

13   to speculate as to when a document begins and when it ends,

14   which document, which e-mail might be connected to whichever

15   attachment, where a spreadsheet begins and where it ends, so of

16   course we sought the paper production in order to try to resolve

17   that problem, and it turns out that the paper production also

18   doesn't have any of those natural separators.  The government

19   has represented to us -- of course we've met and conferred with

20   them -- that some unknown proportion of those documents did have

21   such separators but they were removed before scanning, and the

22   scanning process, the way they conducted it simply has lost this

23   information, so as a practical matter there is not much that we

24   can do about that.  However, that's an important context because

25   the --

1          THE COURT:  Are the documents Bates-stamped?  The

2     documents are Bates-stamped; is that correct?

3          MR. ROMAIN:  That is an important context, your Honor,

4     because there is more production forthcoming, so the government

5     has agreed on documents that it has not yet scanned to make sure

6     that it includes the separators that would allow us to know

7     where a document begins and where it ends.  However, there is a

8     critical subset of documents, unknown what the exact volume is,

9     which reflect documents retrieved from Veco's computers and hard

10    drives where the government would retrieve, for example, a Word

11    document or a spreadsheet and the government has the information

12    about where that document begins or ends, or where an e-mail has

13    a particular attachment, where a spreadsheet begins or ends, but

14    the way they've indicated to us they intend to produce it is

15    simply print it out, no separators, Bates-stamped.  There is of

16    course a simple solution to this problem which we've asked the

17    government to undertake and it has unfortunately refused.  As we

18    understand it, the government simply needs to download from its

19    server the information it has, burn it on to a disk, provide

20    that disk to a vendor of their choice if necessary and then that

21    vendor would be able to produce it to us in a form that doesn't

22    provide us with any other information other than the information

23    the government has itself so that we are not left to speculate.

24    Of course as --

25              THE COURT:  And that document will provide you with

1   the separators?

2         MR. ROMAIN:  Yes, it will.

3         THE COURT:  It will tell you the commencement and the

4   conclusion of a document?

5         MR. ROMAIN:  Yes, it will.  If the government were to

6   take what it has on its server, burn it on to a disk and send it

7   to a vendor, that vendor could then produce it to us a form that

8   would allow us to know exactly where the separators are, so we

9   wouldn't be able to manipulate any document that were in Word

10  form or something of that sort.  We simply are put in a position

11  where we don't have to guess.

12        Now, in our conversations with the government, the

13  government has indicated --

14        THE COURT:  Is this really much guesswork about the

15  commencement of these documents and the end?

16        MR. ROMAIN:  That's exactly the point I wanted to

17  address, your Honor.  I think that for some documents it may not

18  be a problem, but in particular for a document such as

19  spreadsheets I think that we could have a very serious problem.

20  There could be no question that these documents retrieved from

21  Veco Services are documents that are central to the case both

22  for the prosecution and for defense, and so we will have to

23  spend the next few weeks trying to figure out where a particular

24  spreadsheet begins and ends, and considering the burden and the

25  problem and that issue around that speculation, the solution to

1    that problem is a fairly simple one --

2            THE COURT:  Let me ask you, this document, the

3    download, what you received from the government, you want the

4    government to burn it on to a drive and then send it out to a

5    vendor?

6            MR. ROMAIN:  We can't identify where the separators

7    are without the information that the government has but has

8    refused to give to us, because obviously if we could we would

9    have done it.

10           THE COURT:  You wouldn't be here.

11           MR. ROMAIN:  We wouldn't be here at all, your Honor,

12   so that is one issue.

13           THE COURT:  Bates stamps doesn't make this job easier

14   for you then?

15           MR. ROMAIN:  No, they don't.  What they provide are

16   obviously there's sequential numbering, but in addition to that

17   we know what the source is, so if it's from, you know, one

18   particular Veco employee's server or hard drive, we'll know it's

19   from that drive, but there could be any number of thousands of

20   pages from that source, so, you know, we haven't received the

21   documents yet, but we've been trying to request that the

22   government provide it in a way that we believe is meaningful.

23           THE COURT:  All right.

24           MR. ROMAIN:  Constitute meaningful production.

25           THE COURT:  You had discussions with government

1    counsel about this and they refused to do it?

2         MR. ROMAIN:  Yes.  We had a conference call yesterday,

3    and I'm sure they'll be able to speak on their own behalf.  I'm

4    just trying to provide a full picture, your Honor.

