```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2


 3     UNITED STATES OF AMERICA,      .
                                      .
 4              Plaintiff,            .
                                      .  CR No. 08-231
 5        v.                          .
                                      .
 6     THEODORE F. STEVENS,           .  Washington, D.C.
                                      .  Wednesday, August 20, 2008
 7              Defendant.            .  11:17 a.m.
                                      .
 8     . . . . . . . . . . . . . .    .

 9

                  TRANSCRIPT OF MOTION FOR CHANGE OF VENUE
10                BEFORE THE HONORABLE EMMET G. SULLIVAN
                       UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

13     For the Government:          BRENDA MORRIS, ESQ.
                                    EDWARD SULLIVAN, ESQ.
14                                  NICHOLAS MARSH, ESQ.
                                    United States Department of Justice
15                                  1400 New York Avenue, N.W.
                                    12th Floor
16                                  Washington, D.C.  20005
                                    202-514-1412

17     For the Defendant:          BRENDAN V. SULLIVAN, ESQ.
                                    ROBERT CARY, ESQ.
18                                  ALEX ROMAIN, ESQ.
                                    Williams & Connolly, LLP
19                                  725 Twelfth Street, N.W.
                                    Washington, D.C.  20005
20                                  202-434-5000

21     Court Reporter:             JACQUELINE M. SULLIVAN, RPR
                                    Official Court Reporter
22                                  U.S. Courthouse, Room 6720
                                    333 Constitution Avenue, N.W.
23                                  Washington, D.C. 20001
                                    202-354-3187
24
       Proceedings reported by machine shorthand, transcript produced
25     by computer-aided transcription.
```

P R O C E E D I N G S

COURTROOM DEPUTY:  08-231, United States versus Theodore Stevens.

Will counsel please identify yourselves for the record?

MS. MORRIS:  Good morning, Judge.  Brenda Morris, Nick Marsh, and Ed Sullivan for the government.

THE COURT:  Good morning, counsel.

MR. B. SULLIVAN:  Good morning, your Honor.  Brendan Sullivan, Rob Cary, Alex Romain for Senator Stevens.

THE COURT:  Good morning, counsel.  It's your motion.

MR. B. SULLIVAN:  Thank you.

I think that in the history of the Republic it's probably safe to say that there have never been more than forty witnesses that will travel round trip seven thousand miles to get to a trial.

THE COURT:  Well, some may not have to travel.  We have video-conferencing capability.  State-of-the-art.  It's HD quality.

MR. B. SULLIVAN:  My dearly beloved senior partner, Ed Bennett Williams, died twenty years ago today.  I don't think he'd ever advise me to permit a video if we can get the real live witness right here that close to a jury.  In the forty years I've been doing this, I think there may be sometimes it's necessary, you just don't get the witness otherwise, and that

1    technology has to be used, and I think it can be used

2    effectively, but not as effectively, especially in the area of

3    cross-examination, your Honor.  I think it's crucial to have the

4    witnesses here.

5                THE COURT:  But you raise another point, though.  The

6    government hasn't said that it would have problems producing its

7    witnesses, so your right to cross-examining is not adversely

8    impacted at all.  You will have the right within reason to

9    vigorously cross-examine the government witnesses, and they

10   haven't indicated to the Court there's any hardship whatsoever,

11   and indeed the Court would not be sympathetic to the

12   government's request to allow its witnesses to participate by

13   way of video-conferencing because that would probably intrude on

14   your client's confrontational rights, so I wouldn't allow that.

15               MR. B. SULLIVAN:  Right.

16               THE COURT:  You're going to have the right to cross-

17   examine to your heart's content if the case stays here or

18   wherever the case is tried.

19               MR. B. SULLIVAN:  I certainly wouldn't expect the

20   government to claim hardship for its witnesses.  I guess it may

21   not be true, but from where we sit, it looks like the government

22   has a lot of assets, and transporting witnesses in order to have

23   a case in the District of Columbia I'm sure is not of any

24   concern to our United States government.  The government --

25               THE COURT:  It's a concern to the Court, though.

```
 1              MR. B. SULLIVAN:  Yes, your Honor.

 2              THE COURT:  And the Court seriously considers your

 3    arguments.

 4              MR. B. SULLIVAN:  We have asked the government to tell

 5    us how many witnesses there were.  The first day in court I

 6    alerted the Court that there would be a venue argument.  On the

 7    very next day, August 1st, I believe, we wrote a letter to the

 8    government and we said tell us how many witnesses are from

 9    Alaska.  We think the Court should know.

10              THE COURT:  I think the response was thirty to forty.

11    It's been fairly consistent in that regard.

12              MR. B. SULLIVAN:  I'm just not sure where that figure

13    came from.  I don't think they contested when we say ninety

14    percent are from Alaska, but when we wrote the letter

15    specifically asking how many from Alaska, they responded in an

16    unusual way.  They didn't state a number.  They said witnesses

17    will come from three places:  Alaska, the District of Columbia,

18    and Other, with the majority from Alaska.  I don't think that's

19    candid with us or with the Court, so we can argue this kind of

20    motion, and maybe I think it would be helpful if we can find

21    out.  I'm from a little state.

22              THE COURT:  Are you suggesting that the government

23    didn't in good faith represent to the Court that there were

24    approximately thirty to forty witnesses and that indeed the case

25    would take three to four weeks?  I know I asked that a number of
```

1    times just to make sure I was hearing correctly, that we had

2    that number of witnesses and that number of weeks, because if

3    the case were to remain here I wanted to accommodate the parties

4    and also accommodate this Court's other very busy schedule.

5            MR. B. SULLIVAN:  I think you're absolutely right,

6    that they said it was three weeks.  That's the first time I

7    heard it.

8            THE COURT:  I think four weeks.

9            MR. B. SULLIVAN:  Three or four weeks, maybe it could

10   be.  I heard three the first time, and yes, I think they said

11   three --

12           THE COURT:  Do you know what?  I think this case can

13   probably be tried in two weeks because there won't be any other

14   interruptions on the Court's calendar.  It wouldn't be the first

15   time that the parties have represented the trial is going to

16   take three to four weeks and we've been able to try it in a few

17   days, and you know it from your own experience as well.

18           MR. B. SULLIVAN:  I would hope it could be done

19   earlier.

20           THE COURT:  It will be, believe me.  There are some

21   other matters waiting.

22           MR. B. SULLIVAN:  I've even had in mind to ask the

23   Court to consider a Saturday if we were running late.

24           THE COURT:  Fine with me as long as the jurors are

25   happy.  Do you want to do that?  Do you want to bring jurors

1    down here on a Saturday?

2              MR. B. SULLIVAN:  Yes.

3              THE COURT:  It's fine with me if they want to do it.

4    That's something we'll consider.  I'm not going to commit to it.

5    It wouldn't be the first time we've done that.  We don't do it

6    often, but we'd certainly consider that, but the jurors would

7    have to be very comfortable with that.

8              MR. B. SULLIVAN:  Yes, your Honor.

9              Let's go with the Court's recollection then.  I hope

10   to point out during this hearing whether or not it is thirty or

11   forty witnesses and whether or not it is ninety percent.  I

12   wanted to address the Court's attention I think to a couple of

13   things.  These are just Flatt factors.

14             THE COURT:  Can I stop you for one second before you

15   get to that?

16             MR. B. SULLIVAN:  Yes.

17             THE COURT:  You say you may request the Court to sit

18   on Saturdays.  That goes against our other argument that

19   essentially impedes on the ability for your client to campaign,

20   doesn't it, because the most major campaign day for his schedule

21   is Saturdays?

22             MR. B. SULLIVAN:  Your Honor, the answer to that is

23   this:  Very clearly we want the earliest possible trial date.

24             THE COURT:  And you got it.

25             MR. B. SULLIVAN:  We will never ask for a continuance.

1   We want it to go as quickly as possible and we want the verdict

2   as far this side of election date as possible.

3            THE COURT:  So even if the case --

4            MR. B. SULLIVAN:  That is clear.

5            THE COURT:  So regardless of whether the case stays

6   here or goes to Alaska, you're asking that the Court consider a

7   six-day week trial?

8            MR. B. SULLIVAN:  No, your Honor.  It's very different

9   if it's here versus Alaska.  Let's look at the very first

10  location of Senator Stevens.  He would normally be, and a Flatt

11  factor is the residence.  Well, he lives here most of the year,

12  there's no question.

13           THE COURT:  Right.

14           MR. B. SULLIVAN:  He goes back and forth.  But where

15  he is every year in September to October to election day, he's

16  in Alaska.  That's his home.  That's his legal home.

17           THE COURT:  Congress will be back in session in

18  September, though?

19           MR. B. SULLIVAN:  Yes, your Honor.  He has to come

20  back for Congress, but Congress gets out by the 26th for

21  election.  It is closed down from September 26th through all of

22  October through November 4th.  Now, there's a reason for that in

23  our democracy.  Business is shut down in Washington.  The

24  representatives go to their home states, they live there,

25  breathe there, work there morning, noon and night to get the

1    public to vote.  That's what they do, and that's where he would

2    be, but let's look --

3              THE COURT:  But if the case is transferred, if the

4    case is transferred to Alaska, he's in trial eight hours a day

5    in Alaska.  He's in trial eight hours a day in D.C., so he can't

6    campaign.

7              MR. B. SULLIVAN:  Oh, your Honor, it is very

8    different, very, very different.

