```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3      UNITED STATES OF AMERICA,      .
                                       .
 4              Plaintiff,             .
                                       .  CR No. 08-231
 5         v.                          .
                                       .
 6      THEODORE F. STEVENS,           .  Washington, D.C.
                                       .  Wednesday, September 10, 2008
 7              Defendant.             .  10:09 a.m.
                                       .
 8      . . . . . . . . . . . . . .    .

 9
                        TRANSCRIPT OF MOTIONS HEARING
10              BEFORE THE HONORABLE EMMET G. SULLIVAN
                      UNITED STATES DISTRICT JUDGE
11

12      APPEARANCES:

13

14      For the Government:           BRENDA MORRIS, ESQ.
                                      EDWARD SULLIVAN, ESQ.
15                                    United States Department of Justice
                                      1400 New York Avenue, N.W.
16                                    12th Floor
                                      Washington, D.C.  20005
17                                    202-514-1412

18                                    NICHOLAS A. MARSH, ESQ.
                                      United States Department of Justice
19                                    10th and Constitution Avenue, N.W.
                                      Washington, D.C.  20530
20                                    202-307-1049

21                                    JOSEPH W. BOTTINI, ESQ.
                                      United States Attorney's Office
22                                    District of Alaska
                                      22 W. Seventh Avenue
23                                    Federal Building and U.S. Courthouse
                                      Anchorage, Alaska  99513-7567
24                                    907-271-5071

25      APPEARANCES con't. on next page.
```

1    APPEARANCES, con't.

2

3

     For the Defendant:           BRENDAN V. SULLIVAN, ESQ.
4                                 ROBERT M. CARY, ESQ.
                                  ALEX G. ROMAIN, ESQ.
5                                 Williams & Connolly, LLP
                                  725 Twelfth Street, N.W.
6                                 Washington, D.C.  20005
                                  202-434-5000
7

8

9

10   Court Reporter:             JACQUELINE M. SULLIVAN, RPR
                                  Official Court Reporter
11                                U.S. Courthouse, Room 6720
                                  333 Constitution Avenue, NW
12                                Washington, D.C. 20001
                                  202-354-3187
13

14

15   Proceedings reported by machine shorthand, transcript produced
16   by computer-aided transcription.

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

COURTROOM DEPUTY:  Criminal case 08-231, <u>United States</u> vs. <u>Theodore Stevens</u>.

Would the parties please identify yourselves for the record?

MS. MORRIS:  Good morning, Judge.  For the government we have Joe Bottini from Alaska, we have Nick Marsh, Ed Sullivan.  We also have with us Mary Beth Kepner with the FBI, as well as Chad Joy with the FBI.

THE COURT:  Good morning.

MR. CARY:  Good morning, your Honor.  For the defense, Brendan Sullivan, Rob Cary, Alex Romain.

THE COURT:  All right.  Good morning, counsel.

There are a number of motions pending before the Court, and it's my intent to address all of them, with the exception of I believe one was filed last evening.  I haven't really taken a hard look at that.  It's a motion for medical records.  If I can get to that I will.  I believe the government did file a response to that.

MS. MORRIS:  No, Judge.  We are prepared to argue it, however.

THE COURT:  I may not get to that at this hearing.  I may get to that at the supplemental pretrial.

MS. MORRIS:  And we can file something later today, Judge.

1          THE COURT:  That's fine.

2          I'm going to defer ruling on the government's motion

3     in limine to exclude prior criminal convictions with respect to

4     government witnesses.  I think that it's more appropriate to

5     focus on that either prior to direct examination of those

6     witnesses or shortly after direct examination, certainly prior

7     to cross-examination, so I'm not going to address that one.

8          With respect to defendant's motion for additional

9     relief, which essentially is a motion to file more motions, I'll

10    grant that.  It doesn't mean I'm opening the floodgates to

11    motions, but I recognize that the need does arise from time to

12    time to seek additional relief, so that's granted over

13    objection.

14         I want to focus on what I have and I believe defendant

15    has noted as defendant's motion one, which is the motion to

16    dismiss count one, the 1001(a) count, as time-barred or

17    duplicitous, or in the alternative to compel the government to

18    elect between count one and counts two through seven on the

19    grounds of multiplicity.

20         I've read all the pleadings.  If you want to take a

21    few minutes to highlight your argument, Mr. Sullivan, or one of

22    your colleagues, I'd be delighted to hear from you.

23         MR. CARY:  Your Honor, Rob Cary for the defense on

24    that motion.

25         Your Honor, as I was trying to understand the

1    indictment and thinking about this motion, I found it helpful to

2    diagram the indictment, and I've showed it to government

3    counsel.

4              THE COURT:  I do that often.  Go ahead.

5              MR. CARY:  Okay.

6              THE COURT:  You know, we're in the electronic age.  We

7    have all this wonderful equipment in this courtroom.  You can

8    use the Elmo, and in fact, I'm encouraging everyone right now to

9    become knowledgeable about the Elmo.  You can put that on the

10   screen and everyone in the jury box and in the courtroom can see

11   it.  You can put it on the screen.  If you want to do it the

12   old-fashioned way that's fine.

13             MR. CARY:  This will be the last time, your Honor.

14   We'll do it on the Elmo.

15             THE COURT:  I think I said this before as well:

16   Counsel need to contact John Cramer if you have any question on

17   the devices, because I'm not going to allow the jury to be a

18   learning ground for learning that equipment.

19             MR. CARY:  I understand, your Honor.  We've had one

20   session with Mr. Cramer and we will have more.

21             THE COURT:  That's fine.

22             MR. CARY:  As I think about the indictment as I've

23   mapped it out --

24             THE COURT:  See, I'm the only one who can see it.  Do

25   you have a copy for the government?

1        MR. CARY:  I've shared it with them and I'll show it
2   to them.
3        THE COURT:  You can just put that on the tripod there,
4   which is also a dinosaur, and you can just turn it around and we
5   can all see it.  Now I can't see much of it.  There you go.
6   That's fine.
7        MR. CARY:  Your Honor, counts two through seven allege
8   false filings that clearly the allegations are not time-barred.
9   Each count relates to a separate filing for a separate year:
10  2006, 2005, 2004.
11       THE COURT:  Just so the record is clear, you're not
12  making an argument that those counts are time-barred at all?
13       MR. CARY:  I'm not making the argument.  Those are not
14  time-barred, clearly not.  What I've highlighted in black, your
15  Honor, is not time-barred.  What is time-barred and what we are
16  arguing is time-barred are the 2000 disclosure and the 1999
17  disclosure, and the technique that the government uses to
18  attempt to revive those time-barred disclosures, your Honor, is
19  to lump them all together with the previous counts and label
20  that count one and call it a scheme.  Your Honor, there's no
21  case that suggests that the government can do this, and we
22  submit that if this technique were appropriate, whenever there
23  were annual reports you could always revive old reports by
24  labeling it a scheme.
25       THE COURT:  What about Hubbell and Bramblett from our

1    Circuit?

2              MR. CARY:  Hubbell, your Honor, is a case that --

3    first of all, it's not a statute of limitations case.

4              THE COURT:  Right.

5              MR. CARY:  And it also relies on the Bramblett

6    decision, which is a very old decision.

7              THE COURT:  Right, but essentially it reaffirmed

8    Bramblett, though, didn't it?

9              MR. CARY:  It did reaffirm Bramblett, your Honor, but

10   Bramblett, your Honor, it does not survive the Toussie case,

11   which is a Supreme Court case.

12             THE COURT:  Don't you think our Circuit was aware of

13   Toussie when it decided the Hubbell case?

14             MR. CARY:  There's no presumptions -- I know there are

15   presumptions that the Court knows what the law is, but because

16   it wasn't a statute of limitations case, your Honor, that's why

17   we submitted it didn't need to look at Toussie, it didn't

18   matter, but Bramblett is a statute of limitations case, and,

19   your Honor, we submit that the case that makes a lot more sense

20   is the Gremillion-Stovall case from the Louisiana District

21   Court,  Fifth Circuit, applying Fifth Circuit law, and in that

22   case there were six alleged false statements.  I drew a big

23   black line here where the statute of limitations time period

24   ran.  Four of those statements were past, below the line, before

25   the statute of limitations time period.  Two were after.  And

1    what the Court did is it, based on the precedent, based on the

2    Heacock case, which they cite, it said that those older counts

3    need to be excised.  Those were dismissed.  It's only those that

4    are within the statute of limitations time period, and the

5    reason is because of the London case in the Fifth Circuit, which

6    essentially says --

7         THE COURT:  You look at all these cases outside of our

8    Circuit.  I mean, I have to focus squarely on Bramblett and

9    Hubbell, and if I'm inclined to agree with you I have to be

10   persuaded that if our Circuit were confronted with a pure

11   statute of limitation argument, as was raised in Toussie, then

12   our Circuit would depart from its own decisions in Hubbell and

13   Bramblett, and grant you, affirm the relief that you're seeking

14   then.

15        MR. CARY:  Your Honor, Bramblett is such an old case

16   it was argued by our firm's founder, Edward Bennett Williams,

17   and it is obsolete law.  It does not possibly survive Toussie,

18   and I understand, I certainly acknowledge that Toussie was

19   decided before Hubbell, but when the D.C. Circuit decided the

20   Hubbell case --

21        THE COURT:  There are a lot of old cases out there

22   that are still great law, counsel.

23        MR. CARY:  Pardon?

24        THE COURT:  There are a lot of old cases in our system

25   that are still great law.

1          MR. CARY:  Understood, your Honor.  But <u>Hubbell</u>,

2     because it wasn't a statute of limitations case, there's very

3     little analysis.  It was a vagueness case.  It just doesn't

4     apply to these circumstances.

5          THE COURT:  <u>Hubbell</u> has recognized that there can be a

6     continuing scheme for a 1001(a) offense, correct?

7          MR. CARY:  I agree with that.

8          THE COURT:  And in doing so it recognized <u>Bramblett</u>,

9     and in doing so <u>Hubbell</u> went a step further and compared the

10    1001(a), continuing nature of that scheme, to a conspiracy,

11    right?

12         MR. CARY:  It did, your Honor.  But I would suggest

13    this is very different than conspiracy.

14         THE COURT:  But nevertheless, given what our statute

15    of limitations are, our Circuit would depart from <u>Hubbell</u> and

16    <u>Bramblett</u> and pursuant to <u>Toussie</u> grant you the relief you're

17    seeking?

18         MR. CARY:  The United States Supreme Court case in

19    <u>Toussie</u>, your Honor, yes, that is what we submit.  That is the

20    binding law in the statute of limitations context.

21         THE COURT:  Right, but I'm bound to follow <u>Bramblett</u>

22    and <u>Hubbell</u>, though, am I not?  I read those cases from the

23    other jurisdictions.  I'm not bound to follow those cases.  I

24    mean, when persuaded that those cases are indeed persuasive I've

25    adopted rationale from other Circuits, but I'm bound by

 1    Bramblett and Hubbell until overruled by either the Embank Court

 2    or the Supreme Court, right?

 3              MR. CARY:  If you find them applicable on these facts

 4    that is the law of the Circuit that has not been overruled.

 5              I would submit, your Honor, I actually went and pulled

 6    the Hubbell indictment, which is a lengthy indictment that

 7    clearly alleges a scheme that takes place over many years.

 8              THE COURT:  It does, and Judge Robertson did a heck of

 9    a job outlining all the allegations.

10              MR. CARY:  Understood, your Honor.

11              In this particular case the affirmative acts that

12    constitute the alleged act of concealment or the filings of

13    these forms that I've listed here, that's all there is.  Hubbell

14    is full of many, many paragraphs; 85 paragraphs is my

15    recollection.  The affirmative acts of concealment here that

16    constitute, according to paragraphs 45 and 46 of the complaint,

17    are these disclosures that are filed every year.  Two of them

18    are clearly time-barred.  That's our argument.  It's different

19    than Hubbell, your Honor.  Hubbell doesn't apply.

20              THE COURT:  All right.

21              Let me hear from government counsel.

22              MR. MARSH:  Nicholas Marsh for the government, your

23    Honor.  Good morning.

24              THE COURT:  Good morning.

25              MR. MARSH:  Your Honor, we --

1          THE COURT:  Why shouldn't I be persuaded by

2    Gremillion-Stovall?

3          MR. MARSH:  Absolutely.

4          THE COURT:  Hubbell was not a statute of limitations

5    case at all, was it?

6          MR. MARSH:  Well, we do believe that it was clear that

7    in Hubbell one of the issues that came up before the D.C.

8    Circuit was whether or not this scheme, which did go a number of

9    years, was permissible to be charged.  It was a vagueness case.

10   It also had a supplemental argument:  duplicity.

11         THE COURT:  But the Circuit never addressed the

12   passage of time, the significant passage of time alleged in the

13   indictment.  The Circuit didn't say anything about the time

14   element.  Judge Robertson did in his opinion, but the Circuit

15   didn't say a word about it, did it?

16         MR. MARSH:  That's correct.  However, what the D.C.

17   Circuit did in response to those was, quote, in great detail,

18   the Bramblett decision.  Again, we agree with the Court that

19   Toussie was decided in 1970.  Hubbell comes up almost thirty

20   years later.  One should assume that the D.C. Circuit was aware

21   of that case on continuing offenses, and in citing the relevant

22   portions of Bramblett, Hubbell --

23         THE COURT:  Do I need to do that?  Do I need to

24   recognize that principle that the Circuit was aware of the

25   Toussie case when the issue raised in Toussie was not really an

issue raised in Hubbell, so why would there be a presumption
that the Circuit was aware of Toussie when it decided its
decision in Hubbell?

MR. MARSH:  Your Honor, we agree that the Court
doesn't have to go there.

THE COURT:  Why should I do that?  Is there some
principle of law that suggests I should do that, though?

MR. MARSH:  Your Honor, we think it's, certainly to
the extent that it's -- what we focus on, if I may, is that what
the Court should look to is exactly what the D.C. Circuit did in
Hubbell, and in Hubbell they quoted Bramblett, and specifically
the relevant portion of Bramblett in which it acknowledged that
1001(a) or 1001 is a continuing offense and specifically noted
that the Bramblett holding indicated that 1001 prosecution was
perfectly permissible, even after the culmination of the
specific acts that were within the statute of limitations
period, so to that extent, what we say that this Court can do is
note that Hubbell was very aware of that part of the Bramblett
holding and specifically adopted it in connection with Hubbell,
so we submit that the Court doesn't have to go any farther than
that.  The Court can look at the plain letter of Hubbell.

With respect to this issue, your Honor, one thing that
didn't come up but that we have briefed is that from the
government's position the Court need not address and need not
reach the question of whether 1001 is in fact a continuing

 1   offense.  This is briefed and only I'll spend time on it if the

 2   Court has a specific question, but even the cases cited by the

 3   defendant make clear that if there are acts that occurred during

 4   the affirmative statute of limitations period in connection with

 5   this scheme or a conspiracy, the Doctrine of Continuing Offense

 6   does not apply.  Those cases relate to ones in which there is a

 7   bunch of stuff that happens back before the statute of

 8   limitations period, the period runs, and then an indictment

 9   occurs, and the Continuing Offense Doctrine is one where the

10   courts have to consider whether or not all those acts that

11   occurred prior to the statute of limitations period were in fact

12   running.  This is borne out at least in part in the Babia (ph)

13   case.  It's a district court decision from Massachusetts cited

14   by the defendant.  It's a case where there were defendants who

15   were treated differently because one had some affirmative acts

16   and one didn't, so we submit that the Court need not go there,

17   but if the Court does go there we agree with the Court that

18   under Hubbell and under Bramblett the D.C. Circuit has plainly

19   held that 1001 is a continuing offense.

20          I'm also happy to address the Court's concerns about

21   Gremillion-Stovall if the Court would like.

22          THE COURT:  Yes.  I was about to get there.  Those

23   decisions have been very critical of the Hubbell decision.

24          MR. MARSH:  Certainly Gremillion-Stovall was.  I do

25   respectfully disagree.  We do disagree that Gremillion-Stovall

1    was based on the Fifth Circuit decision in <u>Heacock</u>.  As the

2    Court's aware, <u>Gremillion-Stovall</u> was from the Middle District

3    of Louisiana, and it related to a series of false statements,

4    but in deciding that case the Middle District of Louisiana

5    specifically contrasted its situation to the one in <u>Heacock</u>.

6    The one in <u>Heacock</u>, as the Court is aware, was a tax fraud case

7    going from 1980 to 1992, a series of affirmative acts of

8    misrepresentation, a series of benefits received, and a

9    continuous scheme to fail to report the benefits that the

10   individual had received.  Contrast the <u>Gremillion-Stovall</u> case,

11   which was a single individual who filed a number of different

12   types of claims, claims for home loans, free subsidies, Food

13   Stamps, USDA benefits over a span of years, and what

14   <u>Gremillion-Stovall</u> said is our case is different than <u>Heacock</u>.

15   <u>Heacock</u> was a case in which there was a continual scheme,

16   continuous receipt, continual failure to report, and at least

17   inferentially the concept that it was in fact an overall scheme

18   because at some point the defendant in <u>Heacock</u> had to keep

19   failing to report because if he did in fact report it would have

20   raised some suspicion, as opposed to the situation in

21   <u>Gremillion-Stovall</u>, which we submit is also different than the

22   situation in the case before this Court in which they were

23   discrete -- they were discrete benefits made to a variety of

24   different entities.  One did not rely on the other.  There was

25   no consistent scheme.  So we submit that the Court absolutely

should follow Bramblett, should follow Hubbell, and we believe

that the law is clear on that.

