UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .
                                   .   CR No. 08-231
     v.                            .
                                   .
THEODORE F. STEVENS,               .   Washington, D.C.
                                   .   Thursday, September 12, 2008
          Defendant.               .   1:51 P.M.
                                   .
. . . . . . . . . . . . . . . .    .


                    TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE EMMET G. SULLIVAN
               UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:          BRENDA MORRIS, ESQ.
                             United States Department of Justice
                             1400 New York Avenue, N.W.
                             12th Floor
                             Washington, D.C.  20005
                             202-514-1412

                             NICHOLAS A. MARSH, ESQ.
                             United States Department of Justice
                             10th and Constitution Avenue, N.W.
                             Washington, D.C.  20530
                             202-307-1049

                             JOSEPH W. BOTTINI, ESQ.
                             United States Attorney's Office
                             District of Alaska
                             222 W. Seventh Avenue
                             Federal Building and U.S. Courthouse
                             Anchorage, Alaska  99513-7567
                             907-271-5071


     APPEARANCES con't. on next page.

1    APPEARANCES, con't.

2

3

     For the Defendant:          ROBERT M. CARY, ESQ.
4                                ALEX G. ROMAIN, ESQ.
                                 Williams & Connolly, LLP
5                                725 Twelfth Street, N.W.
                                 Washington, D.C.  20005
6                                202-434-5000

7

8

9

     Court Reporter:             JACQUELINE M. SULLIVAN, RPR
10                               Official Court Reporter
                                 U.S. Courthouse, Room 6720
11                               333 Constitution Avenue, NW
                                 Washington, D.C. 20001
12                               202-354-3187

13

14

15   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

COURTROOM DEPUTY:  Calling the case of <u>United States</u>
<u>of America</u> versus <u>Theodore Stevens</u>, criminal case 08-231.

Counsel, will you identify yourselves for the record
and the reporter?

MS. MORRIS:  Brenda Morris for the government, as well
as Joe Bottini and Nicholas Marsh.  Good afternoon, Judge.

THE COURT:  Good afternoon, counsel.

MR. CARY:  Rob Cary and Alex Romain for Senator
Stevens, who waives his appearance, for the record.

THE COURT:  That's fine, counsel.

MR. CARY:  We also have with us Patrick Markey, who is
a computer professional in our office.

THE COURT:  All right.  Thank you.

Let me just make one suggestion, and maybe this will
address the problem that defendant has in looking over the
exhibits and maybe it won't.  If the government were to provide
you with a copy, a hard copy of each of the exhibits, would that
address your concern?

MR. ROMAIN:  Your Honor, Alex Romain on behalf of
Senator Stevens.

It would address our concerns to a point, but
certainly the current interim deadline in terms of us providing
objections to the government's exhibits would be, it would be
prejudicial to us, your Honor, and so if the government wants --

1          THE COURT:  I'm trying to understand what the problem

2     is.  You have the computerized copies of the government's

3     exhibits, you have all of them.

4          MR. ROMAIN:  No, we don't, your Honor.

5          THE COURT:  I thought that during the discovery when

6     the government provided you with that multi-gigabyte CD or

7     whatever, that I thought that document contained all of the

8     government's exhibits that the government was obligated to turn

9     over.

10          MR. ROMAIN:  That's right, your Honor, but the reality

11     of the situation --

12          THE COURT:  So you do have photos?

13          MR. ROMAIN:  If the documents are somewhat --

14          THE COURT:  Just a minute.  You do have photos of all

15     the government's exhibits in a computerized basis, right?

16          MR. ROMAIN:  Yes, we do.

17          THE COURT:  All right, you do.  All right.  If you

18     have an exhibit list that identifies a document that gives you a

19     Bates number for, if it's voluminous, for commencement and

20     conclusion of that document, so you know what the document is,

21     so what's the impediment to looking at the CD or DVD or whatever

22     it is and hooking up the exhibit with the computerized version

23     of that exhibit?  What's the hardship there?  I'm not following

24     that.  It seems as though you have everything.

25          MR. ROMAIN:  Well, your Honor, let me try to explain,

and I appreciate that it's a little bit technical and confusing, but nevertheless, the reality is that the problem we have now stems from the way the government produced its documents in the first place, and while we came to the Court on August 13th and said that we would hope that moving forward the government would provide documents in a fashion where every particular document was written up, now what we have are portions of documents, some of which are the most important, which are locked files. These are not things that happened automatically. The government has chosen to produce a PDF.

THE COURT: Tell me what a locked file is.

MR. ROMAIN: A locked file, not pretending to be an expert on all these technical issues, but if you provide, for example, a PDF, a locked file does not allow you to OCR that document, which means an ability to be able to search through that document much more easily or to be able to break up that document, so if you have a six-thousand-page PDF and the exhibit identified by the government is in the middle of that PDF, automatically, the Court would think, you can just go straight to that, break it up and do it, but that's not the way it is.

THE COURT: Don't you have the Bates number, though? The Bates number is for each and every page of every document received, right?

MR. ROMAIN: It is, your Honor.

THE COURT: These are Bates-numbered. Can't you fast-

1    forward to that page?

2          MR. ROMAIN:  We can fast-forward to the three

3    thousandth page.  Then you have to reprint it.  Then you have to

4    rescan it, as opposed to if the government had not taken an

5    extra and unnecessary step of trying to create an obstacle which

6    simply makes it much more difficult, for no apparent reason, for

7    us to have the documents identified.

8          THE COURT:  Do you really think the government went

9    out of its way to make it more difficult for you?  The

10   government I found in this case, and I can't always say this,

11   but I've been pleased with the manner in which they produced

12   documents and responses, and I just haven't seen a lot of games-

13   manship on either side.  I really haven't.  You're not

14   suggesting the government --

15         MR. ROMAIN:  I'm not impuging anybody's personal

16   character, your Honor.  What I am saying is that there has in

17   fact been gamesmanship.  We've tried very hard.  We have tried

18   very hard to keep these disputes away from the Court.  I would

19   like to --

20         THE COURT:  I wish you'd try harder.

21         MR. ROMAIN:  I'd like to reaffirm, your Honor, I'd

22   like to reaffirm our gratitude for the Court hearing this, but

23   it's necessary to be clear about where we stand.  It is not in

24   fact possible for us to be able to spend all the time that it

25   takes for us to identify and determine precisely which document

1    we're talking about and then be able --

2            THE COURT:  It gets back to my question.  If I tell

3    them -- I want to hear from the government first.

4            First of all, we made a mistake.  Let me back up.  We

5    made a mistake and issued a minute order that says that the

6    Court granted your motion.  I didn't do that, it was inadvertent

7    on someone's part, not Jim's part, not chambers' part.  We don't

8    know whose part.  No one in my office.  I didn't grant your

9    motion.  All I did was schedule a hearing on your motion, so

10   there is a docket entry that says I granted your motion, so I

11   don't want anyone fooled by that.

12           MR. ROMAIN:  I understand.

13           THE COURT:  Getting back to my original suggestion,

14   suppose I were to say for the thousand documents --

15           MR. ROMAIN:  Thousand and twelve.

16           THE COURT:  Just tell them to make a hard copy of each

17   document, that has to address your concern because your concern

18   is you can't find the document easily, right?

