UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .

          Plaintiff,               .

                                   .   CR No. 08-231

     v.                            .

THEODORE F. STEVENS,               .   Washington, D.C.
                                   .   Wednesday, September 18, 2008
          Defendant.               .   10:22 a.m.
                                   .
. . . . . . . . . . . . . . .       .   ***SEALED bench conference
                                       redacted.***


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:          EDWARD SULLIVAN, ESQ.
                             United States Department of Justice
                             1400 New York Avenue, N.W.
                             12th Floor
                             Washington, D.C.  20005
                             202-514-1412


                             JAMES A. GOEKE, ESQ.
                             United States Attorney's Office
                             District of Alaska
                             222 W. Seventh Avenue
                             Federal Building and U.S. Courthouse
                             Anchorage, Alaska  99513-7567
                             907-271-5071


APPEARANCES con't. on next page.

1    APPEARANCES, con't.

2

3

     For the Defendant:          ROBERT M. CARY, ESQ.
4                                ALEX G. ROMAIN, ESQ.
                                 BETH STEWART, ESQ.
5                                CRAIG SINGER, ESQ.
                                 Williams & Connolly, LLP
6                                725 Twelfth Street, N.W.
                                 Washington, D.C.  20005
7                                202-434-5000

8

9

10

     Court Reporter:            JACQUELINE M. SULLIVAN, RPR
11                               Official Court Reporter
                                 U.S. Courthouse, Room 6720
12                               333 Constitution Avenue, NW
                                 Washington, D.C. 20001
13                               202-354-3187

14

15

16   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S
 2           COURTROOM DEPUTY:  Criminal case 08-231, United States
 3   vs. Theodore Stevens.
 4           Will counsel please identify yourselves for the
 5   record?
 6           MR. E. SULLIVAN:  For the government, Edward Sullivan.
 7           MR. GOEKE:  And for the government, James Goeke.
 8           MR. E. SULLIVAN:  And Chad Joy from the Federal Bureau
 9   of Investigation.
10           MR. CARY:  Good morning, your Honor.  For Senator
11   Stevens, Rob Cary, Alex Romain, Craig Singer, Beth Stewart.
12   Senator Stevens is not here this morning.  He waives his
13   appearance.  He'll be here Monday.
14           THE COURT:  All right.  Good morning.
15           I want to go over a few matters today.  Let me focus
16   on the questionnaire first.  I'll entertain any objections
17   anyone has, and as I indicated at the last hearing, if someone
18   has a really burning desire to have me consider adding another
19   question, let me know what it is.
20           Any objections?
21           MR. ROMAIN:  Good morning, your Honor.  Alex Romain.
22           We don't have an objection.  We just wanted to point
23   out a few minor issues if we could.
24           On page two of the questionnaire in the first full
25   paragraph, on the fourth line where it says including
```

 1    renovations to his home in Alaska, a car.  I believe that the

 2    government's allegation is a reduced price for a car.  I just

 3    wanted to --

 4                THE COURT:  Any objection to that?

 5                MR. E. SULLIVAN:  No, your Honor.

 6                THE COURT:  All right.  Reduced price for a car.  All

 7    right, that's fine.  That's my recollection as well.

 8                Go ahead.

 9                MR. ROMAIN:  On page twelve at number 38 I would

10    simply note that we would ask that the word "special" be

11    stricken, and that any opinion that affects the decision would

12    be relevant.

13                THE COURT:  Am I going to open up the floodgates for

14    all opinions by doing that?

15                MR. ROMAIN:  No.  Just that one.

16                THE COURT:  "Have you formed opinions concerning

17    defense attorneys?"  Maybe the question should be, "Have you

18    formed negative opinions?"  What's wrong with that?

19                MR. ROMAIN:  I think perhaps "strong opinions" might

20    make it neutral.

21                THE COURT:  Strong opinions?

22                What does the government have to say to that?  I mean,

23    opinions, you know, we're talking.

24                MR. E. SULLIVAN:  Substitute "strong" for "special."

25    I don't think we'd object to that.

```
 1              THE COURT:  Strong?  All right, that's fine.

 2         What else?

 3              MR. ROMAIN:  Fine links, your Honor, on page 18 at

 4    number 63.

 5              THE COURT:  Just a minute.

 6              All right.

 7              MR. ROMAIN:  For defense counsel, we need to add

 8    another attorney, Beth A. Stewart, who has entered her Notice of

 9    Appearance in this case.

10              THE COURT:  All right.  Should I leave some more blank

11    lines on this one?

12              MR. ROMAIN:  No, your Honor.

13              THE COURT:  We'll make sure we get the correct

14    spelling.  Actually, she entered her appearance on ECF.

15              MR. ROMAIN:  Yes, she did.

16              I'm sorry, I just wanted to note one other thing.  At

17    number 64 at 65, which delineates the government and defense

18    exhibits, we would propose having a combined list of witnesses.

19              THE COURT:  Well, then, if you do that -- I don't

20    really have any problems with that.  If you do that, you want

21    the Court to read the question?  I don't have any problems with

22    that.

23              What do you have to say to that?  I don't have any

24    problems with that.

25              MR. E. SULLIVAN:  That will do.
```

 1                THE COURT:  What I'll do is I'll say the parties may

 2      or may not call the following witnesses.

 3                MR. ROMAIN:  Thank you, your Honor.

 4                THE COURT:  I'll do that.  That's fine.

 5                MR. E. SULLIVAN:  Fair enough.

 6                THE COURT:  Any additional questions you want?

 7                MR. ROMAIN:  No, not with respect to that.  Thank you.

 8                THE COURT:  I'm not going to ask you again.

 9           What about the government, any questions, any

10      additional questions?

11                MR. E. SULLIVAN:  No, your Honor.

12                THE COURT:  All right.  Then we have a questionnaire

13      anyway.  All right, that's fine.

14           There's one change with respect to the questionnaire.

15      It says to the jurors that we'll be taking testimony from I

16      think 9:00 to 4:30.  I'm going to change that to 9:30 to 5:00

17      each day.  That's the only other change.

18           I do need your witness list, your prospective witness

19      list, just for my eyes only.  I'm just going to read from that

20      during voir dire.  You don't have to follow that if you don't

21      want to right now.

22           While we're talking about voir dire, let me just go

23      over a couple of other details.  We have a requisite number of

24      jurors qualified to report on Monday.  I'm going to ask the jury

25      office to make sure that they're present in the jury lounge by

1    no later than 8:30 so they can receive introductory comments

2    that the jury office normally gives jurors, and be ready to

3    proceed promptly at 9:00.  I have other matters scheduled that

4    day and I think my presence is required in another courtroom

5    around 9:30 or so, so I'm going to start as close to 9:00, which

6    means that the attorneys and the parties should be present at

7    9:00.  The media can be in the courtroom for purposes of my

8    brief instructions with respect to voir dire, and normally I

9    provide an overview of just what voir dire is about:  their

10   obligation to speak truthfully, about how important it is to

11   serve.

12          This panel has been pre-screened.  It may well be,

13   though, in the sense of pre-screening, if someone has

14   nonrefundable tickets to go to some nice place, that would be a

15   compelling reason, or someone has to have elective surgery or

16   something like that, that would be a pretty compelling reason to

17   be excused.

18          But I do spend a few minutes talking to the jurors

19   about how important it is to serve as a juror when requested to

20   do so, and that I strongly encourage them to bring only the most

21   compelling reasons to my attention of why they can't serve.  So

22   it will take five minutes, ten minutes or so.

23          And then I'm going to ask everyone, I'm going to tell

24   the jurors, explain to them the process, that they have to

25   complete the questionnaire, when they complete it they can

1    leave, and that's all the instructions I'm going to give them.

2    They can't ask Carol any questions, they can't ask anyone in the

3    courtroom any questions, and then everyone is going to leave.

4    Once the questionnaires are completed and once Carol has all the

5    answers, then the jury office will, for want of another word,

6    shuffle the questionnaires.  We're not going to bring back the

7    first 75 who have completed the next day.  We'll randomly -- the

8    juror office will randomly select 75 jurors to come back the

9    next day, 40 in the morning and 35 in the afternoon the first

10   day, and if necessary, we'll repeat that process the second day.

11         It's important that we assemble at three o'clock, the

12   attorneys, and the parties, if appropriate, assemble at three

13   o'clock so that the attorneys will know the numbers of those

14   jurors who will be present the following day so that you can go

15   over the answers that evening and be prepared to start at -- I

16   think it's probably not possible to start at 9:00.  We'll

17   probably have to start at 9:30, and that voir dire process will

18   take place in this courtroom.

19         I've already provided Mr. Snook with a guide for the

20   seating of media, family members, etcetera.  No one other than

21   the attorneys and security will be in the well of the court in

22   the first row on my right-hand side.  If you have support staff

23   who are going to help you, they can sit in that first row, and

24   with respect to the government, they can sit on -- support staff

25   can sit in the first row, but no family members, friends, or

1   anyone else in the well of the court.

2           The media reps who will participate in voir dire, and

3   this has been prearranged with Mr. Snook and Ms. Gatski, also

4   known as Shelly and Jenna, so they're probably looking around

5   saying who's Mr. Snook, Shelly and Jenna?  Thank you very much

6   for everything they've done and everyone else.  The media reps

7   will be one from each media, the news print, and this has been

8   prearranged, and the media representatives know who they are.

9   There's an overflow room somewhere, but Shelly and Jenna can

10  tell you where that is.  There's a media room.  The media

11  personalities know where that room is.  That's all I need to say

12  right now about voir dire, but we're going to reassemble at

13  three o'clock, and it's important we do it at three o'clock

14  because the jury office has to post recordings for the 40 jurors

15  and 35 jurors respectively to advise them in a timely manner

16  when they have to report the next day.

17          The completed questionnaires pursuant to arrangements

18  by the Court and court staff will be copied.  One copy will be

19  given to the attorneys.  We're not going to do the multiple

20  copies, and the attorneys have worked out just how they're going

21  to make the multiple copies.  I emphasize that the completed

22  questionnaires are confidential, shall not be distributed or

23  discussed with anyone other than co-counsel, the immediate trial

24  team members and your principals, and of course Senator Stevens.

25          As I've stated, I've already talked about randomly

1    selecting the 75 jurors, and that's about it.  At three o'clock

2    we can talk about any final issues that have come up with

3    respect to voir dire.

4            I've considered the motion to produce medical records

5    for Mr. Allen.  Over objection I'm going to grant that motion,

6    and I'm going to direct that his medical records as they pertain

7    to the motorcycle accident only shall be produced pursuant to a

8    protective order, and I want to finalize that protective order

9    today.  I'll direct that counsel, and this comes as no surprise,

10   draft a protective order.  I'm sure you can readily agree on the

11   terms of one.  If you can't, let me know what your disagreement

12   is, but I'm going to sign that protective order today.  The

13   medical records do not, in fact, shall not be filed on the

14   public docket.  And there will be a couple of other conditions.

15           Prior to utilization of those medical records in any

16   way or prior to any attempt to have an expert or any other

17   medical person testify, I'm going to need a proffer outside the

18   presence of the jury and outside the presence of the public with

19   respect to the relevance of either the utilization of the

20   medical records and/or the testimony of the proposed expert.  I

21   emphasize, it's only the records that pertain to the motorcycle

22   accident, that's it.  That's over objection.  I'd like to get

23   that protective order today, and I expect that the subpoena will

24   be complied with forthwith, and if there are any problems

25   enforcing the subpoena I need to know.