5         With respect to that production, there's another

6    issue, a request that came up.  We've received nearly three

7    thousand audio files.  We have not yet -- and by that I mean

8    files of audio recordings of wiretaps of cell phones, land

9    lines.  We have not yet been able to determine precisely how

10   many hours those recordings constitute.  However, we're fairly

11   certain it is in the multiple of hundreds of hours, and

12   obviously in addition to that, there are video files that also

13   presumably have hundreds of hours.  What we have asked the

14   government to do is to provide us simply with an index of, for

15   the audio files, who the person calling is and who the person

16   being called is.  The government hasn't quite represented to us

17   that it doesn't have that information.

18        THE COURT:  Of course it does.

19        MR. ROMAIN:  But instead it has suggested that that

20   information constitutes its work product.  Your Honor, I think

21   our view is that under Rule 16(a)2 that is not the kind of work

22   product that is prohibited.  It is not a report, it is not a

23   memo.  There is no mental impression with respect to this

24   information.  It is simply information about who called and who

25   the callee is.  That is all that we have asked for.

1   Unfortunately, that information has not been provided for that

2   or any of the video files, and so those are the two things we'd

3   ask for.

4           And your Honor, the final issue relates to a potential

5   suppression motion.  Of course our motions are due tomorrow, and

6   as the Court contemplated during the arraignment, it is possible

7   that there may have to be some straggling motion that's come

8   after that because of course some issues are not even ripe.  The

9   production will not have been completed, etcetera.  However, the

10  Court, as the Court is well aware, the government has an

11  obligation to minimize in terms of its surveillance of audio and

12  video and we have asked the government to provide surveillance

13  logs.  The government's position has been that we're not

14  entitled to those surveillance logs.  We think that we are and

15  that when a challenge on minimization is brought, the government

16  then has to make a prima fascia case, and then the original and

17  best evidence of what the government actually did to minimize in

18  these circumstances are those minimizations or those

19  surveillance logs.  We have not asked for work product to the

20  extent that it reflects subjective assessments or to the extent

21  that it reflects their mental impressions.  And all that

22  information could easily and properly be redacted, but the

23  notion that we should not have that information available to us

24  and for the Court's consideration for any potential challenge we

25  think simply is not supported by the case law.

1          So we come to the Court with three requests for

2     relief.  First, to ask the Court to direct the government, we'd

3     be happy to pay for the cost of providing a CD and providing a

4     shipment from the government's office to a vendor to provide the

5     electronic production in a meaningful way; secondly, to provide

6     us with an index of the audio and video files; and thirdly, to

7     direct the production of surveillance logs.

8          THE COURT:  When you say "surveillance logs," what is

9     it that you're --

10         MR. ROMAIN:  I mean the monitor log sheets to indicate

11    when a call begins, when a call ends, who the other person on

12    the line is, what efforts were made to minimize, how long the

13    minimization was, etcetera.  I don't want to be in a position of

14    speculating what the government's monitor log sheets in this

15    particular case might have contained, but our understanding is

16    that that is the kind of information that is typically found in

17    those logs and that would go to the heart of our assessment on a

18    minimization challenge and the Court's evaluation of any such

19    challenge.  And frankly, your Honor, we're not looking, and I

20    just want to be explicit about this, we obviously believe the

21    government ought to be able to redact information if that

22    information reflects mental impressions or substantive

23    assessments.  That's not what we're looking for, but we think --

24         THE COURT:  In other words, you already have the

25    tapes?

1          MR. ROMAIN:  We have the tapes.

2          THE COURT:  Right.  You want a log that will show the

3    commencement/duration of tapes, the ending time for the tapes,

4    but you want something else also.

5          MR. ROMAIN:  As we understand it, the monitor log

6    sheets or the surveillance logs would also indicate what efforts

7    the Court has made -- I'm sorry -- the government has made to

8    avoid recording material that is simply unnecessary and

9    irrelevant and has made efforts to minimize, as it must under

10   Title 38.  That information should be found on their

11   surveillance logs.  As we understand it, the government, and

12   obviously they'll have the opportunity to represent whatever

13   they would like, isn't suggesting that they don't have that

14   information, but that simply we are not entitled to receive that

15   information.  I think the law is clear that we are.

16         THE COURT:  What law are you referring to?

17         MR. ROMAIN:  Well, your Honor, there are several cases

18   relating directly to this issue.  For example, United States vs.