9              THE COURT:  You concede he's in trial, though?

10             MR. B. SULLIVAN:  Of course.

11             THE COURT:  The campaign is limited to, his personal

12   campaign is limited to after hours, court hours in Alaska or

13   after court hours in D.C.

14             MR. B. SULLIVAN:  If he's in D.C. he cannot campaign.

15   He can't get there.

16             THE COURT:  Suppose the Court weren't sitting on

17   Fridays because the Court has other business?

18             MR. B. SULLIVAN:  Yes.

19             THE COURT:  It has many cases on its calendar.

20   Suppose the Court says, you know, I'm sensitive and indeed I am

21   sensitive to all the competing considerations and indeed his

22   desire to get re-elected, so suppose the Court says I'm going to

23   deny the motion, but recognizing that very important reason he's

24   articulated, the Court's not going to sit on Friday.  He can

25   leave Thursday evening.  He'll have Friday, Saturday, Sunday.

1   Indeed we can start later.  We can start at 9:30 or 10:00 on

2   Monday.  That doesn't give you the six days you want.

3           MR. B. SULLIVAN:  Your Honor, if you thought that this

4   trial could be over well before November 4th, that is a factor

5   that would be very helpful to accommodating the fact that he has

6   election responsibilities.  There's no question.  The fact --

7           THE COURT:  I have the same information that you have,

8   although you probably know more about the government's evidence.

9   You know more about how this evidence will come in.  The Court

10  doesn't know.  The Court will utilize its 23 years' experience

11  in determining that there will be a lot of testimony, there will

12  be a lot of testimony taken by way of tapes, videotapes, audio

13  tapes; there will be live witnesses.  I have every reason to

14  believe based upon the proffer that's been made about the number

15  of witnesses that the government plans to introduce, and I

16  haven't heard from you and I'll probably hear an ex parte

17  proffer from you about how long you think your case in chief

18  will take because I'll probably need to have that information in

19  order to make a reasonable decision about how long this trial

20  will last.

21          MR. B. SULLIVAN:  I think that's fair, your Honor, and

22  I have here today to submit in-camera and ex parte a list of

23  witnesses.

24          THE COURT:  Great.

25          MR. B. SULLIVAN:  Which I can say to the Court is

1   about forty.  Now, remember, I think you saw --

2            THE COURT:  Would that include some of the

3   government's witnesses?

4            MR. B. SULLIVAN:  Yes, I think it would.

5            THE COURT:  Would it be all the government's

6   witnesses?

7            MR. B. SULLIVAN:  No, it would not clearly.  That's

8   why I'm struggling to find out how many.  I was witness to a

9   government statement at one time that they wouldn't call three

10  or four that I would consider key witnesses.  Then I would call

11  them perhaps.

12           THE COURT:  You know, there's a way to deal with

13  witnesses that both sides plan to call, and that way, unless

14  someone has objections for a compelling reason, that way would

15  be to expand the scope of cross-examination and let you get your

16  testimony in.  That's one way to do it.  Maybe that's not

17  appropriate in this case.  Maybe you need to call those same

18  witnesses in your case in chief, I don't know, but we can be

19  very flexible and not inconsistent with the Federal Rules of

20  Evidence.

21           MR. B. SULLIVAN:  I will say this:  It's not likely we

22  would recall witnesses.

23           THE COURT:  Right.  That's what I thought.  Right.

24           MR. B. SULLIVAN:  Not recall.

25           THE COURT:  So we're cutting down the time of this

1    trial dramatically now.

2              MR. B. SULLIVAN:  I hope so.  Look, they filed a

3    motion called the government's motion in limine concerning

4    inapplicability of the Speech and Debate Clause in which they

5    publicized to the world during an election at page five all the

6    things that they want to bring into the case.  Well, I thought

7    this case was about a house and some gifts and some forms.

8              THE COURT:  I think it's about some forms principally.

9              MR. B. SULLIVAN:  Yes.

10             THE COURT:  And we'll get to that.  It's about some

11   forms and statements made in the District of Columbia.

12             MR. B. SULLIVAN:  But remember I'm only hearing what

13   the government says.  They said three weeks.  That surprised me

14   so I'm dealing with that, but look --

15             THE COURT:  You were surprised at the length or the

16   brevity?

17             MR. B. SULLIVAN:  I'm surprised at the three weeks.  I

18   thought it was going to be a week trial.  That was my general

19   understanding.  I'm not blaming anybody.  I was just surprised.

20   I think you saw that surprise.  I said I thought I was told five

21   days, but --

22             THE COURT:  I was focusing on my own surprise at the

23   time.  The government's expected duration, we can get more

24   information from the government.

25             MR. B. SULLIVAN:  All right.

1            Let me show the Court here.  Look, these are just the
2   factors from the cases.  I'm not going to reargue what's in the
3   pleadings.  Witness location is very important.  I mean, forgive
4   me for being a little coy, but I'm from the state of Rhode
5   Island and geography is not my strong suit, but once in a while
6   we should remember where Alaska is.  It's 3,500 miles out there.
7   New York is two hundred miles, Maine is eight hundred miles.
8   You know, Miami is about a thousand miles; San Diego is closer,
9   Los Angeles is closer, London is about the same.  And we're
10  bringing about ninety percent of forty witnesses -- let's use
11  the figure if it was heard correctly -- ninety percent of forty
12  witnesses three thousand miles to testify.  Now, what's the
13  practical implication of that?  These are mothers, fathers,
14  business owners, hourly-wage workers.  We all know what the
15  travel involves.  I just did it.  I left Friday about five
16  o'clock.  It takes twelve hours door-to-door to get to Alaska.
17  That's a good rule of thumb.  I changed planes twice somewhere
18  along the way, Detroit, Seattle, the Twin Cities.  It's a
19  twelve-hour flight either way.  The red eye coming back -- I
20  just took it -- you leave at about eleven o'clock eastern time,
21  seven o'clock Alaska time.  There's a four-hour difference, and
22  you're into Washington about 8:30 in the morning.  What's the
23  practical effect of it?  It certainly has a cost factor.  You
24  know, we got to send a $1,500 ticket.  That's the best estimate
25  we have, $1,500.  We can send a ticket to a witness and have

1   them travel the round trip.  We're not sure of the figure.  You

2   know the way plane rates are and you can't have a ticket that

3   vanishes --

4           THE COURT:  Under certain circumstances, though, the

5   government can be required to pay the cost of transportation,

6   though, but you're not asking the Court to do that, are you?

7           MR. B. SULLIVAN:  I'd love to.  I didn't know we

8   could.  Maybe we would, sure.

9           THE COURT:  Under certain circumstances.

10          MR. B. SULLIVAN:  I'll research that and if

11  appropriate I'll make a motion to that effect.

12          But let me go back to the point here.  We're talking

13  about cost and expenses, you know.  If we had forty witnesses

14  and we brought them just at $1,500 times forty --

15          THE COURT:  You've not made that argument in writing,

16  though, about the cost.  No one referred to cost or expenses.

17  That was a question I was going to ask.  Indeed the record is

18  clear that there is no information on cost and expenses.

19          MR. B. SULLIVAN:  I think we did say expense to the

20  witness.  We didn't parse it like this.

21          THE COURT:  You didn't argue financial hardship to the

22  defendant, though, did you?

23          MR. B. SULLIVAN:  No.  We just said expense.  It's in

24  our motion.  We said expense.  We didn't break it down, we

25  didn't talk about the cost of the ticket or things like that.

1    But think about the timing.  You know the way travelers, we're

2    always terrified that we won't have a witness on time for the

3    Court or that we disrupt the jury or the progress.

4            THE COURT:  I'm putting everyone on notice right now,

5    if the case remains here or goes to Alaska this Court will wait

6    for no one.

7            MR. B. SULLIVAN:  I understand.

8            THE COURT:  Subpoena the witnesses today.  I'm not

9    going to wait.  They're all going to be here, if a day or two in

10   advance.

11           MR. B. SULLIVAN:  I simply understand that, and that's

12   the way I operate and I would expect to be harshly treated if I

13   didn't have a witness, but the fact of the matter is, when you

14   got witnesses three thousand miles away you got to get them

15   here, you got to kind of stack them up in a hotel because it's

16   not like calling Virginia or Pennsylvania and saying get on a

17   train and come down here.  There are factors of travel, of

18   hotels and other things.

19           In addition, we have --

20           THE COURT:  The Court will bend over backwards to

21   accommodate anyone.  It may not be necessary for a two- or

22   three-day stayover in D.C.  We're going to proceed very quickly

23   but very fairly in a very orderly manner, and to the extent

24   witnesses can come in and testify in the morning, they can leave

25   in the afternoon, so I'm going to bend over backwards to

accommodate anyone, especially those witnesses who may have to

travel thousands of miles.

MR. B. SULLIVAN:  I understand, and I expect you to be

fair, as you have been already.  If I said a witness missed his

plane in Detroit you'd make some accommodation.

THE COURT:  Of course I would.

MR. B. SULLIVAN:  That's natural given the --

THE COURT:  If I hear this every day I'm going to be

less accommodating, I'll tell you that.