         And finally, your Honor, we do note that to the extent

there are any concerns here, we do submit that the statute of

limitations is not a rule of evidence, and to the extent that

the Court has any concerns, this can be dealt with in a jury

instruction.  Certainly it was not in Gremillion-Stovall, but

also the issue was not briefed in any way.  It was not written

on by the Court in Gremillion-Stovall.  It was not considered.

We see no harm whatsoever should the Court have any concerns

about having a jury instruction in which it makes clear that the

evidence is relevant, because certainly the evidence is relevant

to prove the scheme and then allowing the jury to find an

affirmative act that took place after the statute of

limitations.

         THE COURT:  What would the jury instruction say to the

jurors?

         MR. MARSH:  Your Honor, generally it would say

something to the effect that the jury must decide that one overt

act took place on or after May 9th, 2001, which I think is the

date that the parties agree on.

         THE COURT:  What about the multiplicity/duplicity

arguments raised by the defendant?

         MR. MARSH:  Certainly, your Honor.  With respect to --

         THE COURT:  It may be addressed pretrial or not?

1          MR. MARSH:  Certainly multiplicity we submit does not.

2     It's a clear holding in Hubbell.  It's clear in this Court's

3     opinion --

4          THE COURT:  It should be addressed post-trial?

5          MR. MARSH:  It should be addressed after trial.

6     Multiplicity concerns, even to the extent that they exist, are

7     things that this Court can handle after conviction.

8          With respect to duplicity, duplicity is one of the

9     cases.  As this Court is aware, the government has expressed its

10    concern in writing about, whether intentional or unintentional,

11    the failure by the defense to cite relevant and controlling case

12    law in its many motions, and we submit that perhaps there is no

13    clearer indication and instance of that than with respect to the

14    duplicity argument that the defendant's put forth before this

15    Court.  The defendant cited the Hubbell decision from the D.C.

16    Circuit in connection with their statute of limitations case, a

17    very brief cite saying that it didn't apply, but they cited it

18    in the context of that same motion with respect to the statute

19    of limitations.  It was not cited at all with respect to the

20    duplicity, and again we submit that that's somewhat disturbing

21    because Hubbell's very clear holding related to a duplicity

22    challenge.  Hubbell said it was appealed on vagueness, but one

23    of the aspects of that vagueness challenge was duplicity.  It

24    was specifically retained and argued by Hubbell on appeal and it

25    was in the context of a case in which there was an A-1 scheme

and a number of A-2 false statements charged, and the D.C.

Circuit said there aren't duplicity problems.  We see no reason

for that to be revisited.  Certainly the citation instead to the

prior case in Bruce from the D.C. Circuit, it's a wire fraud

case, and it was a case in which ironically the discussion about

duplicity was indicta because it was a case where the D.C.

Circuit affirmed the manner in which those cases were charged.

We submit there's no reason for this Court to vary from what we

submit is a very clear holding in Hubbell that duplicity

concerns are not appropriate in this, and also the holding in

Hubbell and other courts in other cases recognizing that

multiplicity concerns, even to the extent they exist, are things

that should be handled after trial.

          THE COURT:  Counsel, anything further, or do you wish

to rest on your papers?

          MR. CARY:  Very briefly, your Honor.

          Government counsel suggests there's no harm in leaving

this count in.  The cases are legion that cite the policy

reasons why you have a statute of limitations, including stale

evidence.  The Heacock case was a conspiracy case.  I noted

reference to an overt act.  This is not a conspiracy case.  It's

not charged, it's not alleged.  The conspiracy rules don't

apply.  What is needed --

          THE COURT:  So it's clear, though, that the Hubbell

panel likened this scheme, though, to a conspiracy case?

```
 1              MR. CARY:  It did, but very different allegations,

 2   your Honor, and my point is this:  This case is like

 3   Gremillion-Stovall.  The affirmative acts of concealment that

 4   are alleged are the alleged false filings.  That's what's

 5   alleged.  It's not like Hubbell at all with a long, long list of

 6   acts in the ongoing conspiracy, or ongoing scheme.  These are

 7   eight specific alleged acts of affirmative conduct, and I didn't

 8   hear anything else that's going to constitute so-called overt

 9   acts, which didn't apply here, your Honor.

10              THE COURT:  All right.  Let me ask you this:  Are you

11   addressing the prejudicial surplusage argument as well?

12              MR. CARY:  I am, your Honor.

13              THE COURT:  All right.  Go right ahead.

14              MR. CARY:  May I grab another notebook and take down

15   my dinosaur blow-up?

16              THE COURT:  Sure.

17              MR. CARY:  Your Honor, with respect to defense motion

18   number three, I think there's a general agreement amongst the

19   parties as to what the standard is, and the standard is that

20   language that is not relevant and prejudicial may be stricken.

21   There also appears to be an agreement, as I read the papers,

22   that there is absolutely --

23              THE COURT:  Can an instruction cure your concern about

24   the surplusage?

25              MR. CARY:  No, your Honor, because I think this is
```

1    going to open the Pandora's box to a multitude of evidence that

2    is prejudicial, and I don't know what your Honor's practice is

3    in terms of reading the indictment or letting them see the

4    indictment, but this particular paragraph opens this case wide

5    up to things that this case should not be about.

6              I think there's agreement, as --

7              THE COURT:  You raised that.  I'll ask the government

8    as well.  What would be your recommendation in this case?

9    Should the indictment go back to the jury room to be considered

10   by the panel during its deliberations or not?

11             MR. CARY:  We would prefer that it not go back, your

12   Honor.

13             THE COURT:  I just wanted to --

14             MR. CARY:  Especially if this language is in it, but

15   that doesn't end the inquiry.  I believe --

16             THE COURT:  So if it's excised it's okay to send the

17   indictment back?

18             MR. CARY:  I didn't say that, but we'll think about

19   that one.

20             I think there's agreement, as I read the papers, and

21   there was some criss-crossing of papers, there's nothing wrong

22   with the conduct that is alleged in paragraph 17.  The

23   government hasn't charged in this case, they haven't charged a

24   conflict of interest, they've not charged bribery, they've not

25   charged receipt of gratuities, they've not charged a conspiracy,

1    they haven't charged on a services fraud, and there's no great

2    mystery or dispute that Senator Stevens listens to his Alaskan

3    constituents and he tries to help them when it's in his best

4    judgment and in the best judgment of his staff.  If this case is

5    going to be about constituent solicitations and constituent

6    service, we're going to be here, your Honor, unfortunately for a

7    very, very long trial.

8           The Court has consistently said that the case is about

9    -- excuse me -- the government has said that this case is about

10   forms that were filed in Washington, D.C. and it shouldn't be

11   about ten different acts of constituent service, solicitations,

12   things that we'll get to I guess in the next motion that we also

13   suggest are speech or debate.  In page eight of their opposition

14   they say that there is a, quote, perceived link between official

15   acts and things of value exchanged between Senator Stevens and

16   VECO and Bill Allen.  They don't say there's an actual link.

17   They say it's a perceived link.

18           I'm not a Latin scholar, your Honor.  I never took

19   Latin, but my colleagues tell me that "quid pro quo" means this

20   for that, and this is an indictment that charges this and

21   paragraph 17 charges that, but there's no pro, there's no for

22   involved, and to suggest that it's just a perceived link is

23   highly, highly prejudicial, your Honor, and if we are forced to

24   respond to that, we are going to have to put on a much more

25   extensive defense than we thought what this case was about.

1          In terms of the cases they cite, I think the leading

2     one they cite --

3          THE COURT:  Give me a clue as to why your defense

4     would be different.

5          MR. CARY:  Because, your Honor, if they come in and

6     say, well, Senator Stevens' office received a solicitation from

7     somebody at VECO and suggests that there's something terrible

8     about that when in fact it is just something that happens every

9     day in every office on Capitol Hill, and on top of that they're

10    not even suggesting that it was improper.  Or I shouldn't say

11    they're not suggesting.  They're not claiming that it's

12    improper.  They can't allege that it's improper, but they want

13    to taint this courtroom with a suggestion of a quid pro quo, and

14    if that is the suggestion, we're going to have to respond to it.

15         THE COURT:  All you're suggesting is that that's just

16    real life in the lobbying world in D.C. then; is that correct?

17         MR. CARY:  I'm sorry.  Pardon?

18         THE COURT:  All you're suggesting is that this

19    activity, the phone calls into congressional offices, the favors

20    bestowed upon Congressmen, that's just everyday life in the

21    world of lobbyists in Washington, D.C., there's nothing sinister

22    or indeed criminal about that activity?

23         MR. CARY:  That, your Honor, and the fact that Senator

24    Stevens especially has listened to his constituents for forty

25    years, and that he and his staff respond to their constituents

1    when in their best judgment it makes sense to do so.

2         And what's especially bad about this is that there's

3    no allegation that there was anything inappropriate about it.   I

4    think they concede it but they want to suggest that there's

5    something inappropriate.

6         THE COURT:  Why is this language prejudicial then?  If

7    you say, Judge, this is what happens in Washington, D.C., this

8    is happening every day on Capitol Hill and we can bring in a ton

9    of lobbyists to talk about the activities on Capitol Hill, how

10   are you prejudiced by this?

11        MR. CARY:  Because Rule 403, your Honor, and now we're

12   maybe moving into evidence a little bit, but it's the Pandora's

13   box I was suggesting, is it's going to make this trial, which is

14   supposed to be -- we have responses.  Certainly Senator Stevens

15   is proud of the fact that he listens to Alaskans and responds to

16   their requests, but we're going to have a trial about that

17   rather than about the forms that were filed in Washington, D.C.,

18   and frankly, your Honor, it's not so much about lobbyists, it's

19   about Alaskans and Alaskan constituents, and there's going to

20   have to be a lot of evidence to respond to that taint that we

21   suggest is highly prejudicial, unfair, especially in a case like

22   this where there's no allegation that there's anything

23   inappropriate about it.  They just want to suggest it and stink

24   up the courtroom with it.  It's not right, your Honor.

25        MR. BOTTINI:  Good morning, your Honor.  Joseph

1    Bottini for the government.

2              THE COURT:  Good morning, counsel.

3              MR. BOTTINI:  Mr. Cary's right, I think we do have

4    agreement on the boilerplate here, and that is that the law in

5    this Circuit says that motions to strike surplusage are highly

6    disfavored and rarely granted, and for charging language to be

7    surplusage it must be both irrelevant and prejudicial.  Here the

8    language in paragraph 17 is highly relevant to the central

9    issues in this case, that being intent and materiality.  What

10   the grand jury charged on here is a theory that Senator Stevens

11   knowingly and willfully failed to disclose the fact that he was

12   getting financial benefits from Bill Allen, the CEO of VECO, and

13   VECO Corporation.  At the same time Senator Stevens was

14   solicited and requested by Allen and VECO to do certain things

15   in his capacity as a United States senator, and in some of those

16   instances he did so.  It is not an allegation that he did one

17   for the other, but it is highly relevant and part of the

18   government's proof in this case to intent and materiality

19   that --

20             THE COURT:  How do I really rate that concern, though,

21   because your opponent makes a pretty good argument that it's

22   quid pro quo, and you just told me that's not really what you're

23   alleging here, but it sounds like it, so what can the Court do

24   to address that prejudicial impact of that insinuation, that

25   quid pro quo?

1        MR. BOTTINI:  It is not alleged that way and the

2   government is not going to present a theory at trial advancing

3   that.  That's not what the grand jury charged on, and it's not

4   what we intend to prove at trial.  What we intend to prove

5   is that --

6        THE COURT:  Should I instruct the jury that this is

7   not a quid pro quo and when you get to paragraph 17 of the

8   indictment the government is not alleging that there was certain

9   conduct exchanged as a favor pursuant to certain requests?

10       MR. BOTTINI:  I'm not sure that even calls for some

11  sort of curative or precautionary instruction, quite frankly.

12       THE COURT:  Is that prejudicial to the government's

13  case if I do that?  It's not a quid pro quo case.

14       MR. BOTTINI:  It may not be.

15       THE COURT:  Why do you need that language in there?

16  It's not a quid pro quo case, and I appreciate your candor.

17  It's not that, so why should that language remain?

18       MR. BOTTINI:  Because it is central and key to our

19  theory of the case, and that is that he's not doing one for the

20  other, but he knows, obviously, that he has been requested and

21  has done some things for VECO and Allen.  At the same time he

22  knows he's getting benefits from them.  It's not one for the

23  other.  Nobody's alleging that.  Nobody intends to try to prove

24  that at trial.  But that goes to our theory of the case and our

25  proof at trial regarding intent and materiality.  He knows that

1   if he put down on those financial disclosure forms that VECO

2   provided him with certain benefits someone is going to look at

3   that and go, huh, here he's writing letters on behalf of VECO at

4   the same time.  No suggestion or indicia that one for the other,

5   but someone is going to look at that and they're going to go

6   wait a second, he's getting stuff from VECO and Allen and he

7   wrote a letter on their behalf during the same time.  That's the

8   evidence in this case that goes to intent and materiality.  He

9   knows he's done certain things for them.  At the same time he

10  knows he's getting benefits from them.  If he discloses that on

11  the form, you know, someone is going to look at that and go

12  ah-ha, so that's the proof that's going to be advanced at trial,

13  that's the theory that this case was indicted on.  The language

14  in paragraph 17 is highly relevant and it is not prejudicial and

15  therefore surplusage, so that charging language in that

16  paragraph is central and key to the primary issue in this case,

17  and that is intent, materiality.  It's also relevant to motive.

18  That's the way the case will be presented and that's the way it

19  will be argued to the jury.

20          THE COURT:  Is that language analogous to 404(b),

21  though, or not?

22          MR. BOTTINI:  Not really.  No, it's not analogous to

23  404(b).  It's not.

24          By the way, I'd just like to mention too, Mr. Cary's

25  observation or his speculation that this is going to greatly

1   lengthen the trial is really misplaced.  We're not talking about

2   spending days on this issue.  We're talking about a pretty

3   discrete handful of things that VECO solicited the senator to

4   do, and in some instances he carried out those requests.  We're

5   not talking about a couple of days of testimony on this.

6           THE COURT:  Are we talking about nonlegislative

7   requests, or what were the requests?

8           MR. BOTTINI:  In some instances it was requests for --

9   I'll give you an example.  VECO had an operation over in

10  Sakhalin Island over in the Russian far east.  They were seeking

11  federal funding to train welders, to train Russians to become

12  welders, that they could work on this project they had going

13  over there, all right.  They solicited Senator Stevens for

14  assistance in that regard.  That's one example of where they

15  made a request specifically for, you know, help in getting

16  federal funding for that.  In other areas they simply requested

17  him, for instance, to write a letter on their behalf where they

18  had a contract with another specific government agency, so it's

19  in large part -- thank you.  My colleagues point out that what

20  we intend to prove at trial would be only nonlegislative acts

21  performed by Senator Stevens, so we're not going to get into

22  obviously anything in treading over into speech or debate.

23  We're very conscious of that, and this case has been very

24  carefully presented to the grand jury, which you're going to

25  hear about here when that motion is argued obviously, to stay

1    away from that area, and certainly we're not going to tread into

2    that, so in regards to what VECO requested Senator Stevens to

3    do, the proof at trial will only involve nonlegislative acts.

4           THE COURT:  At page eight, you do state that the

5    perceived linkage between official acts and things of value

6    exchanged between Defendant Stevens and VECO and Bill Allen goes

7    to the heart of the materiality inquiry, because the commission

8    of official acts plus the receipt of things of value made it

9    more likely, if not a certainty, that an investigation might

10   commence, but that's not quid pro quo.

11          MR. BOTTINI:  It's not quid pro quo.  It's not.

12   Again, you know, our theory is that had he disclosed the fact

13   that he was getting benefits from them at the same time that he

14   was doing things that they had requested, we're not suggesting

15   there's any kind of link between the two, but he knows they've

16   asked me to do certain things, I know at the same time that I've

17   been receiving certain benefits from them, he puts that on the

18   disclosure form, someone is going to go ah-ha.  That's the

19   theory, not that he's doing one for the other.

20          THE COURT:  Counsel, what about an appropriate

21   curative instruction to keep the jurors on track here, that this

22   isn't quid pro quo, it goes to materiality, you can only

23   consider that language in an effort to determine what we tell

24   them to focus on.  I mean, jurors presume to follow our

25   instructions as well, right?

1          MR. CARY:  Your Honor, they are, but, your Honor, that

2     goes part of the way there.  I don't think it goes all the way

3     there.  Twice Mr. Bottini said when somebody learns about this

4     they're going to go ah-ha.  That's the problem.  It is highly,

5     highly --

6          THE COURT:  If I tell them this is not a quid pro quo

7     case, ladies and gentlemen, the government's theory is that this

8     was not done in exchange for something else, your focus on

9     paragraph 17 should be for the following reason.  You see that

10    goes some way to ameliorate the prejudice that you're

11    articulating.

12         MR. CARY:  I certainly agree that it goes some way to

13    ameliorate --

14         THE COURT:  If I give you the opportunity to craft an

15    instruction, which I'm inclined to allow, which I am.  I'll

16    certainly give you an opportunity to do a better job.  That's

17    just rough language.  I think if the Court allows this language

18    to remain, which I'm inclined to do, especially given other

19    Circuit authority that tells us that it's frowned on to strike

20    language in the indictment, I'd probably seriously consider

21    giving an appropriate curative instruction more than once.