19           MR. ROMAIN:  Yes, your Honor.  And let me be clear

20   about one other thing, your Honor.  Notwithstanding the fact

21   that the documents they've identified are identified by Bates

22   ranges, those Bates ranges, because of the way the government

23   has produced it, don't actually match up with the computer

24   files, so now you have a hundred thousand pages or subsets of

25   several thousands of pages that cannot be searched because you

```
 1    don't know, you'd have to go through every single document page
 2    by page by page.  There is a very simple solution.  I appreciate
 3    the Court's suggestion that the government should simply give us
 4    the hard copies.  If it had done so we wouldn't be here this
 5    morning, but it's also a simple solution to be able to keep us
 6    on track to give us the documents in a CD with all the documents
 7    exhibit by exhibit.  You know, it's a little bit surprising
 8    because we had this conversation before when we had this dispute
 9    and it arose and we thought that that might become a problem
10    long-term.  We believed that our agreement with the government
11    was that moving forward it would produce its documents in the
12    way we asked, in the same way, by the way, that we produced our
13    documents to the government, and certainly the way that we
14    anticipated producing our documents and exhibits to the
15    government, but the reality is, your Honor, that our exhibit
16    list is due tomorrow at eight o'clock p.m.  Based on an ability
17    to actually review these documents, and it would take several of
18    our information technology professionals multiple days just to
19    gather the documents, your Honor, and of course, I mean, you
20    don't have to take my word for it.  When I called the government
21    last night I was surprised, a little bit dismayed initially, but
22    I didn't call them right away.  I made sure that I spoke to
23    several I.T. professionals to make sure that my understanding of
24    the way that the obstacles that this would produce or create for
25    us was in fact correct, and it's only after that that I called
```

1    government's counsel and made clear that we couldn't possibly

2    waste any more time on this, that we simply wanted the documents

3    in a way that we could easily use them, easily review them and

4    consider them and produce our own.

5              Furthermore, your Honor, our objections are due on

6    Monday at noon.  If it takes them multiple days even to identify

7    the documents, because they're not all sequential, you have to

8    go to several different portions.  Some of the Bates ranges that

9    are actually identified we don't even have.  We have never seen

10   a document with the Bates range that begins with TC.  We've seen

11   a lot that come with Girdwood.  I'm not complaining about every

12   single thing here.  I'm not complaining about the mere

13   production of the exhibit list.  What I'm suggesting is that

14   this exhibit list --

15             THE COURT:  You wouldn't be here today if the exhibits

16   had been accompanied by the exhibit list, a copy of all the

17   exhibits, you wouldn't be here.

18             MR. ROMAIN:  Absolutely not, your Honor.  Absolutely

19   not.

20             THE COURT:  Let me just stop you.  What about that,

21   would you make the copies, paper copies?

22             MS. MORRIS:  Judge, if I may, though, just explain

23   briefly.

24             THE COURT:  Sure.

25             MS. MORRIS:  If there's a simple solution, you know,

1    Judge, without an explanation, we can do it, that's fine.

2            THE COURT:  I'm not accusing anyone of anything.

3            MS. MORRIS:  I appreciate that, Judge, but actually to

4    really to be quite honest and put it as frank as possible, this

5    can be rectified with a phone call.  This is a very simple

6    thing.  Just to be clear, we have been working and bending over

7    backwards, as you've seen.

8            THE COURT:  Everyone has, and I appreciate everyone's

9    hard work, and you know we have as well, my staff has as well.

10            MS. MORRIS:  I understand that.  I understand that,

11    Judge, but we have been getting discovery requests since the

12    beginning of this case, at least two per week, and we've

13    accommodated, so to a certain extent Mr. Romain is correct that

14    we have been communicating with each other.

15            But for the record, Judge, he's not giving us the due

16    that we deserve.  In this particular situation with regard to

17    the exhibit list, this is an exhibit list that was put together

18    with our office in combination with the office in Alaska, and

19    just combining the exhibit list some numbers came off.  What his

20    main, I think, rightful objection is, is that some of the

21    documents when they were scanned by our vendor, they gave it

22    different file names, electronic file names as opposed to the

23    ones we already had, so just like the example that Mr. Romain

24    just gave, he doesn't know what documents T.C. Girdwood is.  Our

25    documents are T.C. Girdwood.  If you just look, I mean, common

sense, they've objected.

There's one where it's Am Ac 001.  It's American Financial 0011.  I mean, they are a little different, but Judge, it's not -- this is nothing mind-blowing.  We would have and could have rectified this last night, but again working with different time zones, at eight o'clock most of us went home. Mr. Romain I guess called around, he says he called around to all of us.  We know that Mr. Sullivan was still in the office when he called and spoke to him directly and was trying to calm him down and said, look, we can get this fixed, but instead before we had a chance to answer him this morning we see that there is a motion and now to come to court.  The only reason he even took as long is because some of the documents, some of the records were in the computer in Alaska and it was four o'clock in the morning in Alaska so we waited until quarter to seven in the morning in Alaska to get the paralegal who had been working on it into the office, and basically what it comes down to, Judge, is we went through every file.  They have every document. And what we did is we had them listed by Bates-stamped numbers, so it's not -- there's no flaw here.  It's not fatally flawed, Judge.  The Bates-stamped numbers are correct, so when he's saying that some of the Bates-stamped numbers they don't have, yeah, on some of them they were incorrect with the number, but if you go to that subset that's there, the documents are there, Judge.  It may be just a little awkward, or they're just some

1    flaws like that, but mainly, Judge, they're categories of

2    documents, and common sense would tell you where these

3    categories of documents exist.

4            THE COURT:  They shouldn't have to figure it out,

5    though.

6            MS. MORRIS:  But Judge, it is as basic as that, and as

7    a matter of fact, what we did is we could have gone through it

8    and we can redo the exhibit list, but just because we were

9    rushing to get here we didn't want anything to arise.  We just

10   came up with something simple to show where the mistakes are on

11   the whole list, and we of course did it to show where the

12   mistakes are and what the correct number is.  They have

13   everything.  The Bates numbers are there.

14           THE COURT:  So this is like an errata sheet to the

15   exhibit list?

16           MS. MORRIS:  Yes, sir.  Like a supplement in the

17   supplemental index.

18           THE COURT:  They have all that, right?

19           MS. MORRIS:  No.  They can have it right now, and they

20   can also have -- we also got all the photographs and a little

21   extra with the metadata, just all of it.  I mean, this is all

22   the stuff that we were going to provide them, as well as --

23           THE COURT:  So in other words, then they don't need

24   the paper copies?

25           MS. MORRIS:  No, they don't, sir.  No, they don't.

1    Everything is there.  This could have been -- I don't

2    understand.  This is a phone call.  This is a phone call.

3         THE COURT:  Let me ask you this:  Is there an extra

4    set of paper copies of all the exhibits just laying around?

5         MS. MORRIS:  No, there isn't an extra set.  There

6    isn't an extra set just laying around.

7         THE COURT:  How burdensome would that be, just to give

8    them a copy of the paper?  And I'm going to require them to do

9    the same thing.

10        MS. MORRIS:  First of all, that a quarter of it, they

11   are correct, are documents they provided to us.  A quarter of

12   them are documents they provided to us.

13        THE COURT:  They don't need copies of them?

14        MS. MORRIS:  They didn't need copies of those, first

15   off the bat.

16        Second of all, Judge, a lot of documents are not so

17   much duplicates because we got them from different sources and

18   we anticipated that there may be some argument as to what we can

19   and can't use.  There may be a document that's a blank document,

20   meaning on its face no writing.  Then we have another document

21   that we got from another source that may have the defendant's

22   writing on the document, so therefore those -- there's two

23   documents that are virtually the same except one has handwriting

24   on it, so there are a lot of instances of that, so it sounds

25   like a lot of paper, Judge, but it really isn't as much paper as

1    it would seem.  There are categories of documents here, and

2    again, it was just very easy, easily rectifiable, and in certain

3    instances where I told you --

4             THE COURT:  Their back is to the wall.  It's

5    understandable they filed a motion, I guess.  I don't know.  I

6    wish the parties could have picked the phone up.