```
 1              Now, let me just say one thing, and I'm not being
 2     critical and I'm certainly not trying to embarrass you when
 3     everyone has worked very hard.  The attorneys have worked very
 4     hard, my staff has worked very hard, I've worked very hard, and
 5     do you know what?  We're going to make mistakes every now and
 6     then.  It wasn't until late evening, and it was late evening
 7     because there are a few other matters on my calendar that I have
 8     to spend some time and attention addressing, but it wasn't until
 9     late evening that we realized that, contrary to my instructions
10     to the parties, it was very simple and straightforward, if you
11     object to an exhibit give me a copy of the exhibit that you
12     object to and the basis for your objection.  Government gave us
13     all of their exhibits.  I didn't need all of your exhibits.
14     Now, I don't want someone going back, I don't want to hear that
15     some paralegal has been fired or delivery person has been fired.
16     That's not the purpose of this, but, you know, it impeded my
17     ability.  You may have gotten to your office this morning and
18     noted a call from Addy at, I don't know, 10:30 or 11:00.  That's
19     why she was calling.  We realized we couldn't deal with a major
20     part of what we wanted to deal with.  I just caution everybody,
21     just slow down.  I mean, all of this is important, and again,
22     I'm not being critical.  I just wasn't able to accomplish
23     everything I wanted to.  Thankfully the defendants -- let me
24     thank the defense team.  You provided copies of the relevant
25     exhibits, but we realized that it was just too late in the night
```

1    to do anything, so I wasn't able to get as far along as I wanted

2    to with respect to considering all the government's objections,

3    and the more I thought about it, there's probably more

4    flexibility with the government's objections because the

5    government is going to present its case first, but we try to

6    take advantage of all available time, and that's something we

7    just don't have a lot of between now and when this trial starts,

8    so I just caution you to be a little more attentive to requests

9    by the Court.

10            And again, I'm not being critical, I'm not trying to

11    embarrass anyone on the defense side, but I did grant over

12    objection the medical records, but there's one thing that

13    concerned me, and I'm going to bring it to your attention.  I'm

14    not casting any aspersions on the integrity of the defendant's

15    attorneys, I'm not doing anything like that, but some time ago I

16    recall that a local bar association asked me and some other

17    judges to prepare some tips from the bench to help some new

18    lawyers and some lawyers not so new, and we did that.  We spent

19    a lot of time doing it.  It was fun, it was important, it was

20    interesting, and one of the things we stressed is, be careful

21    how you use ellipsis.  You know, be very careful how you use

22    ellipsis, because judges look at ellipsis to see what was

23    deleted, and it wasn't ellipsis that appeared in the reply brief

24    that focuses on language from the George case and the ellipsis

25    appeared in place of the word "only," and that changes the

 1    meaning of that sentence, and those are things that cause us to

 2    pause.  You know, I granted you the relief, I didn't hold it

 3    against you, and I wouldn't hold it against anyone because of

 4    that, but I just bring it to your attention because at this

 5    stage, at this level, judges shouldn't be focusing on ellipsis,

 6    but we do.  When we see it we want to know what's the reason for

 7    this ellipsis.  The word "only" should have appeared and it

 8    didn't appear and that arguably changes the meaning of that

 9    sentence, but that's all I want to say.  Hint to the wise should

10    be sufficient.

11            You've got to ban the production of the records, and I

12    need to know how much time is it going to take.  If anyone has a

13    calculated prediction of how much time it will take to get those

14    records I assume -- I don't want to assume anything.  The

15    government doesn't have possession of the documents.  I don't

16    know.  How much time do you think?

17            MR. E. SULLIVAN:  With respect to the medical records?

18            THE COURT:  Right.

19            MR. E. SULLIVAN:  I think we can work with defense

20    counsel to contact counsel for Mr. Allen and try to work out

21    getting it done expeditiously.

22            THE COURT:  That's fine, that's fine.

23            MR. CARY:  Agreed, your Honor.

24            THE COURT:  I want a copy for the Court, I want a copy

25    for the government, I want a copy for the defense counsel.  All

1   the copies shall be under seal and pursuant to protective order

2   and not to be discussed publicly and not to be utilized without

3   further Court order.

4           Now, I'm going to focus, I want to go quickly through

5   the objections, because --

6           MR. CARY:  Your Honor, if I may before we move past

7   the medical records, I just want to clarify that I understand

8   there will be a protective order that we're to work out the

9   terms, and we understand.

10          THE COURT:  I'm sure you can do it, but if you can't,

11  if you disagree on some terms, let me know.  I'd like to get

12  that signed today.

13          MR. CARY:  Fair enough, your Honor.

14          THE COURT:  All right.  I'm confident that counsel and

15  the government can work out the terms of the protective order.

16          All right.  With respect to those exhibits produced by

17  the government that have grand jury exhibits, has that issue

18  been addressed yet, grand jury exhibit stickers?

19          MR. E. SULLIVAN:  Your Honor, we have been addressing

20  it with defense counsel, but we can agree to what they're

21  proposing, which is I think if we just introduce the exhibit

22  without the grand jury sticker on it.

23          THE COURT:  That's fine.  That's fine.  I thought you

24  could.

25          Let me start at the beginning.  There was an

1   objection, and I don't want to spend a lot of time, there was an

2   objection to the form of the government's exhibit production.

3   Defendant claims they had to spend a lot of hours to process it.

4   Is this still a viable objection?  Is there anything else I can

5   do to make your life a little easier?

6           MR. CARY:  No, your Honor.  It was just, by way of

7   explanation, that we had to do this in a hurry, your Honor.

8           THE COURT:  All right.

9           There's the hearsay objection to the audiotapes, the

10  tapes with the senator on it.  As we know, they come in.  What

11  defendant is arguing about, I assume, are tapes that are between

12  people other than a party to this case.  What's the evidentiary

13  basis for those tapes?  And I think there are one, two, three,

14  four, five, eight tapes that come in.

15          MR. GOEKE:  The Court's correct, your Honor.  The

16  defendants object to the eight tapes where Senator Stevens does

17  not appear on the tape.  The government's position is with

18  regard to four of those -- let me grab my -- Exhibit 656, 659,

19  660, and 662, those audiotapes involve co-conspirator statements

20  that come in under 801(d)(2)(e), and they involve a conversation

21  with Mr. Allen and Mr. Ladd, Mr. Allen and Ms. Croft, and two

22  conversations with Mr. Allen and Mr. Persons, and if you go to

23  654, 665, 664 and 665, those are conversations with Mr. Allen.

24  Three involve relatives of his, sisters and brothers, and one

25  involves Mr. Rick Smith, a coworker of his.  The government

1    intends to introduce those as prior inconsistent statements when

2    Mr. Allen is inevitably impeached on some of the content of

3    those statements.  And specifically focusing in particular on

4    the conversation in Exhibit 662, the reason that defense doesn't

5    want those in, it has very probative information, from the

6    government's point of view.  Mr. Persons says to Mr. Allen the

7    senator gets hysterical when he has to spend his own money,

8    things of that nature, and it's clear it's a joint-venture-type

9    of situation.  Like the situation in the United States v Gewyn,

10   471 F 3rd 197, a D.C. Circuit case from 2006.

11             THE COURT:  What's that citation?

12             MR. GOEKE:  471 F 3rd 197, D.C. Circuit, a 2006 case.

13   I have a copy for the Court if you'd like.  May I approach, your

14   Honor?

15             THE COURT:  You can just pass it up to Carol.

16             MR. CARY:  May I have a copy as well, please?

17             THE COURT:  Here.  Here, take mine.  I can read it

18   after.

19             MR. CARY:  And I want to know while there's a pause,

20   there's no conspiracy allegation in this indictment, your Honor.

21             MR. GOEKE:  That's exactly what that case said-there

22   need not be a conspiracy allegation in this case.  It need not

23   be an unlawful conspiracy.  It doesn't need to be conspiracy.

24   It needs to be a joint venture.  The doctrine is not limited.

25   Gewyn simply states --

1          THE COURT:  That's from our Circuit?

2          MR. GOEKE:  From this Circuit.

3          When two or more individuals are acting in concert

4    toward a common goal, the out-of-court statements are admissible

5    towards the others made in furtherance of that common goal.

6          Looking at, for instance, the conversation in

7    Government's Exhibit 662, Mr. Allen and Mr. Persons are talking

8    in the context of a horse partnership the senator is involved

9    in, and they're making statements generally speaking about the

10   senator's financial situation, the fact that part of the

11   conversation the government is particularly interested in, Mr.

12   Persons says, and I'll directly quote:  As Catherine says, Ted

13   gets hysterical when he has to spend his own money.  Laughter.

14   So I want to keep it down because -- and you know the other flip

15   side of it is he gets hysterical because he can't really afford

16   to pay a bunch of money, I don't think, and after Allen says, I

17   know.  That's talking about the financial situation of the

18   senator as those two individuals perceive it, and it's talking

19   about a venture to which the senator is a part of.

20          THE COURT:  All right.

21          MR. GOEKE:  That's a similar situation to the other

22   three conversations the government seeks to admit directly, not

23   as hearsay, under 801.  The situation, the conversation

24   involving Mr. Ladd, Mr. Ladd calls Mr. Allen and states to -- in

25   substance states to Mr. Allen that he has been asked by the

senator to talk to Mr. Allen about a possibility of a job for
the senator's son.  He relates what the senator told him to do
and talks to Mr. Allen about it.  The joint venture interest is
to get the senator's son a job.  It's a conversation toward a
common goal.

          The other conversation involving Mr. Persons, Mr.
Persons and Mr. Allen have a rather lengthy discussion about
several things.  One of them is the payment of an invoice for
work that was done at the senator's house that Mr. Allen paid
half of, and the senator received a bill.  There's other
conversations that relate to that.  The conversation of Ms.
Croft is a precursor to that conversation.  It relates directly
to I got an e-mail -- Ms. Croft relates in substance I got an
e-mail from the senator.  He says he needs to pay that bill.
She reads the e-mail in the course of the conversation to Mr.
Allen.  That leads to the conversation with Mr. Persons later
that same day.  They discuss the bill.  The common venture
there, it relates back -- in a large picture it relates back to
the chalet, to the house.  Mr. Persons and Mr. Allen are talking
about improvements on the chalet.  The senator knows about it.
We already know from the previous conversation that he has sent
an e-mail to Mr. Allen that his secretary has read to him over
the phone.  There is a macro and a micro joint venture there.
The joint venture toward the common goal is to provide an
improvement to the senator's house that the senator doesn't have

1    to pay for, specific to the boiler, and in the larger instance

2    to provide an improvement, and affixed to the larger house that

3    is being an ongoing common scheme between Mr. Persons, Mr.

4    Allen, and the senator since 2000 -- on into 2006.  That clearly

5    is a large part of the government's -- the context of the

6    government's indictment, and it relates back to the disclosure.

7    These are benefits provided to the senator that were not

8    disclosed.  The senator is a part of this venture in the

9    discussion with Mr. Persons about the boiler bill.  The

10   discussion is plain about, well, how can we involve the senator

11   in this?  Mr. Allen or Mr. Persons suggested to Mr. Allen maybe

12   you can write him a check and he wouldn't cash it.  They're

13   talking about the senator's involvement, they're talking about

14   contact with the senator.  The senator is talking about

15   contacting them.  They're all working towards a common

16   objective.

17            Lastly, with regard to the -- yes -- that

18   conversation, the conversations with Mr. Persons, those are 660,

19   662, and the conversation with Ms. Croft and Mr. Ladd.  The

20   other four conversations, arguably the government could seek

21   their admissibility under 801.  Frankly, in this case, given the

22   nature of those conversations, those are going to be -- the

23   government will seek to admit those as prior inconsistent

24   statements after Mr. Allen testifies.

25            THE COURT:  All right.  You were just handed that

 1    case.  If you want to submit some authority that opposes that

 2    authority I'll certainly give you that opportunity, and I may

 3    have to address any further objections on the morning of the day

 4    that the government plans to introduce those tapes.