19   Wright, which is 121 F sub 2nd 1344, and while it is a District

20   of Kansas case, it certainly evaluates this very question.

21         THE COURT:  Any authority from this Circuit?

22         MR. ROMAIN:  No, your Honor, not directly.  But

23   nevertheless, we think that it makes it clear, and I can discuss

24   some of the rest of the law.

25         Frankly, a lot of cases simply move beyond this issue

and simply say that the disputes tend to relate to when these

things are going to be produced as to whether or not somebody is

entitled to receive them because they go to the heart of an

ability to challenge or evaluate the minimization efforts of the

government, which are, of course, required.

THE COURT:  What are the other citations you have?

MR. ROMAIN:  I would direct the Court's attention also

to United States versus Martinez, which is 1995 Westlaw 10849, a

Southern District of New York case.  And United States versus

Sanchez, 1992, Westlaw, 2959, also a Southern District of New

York case.  Of course we'd be happy to provide additional

authority to the Court if the Court so desires.

THE COURT:  Fine.  All right.

MR. ROMAIN:  Thank you very much, your Honor.

THE COURT:  Thank you, counsel.

Ms. Morris?

MS. MORRIS:  Good afternoon, Judge.  I'll address all

of defense counsel's issues, but if I could take the last first.

That wasn't clearly represented the way the call kind of

occurred.

We received a call from defense counsel this morning.

They left an e-mail last night that they wanted to discuss a

discovery issue, and so we had a call with them this morning at

approximately eleven o'clock, and the discovery issue was that

they asked for the logs, the logs that were maintained during

the T-3, and I said you're not entitled to them, and he said so

you're not going to give them to me?  I said no, that would

constitute work product.  I said, however, what information are

you looking?  He said we want the logs, "he" being Mr. Romain.

Both individuals were on the call and all three of us were on

the call as well.  No.  Mr. Bottini was not.  It was a little

early for Alaska.  So I asked, I said, we're not trying to be

difficult here, we'll give you whatever information.  What

information are you looking for?  And he said, we want the logs.

I said you're not entitled to the logs, so it was like a who's

on first, so it was after that that I realized --

THE COURT:  After that you called me?

MS. MORRIS:  I sure did.

THE COURT:  Have you sat down face-to-face and put the

telephones aside to see if you can resolve this?  I mean, I'm

glad I'm available, well, almost glad I'm available, but I'm

here, I'm available, but this sounds like a dispute that if I

left you locked in the courtroom for a few minutes or so you can

probably resolve them.

MS. MORRIS:  Do you know what, your Honor?  I think

too if this were under normal circumstances, if we had regular

time, but the time constraints --

THE COURT:  You don't have time.

MS. MORRIS:  That's exactly right.

THE COURT:  All the more reason to try to resolve

them.  The five of you are here.  You can spend a few minutes.

I was just kidding when I said lock you in the courtroom.  But

would the five of you like an opportunity to use the jury room

to talk for a few minutes to see if you can resolve this?  These

are issues I think that it's in everyone's best interest that

you resolve them yourselves.  I'm prepared to resolve them.

MS. MORRIS:  That's fine.

THE COURT:  But I want to give you a reasonable

opportunity, a short opportunity to try to resolve them.  I have

every reason in the world to think that the government can reach

an agreement with defense counsel, a reasonable one, and if you

can't, whatever portion you can't resolve I'm going to resolve

and it's going to be a reasonable resolution.

MS. MORRIS:  I understand.

THE COURT:  I want to give you a chance to take a few

minutes to talk face-to-face, and let me just say this while I

have the opportunity:  We don't have the luxury of a lot of time

either and there may be some other disputes that you folks are

going to have to work very hard to try to resolve them.  To the

extent that I'm available, I mean to the extent that my other

cases make me available, I'll be more than happy to assist the

parties with the resolution of whatever issues you can't resolve

among yourselves, but it sounds like here that these issues are

capable of resolution by counsel.

MS. MORRIS:  If I just may, your Honor, and I don't

1    want to take up a lot of your time, it's just that there were a

2    lot of statements made and I just want to make sure the record

3    is clear.

4          We are more than obliging and we have been telling

5    them that we will help in whatever way we can.  However, it's

6    not our job to go through the documents and to tell them which

7    documents -- they want us to indicate which documents they

8    should be looking at, and it's not my job, nor do we feel

9    comfortable, and heaven forbid we rush to go to trial and,

10   should the government be victorious on that, have it go away on

11   appeal for some technicality, so I'm not about to overstep our

12   boundaries.  And, you know, your Honor, we made perfectly clear

13   at the arraignment the voluminous documents and production that

14   was involved.  We told them specifically it was over ten

15   thousand calls.