MR. B. SULLIVAN:  We can struggle to accommodate, but

you can't get away from the fact that you've got about forty

witnesses traveling 3,500 miles to get here with all the

attendant costs, difficulties, that any of the parties would

have to do that.  And I think that's extremely important.  You

have the location of Senator Stevens, which would normally be

there at the time anyway, and yes, he's a dynamo at 85.  I was

just out there with him.  I spent twelve hours a day some days

and saw what his schedule was and he works from morning to

night, but is he capable of being here in the District of

Columbia for a trial and getting out there?  That's really

practical.  Maybe a weekend maybe something could be done on the

schedule, or if the Court is right and this case is two weeks --

THE COURT:  I don't know.  I can't sit here and

predict that.  I don't know.  I can tell you because this Court

has already made significant, and I emphasize the word

1    "significant," changes to its calendar, there will not be any

2    other cases on this Court's docket that will impede --

3              MR. B. SULLIVAN:  Yes, your Honor.

4              THE COURT:  -- that will impede the progress of this

5    trial.  That doesn't mean that I'm not working before we take

6    the bench and after we leave the bench.  It just means there

7    aren't going to be a lot of calendar calls and status hearings

8    and other matters that impede the orderly process of this case.

9    I can assure you of that.  We haven't gotten to how long the

10   trial is going to take, but we're going to proceed very, very

11   quickly, but fairly.

12             MR. B. SULLIVAN:  I accept that, and I'll say again

13   for the record the fairness of the Court I will never question.

14   We may disagree.

15             THE COURT:  I'm sure.

16             MR. B. SULLIVAN:  It's balls and strikes.

17             THE COURT:  Undoubtedly we will, I am sure.

18             MR. B. SULLIVAN:  The fairness I will never ever

19   disagree with.

20             Let me address another issue that needs addressing,

21   your Honor, right from the government's brief.  The government

22   basically says here, hey, it's not appropriate to have this case

23   in Alaska because the senator is out there campaigning, and to

24   quote them, for example, they say that he's tainting the jury,

25   that --

1            THE COURT:  Did they say he'd be tainting them or

2    there's a potential for?

3            MR. B. SULLIVAN:  I'll read it exactly.  Although it

4    might very well be that a significant amount of the senator's

5    pretrial campaign activities as well as those of his opponents

6    could potentially taint a jury pool in Alaska.

7            There would be no question that his proposal to

8    campaign during the trial poses severe problems.  What are the

9    severe problems?  The problem relates to taint.  They're

10   suggesting sequestering, and I think they say further he's

11   vocally proclaimed his innocence.  So far, thank God, that's not

12   a crime in America.  He came into court and he proclaimed his

13   innocence, and for heaven's sake, if in a campaign he has to

14   proclaim his innocence a hundred times he will, but there's one

15   thing he is not doing, your Honor, and will not do as long as

16   I'm his counsel, and that is, discuss the facts or discuss the

17   law of the case.  Back to Ed Williams, that's one admonishment

18   he gave us as young lawyers -- maybe 39 years ago I heard that

19   one -- try the cases here in the court, not on the courthouse

20   steps.  And that's what I've done for 39 years.  I won't do it.

21   He doesn't do it.  They quote him saying it's not bribery.

22   That's a quote virtually from the Justice Department itself.

23   Remember, we didn't --

24           THE COURT:  It's not bribery.  He's not been charged

25   with bribery.

1          MR. B. SULLIVAN:  I understand.  What I'm saying is

2    that they, at the time of the indictment, they had a press

3    release, they had a press conference in which they articulate

4    the charges.  You know, the defendant is only a punching bag at

5    this stage.  We can't even begin to fight back until they start

6    to make their case.  In the meantime he's out there in a

7    campaign saying nothing about the facts, nothing about the law.

8    This quote that they have here is merely a quote basically of

9    what the chief, the deputy assistant general -- attorney general

10   for criminal stated himself before T.V. cameras.  He's not doing

11   that.  In fact, today's paper, in the Anchorage paper, and I'm

12   quoting, quote:  Stevens wouldn't discuss the charges against

13   him, saying that's the job of his lawyers.

14          I've trained him well.  It's not easy with public

15   figures.  Imagine the urge to discuss the facts after the

16   government barrages with allegations and pleadings which make

17   headlines all over the campaign trail.  Look, he lives in Alaska

18   during the time of this trial normally if he weren't on trial.

19   He will campaign, he will stay away from the facts.  He will

20   stay away from the law and he will campaign.  If he slips into

21   declaring himself innocent I say hurray for him, he has to do

22   that, and he believes that he is innocent and that these charges

23   are allegations only that have no merit, and that will be proven

24   at trial.  So if the government is saying, hey, we can't

25   possibly go to Alaska because of all the problems it would

1   create, I say to you this:  We extended the statute five times,

2   five times at the government's request over a period of a couple

3   of years.  They didn't have to bring this case 28 days before a

4   primary, 98 days before an election.  We didn't cause that

5   problem.  It could have waited but they put it in the middle of

6   a campaign.  We are grateful that this Court has given us a

7   chance to try this case before the election.  He's worked forty

8   years.  The people of the state of Alaska are great independent

9   smart people.  They've had him as their representative for forty

10  years.

11          Another factor, we talk about special factors --

12          THE COURT:  Do you want that, counsel, against the

13  jury pool being selected from that electorate?

14          MR. B. SULLIVAN:  No, I don't think so, because every

15  time I've selected a jury pool the judges admonish -- I make a

16  big deal about hearing this and hearing that, and I've done it

17  in so many cases where there's a lot of publicity, and the judge

18  says we will find a jury, and every time they found a jury.

19          THE COURT:  They never had to deal with this scenario

20  because unfortunately the citizens of the District of Columbia

21  don't have a senator representing them.

22          MR. B. SULLIVAN:  Unfortunately.  You and I and others

23  who live here for their lifetimes, but hopefully that will

24  change sometime.  They talk about us up there as the lower 48.

25  I guess they don't mean us.

```
 1              But anyway, your Honor, there's another special
 2      factor.  What is this special factor that I have on the board?
 3      I'll give you one.  How about the eight hundred thousand people
 4      in Alaska that are voting for this man, that have depended upon
 5      this man?  This is a man who crosses party lines.  He's been
 6      there for forty years.  He's a senator for all the people up in
 7      Alaska.  Why should their election be interfered with?  He
 8      should be in Alaska.  He should be where the witnesses can roll
 9      down their street and come to court just like any other witness.
10      If in fact there are forty people out there that have to travel
11      across this land to get here -- by the way, if you want to drive
12      it's 4,200 miles.  I doubt if anybody is driving, but an
13      interesting fact.  At any rate, I say to you that if I were
14      here, if I were here saying by the way, we got forty witnesses
15      in New York City, I think we'd go to New York City.  Why not
16      Alaska?  We can move.  I said before and I didn't mean it
17      humorously, I'd like the Court to move.  We're ready to go.
18      There are important factors here.  This Court has struggled to
19      find it.
20              THE COURT:  Why would it be necessary for this Court
21      to go as opposed to having this case randomly assigned to a
22      district judge in Alaska?
23              MR. B. SULLIVAN:  Because you're ready to try it and I
24      think you'd give an absolute fair trial to both sides and you'll
25      get this thing done and there's an interest.
```

1          THE COURT:  I'm sure my colleagues in Alaska would be

2     just as fair-minded.

3          MR. B. SULLIVAN:  I would rather have you.

4          THE COURT:  I'm flattered, I'm flattered, but I have

5     another calendar, though, too.

6          MR. B. SULLIVAN:  I understand, I understand.

7          THE COURT:  I have many other cases on my calendar.

8          MR. B. SULLIVAN:  We'll go out there, we'll work seven

9     days a week, and we'll be back in a couple of weeks.  I'll work.

10    We don't go home.

11         THE COURT:  If the case stays here I can sit on

12    Fridays I can handle other people in court.  I have to give

13    other people who are sitting in D.C. jail the opportunity to

14    come see me in person.  I won't have that opportunity to do

15    that, though, if I go to Alaska.  I won't have the opportunity

16    to schedule hearings for other litigants before the Court to

17    have the opportunity to be in front me, not just see me on a

18    television screen.

19         MR. B. SULLIVAN:  Your Honor, I know we're a long ways

20    away from the Circuit judges, although I guess they still have

21    some in this country, but once you get to Alaska I think we'd

22    set in very comfortably and be able to try this case even faster

23    if we're out in Alaska.

24         THE COURT:  But the impact on the Court's docket,

25    though, is a factor that the Court has to consider, and the

1    impact my docket would be adversely impacted if I had to go

2    there.  It's a beautiful state.  I've not had the pleasure of

3    going before.  I'd be delighted to go and visit, but to go there

4    and try the case, that would be an experience as well, but I

5    have to be concerned about the other litigants on my calendar

6    waiting for their fair day in court.  How can I justify that to

7    them?

8             MR. B. SULLIVAN:  One thing I can't address is the

9    Court's docket because I don't know it, and I apologetically

10   stated the first day that I was here, although we were asking

11   for a fair trial, I know full well that everybody deserves a

12   fair and fast trial when they're seeking it.

13            THE COURT:  One of the things the Court did, it

14   delayed commencement of another trial that has been pending on

15   the Court's calendar for I'll just say a long time.  The Court

16   commenced the date of the trial October 3rd or 4th, I believe.

17   It's a civil case.  The criteria is a little different, but

18   nevertheless the Court had to delay commencement of this case

19   that's been pending for quite a while, shall we say.  It's a

20   high profile case.  I did that in an effort to accommodate your

21   client because this is a criminal case.  He articulated a very

22   compelling reason to want to have this case be decided before an

23   election.  I can appreciate that.  I'm sensitive to that.  I'll

24   tell you it was no small feat, though, to be able to move that

25   case as well as many other cases.  We have been working very

1  hard, having status hearings, telephone and otherwise, with

2  respect to other litigants, not letting them know, not telling

3  them that their case is less important than this, but crafting

4  out a way in which the Court can fairly focus its attention on

5  those cases without just, you know, just casting them to the

6  sideline, so it's not been easy at all, but we've moved

7  everything, and in the matters that we haven't moved, the Court

8  could, if it keeps the case here, address those matters either

9  prior to commencement of the trial each day or after everyone

10 leaves.