22         MR. CARY:  That goes part of the way, your Honor, but

23    the ah-ha -- he twice said people are going to look at this

24    evidence and go ah-ha.  That's what we're trying to cure.  It's

25    highly, highly prejudicial, and it's not what this case is

1   supposed to be about at all, which is about the forms that were

2   filed in Washington, D.C.

3         THE COURT:  All right.  I guess the other part of that

4   argument is not to give the instruction at all, not to highlight

5   what the case is not about.  Would you prefer that?

6         MR. CARY:  I'd have to think about that, your Honor,

7   and discuss that with my colleagues, but we're very concerned

8   about this paragraph and this evidence, and it will lengthen

9   this case.  Just because they say they want to do it briefly

10  with nonlegislative activity or nonlegislative evidence, we'll

11  get to speech or debate I suppose in a minute, but we're going

12  to have to respond to what we consider to be highly prejudicial

13  and inappropriate evidence in this case.

14        THE COURT:  All right.  Well, you have to give me some

15  hint as to how long you believe this trial will be lengthened if

16  you have to respond to this.

17        MR. CARY:  A hint, a prediction would be a week, your

18  Honor.

19        THE COURT:  Why?

20        MR. CARY:  Let me give you one example.  The natural

21  gas pipeline is, the Alaskan natural gas pipeline that -- and

22  I'm starting to bleed into speech or debate a little bit, but if

23  you'll forgive me, that is a result of an act of Congress

24  authored, sponsored, advocated for, voted on, championed by Ted

25  Stevens, Senator Stevens, for the state of Alaska.  That was

1    originally done in '76.  There was another act in 2004.  They

2    want to bring in evidence about the pipeline as if it's

3    something done just for the benefit of VECO.  First of all, we

4    believe we need to respond that's legislative because the

5    beginning of the whole thing were two acts of Congress, but

6    moreover, we're going to have to come in and say prove through

7    Alaskans that this is not just for VECO.  VECO may or may not

8    have benefitted from it, but there are lots of workers in Alaska

9    that will, and pretty soon we're going to be having a trial

10   about everything else in Alaska other than the forms that were

11   filed in Washington, D.C., and by the way, we still think that

12   you're going to see many Alaskans parading in here, your Honor,

13   but this is just going to expand it even more.

14        THE COURT:  I'm talking about noncumulative testimony

15   as well.  It probably might be appropriate to hear from someone

16   from Alaska, but not many people from Alaska.

17        MR. CARY:  Your Honor, I'll give another example.  One

18   of the allegations -- there are ten things that they have listed

19   in their motion in limine that they want to admit that they say

20   is quite limited.  One is a joint venture between VECO and a

21   native Alaskan corporation.  Native Alaska corporations were

22   formed by an act of Congress that Ted Stevens authored,

23   championed, advocated, voted for.  He's considered kind of the

24   father of this legislation.  It's possible to talk about what

25   they want to say that the suggestion that there's some stench

1    because VECO is involved without talking about all that Ted

2    Stevens has done for native Alaskans over the years, and I

3    understand we do not, there's no intention of being cumulative,

4    but we're going to respond in kind to what we consider highly

5    prejudicial evidence.

6            THE COURT:  You mentioned Senator Stevens' name.  It

7    has been mentioned prominently.  He's not present.  My

8    understanding is he desired to waive his presence, and that's

9    fine.  We need to put that on the record.

10           MR. CARY:  That's correct, your Honor.  He waives his

11   presence today.

12           THE COURT:  Let me shift gears a little bit and I'll

13   come back to the speech and debate and the 404(b) issues.  I

14   want to focus on discovery, defendant's motion to compel.

15   That's ripe, and to the extent that I can resolve that motion

16   today I will attempt do so, but let me just review with counsel

17   my understanding of at least where you were when the motion

18   became ripe, and it appears that there was some meaningful

19   discussion among counsel and you were able to address some of

20   the issues.  I'm going to go with the list as I understand it

21   now as set forth in your motion, response, and reply, and then I

22   need to find out just where you are with respect to any

23   additional agreements that you may have with respect to turning

24   over yet still additional information, but I'll go through the

25   list that I have, and I believe it tracks and indeed summarizes

1    where you were when you filed your respective pleadings.

2          The defendant had requested copies of all exculpatory

3    grand jury testimony, the FBI Form 302, witness interview

4    memoranda, and all contemporaneous notes of witness interviews,

5    including notes or memoranda reflecting false statements.  The

6    government's position was that, one, it was not obligated to

7    turn over the transcripts under Rule 16, which expressly does

8    not apply to grand jury proceedings, and two, that the parties

9    have expressly agreed that the government be obligated to turn

10   over summary letters or redacted transcripts describing the

11   exculpatory information and that the government was in the

12   process of doing that.  When it's time to hear from the

13   government I need to know just what the status of that process

14   is and what's the time frame since that's something we don't

15   have a great deal of.

16         The second part of that issue had to do with the FBI

17   notes.  The government's position is that the FBI notes was that

18   production was subject to -- strike that.  Notes were subject to

19   production if they constitute statements filed under Jencks or

20   containing Brady material, and further stated that government

21   was in the process of further reviewing the agent's rough notes

22   and formal interview memoranda and had agreed to produce either

23   a letter summary or redacted notes, so when it's time for

24   government counsel to address the grand jury issue then I'll

25   need to know just where the government is and what the remaining

1   demands are from defense counsel.

2          The second issue focused on the allegedly false

3   affidavit signed by a government witness, David Anderson.  The

4   government stated, I believe, in its response that it has

5   provided the affidavit and therefore their argument is that that

6   request was therefore moot, and I need to hear more about that.

7   It's moot?  Has it been provided?  I assume it has.

8          There was a request for plea agreements for government

9   witnesses David Anderson and Rocky Williams, and the

10  government's position is that there are no such agreements.

11         There was also a request for all information related

12  to the Alaska state investigations into another government

13  witness, Allen, Bill Allen.  The government stated that in the

14  government's view that the defendant was not entitled to that

15  information and further states that it's not aware of any

16  documents in its possession, custody or control concerning any

17  state or local investigation concerning Allen.  I don't recall

18  there was any authority cited for the government's position that

19  defendant is not entitled to the information related to the

20  state investigation of Allen, but I'll hear more from the

21  government about that and more from Stevens about that.

22         The medical records for Allen, and I believe this is

23  in keeping with the motion that was filed sometime yesterday,

24  motion for subpoena, I believe, a HIPPA subpoena, that I've

25  read, I will probably defer until the next hearing.

1    There was another request for all, quote, information,

2    including medical and arrest records, relating to possible drug

3    or alcohol abuse of government witnesses.  The government's

4    position was it had no obligation to turn over a potential

5    witness' private medical or treatment records, which probably

6    prompted the HIPPA subpoena concerning drug or alcohol abuse,

7    and further states bottom line it doesn't have such information

8    in its possession, custody or control.

9    With respect to grand jury exhibits and subpoenas, the

10   government's position is that defendant is not entitled to

11   either subpoenas or exhibits, and indeed the defendant hadn't

12   cited the authority for that.  It's his argument that he's

13   entitled to that information.  The government further states

14   that it turned over quite a bit of the grand jury exhibits

15   relating to the defendant but will not turn over exhibits that

16   do not relate to Stevens.

17   The logs and electronic metadata associated with the

18   digital photographs taken by the government, the government says

19   it's turned over all photographs it intends to use in its case

20   in chief and that it's not aware of any authority requiring

21   production of metadata or logs.  I do note there is one opinion

22   from my colleague, Judge Facciola, that was issued in February

23   of this year that addresses metadata, so there is authority.

24   We'll talk about that.

25   One of the questions the Court has is just what is the

1    problem with turning over metadata as to the photos produced,

2    and I guess dovetailing into that is the other question of

3    whether or not the photos were produced in their native format.

4    If indeed they were produced in native format, maybe that

5    addresses defendant's concern.  If we're talking about photos of

6    defendant's own home, it seems to me if he disagrees with the

7    manner in which the photos were taken or indeed the photos

8    themselves, he can take his own photos of his own home, it seems

9    to me, but we'll talk about that.

10         The next issue has to do with Title 3 surveillance

11    logs maintained by the government during the course of its

12    electronic surveillance.  The government says it's produced

13    indices, including participants they can identify, and the start

14    and stop times of recordings.  The government argues that

15    they're not under any obligation to produce minimization logs,

16    and that line sheets or line logs are work products.  The

17    questions I have for the parties have to deal with whether the

18    defendant can tell from what has been produced how often call

19    proceedings were minimized.  If he can't, then query whether the

20    government has another obligation to provide additional

21    information to the defendant to enable him to be able to

22    intelligently address the minimization issue.

23         Another question the Court has to the parties is

24    whether the government's produced percentage of calls that led

25    to evidence, and has the government produced the number of calls

1    that were minimized, and the parties used these terms

2    interchangeably:  line sheets, log sheets, logs, indices, you

3    know, and I'll query whether the parties are on the same page.

4    It may well be that logs are needed, logs that don't have to be

5    scrubbed, logs that don't contain work product.  I query whether

6    the logs will show minimization efforts.  If so, then that's all

7    the defendant gets.  I'm mindful of the government's argument

8    that has not been attacked by the defendant that it would take

9    two months to scrub the case monitoring agent's reports because

10   of work product, and the Court would certainly have no desire to

11   require the government to turn over any work product at all, but

12   query whether there's an easier way to give the defendant the

13   information he needs to determine whether or not there's been

14   minimization compliance with 302.  But I'll hear from the

15   parties.

16          And finally, the defendant argues that the government

17   should produce load files.  And again, what are we talking about

18   here?  The government argue it's produced paper PDF/TIF images

19   notes, that the defendant is arguing for additional electronic

20   production with markers that replicate paperclips and staples.

21          It seems to me the government has an obligation to

22   produce the paper in the same format that the government

23   received them.  If the paper didn't have staples the government

24   is not required to produce it with staples where the defendant

25   can staple his own pleadings, but if they did receive stapled

documents or clipped documents or rubberband documents, then they need to produce them and give them to the defendant in the same manner in which they received them.

And that's the last issue with respect to discovery. Hopefully you were taking notes. I need to hear from both sides, and maybe I need to hear from the government first as to what you've produced and then hear from the defendant what remains to be produced.

Sorry, counsel. Not to cut you off. I want to hear what they intend is their obligation to produce and what they've done and then I'll hear from you.

MR. E. SULLIVAN: Your Honor, Ed Sullivan for the government. Good morning.

I may not address them in the order that you raised them, but I'd like to focus first on some of the Brady-related issues that they raised.

THE COURT: Stick with my list, counsel. Hopefully you were taking notes. I want to stick with my list. It's my map to get through these proceedings in as timely a manner as we can, so let's stick with my game plan here.

MR. E. SULLIVAN: Okay.

With respect to the Brady evidence which involves the grand jury transcripts, the FBI formal memorandum, 302s, and the rough notes, last night we produced to defendant a very detailed letter that summarized the Brady-Giglio material that we located

 1    within the rough notes, as well as the 302s, so that in our view

 2    is a nonissue now.

 3              We have also gone through all the grand jury

 4    transcripts.  We've provided in summary format the Brady-Giglio

 5    related statements in the grand jury transcripts in the letter

 6    that we sent last evening, so again we believe that's a non-

 7    issue.

 8              THE COURT:  How late last evening?  Have they had a

 9    chance to look at it?  They can answer that.  How late?

10              MR. E. SULLIVAN:  It was roughly 8:30 last night, I

11    believe.

12              There are two individuals that, rather than trying to

13    redact or provide a summary, because there are numerous Brady-

14    Giglio statements within those two individual transcripts, we

15    are going to just turn over the entire transcript today to

16    defense counsel.

17              THE COURT:  Who are those witnesses?

18              MR. E. SULLIVAN:  Augie Paone.

19              THE COURT:  How do you spell that surname?

20              MR. E. SULLIVAN:  Paone is P-a-o-n-e.  And he is the

21    owner of a company called Christiansen Builders.  And the other

22    individual is -- the other individual is Bob Persons, who is a

23    friend of Senator Stevens.

24              Now, on the issue of evidence of drug and alcohol

25    abuse, we did --

 1          THE COURT:  Let me stop you.  David Anderson, you

 2    provided the affidavit.  As far as you're concerned that's moot,

 3    there are no plea agreements for Anderson and Rocky Williams,

 4    right?

 5          MR. E. SULLIVAN:  That's correct, and there was a

 6    severance agreement which, your Honor, we did not think that's

 7    what they were requesting in their original motion to compel.

 8    We aren't frankly still not sure if that's what they're looking

 9    for.  We disclosed it to them yesterday, so we believe again

10    that's a nonissue.

11          THE COURT:  What about the Alaska state investigation

12    regarding Bill Allen?

13          MR. E. SULLIVAN:  In the letter that we sent last

14    evening we provided detailed information about the Alaska state

15    investigation.  We made a correction in the brief that we filed

16    yesterday as far as the opposition to motion to compel.  In our

17    original filing we said that there were no documents in our

18    possession, control or custody relating to that state

19    investigation.  Subsequently we did find a handful of documents.

20    Those documents were summarized in the letter and provided to

21    defense counsel last evening, so again we think we've fully

22    complied in that regard.

23          I believe the next issue on your list was medical

24    records for Bill Allen.

25          THE COURT:  Right.

1      MR. E. SULLIVAN:  And my colleague is here to address

2  the issue on the merits if your Honor would like to, but I think

3  we can just represent for now that we don't have any of his

4  medical records in our custody and control, and even if we did,

5  we think that would be an issue that would have to be litigated

6  because of some of the privacy concerns that might be at issue.

7  We also note that there is a possibility that Mr. Allen's

8  separate counsel might intervene, might file a motion on this

9  particular issue.  We don't know his position currently.

10      THE COURT:  Does the government have an obligation to

11  ask him about his medical records for the motorcycle accident

12  and for the other medical issues that have been raised by the

13  parties?

14      MR. E. SULLIVAN:  No, your Honor.  He has testified

15  twice in two state-related investigations, and both times he

16  testified at great length about the motorcycle accident, what

17  type of impact it had on him with respect to his speech.  He

18  talked about his cognitive abilities still being intact, so

19  there's a fully developed record from which defense counsel is

20  able to cross-examine Mr. Allen at trial if that's what they

21  intend to do, but he's already addressed it on the record in

22  open court twice.

23      Going to the next item on your list, the grand jury

24  subpoenas and exhibits, let me just take the grand jury exhibits

25  first.  We have produced all grand jury exhibits to defense

counsel that relate to the investigation of Senator Stevens.
Defense counsel complained that when they looked at the grand
jury exhibits they could see that there were missing gaps in the
sequential order of the grand jury exhibits.  The ones we
removed from production related to other investigations,
including the state-related investigations that I just referred
to.  We don't think that they're entitled to exhibits relating
to other government investigations.  The ones related to Senator
Stevens have been turned over.

On the issue of grand jury subpoenas, they've cited no
case law saying that under Rule 16 they're entitled to receive
grand jury subpoenas under 16(a)(1)(e), and there's an obvious
reason for that.  What they're trying to get at is material that
is part of the function of the grand jury in carrying out their
investigative powers, and until Brady or Jencks trumps that
grand jury secrecy or that work product, if you will, there is
no obligation to produce it.  What defendant really seems to be
trying to get at is obtaining the attachments to the subpoenas
to see what the government's mental process or work product is
with respect to those particular subpoenas, not just why we are
subpoenaing certain individuals, but what topics we are seeking
from them.  They know who we've subpoenaed.  They have the
underlying documents.  We don't think they need the subpoenas to
have the attachments as well.

With respect to metadata and photo logs, the photo

1   logs is I think a straightforward issue.  There's nothing under

2   Rule 16 requiring production of them.  We do have photo logs.

3   My understanding is that they are relatively cursory.

4           THE COURT:  Rule 16 does require the production of

5   data, though, doesn't it, and metadata is indeed data for

6   photos.

7           MR. E. SULLIVAN:  Switching over to metadata, Rule 16

8   does have the word "data" in it.  Again, though, just because

9   it's material that might, in their view, be relevant towards

10  preparing their defense, doesn't mean it's automatically

11  producible under Rule 16.  There is many types of data or

12  internal work product that the government has in its possession.

13          THE COURT:  Do you have it?  First of all, are the

14  photos just of the defendant's home?

15          MR. E. SULLIVAN:  By and large.  I believe there's a

16  few photos of the Mustang that's alleged in the indictment.

17          THE COURT:  Would you agree they're digital photos,

18  the metadata is on the computer, it shows what type of angle the

19  photo was taken at, whether it's been enhanced, whether it's

20  been brightened?  Why don't you just give that to them?  How

21  burdensome will that be?

22          MR. E. SULLIVAN:  It will take about a day to produce

23  them, but we can do that.

24          THE COURT:  Will it take that long?

25          MR. E. SULLIVAN:  I believe so, because the photos

1    that are produced had the metadata removed from it, but we can

2    go back and reinsert it --

3           THE COURT:  Have you produced the photos in the native

4    format?

5           MR. E. SULLIVAN:  No, we have not.  What we added on

6    the photographs were Bates numbers and the metadata was removed,

7    so we can go back and produce the photographs with the metadata.

8    Unfortunately, I think there's no way to put the Bates number on

9    it at the same time so it might be a little bit confusing.  One

10   of our concerns about producing the photographs with the

11   metadata is -- I'm not a tech guru -- but my understanding is

12   that with the metadata --

13          THE COURT:  Believe me, I'm not either.  I may sound

14   like one, but I'm not.