7             MS. MORRIS:  I wish they had just talked to us first,

8    Judge, and I could simply have told them we need to talk to

9    Alaska, and that's my understanding of what Mr. Sullivan told

10   them.  This can be rectified.  If there was some typos, if there

11   was some problem marrying the list together, we can get this

12   rectified, that's my understanding, because Mr. Sullivan called

13   me as soon as he got off the phone with Mr. Romain last night,

14   so again, here you go.  I'm turning this over as far as the

15   minimization with regards to the calls involving the senator --

16   oh, our exhibits, I'm sorry, the exhibits, and here is the

17   cross-reference or the supplementary index, and here are all the

18   photos with metadata attached, so I think we're settled.

19             MR. ROMAIN:  May I be heard, please?

20             THE COURT:  Why don't you take a minute or two and

21   take a look at the document, and then if I want to hear from

22   you.  I don't know whether those documents and tapes address the

23   concern.  I don't know whether you need the paper copies or not.

24   I don't know.  Maybe the errata sheet to the exhibit list is

25   fine.  I don't know.

1          MR. ROMAIN:  I absolutely want to take a look at this,

2     but I think it's important to realize that we did not file a

3     motion and call the Court because of typographical errors.  This

4     errata sheet does not save us any time in trying to put these

5     documents together.

6          Now, I'm a lawyer, I'm not an information technology

7     expert.  We do have one here that can explain precisely the

8     problem, but the reality is, your Honor, that we did not call

9     the Court to disturb the Court about this, and when I called Mr.

10    Sullivan last night, what I made clear to him was that, you

11    know, the reality is I just asked him for exactly what we wanted

12    and he asked me why because he said you have all the documents,

13    and I proceeded to explain here's the reason why it's a problem.

14    And I gave him three particular reasons.

15         Now, I made it also clear to him that if we hadn't

16    heard from the government by 9:30 the next morning that we

17    couldn't just sit around and do nothing because that's not

18    acceptable clearly.  If we have a problem we've got to do

19    something about it.  We've got to say something.  There are

20    deadlines.  We intend to go to trial.  We are ten days away from

21    trial.  We have to do something.

22         What's most curious about all this, your Honor, is

23    that the government is resisting so strongly to give us some

24    boxes of documents.  We're going to trial in ten days.  It's

25    stunning because we fully intended, fully intended to provide an

1    exhibit list and a CD with every single document with no

2    problems, precisely what I would expect the government to give

3    us.  If they had given us paper we wouldn't have complained.  If

4    they had given us a CD with load files, however form they would

5    have given it to us so we can easily put it in there.

6            THE COURT:  How do you know that supplemental sheet

7    doesn't address your concern?

8            MR. ROMAIN:  Your Honor, because even if we were able

9    to find these particular documents, the work that has to go into

10    it by several information technology professionals, I can't do

11    it.  I cannot go into the database and do it myself.  I have to

12    have someone else do it.  And we talked to our people last night

13    and they gave us estimates about how many different people would

14    have to do it together, so it is -- I still remained a little

15    bit stunned as to why we should spend so much time arguing about

16    this sheet, about these particular examples of what's here and

17    what's there.  I didn't call the Court, we didn't write a motion

18    about a typographical error, your Honor.  We're going to trial

19    in ten days.  This is absolutely critical information, and the

20    question is why is it -- why is the government resisting making

21    a copies of a few boxes?

22            THE COURT:  Well, did you ask for paper copies last

23    night?

24            MR. ROMAIN:  I did, and then I made it clear --

25            THE COURT:  What was the response?

1    MR. ROMAIN:  The response was that Mr. Sullivan had to

2  speak to other people, and I made it clear to him that I

3  understood that and I appreciated that, and I also told him we

4  didn't have all day to wait, and I made it clear to him that we

5  would have to do something, go to court by 9:30 if we weren't

6  able to hear from him, and of course I didn't hear from him.  If

7  I had ever heard that there was some kind of a problem, there

8  was an Alaska issue, then it's unfortunate that representation

9  wasn't made, but the fact is, your Honor, that we have been

10  acting in as reasonable a way as possible.

11    THE COURT:  All right.  But fair is fair.  You have a

12  fair idea of what the government's exhibits are, right?

13    MR. ROMAIN:  Your Honor, your Honor, we have a fair

14  idea of what the Bates numbers are, but in order for me to

15  actually access this document, in order for me to put it

16  together, I have to have Mr. Markey go into the database, go

17  into several different databases, break them out, then rescan it

18  and put them together, and he has to do that over and over and

19  over and over again, and then after he's done that --

20    THE COURT:  Give me an example.  Just pick any

21  exhibit.  Tell me what you have to do.  If you want to have your

22  computer person tell me, that's fine, he can.  He can tell me

23  from the podium.  He doesn't have to sit there.  He can tell me.

24  I need to get a true appreciation of just what the hardship at

25  this point is.  I've not seen an exhibit list.  I didn't want

1    the exhibit list.  I asked counsel not to give me an exhibit

2    list, but from the exhibit list just give me one example.

3              What's your name, sir?

4              MR. MARKEY:  Patrick Markey.

5              THE COURT:  All right.

6              MR. MARKEY:  Exhibit Government Exhibit 18.

7              THE COURT:  All right.

8              MR. MARKEY:  They have the date of "Various," and then

9    there's a list of five different Bates numbers, five different

10   ranges of Bates numbers, where it would require me to pull them

11   from five different places, where when we first received this

12   production, I don't know, a week or two ago, two weeks ago, that

13   they're all over the place.  It's essentially trying to pull

14   these five ranges from, just to give you an example, thirty

15   boxes and trying to pinpoint which box each of these ranges are

16   in.  That's what it takes for me --

17             THE COURT:  Do those ranges appear on the original log

18   for these exhibits, those ranges, those Bates ranges?

19             MR. ROMAIN:  Which original log?

20             THE COURT:  I assume you got a log when you received

21   these documents, some sort of list when you got the exhibits

22   from the government.

23             MR. ROMAIN:  Are you talking about the exhibit list?

24             THE COURT:  No, I'm not talking about the exhibit

25   list.  Did you get a list of whatever materials the government

1    turned over to you in discovery?

2            MR. ROMAIN:  No, your Honor.

3            THE COURT:  There was no itemization of what you're

4    receiving?

5            MR. ROMAIN:  No, your Honor, not that I know of.

6            MR. MARKEY:  No.

7            MR. ROMAIN:  We received disks, along with cover

8    sheets.

9            THE COURT:  Right.  Just give me an idea.  I just

10   assumed there was some sort of -- well, wait a minute.  I recall

11   there being references to Bates numbers for the exhibits you

12   received.  Am I wrong in that regard?

13           MR. MARKEY:  By the prefix?

14           THE COURT:  The exhibits turned over in discovery,

15   weren't there Bates numbers assigned?

16           MR. ROMAIN:  There were Bates numbers, your Honor,

17   yes.

18           THE COURT:  A log of some sort, a running list of

19   exhibits turned over?

20           MR. ROMAIN:  They all have Bates numbers.

21           THE COURT:  I understand that.  So you were able to

22   read the government's discovery, you were able to learn about

23   the government's discovery, no one told me there was an

24   inability to understand what the government had turned over

25   during discovery, that was not a problem at all.

1      MR. ROMAIN:  We are in fact able to read the document.

2      THE COURT:  So the problem now, though, is hooking up

3  some material that's identified by Bates numbers only, and the

4  problem is that there's a range, like from one exhibit there

5  could be three different ranges for that exhibit, that's a

6  problem, hooking everything up; is that correct?

7      MR. ROMAIN:  That is one of the issues.

8      THE COURT:  So your computer expert has to go back to

9  the computer, if he sees a Bates number from two to nine, he has

10  to go in a document and highlight two to nine and then copy two

11  to nine; is that correct?  Is that right?  Is that what you have

12  to do?

13      MR. MARKEY:  That's correct.

14      THE COURT:  If you have three ranges in that exhibit

15  you just mentioned has three ranges, then you have to do that

16  for each range, and then what you do is you scan that and print

17  it out?