 5              MR. CARY:  We'd be happy to take them up.  I would

 6    simply note, I underlined your case a little bit, your Honor.

 7              THE COURT:  That's all right.

 8              MR. CARY:  May I provide you a clean one later?  But I

 9    do note the very first sentence says it is a conspiracy case,

10    the case he cites, and I also would note that the government has

11    told us they're going to give us transcripts of the --

12              THE COURT:  You've not received the transcripts?

13              MR. CARY:  We've not received those yet.

14              THE COURT:  What about those, counsel?

15              MR. E. SULLIVAN:  Your Honor, we just provided them

16    with CDs that have transcripts on them.  We would note, though,

17    that they are stickers -- they are rough transcripts.  What

18    we're going to propose at some point today is, as those become

19    finalized, if we could resticker with the same number but put in

20    a final draft.

21              THE COURT:  That's fine, because that was going to be

22    one of the questions, whether or not you had a transcript for

23    the Court to take a look at over the weekend.

24              MR. E. SULLIVAN:  In that regard, your Honor, we do

25    have CDs for the Court if you'd like us to drop them off now.

1          THE COURT:  How long are those tapes?  Fairly long,

2     aren't they?

3          MR. E. SULLIVAN:  Some of them are.

4          THE COURT:  I prefer to listen to the relevant portion

5     or read the relevant portion of the transcript, and I'm sure

6     they prefer to do that as well.  You're going to get the

7     transcripts to them today and just provide the Court with a copy

8     of the transcripts?

9          MR. E. SULLIVAN:  Just to be clear, they already have

10    the transcripts.

11         THE COURT:  They already have the transcripts?

12         MR. E. SULLIVAN:  We can provide a copy right now if

13    they want a hard copy.

14         MR. CARY:  I would like a copy, please.

15         I would note the first example that Mr. Geoke gave

16    involves a horse partnership.  There's absolutely no allegation

17    that there's anything wrong with that.  As I understood it, Mr.

18    Allen and Mr. Persons are talking about something that Mrs.

19    Stevens said.  They lost money on that venture, and it strikes

20    us as at least triple hearsay, but we'll address it for the

21    Court.

22         THE COURT:  You can address that.  All right.  I'm

23    going to focus on the "official act" objections, and I want to

24    be fair about this to defense counsel.  I recognize that your

25    objections were filed prior to the Court's ruling, and the Court

did rule after it reviewed some of the grand jury exhibits and

other materials provided to the grand jury.  The Court ruled

that there was no overall impediment to utilization of that

information that does not pertain to legislative acts as

legislative acts have been defined by Rostenkowski and other

cases in this Circuit and the Supreme Court.

        So at the time you prepared this you made objections

to 320 of the exhibits.  The Court did recognize also that there

was some exhibits that were problematic.  The Court indicated it

would be vigilant and expected defense counsel to be vigilant,

and I have every reason to believe that they will be vigilant in

an effort to keep from the jury's consideration, and indeed the

evidentiary record, any inappropriate speech-or-debate clause

material.  It seems to me that the better part of wisdom is, as

opposed to going through all these 300-plus exhibits, some of

which, the vast majority of which, based on the Court's review,

are not legislative.  It seems to me the better part of wisdom

says the defendants will receive on a daily basis Jencks

material, and at the end of the day the defendants will know who

the government's witnesses are for the next day.  It seems to me

that you should that evening identify those exhibits that you

truly believe are legislative, I mean truly believe violate the

speech-and-debate clause consistent with Rostenkowski and other

precedent and let me know what your objections are to those

exhibits, and I'm going to at some point today or tomorrow issue

1    a written order that sets forth a procedure for the defendant

2    and/or the government to inform the Court by a certain time,

3    either in the evening or early morning, what their objections

4    are to exhibits that they know that the government or defendant

5    will attempt to use that following day so that I can address

6    those exhibits and finally rule before the jury is seated that

7    morning, so I don't know what the time setting will be.  I don't

8    know what the time deadlines will be for you to do that.  But I

9    did recognize that there's some exhibits that won't come in.

10   But I've already ruled.  I've granted the government's motion

11   for in-limine relief, that they can use those exhibits that

12   don't cross the line, recognizing that there are some exhibits

13   that might be problematic, but I also recognize that there was

14   not a pervasive use of the improper speech-and-debate material

15   before the grand jury.

16        Let me ask you a question.  You've heard what the

17   Court's going to do.  What would be fair, let the Court know and

18   your opponent know, about what time that evening?  Is eight or

19   nine o'clock that evening with respect to you'll know who the

20   next witness is?  For instance, hypothetically if it's a

21   legislative aide, then, you know, you have some idea what

22   exhibits the government is going to use in an effort to question

23   that aide.  So what makes sense?  By eight o'clock that evening,

24   nine o'clock that evening?  Let us know what your objections are

25   earlier.  I mean, we're going to be here till five o'clock every

1    day.

2            MR. CARY:  Yes, your Honor.

3            THE COURT:  I don't want to be just arbitrary and just

4    say do it by three o'clock in the morning, because I'm not going

5    to be sitting up at three o'clock in the morning waiting for it

6    to come across, but I want to be able to get them in a timely

7    manner also so I can rule on them before the jury is seated

8    every day at 9:30.

9            MR. CARY:  Your Honor, first of all, I do think we

10   have an agreement that we'll notify each other of witnesses in

11   the morning 24 hours in advance, so, for example, if it's a

12   Friday session, by 9:00 a.m. Thursday or 9:30 or whatever.

13           THE COURT:  That's even better.  I appreciate that.

14   That's even better.

15           MR. CARY:  So we have this agreement with the

16   government already.

17           THE COURT:  So maybe we don't have this time crunch

18   then.  That makes more sense in the world than waiting till the

19   end of the day.

20           MR. CARY:  There are over a thousand exhibits, and I

21   certainly believe if we know who the witness is we'll have a

22   pretty good idea what they are, but it would be helpful if we

23   knew what exhibits they're going to use as well.

24           I would also note, however, that we don't believe that

25   we should have to turn over impeachment or cross-examination

1    exhibits, which I don't think is what the Court has in mind.

2              THE COURT:  No.  I'm talking about case-in-chief

3    exhibits.  They made their objection.  I didn't dismiss.  I

4    granted their motions for limine, and I recognize that there's

5    some exhibits that cross the line, but there was no pervasive

6    use, but the burden should be on the defendant now, though,

7    during the trial to say, Judge, this legislative aide is going

8    to testify.  This is what happened, this is what he will testify

9    to, this crosses the line.  Let me know.  Let me know.

10             MR. CARY:  I would suggest eight o'clock in the

11   evening, your Honor.

12             THE COURT:  But that means every night they're up

13   until midnight.  Eight o'clock, I'll give it some thought.

14             MR. CARY:  We can give it some more thought too, your

15   Honor.

16             THE COURT:  All right.  All right.  At some point I'll

17   take a recess and you can talk with your opposing counsel.  I

18   want to be fair about that, but maybe eight o'clock is probably

19   the best we can do.  We'll talk about it after I recess and I'll

20   give you a chance to speak to your opposing counsel.  I've

21   already ruled on this, and I recognize you filed this before and

22   that's fine, but I'm just not going to go over all these

23   documents now, but I do recognize they're somewhat problematic.

24             MR. CARY:  Your Honor, just to be clear for the

25   record, just to preserve the record, our objection goes beyond

1    the documents themselves.

2            THE COURT:  I understand that.  No.  You're not

3    willing to waive your objection at all.  I understand that.  You

4    moved to dismiss, I denied it.  You know, you opposed the

5    government's motion in limine, and arguably from your point of

6    view all these documents cross the line.  I've already ruled

7    that most of them don't, so you're going to be vigilant and

8    point out the ones that really -- I recognize there are at hand,

9    there are some that are not going to come in this evidentiary

10   record.

11           MR. CARY:  Understood, your Honor.  And our position

12   as well, just to make it clear, by introducing these documents

13   it's going to open the floodgates to legislative --

14           THE COURT:  No, it won't.

15           MR. CARY:  Also we have a 403 record.

16           THE COURT:  Because I'm not going to allow any flood

17   in here.  No, it's not going to happen.

18           I'm concerned about the next category, the large

19   quantities of undifferentiated documents, especially the

20   Government Exhibit 370, the 2,200-page collection.  I'm not

21   going to allow that document to come into the evidentiary

22   record, or is there a reason I should consider allowing it to

23   come into the record?

24           MR. E. SULLIVAN:  Your Honor, we believe that there

25   actually is a good reason to allow the introduction of the

1    document.  Obviously one of the central issues in the case is

2    whether Senator Stevens may or may not have reimbursed any of

3    the costs associated with the Girdwood residence.  These

4    financial records relate primarily to all the accounts of

5    Senator Stevens, so there will be a witness to testify about the

6    review of those financial records with respect to any payments

7    that may have been made or not.  So we think it's important to

8    introduce exhibits.  We do recognize that the one in particular

9    is quite voluminous, but we were interested in stickering those

10   exhibits, introducing them so that the witness could testify

11   that in fact they had reviewed all of the -- in that case, all

12   of the McKinley capital account or another account, and discuss

13   on the stand what that review showed with respect to payments by

14   Senator Stevens.

15              THE COURT:  Counsel?

16              MR. CARY:  Your Honor, this is a Rule 1006 summary

17   witness.  I think we need some indication of what that review

18   has indicated.  Moreover, they've gone over their financial

19   records with an electronic microscope.  They should not dump all

20   of them, every single transaction.  There are credit cards

21   purely completely unrelated to this.  All their bank accounts

22   should not be part of the public record in this case.

23              THE COURT:  I totally agree.  If they come in at all

24   they come in with appropriate redactions:  numbers, credit card

25   numbers, just a document, with tax returns or not.

1    MR. CARY:  I frankly forget which one it is.  It's

2    such a voluminous amount of material that it's hard to imagine

3    the jury being able to digest it.

4    And their lives should not just be completely -- every

5    single transaction that they've ever encountered in the past

6    eight years is not appropriate.

7    THE COURT:  What's the relevance of all these

8    transactions?  There may be some that are relevant.  Every

9    transaction is relevant, the 2,200-pages of documents?

10   MR. E. SULLIVAN:  It's not the individual

11   transactions.  It's to show what is not there, and credit card

12   receipts, credit card transactions, are relevant to determine

13   whether or not Senator Stevens repaid -- in our position, repaid

14   certain costs incurred by VECO Corporation, so the witness needs

15   to indicate that in fact those accounts had been reviewed and

16   that in fact there has not been a reimbursement of costs

17   incurred by VECO, so we're not --

18   THE COURT:  Is there something, is there another way

19   we can deal with this, by way of a stipulation?  Is that

20   appropriate?

21   MR. CARY:  Well, the stipulation that was proposed to

22   us, it just all gets dumped into evidence.

23   THE COURT:  No.  Maybe the documents in their entirety

24   don't need to become a part of the evidentiary record at all as

25   long as the parties can agree on what the documents show and

what the documents don't show.

MR. CARY:  Your Honor, this is the first I've heard of this witness and what is proffered, and I'd be interested to know what the testimony is, and then we certainly could discuss it, yes.

THE COURT:  I think you probably can, because the jurors -- there are 2,200 pages.  I mean, that's going to tie them up for a significant amount of time.

It would seem to me on the one hand if it's appropriate for this witness to testify, and it strikes me that it's highly appropriate for the witness to testify, he or she will say what the records show and what they don't show.  No one needs to see the identifying information.  The credit card numbers, Social Security numbers, bank account numbers, that strikes me that it's extremely workable that the parties could stipulate that the witness has reviewed the documents, that indeed the documents consist of X number of pages, that the documents cover a certain period of time, and that indeed the document show things and don't show certain things, subject of course to your cross-examination and utilization of any portion of the record.