16         THE COURT:  I'm not pointing fingers.

17         MS. MORRIS:  A lot of documents that came to us by way

18   of subpoena or whatever method we received information during

19   the course of the government's investigation, a lot of that

20   information came to us without staples or any kind of break in

21   them and we scanned them in as such, and then records that we

22   did have that had those kinds of staples or something, all we

23   did was just unstaple them to get them scanned and to have them

24   Bates-stamped.

25         With regard to --

1          THE COURT:  Let me just stop you.  Is it unreasonable,

2    though, for someone to ask for the commencement of those

3    documents and the conclusion of those documents?

4          MS. MORRIS:  Well, your Honor, it's not, but it's not

5    -- the way we gave them to them is not unusual or unusable.

6          THE COURT:  I understand that, I understand that, but

7    you know where the documents start and you know where they end.

8          MS. MORRIS:  For the most part, yes, but some of them,

9    your Honor, you realize are bank records or records that we got,

10   and the banks, that's the way they give it to us, so you have to

11   actually physically look at them to see where the documents

12   begin or end, but at the same time, your Honor, there are some

13   records, of course, that they are requesting now from the

14   imaging of computers for the most part, and the reason why we

15   didn't give them those kinds of electronic things and we scanned

16   them is so that we could maintain some control over them with

17   the Bates-stamped numbers.  If we just gave it over in the raw

18   form it can be manipulated, it can be worked with, and that's

19   why we gave it to them in a form that the document maintains its

20   integrity, so I just want to make sure that the Court is clear

21   there wasn't any hide the ball.  We didn't pick up documents and

22   shake stuff up and throw it in there and give it to them.

23   Everything is in order.  It's just a matter of the way we

24   received it, that's the way we scanned it, and some of the

25   documents again, and we have them all listed in categories with

the Bates-stamp numbers so they know from whom they came, they
know the individual involved.  It is a usable form, so it's not
like we were doing anything.  I just want to make sure the Court
knows, and we've asked them, well, from here on out, now that
you've made that an issue, would you like for us to just give
you everything in hard copy?  We will just give you hard copy
documents.  That wasn't enough.  They didn't want it that way
either.  They want it to be in electronic form.

THE COURT:  I think electronic format would help
everyone, including the Court, at some point.

Again, I'm not blaming anyone, I'm not pointing
fingers to anyone, but I want to give both sides a fair chance
to try to resolve these issues, give you a few minutes.  If you
can't resolve it I will, but I want to give you the opportunity
to try to resolve it and see if you can reach a fair resolution;
if not I'll resolve it, but these sound like issues that counsel
are most capable of resolving.

MS. MORRIS:  Just, you know, Judge, because motions
were due tomorrow, our nervous levels began to rise.  We said
are we filing motions?  Is this going to get prolapsed?  So we
just wanted to get the Court involved.  Actually, it was the
defense that wanted to get the Court involved.  I just moved it
along to call the Court to find out what your availability was.
It was actually their prodding.  They told us for the last few
days we're going to have to call the Court, and I said okay,

1    that's fine, we'll call the Court.

2              THE COURT:  No, no, no.  That's fine.  I'm glad you

3    did, and to the extent we can put these types of issues on the

4    record, we should.

5              MS. MORRIS:  Yes, sir.

6              THE COURT:  But I think these issues are issues that

7    counsel can resolve by taking a few minutes and talk about them,

8    and I encourage you to try to reach a resolution.  If not I'll

9    resolve them.  I'm not going to keep you here all afternoon.  I

10   want to give you at least a chance first to talk about them.

11             While I have you here let me raise another issue.

12   Again, I've not prejudged the transfer issue, but I have to be

13   mindful of the fact that we have to look down the road and to

14   make plans, alternate plans, if you will, in the event this case

15   remains here.  One of the questions, one of the issues that

16   we're confronting right now is with respect to the

17   questionnaires and how those questionnaires, how answers to the

18   questions are reproduced.