11         MR. B. SULLIVAN:  Your Honor, I can understand that,

12 and again, I don't profess -- I can't make a suggestion.  That

13 is a world known to you and far be it for me as a defense lawyer

14 to say that others could be harmed by the fact that we are going

15 early.  The only thing --

16         THE COURT:  Do you know what?  That's very significant

17 to bring because no one is going to be harmed at all.  People

18 have actually gotten earlier hearing dates because we had to

19 move some, but no one is going to be harmed by this at all.  I'm

20 very sensitive to that as well, but the cases have been moved.

21 Even the trial that was supposed to commence in October, the

22 attorneys were happy, or at least they were happy the last time

23 I spoke with them, so no one's been harmed.

24         MR. B. SULLIVAN:  I leave you with this thought.

25         THE COURT:  Sure.

1        MR. B. SULLIVAN:  Why are we here struggling as you

2   are and as I am to find the right thing to do?  It's all about

3   fairness.  The Flatt Factors, you can go down them.  It's all

4   about fairness.  Bottom line, I know you try to be as fair as

5   you can, but remember when you're making this decision, this is

6   not your doing and it's not my doing.  I don't know why the case

7   had to be brought so soon before an election, which is a

8   complicating factor, and frankly with forty witnesses in the

9   state of Alaska or close to it, ninety percent of them, I still

10  say it will be the only case in the history of our Republic

11  where people traveled so far to come here to present evidence

12  with all the complications, and I leave it in your hands as a

13  matter of fairness with this information.

14        And I'd like to pass up to you the ex parte.

15        THE COURT:  Thank you very much.  You did a good job

16  of reading my mind.  Thank you.

17        MR. B. SULLIVAN:  Thank you, sir.  I also have a paper

18  copy of this.

19        THE COURT:  Great.  That's great.

20        Let me can ask you this, counsel:  What about Judge

21  Bates' opinion in the Quinn case?  Persuasive, not persuasive?

22        MR. B. SULLIVAN:  Well, I think the bottom line of

23  that is that that's the case where it's basically equipoise in a

24  circumstance where there's equipoise.  I mean, that's calling

25  balls and strikes, your Honor.  I'm a baseball dad.  My kids

1    played baseball.  I didn't like a lot of calls over the years

2    but I wouldn't want to be the umpire making the call, but here

3    when I see this case I can't imagine why this case is not in

4    Alaska.  I can't imagine why we'd bring forty witnesses seven

5    thousand miles round trip.  You mentioned, and that's a good

6    point, forms are filed here.  So what?  The sight of everything

7    that happened here, all the allegations, the structure itself,

8    the people who worked on it, the alleged gifts that were

9    provided to it, it's all there.

10              THE COURT:  That's not the crime scene, though, and

11   the government does a pretty good job of arguing indeed the

12   crime scene, if there is one, is the filing of allegedly

13   fraudulent documents in the District of Columbia.

14              MR. B. SULLIVAN:  You know, your Honor, I think that

15   that's more clever than accurate, because the fact of the matter

16   is, as you'll see it unfold and as I represent to you, it's all

17   about Alaska, it's what happened in Alaska.  It's who worked on

18   it, what was the value of it, was it a gift, what was done,

19   should it have been, you know, what was the knowledge, what was

20   the knowledge of the senator?  It's all Alaska.  I mean, is all

21   there is five percent in the District?  Sure.  I'm not arguing

22   there's no jurisdiction.  Of course the forms were filed here,

23   but the forms don't control all these other factors.

24              THE COURT:  All right.  Thank you, counsel.

25              MR. B. SULLIVAN:  Thank you, sir.

1          MR. MARSH:  Good morning, your Honor.  Nicholas Marsh

2     for the United States.

3          I'm sorry that I didn't bring a world map to this

4     argument.  I had no idea that would be required, but what I did

5     bring instead was I brought my rule book and I brought a bag of

6     cases, and we submit under the rules and under the cases that

7     are relevant to this case a venue transfer, especially a

8     discretionary venue transfer, is not appropriate.

9          As the Court is aware, Rule 21(a) deals with mandatory

10    transfers for pretrial publicity and other matters.  Rule 21(b)

11    in contrast is discretionary, and what it asks the Court to do

12    is to look and see whether or not just from a matter of

13    convenience the case should be transferred, and we submit that

14    it shouldn't.

15         We'd like to pick up with what the Court just asked.

16    Quinn is a case that of course defense did not cite in their

17    brief despite the fact it is, by the government's view, the most

18    recent published opinion from this court on venue and it does

19    not simply stand for something that is equipoise.  It does say

20    that, it says if the factors are equipoise then the Court should

21    still keep it in the jurisdiction chosen by the Court.  It also

22    says that under Judge Bates' opinion it is appropriate for the

23    Court to defer and assume that there should be a presumption

24    that the case should be kept in the forum that it was charged,

25    and as Mr. Sullivan acknowledged, this is the proper venue for

1    the crime that's charged in the indictment.

2         Now, why is Quinn simply not an equipoise case?

3    Because the factors in Quinn, the facts of Quinn are very

4    similar to the facts that the defense claims are at issue here.

5    We submit that there's actually a substantially larger amount of

6    factual connection in this case to the District of Columbia than

7    what Mr. Sullivan has argued in his papers, but taking their

8    briefs at face value, Quinn is a very similar case.  Quinn is a

9    case where none of the defendants lived in the District.  They

10   lived in the Eastern District of Kentucky.  I'm from Kentucky.

11   It's a long way away.  All of the witnesses were in Kentucky or

12   other places.  There was no actual affirmative connection with

13   the shipments at issue with the District of Columbia, and in

14   reviewing the discretionary 21(b) motion, Judge Bates said these

15   are not sufficient reasons to move the case to the Eastern

16   District of Kentucky, the venue was appropriate in the District

17   of Columbia, the case should be kept here.  That's what Judge

18   Bates did.  We submit that under Quinn this Court should adopt

19   the very same approach.

20        I would like to walk through the Flatt Factors that

21   Mr. Sullivan went through.  First, Location of the Defendant, a

22   couple of points I think are relevant here.

23        First, the cases that deal with this, your Honor, are

24   not cases in which -- the cases that deal with this are not

25   cases like the case at bar.  These are cases, for instance, the

 1    Coffee case cited in defendant's briefs, that was a situation in

 2    which some indigent defendants lived in a different state.  They

 3    didn't even have the money to pay for the $225 hotel room for

 4    their initial appearance, and that was a case in which the Court

 5    found that they didn't live in the jurisdiction, and that factor

 6    was one of the predominant factors that militated toward moving

 7    it to a different jurisdiction.  However, those factors are not

 8    present.  Senator Stephens owns a house in the District of

 9    Columbia.  As defense counsel conceded, he spends a substantial

10    amount of his time here.  His spouse is employed as an attorney

11    here.

12            THE COURT:  Don't mention the firm.  Go ahead.  She's

13    a partner at a law firm in D.C.; is that correct?

14            MR. MARSH:  General counsel, but yes.

15            The hardships that underlie the other cases cited by

16    the defendant are generally the fact that the defendant will

17    have to incur substantial expense to go somewhere else to live

18    during trial.  That's not the case here.

19            Furthermore, I point to the fact that Quinn cited

20    approvingly to the Southern District of New York's decisions in

21    Spy Factory.  One of the decisions that these courts have

22    recognized is that, contrary to what the defendant suggests,

23    location is not the most important factor.  Now, there is some

24    case law either way on that, but certainly we submit that it's

25    not as important a factor as the defendant makes out, and to the

1    extent that it is, this is a circumstance in which it's much

2    different.  The defendant has a house here.

3            And finally, I note that Mr. Sullivan represented that

4    every year during this time Senator Stevens is back in Alaska to

5    work on campaigns.  Now, I believe it's in fact accurate to say

6    that a member of the United States Senate runs for reelection

7    once every six years and that federal elections are held once

8    every two years.  Even assuming that Senator Stevens needs to

9    return to the District of Alaska for every federal election,

10   that's one out of every two years.  I'm not aware that this is a

11   period of time that he goes back to election year when in fact

12   there are no elections.

13           The second, your Honor, Witness Locations.  What I

14   find particularly interesting about this chart, I'd like to --

15           THE COURT:  How many witnesses does the government

16   absolutely need to call?  Let's talk about witnesses and time.

17           MR. MARSH:  Sure.  We believe it's forty.  We believe

18   it's generally forty.  We're still in the process of trying to

19   come up with a list.  It's one of the reasons that we didn't

20   provide Mr. Sullivan with a number, a specific number that he

21   asked.  We don't believe that we're entitled -- we didn't want

22   to be locked in.  We don't believe we're entitled, we have a

23   pretty good idea.