15          MR. E. SULLIVAN:  One of our concerns, though, as I

16   understand it, with the metadata there actually is an

17   opportunity to manipulate the photograph from that point

18   forward.  We've produced the photographs in the form in which

19   they were taken precisely because we wanted it to be clear that

20   these photos had not been doctored or manipulated in any way, so

21   that's our concern then.  If they get the metadata there is a

22   possibility of manipulating the photographs, but if your Honor

23   would like us to produce that we can do that.

24          THE COURT:  You say it would take a day.  How many

25   photos are we talking about of the defendant's home?

1        MR. E. SULLIVAN:  There's 2,200 photos in total.  I
2   believe the majority of those are relating to the home, and
3   that's also a common-sense point, I mean, do they really need
4   the metadata to know that this is the picture of his house or
5   his bathroom or the back of the house?
6        THE COURT:  They can disagree with the way in which
7   the home is portrayed.  We're only talking about one home,
8   correct?  We're not talking about multiple homes, just a single
9   home?
10       MR. E. SULLIVAN:  Single home.
11       THE COURT:  They can take their own photos.  I don't
12   want to be flippant about it, but what's wrong with that
13   argument?
14       MR. E. SULLIVAN:  Well, we certainly think they can go
15   in and take their own photos.  To me this goes to evidentiary
16   foundation.  We have the burden of trying to get those
17   photographs admitted at trial, and if they think photos have
18   been manipulated, doctored, don't accurately reflect his home,
19   then when we're trying to admit those photographs they can
20   object and make the appropriate objection at trial at that point
21   in time.
22       THE COURT:  These photos were taken over a number of
23   years, I assume, or not?
24       MR. E. SULLIVAN:  No.  The vast majority -- I believe
25   there was a handful that were taken during the construction

1    phase.  The vast majority of the photographs were taken when the

2    FBI actually executed a search warrant.

3            THE COURT:  '07, in 2007?

4            MR. E. SULLIVAN:  That's correct, that's correct.  So

5    they know when the photos were taken, who took the photos, what

6    the photos represent, so in our view the metadata is really

7    irrelevant.

8            The bigger concern on that point, though, your Honor,

9    is, it seems that they're getting ready to tee up a substantive

10   motion to suppress all of the photograph information based on

11   utilizing the metadata, and that is sort of the bigger issue,

12   that this is troublesome in our view, that we're at a point now

13   where trial is fast approaching.  We were all under the

14   impression at arraignment that counsel stood up and said this is

15   a simple case.  I think we were all working under the impression

16   that this case was not going to involve an extensive motions

17   practice.  We're now on motion number twelve and we're talking

18   about it sounds like Rule 12 motions coming up on motions to

19   suppress photo data, a potential competency hearing as to

20   whether Bill Allen can testify.  I mean, those are the concerns

21   for us.  Producing the data can be done.  We do take issue with

22   the fact that you can't have it both ways.  You can't say this

23   is a simple case and get up and say that we can proceed to trial

24   within 55 days but also file very substantive motions, and we're

25   at a point in time where the government's rights are at issue

1    too on some of these substantive motions, particularly if

2    they're going to move to suppress all the electronic

3    surveillance based on a minimization argument, particularly if

4    they're going to seek to disqualify Bill Allen from testifying,

5    particularly if they're going to try to strike all the

6    photograph evidence or move to suppress all the photograph

7    evidence.

8            I believe your next --

9            THE COURT:  The Court was implying to require the

10   government to provide metadata to the defendant, then it seems

11   to me, and you have a concern as to whether or not the metadata

12   is manipulated, it seems to me that if the defendant's used

13   photos, then they should likewise be required to provide

14   metadata for the photos they used to the government.

15           MR. E. SULLIVAN:  Certainly.  We haven't gotten any

16   reciprocal discovery with respect to photographs that they may

17   or may not want to use at trial, but if they are going to do

18   that and they are going to produce it with metadata, then we

19   believe what's good for the goose it good for the gander

20   certainly.

21           I believe the next issue on your list is the Title 3

22   surveillance logs.

23           THE COURT:  Yes.

24           MR. E. SULLIVAN:  We briefed this issue pretty

25   extensively.  I think the case law is pretty clear that the

1    majority of the case law says that those logs are --

2         THE COURT:  Everyone is using different terms, though.

3    The term "indices" has been used, "logs" have been used, "log

4    sheets."

5         MR. E. SULLIVAN:  Sure.  To be clear --

6         THE COURT:  Everyone cited one really, really good

7    case to support each side's position, and there are a lot of

8    cases in the gray area.  I don't think there's an obligation, I

9    don't think there's an absolute requirement that the logs have

10   to be produced, but nevertheless, defendant should have some

11   material to determine whether or not the government's

12   minimization efforts comply with 302, right?

13        MR. E. SULLIVAN:  That's correct as a general matter.

14   What we gave to them were logs showing participants for each of

15   the recordings, audio, video, as well as --

16        THE COURT:  Did that show hang-ups?

17        MR. E. SULLIVAN:  Pardon me?

18        THE COURT:  Would that show calls that were hung up or

19   disconnected calls?

20        MR. E. SULLIVAN:  You would have to go to the line

21   sheets to figure out all of the times, at what point in time

22   calls were minimized, and our problem is, whether you call them

23   line sheets, log sheets, I think we're all talking about the

24   same thing.  That is, basically --

25        THE COURT:  I'm not sure about that because the cases

1    talk about -- the cases use different phraseology as well, so

2    it's not clear.

3                It seems to me, correct me if I'm wrong, though, it

4    seems to me that if you have any obligation at all it's probably

5    to turn over the logs of all calls, including those calls that

6    were minimized without the work product.  Do you have that

7    information?

8                MR. E. SULLIVAN:  We have those line sheets.  The

9    problem is, we noted in our brief, is --

10               THE COURT:  Those are documents that have to be

11   scrubbed because of work product?

12               MR. E. SULLIVAN:  They have to be scrubbed, and the

13   scrubbing is not going to be easy.

14               Let me just describe what the line sheets are.  They

15   actually say time of call, participants, and somewhere in that

16   line sheet -- it's sort of like a privilege log.  It's the

17   agent, the monitoring agent's contemporaneous summary of the

18   conversation.  In those contemporaneous summaries it may say in

19   the middle of it "minimized."

20               THE COURT:  Isn't everything on a database, though?

21               MR. E. SULLIVAN:  It is on a database.

22               THE COURT:  Can't you push a button and hide the work

23   product and just give them the log?

24               MR. E. SULLIVAN:  No.  We checked with agents, and no,

25   we don't think it can be done that way.  It has to be literally

```
 1   hand-redacted with a magic marker, and we do believe it's going

 2   to take a little bit of time to do that.

 3           THE COURT:  You told me two months.  Is that a good-

 4   faith estimate of time?

 5           MR. E. SULLIVAN:  Whether it's three weeks or two

 6   months, I think it's somewhere in between that.

 7           THE COURT:  That's a lot of difference, three weeks

 8   and two months.

 9           MR. E. SULLIVAN:  The first representation from the

10   agents was two months.

11           THE COURT:  Then you said three weeks, though.  Wasn't

12   that the second response?

13           MR. E. SULLIVAN:  To be fair to us --

14           THE COURT:  How long would it take, if you were asked

15   today, a week or so?  Seriously, how long is it going to take?

16   Because the Court has to weigh the respective burden.  Is it

17   more burdensome to tell the defendants figure it out?  If they

18   listen to the tapes they won't learn anything about

19   minimization, right?

20           MR. E. SULLIVAN:  That's correct, your Honor.

21           THE COURT:  How will they be able to determine whether

22   the government's complied with its obligations under the law if

23   they can't just listen to the tapes and determine minimization?

24           MR. E. SULLIVAN:  Fair enough.  I just don't want to

25   overstate our ability to get it done within three weeks, so I
```

1    think I'll stick with the original assessment by the FBI agents

2    who indicated that it will take two months to get the redactions

3    completed.

4           THE COURT:  All right.  Next category?

5           MR. E. SULLIVAN:  According to my list that -- oh, the

6    load data I believe is the last issue, your Honor.

7           THE COURT:  Right.

8           MR. E. SULLIVAN:  We already represented that the

9    material that we produced is readily usable.  If it was produced

10   to us in PDF we turned around and produced it in PDF.  If it was

11   produced in TIF files we gave it to them in TIF files.  We

12   believe the materials that we originally received was not

13   rubberband, stapled, clipped, etcetera, so we turned it over in

14   the format that we received it.  We will go back and check our

15   earliest productions.  This issue didn't come up until after we

16   gave them this five hundred gigabytes of information.  We'll go

17   back and look at those earlier productions to see if it was

18   paper-clipped or stapled.  My understanding is, though, when it

19   came in the door it was electronic format or hard-copy documents

20   that were not stapled or paper-clipped.

21          THE COURT:  Let me ask you this:  Going back to the

22   phone logs, what about information or records that show just the

23   percentages of the number of calls minimized, do you have that

24   information?

25          MR. E. SULLIVAN:  We can get that information.

1    THE COURT:  All right.  Then tell me, you can get that

2    information, that information would show exactly what I just

3    said, percentages and number of calls minimized?

4    MR. E. SULLIVAN:  I believe we can do that, yes, yes,

5    and if they are focused solely on the -- my understanding, for a

6    minimization tag, it would have to show that they're one of two

7    things:  that we minimized improperly as it related to

8    defendant; or the broader issue, that how we are minimizing as a

9    pattern was incorrect by looking at the broad spectrum of all

10   the intercepted communications.

11   THE COURT:  Right, right.

12   MR. E. SULLIVAN:  If they're arguing for the latter,

13   that's what's going to take two months.  There are so many

14   intercepted communications that again we have to scrub out those

15   logs.  Could we provide a percentage of all the calls that were

16   minimized?  I think we can do that in fairly short order.

17   THE COURT:  How much of a burden will that be?

18   MR. E. SULLIVAN:  I don't think that would be overly

19   overburdensome.  I think we can do that relatively quickly.

20   THE COURT:  All right.  Thank you.

21   MR. E. SULLIVAN:  Thank you, your Honor.

22   THE COURT:  All right.  Let me invite defense counsel

23   back up.  Good morning.

24   MR. ROMAIN:  Good morning.

25   THE COURT:  Let's deal with the last issue first.

1   What about the information regarding percentages of number of

2   calls minimized?

3         MR. ROMAIN:  We'll happily take that information, your

4   Honor.  We believe we're entitled to more.

5         THE COURT:  You may be.  It was your request, and I

6   was available to try this case, so it was your request for an

7   early trial, and I'm asking you now, do you still want an early

8   trial or do you want to wait two months?  I'm not saying you're

9   going to get that information, but your request is not

10  insignificant.

11        MR. ROMAIN:  We appreciate that, your Honor, and not

12  withstanding the changing representations about how long it

13  would take, we absolutely want to go to trial on September 22nd,

14  and so if the government is going to represent now that it will

15  take two months to actually give us that information, then we'll

16  happily take what they can provide now and we'll make a

17  determination at that point and we'll forego all the rest of the

18  minimization logs which we believe we're entitled to because

19  it's very important that we keep our trial date.

20        THE COURT:  Well, what about this, maybe it's a happy

21  medium.  I should have asked government counsel.  I want his

22  response as well.  Just the information for the taped material

23  that the government plans to introduce in its case in chief,

24  which may not be the full universe of tapes, how burdensome --

25  where is defense counsel?  How burdensome is that?  I'm sorry.

1    I meant to ask you that.  You turned over everything in the

2    entire universe.  I'm going to make an assumption that you

3    didn't plan to attempt to introduce all the tapes.

4                MR. E. SULLIVAN:  No.

5                THE COURT:  What about the tapes that you plan to

6    introduce?

7                MR. E. SULLIVAN:  Those could be hand-redacted I think

8    fairly quickly.  The universe is much smaller.  We were under

9    the impression that they wanted everything.

10               THE COURT:  Well, I'm just throwing this out.  You

11   could live with what they plan -- you don't care about

12   everything if they're not going to use it, right?

13               MR. ROMAIN:  We'll take that, your Honor.

14               THE COURT:  You can do that.  How long will that take?

15   It won't take two months, that's for sure.

16               MR. E. SULLIVAN:  No.  We think a day or two.

17               THE COURT:  That's fine.  I think we can resolve that

18   issue along that way.  You don't need the percentage and number

19   of calls minimized, you just need the information for the

20   exhibit list.

21               And let me just say right now, and this dovetails into

22   the exhibit list and witness list, I'm going to require

23   production of those lists in a short time frame.  Probably the

24   government, what I want you to do is this:  I'm going to have

25   you exchange the list among yourselves.  You don't need to file

anything.  Exchange your witness list.  The government will

exchange first, and that will be tomorrow, probably by no later

than eight p.m., exhibit list and witness list.  You'll have two

days to likewise exchange your exhibit list and witness list

with the government.  I don't need a copy it.  You don't have to

file anything on the public docket.

Objections to exhibits and/or witnesses are going to

have to be filed by Monday because I'm going to try and deal

with objections and resolve objections before this trial starts

because I don't get tied up with a lot of bench conferences

during the trial, so I just happen to mention that now so

everyone's on notice.  It's a short turnaround but hopefully it

will lead to a more productive trial.

So we don't need to talk about the log issue then, do

we?

MR. ROMAIN:  No, your Honor.  I think that's been

resolved.

THE COURT:  What about this metadata issue?  Can't you

take your own photos?

MR. ROMAIN:  Let me be clear, your Honor.  When the

government made an argument, its response to our venue transfer

motion, one of the points that it made is that there are

thousands of pictures of Senator Stevens' house and that those

pictures would provide enough information about the house to a

jury that would be 3,500 miles away.

1          THE COURT:  It's going to be the same for the photos,

2     just for the photos that the government plans to introduce in

3     its case in chief.  If photos become a big interest in the case,

4     you can provide the metadata, not for the thousands of photos.

5     We don't need to see thousands of photos of this man's home.

6          MR. ROMAIN:  We certainly don't, and we don't want the

7     metadata for all the irrelevant pictures.  What we do want,

8     however, is the metadata for the relevant pictures that the

9     government intends to use in its case in chief.

10          THE COURT:  And also conversely, if you get those

11     photos and you were -- the word "alter" is not appropriate, and

12     "manipulate" is not appropriate.  What's the word I'm looking

13     for?

14          MS. MORRIS:  Enhance.

15          THE COURT:  If you enhance them, you have to provide

16     the metadata for the photos you plan to introduce in your case.

17          MR. ROMAIN:  Absolutely, your Honor.  We have no

18     objection to providing metadata for any photos that we intend to

19     use or provide in our case.

20          THE COURT:  We don't need to talk about photographs or

21     logs anymore.  We've resolved those issues, right?

22          MR. ROMAIN:  Thank you.

23          THE COURT:  The subpoena, you haven't cited any

24     authority for the grand jury subpoenas.

25          MR. ROMAIN:  Your Honor, we believe that that's

1    actually dealt with by Rule 16 itself, your Honor.  The

2    subpoenas are papers --

3              THE COURT:  You made the argument documents, and

4    documents include the subpoenas, but there's no authority

5    anywhere, I don't believe, that requires the government to

6    produce copies of subpoenas, is there?  I mean, if there's some

7    authority I want to read it, but we haven't found any and you

8    haven't cited any.

9              MR. ROMAIN:  Yes, your Honor.

10             THE COURT:  You agree there's no authority?

11             MR. ROMAIN:  We haven't cited any authority.  We

12   haven't found anything specifically on that issue.  However, we

13   do believe, your Honor, that a meaningful production here allows

14   us to evaluate what would otherwise be irrelevant invoices or

15   accounting entries that appear irrelevant once we understand

16   precisely what was requested, and furthermore, your Honor, we

17   are trying to necessarily issue subpoenas, and for us to spend

18   time, unnecessary time duplicating what the government has

19   already done, I mean, the Court understands well the process,

20   you issue a subpoena, you have a dialogue; sometimes they simply

21   don't have any documents.  It seems to me that there is -- I

22   actually haven't heard any reason why we shouldn't be able to

23   receive --

24             THE COURT:  Look, the reason they've given is you're

25   not entitled to it.  They're going to give over what they're

1     obligated to do, and I'm going to require them to give over what

2     they don't want to give over if they're required to do so by the

3     law, but I don't think there's any authority for the subpoenas.

4     The exhibits issue you resolved I assume to your satisfaction.

5              MR. ROMAIN:  We accepted the government's

6     representation that they've produced all the exhibits relevant

7     to this case.

8              THE COURT:  If you give me some authority on the

9     subpoena issues, you may be entitled to it, but I haven't found

10    any authority, you haven't cited any, and I'm not aware of any

11    that enables you have to the grand jury subpoenas.

12             The Bill Allen records, you filed a HIPPA motion for a

13    subpoena?

14             MR. ROMAIN:  We have, your Honor.

15             THE COURT:  Does his attorney plan to intervene in

16    this and challenge the subpoena?

17             MR. ROMAIN:  We certainly served him with the motion

18    and we assume that he will --

19             THE COURT:  Who is the attorney, by the way?

20             MS. MORRIS:  Bob Bundy.

21             MR. ROMAIN:  Robert Bundy.

22             THE COURT:  I'll deal with that issue when it's ripe.

23    I don't need to focus on that.

24             Are you suggesting that the government has an

25    obligation to ask Mr. Allen for his medical records?