18      MR. MARKEY:  I may have to pull it together.  Printing

19  it out probably would be easier and then have to rescan it.  It

20  would probably have to go through a vendor for that because

21  there's multiple documents like this.

22      THE COURT:  All right.  Then I'm going to direct the

23  government to produce hard copies of all the exhibits, so the

24  question becomes when can they get them?  They shouldn't have to

25  hunt and peck that way.  How much time do you need?  That's

1    something we don't have a lot of.

2              MS. MORRIS:  I'm sorry, Judge.  The Court's

3    indulgence.  I'm just trying to figure it out.

4              THE COURT:  All right.  And let me just say one thing

5    to government counsel:  You'd have the same complaints.  If they

6    gave you that information in the same way, you'd be complaining

7    and we know it, so fair is fair.

8              MS. MORRIS:  With a phone call.

9              THE COURT:  What's that?

10             MS. MORRIS:  With a phone call.

11             THE COURT:  All right.  Well, there wasn't that phone

12   call, and I'm not arguing with anyone, but fair is fair, and

13   when they produce it they're going to have to produce it in the

14   same way.

15             MS. MORRIS:  Judge, if I may.

16             THE COURT:  Sure.

17             MS. MORRIS:  In conferring, and we're just

18   guesstimating as fast as we can do it, we think this probably is

19   going to take us the rest of the day, so we should say probably

20   first thing in the morning.

21             THE COURT:  All right.

22             MS. MORRIS:  However, Judge, I just want to make clear

23   they were given, each time we made a production to them, of

24   course they were given a list, not only with the Bates-stamped

25   numbers but with the file category names.  I mean, I understand

1    that the defendant wants a speedy trial.  I understand that.

2    All of us have been bending over backwards, Judge, but do you

3    know what?  This is a defendant like any other defendant and

4    just because he has "U.S. Senator" before his name doesn't mean

5    that we have to drink out of a fire hose every time they call

6    us.  Thank you.

7             THE COURT:  All right.  So what time was it they can

8    get the documents?  What time?

9             MS. MORRIS:  Just a moment, Judge.

10            THE COURT:  The next question is, what impact does

11   this have on the Court's schedule.  Now I'm concerned about

12   these objections and now the Court's ability to resolve

13   objections prior to trial, but what time can they get them?

14            MS. MORRIS:  We can get them to them tonight by ten

15   o'clock.  We can get it there before we go.

16            Judge, we just want to make sure to be clear.  We're

17   not producing any official photographs, we're not producing any

18   documents that they provided to us, and we're not providing

19   recordings that we've already provided.

20            THE COURT:  Insofar as the documents they've given

21   you, as long as they know what your exhibit number is for the

22   document that they produced for you that you plan to introduce

23   in your case in chief, I don't have any problems with that.  You

24   should not have to reproduce that.

25            MS. MORRIS:  For the record, we haven't really gotten

1    the stipulation yet from the defense, but they have originally I

2    think in our initial agreement to the Court way back when said

3    they will stipulate to all the documents for which they

4    provided, so even if it doesn't have a direct correlation,

5    they've agreed that those are going to come in.

6              THE COURT:  All right.

7              MR. CARY:  Your Honor, Rob Cary for Senator Stevens.

8              To clarify, we haven't agreed that every document will

9    come in that we produced.  We have agreed that it's authentic

10   and relevancy and the like will have to be addressed.  Hearsay

11   issues like that will have to be addressed separately, but we

12   certainly don't disagree that the documents we've produced are

13   authentic.

14             Just one practical matter.  We are going to need more

15   time to provide our objections once we get these documents, the

16   exhibits from them.

17             And I also would suggest that at some point -- they

18   don't have to do this on an emergency basis -- but it does make

19   sense to get computerized copies of the exhibits so that both of

20   our teams, as we get ready for trial, which as we all know is

21   coming up very shortly, will have them loaded on the computer

22   and ready to use in court rather than having to go through a

23   separate scanning process.  I think that makes sense, and we'd

24   certainly be willing to do that for the exhibits that we're

25   going to produce as well.

```
 1              THE COURT:  I assume that you're going to use this
 2    Elmo for your production of exhibits.  There's not going to be a
 3    lot of flow of paper back and forth from attorneys to witnesses.
 4    I assume you're going to do that.
 5              MS. MORRIS:  Yes, sir.  It's going to be electronic
 6    and with the Elmo, so no, it's not going to be a lot of paper
 7    floating around.
 8              MR. CARY:  Your Honor, Rob Cary.  We learned how to
 9    use the Elmo two days ago, so we understand that.
10              THE COURT:  I want to get back to this procedure I put
11    in place for attempting to deal with objections.
12              Let me just say one thing.  You know, this defendant
13    is not being treated any differently than anyone else.  The
14    Court was available, and someone asked a question about what
15    other cases had to be moved to accommodate this senator.  No
16    other cases had to be moved.  Actually there was one case, with
17    the consent of the attorneys, the commencement of the trial was
18    put off for a couple of weeks, but no one, and I wouldn't do
19    that for anyone, I wouldn't cancel someone's hearing or trial to
20    accommodate someone because of his or her status in society.  It
21    doesn't work that way in this court.
22              MS. MORRIS:  Judge, I wasn't suggesting that the Court
23    bent over backwards.  I was talking about us.  They call, we
24    jump.  It's just they keep sending letters.  We have to jump
25    because we're trying to accommodate.
```

 1          THE COURT:  They would probably call you regardless of

 2   who their client was.

 3          MS. MORRIS:  That might be true, but I don't know.

 4          MR. CARY:  That's absolutely correct, your Honor.

 5          MS. MORRIS:  This seems a little scarier than others.

 6          THE COURT:  There are battles being fought hard on

 7   both sides.  I'm not casting any aspersions.  I just want to be

 8   clear that the Court's not treating anyone any differently than

 9   it would any other.

10          MR. CARY:  To make clear, we're representing a client.

11          THE COURT:  Mr. Sullivan said on day one this is the

12   first time he's waived speedy trial, this is probably the first

13   time in my career that he waived speedy trial.  And I looked at

14   my calendar and there's availability.  There's been some other

15   developments on the calendar where cases have been resolved, and

16   that's fine.  Things just happened to work out.

17          Let's be realistic about this.  I haven't placed a

18   procedure or plan to try and resolve objections.  How realistic

19   is that?  I mean, you have some idea of your objections.  When

20   can I expect to receive them from defense counsel at this point?

21   I'm not talking about the run of the mill --

22          MR. CARY:  We haven't seen the exhibits yet, your

23   Honor.

24          THE COURT:  -- run-of-the-mill immaterial irrelevant

25   objections.  I'm talking about objections that are supported by

1   fair consideration of the rules and evidence, and, you know, and

2   other rules and precedent obviously from our Circuit, so what am

3   I getting myself into?  If it's not realistic then I'll have to

4   think of something else.

5        MR. CARY:  Well, your Honor, we will review them in

6   good faith, and we certainly will not make frivolous or

7   boilerplate objections.  We've already said we've produced over

8   seventy thousand pages to the government.  We said we're not

9   going to disagree with the authenticity of any of those

10  documents.  Well, obviously we're going to have to reserve our

11  rights to some extent.  There still may be a foundation --

12       THE COURT:  I'm not asking you to give up your rights

13  at all.  I just want a preview of just what's looming on the

14  horizon here.  If this is not realistic then we'll just do it

15  the old-fashioned way, which means there will be a lot of

16  attorneys around here after 5:30 at night and prior to 9:30 in

17  the morning.  I prefer not to do that, but if I have to, if

18  there is to be a combination of that either pretrial as well as

19  during the trial days, I don't know.  What I'm trying to avoid

20  is wasting jurors' time because they hate it.  They hate it, I

21  hate it, and the lawyers hate it as well.  It will be

22  unnecessary bench conferences, so that's why I decided to do it

23  this way, to accommodate everyone.