MR. CARY:  That makes sense.  I'd like to hear what the testimony is going to be and then we can certainly discuss it.

THE COURT:  It's extremely workable.  We've done it

1    before in other cases.

2         MR. E. SULLIVAN:  Absolutely, your Honor.  We do think

3    it's workable.  We'll talk to counsel about their issue.  To be

4    clear, we didn't intend to introduce the exhibits with Social

5    Security numbers, account numbers.

6         THE COURT:  Right.  That's going to be a Herculean

7    task on the part of someone over the weekend to redact the

8    exhibits.

9         I might as well shift gears.  All the exhibits are

10   going to be part of the evidentiary record each day for the

11   public.  The government had planned to post the exhibits on the

12   government's website.

13        MR. E. SULLIVAN:  I think, your Honor, I proposed

14   that -- frankly, I have to check with my colleagues about what

15   we ultimately decided.

16        THE COURT:  All right.  There's no way the Court can

17   help you in that regard.  We just don't have the resources to

18   take copies each day and post them.  I don't know where we post

19   them.  We have a website, but it's for official use.  The public

20   does have an interest in this case.  I would encourage the

21   parties to think about a way in which at the end of each day

22   evidence that has been admitted into the evidentiary record is

23   indeed posted for the benefit of the public.  It strikes me that

24   it's workable using the government's website, but I don't know.

25   Maybe that's overreaching, I don't know, but we don't have a

1   website that can accommodate this.  And to make paper copies for

2   everyone would just be a task that we just don't have the man-

3   or woman-power to do.

4        MR. E. SULLIVAN:  Fair enough.  I do believe they did

5   something similar to this in the <u>Libby</u> trial.

6        THE COURT:  They did, they did, and I think

7   independent counsel had a separate website, I think.  Maybe you

8   can create one for Stevens or a subset of your web.  I think

9   it's workable.  I don't know how independent counsel did that.

10  I don't know.

11       MR. E. SULLIVAN:  When you start talking about

12  creating websites you've already past my technology level, so

13  I'll have to check and see what's doable and what's not.  But as

14  far as the financial records, I think we can work something out.

15       THE COURT:  I think you can, counsel.  I'd be very

16  reluctant to allow a 2,200-page document to come into the

17  record.  I think the parties can reach an appropriate

18  stipulation.  Where you can't stipulate maybe it's appropriate

19  for the Court to allow questioning, and it probably would be

20  appropriate, but based on what you're telling me, I think it's

21  extremely workable, that you can work out the stipulation and

22  spare everyone the receipt of 2,200 pages.  All right.  That

23  deals with Roman numeral IV.

24       The factual stipulations associated with the plea

25  agreements, the plea agreements are public documents.  What's

1    your objection there?

2         MR. CARY:  Your Honor, it's actually, and I apologize,

3    we actually wrote down the wrong number and attached the wrong

4    number.  There are actually separate stipulated facts both for

5    Mr. Allen and Mr. Smith, who I don't believe is on the

6    government witness list at this point.

7         THE COURT:  Do you know what?  I misspoke also.  I've

8    not ruled as a matter of law -- I want to correct the record --

9    I've not ruled as a matter of law that indeed there are some

10   grand jury exhibits that cross the line.  I said potentially

11   there could be an argument made, so I want to be very clear

12   about that, so I haven't said that the grand jury process was

13   tainted.  If I said that, I misspoke.  There is room for

14   argument with respect to some of the documents, so I invite you

15   to make the argument with respect to some.  The vast majority

16   are, in the Court's view, not legislative at all, so I want to

17   clear the record up there.

18        MR. CARY:  Your Honor, to go back to stipulated facts,

19   for example, with respect to Mr. Allen, Government Exhibit 242,

20   and I apologize, we wrote down 241 on our log.  It's actually

21   242.  I'd be happy to hand it up to the Court.

22        THE COURT:  We all make mistakes, counsel.  What is

23   242?

24        MR. CARY:  Those are stipulated facts that are not

25   part of the plea agreement that is part of the record in the

1    preceding cases, as I understand it.

2              THE COURT:  How was that used, do you know?  Maybe the

3    government knows.

4              MR. CARY:  I don't know how they intend to use it.  It

5    may be we may not have an objection when it comes to --

6              THE COURT:  You would agree if there are stipulated

7    facts in part and parcel of the plea agreement they'd come in,

8    wouldn't they?

9              MR. CARY:  Probably, yes.

10             THE COURT:  So it's 242 that you're concerned about

11   and 243, or just 242?

12             MR. CARY:  I'm sorry.  243 and 244, although I would

13   note 244 relates to Richard Smith, who I understand is not going

14   to be a witness in this case, is not on their witness list, at

15   least in their case in chief.

16             THE COURT:  Counsel?

17             MR. E. SULLIVAN:  The stipulated facts were executed

18   by Messrs. Allen and Smith at the time of their plea, but they

19   were not made part of the plea package at the time.

20             THE COURT:  Were they sealed for some reason?

21             MR. E. SULLIVAN:  To be honest with you, I'm not sure

22   if they were.  I'm not sure if they were filed at that

23   particular time.  They're executed facts.  Mr. Allen's in

24   particular relates to his involvement with Senator Stevens.

25   They were separate from the factual basis for Mr. Allen's plea

1    and Mr. Smith's plea because what they pled to in the District

2    of Alaska related to primarily allegations involving state

3    legislators.  These stipulated facts relate to other

4    investigations, including Senator Stevens.  The reason why we

5    include them on their list is because in fact we assume that

6    there would be an attempt to impeach, for instance, Mr. Allen

7    regarding the factual allegations in the stipulated facts, so we

8    thought it would be necessary to have it on the exhibit list,

9    just like we had the plea agreement, in case it needs to also be

10   addressed on redirect.  But clearly Mr. Allen's statements would

11   be --

12           THE COURT:  So this is not an exhibit or piece of

13   evidence that the government would plan or attempt to use in its

14   case in chief, is it?

15           MR. E. SULLIVAN:  I don't believe so.

16           THE COURT:  Stipulated facts, I don't think there's a

17   basis for that.

18           MR. E. SULLIVAN:  Well, there are prior inconsistent

19   statements of Mr. Allen, so they would be admissible under

20   801(d).  To be frank, I don't think I want to commit us as to

21   whether we want to introduce that during our direct examination,

22   certainly to the extent counsel is going to impeach.  It might

23   be addressed on redirect.

24           THE COURT:  It may be rebuttal testimony, right.

25   There may be an evidentiary basis for a prior inconsistent

1   statement.  Anything further on that?

2          MR. CARY:  No, your Honor, other than to suggest I

3   think we need to wait and see how the evidence plays out.

4          THE COURT:  I totally agree on that.

5          I'm not going to spend any more time on the grand jury

6   exhibit stickers.  We've already talked about that.  The

7   government is going to deal with that.

8          The incomplete documents, I don't know, three

9   documents, 472, 714, 810, they're incomplete why?  What's your

10  basis for that?  I didn't see that.

11         MR. CARY:  Your Honor, I need to actually pull them

12  out of my box.

13         THE COURT:  Okay.  I mean, under the Rule of

14  Completeness I guess if there's a portion you want to introduce,

15  I guess you can.  I guess the government can introduce anything

16  it wants to at this point with respect to those documents.

17         MR. CARY:  472 appears to be something -- a Post-It

18  note says attaches a draft letter regarding a credit card

19  problem.  714 says keep this file together.  It is the Alaska

20  gas pipeline file, but there's no file attached.

21         THE COURT:  All right.  Have you --

22         MR. CARY:  801 appears to have no substance to it at

23  all from what we can read.  It's simply a portion of an e-mail

24  header.  That's all it appears to be, from what we see.

25         THE COURT:  All right.  Let me just, without spending

a lot of time on that, I don't know if you can address that now.
I don't want to spend a lot of time on this.  If the documents
are incomplete you need to complete them, and that is something
that counsel can work out.  If there's a further objection the
day before they testify you can just bring it to my attention
again.

If you want to spend a minute or two to explain this.

MR. E. SULLIVAN:  Just ten seconds actually.

One of them, I just noticed that the Bates ranges is,
it says page range 834 to 834.  Clearly we've made a mistake on
that, so I think it was supposed to be a multiple-page document.
We'll correct that immediately.

THE COURT:  All right.

MR. E. SULLIVAN:  And I think one of the other ones,
frankly, that got stamped was the wrong document, so we'll make
those corrections.

THE COURT:  All right.  That's fine.

The witnesses, same ruling with respect to the
witnesses the defendant believes will cross the line into the
speech and debate, improper speech and debate area.  I don't
think it's inappropriate for the Court to say that the
government knows how it's going to present its witnesses, it
knows which hypothetically legislative members of the senator's
staff, legislative members may testify, or other people may
testify, who arguably will testify about speech-or-debate issues

1    or issues that the government -- or attempt to or testify about

2    matters that the government believes does not violate the

3    speech-and-debate clause, so I think that when the government

4    tells defense counsel each morning who the witnesses are for the

5    following day, they need to let defense counsel know what

6    exhibits they're going to utilize for each of those witnesses so

7    that your objections will be in by that designated hour,

8    whatever hour it is, eight o'clock or so.  You'll know exactly

9    which objections to make to the exhibits that the government is

10   going to attempt to utilize for each witness who will testify in

11   that area.

12           I'm just thinking out loud.  If you file your

13   objections at eight o'clock and the government responds at ten,

14   that means that the Court always gets them at the midnight hour

15   then and the court staff.  All right.

16           MR. E. SULLIVAN:  Your Honor, that point, a little

17   clarification.  Is what your Honor is proposing that --

18           THE COURT:  Each morning you're going to tell the

19   defendant who you plan to call the following day.

20           MR. E. SULLIVAN:  Yes.

21           THE COURT:  All right.  Let's say it's a legislative

22   aide, and you'll say we're going to call this legislative aide,

23   and for this aide the government is going to attempt to

24   introduce the following number of exhibits through this witness,

25   so they can tell me that, Judge, they're calling this

1    legislative aide.  This person is going to violate the

2    speech-and-debate clause and these are the reasons why, and be

3    able to point to the exhibits and make their best argument, and

4    then I can rule up or down on the document without any guesswork

5    at all and no one has to try and figure out over the evening

6    hours just what documents will be utilized for that witness.  I

7    don't think that's unfair because you know what you're going to

8    do anyway with respect to a witness.

9         MR. E. SULLIVAN:  A point of clarification.  I fully

10   understand that rule and comply with it.  The clarification

11   point, let's say, for instance, it's a former staff.  Do they

12   need every exhibit that we intend to do with that witness on

13   speech and debate?

14        THE COURT:  It would be fair so they can make their

15   objections.  The Court has to be vigilant, the defense counsel

16   has to be vigilant, to keep arguably any problematic documents

17   out.  I think it's appropriate.  If you've overlooked something,

18   that's fine.  You can let me know the next day and then I can

19   deal with it outside the earshot of the jurors.  I think it's

20   only fair.  If you know the legislative aide is going to testify

21   and these exhibits are highly relevant to that person's

22   testimony, you're going to try to get those exhibits in, just

23   let them know and they can make their best objection and I can

24   rule up or down on the documents.

25        MR. E. SULLIVAN:  Thank you for the clarification.

1      The additional point, though, is, do we need to do

2  this with all witnesses, or only those that would arguably

3  approach speech-or-debate issues?

4      THE COURT:  Speech or debate is the big category.

5  That raised a good point.

6      MR. E. SULLIVAN:  I would ask if we're going to have

7  to do it with all witnesses then certainly we would expect the

8  same from defense counsel.

9      THE COURT:  Oh, absolutely, from their case in chief,

10 absolutely.  Both sides then, absolutely.  And again, the reason

11 for this is to streamline this trial and make sure it proceeds

12 just as efficiently and effectively as possible, and I agree

13 with you.