19             A couple of thoughts.  Unfortunately this Court

20   probably lacks the ability to copy or to mass produce 150

21   questionnaires, let's just say approximately 30 to 40 pages

22   each, in a short time frame.  Now, there are a couple of

23   thoughts that I have along those lines.  One is that the answers

24   be commercially copied, Kinko's or some other place, or

25   alternatively that the government have the responsibility to

1   copy.  We just lack the resources to do it right now.  It would

2   be a strain.  We could do it but it would be a strain.  It would

3   probably involve multiple copiers working for several hours or

4   so.  So let me throw that out to you.  We rarely use

5   questionnaires in this court.  We have done it before.  And I

6   understand that my colleagues have entrusted that copying

7   responsibility to the government.  That's one way to do it.  I'm

8   not sure whether anyone has thought of using commercial copiers.

9   It seems to me that might be the best thing to do where the

10  Court's clerk just takes the questionnaires to the commercial

11  copier and has them reproduced in a few minutes or so, but I'll

12  leave it to you to talk about that as well.  I welcome any

13  suggestions you have.  We just lack the ability to do that

14  without putting a serious strain on our copying capability, but

15  that's something else you can talk about.

16          MS. MORRIS:  Believe me, we totally understand, Judge.

17  We totally understand.

18          THE COURT:  Why don't I do this, why don't I give you

19  fifteen minutes or so?

20          MS. MORRIS:  That would be fine.

21          THE COURT:  You can use my jury room, and then we'll

22  talk at 2:45.  I have some other matters on my calendar.  Okay.

23  We'll talk again at 2:45.

24          (Recess taken at about 2:30 p.m.)

25          COURTROOM DEPUTY:  Please remain seated and come to

1   order.

2            (Back on the record at about 3:03 p.m.)

3            THE COURT:  Counsel, were you able to work it out?

4            MS. MORRIS:  To a degree.

5            THE COURT:  I'm not surprised.

6            MS. MORRIS:  You can come on up.  I mean, this is a

7   joint effort.

8            MR. ROMAIN:  Well, your Honor, thank you very much for

9   the opportunity.  We have reached some resolution on a number of

10  issues.

11           With respect to the --

12           THE COURT:  I'm not surprised at all.

13           MR. ROMAIN:  And so with respect to the electronic

14  production, we'll look at it and to the extent we have

15  questions, we will ask the government.  They represented that

16  it's a certain amount; if it's an overwhelming amount, then we

17  might have a different issue, but we'll go with that.

18           With respect to the audio files, the government has

19  agreed to provide information about the caller/the callee, where

20  it begins and where it ends, and people who are on video files

21  for the number of files.

22           With respect to the surveillance logs, the government

23  has agreed to provide some information about when it stops and

24  starts, and they're going to determine and evaluate how much

25  more they can provide with respect to those logs.

1          And what I anticipate, your Honor, is that tomorrow

2     when we file our motions, on one of those motions the Court

3     would be sort of a placeholder, that motion that identifies a

4     potential issue around a motion to suppress, that is clearly not

5     ripe, but we'll move to do that as quickly as possible if it's

6     appropriate.

7          THE COURT:  That's fine.  That's fine.  For the

8     record, I've had a chance to read the Kandz (ph) opinion.  It's

9     extremely well written, very persuasive.  There's not a lot of

10    case authority out there.  The Kandz opinion cites back to the

11    two-sentence Circuit decision that just merely references the

12    production of loss.  The Kandz opinion does go into more detail

13    and ultimately, and I just say this for the benefit of both

14    sides, ultimately the question of what's produceable with

15    respect to the logs is left to, and I quote, I'm quoting the

16    Supreme Court decision Alterman versus the United States, is

17    left to the form, discretion, good sense, I emphasize that, and

18    fairness, emphasis added again, of the trial judge.

19         MS. MORRIS:  Well, Judge, if I may to be clear, we

20    weren't saying we weren't going to provide information.  It was

21    what information do you want.

22         THE COURT:  No, you don't have to defend your

23    position.  I just wanted everyone to hear that ultimately if I

24    have to decide it it's going to be left to my good sense.

25         MS. MORRIS:  I understand, Judge.

1      If I may say one last thing about the actual starts

2 and stops.  The tape, it was basically with the proviso that we

3 need to talk to the federal agents who are responsible for that

4 and how cumbersome that is.  Our belief is if it's electronic

5 and we can provide that easily it shouldn't be a problem.  But

6 if it's more to it, it could be a problem, but we've discussed

7 that.

8      MR. ROMAIN:  And I will just assure your Honor that we

9 will of course continue to do everything we can to resolve these

10 issues without the Court's intervention.