24           THE COURT:  What's your good faith estimate for the

25   amount of time it would take to enable the government to present

```
 1      just its case in chief, not cross-examination, but you have a
 2      pretty good idea?
 3               MR. MARSH:  We do.
 4               THE COURT:  Absolutely.  So what's your best
 5      prediction?
 6               MR. MARSH:  We still believe it's three weeks.
 7               THE COURT:  And not four weeks?
 8               MR. MARSH:  We believe that the government's case,
 9      soup to nuts, including cross-examination, should be done in
10      about three weeks.
11               THE COURT:  Including cross-examination?
12               MR. MARSH:  I believe so.  It may be that that slips
13      over a little bit, but we have given a significant amount of
14      thought to that.  As the Court is aware, anything can happen in
15      trial, but we have been -- we believe we're very accurate on
16      that.  It could possibly be four.  We doubt highly that it will
17      be two.
18               THE COURT:  That excludes, though, defense counsel's
19      plan to call a number of witnesses.  Some of those witnesses may
20      already have been identified by the government, I don't know.
21      But let's assume worst case scenario another twenty witnesses or
22      so.  That's probably going to add another, we're looking at four
23      weeks, then probably maybe, but then I don't know.  I don't know
24      about the duration.  I'll have to ask Mr. Sullivan that at the
25      bench maybe about his prediction and good faith estimate for
```

1   time that it would take to enable him to present his case in

2   chief, but that's your good faith prediction of time at this

3   point in your understanding of the case?

4           MR. MARSH:  That's correct, your Honor.

5           If I can, I'd like to take points B and C on the chart

6   that's up here.

7           First, the government's fact witnesses, as the

8   government set forth in its memorandum, there is a substantial

9   amount of authority suggesting that because it's a discretionary

10  motion and because the defendant carries the burden the

11  defendant has an obligation to provide some detail as to who

12  it's going to do.  The defense didn't do that.  Now, we

13  understand why they don't want to give us their witness list.

14  We understand why they don't want to make their witnesses public

15  at this point, but it doesn't mean that they still get the

16  benefits of filing a 21(b) motion.  They have to make a choice

17  and they chose to make the motion, but they put in no evidence

18  whatsoever to support their contention that they were going to

19  have witnesses.

20          Second, the cases indicate that this is a factor from

21  the defendant's standpoint when they talk about hardship.  There

22  was no reference in any of the defendant's briefs that they were

23  going to engage in substantial hardship because of that, and to

24  fast-forward to expenses to parties, the Court was correct in

25  remembering that the defendant didn't make any suggestion that

expense was an issue.  In fact, what the defense said was not

what was represented in court but was actually, quote, neutral

at best, unquote.  That's opening brief, page thirteen.

Now, we submit that the defense fact witness point was

they did not meet their burden on that, but very interestingly,

your Honor, I wanted to point to number 2(c), which also goes to

6(c), Defense Experts.  This is very interesting from the

government's standpoint because that was not something

referenced in any of their paperwork.  It's also something that

the government is hearing about for the first time today.  As

the Court is aware, Rule 16(b)(1)(c) requires disclosure of

expert witness information.  Not only have we received no Rule

16 disclosure after indictment from the defense, we've received

no notification whatsoever concerning expert witnesses, and now

the fact that defense is so clear about the status of their

expert witnesses and the identities that they can pull together

a percentage of where they're located and an estimate of how

much more expensive it will be to go to Alaska, given the fact

that the government has no knowledge whatsoever of who those

expert witnesses were.  That is disturbing.

With respect to location of events, the chart said 98

percent.  We respectfully disagree.  As the Court will note from

the government's filing in this case, this is not a case in

which everything happened in Alaska but a couple of forms were

filed in D.C.  This is a case in which there was a substantial

1    amount of communication, the government will prove at trial,

2    with D.C.:  faxes, e-mails, letters, telephone calls, to and

3    from the District of Columbia, merchandise going back and forth,

4    cars being shipped back and forth, other things being shipped

5    back and forth to the District of Columbia.  There is a

6    substantial factual connection with this.

7             Now, it's true a lot of this relates to Alaska, but

8    it's not 98 percent.  It's certainly not 98 percent, and it's

9    not accurate to represent to this Court that it's something

10   where it's exclusively in Alaska, and to that extent Mr.

11   Sullivan mentioned the fact that the forms were filed here, so

12   what?  That's precisely the key of this case.  These forms are

13   very important.  They serve an important public function.  They

14   are filed here, they were prepared here, they were signed here.

15   There are substantial reasons to keep this case in Washington,

16   D.C.

17            I would like to shift to the last factor before coming

18   back to factor number five on the chart.  With respect to

19   Special Factors, the Court engaged in some detailed colloquy

20   with defense counsel about how the Court situation will be

21   staffed.  Now, the government is simply speculating here as we

22   must because we have no information on this, but we do note that

23   every single active federal judge in the District of Alaska was

24   appointed by the United States Senate during a time that Senator

25   Stevens was in office.  We thus think it's highly likely that

1    the members of the district court of the District of Alaska

2    would recuse themselves, which would either require this Court

3    to move its staff and its chambers up to Alaska to hear the

4    trial or the 9th Circuit to get a judge from somewhere else, and

5    that is a substantial amount of effort, it's a substantial cost,

6    it is, as the Court noted, disruptive not only to this Court

7    with respect to the other matters that are attendant to any

8    member of the federal judiciary, but also to whatever other

9    Court would be tasked to go up to Alaska to take three to four

10   weeks to try the case.

11           And finally, your Honor, disruption of Senator

12   Stevens' business.

13           THE COURT:  Let me ask you something.

14           MR. MARSH:  Yes.

15           THE COURT:  Counsel proposed that the Court sit six

16   days a week.  What does the government say to that?

17           MR. MARSH:  Your Honor, it's something that we've

18   never considered.  Certainly with respect to -- it's something

19   that we're happy to entertain in discussions with the Court and

20   with defense counsel about.  It's something that we hadn't

21   previously considered.  We do believe that the trial schedule as

22   put forth is sufficient to be able to allow the trial to go

23   forward during the time and the time frame Defendant Stevens

24   would like.  We, of course, very much agree with the Court that

25   to the extent that that suggestion was made, it directly

1    counters the best of the argument for Senator Stevens that he

2    needs to be able to engage in his business of campaigning during

3    the election.

4          THE COURT:  Whether the trial is in D.C. or Alaska,

5    six days a week is six days away from the campaign trail during

6    the day anyway.

7          MR. MARSH:  That's correct, and as the Court will

8    note, in the Spy Factory decision from the Southern District of

9    New York then district Judge Sodamayor addressed this argument

10   that was made in connection with disruption of business, and in

11   that case the defendant noted that they plan on working nights

12   and weekends.  The government responded by saying it was really

13   very difficult to imagine a defendant on trial in a federal

14   criminal case being able to do that, and Judge Sodamayor

15   expressed her concerns about that as well, but taking it at its

16   word, certainly it is something that could be done, but it does

17   raise some issues.

18         THE COURT:  It's going to be very difficult to get a

19   jury panel willing to sit four weeks anyway.  It's very

20   difficult.  I've been a jury judge for this court for a number

21   of years and it is indeed alarming to suggest to a jury panel

22   that they now have to sit six days a week.  I don't think that's

23   going to go over very well in terms of their ability to sit.

24         MR. MARSH:  And it may very well be, your Honor, and

25   certainly we do think that given our representations --

1        THE COURT:  Not only their ability, their willingness

2    to sit.  I don't think it's going to go over very well,

3    actually.

4        MR. MARSH:  Certainly we think that five days a week

5    is enough to get this trial done.

6        THE COURT:  What about the Court's thought that maybe

7    the Court could address with more sensitivity the defendant's

8    desire to campaign in Alaska by sitting four days a week and he

9    can leave Thursday and go to Alaska and have the full day

10   Friday, Saturday, and Sunday?

11       MR. MARSH:  My guess is defense counsel wouldn't be so

12   thrilled with that because their stated reason for having the

13   trial as early as it is to be able to facilitate, one of those

14   reasons is to get the case done before November, and we would

15   submit that should we go back up to four days a week it would be

16   pretty difficult, I think it may well be difficult to get that

17   done.  Certainly those kinds of things are things that we are

18   happy to engage in with defense counsel and with the Court.

19       With respect to what the Court was just discussing,

20   though, we do submit that there are significant, significant

21   concerns about having this case -- having a jury veneer in

22   Alaska on this case.  It is not the same as having it in D.C.,

23   and we, I think we respectfully disagree with Mr. Sullivan that

24   the defendant has not been discussing the facts of the case or

25   the law.  As the Court notes, we did attach the article from the

1   Kavern Daily News in which Mr. Stevens said that, quote:  This

2   is an indictment for failure to disclose gifts that are

3   controversial in terms of whether they were or were not gifts.

4   It's not bribery.  It's not some corruption.  It's not some

5   extreme felony.  He then additionally said, These charges are

6   for failure to disclose gifts and it's not some multi-million

7   dollar scandal or bribery charge or anything else.

8           We also note in other circumstances prior to

9   indictment Mr. Stevens made some very specific conversation,

10  among other things, and I paraphrase:  I paid every invoice sent

11  to me.

12          THE COURT:  Are you saying it's impossible for the

13  government to get a fair trial in Alaska?

14          MR. MARSH:  No, not necessarily.  What we do say, as a

15  necessary part of the campaign, and certainly Mr. Stevens

16  running for reelection, has the right to campaign in whatever

17  way he chooses, but that does have some attendant effects on the

18  jury veneer, is what we're concerned with.

19          THE COURT:  Not too long ago the former mayor of the

20  city was tried in the District of Columbia, and my recollection

21  is he was convicted of some counts, I'm not sure, but there were

22  no impediments to selecting a jury, and I think he was an

23  incumbent mayor at that time, I believe.  I think he was.  I'm

24  not sure, but I think he was.