1        MR. ROMAIN:  No.  What we're suggesting is when Mr.

2   Allen is put up as a witness by the government and proceeds by

3   testifying that a quarter of his brain has died, the notion that

4   the government doesn't have any information, information, about

5   his medical status, is really hard to believe.

6        THE COURT:  But that's what they've said, though.

7   They've said as officers of the court and they've said, Judge,

8   we don't have it.

9        MR. ROMAIN:  I think that their motion is carefully

10  crafted to say that they do not have private and personal

11  medical records.  What we are asking for is information.  The

12  notion, your Honor, that the government would put up a primary

13  witness who had an accident in which a quarter of his brain had

14  died and had no further information, that's it?  It's pretty

15  hard to believe, your Honor, and so the government hasn't made

16  that specific reference or that specific representation.  What

17  they've said is they don't have private or personal medical

18  records.  What we're dealing with is personal medical records in

19  a different form, in a different way, but we still would like to

20  find out whether or not -- and we think we're entitled to that

21  information -- the government's primary witness, what

22  information they have.

23        THE COURT:  Read the transcripts of those proceedings

24  that Allen was a witness in and acquire information, though,

25  about his -- I assume he was cross-examined about his medical

1    condition.

2         MR. ROMAIN:  We're talking about some of the same

3    prosecutors examining the same witness, your Honor, last year.

4    It's just I haven't heard that representation from the

5    government.

6         THE COURT:  Are we talking about the prosecutors in

7    this case examining him in another proceeding somewhere?

8         MR. ROMAIN:  Yes.  Yes, your Honor.  I mean, we have

9    some of those transcripts.

10        THE COURT:  The record is what the record is.  If they

11   have information you have it as well because it wasn't sealed,

12   was it?

13        MR. ROMAIN:  No, your Honor, but what I'm saying is,

14   what I'm saying is, that if the government has information, and

15   it's just important to go back to the language in their motion.

16   I understand what representation they made in the motion.  It

17   wasn't that they don't have information.  It was that they don't

18   have any obligation to produce private or personal medical

19   records.  Well, let's move beyond that point and ask whether or

20   not they have information.  We think if they do have information

21   we ought to get it.  That's what we've been asking for on a

22   number of different issues related to Brady information,

23   exculpatory impeachment material, and so we're still waiting for

24   that representation.

25        THE COURT:  With respect to Brady, why shouldn't the

```
1    Court just say everyone knows, everyone has read, and everyone

2    is well versed with respect to opinions from this Circuit and

3    opinions from my colleagues, including Judge Friedman in the

4    Safavian case and other district court opinions that address

5    Brady obligations and responsibilities.  Everyone knows what the

6    law is.  Why shouldn't the Court just say to the government you

7    know what the law is, follow the law?

8              MR. ROMAIN:  Well, there are two --

9              THE COURT:  Wait a minute.

10             And abide by your Brady obligations period, because

11   there's no question as to what the law -- what our Court of

12   Appeals has said about Brady and the government's

13   responsibility.  It's not just exculpatory evidence; we all know

14   that.  So the government says we're aware of our Brady

15   obligations, and I say fine, then comply with your Brady

16   obligations, and why should I do more than that?

17             MR. ROMAIN:  Your Honor, first it would be in fact

18   helpful if you could do precisely that.

19             THE COURT:  I just did it.  I just did it.

20             MR. ROMAIN:  And I appreciate it, and let me tell you

21   where the record stands, your Honor.

22             THE COURT:  Why do I have to do anything more than

23   that?  Everyone knows what their obligations are.  I shouldn't

24   have to.  We've all read, we all know --

25             MR. ROMAIN:  I appreciate that, your Honor.  It is
```

```
 1    absolutely true that the state of the law is clear.

 2              THE COURT:  Right.

 3              MR. ROMAIN:  But the state of production is not in a

 4    position where the government can say they have actually met

 5    their Brady obligations.  There are two issues with respect --

 6              THE COURT:  Then I say produce everything by no later

 7    than, and finish that sentence.

 8              MR. ROMAIN:  Tomorrow.  Tomorrow.

 9              THE COURT:  If they can't produce everything that they

10    haven't produced by tomorrow, produce it or let the Court know

11    the reason why they can't produce it.  I shouldn't have to go

12    through each opinion because we all read these opinions time and

13    time again.

14              MR. ROMAIN:  Your Honor, we are less than twelve days

15    away from trial.

16              THE COURT:  Thanks for reminding me of that.

17              MR. ROMAIN:  I'm reminding myself, your Honor.

18              There is no reason why we should not have all the

19    Brady information right now.  The government ought to return to

20    its offices today and start copying it.  We'll be available to

21    receive a rolling production starting this evening and it should

22    be completed by tomorrow.

23              But let me point out that the letter we received last

24    night sometime after 8:30, was -- I need to read one sentence

25    from that for you.  Please note, and I quote, Please note that
```

1    the information set forth in this letter and the government's

2    letter dated August 25th, 2008, does not contain all potential

3    impeachment material related to certain government witnesses.

4    Close quote.

5            I believe that makes it clear that their Brady

6    obligations have not yet been satisfied.

7            In another letter, your Honor, there's an important

8    point that the government tries to make, so we're talking about

9    timing already, but in terms of the scope, the government said

10   in a letter dated September 5th, 2008, of course it's aware of

11   its Brady obligations, quote:  We will continue to abide by that

12   duty and provide the defendant with information in our

13   possession that is material to your client's defense.  Close

14   quote.

15           The case that the Court just referenced, United States

16   vs. Safavian, makes it clear that it is not the government's

17   province to determine as if it were the D.C. Circuit Court of

18   Appeals in a hypothetical appeal from a hypothetical conviction

19   that this material that we're entitled to should not be

20   produced.

21           THE COURT:  Let me ask you this:  There was an appeal

22   in Safavian, correct?

23           MR. ROMAIN:  There was an appeal?

24           THE COURT:  There was an appeal, correct?  I believe

25   there was.  I want to be clear about that.  Was Judge Friedman's

opinion challenged in the Court of Appeals?

MR. ROMAIN:  I don't know.

THE COURT:  I don't think it was.  I don't think it was.  I don't think the government in response to reciting it said that that's no longer the law in this jurisdiction, and I believe there was an appeal in Safavian, I believe.

MR. ROMAIN:  Well, your Honor, I think that the core of the case is quite clear.  It is not the government's province to decide in its own wisdom what could happen with a whole series of hypotheticals and some attenuated chain.  The obligation, which the Court has already indicated is clear, is to give us all that material right now.  Of course this letter creates significant concern.

THE COURT:  Well, not just right now, because the government has a continuing obligation.

MR. ROMAIN:  That is absolutely true, your Honor, but we know that that obligation has not been satisfied.  That's clear because they said so.

I was a little confused by the prior representations made by counsel for the government about having reviewed all the 302s and reviewed all the notes and reviewed all the memorandum, because the letter we received last night made it clear that we are not done.  We are not done.

I simply want to identify that there is an issue of timing.  We need it now.  There is an issue of scope.  The law

1    is clear.  It is not a question of acting as if you're the D.C.

2    Circuit later on.  You are the government right now.  Those

3    pretrial obligations are to provide all the exculpatory material

4    as defined in the case law.

5              THE COURT:  Do you know what, counsel?  We've been

6    doing this for an hour-and-a-half now.  I need to give the court

7    reporter a short recess, and we'll do that and I'll come back to

8    this, but with respect to -- let me just ask you a couple of

9    short questions.  David Anderson, there's no longer a question

10   with respect to the affidavit there, right?

11             MR. ROMAIN:  Well, we received the affidavit, yes,

12   your Honor.

13             THE COURT:  And there are no plea agreements for the

14   government's witnesses, Anderson and Williams, you accept that,

15   right?

16             MR. ROMAIN:  We do accept that, your Honor.  What we

17   sort of noted was that if there are any other offers of

18   preferential treatment or immunity, something other than a plea

19   agreement, then we ought to receive that information too.

20             THE COURT:  We'll take a 15-minute recess and we will

21   promptly reassemble at 11:45.  I'm probably not going to be able

22   to finish before lunch.  We'll go as far as we can and then

23   we'll break before the afternoon session.

24             There's no need to stand.  The Court will take a brief

25   recess.

1          COURTROOM DEPUTY:  This Honorable Court is in a brief

2     recess.

3          (Recess taken at about 11:30 a.m.)

4          COURTROOM DEPUTY:  Please remain seated and come to

5     order.

6          (Back on the record at about 11:56 a.m.)

7          THE COURT:  All right.  Counsel?

8          MR. ROMAIN:  Thank you, your Honor.

9          If I may begin simply by trying to address one

10    lingering issue with respect to Brady, and that has to do with

11    the form of the production, your Honor.

12         We have received of course a couple of letters that

13    summarize some information, but it seems clear that that is not

14    enough.  For example, if we receive a letter, as we did last

15    night, from the government that indicates that it essentially

16    has produced all the Brady information for one of its primary

17    witnesses in a total of eleven lines, eleven lines, when we have

18    information that this witness has been interviewed multiple

19    times, there are several problems with this.  First, if there

20    are additional documents that reflect that same Brady

21    information we're entitled to it, but in addition, your Honor, a

22    letter like this is not sufficient.  We have never agreed to it

23    because if that same witness comes on the stand and makes one

24    statement, what kind of impeachment can we actually do with a

25    letter about so and so stated X, Y, and Z?  That actually and

1    simply doesn't work.

2            For example, if the FBI has Form 302s, which we

3    understand its policy to maintain and to draft, then we should

4    receive those Form 302s.  We should know what the witness said,

5    when he said it, to whom he said it, so that we can use that

6    information to effectively impeach the witnesses, so I think, I

7    just want to make clear that we have issues of timing, we have

8    issues of scope, and we also have issues of form, your Honor.

9            THE COURT:  You mentioned the 302.  My

10   understanding -- I said this, that was my first topic -- my

11   understanding is that the parties have already agreed that the

12   government would turn over either summary letters or redacted

13   transcripts of exculpatory information, and then my question,

14   there was a time frame for that.

15           MR. ROMAIN:  Well, let me be clear about the nature of

16   our agreement.  I'm not sure exactly so I want to clarify that.

17           My understanding of our agreement with the government

18   is that the government would produce the Brady material, but we

19   didn't -- we never agreed that we could get it in an unusable

20   form.  And the form that it's now been produced in, a letter,

21   eleven lines, is not usable.  Of course if there's some Jencks

22   material we know we have an agreement they will produce that 24

23   hours before the witness.  However --

24           THE COURT:  Is that your agreement on Jencks?

25           MR. ROMAIN:  Yes, it is.

1          THE COURT:  It is?  Okay, that's fine.  I'm not going

2     to interfere with that.

3          MR. ROMAIN:  But the law does say, your Honor, that

4     Brady trumps Jencks and it trumps Rule 16, so when we receive

5     this production starting tonight, and by tomorrow morning we

6     expect, your Honor, that if the government cannot redact the

7     grand jury transcripts that contain the Brady information it

8     should simply produce it.  That's what the law says.  I mean,

9     it's clear, it's abundant, and there can really be no serious

10    question about that issue, your Honor, so I just want to be

11    clear that when the Court has made this very basic, very

12    fundamental ruling about producing all Brady.  You know the law.

13    We understand the timing:  now; the scope:  everything we're

14    entitled to.

15          THE COURT:  I can sit here and craft an order and lift

16    the language from Judge Friedman's excellent opinion in

17    Safavian, and indeed there was an appeal and there was a

18    reversal, but his Brady rulings weren't challenged in the Court

19    of Appeals and it's good law.  I think it's an excellent

20    opinion, and I totally agree with it, and all Judge Friedman did

21    in that opinion -- he had the time to do it.  I don't have the

22    time right now -- he repeated what Chief Judge Sentelle said in

23    Marshall, in Poindexter, and all my other colleagues who read

24    it, so every- one knows what the law is.

25          MR. ROMAIN:  It is unfortunate, your Honor, that we

```
 1    should be having a discussion about whether or not we're

 2    entitled to material that is useful in terms of impeachment.

 3              THE COURT:  You're in a court of law.  We have these

 4    discussions every day.

 5              MR. ROMAIN:  I appreciate that, your Honor, but we

 6    just want to be clear about what it is we need and when we need

 7    it.

 8              THE COURT:  All right.  Let me ask you, now my

 9    interest is up.  You and the government have already agreed on

10    Jencks 24 hours before a witness.

11              MR. ROMAIN:  Except if it actually includes Brady

12    material.

13              THE COURT:  If it's Brady material you want it now,

14    that's what you want?

15              MR. ROMAIN:  Yes.

16              THE COURT:  What's the government's position on that?

17              MR. ROMAIN:  I don't know if the government -- our

18    agreement is that the government would in fact produce it before

19    trial, but we're still waiting on it obviously, and that's a

20    problem, and that's why we're here before the Court.  We need to

21    get that material right now.

22              THE COURT:  Giglio material?

23              MR. ROMAIN:  Well, we have talked about that also.

24              THE COURT:  Are you in agreement also?

25              MR. ROMAIN:  We don't have, as far as I understand it,
```

1    a specific agreement with respect to Giglio, unless I'm wrong

2    about that.

3         MR. CARY:  Rob Cary.  I had the original discussions

4    and we consider Giglio to be a subset of Brady, so we've always

5    said we want Giglio now.

6         MS. MORRIS:  Judge, for the government I'm the one who

7    spoke to Mr. Cary and he's absolutely right.  We just agreed

8    that Brady and Giglio went together, and we understand our

9    continuing duty.

10        THE COURT:  All right.  So everyone knows, everyone is

11   on the same page, everyone knows what the law is?

12        MR. ROMAIN:  Except, your Honor, that we're still

13   waiting for the documents.

14        THE COURT:  All right.

15        Counsel, anything further?

16        MR. ROMAIN:  I'd like to make sure that we've

17   addressed all of the Court's issues.

18        THE COURT:  I think you have.  I left off with

19   Anderson and Williams and Anderson again, the Alaska state

20   investigation.

21        MR. ROMAIN:  Well, we received last night information

22   about that investigation, in a letter of course, and my point

23   here remains that if there is additional information that the

24   government has we ought to get it and we ought to get it now.

25   We ought to be getting the memos of those interviews that are

1   referenced here or however it is that the government was able to

2   provide this information.

3          THE COURT:  You've heard the Court state what the

4   Court thinks is reasonable.  What are you asking me to do with

5   respect to Brady?

6          MR. ROMAIN:  Your Honor, what we need is, rather than

7   to have a colloquy between Senator Stevens and the government

8   about the government's clear obligations, is, and I believe the

9   Court has already done it, to be clear about the law that

10  governs.  United States vs. Safavian is a very well-reasoned,

11  thorough case on the issue; the timing:  now.

12         THE COURT:  Very fair.  Judge Friedman, he didn't

13  authorize everything to be produced.

14         MR. ROMAIN:  Absolutely, your Honor.

15         The timing:  now; the scope:  everything that we're

16  entitled to as per United States vs. Safavian, and the form,

17  which is not eleven lines or some additional ten lines on a

18  primary witness.  We're entitled to the form 302s, we're

19  entitled to documents, we're entitled to memoranda.  There

20  certainly was no agreement that the government could provide

21  this information in a form that makes it unusable.  Impeachment

22  material must be useful for impeachment, and with the letter

23  that we have now, it's certainly of some use, but we are

24  certainly --

25         THE COURT:  I've not seen that letter.  Did the

1    government say in that letter or in any other letter or other

2    communication between your office and the government's office,

3    did the government ever say that you're not entitled to

4    impeachment information of a witness?

5          MR. ROMAIN:  I don't think that the government has

6    ever taken that position.  What they have taken is a position as

7    recently as September 5th that they understand their duty and

8    that we are entitled to information that is material to our

9    defense.  That's not the standard, and so we just -- all we need

10   is clarification and directive from the Court so that we can

11   prepare adequately.

12         THE COURT:  All right.

13         MR. ROMAIN:  Thank you, your Honor.

14         THE COURT:  Counsel?

15         MR. E. SULLIVAN:  Your Honor, just to briefly respond

16   to a few points, going back to before the break we were talking

17   about Bill Allen's medical condition.  Defense counsel stood up

18   here and said repeatedly that Bill Allen testified that a

19   quarter of his brain was dead, and having sat through -- there

20   were two federal public corruption trials in Alaska, Judge

21   Sedwick presiding over both of them.  Bill Allen testified in

22   both of them.

23         THE COURT:  Did your office prosecute?  Were you

24   involved in the prosecution?

25         MR. E. SULLIVAN:  That's correct, as well as Mr.

1    Bottini and Mr. Marsh.

2              Mr. Allen's testimony was crucial to both of those

3    cases.  His testimony was permitted.  There was no competency

4    challenge in either of those cases, and most importantly, having

5    sat through the trial, what he indicated on the stand is a

6    quarter, he was holding up his hand the size of a quarter and

7    was pointing to the back of his head, that a spot the size of a

8    quarter.

9              THE COURT:  A quarter of?

10             MR. E. SULLIVAN:  Not a quarter of his brain.  That he

11   hit his head on the pavement during a motorcycle accident and

12   there was a spot on the back of his head where he suffered

13   damage.  What he indicated in the testimony, and they have the

14   transcripts for it, is that his cognitive ability is in tact.

15   It's his speech, he has difficulty, and we freely admit that he

16   has difficulty getting words out.

17             THE COURT:  Is there an ambiguity in the transcript,

18   in the recorded transcript, as to what he meant when he said a

19   quarter of?