24       MR. CARY:  Nobody likes bench conferences, and we will

25  not make frivolous objections.  We will need in some instances,

1    your Honor, I --

2            THE COURT:  I'll just have to wait and see what people

3    file then.  I think that's the only fair way.  If it's going to

4    work to a certain extent, I'll be able to do some things, that's

5    for certain.  Whether I'll be able to address all the

6    objections, it's probably doubtful, but I'll wait and see what

7    sort of objections are filed.  To the extent I can, I'll rule on

8    them.

9            MR. CARY:  I can assure the Court, we have no desire

10   to ever keep the jury waiting.  It's not for anybody's benefit

11   that we do that.

12           THE COURT:  We've all learned over time that they hate

13   it, and I don't want to bring them down four weeks and then, you

14   know, after the new year I'm telling them just a few more days

15   of the trial.  I don't want to do that, and no one else wants to

16   do it.

17           MR. CARY:  Agreed, your Honor.

18           THE COURT:  Ten o'clock tomorrow morning, Saturday.

19   You were supposed to produce your witness list and exhibit list

20   by when, eight o'clock Saturday; is that right?

21           MR. CARY:  Eight o'clock Saturday evening, your Honor.

22           THE COURT:  So what's fair?  So I should change that

23   to Sunday morning or so?

24           MR. CARY:  Well, we've been reduced --

25           THE COURT:  You've had some time already.

1           MR. CARY:  We've had some time to make some --

2           THE COURT:  When did you get your exhibit list?

3           MR. CARY:  We got it at eight o'clock yesterday

4  evening, your Honor.

5           THE COURT:  Last night?  Let me just think out loud

6  here, and I want your reaction.  Maybe what I should do is

7  extend it for 24 hours from the time you get it, from ten a.m.

8  to ten a.m. on Sunday.  I want to try to stay on track with the

9  objections.

10          The status hearing is Thursday.  I don't plan to move

11  that, although I need to talk to my staff.  Maybe I can move

12  that to Friday.  I hate to do that because I do have some other

13  matters.

14          Do you know what?  I think what I'll do, and I'll take

15  a very short recess, you can respond, I can hear from government

16  counsel as well, maybe extend it to ten o'clock Sunday, for you

17  to file tomorrow at eight p.m., keep the expanded time for the

18  objections.  Originally the objections were due Monday; is that

19  right?  Monday?  Maybe I should make it Tuesday.  That's cutting

20  into my time.  It will have to be Tuesday at noon, and keep the

21  hearing for the 18th, with the understanding that I may want to

22  use the 19th as well to kind of -- I didn't really want to do

23  that, but to the extent that rulings can be made prior to jury

24  selection I think that helps everyone.  Any reaction?

25           MR. CARY:  I think that's acceptable.

```
1              THE COURT:  What about the government?  It's cutting
2    into everyone's time, but that's about as fair as I can be under
3    the circumstances.  Any problems with that timetable?
4              MS. MORRIS:  I don't think so, Judge.  I would ask
5    that if we're going to keep the hearing, the status conference
6    on Thursday, that we keep it on Thursday or do it on Friday as
7    opposed to two days.  That just interrupts our preparation time.
8              THE COURT:  The only reason why I want to keep it on
9    Thursday at this time --
10             MS. MORRIS:  That's fine.
11             THE COURT:  -- at this time is because I want to have
12   the luxury of having Friday available in the event that we need
13   to work eight hours Friday.
14             Now, you get a free ride essentially on the 22nd.  You
15   don't have to do any work.  You have to show up at nine o'clock,
16   but no one has to do any heavy lifting on Monday.  That's voir
17   dire.  We're going to meet probably at the end of the day, four
18   o'clock or five o'clock, just to talk about the following day,
19   so you're going to have the luxury of being in your office that
20   day.  But I want to reserve that Friday because I may need that
21   Friday.  I may need all of that Friday.  I may have everyone
22   here for ten or twelve hours that Friday trying to resolve
23   objections so once this trial starts everyone's made their
24   record to the extent they can.  I mean, some of these objections
25   I'm sure we'll need an evidentiary basis and context for the
```

 1    Court to be able to resolve, but to the extent I can deal with

 2    some of the more routine objections I'm going to do so.

 3    Recognizing that I may not be able to deal with everything, I

 4    want to leave that Friday, not that I'm a glutton for

 5    punishment, but I just want to leave that Friday available in

 6    the event that we absolutely need to work that day, and the

 7    tradeoff is Monday you can stay in your office.  Actually the

 8    tradeoff will be that weekend, Saturday and Sunday, you can

 9    prepare for trial on Monday.

10              Let me take a short recess and just talk over these

11    dates, but no serious objections.

12              Anything else we need to talk about?

13              MR. CARY:  Yes, your Honor.

14              THE COURT:  You're going to have provide paper also

15    with your exhibits.

16              MR. CARY:  We intend to do so.

17              I do want to suggest, I think it will work much

18    better, it doesn't have to be done on an expedited basis, but I

19    do think we ought to exchange computerized copies so we can load

20    them.

21              THE COURT:  I totally agree with you.  I totally agree

22    with you.

23              MR. CARY:  If we can work that date out amongst

24    ourselves, we will.  I can't promise we can work it out, but we

25    will try.

1          THE COURT:  I have no doubt you can work it out,

2     right?  When do you need the computerized?  You don't need that

3     until next week sometime.

4          MR. CARY:  It occurs to me --

5          THE COURT:  The sooner the better.

6          MR. CARY:  It occurs to me at the time of the pretrial

7     or sometime next week.

8          THE COURT:  I was going to suggest Wednesday, but just

9     say not later than the pretrial hearing date.  Just say

10    Wednesday.

11         MR. CARY:  That makes sense, your Honor.  We do have

12    one more providing of Brady and Giglio in a usable format, and

13    your Honor's order we thought was clear that it was supposed to

14    be provided in usable format.  We have a letter that purports to

15    provide Brady and Giglio, but it is not in a format that we can

16    use to cross-examine.

17         Take one example.  November 8, 2006, Jack Owen stated

18    that it was his understanding that defendant was going to pay

19    the repair to the boiler system, but did not see a bill go to

20    the defendant.  It's nice that they told us that in a letter,

21    but as we're eight days away from trial, we need to know the

22    context in which that was stated, who was present, so that we

23    can, if Mr. Billings is on the stand, so that we can

24    cross-examine him about that.  We need to know who the agents

25    were, the notes, the context, and we submit that the way to do

1  that is to provide us with 302s or --

2          THE COURT:  I thought there was an agreement with

3  respect to 302s, redacted versions.  I thought that's my

4  recollection.

5          MR. CARY:  That's what I thought at the end of the day

6  too, but we haven't seen anything, your Honor.

7          THE COURT:  Counsel, was it not?  I thought it was.

8          MS. MORRIS:  No, Judge.  I believe what we did --

9          THE COURT:  Or summary or something.

10          MS. MORRIS:  We provided summaries, but what it was

11  is, when there were instances, it may be so intertwined that we

12  didn't want to extract or to complicate it by trying to

13  summarize it.  We provided transcripts, and we will do that,

14  when it was in those situations.

15          THE COURT:  302s?

16          MS. MORRIS:  No.  Of grand jury transcripts.  Those

17  summaries are just that.  That's the information we have.  It's

18  no more, no less.  We try -- I mean, we may have a 302 with some

19  additional information, but that's what it would say.  I mean --

20          THE COURT:  Why not just give them the 302s?

21          MS. MORRIS:  Judge, we would not want to go into the

22  302s because that wouldn't be Jencks to that witness.  That

23  would be Jencks to that agent, so they have the information to

24  question Mr. Billings, the example they gave.  They can do that.