14     MR. E. SULLIVAN:  So for all cases for both sides --

15     THE COURT:  Case-in-chief witnesses, case-in-chief

16 witnesses, absolutely, absolutely.

17     MR. CARY:  And your Honor, I might add, that if we can

18 actually get a copy of them it might even be possible for us to

19 go over them during the lunch hour or promptly before we leave

20 court in order to allow them to respond to you and your staff --

21     THE COURT:  That's not an unfair request.  Let me

22 think about it.  That's not an unfair request.

23     MR. CARY:  Frankly, I need to think about it a little

24 bit too to make sure we can really do that, but we'd certainly

25 be willing to -- I think that would work.

 1              THE COURT:  Do you know what?  Let me think about it.

 2    I'll take a short recess also, but that's probably not unfair.

 3    Let me think out loud a little bit.  You're going to tell them

 4    before the trial starts who your people are the next day so then

 5    you know what the exhibits are, because this case has been,

 6    preparation for this trial has been going on for some time, so

 7    that when you tell them then exhibits should be -- when you

 8    identify the witnesses, then they should be told of the

 9    government's intended use of certain exhibits.  That way you

10    don't have to wait until eight o'clock to file and they don't

11    have to be sitting around waiting until the fax machine goes off

12    at ten o'clock.  What's reasonable, though?  If you get them

13    under those circumstances then I'm going to have to get them

14    before, I'm going to have to get them earlier in the day while

15    you're in trial, so I don't know how you can do that.  Maybe it

16    can be six o'clock and eight o'clock, I don't know.  Let me

17    think about that.  If I were to do that, and that's something

18    that does have some appeal to me, what would be fair and

19    reasonable to the defendants, because they're going to turn it

20    over early?

21              MR. CARY:  I think what would be fair and reasonable

22    is if they notify us at the beginning of the court day these are

23    witnesses for the next day and actually gave us a copy of the

24    exhibits and we can look at them while we're in court.

25              THE COURT:  Just tell you the numbers?

1        MR. CARY:  Not to complain and whine about this too

2   much, if they just say "the numbers," it's an additional step of

3   having to pull them, but that probably works.

4        MR. E. SULLIVAN:  Your Honor, just on the last point,

5   I mean, I think it suffices to say here's the witness here.

6        THE COURT:  Here are the exhibits.  I'm not going to

7   make them make copies again.  You have someone to pull them, but

8   then I need to get your objections early.  We'll talk about

9   that.  What's fair and reasonable, because you're going to be in

10  trial all day?  But, yes, I mean, that has all the appeal in the

11  world.  Otherwise we're considering these things early the next

12  morning or late at night every night.

13       MR. E. SULLIVAN:  Last point:  My only concern with

14  this procedure of giving each other the exhibit list for each

15  particular witness in advance is, certainly some of this is

16  going to have to be done on the fly if you're on redirect and

17  you're trying to address a point they raised on

18  cross-examination.  You may want to introduce an exhibit not

19  identified the previous day.

20       THE COURT:  Let me know.  There are exceptions of

21  every rule.  We're talking about the vast majority of these

22  exhibits that you're going to utilize in your case in chief.  I

23  recognize there are exceptions, absolutely.

24       MR. E. SULLIVAN:  Thank you.

25       THE COURT:  Give me a heads-up, though.  I think the

1    burden should be on the government also to give me a heads-up if

2    something comes up and you think that there's some potential

3    problem with a speech-or-debate issue.  Let me know before you

4    ask that question to keep them from objecting, to keep us from

5    taking another bench conference.  Let me know.  Just give me a

6    heads-up on it because I have a fair understanding of most of

7    your exhibits, but every now and then there's a surprise

8    exhibit, there's something new.

9              MR. E. SULLIVAN:  Sure.

10             THE COURT:  Or there's some unanticipated testimony

11   that I need to know about beforehand.

12             I think I've dealt with all the objections in a broad

13   manner that the defendants have filed.  I'm going to take a

14   short recess.  Defendant's, the government's objections we'll

15   spend some time on; a lot of hearsay objections.  I probably

16   need to know the context, and the government even admits, and I

17   appreciate the candor, that the proper foundation is laid and of

18   course it probably comes in, but I'm not going to spend time

19   today going over a couple hundred hearsay objections when it may

20   well be that there's no legitimate objection, but you don't

21   know.  You're looking for a context, you're looking for a

22   foundation, and you've raised a potential objection, and I

23   appreciate that.

24             Before we go any further, let me take about a ten-

25   minute recess and then I'll focus on the remaining categories of

1    objections that the government has raised to defendant's

2    exhibits, but I believe I've dealt with properly all the

3    objections that defendants have raised, subject to of course

4    further work for all of us, but I've dealt with that.

5            There are no other reasons to revisit the voir dire

6    issue at all.  All right, we're finished with that.  Okay.

7    We'll finalize that.  We'll make copies.

8            With respect to the voir dire, I'm not going to post

9    the voir dire on the public docket until after the jury panel

10   has been sworn.  Then of course we'll post it.  We'll never post

11   the juror numbers, but I'm just not going to post those

12   questions on the public docket until after we swear and impanel

13   a jury.  I think that's all I need to say about voir dire.

14           We'll take a ten-minute recess and I'll deal with

15   further objections and any other issues that I have to deal

16   with.

17           COURTROOM DEPUTY:  This Honorable Court now stands in

18   a brief recess.

19           (Recess taken at about 11:18 a.m.)

20           COURTROOM DEPUTY:  Please remain seated and come to

21   order.

22           (Back on the record at about 11:44 a.m.)

23           THE COURT:  All right, counsel.  With respect to the

24   government's objection, category one, and I appreciate that is

25   going to be dependent upon foundation, but let me just say

something about the procedure I'm going to put in place for
objections to exhibits.  I'm not suggesting, I'm not inviting
any and every objection that anyone has to any exhibit that an
opponent wants to introduce.  There's some that are going to be
dependent on the context, on the foundation laid.  You know it
as well as I do, so spare us all those objections.  It appears
to be hearsay.  It may be hearsay, but, you know, maybe it's a
business record exception, or maybe there's some other
foundation or maybe some other exception to the hearsay rule,
that depending on how it's introduced or attempted to be
introduced at trial will pave the way for a ruling on
admissibility, and I don't need to focus on those types of
objections and you don't need to waste your time focusing on
those types of objections in the evening or late at night, so
just for those broad categories, and I'll use speech and debate
again as an example, that type of category, although some
speech and debate questions probably will not be resolved until
some foundation is laid or some testimony heard or the issue put
in context, so I'm going to rely on your wisdom in that regard.
I'm not inviting each and every and all objections to every
exhibit, because, as we all know, there will be some objections
that cannot possibly be resolved until some testimony is
elicited from a witness, so again, a hint to the wise should be
sufficient, but, you know, if there's some that can be decided
on legal grounds, let me know what the legal grounds are.  Those

are the ones that I need to know, that aren't dependent upon
foundation, that aren't dependent upon context, that's the type
of objection that I need to attempt to resolve before the
witness testifies or before the effort is made to introduce the
exhibit into evidence.

I mean, for instance, I'm looking at the hearsay
correspondence on page three of the government's.  I mean,
there's a ton of objections.  I wouldn't attempt and wouldn't
invite people to oppose or defend those objections.  I probably
need to hear the testimony at trial.  So let's just focus on
those objections that I can reasonably be expected to rule on
without any foundation basis or the contextual basis, and I'm
sure there will be -- I'm sure you can bring the appropriate
objections and defenses to the objections to my attention in an
orderly manner, and that will save a lot of jury time.

MR. E. SULLIVAN:  Your Honor?

THE COURT:  Yes.

MR. E. SULLIVAN:  I'm sorry, your Honor.  In that
regard it seems to me, during the break I was thinking about the
procedure for not just disclosing our witnesses, but also
providing each other exhibits that we intend to use with each
witness.  It may be the easier thing to do is just to include or
to exchange exhibit lists with respect to
speech-or-debate-related material rather than all the other
documents that are going to be objected to and apparently

1    resolved at trial anyways, so we can exchange, identify it at

2    9:30 in the morning.

3         Witness acts, and witness acts we list out any

4    exhibits that arguably might impede on speech and debate.

5         THE COURT:  That's what I anticipated.  I'm glad you

6    brought that subject up because it seems to me everyone's

7    interest is best served if there's a disk with all the exhibits

8    on that disk and that everyone has a copy of the disk.  That way

9    no one needs to share any more paper.  I have a disk, your

10   opponent has a disk, you have a disk of opponent's evidence/

11   exhibits, and we just need to know the exhibit numbers, and

12   hopefully there's a correlation between what's on the disk and

13   the real number.  And really people need to spend some time on

14   that because that's annoying when you can't hook up the exhibit,

15   but that dovetails into what counsel asked for:  additional

16   paper.  No one needs any additional paper.  There's a ton of

17   paper here.

18        And I assume that everyone, both sides, will use this

19   Elmo.  We have state-of-the-art.  We have T.V. screens for the

20   jurors.  There will be another screen over there for the public

21   and the media.  We have that screen there.  You know, we don't

22   have to try this case the old-fashioned way walking back and

23   forth with paper and can you identify this, and so everyone is

24   going to have to use this Elmo, so I'm going to direct that we

25   have disks, everyone has at least one disk, and that way that's

1   going to simplify everyone's job.

2           MR. E. SULLIVAN:  Certainly we'll try to do as much

3   electronically as we can, and we'll provide defense counsel 24

4   hours in advance those issues that are speech-or-debate related.

5           THE COURT:  Thank you, counsel.

6           We've talked about defendant's financial records.  I'm

7   totally reluctant to allow, you know, just the mass production,

8   the introduction into evidence just volumes of financial

9   records.  I don't think I need to say anything more about that.

10          I'm going to let both sides try your case, but there's

11  going to have to be an element of reasonableness.  We want to

12  complete this trial in a timely manner, and there certainly has

13  to be compliance with the Federal Rules of Evidence, so just to

14  say, just to ask the Court to allow four hundred pages of a

15  financial document to be part of the evidentiary record, without

16  more specificity I'm probably not going to do that.  So again,

17  hint to the wise should be sufficient.

18          And I think that it seems to me it's entirely

19  reasonable for counsel to be able to stipulate to a lot of

20  exhibits without more, that indeed the exhibit is what the

21  exhibit is.  You're not going to see it and counsel says if it

22  was here it's true for whatever reason and it shows something or

23  doesn't show something.  I encourage the parties to try and

24  stipulate.  And again, I have no desire to allow that 2,200-page

25  document to be a part of the evidentiary record.

1        The Girdwood appraisal, you know, the appraisal is

2    what the appraisal is.  If it's a complete report -- I assume

3    there will be an appraiser testifying, I assume; is that right?

4    That's the defendant.  I assume.

5             MR. CARY:  There is an appraiser on our list.

6             THE COURT:  All right.  And he or she will testify, I

7    assume, at some point about the value of the home, I assume?

8             MR. CARY:  That would be -- I mean, we don't know

9    exactly, but that is why he is on the list, yes.

10            THE COURT:  That's within the realm of reason anyway.

11            MR. CARY:  Yes, I think so.

12            THE COURT:  That person prepared arguably a report

13   that you're going to attempt to utilize?

14            MR. CARY:  Correct, your Honor.

15            THE COURT:  Do they have the complete report?

16            MR. CARY:  If not, and if it's our mistake, we'll make

17   sure they get the complete report.

18            THE COURT:  All right, that's fine.

19            Handwritten marginalia, I mean, a document is what a

20   document is.  Some documents have some handwriting in the

21   margin, I assume.

22            MR. CARY:  Yes, your Honor, some of which are integral

23   parts of the document, some are perhaps --

24            THE COURT:  And the documents were received by a

25   witness with the handwriting on it?