11      THE COURT:  I encourage you to do that.  I'm going to

12 make myself available.  I'm not going to promise someone a trial

13 date in late September and not deal with the issues.  This is an

14 issue that is probably best resolvable by the attorneys, but if

15 you can't I'm going to be available to resolve it.

16      MS. MORRIS:  I encourage that.

17      THE COURT:  Sometimes just a meeting, face-to-face

18 meeting will pave the way for counsel to be able to resolve

19 these type of issues as opposed to being on the telephone,

20 seriously, and so I just encourage you to try to settle them.

21 If you can't, then get me on the phone.  I'm probably going to

22 be reluctant to try to resolve issues over the telephone.

23 There's a lot of media interest in this case.  I think to the

24 extent that we need to place things on the public record it

25 should be done that way.  It should be as transparent as

1    possible.

2            MS. MORRIS:  We agree.

3            THE COURT:  It would be easy to resolve these type of

4    issues on the phone, but this is not the type of case where I

5    can do it.

6            MR. ROMAIN:  Thank you very much, your Honor.  We

7    appreciate it.

8            MS. MORRIS:  Thank you.

9            THE COURT:  Do you want to reduce your agreement to

10   writing, or would that produce another disagreement?  I think

11   the record --

12           MR. ROMAIN:  I think that would be wise.  I think the

13   record will speak for itself.

14           THE COURT:  You don't dispute anything counsel was

15   saying?

16           MS. MORRIS:  No.  Just the proviso we're going to try

17   to work it out.  There may be some additional issues, but right

18   now we're going to try to work it out to the degree that it can.

19           THE COURT:  In the event this case stays here, think

20   about it, it's a burden on our resources, and I'm not quite

21   sure, but the best way, it seems to me the better part of wisdom

22   would be to send some law clerk to Kinko's.

23           MS. MORRIS:  It's a question, I think it's best left

24   for me to go back and make sure, we can talk to our

25   administrative personnel, but I'm pretty sure we can cover the

1    cost of it, Judge, and get it turned over pretty quickly

2    overnight.  That's not a huge production.

3            THE COURT:  I think it's going to have to be turned

4    around overnight, though.

5            MS. MORRIS:  That's true.

6            THE COURT:  If the case stays here, we're talking

7    questionnaires answered by 150 people.  We're going to have to

8    make decisions about who to bring in the next day.

9            MS. MORRIS:  Right.

10           THE COURT:  So we're going to have to have a very

11   quick turnaround.  That's why I think our resources are going to

12   be stretched very thin.

13           MS. MORRIS:  I'll talk to our administration people,

14   and maybe what we can do is have some folks actually available

15   and here present to take the questionnaires as we get them to

16   get them produced as, you know, not waiting for the whole bulk,

17   but just getting them done as we receive them, and I think

18   that's doable.

19           THE COURT:  Right.  It may be.

20           I don't know, would you object to that?

21           MR. ROMAIN:  No, your Honor, but let me simply say

22   that the voir dire questionnaires are due, I believe, next

23   Monday, and I'd like the opportunity to consult with the

24   government and with my co-counsel to be able to provide some

25   response by Monday.

1        THE COURT:  Sure, that's fine.

2        MS. MORRIS:  We've actually been working, I've been

3    working with Mr. Carey with regard to the questionnaires

4    themselves, and so I think we're going to have the joint

5    questionnaires resolved today or tomorrow, so we'll be able to

6    get it to the Court soon.

7        THE COURT:  Right.  Great.

8        Are there any other issues you want to bring to my

9    attention now?  Anything else?  Since we're all here, if there's

10   something else, let me know now.  If there's something I need to

11   start thinking about, let me know now.

12       MR. ROMAIN:  No, your Honor, nothing right now.

13       THE COURT:  All right.

14       MS. MORRIS:  I can't think of anything.

15       THE COURT:  You know how to reach me, everyone.  Have

16   a nice afternoon.

17       MS. MORRIS:  Thank you, Judge.  You too.

18       COURTROOM DEPUTY:  This Honorable Court now stands in

19   recess.

20       (Proceedings concluded at about 3:09 p.m.)

21                           - - -

22

23

24

25

I N D E X

WITNESSES:

    None.

E X H I B I T S

None.

1                           CERTIFICATE

2          I, JACQUELINE M. SULLIVAN, Official Court Reporter,

3     certify that the foregoing pages are a correct transcript from

4     the record of proceedings in the above-entitled matter.

5                         _____

6                         JACQUELINE M. SULLIVAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25