25          MR. MARSH:  Certainly with respect to the veneer, we

1    have no idea what it will pose, but with respect to how the

2    petit jury will be operating, we do believe it's substantial

3    because it will be an election season, there will be debates,

4    there will be ads.  This will be on the front page of

5    everything.  The only way to practically do it, from the

6    government's view, in Alaska is to sequester the jury four

7    weeks, and we note that having had some experience doing jury

8    trials in the District of Alaska it is logistically different

9    than doing a jury trial in the District of Columbia.

10             THE COURT:  How so?

11             MR. MARSH:  The jury pool within the District of

12   Alaska comes from a very large point.  I hesitate to pull up Mr.

13   Sullivan's nice map, but the state of Alaska is very large and

14   the jury pool --

15             THE COURT:  He'll hold it up for you.

16             MR. MARSH:  Sure.  I'm not sure we're that close.

17             But certainly the jury pool within the District of

18   Alaska where Anchorage draws its jury pool is large and some

19   jurors have to fly in.  They have to be put up in hotels, and so

20   it's a substantial, it's a substantial hardship.

21             Finally, your Honor, from the government's side, we

22   have a little, actually more than a little, heartburn about this

23   point number five, the disruption of Senator Stevens' business.

24   As the Court is aware, the Court moved heaven and earth to be

25   able to accommodate a trial before the November elections.  Now,

1    at the time that Defendant Stevens requested that he knew that

2    he was running for reelection during the very period that his

3    criminal trial would be conducted, and we submit that it is not

4    appropriate for a defendant to be able to effectively engineer a

5    Platt factor in that way to be able to demand a trial before an

6    election and then use the fact that campaigning is necessary

7    during that election as a primary factor in moving that trial to

8    a jurisdiction that he believes is more favorable to him.  We

9    believe that Quinn and Rule 21(b) and the factors that are

10   attendant to this case can militate very, very strongly toward

11   this Court keeping this case in the venue where it was

12   appropriately brought, the venue where the false forms were

13   submitted, the venue where these crimes were committed, right

14   here in the District of Columbia.

15              THE COURT:  All right.  Thank you, counsel.

16              Mr. Sullivan?

17              MR. B. SULLIVAN:  Will you permit?

18              THE COURT:  Sure.

19              MR. B. SULLIVAN:  Very briefly, your Honor.

20              THE COURT:  Absolutely.

21              MR. B. SULLIVAN:  We did say in our pleadings, we

22   addressed in our pleadings the issue that it was a burden on

23   counsel making arrangements to get witnesses to court 3,500

24   miles from their home, and of course it goes without saying we

25   need subpoenas and so forth.  As to the issue that counsel

described as disturbing, out of an abundance of caution, to be
totally candid, we figured we didn't want to just list defense
experts, but if we had others we should list them when we're
talking about this, and by the way, my understanding of Rule 16
is if we don't ask for their experts we don't have to give them
ours.  I believe that's the rule.  That's the way it's always
been applied in other cases.

As to the experts, I only met them Saturday and
Sunday.  This is now Wednesday.  As you know, meeting with
expert witnesses is a process, so that deals with that issue.

And again, on the last issue about saying, well,
somehow we've demanded a quick trial, we were pleaders, we were
asking for a quick trial and the Court generously gave it.  The
fact of the matter is, as it's developing with a three-week
case, the senator is in Alaska.  Let's pretend he wasn't a
senator, let's just pretend he ran a business, a small business
of twenty people in the carpentry business.  He's there, he runs
his business, he's important to his business.  Yes, it sounds a
little strange that he's a senator and he's running for election
at the same time, but I close with the reminder that the
problems you're struggling with are not of your making and
they're not of our making.  They could have asked for an
extension; they didn't.  They called me the morning of the
indictment and said it was indicted.  It happens to be that the
trial is now set at a period in which he naturally would be in

Alaska.  I don't mean he's in Alaska campaigning every six

years.  I think one of the benefits of being a senator is you

campaign once every six years, but this is the sixth year.  He's

intensely in Alaska at this period of time.  Certainly in other

years he's very active in campaigning for others in other years,

I believe, but my point is this year it just happens to be it

all comes together, but we didn't do it.

THE COURT:  Let me ask you this question, counsel,

before you sit down.  If the Court's inclined to keep this

proceeding here in the District of Columbia, would you prefer to

sit four days a week or five days a week?

MR. B. SULLIVAN:  Your Honor, that's kind of like -- I

actually looked it up.  I didn't know whether I'd be confronted

with a Hobson's choice.  I actually looked it up.  I think maybe

we've been using it wrong all these years.  Here's the way it

was explained to me:  Hobson was a guy who owned a stable back

in the 1500s and he rented horses and he said to every customer

you can take that horse in that stable, but he wanted to rotate

them.  You can't take the horse back there.

THE COURT:  I'm not going to hold the answer against

you and say you waive.  It's not a trick question.  I'm trying

to be fair.

MR. B. SULLIVAN:  I know you are, and I will never say

otherwise.  What we want is the earliest, fastest trial

possible.  First so that the result can be in before the

1   election.  That's first and foremost.  Secondly, we've presented

2   very real concerns in the most unique circumstance.  I think

3   everywhere forty witnesses they admit or ninety percent of forty

4   they still don't say are coming three thousand miles to be here.

5           Lastly, if in the beautiful world which none of us can

6   create we could try this case in four days a week, let him

7   campaign on the weekend and have it done by election, yes, that

8   would be positive, very positive, but does it eliminate the

9   concerns that we have about transporting people more than across

10  the country, further than across the country?  No, it doesn't.

11  Those are still very important factors.

12          THE COURT:  So I can't give you the answer to that

13  part of your question, your rhetorical question, will it

14  conclude prior to the election date.  No one knows.

15          MR. B. SULLIVAN:  I know that.

16          THE COURT:  No one knows.

17          MR. B. SULLIVAN:  That's what's frightening.

18          THE COURT:  So I need an answer to my question.  Do

19  you want to sit four days or five days?

20          MR. B. SULLIVAN:  That's what's frightening.  That's

21  very frightening.  I am frightened by the fact that we could --

22          THE COURT:  By sitting four days?

23          MR. B. SULLIVAN:  Um-hmm.

24          THE COURT:  This could happen in Alaska, though.  I

25  could transfer the case to Alaska and that judge say, look, I've

1    got other matters, I'm going to hear this three days a week, so

2    there's no guarantee if the case is transferred that the judge

3    will sit four days a week.  There's no guarantee.  That judge

4    could sit four or five days a week.  That doesn't put your

5    client in a better position for campaigning because he'll be in

6    trial four days a week.

7         MR. B. SULLIVAN:  Your Honor, I understand that

8    always.  I know the worst of circumstances is going to be that

9    if they say four weeks and they can't commit to three.  No trial

10   lawyer can predict.

11        THE COURT:  It's difficult to predict how long.  We

12   tell the jurors, look, I can't tell you how long it's going to

13   take you to deliberate.  I just give you a prediction for how

14   long.

15        MR. B. SULLIVAN:  That's exactly --

16        THE COURT:  That's why we say approximately four

17   weeks, because you start telling people that it's going to end

18   on a certain day and it doesn't, then we've got problems.

19        MR. B. SULLIVAN:  I understand, your Honor.  I think

20   from a defense lawyer's perspective we move very quickly.  We

21   move very quickly I think from our perspective.

22        THE COURT:  All right.

23        MR. B. SULLIVAN:  Thank you, sir.

24        THE COURT:  All right, counsel.  Thank you.

25        MR. MARSH:  Your Honor, would the Court permit a very

1   brief response to the question of timing?

2           THE COURT:  Sure, sure.

3           MR. MARSH:  Your Honor, I just wanted to respond very

4   briefly to the question of the timing.  As Mr. Sullivan

5   indicated, there were a number of tolling agreements entered

6   into in this case.  I don't believe it's relevant to go into a

7   significant amount of detail about the circumstances, but I

8   would like to represent from the government's view that there

9   were a number of reasons why those agreements were entered into.

10  There were a number of factors relating to them and we do not

11  believe that the defendant was unaware about the timing issues

12  the government faced with respect to this indictment.

13          THE COURT:  It's your motion, counsel.  You have the

14  right to have the next to last word, anyway.

15          MR. B. SULLIVAN:  Your Honor, I have no reason in the

16  world to understand why this case wouldn't have been brought

17  after an election.  None.

18          THE COURT:  All right.  I'm prepared to rule today on

19  this.  I want to take about a five-minute recess and I'll

20  announce my ruling when I return.  Thank you.  No need to stand.

21          COURTROOM DEPUTY:  This Honorable Court now stands in

22  a brief recess.

23          (Recess taken at about 12:13 p.m.)

24          COURTROOM DEPUTY:  Please remain seated and come to

25  order.

1          (Back on the record at about 12:19 p.m.)

2          THE COURT:  All right, counsel.  Federal Rule of

3    Criminal Procedure 21(b) provides, and I quote, that "upon the

4    defendant's motion, the Court may transfer the proceeding, or

5    one or more counts, against that defendant to another district

6    for the convenience of the parties and witnesses and in the

7    interest of justice."  End quote.  The defendant bears the

8    burden of establishing that the case, and I quote, "would be

9    better off", end quote, transferred to another district.  In

10   that regard, see United States versus Quinn, 401 Fed Supp. 2d,

11   80, 85, an opinion by my colleague, Judge Bates.  In determining

12   whether a case should be transferred under Federal Rule of

13   Criminal Procedure 21(b), the Court must consider ten factors:

14   location of the defendant, location of possible witnesses, the

15   location of events likely to be an issue, location of documents

16   and records likely to be involved, the disruption of defendant's

17   business unless the case is transferred, expense to the parties,

18   the location of counsel, relative accessibility of the place of

19   trial, the docket condition in each district or division

20   involved, any other special elements that might affect transfer.