20             MR. E. SULLIVAN:  There is probably an ambiguity in

21   the transcript, but that's why we wanted to clarify it now.

22             THE COURT:  Because it sounds pretty startling when

23   someone says a quarter of the brain was affected.  And it's

24   probably also startling that the size of a quarter is affected

25   as well.

1          MR. E. SULLIVAN:  Certainly.  But we --

2          THE COURT:  The transcript is not clear then?

3          MR. E. SULLIVAN:  It is somewhat ambiguous on this

4     point, but that's why we wanted to clarify it for the Court.

5          We have met with Bill Allen a number of times and

6     that's part of our evaluation process.  If we really thought a

7     quarter of his brain was dead we wouldn't have put him on the

8     stand.  That's not the case.

9          THE COURT:  It didn't affect his cognitive ability?

10         MR. E. SULLIVAN:  He has indicated it has not affected

11    his cognitive ability, and importantly, he did testify in both

12    cases.  The testimony was permitted.  It was crucial to the

13    convictions of both of the defendants in those two federal

14    corruption cases.

15         Now, just jumping back over to the Brady-Giglio, just

16    briefly, we fully understand what our obligation is, and I don't

17    think we need to belabor the Court because the case law is clear

18    on this issue.

19         THE COURT:  What should the Court do?

20         MR. E. SULLIVAN:  We don't think that there's anything

21    for the Court to do.  We have --

22         THE COURT:  Should the Court just issue an order and

23    say everyone recognizes what Marshall says, Safavian says,

24    Poindexter says, and a litany of other cases say, and so the

25    government is directed to immediately -- to forthwith provide to

```
1    defense counsel any outstanding Brady material as defined by

2    those cases and on an ongoing daily basis provide information as

3    that information becomes in the possession, knowledge, control

4    of the government, should the Court do that?

5              MR. E. SULLIVAN:  We don't think so, your Honor.  We

6    understand --

7              THE COURT:  How are you prejudiced if I do it, though?

8              MR. E. SULLIVAN:  The Court can.  If it wants to issue

9    an order to that effect, we will comply with that order.

10             THE COURT:  The government's position should be,

11   Judge, that's just surplus, because all of us know what the law

12   is?

13             MR. E. SULLIVAN:  Absolutely, your Honor.

14             THE COURT:  I'll just issue an order as a general

15   reminder to the government to remind it of its daily ongoing

16   obligation to produce that material.

17             MR. E. SULLIVAN:  Fair enough.  We just want to make

18   --

19             THE COURT:  What about impeachment material of

20   government witnesses, though, is that Brady material?

21             MR. E. SULLIVAN:  We have produced both Brady and

22   Giglio.  We treated the terms interchangeably.  We viewed it all

23   as Brady material.

24             THE COURT:  I don't need to say anything more about

25   Brady, at least today anyway?
```

     1          MR. E. SULLIVAN:  That's true, your Honor.

     2          One thing we do want to clarify, though, a portion of

     3     our letter from last evening was read on the record giving the

     4     impression that we're still sitting on a treasure trove of

     5     Brady-Giglio material.  That's simply not the case.  The

     6     sentence that was read --

     7          THE COURT:  What about counsel's representation that

     8     the Brady material provided to counsel as late as last evening

     9     is just a few lines in a letter?

    10          MR. E. SULLIVAN:  That's not accurate.  It's an

    11     exceptionally detailed letter and it's the second letter that we

    12     sent in this regard.  And what we made clear in this second

    13     letter is that our Brady-Giglio productions also include all of

    14     the documents that we have previously produced.  There's a

    15     hundred thousand pages that we have turned over, including a

    16     massive amount of documents turned over to Senator Stevens prior

    17     to indictment.  That's what was made abundantly clear in the

    18     letter, and that's the portion that was left out.

    19          Quote:  As you know, the government has produced

    20     substantial discovery to defendant which may contain additional

    21     Brady-Giglio material.  This discovery also includes the

    22     documents voluntarily produced to us by the defendant prior to

    23     his indictment.

    24          We made that clear, that it included everything, so if

    25     anything, our letter is supplementing to what we have already

produced.

Lastly, your Honor, we do recognize too that there is a continuing obligation.  It sounds like your order is going to make that clear as well.  There was an agreement between the parties on this, how the Brady-Giglio information was going to be produced.  Specifically Mr. Cary sent an e-mail to myself and Ms. Morris and other prosecutors on the team in which he summarized the parties' agreements.  Brady and Jencks, he said, quote:  Finally we agree that to the extent that Brady material was contained within Jencks material the government would produce that Brady information in the due course of discovery, parenthesis, as opposed to within 24 hours of the witness' testimony, close parenthesis, even if it chooses not to provide the transcript itself.  Recognizing that when we were discussing that particular issue there would be a chance that we were going to either produce redacted transcripts or summary information regarding Brady-Giglio, and that's what we are complying with. That is an e-mail dated August 12th, 2008.  It's page 17 of Exhibit 1 of our opposition to the motion to compel.  United States vs. Blackly, a district court decision from this Court in 1986, F sub 600, makes clear that the government does have the right to produce Brady-Giglio in summary format.

Lastly, counsel indicated that they're entitled to the 302s or the notes themselves.  You can't impeach a witness with a 302 statement of an FBI agent.  I mean, there's plenty of

1  black letter law on this particular point, so they don't need

2  the 302s.  What they need are the underlying statements of the

3  witness to impeach the witness, and that has been provided.

4         Unless there are further questions, we have nothing

5  else.  Thank you, your Honor.

6         MR. CARY:  Your Honor, Rob Cary.

7         If I may respond, because it was my e-mail back right

8  after this case was indicted that leads to this, what I think is

9  a misunderstanding.

10        What I was trying to emphasize was even if they

11 weren't going to produce a transcript because they said it was

12 Jencks, we still wanted the Brady information, and I was never

13 in a million years wanted to suggest that we weren't going to

14 get it at a time when we could use it, in a form that we could

15 use it for.  For example, Form 302 you can use to refresh the

16 witness' recollection.  It will tell us who the agents were so

17 that we will be able to ask -- plan to ask the appropriate

18 questions in order to refresh recollections and then call the

19 agent to impeach.  The letter that we have that Mr. Romain has

20 that we received last night is simply insufficient in its form

21 to be meaningful to us, and we did -- 24 hours, by the way, was

22 the best we could get the government to agree to on Jencks, but

23 it certainly seems like right now with twelve days away from

24 trial, the trial would go a lot smoother if we had the Jencks

25 now, and certainly if it's got Brady-Giglio material in it we

need at least that portion of the transcript so that we can use it.  I just wanted to stand up and clarify that initial discussion when we were trying to work out discovery in this case, your Honor.

THE COURT:  All right, counsel.  I had not planned to be hearing your argument with respect to the motion to dismiss, raising the unconstitutionally vague argument separation of powers argument or for the bill of particulars.  If someone has overlooked something that he or she wanted to say with respect to the motion or the response, I'll give you a chance to say it, if there's something new you need to bring to my attention and focus my attention on it.  Otherwise I'm going to deny those motions substantially for the reasons stated by the government, and let me be clear about this.

Recognizing that I don't have a lot of time, I don't have a lot of time to author opinions right now, I will do so when it's absolutely necessary, but I'm putting everyone on notice now that I plan to address these motions and resolve these motions orally, reserving the opportunity to write as appropriate and need be.  I do want to hear some argument with respect to the speech and debate motion filed by the government in limine concerning the inapplicability of the speech and debate clause, and I also want to hear some brief argument with respect to the government's motion to dismiss raising the speech and debate clause argument.  With respect to the motion in

```
1    limine, though, I probably need to hear from the government
2    first.
3              And my question to you up front is this:  You're
4    asking me to rule on the papers that certain requests, that
5    certain statements, that certain information that's out of
6    context of a trial should be allowed and query whether or not I
7    should wait until the picture has been developed and then rule
8    as appropriate.  Wouldn't that be more consistent with
9    Rostenkowski, being the gatekeeper during the trial and make a
10   determination whether this borders on speech and debate?
11             MR. E. SULLIVAN:  Your Honor, that's an excellent
12   question.  You can handle it that way.  You can also review that
13   material ex parte in camera.
14             THE COURT:  Isn't that frowned on?
15             MR. E. SULLIVAN:  It is to a certain degree.
16             THE COURT:  I think I would be more comfortable ruling
17   on that motion as the picture develops during the course of
18   trial, recognizing it may add some time, but at least I'm aware
19   of the arguments, and I'm sure that defense counsel, I'm not
20   going to sleep on their objections, and the Rostenkowski court
21   made it clear that the burden is on defense counsel to raise the
22   question of speech and debate as appropriate.  I'd feel more
23   comfortable doing that.  I guess the second part of that
24   question will be if I defer ruling is the government prejudiced
25   in any way at this point?
```

1          MR. E. SULLIVAN:  Your Honor, I might have to give

2     some thought to that, but I don't believe so so long as there is

3     an opportunity.  If I understand the Court correctly --

4          THE COURT:  In other words, you're letting me know,

5     you're giving me a heads up during the trial, Judge, we're about

6     to do this?

7          MR. E. SULLIVAN:  Sure.

8          THE COURT:  At that point there's some context for

9     what you're about to do.  You've already laid a foundation for

10    something.  It's just not going to come out of the clear blue.

11    I'm aware of what you're about to do, they're certainly aware of

12    what you're about to do, and I can call it up or down whether

13    it's permissible or not permissible as opposed to just looking

14    at the list and trying to determine speech and debate or not

15    speech and debate.  Would my ruling be different in the subject

16    matter if the request were put into context vis-a-vis other

17    testimony?

18         MR. E. SULLIVAN:  The only concern there, and I do

19    think it's a big concern for the Court to consider, is they have

20    moved to dismiss the indictment.

21         THE COURT:  I understand that.  I understand that.

22         MR. E. SULLIVAN:  We're dealing with a Rule 12 motion

23    that has to be resolved prior to trial.

24         THE COURT:  Right.  The motion to dismiss has to be

25    decided prior to trial.  The motion in limine doesn't have to

1  be.  I recognize the motion to dismiss has to be.

2          MR. E. SULLIVAN:  That's correct.  With that caveat

3  and that distinction, it could be handled that way.

4          THE COURT:  All right.  Let me hear from defense

5  counsel.  What's wrong with that approach, deferring ruling on

6  the government's motion?  I recognize that your motion to

7  dismiss needs to be decided pretrial.  I recognize that.

8          MR. CARY:  Yes, your Honor.  Setting aside the motion

9  to dismiss, just talking about their motion in limine, I don't

10 see a problem with that, except for the fact --

11         THE COURT:  With what, my approach?

12         MR. CARY:  Your proposal.

13         THE COURT:  You can object any time you think it

14 crosses the line.  Speech and debate, you're going to be

15 stepping up.

16         MR. CARY:  I'm concerned about opening, your Honor,

17 opening statements.

18         THE COURT:  How should the Court handle opening

19 statements?

20         MR. CARY:  It should be left out.  That proposed

21 evidence should be left out of the opening statement.

22         THE COURT:  I think that's probably correct.  I think

23 that's probably what the Court should do because I haven't

24 ruled.  I'd certainly feel more comfortable if the evidentiary

25 context were developed in making that ruling, but I want to be

1    fair to the government about that insofar as opening statement

2    is concerned.  Actually, the government's opening statement

3    would probably be this has nothing to do with speech and debate.

4    This case is not about speech and debate at all, right?  That's

5    not unfair to Senator Stevens, is it?  It's absolutely a true

6    statement from defendant's point of view.  It's not speech and

7    debate, then he can't be prosecuted for that, right?

8              MR. CARY:  Correct, your Honor.  I believe that's a

9    legal issue, not a jury issue.

10             THE COURT:  They could probably talk about what the

11   case is.  This doesn't involve speech and debate.  This doesn't

12   involve prosecuting the senator for his legislative activity.

13   That would be fair, wouldn't it?  What the evidence will show,

14   ladies and gentlemen, is that there was a scheme and a number of

15   years of false statements.  I mean, that's what this case is

16   about, so you're not prejudiced and they're free to make their

17   argument because their argument isn't that he's being prosecuted

18   for protected legislative activity, that's not their argument,

19   actually, and I'm not going to let any of that come up.

20             MR. CARY:  I agree with as far as your Honor's gone.

21   I'm somewhat concerned --

22             THE COURT:  That's as far as I want to go.  I want to

23   be fair to both sides.  I agree if I'm going to defer a ruling

24   on it I don't want to tie the government's hand.  One way to

25   approach it is to say what the case isn't about.

1        MR. CARY:  A limiting instruction on paragraph 17, and

2    I'd like to discuss this more and think about this more with my

3    colleagues.

4        THE COURT:  No.  I share that thought with you.  You

5    may not want it.  You may not want it.  I don't know what I'd

6    want if I were in your shoes.  I may not want to highlight that.

7    I don't know, but that's an option available.

8        MR. CARY:  To tell somebody to ignore something

9    sometimes highlights it more, and that's what gives me a little

10   caution, your Honor.

11       THE COURT:  I always have their undivided attention on

12   me.  I'm always looking at them, looking in their eyes, because

13   I want them to understand how important it is that they're given

14   an instruction either to do something or not do something, so it

15   can work.  Believe me, there's a ton of case law that says the

16   jurors will assume the following instructions.  They're not

17   going to be loose canons back there.  They're going to follow

18   the instructions.  Think about that.  I don't know.  It's an

19   open question.  It's a debatable question.  I don't know if I'd

20   want it if I were a defense attorney.  I just don't know.

21       MR. CARY:  Well, I think that, your Honor, as to the

22   motion in limine, we certainly cannot agree to deferring that

23   until your Honor sees how the evidence pans out.

24       THE COURT:  You had argued the motion to dismiss,

25   speech and debates motion.

1          MR. CARY:  I had, your Honor.

2          THE COURT:  Go right ahead.

3          MR. CARY:  And I must say that I had planned to argue

4     it together with a 403 argument on the speech and debate

5     evidence so I'll just limit myself now to the motion to dismiss.

6     And I think it's important to look at the context.  We were a

7     little bit like ships crossing in the night here or passing in

8     the night.  We made a motion to dismiss on the same day that

9     they filed a motion in limine setting forth what their evidence

10    was going to be, and as we look at that evidence we note -- or

11    evidence that they would like to put in, we note references to

12    earmarks, funding, reference to the Alaskan Natural Gas Pipeline

13    Act as I originally asserted.  We suggest, your Honor, that

14    that, first of all, there is very broad language in paragraph 17

15    in the indictment that we thought fairly could be read to

16    suggest that the grand jury had been exposed to speech or debate

17    evidence.  When you see that list we think it's even more clear,

18    because, for example, federal funding with respect to the

19    Sakhalin Island project, that's a legislative activity, federal

20    funding.  An earmark for the National Science Foundation, an

21    earmark for the Department of Transportation Research and

22    Special Projects Agency.  I mentioned already the Native

23    Corporations Act in a joint development that one of the native

24    corporations had with VECO.  Immigration, your Honor, I can't

25    think of a legislative hook there so I'll leave that out.  Also

1   there's a suggestion that there might be, there was some

2   information shared about the labor department.  I don't see a

3   legislative hook there either, but the other items listed

4   beginning with the natural gas pipeline, as I mentioned with

5   respect to the motion to strike surplusage, is in fact

6   legislative, and the government says, well, this will be

7   routine, unremarkable evidence.  Your Honor, we disagree with

8   that completely.  I can't think -- we've researched -- of a

9   single case in the history of the country where the government

10  has said that we want to walk right up to the line, at best walk

11  right up to the line of speech or debate and dance along it and

12  bring this sort of evidence into trial.  The Fields case is

13  actually a case where it's an unusual sort of case because it's

14  an employment discrimination case, but it says that the evidence

15  is an integral part of a legislative process.  It has no

16  business in an Article 3 court.  And that case is an employment

17  discrimination case, was different than this case.  Rostenkowski

18  was a case essentially about misuse of funds and embezzlement.

19  It wasn't a case about policy.  This is a case where there's a

20  specific provision in the indictment that is drafted in very

21  broad language, and then they've come along and said here are

22  ten points of evidence that we want to use in this case that

23  presumably the grand jury heard evidence about.  That is

24  legislative.

25          In addition, one fact that we've learned since we

 1    filed our papers, your Honor, is that we were provided with a

 2    proffer agreement from a former legislative director on Senator

 3    Stevens' staff suggesting that he was interviewed by the

 4    government at the least and perhaps gave grand jury testimony.

 5    One, the present chief of staff has been interviewed by the FBI,

 6    a former chief of staff, deputy chief of staff, three other

 7    members of his personal staff, and a member of the

 8    appropriations staff have all been interviewed by the FBI.  Your

 9    Honor, we're not privy to what happened in the grand jury.  It's

10    difficult for us to make assertions about what happened in the

11    grand jury.

12         THE COURT:  So what should I do?  Should I review the

13    grand jury transcripts?  Rostenkowski says I shouldn't do that.

14         MR. CARY:  We're very aware of the heavy burden that

15    this case has put on the Court, and what we propose is that we

16    be given an opportunity under appropriate conditions to review

17    the testimony that might go to legislative activity, those

18    summary testimony of FBI agents who interviewed staffers, any

19    testimony of staffers or former staffers.  That's what was

20    applied in the Jefferson case.  We think it would work here, and

21    then if we see that there was legislative evidence put before

22    the grand jury then we can bring it to your Honor in a distilled

23    form.  I understand that the Court is going to be reluctant with

24    this time frame to conduct an in-camera review and probably

25    doesn't have the time to do that.  If the Court is not inclined

1    to do an in-camera review, is not inclined to dismiss the

2    indictment based on the face of the indictment and the motion in

3    limine, which lists ten items, eight of which I submit seem to

4    have a legislative component, then we would ask the grand jury

5    testimony -- and if the Court is not inclined to let us review

6    it under appropriate circumstances, then we would ask that it be

7    filed under seal and preserved.