25  They can use it as they will.  They can ask Mr. Billings them-

1    self.  We are providing them what we are obligated, and then

2    some.

3            THE COURT:  Wouldn't that information that the agent

4    is taking down in a 302 as a result of a conversation with the

5    witness also be potentially impeachable material insofar as the

6    witness is concerned?

7            MS. MORRIS:  That's why --

8            THE COURT:  Recognizing it's <u>Jencks</u>.  I recognize it's

9    <u>Jencks</u>.

10           MS. MORRIS:  When you talk about as far as Mr.

11   Billings?

12           THE COURT:  Any witness, hypothetical witness, one

13   that gives a statement to an FBI agent, that's recorded on the

14   302?

15           MS. MORRIS:  Not when it's hearsay, Judge.  Not when

16   it's hearsay, and that's what it sounds like.  No.

17           MR. CARY:  Your Honor, we can use that 302 to attempt

18   to refresh recollection, to ask the witness whether it refreshes

19   his recollection, to ask whether, whoever the agent was, whether

20   he remembers saying that to the agent.  We need that in order to

21   in our case call the agent to impeach that testimony.  We need

22   that information.  It's not helpful without it unless -- let's

23   see who signed the letter.  Ms. Morris signed the letter.  We're

24   not going to be able to put Ms. Morris on the stand.  We need to

25   know who the agents were who it was sent to.  We need the

1    information, and it's eight days from trial.  We need it now.

2         Same goes for grand jury testimony.  I acknowledge

3    that we did receive two witness' grand jury testimony, but when

4    there is impeachable material we need that impeachable material

5    now, not later.

6         THE COURT:  Counsel?

7         MS. MORRIS:  You can't impeach the witness -- we've

8    given them enough that they can cross-examine whomever they want

9    however they want.  They have the information.  We've not held

10   back.  We've even in instances where we didn't think necessarily

11   it was Brady in an abundance of caution, or Giglio, we turned it

12   over just so they can have it so there's no witness that takes

13   that stand or any witness that they may want to call themselves.

14        THE COURT:  Didn't we talk about this just two days

15   ago?

16        MS. MORRIS:  Yes, we did, Judge, and I think we've

17   accommodated.

18        THE COURT:  When I left that hearing I asked is anyone

19   in disagreement with respect to anything the Court said, any

20   further questions about what the government's obligations were.

21   No one uttered a sound, so what's happened since then?  You

22   haven't received information, that's what's happened since then.

23        MR. CARY:  Yes, your Honor.  I'll tell you what's

24   happened.  You said at the end of the hearing, and I believe the

25   minute order says it as well, that we're supposed to receive

1    Brady-Giglio material in a usable format.

2              THE COURT:  Yes.

3              MR. CARY:  Usable format.  Mr. Romain sends a letter

4    as soon as we get back from court:  Please provide in usable

5    format.  And the only answer we get was we understand our

6    obligations under Brady-Giglio.  We're not going to provide you

7    anything more.  That's what we got.  This is not usable format.

8    We can't cross-examine Mr. Billings with Ms. Morris' letter, and

9    we need, in order to, even if it is hearsay from an agent, then

10   we need that information to attempt to refresh recollection.  In

11   many instances that will work.  It's certainly something that's

12   needed for the defense, and if it doesn't work, if the witness

13   doesn't recall, then we can call these agents and use those

14   notes with the agent.  That's a format that's usable for us.

15             It's also true with respect to the grand jury

16   transcripts themselves.  We did reach a 24-hour agreement

17   because that was the best they would agree to.  We certainly

18   insisted on more, but at this point if it's Brady and Giglio we

19   ought to get those portions of the grand jury testimony now so

20   we can get ready for trial.  And the last thing anybody wants,

21   we all know, is to be asking for continuances because we're

22   getting a lot of Jencks in the middle of trial.

23             MS. MORRIS:  Judge, they agreed to Jencks to be

24   provided 24 hours before a witness takes the stand.  Now they're

25   trying to go back and trying to get it a different way.  The 302

is not Mr. Billings' Jencks.  You know, the thing is that they

are doing exactly what the Rules of Evidence say that they can't

do:  They can't use extrinsic evidence to impeach a witness, and

that's exactly the argument that Mr. Cary is making.  That is

not available to them.  They will receive the Jencks as we

agreed upon, and they have the information.  They can ask Mr.

Billings the question, Mr. Billings or whomever that they see

that we've listed in the letter, they'd like to approach him to

find out did you do this or what more was said.  Didn't you say

this?  Did you not say it?  We gave them access.  That's what we

do and that's what we do normally.  I've never provided anything

beyond, unless, again, there was so much of it or so intertwined

that I said here, I'm not going to try to explain what this

witness said.  You read it for yourself.  I'm not going to take

it upon myself.  We have done that here, Judge.  We have done

our job here, Judge.  We have more than adequately met our

obligation, and again, this is just yet another example of

drinking out of that fire hose.

          THE COURT:  Okay.

          MR. CARY:  Your Honor, I understand that if I have a

302 that I can't admit the 302 through a witness on the stand.

I understand that.  But it's useful to the defense, which is the

hard Brady-Giglio, who was there, what was the day, what were

the circumstances.  One sentence in a letter, oh, by the way,

you might want to know that Mr. Billings told somebody this on a

1    certain day is not helpful to the defense as we prepare for

2    trial and --

3         THE COURT:  Has any court anywhere -- I don't recall

4    this from the pleadings.  I don't believe anyone cited any

5    authority that focused precisely on 302s.

6         MR. CARY:  Your Honor, I recall -- we're all a little

7    fatigued.  I do remember from our original brief on this that we

8    cited the Poindexter case and the Marshall case for Jencks being

9    provided in advance.  I can't --

10        THE COURT:  Marshall 302.  Poindexter doesn't even --

11        MR. CARY:  I can't say that I recall that 302 is

12   objectionable by the Jencks, and the Jencks is provided by

13   Jencks.  The point here is, if it's Brady-Giglio we ought to get

14   it now.  We ought to get it now in a form that we can use it, in

15   a usable format, which is what we left court two days ago

16   thinking we were going to get.

17        THE COURT:  As opposed to reviewing all these

18   documents, why shouldn't I just accept the government's

19   representations that indeed they're aware of their obligation,

20   they're going to produce it, and if they don't then an

21   imposition of sanctions is appropriate, right?

22        MR. CARY:  Well, that may well be, but we're trying to

23   have a fast and expeditious and fair trial.

24        THE COURT:  So am I.

25        MR. CARY:  And take Mr. Billings just as an example

 1    because it's a fairly simple one, and it's one sentence.  It's

 2    not useful to us.

 3               THE COURT:  What does that sentence say?  What does it

 4    say?

 5               MR. CARY:  It says, your Honor, and I quote:  On

 6    November -- it does say the date.  I apologize for that.

 7               On November 8th, 2006, Jack Billings stated it was his

 8    understanding that defendant was going to pay for the repair to

 9    the boiler system, but Billings did not see a bill go to

10    defendant.  End of quote.

11               Now, what I would like is to know who was --

12               THE COURT:  Do you have the date?  You have the date

13    and you have the statement.  What else do you need?

14               MR. CARY:  I'd like to know the context, I'd like to

15    know who the agents were because the way to impeach Mr. Billings

16    is to show him the notes or the 302 or the grand jury testimony.

17    We could actually impeach with the grand jury testimony.  If

18    it's a prior inconsistent statement that's impeachment.

19               THE COURT:  But you can certainly cross-examine him

20    about that statement, though, can't you?

21               MR. CARY:  Yes, but we want to do it effectively, in a

22    way that we can put it into context.  Let's say Special Agent

23    Kepner was there.  Isn't it true that on November 8th, 2006 you

24    told Special Agent Kepner this?