```
1            MR. CARY:  Correct.

2            THE COURT:  I guess I'm concerned about where the

3   handwriting comes from.

4            MR. CARY:  One example may be, you know, a note back

5   and forth between two people, a typed document with a response

6   on it.  That's one example.  If it's truly extraneous

7   after-the-fact sort of marginalia we'll redact that, obviously.

8            THE COURT:  Fine.  I accept that.  I accept that.

9            I don't think I have anything else to say with respect

10  to the exhibits.  I think I'll quit while I'm ahead.  Anyone

11  requesting me to address anything else regarding the exhibits

12  and/or witnesses?

13           MR. CARY:  Not on that point, your Honor.

14           MR. E. SULLIVAN:  Your Honor, with respect to

15  exhibits.

16           THE COURT:  Yes.

17           MR. E. SULLIVAN:  We did have one category.  It

18  appeared to be some that --

19           THE COURT:  I'm sorry, did I overlook a category?

20  Which category?

21           MR. E. SULLIVAN:  Page two of our objections.

22           THE COURT:  Oh, the irrelevant -- all right.

23           MR. E. SULLIVAN:  Just to be specific, what these

24  relate to generally are some National Science Foundation related

25  documents that we think are relevant, as well as documents from
```

1     the --

2                    THE COURT:  You think they are irrelevant?

3                    MR. E. SULLIVAN:  Relevant.

4                    THE COURT:  That probably would be the type of

5     objection I would not invite over the evening hours because I

6     don't know whether they're relevant or not and probably wouldn't

7     know until I hear some testimony.

8                    National Science Foundation, you've identified some

9     documents; I haven't seen them.  Give me a proffer as to just

10    what a document says.

11                   MR. E. SULLIVAN:  For instance, they've included, it

12    appears to be a performance appraisal of VECO with respect to

13    compliance with contracts that VECO received from the National

14    Science Foundation.  What is relevant is how they obtained those

15    contracts.  What is not relevant is their performance with

16    respect to those contracts.

17                   THE COURT:  And what that document says then?

18                   MR. E. SULLIVAN:  That's correct.  The documents that

19    they have on their exhibit list relate primarily to how VECO is

20    complying.  Government agencies obviously do audits of entities,

21    private contractual entities like VECO Corporation.

22                   THE COURT:  Right.

23                   MR. E. SULLIVAN:  And how they're performing isn't

24    particularly material in the allegations in this case, in our

25    view.

1        The second category relates to documents from the

2   Kenigh (ph) River Sport Fishing Association up in Alaska, and it

3   appears that they're trying to introduce documents related to a

4   fish statue that --

5        THE COURT:  A fish what?

6        MR. E. SULLIVAN:  A statue that Senator Stevens

7   received.  That's what the intended purpose of those documents

8   relates to.

9        THE COURT:  Then that's irrelevant given the

10  allegations under the indictment.

11       What about those two as examples, the performance

12  evaluation?

13       MR. CARY:  The performance evaluation, your Honor, I

14  think we need to see how the evidence comes in with respect to

15  the National Science Foundation, but if the allegation is that

16  there's something improper, and certainly we believe that's what

17  the suggestion is going to be and they're going to try to leave

18  that ora in the courtroom, we're going to want to respond with

19  public documents that show there is nothing improper about the

20  way that that NSF grant was made.

21       THE COURT:  That's probably an objection that I have

22  to wait until the foundation is laid, and that's probably an

23  objection I have to wait until the evidence is put into context

24  before I can rule on it.

25       MR. CARY:  Agreed, your Honor.

1          As for the fish statue, we're not clear whether it's

2     in the indictment or not.

3          THE COURT:  I'm sorry.  Was the allegation that he

4     received a statue?

5          MR. CARY:  I just heard Mr. Sullivan say that Senator

6     Stevens received a statue of some fish.

7          THE COURT:  Of some fish?

8          MR. CARY:  Yes.  Fish statue, your Honor, migrating

9     salmon.  There are migrating documents.

10          THE COURT:  It has nothing to do with fish

11     legislation, it's a statue?

12          MR. CARY:  Yes.

13          THE COURT:  I thought we were back to speech and

14     debate.

15          MR. CARY:  A statue, without a "t" on the end.

16          THE COURT:  Let me hear the government's proffer.  Is

17     this something the government wants to utilize, the statue?  I'm

18     sorry to cut you off, counsel.  I just wanted a proffer.  Now I

19     understand.

20          MR. E. SULLIVAN:  I apologize if I did not enunciate

21     clearly.  It's an artist-sculpted statue.

22          THE COURT:  See, it wasn't my mistake then.

23          MR. E. SULLIVAN:  Statue.  We can deal with it as it

24     comes up.  They do have exhibits showing pictures of that type

25     of thing.

1          THE COURT:  This was an award or something?

2          MR. E. SULLIVAN:  No.  Well, it's the government's

3     position that it was given to Senator Stevens.

4          THE COURT:  A gift that should have been reported?

5          MR. E. SULLIVAN:  That's right, and I think they have

6     a different position on that.

7          THE COURT:  What's the value of this fish statue?

8          MR. E. SULLIVAN:  I believe roughly $29,000.

9          THE COURT:  $29,000?

10         MR. E. SULLIVAN:  It's a very large bronze sculpted

11    statue that's sitting on his front porch.

12         MR. CARY:  And there are many, many documents,

13    including the ones that Mr. Sullivan objects to, suggesting that

14    this was purchased for the Ted Stevens Library.  There's a

15    foundation, an active foundation in Alaska, to create a Ted

16    Stevens Library, and there are many contemporaneous documents

17    which suggest this is for the library, which has not been built.

18         THE COURT:  He didn't purchase it, he didn't own it,

19    someone else purchased it?

20         MR. CARY:  For the library, your Honor.  That's what

21    the documents go to.

22         THE COURT:  I'm going to need to hear some testimony

23    on this.

24         MR. E. SULLIVAN:  Just to be clear, your Honor, this

25    is a Ted Stevens Library which has not been built, no

 1   foundation.  It's going into argument.  There's a lot of money,

 2   your Honor, raised.

 3            THE COURT:  I've dealt with the medical records issue.

 4            The 404(b) evidence I'll allow to come in.  I invite

 5   defense counsel to give me an appropriate limiting instruction

 6   if you want one.

 7            The exhibits, releasing the exhibits at the end of the

 8   day, have you given more thought to that?  How are you going to

 9   be able to work that out?  Again, the Court doesn't have the

10   resources, we don't have the man- or woman-power to do that.

11            MR. E. SULLIVAN:  This is with respect to the

12   government's exhibits?

13            THE COURT:  Everyone's exhibits.  The government's

14   exhibits first.  In the event that the defendant offers exhibits

15   in the government's case in chief -- it may happen, it may not.

16   It probably wouldn't -- but if that happens, it will be

17   defendant's exhibits as well.  Whatever is received into the

18   evidentiary record, not just the exhibits identified through a

19   witness, whatever actually is admitted into the record.

20            MR. E. SULLIVAN:  I apologize.  The issue, is it going

21   to be made available to the public?

22            THE COURT:  It should be, yes.

23            MR. E. SULLIVAN:  I did speak to somebody much more

24   informed than I am on this issue.  There is a website that's

25   going to be set up connected to the Department of Justice main

1   website under the criminal division, which will -- it was our

2   intent to load the government's exhibits, and to the extent

3   defendant wants to load his exhibits somewhere, I think he's

4   free to do that.

5            THE COURT:  Can't he use -- do you want to use their

6   website?

7            MR. CARY:  They're going to be -- the government

8   posted every night, and there are defense exhibits.  We want the

9   defense exhibits posted as well.  That's only fair.

10           THE COURT:  I totally agree with you.  I totally agree

11  with you.

12           Do you have objection to posting their exhibits?

13           MR. E. SULLIVAN:  Actually we do, your Honor.  This is

14  an expensive burden to us, so I don't see why they can't

15  individually put up their own website and put up their own

16  exhibits and let the public know where it's located.

17           THE COURT:  What's your request, counsel?

18           MR. CARY:  That's completely unfair, your Honor.  Our

19  defense team by policy doesn't try cases in the media.  We try

20  them in the courtroom.  We've never posted exhibits like that

21  before in an ongoing trial.  We don't have the resources either.

22  Senator Stevens shouldn't be charged with that.  If they're

23  going to issue documents from the trial about the case, it

24  should be all the evidence, not just their exhibits, not just a

25  one-sided story.

1    THE COURT:  I don't think I'm being unreasonable by

2    saying this:  That the government does have vast resources.

3    There is a strong public interest in this case.  The reason why

4    we're talking about this is because at the end of the day the

5    public wants to know what evidence has been received into the

6    evidentiary record.  I don't think that I'm abusing my

7    discretion or authority by directing that if the government

8    utilizes the government's website and posts its exhibits that

9    are introduced into evidence, then it should do so for the

10   defendant, and that's pursuant to Court order.  I don't want

11   to -- I never want to overstep my authority, and I don't think I

12   am, but if you think I am, tell me.  I invite that.  Otherwise I

13   can't think of how we can serve the public's interest, and

14   that's an interest that should be served in this case.

15       MR. E. SULLIVAN:  We fully understand.  We'll adhere

16   to whatever the Court wishes.

17       THE COURT:  I was thinking you were telling me to

18   create a website.  Both of you just create a website.

19       MR. E. SULLIVAN:  What we think is fair, I could be

20   wrong on this, but I believe that's what they did with the

21   Scooter Libby trial, that Libby had his own website set up where

22   they put on their exhibits that were admitted into the record,

23   and I think we could each have our own individual website, and

24   the media knows where ours is going to be located.

25       THE COURT:  The only alternative -- I hate to do that,

though.  I hate to have anyone incur that expense.  This is

going to be an expensive trial anyway.  It would be easy for me

to say order it and do it.  I don't want to do it.  The

government has its own website.  What's the prejudice to the

government if I say, look, I want you to post your exhibits

every day, but when defense exhibits are received, post them as

well, why is that prejudicial?  Otherwise the Court has to do

it, and we just don't have the resources.

            MR. E. SULLIVAN:  Sure, your Honor.  And what I

articulated before, the prejudice, just time, energy, and

resources, just like the Court lacks resources at times, this is

going to be difficult for us to do as well.  We don't see why

they can't put up their own exhibits, but we will do whatever

the Court wishes on this point.

            THE COURT:  Do you want your exhibits on the

government's website?

            MR. CARY:  Yes, if they're going to put theirs up, we

do.  We don't have a public relations department in our law

firm.  They do.  They have an extensive one.  They held a

national press conference to announce this indictment.  They can

do it.

            THE COURT:  I don't think I'm overstepping my

authority.  I think that's only fair.  There's a common goal

here.  The common goal is that we're going to provide to the

public just what's going on in this trial.  There's nationwide

1    interest in this case, so I don't think I'm overstepping my

2    authority by directing that the government post whatever

3    evidence comes into the evidentiary record.  We'll work out the

4    details of that.  I mean, the bottom line is we just simply

5    can't do it.  We just don't have the resources to do it.

6              I'm not going to spend any time on final instructions.

7    I'll make this one comment:  Every now and then someone will

8    propose a final instruction and I'll sit back and say, well,

9    what does this have to do with this case?  And someone has a

10   theory as to an issue that should be presented, maybe the nature

11   of a defense, maybe the nature of the government's theory of an

12   issue that should be developed, and the instruction.  If that

13   theory is developed, that instruction becomes highly relevant at

14   the conclusion of the trial and highly understandable.  There

15   are a ton of proposed instructions that everyone submitted.

16   Some I'll give, some I won't.  But is anyone asking me to spend

17   any time now on any proposed final instruction that impacts the

18   development of a theory that someone wants to pursue during the

19   course of this trial, so much so that it's more appropriate now

20   for the Court to focus on that instruction now rather than at

21   the end of the trial?  And I raise that because that happens

22   every so often.  We don't spend a lot of time on final