21   And those factors were particularly articulated by the Supreme

22   Court in the case of Platt versus Minnesota Mining and

23   Manufacturing Company.

24          Upon consideration of those factors and written and

25   oral arguments advanced by the parties, the Court denies

defendant's motion to transfer this proceeding to the District

of Alaska for the following reasons:

In United States versus Quinn my colleague, Judge

Bates, considered and denied an analogous motion to transfer a

case to the Eastern District of Kentucky.  In his opinion

denying the motion the Court stated that while the, quote,

"fact- intensive and discretionary nature of the Platt inquiry

makes it difficult to generalize about how courts decide which

of two districts is more appropriate, some patterns are

discernible.  End quote.  For example, he noted a presumption

favoring the government's choice of forum, as long as venue is

proper, and that, and I quote, "if consideration of the Platt

factors leaves the Court in equipoise, the Court should err on

the side of caution and deny the motion.  End quote.  Judge

Bates concluded, and I quote, "The Court's own research supports

the observation to transfer under Rule 21(b) although not

unheard of, has been rare in recent years.  This is hardly

surprising when one considers the massive expansion of

technology and the relative decline in costs for long-distance

travel over the past few decades.  End quote.

This Court is persuaded by the rationale of Judge

Bates' ruling.  The Court will summarize the parties' respective

arguments as to each factor, or note where the parties agree

that the factor is neutral, and give my recommendation.

With respect to the location of the defendant, the

defense argues that this factor weighs heavily in favor of

transfer and cites cases for the proposition that it is, quote,

"preferable to try a defendant in the district where he resides.

End quote.

The defendant also points out that Senator Stevens'

residence in Alaska and the value of renovations to that

residence is the focus of that indictment and the case and to,

quote, "assist the jury in understanding that these renovations,

Senator Stevens intends to request that the Court permit a jury

visit to his Girdwood residence.  End quote.

The government counters that the senator works in the

District of Columbia.  The government has represented Alaska

since 1968; he owns a home in D.C. and his wife is a partner in

a law firm in D.C.  The government notes that if the trial is

here, the Senator will be able to maintain close contact with

his Senate office and live in his own home.  In addition to the

Quinn case, the government cites Jones versus Gasch, G-a-s-c-h,

404 Fed 2d 1231, another opinion from the District of Columbia

Circuit affirming a denial of a motion to transfer and noting

that the district court found that residence was, quote, "a

factor to be considered," end quote, but, quote again, "not the

controlling factor."  End quote.

The Court is of the opinion this factor weighs in

favor of the government.  Unlike cases where the defendant would

be tried away from home in an unfamiliar city, Senator Stevens

lives in Washington, D.C. for at least a substantial part of the year.  So far in 2008, the Senate has been in session for a total of 96 out of 232 calendar days, about 41 percent.

The second factor, location of possible witnesses, defendant argues that this is one of the most significant factors in the analysis and that it weighs heavily in favor of transfer.  Defense notes that the government intends to call more witnesses from Alaska than any other jurisdiction and contends that all the government's key witnesses are from Alaska and that more than ninety percent of the witnesses Senator Stevens intends to call are residents of Alaska.

The government again cites to Quinn, where Judge Bates found that although more witnesses resided in Kentucky than in Washington, D.C., there were also a number of witnesses who resided in other jurisdictions and would have to travel in any event.  The government also cites to United States versus Spy Factory, 951 Fed Supp. 450, a case decided by the Southern District of New York, holding that, and I quote, "a naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer", end quote, and defendant, quote, "must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial."  End quote.  Here, the government argues, defendant has not even made a threshold showing that witnesses will be unable to testify here.

1          The Court's persuaded by that argument.  This factor

2     does not weigh in favor of transfer.  There's been no showing

3     that Senator Stevens will be unable to call his witnesses if the

4     trial is here.  Moreover, it appears that D.C. is far more

5     accessible than Anchorage, Alaska for the witnesses who would

6     have to travel to either forum.

7          Further, this courthouse is equipped with

8     video-conferencing capability to ameliorate any travel hardship

9     to any witness.

10         The third factor, the location of events likely to be

11    an issue, the defendant argues that all of the alleged

12    underlying conduct took place in Alaska, this is a significant

13    factor in the analysis, and that it weighs in favor of transfer.

14         The government counters that this is a case about a

15    scheme to conceal, through the submission of false financial

16    disclosure forms to the United States Senate and that the

17    financial disclosure forms were created, reviewed, signed,

18    submitted, and filed in the District of Columbia.  In addition,

19    the government notes that some of the alleged conduct occurred

20    in Washington, D.C.  finally, citing Quinn, the government notes

21    that this factor is more focused, quote, "to contemplate a case

22    where jurors might benefit from a visit to a crime scene or

23    might require some understanding of local geography."  End

24    quote.  The government notes that the Girdwood residence is not

25    a crime scene, that there are more than 1,000 high-resolution

1    digital photos of the residence which could suffice if any of

2    the physical features of the home are relevant in trial.

3         The Court does not draw this factor as one it favors.

4    The financial disclosure forms are required by the United States

5    Senate and are filed here, and thus any falsification of the

6    forms was committed here.  Moreover, there should be no need for

7    a visit to the Senator's Alaska residence to view the

8    renovations.  Any view can be accomplished by viewing

9    photographs or films of the residence.

10         The fourth factor, location of documents and records

11   likely to be involved, the parties basically agree this a

12   neutral factor.

13         The fifth factor, disruption of the defendant's

14   business unless the case is transferred, the defendant relies

15   most heavily on this factor, arguing that the trial here will

16   prevent him from campaigning in Alaska in the weeks immediately

17   prior to the election.

18         The government responds that Senator Stevens requested

19   the transfer motion.  Moreover, the government offers persuasive

20   argument that the Senator's campaign status is a substantial

21   reason against transfer and that his intention to campaign

22   during the trial could lead to significant potential for jury

23   tainting and media exposure.

24         The government's argument is persuasive and this

25   factor can be further neutralized if the Court determines, as it

has, that it will not hold trial on Fridays.  That's a decision

that the Court will give further consideration to after

obtaining additional input from both sides.  By not sitting on

Fridays this will allow Senator Stevens to travel to Alaska and

campaign on weekends, arguably more time than he would have if

the trial were held five days a week in Alaska.  This would also

reduce the risk of jury exposure to the media.  Further, this is

a travel schedule that will not be unfamiliar to the defendant.

It is fairly common knowledge that many or all senators and

presumably Senator Stevens regularly return to their home states

for the weekends.  By the way, the Senate often is not in

session on Mondays and Fridays.  So far in 2008 there have been

only five weeks where the Senate was in session for all five

days.

The sixth factor, the expense to the parties, the

experts essentially agree this factor is neutral in the papers

filed, although the Court has heard some unsubstantiated

evidence today with regards to expense, but the Court doesn't

factor the expense issue into the decision-making process at

this time because, other than a vague argument about expenses,

there's been no evidence to persuade the Court that the expense

to the parties is a significant factor in this case.

The location of counsel, defendant -- strike that.

Defense argues this factor is likely neutral.  Government argues

that if anything, it tips against transfer.  In the Court's view

the factor does not favor transfer.  The investigation was done

principally here in the District of Columbia and Alaska as well

to a certain extent.  The lead prosecutors are here and the

defendant's defense counsel's firms has offices here.

Relative assessibilty to place of trial.  The parties

agree this factor is essentially neutral.

The docket, the ninth factor, docket condition of each

district or division involved.  Defense argues that this factor

is neutral because the Court has agreed to an early trial date

and they ask that the Court preside over the trial in Alaska,

and indeed the Court's flattered.

The government argues that this factor weighs against

transfer because transfer would likely require this Court or

another district judge to travel to Alaska to preside over the

trial.  Arguably there could be issues of judicial recusal by

active judges in the U.S. District Court for Alaska.  Moreover,

in a footnote the government references this Court's recent

experiences with high profile cases and the procedures in place

to deal with significant media attention and note that the court

in Alaska may not be similarly equipped.

This factor in the Court's view weighs against

transfer.  Moreover, although the government concedes the

recusal issue is speculative, it is not entirely far-fetched.

Having this Court move to Alaska would almost certainly cause

delay.  This Court went to great lengths, emphasis added, great

1    lengths, to rearrange its calendar to give the defendant an

2    early trial date here in the District of Columbia and the

3    defendant assumes that the Court will be able to stick to the

4    same trial date even if the trial were moved to Alaska.  The

5    disruption to the Court's calendar and cases it presides over

6    would be significantly adversely impacted.  It's doubtful that

7    the Court would be able to conduct its normal Friday business

8    while on detail in business.

9          And finally, as we know, the Court in Alaska is

10   unequipped to handle the media and other logistical issues

11   associated with this case.

12         Any other special elements that might effect transfer:

13   The defendant doesn't really articulate any others.

14         The government argues, and the Court is persuaded,

15   that because the defendant is up for reelection in Alaska and

16   will be campaigning, that's actually a reason not to transfer

17   the trial to Alaska.