8         THE COURT:  All right.  So at the very least you're

9    asking that the Court should review that portion of the grand

10   jury testimony that addresses the subject of the motion in

11   limine, at the very least?

12        MR. CARY:  I'm asking that, your Honor, but I'm also

13   understanding the burdens that the Court is under, and I'm

14   trying to suggest an alternative that would relieve some of the

15   burden on the Court.

16        THE COURT:  Right.

17        MR. CARY:  Thank you, your Honor.

18        THE COURT:  What about that last suggestion?

19        MR. E. SULLIVAN:  We would suggest on the last point

20   that, rather than defendant engaging in an inappropriate fishing

21   expedition of Rule 16 material, that to the extent the Court is

22   interested in ensuring that our representations in our papers

23   are correct as we offered in our paperwork, we are willing to

24   submit ex parte and in camera those transcripts that at least

25   facially might raise speech or debate concerns to assure the

1    Court that no speech or debate privileged information was

2    elicited from those witnesses.

3              THE COURT:  How many transcripts are we talking about?

4              MR. E. SULLIVAN:  A handful.  Maybe four, five.

5              THE COURT:  How many pages?

6              MR. E. SULLIVAN:  If you don't hold me to this, I

7    believe most of them are 45, 50 pages or less.

8              THE COURT:  I'll think about that over the lunch hour.

9              MR. E. SULLIVAN:  And in that regard, we did also

10   indicate in our paperwork that the prosecutors involved with the

11   grand jury proceedings here were careful not to get into speech-

12   or debate-related issues by giving cautionary instructions to

13   witnesses as well as the grand jury alike repeatedly.

14             But before getting into some of the substantive points

15   raised by Mr. Cary on the motion to dismiss, if I might, I just

16   wanted to go back to the issue of whether in addressing our

17   motion in limine the Court can wait until at some point in trial

18   when we're about to introduce material that might arguably

19   impinge on speech or debate.  I may have overstated myself in

20   that there is a concern, if you look at Rule 12(d), there is an

21   automatic right to appeal on rulings regarding speech- or

22   debate-related issues, and that ruling would have to be made, at

23   least in our view, before jeopardy attaches, so not only would

24   the motion to dismiss have to be ruled on, to clarify what I

25   said earlier, we believe that the motion in limine would

1   probably have to be ruled on prior to trial as well so that the

2   parties on both sides can determine whether they have appealable

3   rights that need to be addressed.

4        THE COURT:  Does the government have a right to appeal

5   as well?

6        MR. E. SULLIVAN:  If there was a ruling that was

7   adverse and we decided that was in our best interest, we could

8   take up an interlocutory appeal on that issue.

9        THE COURT:  Let me go back to Rostenkowski, though.

10  There was discussion about in-camera review, wasn't there, in

11  Rostenkowski?  Wasn't that the favored approach, though?  Did

12  the Circuit -- I need to read it over the lunch hour -- but my

13  recollection is that the Circuit was troubled by that suggestion

14  of in-camera review.

15       MR. E. SULLIVAN:  I believe your recollection is

16  right, but the fact of the matter is that most of these

17  decisions that deal with the type of information that we seek to

18  introduce at trial, a garden variety, run-of-the-mill

19  constituent errands, because that doesn't even come close to

20  impeding upon the speech or debate clause, there's really no

21  need to do an in-camera review, that the ruling could be had

22  prior to trial and both sides could then evaluate the decision,

23  and to be clear to the Court, we are not talking a truckload of

24  evidence.  We think it would be something manageable for the

25  Court to review in camera and ex parte.  Probably no more than a

1    red weld of documents, and perhaps a few intercepted

2    communications.

3              THE COURT:  And you're suggesting if the Court were to

4    do that the Court would be in a better position to address the

5    motion to dismiss as well as to potentially rule on the motion

6    in limine?

7              MR. E. SULLIVAN:  To the extent that the Court wants

8    assurances from the government as to what material it seeks to

9    introduce.  We don't believe it's even necessary because,

10   contrary to what Mr. Cary was indicating, what we're trying to

11   introduce is not a vote by Senator Stevens regarding every piece

12   of legislation he ever introduced over the past forty years,

13   whether it be on Native American corporations or the Alaskan gas

14   pipeline in 2004.  That's not what we're trying to introduce.

15             For instance, the gas pipeline issue, what we seek to

16   introduce is, after the federal legislation was enacted, what it

17   did was set up a process where the state, the state of Alaska,

18   had to start negotiating a contract with oil producers and the

19   state of Alaska then had to pass state legislation that would

20   tax the oil profits in Alaska.  Those are state-related issues.

21   They do not raise speech or debate issues, and the evidence we'd

22   like to introduce on that particular point is Senator Stevens

23   intervening, collaborating with VECO Corporation repeatedly on

24   how best to get the state legislation enacted, assurances by

25   Senator Stevens that after the state legislation is enacted,

that he'll expedite the federal permitting and review process.
The federal permitting and review process is something done by
the executive branch.   It is clear under the case law, Brewster,
Gravel, Rose, Fields, that when a member of Congress is
cajoling, influencing, attempting to get the executive branch to
take action, that that's not covered by speech or debate, nor is
a promise or assurance of a member of Congress to take some
future legislative action, so the evidence that we seek to
introduce -- and just to be clear, that's just one example, the
state pipeline issue, but the point is consistent:   we seek two
broad categories of evidence.   One deals with solicitation, mere
solicitations.   A solicitation by VECO Corporation, Bill Allen
or any of its executives standing alone can't raise a speech or
debate component because there's no action on the part of any
member of Congress.   It's just a request.   And at best it's a
request to do a future legislative act that's unprotected, in
any event.

        The second category of material that we seek to
introduce are not, just to be absolutely clear, we're not
seeking to introduce Senator Stevens' voting record, speeches on
the floor of the Senate, how he deliberated internally with
staffers to the extent those deliberations were not then
communicated to VECO Corporation.   We're not trying to focus on
the pure speech.   We're talking about nonlegislative actions:
making of appointments with government agencies, assistance in

securing government contracts and federal grants, influencing

other government agencies and entities, disseminating

information to VECO and Allen.  The case law could not be more

clear on this particular point that those are the

run-of-the-mill constituent errands that are nonlegislative

activity.

THE COURT:  Let me ask you this:  If I were to defer

the evidentiary ruling, they're concerned about the government

in opening statements saying Senator Stevens was doing things

for VECO and Allen.  That's what they're concerned about.

MR. E. SULLIVAN:  That's why I think there may need to

be a ruling prior to trial, and I know this is going against

what I said earlier to your Honor, but having looked at Rule

12 --

THE COURT:  What would be fair, though?  You agree

that that's one approach the Court could follow, and defendants

didn't necessarily disagree with that approach to enable the

Court to put this in some kind of context and be able to rule

properly, but if I do that, there has to be some control over

what the government can say in opening statement.  If I do that,

would it be appropriate for the Court to allow the government to

say what this case is about is Stevens doing things for VECO and

Allen?

MR. E. SULLIVAN:  Your Honor mentioned that I think in

the context of the surplusage motion doing some sort of curative

1    instruction with the jury.

2         THE COURT:  So I start off giving curative

3    instructions in opening statements?  This is going to be a long

4    trial.

5         MR. E. SULLIVAN:  No, but in reading the statement of

6    the case, there may be the ability in that context to make clear

7    that to alleviate their concerns that this is not a quid pro quo

8    case, having something to that effect, but also making clear

9    that the government has the burden on issues relating to burden,

10   intent, and materiality, and that as my colleague Mr. Bottini

11   addressed, that's why this evidence is necessary.  That's why

12   paragraph 17 is in the indictment.  We have to carry our burden

13   on this particular point.

14        And following up on his cogent argument on that point,

15   it's not evidence of quid pro quo.  We've made that abundantly

16   clear.  This is evidence to show that Senator Stevens had a

17   choice.  He's getting hundreds of thousands of dollars of

18   benefits from VECO Corporation.  He is now faced with a

19   conundrum.  Do I disclose it on my financial disclosure form

20   thereby subjecting myself to incredible scrutiny within the

21   state of Alaska, because the state of Alaska knows full and well

22   that Senator Stevens is also taking official and political acts,

23   nonlegislative activities, on behalf of VECO Corporation, or do

24   I --

25        THE COURT:  That's the bottom line here.  Legislative

1   in any way, then it's speech or debate, bottom line boiling down

2   to if its legislative it equals speech and debate, right?

3          MR. E. SULLIVAN:  That's correct, that's correct, but

4   to be clear --

5          THE COURT:  Anything else?  If it's not legislative,

6   if it has nothing to do with a vote on the floor or what,

7   introduction of a bill?

8          MR. E. SULLIVAN:  We're not seeking to introduce that

9   type of evidence, not even close to introducing that type of

10  evidence.  What we seek to introduce are, for instance, letters

11  from Senator Stevens to the National Science Foundation and

12  letters back where he says I think you should give this contract

13  to VECO Corporation; that type of material.  That is trying to

14  secure a government contract.

15         THE COURT:  That has nothing to do with legislation at

16  all?

17         MR. E. SULLIVAN:  That's correct, that's correct, and

18  it is not unduly prejudicial.  I won't get into all the Rule 403

19  arguments.  Certainly it's prejudicial.  We made that point

20  clear in our brief.  It's prejudicial because it goes -- we

21  think it establishes those essential elements that we need to

22  prove for a conviction under 1001.  It is prejudicial in that

23  respect, but it is not highly or unduly prejudicial when

24  compared to the probative weight.

25         THE COURT:  Give me an example of the government's

1   evidence that goes right to the line, right to the line of being

2   arguably legislative.

3              MR. E. SULLIVAN:  Well, the example that Mr. Cary

4   raised, the Sakhalin federal funding.

5              THE COURT:  Right.

6              MR. E. SULLIVAN:  We intend to introduce evidence of

7   communications back and forth between VECO Corporation and

8   Senator Stevens or his staff where he was being requested to try

9   and get funding for a program in Alaska to train Russian workers

10  so that VECO could then turn around and get additional

11  government contracts in Sakhalin Island, Russia.  We'd like to

12  introduce the solicitation, the communications back and forth

13  between Senator Stevens and the VECO Corporation, which is not

14  covered because it's dissemination of information outside of

15  Congress, and then we also want to introduce evidence that

16  Senator Stevens then joined Bill Allen, took a trip to Sakhalin

17  Island, Russia and there met with many government officials over

18  there, tried to promote VECO, tried to get them government

19  contracts over there.  None of that is speech or debate covered.

20  Where it goes up to the line, though, is then he actually went

21  back and got the federal funding, the appropriation into a bill.

22  We don't seek to introduce that particular action by Senator

23  Stevens.  We don't want to introduce the steps that he actually

24  took to get the legislation enacted.  That would be covered by

25  speech or debate in our view.

1    THE COURT:  So the line is when he attempted to get

2  funding for that bill, funding for that program, that's the

3  line?

4    MR. E. SULLIVAN:  The line, yes, where he starts

5  drafting legislation or internally starts talking to his staff

6  about how do we get an earmark into this appropriation bill.

7  We're not seeking to introduce that.  We're seeking again, just

8  to be clear, the solicitations, the action that he took with

9  foreign governments, intergovernmental agencies, or to the

10  extent he was trying to exert pressure, cajole executive

11  branches.

12    THE COURT:  What about hypothetically one of those

13  letters the senator says something about, well, you know, at

14  some point then I can introduce legislation to get funding for

15  this program.  I don't know that to be the case, but I'm just

16  asking is that the case?

17    MR. E. SULLIVAN:  In your hypothetical?

18    THE COURT:  In the government's evidence there are

19  references to future efforts to or efforts on the part of the

20  senator to introduce legislation?

21    MR. E. SULLIVAN:  In certain portions there probably

22  are, but to be clear, it would not be speech or debate privilege

23  if Senator Stevens is disseminating outside of Congress

24  information that even is deliberative or is indicative of the

25  internal processes.

1          THE COURT:  So in other words, if hypothetically in a

2   letter he says, look, I can do this, it's going to require some

3   funding but leave it to me and I'll introduce a bill along the

4   way.

5          MR. E. SULLIVAN:  That's right.

6          THE COURT:  That's not speech or debate, is it?

7          MR. E. SULLIVAN:  No, it's not, and it isn't for two

8   reasons:  Disseminating information outside the public has

9   clearly been established under Supreme Court guidance not to be

10  protected activity.  Additionally, a promise to take a future

11  legislation action, that's not covered either, and the McDade

12  decision is very clear on this point.

13         So unless there are further questions, we do think

14  that their motion to dismiss should be denied, and we do think,

15  contrary to what I said earlier, that our motion in limine would

16  need to be ruled on prior to trial.  Thank you.

17         THE COURT:  Thank you.  Now, the motion in limine

18  needs to be ruled on prior to trial.  That's an evidentiary

19  ruling.  Does the government have a right to challenge an

20  evidentiary ruling in the Court of Appeals?  I recognize you may

21  have the right to challenge a dismissal, but an evidentiary

22  ruling?

23         MR. E. SULLIVAN:  That we probably need to do some

24  additional research on, but I do think if it's a ruling

25  excluding material and the ruling is that it's excluded on the

1   ground that it violates the speech or debate clause, I think the

2   answer is --

3           THE COURT:  And to be fair, there's a reason I'm

4   asking.  I want to be fair about that.  I'm not concerned about

5   it, but I want to be fair about it and issue an appropriate

6   ruling as soon as I can, recognizing there are only a few days

7   left before trial starts.

8           MR. E. SULLIVAN:  That's understood.

9           If the ruling is to exclude the evidence prior to

10  trial and the ruling is based on speech or debate trial

11  violations, we do believe that's something we could appeal

12  immediately.

13          THE COURT:  But again, I thought that there was no

14  impediment to reserving a decision on the evidence until

15  jeopardy attaches.  Are you telling me, though, that the

16  evidentiary rulings have to be made pretrial?

17          MR. E. SULLIVAN:  Yes, yes, and I'm trying to clarify

18  what I said earlier.

19          THE COURT:  So it's not the government's position then

20  that the Court can defer the evidentiary ruling then --

21          MR. E. SULLIVAN:  That's correct.

22          THE COURT:  -- with respect to speech or debate

23  issues?

24          MR. E. SULLIVAN:  That's correct.  And I apologize for

25  stating the position earlier, but during Mr. Cary's discussion I

1    did look at Rule 12 and I think it is a situation where there's

2    going to have to be a ruling prior to trial.

3              THE COURT:  That's fine.

4              (There was a pause in the proceedings at about

5              12:41 p.m.)

6              COURTROOM DEPUTY:  Resuming criminal case 08-231,

7    United States vs. Theodore Stevens.

8              (Back on the record at about 12:46 p.m.)

9              THE COURT:  Counsel, let me ask you, the evidence

10   you've heard, how does that evidence implicate speech or debate?

11             MR. CARY:  Yes, your Honor.  We just heard about the

12   Sakhalin Island funding.  Let me explain that one.

13             Senator Stevens in fact did get legislation passed to

14   fund a training program at Sakhalin Island.  He did that for the

15   benefit of all Alaskans, and guess what?  In the end it did not

16   benefit VECO at all.  Other Alaskan companies benefitted.  It is

17   completely prejudicial and unfair, and I suggest wrong, for the

18   government to be able to submit that evidence to the jury that

19   there was a request that VECO thought Sakhalin Island training

20   might help them when in fact Senator Stevens did enact

21   legislation and it did not benefit VECO at all.  It kind of

22   gives a completely 180-degree opposite inference of what in fact

23   really happened, and that makes it integral to litigation or

24   legislation.

25             Let me give you another example, your Honor.  There

1   was talk about how Senator Stevens would expedite the review of

2   the gas pipeline project.  Section 106(d)(1) of the 2004 Gas

3   Pipeline Act provides, All reviews -- it's called Expedited

4   Reviews and Actions.  Quote:  All reviews conducted and actions

5   taken by any federal agency relating to an Alaska natural gas

6   transportation project authorized under this section shall be

7   expedited.

8            They've gone over the line, your Honor.  It is

9   integral to legislation.

10            THE COURT:  They can go up to the line.  They can go

11  up to the introduction of legislation, can't they?  They can

12  even talk about legislation in a letter that's publicly

13  disseminated, can't they?

14            MR. CARY:  No, your Honor.  The footings of the Speech

15  or Debate clause is that no member of Congress should have to

16  come into an Article 3 court and defend what he or she does in

17  the halls of Congress.

18            THE COURT:  That's it.  That's it.  I agree with you,

19  and I'll enforce that.  But insofar as talking about what

20  someone may do at a future point in time, that's permissible,

21  isn't it?

22            MR. CARY:  Your Honor, I suggest that that is, at the

23  very least it's a violation of Rule 403 because it's highly

24  prejudicial to suggest that there is a perceived link.

25            THE COURT:  Absolutely it's prejudicial.  That's why I

won't let you introduce it, because it goes to motive for all
the scheme.

MR. CARY:  I agree, your Honor.

THE COURT:  It is prejudicial, but why shouldn't the
government be able to attempt to prove its theory?