25               THE COURT:  Can't you ask him who was there?

1          MR. CARY:  Not if he doesn't recall, your Honor.

2          THE COURT:  You're assuming.  Suppose he doesn't say

3     he doesn't recall.  Then you can use it potentially, can't

4     you --

5          MR. CARY:  Then I'm --

6          THE COURT:  -- to refresh recollection, or not?

7          MR. CARY:  We could attempt to refresh recollection

8     with this document, but what we want is the notes and the

9     specific people that were there in the context so that we can

10    then call those people in our case to impeach with an

11    inconsistent statement or to bring it in as a prior recollection

12    recorded.  That's what we want.  That's effective.  So simply

13    knowing that he said in a vague way --

14         THE COURT:  I'm not aware of any authority that would

15    persuade me that you're entitled to those 302s, though,

16    unredacted.  I'm not aware of any authority, and I think we've

17    talked about that before.  I take the government's word that

18    it's aware of its obligations to produce this.  I understand in

19    a best-case-scenario you'd love to have this document, but I'm

20    not aware of any authority that would persuade me that you're

21    entitled to it right now.  And if you want, I'm inviting you

22    again to bring some authority to my attention.  I'm not aware of

23    it.  If the government doesn't abide by its Brady obligation

24    then the government runs the risk of sanctions.  We all know

25    that because we all know what the law is, right?

1          MR. CARY:  Yes, your Honor.  Do I understand that the

2     government's position is that the 302s are Jencks?

3          MS. MORRIS:  They're not.

4          MR. CARY:  They're not Jencks.  Okay.

5          THE COURT:  No.  No.  No.  No.  Not Jencks, not Jencks

6     for the person providing the statement; Jencks insofar as the

7     recording officer's testimony.  That's the government's view,

8     correct?

9          MS. MORRIS:  That's correct, your Honor.

10         MR. CARY:  I understand that distinction, your Honor.

11    Our point remains the same:  We believe that we need more

12    information than has been provided in this letter in order to

13    effectively cross-examine the witness, and impeachment.

14         THE COURT:  Is there anything we've overlooked?  Do

15    you want to give me additional authority or bring the Court's

16    attention to?  Be my guest, counsel.  I think the basis on the

17    state of the record before the Court, and before the record

18    these past two weeks, I don't think that I'm persuaded that I

19    should order just a carte blanche production of Form 302s.

20         Yes?

21         MR. CARY:  And your Honor, one question the defense

22    has, it is not clear to us whether the government believes that

23    they're finished with their Brady and Giglio obligations.  I

24    understand it's ongoing, but at least as to what they know right

25    now.

```
 1                THE COURT:  It's probably fair to ask you, if you had
 2   anything else you'd be producing it right now?
 3                MS. MORRIS:  That's absolutely right, Judge.  We know
 4   that there's a continuing duty.  If something else comes up we
 5   provide it.
 6                THE COURT:  All right.  What else?
 7                MR. CARY:  That's it for now, your Honor.
 8                THE COURT:  All right.  Anything further?
 9                MS. MORRIS:  No, sir.
10                THE COURT:  Let me just take a five-minute -- don't go
11   anywhere -- take a five-minute recess.
12                COURTROOM DEPUTY:  Remain seated.  This Honorable
13   Court stands in a five-minute recess.
14                THE COURT:  I'm not going to keep you long.
15                (Recess taken at about 2:41 p.m.)
16                COURTROOM DEPUTY:  Remain seated.  This Honorable
17   Court is again in session.
18                (Back on the record at about 2:49 p.m.)
19                THE COURT:  Counsel, I'm going to let you go, but I
20   want to be reasonable about this.  And again, everyone has
21   worked hard and we've worked extremely hard as well.  I would
22   not normally do this, deal with the evidentiary objections in a
23   trial.  I was trying to think of the last time I've done it
24   pretrial.  You do it rarely.  This strikes me as the type of
25   case, given the projected duration, the number of witnesses, the
```

1    number of exhibits, it strikes me as the type of case where it's

2    appropriate for a judge to attempt to resolve evidentiary

3    disputes pretrial in order to pave the way for a fairly-

4    conducted trial in the least amount of time necessary.  But I

5    want your reaction as well.  Are there some reservations about

6    this?  I don't want to find myself in a position where

7    everyone's done a lot of work over the last several days, and on

8    Thursday, you know, it's really impossible without a lot of

9    other work, without a lot of other evidence and testimony, to

10   fairly address appropriate objections.  I think it's

11   appropriate, but maybe I need some input from you.  If you don't

12   think it's appropriate you need to tell me and tell me the

13   reasons why it may not be appropriate.

14            MR. CARY:  Your Honor, for the defense it's Rob Cary.

15   I want to say it's inappropriate.  I do have some reservations.

16   I'm the person who volunteered to sit down and look at their

17   exhibits.  When we see them and try to come up with objections,

18   and as you do that there are certain sorts of objections,

19   authenticity, which, you know, we're not going to have problems

20   with that, I don't think.  There will be issues where the

21   relevancy is not entirely clear to us as I'm sitting there on a

22   Sunday morning in my office.

23            THE COURT:  And it won't be clear until maybe you've

24   heard other testimony.

25            MR. CARY:  Right.  And I don't want to burden the

Court with objections, foundation-sorts of objections that went away, but I also don't want to throw them on paper to cause a lot of problems now, which sometimes happens in cases like that. Those are the reservations we have.  We don't want to keep the jury waiting either.

THE COURT:  Let me give you a hypothetical.  It's one thing for the government to list an exhibit.  This is hypothetical obviously.  A letter authored by M. Mouse.  M. Mouse is not going to be a witness.  The government is going to introduce this letter in the government's case in chief.  You know, hearsay?  What is this?  What is the evidentiary basis for this letter?  I think it's probably appropriate for some but maybe not all objections, because I totally agree with you, because I'm sure there's some exhibits that I'm going to need for the exhibit to be put in an appropriate context for admissibility for the foundational testimony about custodial, foundational testimony by the person who can testify about the relevance of that document.  I don't want to just jettison this because I think it may be appropriate for some exhibits, but I don't know.  You've seen a lot of exhibits.

MR. CARY:  I can give you an example of probably where it will be appropriate, your Honor.  The photographs that were taken, we haven't seen all the ones, but we think some may have been taken with a wide-angle lens and the like, the metadata. That's something that we can rule on Thursday.  It may be they

1  haven't included any of those ones.  When we see the metadata

2  we'll know, but that's perfectly appropriate, efficient, and a

3  good use of everybody's time, I think, to resolve that sort of

4  issue.

5          THE COURT:  So the answer probably is we can probably

6  resolve, the Court can probably resolve some but not others.

7          MR. CARY:  That's --

8          THE COURT:  And if that's the case, then there's some

9  progress there.  There's some benefit to that process.

10          MR. CARY:  Yes, your Honor, but I don't want to -- I

11  agree completely.  I'm happy to do that.

12          THE COURT:  I want your reaction and I want the

13  government's reaction because I don't want anyone to do any

14  unnecessary work.  This strikes me as the type of case that I

15  should be attempting to do that because of the time constraint,

16  because of the sheer number of exhibits, because of the sheer

17  number of witnesses, in order to pave the way for a more

18  efficiently-conducted trial, and I guess there's only one way to

19  tell, and that's on Thursday.  I will try, and if it works it

20  works; if not, if it doesn't work, then maybe you folks will be

21  back on Friday.

22          MR. CARY:  Just so the Court understands that we're

23  going to focus on what we think is going to be fruitful rather

24  than a blanket relevance objection to everything.

25          THE COURT:  I understand that.  That would serve

1    everyone's interest.

2            MR. CARY:  Some things clearly are going to be

3    irrelevant.  Some things we may not understand.