23   instructions, but every now and then the parties need some

24   guidance with respect to whether they can do certain things or

25   not do certain things with respect to what someone believes is a

1    critical issue.

2              Yes?

3              MR. CARY:  Your Honor, for the defense I think the

4    answer is "no" at this time.

5              THE COURT:  That's what I thought.

6              For the government?

7              MR. E. SULLIVAN:  The same, your Honor.

8              THE COURT:  All right, great.

9              I've exhausted my list.  Now I invite suggestions.

10             MR. CARY:  Mr. Romain has some Brady issues he wants

11   to address and we want to address, but there's one issue.  If I

12   could go back to the medical records very quickly.

13             THE COURT:  Yes.

14             MR. CARY:  First of all, I've offered a draft

15   stipulated protected order to the government.  They want to

16   confer with other government counsel, but hopefully that will be

17   well under way.

18             THE COURT:  I would be surprised if counsel can't work

19   out the terms of a protective order.

20             MR. CARY:  I think we're well on our way.  There's one

21   nuance to your ruling that maybe is that just has to do with the

22   definition of what is related to the motorcycle accident that

23   perhaps is more appropriately raised at the bench.  I'm happy to

24   do it, but I don't want to intrude on Mr. Allen's --

25             THE COURT:  I chose that word for a reason.  I'll

1    invite you to the bench if you need --

2              MR. CARY:  Only because I want to be respectful of his

3    medical privacy.  We probably ought to do it at the bench, your

4    Honor.

5              THE COURT:  All right.  Okay.

6              (Sealed bench conference redacted.)

7              THE COURT:  All right.  It wouldn't be complete

8    without talking about Mr. Brady.

9              MR. ROMAIN:  Good afternoon, your Honor.

10             From time to time of course we have sent

11   correspondence to the government asking for specific

12   information.  Over the past two to four weeks we've asked for

13   specific information, and in three different letters and in a

14   phone call that I've had with Ms. Morris yesterday and we've not

15   been able to receive any response.  And just so that the record

16   is clear, it is critical information.

17             Let me be clear about what we asked for.  We asked for

18   any and all communications, whether or not written or oral,

19   pursuant to Brady, of course, between the government, including

20   but not limited to federal and local law enforcement and Bill

21   Allen, VECO, CH2M Hill and/or any other person or entity

22   regarding whether or not the government would be or will be

23   bringing charges against VECO.  We made it clear that this

24   request seeks without any limitation a promise of cooperation,

25   communication regarding cooperation, request for a declination,

communication regarding whether or not a prosecution should go

forward, declination letter, cooperation agreement, or potential

agreement between the government and any other person or entity

regarding VECO and/or its corporate successor.

As the Court has stated over and over again, we know

the law.  It cannot really seriously be in dispute that this

information would be critical to any witness who is a current or

a former employee of VECO or its corporate successor.  What's

interesting, however, your Honor, is that notwithstanding the

government's representations about complete <u>Brady</u> production, we

have received no response whatsoever.  This is a fairly

straightforward question with a yes-or-no answer.  If the answer

is yes, that such a thing exists, we ought to get it; if the

answer is no, then of course nothing exists and it should not be

produced.

One other thing that I want to mention is we have also

been asking for the past month, literally since August 15th, to

find out all of the information regarding what the government

has termed as "personal vices" for three of the government's

primary witnesses, and what we are also looking for with respect

to that, we have received the 302s that the Court ordered, we've

reviewed them.  They did in fact produce more information that

we hadn't received before, but we need a confirmation that

everything the government has -- the trial begins on Monday --

we also have with respect to those three witnesses.  And

1   frankly, your Honor, just to be clear, in my conversation with

2   Ms. Morris yesterday she made it clear that we would have to

3   come to the Court to resolve this issue, and so that's why we're

4   here.

5         MR. E. SULLIVAN:   I thought we were past some of the

6   Brady issues, but apparently not.

7         We just received, I don't have the date or have the

8   letter in front of me, but we just received a day or two ago a

9   letter from counsel requesting some material under the auspice

10  of Brady with respect to the acquisition of VECO Corporation by

11  a company called CH2M Hill.  Counsel has left out that they've

12  been in contact -- they served subpoenas on CH2M Hill's counsel

13  as well as Mr. Allen with respect to the exact same documents

14  that he just articulated to the Court, mostly relating to the

15  acquisition itself, and it sounds like to the extent there's

16  been communications between the government and CH2M Hill or VECO

17  Corporation and the predecessor company with respect to charges

18  that may or may not be brought against the company.  This has

19  nothing to do with Bill Allen.  Bill Allen has sold the company

20  and sold his interest, the family has sold their interest in

21  VECO Corporation.  To the extent there are, hypothetically

22  speaking, any communications between the government and CH2M

23  Hill, it's relating to McNulty compliance issues that have

24  nothing to do with this case.  If they want to cross-examine Mr.

25  Allen on impeachment issues with respect to how much he made

1    from the acquisition, you know, what effect that had on him or

2    his family, what his interest was in selling the company, I'm

3    sure they can explore that.  It's been explored twice in the two

4    federal cases that I mentioned earlier up in Alaska, so they

5    already have that information.  They don't need all the under-

6    lying acquisition documents.  They certainly don't need

7    communications between counsel for CH2M Hill and us with respect

8    to a possible course of action with respect to the company and

9    the government.

10            I would also just note that --

11            THE COURT:  The government does not anticipate calling

12   any officers, directors, or personnel of this successor

13   corporation, do you, in your case in chief, or do you?

14            MR. E. SULLIVAN:  I believe the answer is "no."  Bill

15   Allen is a former officer of VECO Corporation.

16            THE COURT:  And you're telling me he sold his interest

17   in CH2M Hill, is that what it is?

18            MR. E. SULLIVAN:  That's correct, CH2M Hill, and they

19   have on their list some individuals who I believe are still

20   affiliated with CH2M Hill.  More importantly, it's my

21   understanding based on conversations with counsel for CH2M Hill

22   they apparently have had conversations with Williams & Connolly

23   as well, that it is likely they would move to quash the

24   subpoena, and I think we are able to represent that they're

25   considering filing a motion to quash.  They've also indicated to

1    us that they would be willing to come down here on short notice,

2    if you wanted, to argue that particular issue, but they have an

3    interest at stake and they don't think that this information is

4    either relevant or something that should be produced.

5              THE COURT:  All right, thank you.

6              MR. E. SULLIVAN:  Just on the second point, that

7    personal vice issue.

8              THE COURT:  Yes?

9              MR. E. SULLIVAN:  We have turned over -- we've made

10   representations about turning over that material in our

11   possession that relates to rumored personal vices of individual

12   witnesses.  We've provided that in a letter.  We've articulated

13   it in some of our briefs, and the Court is aware of the issue as

14   well.  It sounded as if some of that was going to be reserved to

15   be ruled upon if those witnesses testify.  But what they're

16   seeking, if I understand correctly, is that whether an

17   individual has been in for treatment for alcoholism or drug

18   abuse, medical records again, and we've already represented that

19   we don't have that material.  We will double-check that we don't

20   have that material, but we think that satisfies our Brady

21   obligation, to tell them those individuals who may or may not

22   have alcohol-related issues.

23             THE COURT:  All right.  So to be clear, the government

24   is saying that it's told defense counsel and provided defense

25   counsel with information about any personal vice issues for any

1    of the witnesses it knows of and it's provided information

2    within its possession or control?

3           MR. E. SULLIVAN:  That's correct, and we will double-

4    check to make sure we don't have any of that information, but as

5    far as I'm aware, for instance, we do not have medical records

6    for these witnesses as to whether they sought treatment or are

7    seeking treatment.  We don't have anything like that in our

8    possession.  We will double-check, of course, but that's my

9    understanding presently.

10          THE COURT:  All right.

11          MR. E. SULLIVAN:  We'll double-check it.

12          THE COURT:  All right.  Thank you, counsel.

13          What's the relevance of CH2M Hill records?  Why would

14   they arguably be Brady material here?

15          MR. ROMAIN:  Because the government's primary witness

16   is the individual who built up this company, a company that is

17   mentioned in the indictment.

18          THE COURT:  Bill Allen, right?

19          MR. ROMAIN:  Bill Allen.

20          THE COURT:  And the government says he relinquished

21   his interest in the property, he sold it.

22          MR. ROMAIN:  Absolutely, but before that happened the

23   question is, in coordinating an agreement with Mr. Allen, did

24   the government make any promise to Mr. Allen that the company he

25   had built was going to be subject to any potential criminal

1    charges.

2            THE COURT:  That's a little different from any

3    agreement they may have with CH2M Hill.  You're asking something

4    different.  You're saying, look, help us out and let's talk

5    about CH2M Hill, so you're saying maybe there's some impeachment

6    material there, maybe there's some basis with respect to

7    cross-examination with respect to the government's interaction

8    with Allen vis-a-vis CH2M Hill.

9            MR. ROMAIN:  I just want to be clear.  In our letter,

10   in our request --

11           THE COURT:  You haven't gotten a response to your

12   request?

13           MR. ROMAIN:  No, or to my call yesterday.

14           But the heart of the matter, your Honor, is whether or

15   not the United States made any such deal, made any such

16   representation with anyone.  The corporation that was going to

17   acquire VECO, Mr. Allen himself, the conversation has --

18           THE COURT:  Why is that relevant?  I mean, if the

19   government decides hypothetically, the government says, you,

20   CH2M Hill's CEO, you know we're not prosecuting you for

21   anything, what's the relevance of that?

22           MR. ROMAIN:  Because if Mr. Allen is making a deal

23   with the government, Mr. Allen may decide that he wants to

24   cooperate in part because the government will decide to protect

25   the company that he built, a company that he has an interest in,

 1   that other individuals that he cares about have an interest in,

 2   and so that information, it seems to me, goes very much to the

 3   heart of credibility and motivation.

 4            THE COURT:  The theory being there's an incentive to

 5   his cooperation that the company he fought so hard to build will

 6   not be --

 7            MR. ROMAIN:  Absolutely, your Honor.

 8            THE COURT:  As long as he cooperates with the

 9   government.  And that goes to his what, truthfulness?

10            MR. ROMAIN:  Absolutely, your Honor, directly to his

11   credibility and to his motivation for providing whatever

12   testimony he provides, notably, I mean, if such an agreement

13   does in fact exist.

14            THE COURT:  In other words, help us out, Bill.  Don't

15   worry about CH2M Hill.  There's nothing to worry about that.

16   I'm just saying that.

17            MR. ROMAIN:  The history is that we have in fact

18   issued a subpoena, but it's important to note that one of the

19   responses is that we can get that information if the government

20   has that information about a deal that the government itself

21   participated in, or communications they made, oral, written,

22   with whomever, the government has an obligation to provide that.

23            THE COURT:  What you said, though, it's one thing to

24   say did the government tell Bill Allen that this is what will

25   not happen with the CH2M Hill as opposed to the did the

1    government have any discussions with CH2M Hill about what the

2    government planned to do with respect to that corporation.

3    Those are two different things.  Now, with respect to the

4    former, you may be entitled to that.

5              MR. ROMAIN:  Yes.

6              THE COURT:  Was Allen promised anything?  Was he given

7    any assurances that if he cooperated, then CH2M Hill would be

8    left alone, you know, words to that effect?  I can ask the

9    government.  I think that is highly relevant, but with respect

10   to whether or not the government is conducting, you know,