18         The Court's persuaded by that argument as well.

19   Senator Stevens has asked for an early trial date and the Court

20   gave him the date he asked for.  The wrongdoing alleged in the

21   indictment occurred here.  The factors weighing most heavily in

22   favor of transfer (location of possible witnesses and disruption

23   to defendant's business) do not outweigh the factors against

24   transfer (docket conditions, etcetera,) especially where the

25   Court will not hold trial on Fridays.  Any transfer would almost

1        certainly lead to delay and additional expense.

2                And that's the Court's ruling.  The motion to transfer

3        then is denied.

4                Having addressed the only issue before the Court, I

5        want to briefly talk about a related issue because now it is

6        truly related, and that's the question of voir dire.  The

7        parties have complied with the Court's order and have submitted

8        joint proposed questions, individually proposed questions.  I've

9        seen your proposals.  I've not had a great deal of time to focus

10       on this.  I do want to focus on what I believe was an offer by

11       the government to -- let me hear from the government with

12       respect to copying the questionnaires, photocopying the

13       questionnaires.  That's a major problem that requires the

14       utilization of resources that the Court may not have available

15       to it, and I want to be clear about it.  Is this a joint

16       request?

17               MS. MORRIS:  Yes, your Honor.  I've been in touch with

18       Mr. Romain and basically what we had discussed and notified the

19       Court as well as chambers to let you know that the last time we

20       were in court the mention was that the Court really didn't have

21       the capability to get the questionnaires copied.

22               THE COURT:  We could do it.  It would probably break

23       every printer in the courthouse, though, and that doesn't make a

24       lot of sense.

25               MS. MORRIS:  What I suggested with counsel and with

1    chambers, that we can certainly have paralegals from the Justice

2    Department in the courtroom or in the hallway ready, that when

3    the jurors complete the questionnaires -- first of all, we can

4    make copies of the questionnaires and then once they are

5    completed --

6              THE COURT:  Copies before they're even answered?

7              MS. MORRIS:  Before, yes.

8              THE COURT:  That's not a problem at all.

9              MS. MORRIS:  Okay.  The jurors, once they complete the

10   questionnaires, we can have them sent out be copied in waves so

11   we don't have to wait until everyone is finished and someone's

12   shepard them out and bring them back, and that's not a problem.

13   Or the suggestion was to my suggestion was to have the Court PDF

14   the questionnaires to the Justice Department and then we can

15   have them copied as they're completed and that way they can be

16   ferreted back, so it's going to be a shepherding on one end, but

17   I was just trying to eliminate both ends, so I didn't know

18   whether or not that would be a possibility.

19             THE COURT:  As long as we don't have to do it, yes, it

20   is a possibility, and this is by consent of counsel.  I mean, we

21   can work out the details, I think, but that's a generous offer

22   because we just don't have the capability to do that.  We were

23   actually exploring options, but I'm delighted to hear that.

24             This is a joint request, correct, Mr. Sullivan?

25             MR. B. SULLIVAN:  Yes.

1          THE COURT:  I think the details can be worked out, but

2     I just need to know if you are on the same page.

3          MR. B. SULLIVAN:  Absolutely, your Honor.  We believe

4     we can work something out.  We would prefer to have a wave of

5     paralegals go and copy the documents and then bring them back,

6     but we think that would relieve the issue.

7          THE COURT:  Can I make another suggestion?  Let me

8     just throw this out.  I'm almost tempted to keep quiet but I

9     can't.  The suggestion is that the Court select a vendor to do

10    this work and that the government pay for the vendor.

11         MS. MORRIS:  The only proviso I make with that, your

12    Honor, is that as long as it's a vendor in which we already have

13    a contract with because of all the different procurement issues

14    involved with it, so if that's the issue, we've explored that as

15    well.

16         THE COURT:  It might be the easiest as opposed to

17    having a wave of paralegals.

18         MS. MORRIS:  We were thinking it would expedite or

19    shorten the time to have the wave of paralegals, and we're

20    talking like three paralegals take it either to a vendor or back

21    to the offices to be copied.  Either way it's going to be a

22    local vendor or a cab ride to our office, which isn't that far

23    either, or to the U.S. Attorney's Office that's up the street as

24    well.  We have an availability of options.

25         THE COURT:  This is something we can't work out today,

1    but at least you're on the same page, you're in agreement to

2    work together and reach further agreement.  And I would

3    encourage both sides to speak with my courtroom deputy, Carol,

4    and Shelly.  You know Shelly.

5              MS. MORRIS:  Yes, sir.

6              THE COURT:  Standing in the courtroom.  He's either

7    smiling or not smiling based upon the information that he

8    received.  I think he's smiling.  But you need to coordinate

9    this with him and Carol as well and I think we can work this

10   out.

11             I just need to go over your joint -- I probably have

12   no objection to your joint submission, although I will take a

13   look at it.  I need to look at your sole submissions, your

14   individual submissions as well, and I think all of this is

15   workable.  The government -- strike that.  Defense counsel has

16   filed a battery of motions.  I'm not sure whether responses are

17   in yet to the motions.  We have a hearing date scheduled for

18   September the 10th, I believe, correct?

19             MS. MORRIS:  Yes.

20             MR. B. SULLIVAN:  That's correct, your Honor.

21             MS. MORRIS:  That is correct, but I don't believe our

22   responses are due until Monday of next week.

23             THE COURT:  That's fine, that's fine.

24             All right.  I'm going to get a lot of stares from the

25   left if I suggest this but I'm going to suggest it anyway

1    because -- no, there's nothing we can do about that.   I was

2    actually thinking about trying to move it up even earlier.

3    We've already sent questionnaires out, we can't do it, but there

4    were some other developments on my calendar that may have carved

5    out even a few more days.   We can't send out more subpoenas for

6    jurors at this late date.   We just can't do it.   Would you be in

7    a position to proceed even earlier than the 22nd?   I guess

8    there's no sense talking about it now if you can't do it, but

9    let's just forget it.   It would have been a good idea.   But we

10   are scheduled for the 22nd.   There's no way I can advance that

11   to even the 19th.   There's nothing I can do about that.

12            MR. B. SULLIVAN:   Well, your Honor, we'll certainly

13   leave it to the Court to determine whether it can work its

14   schedule to do it a little earlier.

15            THE COURT:   Do you know what?   We've sent out

16   subpoenas and summons already to jurors.   There's no way to do

17   it and this was just a very recent development that would have

18   freed up some more time, but there's nothing else I can do.

19            Now, I want both sides to give some more thought to

20   sitting four or five days.   You know, I'm not going to pin you

21   down today, but that's a big issue here.   We actually thought

22   about the four-day schedule to accommodate Senator Stevens and

23   he could leave Thursday and fly back and have a full day Friday.

24   But I need to hear more about that and what his views are.   I

25   got a mixed answer from Mr. Sullivan.   It's a good answer, but

1    we need to make some decisions, though.  To the extent I can do

2    it, to the extent I can accommodate him I'm willing to do so,

3    but I recognize the downfall of only sitting four days.  That is

4    going to significantly increase the trial time past the election

5    date.  I mean, I know how fast you're going to proceed because

6    there's nothing else on my calendar during the day, but I'm

7    mindful, as you well stated, things happen sometimes that you

8    have no control over.

9         MR. B. SULLIVAN:  The answer is I don't know the

10   answer to the question, but maybe if we see how the trial is

11   progressing and we start on a five-day-a-week schedule.

12        THE COURT:  You know, that's not a bad idea.

13        MR. B. SULLIVAN:  We could then get to the point where

14   we say okay, it's moving along, let's take a long weekend.

15        THE COURT:  Our experience, and I'm sure the

16   experience of you both and everyone else in the well of the

17   court, is that the jurors appreciate, in a lengthy trial, they

18   appreciate that day off to rejoin their families, to go back to

19   work and return the e-mails and do everything else they can't

20   do.

21        MR. B. SULLIVAN:  Why don't we start with the

22   assumption we're going to work a full week and see how it goes

23   for a week or two, get a better assessment then of what the

24   timing is and maybe we could ask for a long weekend.

25        THE COURT:  All right.  Anything is possible.  I just

1    want you, I want everyone to think about it as well.

2            MS. MORRIS:  Judge, the government is ready to

3    accommodate whatever.  I believe it was the defense that asked

4    for an October trial date.  We were the ones who suggested

5    September 22nd, so whatever you tell us to do we're going to be

6    here, so we're ready.

7            THE COURT:  All right.  Is there a need for us to

8    discuss anything else?  I have no other plans to discuss any

9    other issues.

10           MS. MORRIS:  Not today, Judge.

11           THE COURT:  I'll see you on September the 10th, and

12   the time on September the 10th is ten o'clock, and to be

13   followed by the pretrial proceedings.

14           MS. MORRIS:  Thank you, Judge.

15           THE COURT:  All right.  Thank you.  Thank you all.

16   Thank you.  No need to stand.  Thank you.

17           COURTROOM DEPUTY:  This Honorable Court now stands in

18   recess.

19           (Proceedings concluded at about 12:41 p.m.)

20                           - - -

21

22

23

24

25



1                          I N D E X

2

3    WITNESSES:

4

5         None.

6

7

8

9

10

11                      E X H I B I T S

12

13        None.

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2              I, JACQUELINE M. SULLIVAN, Official Court Reporter,

3     certify that the foregoing pages are a correct transcript from

4     the record of proceedings in the above-entitled matter.

5                          _____

6                          JACQUELINE M. SULLIVAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25