MR. CARY:  Because it's unfair prejudice, which is
what's not allowed by Rule 403, to come in here and talk about
the Sakhalin Island project when in fact he got the legislation
for it.  He's going to have to talk about legislation in order
to respond to that.

In the Fields case, your Honor, it's an odd case
because it's an employment discrimination case and on the face
of it it doesn't seem to implicate speech or debate and it's
against actually an office of Congress rather than a Congress-
person him or herself, but it suggests that if in a case, even
if it's not clear on its face, if the defense is going to have
to implicate the legislative process, then it's a violation of
speech or debate, and I'm suggesting that the same thing is
going to occur here.  I believe they've gone over the line on
what they've put in their motion.  Certainly when Mr. Sullivan
said, well, where's one where you've walked up to the line?
Well, they've walked right up to it, but my gosh, it's hard to
believe something more prejudicial than to suggest that there
was some quid pro quo here when in fact exactly the opposite
happened.  He did it for the benefit of all Alaskans and it

 1    benefitted other Alaskans.  That's highly prejudicial.  The

 2    probative value of this evidence, your Honor, is minimal and a

 3    waste of time.  We're going to have mini trials on all ten of

 4    these issues.  The prejudice, the ah-ha moment is great.  This

 5    is not garden variety.  It's the only case in our research where

 6    we've ever seen that this sort of evidence was submitted in a

 7    financial disclosure case, and we don't think it ought to be

 8    permitted both as a matter of 403 and the Constitution.

 9              THE COURT:  It's more than just a financial disclosure

10    case, though, isn't it?  I mean, count one in the indictment is

11    more than financial disclosure.

12              MR. CARY:  Your Honor, I thought we heard repeatedly

13    in connection with the transfer motion that this is about

14    financial disclosures in Washington, D.C.  It should not be

15    about more than that, and especially if it violates the

16    Constitution, your Honor.

17              THE COURT:  All right, counsel.

18              I'll briefly hear from -- it's defendant's motion to

19    exclude -- actually, the government did file a Notice of Intent

20    to Utilize 404(b) Evidence, did you not?

21              MS. MORRIS:  Yes.

22              THE COURT:  And defendants probably simultaneously

23    filed a motion to exclude that.  I've read everything, but I'll

24    give you a few minutes if you want to highlight any principal

25    point you wish to make with respect to 404(b).  I'm inclined to

1    allow it with an appropriate limiting instruction if counsel

2    wants one.  Let me hear from government counsel.

3         MR. MARSH:  Thank you, your Honor.  Very briefly.

4         THE COURT:  404(b) evidence does not pertain to any of

5    the allegations in count one of the indictment.

6         MR. MARSH:  I believe we respectfully disagree with

7    the Court on a lot of it.  Certainly with respect to items two

8    through five in the notice, those are all evidence of

9    transactions occurring between the same parties in count one,

10   the senator, the defendant here, Bill Allen and VECO.  Same

11   parties, same types of benefits, things going to either the

12   senator or his family, and they occurred during the same time

13   period of the time charged in the indictment, and we submit

14   that, as this Court in this district have repeatedly recognized,

15   when evidence of that is offered as evidence of a direct fact in

16   issue it's intrinsic to the matters that are charged in the

17   indictment, not extrinsic, and therefore the Court doesn't even

18   have to get to 404(b), and certainly we acknowledge that some of

19   these benefits --

20        THE COURT:  It's intrinsic then, it's not 404(b), is

21   it?

22        MR. MARSH:  That's correct, your Honor.  And we

23   believe all the matters set forth in our notice are intrinsic to

24   the indictment, the ones two through five involving the same

25   parties, we acknowledge that some of those benefits were

1    intended to go to either grandchildren or children of Senator

2    Stevens, but to the extent that count one charges very plainly a

3    scheme to conceal receipt of benefits, we believe that those are

4    relevant to show the defendant's knowing and willful conduct,

5    and certainly with respect to the full nature of his

6    relationship with Mr. Allen, the generator, we submit --

7                 THE COURT:  This is uncharged conduct, though,

8    correct?

9                 MR. MARSH:  With respect to the --

10                THE COURT:  I mean, if it's charged conduct and it's

11   count one we don't need to have this discussion at all, do we?

12                MR. MARSH:  But to test whether something is intrinsic

13   or extrinsic does not specifically relate to whether an act is

14   charged in the indictment.  In fact, as the government's pointed

15   out in its brief, the cases are directly to the contrary.  The

16   government is permitted to prove additional acts not set forth

17   in the indictment to meet the elements of the crimes charged,

18   and we submit that the evidence that is put in our 404(b) notice

19   goes directly to the elements of crimes.  We've got a high

20   burden:  knowing and willful failure to include this

21   information, and we believe providing additional information of

22   the defendant's requests for benefits from Allen and VECO goes

23   right to the heart of specifically what's charged in count one.

24   Also to the rest for the years that they occur in, but

25   particularly with count one showing the nature and the lack of

mistake, if you will, of Senator Stevens' involvement.  It's also true with respect to the real estate transactions set forth in count one.  It's contemporaneous, and there's evidence, as the government submitted, that it was in fact something that at least tends to allow a jury to conclude that Senator Stevens in fact facilitated part of the home remodel through the transaction that he was able to engage in with another friend, so from the government's position the Court doesn't even have to get to 404(b) because it's intrinsic to the crimes charged in the indictment.  Should the Court conclude that one or all of those falls outside of that in responding to in the motion practice, the defense respectfully has not offered any case law to rebut the very well articulated and well settled principle for courts of this district that Rule 404(b) is a rule of inclusion, not of exclusion, and that when any time the evidence is relevant it goes to prove any fact material in the case other than just straight out the defendant's bad character, Rule 404(b) allows its admission.

        I'm happy to take questions from the Court if you have any, but we submit that there can plainly be no question that the material set forth in the notice, we think it's intrinsic, but there can be no question that it's 404(b).

        THE COURT:  Counsel?  Again, I've read your pleading. If you want to highlight any part of your argument go right ahead.  We're going to break for lunch in a few minutes, but go

1    ahead.

2           MR. CARY:  Your Honor, I would simply suggest 404(b),

3    of course to answer the general proposition that bad character

4    evidence is not allowed.

5           THE COURT:  Right.

6           MR. CARY:  But of course as counsel states, 404(b) has

7    exceptions and it has to be relevant, and it lists a number of

8    relevance theories, but that doesn't end the inquiry.  Rule 403

9    has to come in play as well.

10           For example, with a Florida real estate transaction,

11   the probative value of that -- first of all, it was fully

12   disclosed.  The investment and the profits were fully disclosed

13   year after year.  There's no controversy about that.  It was

14   done with an old law school friend.  The probative value of that

15   has to be practically zero.  On the other hand, the suggestion

16   that it was improper, the need to have a mini trial on an

17   investment in Florida and the appropriate disclosure calling in

18   the people that were involved in that investment is a tremendous

19   waste of time, it's a tremendous distraction, it can confuse the

20   jury, and it's prejudicial.

21           With respect to the Jeep Cherokee and the employment,

22   there's no requirement that the employment of the grandson and

23   the son by the largest employer in Alaska at the time, there's

24   no requirement of disclosure, none whatsoever, and once again,

25   we're going to be forced to have mini trials.  The son works

1    this day for CH2M Hill up on the Arctic ocean, the north slope

2    of Alaska, 850 miles from Anchorage.  It's at the very top of

3    Mr. Sullivan's map.  We'd have to bring the supervisor to

4    contest the bonafides of that employment in order to counter the

5    charges.

6              THE COURT:  Was the child a dependent child at the

7    time?

8              MR. CARY:  Not a dependent child, neither one.

9              THE COURT:  Is that relevant?

10             MR. CARY:  It is relevant because there's no

11   requirement if they're not dependent children, and the same goes

12   for the car transaction, the 404 notice as well.

13             Your Honor, the e-mails, they suggest that it's

14   consciousness of guilt evidence, but in fact, if you read them,

15   and we've attached them, one of them says remember Martha

16   Stewart and Scooter Libby, and the other one says, you need to

17   have your attorney talk to the U.S. attorney.  That's not

18   evidence of consciousness of guilt.  Consciousness of guilt is

19   flight.

20             THE COURT:  What does that mean, remember Martha

21   Stewart and Scooter Libby?

22             MR. CARY:  I'll tell you what it means, your Honor.

23   It means be honest when you talk to federal agents, because they

24   didn't get in trouble for doing something wrong, they got in

25   trouble for not being honest with federal agents.  We should

1    give Senator Stevens a metal for giving that advice.  That's

2    just what you do.

3            THE COURT:  The moral of that story is be honest?

4            MR. CARY:  Yes, your Honor.  It means don't get

5    yourself in trouble by saying something that's not true because

6    if you didn't do anything wrong you can still get in trouble by

7    saying something that's not true, and get a lawyer.  There's

8    nothing wrong with that, and it certainly is not consciousness

9    of guilt.  The consciousness of guilt paradigm is a flight case.

10   That's not this at all, your Honor.  We don't think it should be

11   admitted.

12           THE COURT:  All right, counsel.  Thank you.

13           I've not focused on Allen's motion.  That's not really

14   ripe.  Stevens has filed a motion for a HIPPA subpoena.

15           Have you served Mr. Allen or his attorney?

16           MR. CARY:  We did, your Honor.  We served his

17   attorney, your Honor.

18           THE COURT:  I assume someone is going to surface.  I

19   don't know, maybe the person is here in the courtroom.  I assume

20   someone is going to file something.  Is that an issue you think

21   you can resolve without the Court's involvement?

22           MR. CARY:  We have tried, your Honor.  We've spoken to

23   Mr. Allen's attorney, and perhaps the pendency of a motion will

24   cause us to resolve it, but we were not able to resolve it in

25   candor in advance of filing a motion, which we tried to do.

 1          THE COURT:  Do you know what, counsel?  I'm not going

 2  to say anything more about the log issue and the data issue.  It

 3  sounds as if, with my assistance, resolved those issues, and I'm

 4  just not going to involve -- I mean, there are too many more

 5  issues.

 6          MR. CARY:  Agreed.  We understand that, your Honor.

 7          THE COURT:  All right.  I'm going to rule on the

 8  motion to dismiss raising the statute of limitations grounds

 9  after lunch.

10          I'm going to allow the 404(b) evidence to come in.

11  I'm going to invite defense counsel to submit to the Court, if

12  you want an appropriate limiting instruction to deal with the

13  404(b) evidence, and I'm going to allow that.

14          In all likelihood I will not rule on the speech and

15  debate issue this afternoon.  At the very latest I'll rule on

16  that probably -- well, I'm not going to rule on it this

17  afternoon, but I can assure everyone I'll give you a prompt

18  ruling on that.

19          We'll focus on some aspects of the trial after lunch.

20  I've already addressed what I have in mind with respect to the

21  exhibit list and the witness list, and again, you don't have to

22  file anything.  Just exchange them among yourselves pursuant

23  that time frame that the Court put in place.  I wish I could

24  give you more time.  We don't have any more time, so it's going

25  to be pursuant to the timetable the Court put in place earlier.

1          MS. MORRIS:  I'm sorry, Judge, but on that timetable

2     you talked about earlier, I know you mentioned that the

3     government should turn over their witness list and exhibit list

4     by tomorrow at eight p.m.

5          THE COURT:  Right.

6          MS. MORRIS:  But I don't recall when the defense

7     should be turning over theirs.

8          THE COURT:  They're going to have two days to do that.

9     They're going to respond to yours, the theory being is that you

10    were preparing yours presumably for the last several days or

11    weeks or so, and that's why I have not given you more time.  Is

12    that being unfair to the government?  I don't want to be unfair

13    but I just don't have a lot of time.

14         MS. MORRIS:  I just want to be clear.  I wasn't clear

15    as to when they were going to provide theirs.

16         THE COURT:  Eight o'clock -- two days thereafter.

17    Eight o'clock Saturday.

18         And objections by anyone will be filed, and I leave it

19    up to counsel, if there's something that's sensitive and you

20    think should be protected, although, you know, there have been a

21    lot of public filings, if something is absolutely sensitive and

22    needs to be protected, file it under seal.  I'm not encouraging

23    that but I'm mindful every now and then someone believes that

24    there's something so sensitive that it should be protected, but

25    I need to know what the objections are by no later than noon on

1    Monday to anyone's exhibit list or witness list because either

2    prior to the next pretrial hearing, which is next Thursday, or

3    at the pretrial hearing I'm going to resolve as many of those

4    objections as I can, and the purpose for doing so is to avoid

5    needless and endless bench conferences.  To the extent I can't

6    then I won't, but I'm going to do as much as I can before this

7    trial starts.

8         And voir dire is a work in progress.  I appreciate

9    your input.  There's still a lot of work that I have to do on

10   the voir dire.

11        I had one question, though, to both of you.  Both of

12   you suggested a question about military service and both of you

13   have suggested a question about the employment of former

14   spouses, and for the life of me I can't figure out why in the

15   world I would ask either question.  What does the military have

16   to do with this case?  Anything?

17             MS. MORRIS:  Nothing.

18             THE COURT:  Nothing?  Who cares about former spouses

19   and where they worked?  Okay.

20             MS. MORRIS:  Well, Judge, I believe that was one of

21   the questions that both of us had agreed on.

22             THE COURT:  I know.  That's why I'm asking the

23   question.  I was looking at it last night.  Why would I want to

24   ask about former spouses?

25             MS. MORRIS:  Well, the discussions I recall is that it

1    was along the lines of where they had worked because it's D.C.,

2    whether or not they had been associated or affiliated with any

3    law firms or lawyers or the justice system.

4            THE COURT:  Former spouses?

5            MS. MORRIS:  That's what we had talked about, yes,

6    Judge.

7            THE COURT:  All right.  The military, I didn't know

8    whether there was some aspect of military readiness that this

9    case presents.  I didn't want to get into that.  Politics is the

10   overriding theme here.

11           MR. CARY:  We generally like to know who has served

12   our country in the military.

13           THE COURT:  Really?  Is that right?  I'll give it some

14   thought.  That was a joint request.  There are some others that

15   made me pause, but it's still a work in progress.  What I'm

16   going to do with respect to voir dire, I will give you the

17   Court's voir dire and entertain any objections probably not

18   earlier than Thursday of next week.

19           Before we break, we're going to break for lunch, with

20   respect to voir dire, just so everyone knows, the 150 jurors we

21   bring in on the 22nd, the questionnaire will be used.  I don't

22   plan to be present and no one else will be present other than my

23   courtroom deputy and a marshal or two and the jurors to answer

24   the questionnaires, and what will then happen is that the Court

25   will make a copy.  The Court will retain the original answers to

1   the questionnaires.  The Court will make one copy, give it to

2   government counsel pursuant to the arrangement of government

3   counsel and defense counsel.  Copies will be made for their

4   benefit.  The next day or the first day thereafter 75 jurors

5   will be brought in for voir dire, and it won't be just the first

6   75 who have concluded answering the questionnaire.  We're going

7   to mix up all the questionnaires.  It will be 75 jurors randomly

8   selected.  It just won't be the fastest people who finish their

9   answers, and then we'll proceed, and if we're lucky enough to

10  select a jury on the second day then we will start this trial

11  promptly on that Wednesday.  Someone suggested that the Court

12  may want to start the following Friday.  I think I saw that in

13  the pleading -- the following Monday.  I absolutely totally

14  reject that.  The defendant asked for a speedy trial and a

15  speedy trial is one he's going to get.  It's going to be fairly

16  conducted, but we don't have the luxury of waiting four or five

17  days to start this trial.  If there's some pretrial matters or

18  there's some trial matters that we absolutely have to deal with

19  we'll deal with them before 9:30 every day or after five o'clock

20  each day, but we're going to start that trial just as soon as we

21  get a jury panel of twelve people and four alternates selected.

22  There will be more about the jurors and how the -- well, there

23  will be more about the jurors after we've selected -- more

24  discussion about the jurors after we've selected a panel, and

25  that's all I need to say about jury selection now.

 1          Are there any objections to that?  I don't know how

 2     far we're going to get into pretrial.  I've already told you

 3     about the exhibits and witness list and the jurors.  We're going

 4     to talk some about other pretrial issues that undoubtedly will

 5     come up.

 6          I'm not sure I can use either of your respective

 7     statement of the case statements.  I probably want something a

 8     little more neutral, but I'll draft something and we can share

 9     it with counsel.

10          Your final instructions, I have your final

11     instructions, your proposals.  Thank you.  We might be able to

12     resolve some of the issues at the pretrial.  Probably not all of

13     the issues.  We can talk more about this after lunch.

14          And I will rule on the statute of limitations issue

15     this afternoon.

16          The speech and debate issue, I'll probably defer

17     ruling on that today.  I'll rule on it just as soon as I can.

18          So we'll break for lunch until 2:10.  Thank you.

19     There's no need to stand.  Thank you.

20          COURTROOM DEPUTY:  This Honorable Court now stands in

21     recess until 2:10.

22          (A luncheon recess was taken at about 1:10 p.m.)

23                              - - -

24

25

1                            I N D E X

2

3      WITNESSES:

4

5           None.

6

7

8

9

10

11

12                         E X H I B I T S

13

14          None.

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE

2          I, JACQUELINE M. SULLIVAN, Official Court Reporter,

3    certify that the foregoing pages are a correct transcript from

4    the record of proceedings in the above-entitled matter.

5                        _____

6                        JACQUELINE M. SULLIVAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25