4            THE COURT:  And some things, you know, requires an

5    inordinate consumption of time during the course of the trial.

6    You know that probably.  Maybe there aren't any types of

7    exhibits that require that, but my guess is that besides have an

8    idea that there's some exhibits for some witness that's going to

9    require the Court to comment, you know, an hour, half an hour,

10   whatever, trying to determine whether or not that witness should

11   be allowed to testify or to determine the evidentiary

12   impingement for allowing some exhibits to be admitted into

13   evidence.

14           MR. CARY:  The photos come to mind, your Honor.

15           THE COURT:  Photos is the big issue.

16           MR. CARY:  It may be that when we see them and realize

17   which ones they've chosen that it's not.  I just don't know, but

18   that is certainly something that could be resolved easily

19   pretrial.

20           THE COURT:  The government just gave you the copies

21   today.

22           MR. CARY:  We just got the metadata today.

23           MS. MORRIS:  Judge, they've had the photos.

24           THE COURT:  I was going to say you had the photos but

25   you just got the metadata.

1          MR. CARY:  Correct.

2          THE COURT:  So you know the photos they're going to

3     introduce.  You're talking about your client's home.

4          MR. CARY:  I think reduced it, and, your Honor, it's

5     our belief that some of them were taken with wide-angle lenses

6     that distort the side of the home.  That's why we wanted the

7     metadata that tells us.

8          THE COURT:  Right.  That doesn't affect authenticity,

9     it doesn't affect the weight.  No one disputes, yes, this is his

10    home but this is a wide-angle range, ladies and gentlemen.  They

11    enhanced it, and this is not the true photograph.

12         MR. CARY:  That may be where the Court ends up, but

13    that's something that can be resolved on Thursday.

14         THE COURT:  I'm going to need some authority on this

15    point if indeed enhancement of the original photo affects some

16    authenticity of that.  I'm going to need some authority.  It

17    sounds like a weight issue to me, but I'll certainly welcome the

18    authority you wish to bring.  There should be some law for the

19    benefit of the parties, and again, I'm not trying to increase

20    the amount of work that everyone has to do, but I just need the

21    parties to bring the objectionable exhibits to the Court, but

22    there should be some log, exhibit number, whatever it is.

23         MR. CARY:  We intend to do that, your Honor.

24         THE COURT:  You intend to do that, all right, and you

25    intend to let me know what the basis of it is, as opposed to

1    just saying here.  Let me know what the evidentiary, what

2    subpart of hearsay it is so I can give some thought to it before

3    the hearing.

4              MR. CARY:  Yes, your Honor.

5              THE COURT:  All right.

6              MS. MORRIS:  All right, Judge.

7              THE COURT:  Your reaction as well.  Again, I don't

8    want anyone doing any unnecessary work.  It just strikes me as

9    the type of case I should be doing this.  Do you agree or not?

10             MS. MORRIS:  Well, your Honor, of course we think that

11   it's pretty basic.  I can see where some evidence they may not

12   like and they want to object to, but we think the evidentiary

13   foundations within themselves are pretty rudimentric.

14             THE COURT:  This is about photos and documents, right?

15             MS. MORRIS:  That frightens me a little bit because I

16   don't know where they're going with that.  That whole photo

17   argument, if they're talking about we use a spherical camera

18   inside the home, we may not use those photos or not.  When we

19   did the search, meaning it went around, if that's what they're

20   talking about.

21             THE COURT:  Panoramic view.

22             MS. MORRIS:  Panoramic-view-type thing, just so you

23   can see the whole thing.  I don't know where they're going, and

24   what scares me or gives me a little trepidation is that are they

25   leading to some kind of foundation for a suppression issue?

1    We're just now going to trial.  I don't really understand where

2    that's coming from.  If they're saying that the photos have been

3    enhanced in some kind of way I don't get that either.  They're

4    of his house, so are they going to try to say that isn't a

5    floor, that isn't a chair, that isn't a wall?  I don't really

6    understand that argument.  Or that isn't, you know, the heat

7    system or that isn't, you know, certain items or appliances?  So

8    I'm not quite sure where that argument is going, and I'm not

9    quite sure what that objection would be, so to a certain extent

10   I'm totally in agreement with your Honor because I'd like to

11   know what categories of arguments or objections there will be.

12         THE COURT:  They've alluded to in prior pleadings

13   about authenticity arguments being made with respect to

14   enhancement.  A couple of weeks ago there was an article in

15   Parade Magazine that showed photos of Ben's Chili Bowl this year

16   and maybe 25 years earlier, and the question was what's the

17   difference here?  Well, of course it had been enhanced.  You see

18   a fire plug where a fire plug wasn't.  I mean, I query whether

19   those are the types of enhancements that can indeed affect the

20   authenticity, as an example.  I mean, that's very interesting,

21   but the photos were different in very small detail, and I guess

22   maybe an argument could be made with respect to authenticity.  I

23   don't know.

24         MS. MORRIS:  We don't know either.  We'll wait and

25   see.

1          MR. CARY:  Your Honor, I can eliminate some mystery

2     and they can think about it some this weekend:  When there are

3     certain angles and lenses that are used when houses are listed

4     in real estate listings to make them look bigger than they are.

5          THE COURT:  Or better.

6          MR. CARY:  Or better.  Senator Stevens' primary

7     residence is a modest house in Alaska.  It's called a chalet,

8     but it's modest.  Your Honor, it's modest.  I've been there.  We

9     wanted the jury to see it.  It is modest and it's small, and

10    some of the photographs in the spherical photographs in

11    particular take it with a fisheye lens and make the room look

12    much bigger than it is.

13         THE COURT:  Is there any authority on this?  If

14    there's some authority let us know now.  Let them know now.

15         MR. CARY:  Your Honor, I believe there is, and we

16    engaged the gentleman who's written the leading textbooks on

17    crime scene photography in America who can testify about how

18    misleading these photographs can be.  It may be that they're not

19    going to use them.  We don't know.  We're going to find out, and

20    it may be he can testify and say here's what it really looks

21    like and here's what it looks like with a wide-angle panoramic

22    lens, but it's not really an accurate depiction of what reality

23    is.

24         MS. MORRIS:  Judge, we didn't call it a chalet.  They

25    called it a chalet.  That's what it is.  It's a ski chalet.

1    That's what the senator refers to it as, so, I mean, just to be

2    clear, we didn't take any pictures to make it look any better

3    than what it was.  We took pictures to complete the whole house

4    and all of the renovations and all of the improvements that had

5    been done to the house.  And let's be clear, we're not trying to

6    say anything other than what it is.  It was a small, modest

7    house that was actually physically lifted and a whole another

8    floor to double the size of the house along with all the other

9    enhancements and bells and whistles that are put in.  So let's

10   be clear, Judge.  We're not trying to say it's more or anything

11   else.  We're just trying to state what it is, and this may be

12   all for naught.

13            THE COURT:  All right.  Everyone have a wonderful

14   weekend.

15            MS. MORRIS:  Thank you, Judge.

16            THE COURT:  Let's hear it for the Red Skins if you're

17   a Red Skins fan.

18            COURTROOM DEPUTY:  Remain seated.  This Honorable

19   Court stands adjourned until further notice.

20            (Proceedings concluded at about 3:00 p.m.)

21                          - - -

22

23

24

25

```
 1                        I N D E X

 2

 3    WITNESSES:

 4

 5         None.

 6

 7

 8

 9

10

11

12

13

14                      E X H I B I T S

15

16         None.

17

18

19

20

21

22

23

24

25
```

1

                        CERTIFICATE

2          I, JACQUELINE M. SULLIVAN, Official Court Reporter,

3  certify that the foregoing pages are a correct transcript from

4  the record of proceedings in the above-entitled matter.

5                      _____
                       JACQUELINE M. SULLIVAN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25