11   conversations with CH2M Hill personnel or any other corporation,

12   I think that's probably highly irrelevant.

13             MR. ROMAIN:  Well, your Honor, I do want to make it

14   clear we're only interested with respect to a government deal --

15             THE COURT:  Talking to Allen?

16             MR. ROMAIN:  Well, it could have decided to talk to an

17   entity that wanted to purchase VECO and made the deal directly

18   with them, and Mr. Allen would have been aware of that.

19             THE COURT:  I think it's highly relevant if they're

20   talking to Allen and giving Allen the ease of way he wants in

21   order to pave the way, I think it's highly relevant.  If

22   promises were made to Allen for his testimony, I think it's

23   highly relevant, but for you, you know, for you to ask for

24   information regarding the government's interaction with CH2M

25   Hill, or, you know, Disney World, I mean, it's probably not

1    relevant at all, you know, unless Allen, you know, is the lynch

2    pin there.  I mean, it's probably highly relevant.

3         I'll ask the government, any discussions between the

4    government and Allen vis-a-vis what might happen to CH2M Hill?

5         MR. E. SULLIVAN:  To the extent there's been any

6    discussions with Allen on that, it's been reduced to his plea

7    agreement, and more importantly, he has been crossed on this

8    exact issue, his motivation for selling the company, whether he

9    was trying to curry favor, whether he was trying to help out his

10   employees.

11        THE COURT:  He's been cross-examined in another

12   proceeding, right?

13        MR. E. SULLIVAN:  In two separate federal proceedings.

14   They have that testimony.  They already know the issues, so it's

15   been fully explored, and this sounds like cross-examination

16   material.  Mr. Allen will be here and they can ask those

17   questions again if they would like.

18        MR. ROMAIN:  Your Honor, I didn't hear a yes or no to

19   the Court's question.  I mean, I heard references to other

20   transcripts, other trials, different cases, information that we

21   have.

22        THE COURT:  He was prosecuted by the U.S. Attorney's

23   Office in Alaska; is that right, or State Attorney's Office?

24        MR. E. SULLIVAN:  Actually by the Public Integrity

25   Section here in Washington.

1          THE COURT:  All right.  Let me ask this question:  Is

2     there any information that would impact Brady vis-a-vis Allen

3     and CH2M Hill and the government's interactions with both that

4     was not revealed during the course of cross-examination in that

5     prosecution of Allen?

6          MR. E. SULLIVAN:  Between the cross-examination as

7     well as the plea packages and what we disclosed for Brady

8     obligations in those cases and what we've disclosed in this

9     case, I think the answer is no, they have the information.

10          THE COURT:  That's the answer.

11          MR. ROMAIN:  All right.  I'll take that as a "no,"

12     your Honor.

13          THE COURT:  He said no.  He said no.

14          What about the personal vice issues?  They told you

15     everything they know.  They don't have any records.

16          MR. ROMAIN:  I just want to mention, your Honor, I

17     just want to highlight the point that Brady requires

18     information, not medical records, or not -- we did not ask for

19     medical records.  In response to the Court's question about

20     whether or not there's information that we have not received,

21     the response was that they were not producing -- they didn't

22     have any medical records.  If the government's representation is

23     that we have all of the information, not just medical records,

24     not medical records, information, then we'll accept that.  We

25     just need to hear that specific representation.

 1          THE COURT:  I thought that's what the government said.

 2          I don't know, did you give them all the information

 3   you had regarding the personal vice information?

 4          MR. E. SULLIVAN:  With the caveat that we'll double-

 5   check, but they have, again, received summary information about

 6   the personal vices that are rumored.  They have received as much

 7   information I believe as we currently have.  If we obtain

 8   additional information, we will pass that along.  What we don't

 9   have, though, which would form our summary, is underlying

10   medical records.  We don't have any of that information.

11          THE COURT:  Understood.

12          MR. E. SULLIVAN:  Lastly, I should note, though, to be

13   clear, we have turned over prior conviction information.  We're

14   still running criminal history records on some of the other

15   witnesses.  To the extent that any of them have a DWI, there was

16   some Stalin information that the Court is aware of.  We will

17   turn over those criminal history records as well.

18          THE COURT:  Thank you, counsel.

19          Anything else?

20          MR. CARY:  One thing.  I've been the lawyer primarily

21   with CH2M Hill -- I do believe that there will be CH2M Hill

22   prior employees that will be present in this case, witnesses in

23   this case, and their counsel will not let us talk to them, and I

24   think that forms whether there's Brady materials that relates to

25   CH2M Hill.  If I'm mistaken I'm mistaken, but I thought there

1   were going to be present CH2M Hill personnel who would be

2   testifying.

3           THE COURT:  I didn't get that impression.

4           MR. E. SULLIVAN:  He reminded me there may be current

5   witnesses about CH2M Hill, but I believe you asked executives,

6   and I don't believe that's the case.

7           THE COURT:  I just picked a category, but there are,

8   will be current?

9           MR. E. SULLIVAN:  There will be workers, lower-level/

10  mid-level employees that I believe were retained by CH2M Hill.

11          To be clear --

12          THE COURT:  Give me a proffer of what they are going

13  to testify to.

14          MR. E. SULLIVAN:  Some of them worked on the Girdwood

15  renovations.  Some of them worked in the accounting department;

16  that type of information.

17          To be clear, what I was thinking of was on their list

18  they actually have executives, and I believe possibly one or two

19  may still be retained by CH2M Hill.

20          THE COURT:  All right.

21          MR. E. SULLIVAN:  We don't have our list in front of

22  us, but I don't believe there's executives on our list.

23          THE COURT:  All right.

24          MR. CARY:  And your Honor, the dealings that CH2M Hill

25  has with the government about whether or not they're going to be

1    prosecuted impacts the testimony of those witnesses.  And the

2    fact that CH2M Hill's counsel will not let us interview them

3    speaks volumes too.

4            THE COURT:  You've subpoenaed people and you've

5    subpoenaed documents, I assume; is that correct?

6            MR. CARY:  We have, your Honor, but my point is,

7    they're CH2M Hill witnesses on their list that they're going to

8    put on the stand.  CH2M Hill is having dealings with the

9    government right now, we believe, about whether or not they're

10   going to be prosecuted or not.  That's the point.

11           THE COURT:  I'll probably have to wait until that

12   issue develops.  It would probably come as no surprise, counsel,

13   as I indicated, that someone may file a motion to quash

14   subpoenas, so it may be more relevant for me to focus on that

15   area at the time with respect to your subpoenas and motion to

16   quash, and I don't think I need to say anything further about

17   that.

18           Those people aren't expected to testify the first or

19   second day of the trial, are they, the CH2M Hill personnel?

20           MR. E. SULLIVAN:  There may be some lower-level

21   workers who worked on renovations who may be early in the

22   process.

23           THE COURT:  All right.  All right.

24           MR. GOEKE:  But on that issue, your Honor, we should

25   be clear the fact that CH2M Hill's counsel is advising their

1    employees not to speak with the defense, the government has no

2    role in that.  The government has not instructed CH2M Hill what

3    to do or not do.

4              THE COURT:  I understand.  If a motion is filed we'll

5    probably learn more about the relevance of that corporation

6    and/or its employees and/or its records at that time, I'm sure.

7              Anything else we need to talk about?  I don't think

8    so.

9              MR. E. SULLIVAN:  We do have one minor issue.

10             THE COURT:  All right.

11             MR. E. SULLIVAN:  We have a number of custodians,

12   federal agency custodians, relating to some of the

13   speech-or-debate-related material, custodians from certain

14   companies, Brookstone, for instance, relating to the chair.

15   They've been kind of circling out in orbit and we've yet to get

16   a stipulation.

17             THE COURT:  I would hope counsel can stipulate with

18   respect to authenticity, can you, or not?

19             MR. CARY:  I would think so.  It will help if it's not

20   2,200 documents, and they would tell us -- I would think we'll

21   be able.

22             THE COURT:  I'd be surprised if you can't work it out.

23             MR. E. SULLIVAN:  We'll work it out.

24             The last --

25             MR. CARY:  If I can just add, if we can get specific

1    documents you really are going to use, I'm sure we can work that

2    out.  Big masses of undifferentiated documents are very hard for

3    us to deal with.

4            THE COURT:  All right.

5            MR. E. SULLIVAN:  We'll work it out.

6            The last issue, we waited the transcripts.  We're

7    going to substitute final transcripts for certain of the

8    records.  So it's clear, what's actually going to be admitted

9    would be the actual recording itself.

10           THE COURT:  I understand the transcripts will be used

11   by the jurors in the event there's a discrepancy.  I understand

12   that.

13           MR. E. SULLIVAN:  In the stipulations on the same

14   note, rather than calling individual monitoring agents for each

15   individual call, what we have done in the past is reached a

16   stipulation with defense counsel about calling just one agent

17   who can lay the foundation to get those -- to get all the

18   tapes --

19           THE COURT:  I would hope you can do that.

20           Can you do that?

21           MR. CARY:  I would think so.  We just got the

22   transcript today, your Honor, but I would think so.

23           THE COURT:  All right, that's fine.

24           MR. E. SULLIVAN:  And finally, there's a number of

25   photographs on our exhibit list that were done in JPEG digital

1    files.  The versions of the pictures on our CD were printed on a

2    colored printer.  What we would propose is that we substitute

3    the same version but using a JPEG file that would be used on the

4    screen, if that's amenable to the Court.

5              THE COURT:  That's fine with me.  Are there any

6    objections?

7              MR. CARY:  If I understood it, I don't think so.

8              MR. E. SULLIVAN:  Thank you, your Honor.

9              MR. CARY:  Just a housekeeping matter.  We're to be in

10   the ceremonial courtroom at nine o'clock?

11             THE COURT:  Yes.  We're going to start as close to

12   nine o'clock as we can, so I'd ask that you be there not later

13   than 8:45, counsel.

14             MR. CARY:  Thank you.

15             THE COURT:  Preliminary instructions, I will probably

16   give the one I've been giving for years.  I'm not going to spend

17   any time talking about that now.  At some point we'll e-mail you

18   a copy of it and I'll invite any changes to that or I'll invite

19   any objections to it, but it's very straightforward.

20             Let me just take five minutes to meet with my staff to

21   see if I overlooked something and then I'll let you go and not

22   see you again, I don't think, until -- we don't have a

23   proceeding scheduled tomorrow.  Is there a need to schedule

24   anything tomorrow?

25             MR. CARY:  We hope not.

1          THE COURT:  It's always a pleasure to see everyone,

2     but you got other things to do.

3          Let me just take five minutes to huddle with my staff

4     for a few minutes.

5          COURTROOM DEPUTY:  This Honorable Court now stands in

6     a brief recess.

7          (Break taken at about 12:27 p.m.)

8          COURTROOM DEPUTY:  This Honorable Court is again in

9     session.

10          (Back on the record at about 12:30 p.m.)

11          THE COURT:  All right, counsel.  Everyone have a

12     wonderful weekend.

13          We'll fax to you a copy each of the voir dire with the

14     minor changes that I made.  We're not going to file anything.

15     As I indicated, the questionnaire won't be filed until after we

16     impanel the jury.  The public will have a chance to see the

17     questions that have been asked.

18          Everybody enjoy your weekend, and I'll see you no

19     later than 8:45 Monday morning.  Thank you.

20          MR. CARY:  Thank you, your Honor.

21          MR. E. SULLIVAN:  Thank you, your Honor.

22          COURTROOM DEPUTY:  This Honorable Court now stands in

23     a brief recess.

24          (Proceedings concluded at about 12:28 p.m.)

25                         - - -

1                          I N D E X

2

3    WITNESSES:

4

5         None.

6

7

8

9

10

11

12

13                      E X H I B I T S

14

15         None.

16

17

18

19

20

21

22

23

24

25

1

2

CERTIFICATE

I, JACQUELINE M. SULLIVAN, Official Court Reporter,

3   certify that the foregoing pages are a correct transcript from

4   the record of proceedings in the above-entitled matter.

5

6

_____
JACQUELINE M. SULLIVAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25